UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NAFTALI MOSES, et al.,

                *Plaintiffs*,

    v.

BNP PARIBAS, S.A.,

                *Defendant.*

Case No. 24-cv-4938 (JGLC)

---

**DEFENDANT BNP PARIBAS, S.A.'S MEMORANDUM
OF LAW IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT**

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND........................................................................................................3

   I.  STATUTORY BACKGROUND ......................................................................3

   II. PLAINTIFFS' ALLEGATIONS ...................................................................5

   A.  Alleged Illegal Banking "Scheme".............................................................5

   B.  The Complaint Alleges A Series Of Attacks By Multiple FTOs Over A Ten-Year Period ...............................................................................................................7

ARGUMENT.............................................................................................................8

   I.  THE RULE 12(B)(6) STANDARD ...............................................................8

   II. THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE THAT BNPP AIDED AND ABETTED ACTS OF INTERNATIONAL TERRORISM...................................9

   A.  Plaintiffs Fail To Allege That BNPP Was "Generally Aware" Of Any Role In Relevant Terrorist Activity.................................................................................9

   B.  Plaintiffs Fail To Allege That BNPP "Knowingly And Substantially Assisted" The Particular Acts Of Terrorism That Harmed Plaintiffs.........................................16

      1.  *Plaintiffs Fail To Allege "Conscious, Voluntary, And Culpable" Participation In The Alleged Attacks* ................................................................17

      2.  *Plaintiffs Fail To Plausibly Allege The Requisite Nexus To Support An Aiding And Abetting Claim*.........................................................................18

      3.  *Plaintiffs Fail To Plausibly Allege That BNPP "Systematically And Pervasively" Assisted The Terrorist Activities At Issue*.........................................20

   III. THE NOVEMBER 16, 2006 TO JUNE 12, 2014 ATTACKS ARE TIME-BARRED ...22

   IV. THE COMPLAINT FAILS TO ALLEGE A BASIS FOR PERSONAL JURISDICTION OVER BNPP.............................................................................25

CONCLUSION........................................................................................................29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ...................................................................................................... 8

*Atchley v. AstraZeneca UK Ltd.,*
22 F.4th 204 (D.C. Cir. 2022) ..................................................................................... 18

*Bernhardt v. Islamic Republic of Iran,*
47 F.4th 856 (D.C. Cir. 2022) ................................................................................ *passim*

*Credit Suisse Sec. (USA) LLC v. Simmonds,*
566 U.S. 221 (2012) .................................................................................................... 25

*Daimler AG v. Bauman,*
571 U.S. 117 (2014) .................................................................................................... 26

*Donahue v. Pendleton Woolen Mills, Inc.,*
633 F. Supp. 1423 (S.D.N.Y. 1986) ........................................................................... 24

*Fezzani v. Bear, Stearns & Co.,*
No. 99-cv-0793 (RCC), 2005 WL 500377 (S.D.N.Y. Mar. 2, 2005) ........................... 24

*Freeman v. HSBC Holdings PLC,*
465 F. Supp. 3d 220 (E.D.N.Y. 2020) ......................................................................... 10

*Freeman v. HSBC Holdings PLC,*
57 F.4th 66 (2d Cir. 2023) ........................................................................................... 21

*Gagnon v. Alkermes PLC,*
368 F. Supp. 3d 750 (S.D.N.Y. 2019) ........................................................................... 6

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
564 U.S. 915 (2011) .................................................................................................... 26

*Halberstam v. Welch,*
705 F.2d 472 (D.C. Cir. 1983) ...................................................................................... 4

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) ............................................................................ *passim*

*Kemper v. Deutsche Bank AG*,
911 F.3d 383 (7th Cir. 2018) ......................................................................... 7

*Koch v. Christie's Int'l PLC*,
699 F.3d 141 (2d Cir. 2012) ...................................................................23–24, 25

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013) .......................................................................... 28

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018) .......................................................................... 13

*Mastafa v. Chevron Corp.*,
770 F.3d 170 (2d Cir. 2014) .......................................................................... 8

*O'Sullivan v. Deutsche Bank AG*,
No. 17-cv-8709 (LTS) (GWG), 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) ............... 10

*O'Sullivan v. Deutsche Bank AG*,
No. 17-cv-8709 (LTS) (GWG), 2020 WL 906153 (S.D.N.Y. Feb. 25, 2020) ................. 25

*Pearl v. City of Long Beach*,
296 F.3d 76 (2d Cir. 2002) ............................................................................ 23

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
609 F.3d 30 (2d Cir. 2010) ............................................................................ 26

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*,
712 F.3d 705 (2d Cir. 2013) .......................................................................... 9–10

*Rotella v. Wood*,
528 U.S. 549 (2000) ...................................................................................... 23

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013) ............................................................................ 13

*Sewell v. Bernardin*,
795 F.3d 337 (2d Cir. 2015) .......................................................................... 22

*Siegel v. HSBC N. Am. Holdings, Inc.*,
933 F.3d 217 (2d Cir. 2019) .......................................................................... *passim*

*Smalls v. Collins*,
10 F.4th 117 (2d Cir. 2021) .......................................................................... 24

*Smith-Haynie v. District of Columbia*,
155. F.3d 575 (D.C. Cir. 1998) ...................................................................... 23

*SPV Osus Ltd. v. UBS AG*,
882 F.3d 333 (2d Cir. 2018) ..................................................................... 25, 26

*Sucesores de Don Carlos Nunez y Dona Pura Galvez, Inc. v. Societe Generale, S.A.*,
No. 1:20-cv-851 (MKV), 2023 WL 2712505 (S.D.N.Y. Mar. 30, 2023) ......................... 27

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023) ............................................................................. *passim*

*Wall v. Nat'l Broad. Co., Inc.*,
768 F. Supp. 470 (S.D.N.Y. 1991) ............................................................... 24–25

*Wildman v. Deutsche Bank Aktiengesellschaft*,
No. 21-cv-04400 (HG) (RML), 2022 WL 17993076 (E.D.N.Y. Dec. 29, 2022) ...... 10–11, 12, 16

## Rules and Statutes

18 U.S.C. § 2333 ................................................................................ *passim*

18 U.S.C. § 2335 ................................................................................. 22, 23

Pub. L. No. 112-239, 126 Stat 1632 (2013) ........................................................ 23

Pub. L. No. 114-222, 130 Stat. 852 (2016) ....................................................... 1, 3

## PRELIMINARY STATEMENT

Plaintiffs and their family members were victims of attacks by terrorist groups (the "Attacks") including Hezbollah, Harakat al-Muqawama al-Islamiya ("Hamas"), and Palestinian Islamic Jihad ("PIJ"). While those terrorists should be held responsible for their heinous crimes, BNP Paribas, S.A. ("BNPP") did not commit any acts of terrorism and did not support any terrorist or Attack.

This case relies on a theory of liability that BNPP's resolutions with U.S. authorities for violating U.S. financial sanctions on Iran-linked entities are alone sufficient to establish secondary liability under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016). But this same theory of liability has already been rejected in decisions by the Second Circuit, as well as courts in this and other districts. *See infra* Argument Section II.A.

Under the controlling case law, the Complaint falls well short of sufficiently alleging ATA aiding and abetting liability for several independent reasons. The Complaint is devoid of well-pleaded allegations that, as required by JASTA, BNPP was "generally aware" of its role in unlawful activity from which the Attacks were foreseeable, *and* that it "knowingly and substantially" assisted the Attacks. *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 496–99 (2d Cir. 2021); *see also* 18 U.S.C. § 2333(d)(2). JASTA reserves aiding and abetting liability for "truly culpable conduct," and it is not enough to allege "substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 489, 495 (2023). Plaintiffs are seeking to impose the type of overbroad theory of liability rejected by the U.S. Supreme Court in *Twitter*.

*First*, the Complaint alleges that by providing arm's-length banking services to Iran-linked entities (none of which was a designated Foreign Terrorist Organization ("FTO")), at times in violation of U.S. economic sanctions on Iran, BNPP was supporting Hezbollah, Hamas, and other FTOs that committed the Attacks.[1]  The Complaint alleges that the entities BNPP transacted with were tangentially linked to the responsible FTOs, but there are no well-pleaded allegations that BNPP was actually aware of any such connections.  Accordingly, Plaintiffs have not met their burden of pleading BNPP was aware that it was assuming a role in any activity from which the disparate Attacks were foreseeable.

*Second*, vague allegations about providing banking services to entities in a speculative chain of intermediaries do not establish a "knowing and substantial" nexus to the specific Attacks as required by JASTA.  As clarified by the Supreme Court in *Twitter*, the gravamen of a JASTA aiding and abetting claim is that the secondary actor "consciously and culpably" aided "another person in *the commission of the actionable wrong*—here, an act of international terrorism."  *Twitter*, 598 U.S. at 493, 495 (emphasis added).  The Complaint does not and could not allege that BNPP provided banking services to the FTOs that injured Plaintiffs.  And even before *Twitter*, allegations that banking services provided to Iran-linked entities indirectly made funds available to Iran and that Iran in turn promoted terrorist activities, have been rejected by courts addressing similar claims.  *See infra* Argument Section II.A.  Plaintiffs' failure to connect any BNPP-linked banking transaction and any of the Attacks that harmed Plaintiffs requires dismissal of the Complaint.

---

[1] In addition, Jaysh al-Mahdi ("JAM"), one of the alleged perpetrator groups listed in the Complaint, is not and has never been an FTO.  *See* 18 U.S.C. § 2333(d)(2); Compl. ¶ 46, ECF No. 1 (alleging in broad terms that "Special Groups" linked with Hezbollah have been designated FTOs, but Plaintiffs do not and cannot assert that JAM is an FTO).

*Third*, in addition to the above, Plaintiffs' claims relating to fifty-five of the sixty-three alleged Attacks are time-barred under the ATA's ten-year statute of limitations. Plaintiffs' claims accrued, for the purposes of JASTA, at the time of those Attacks, which occurred some thirteen to eighteen years before the filing of this action.

*Lastly*, in the alternative, the Complaint should be dismissed because it fails to allege claim-related personal jurisdiction over BNPP, a foreign bank. As explained in connection with the ATA legal standard above, Plaintiffs fail to allege a relationship between the banking services by BNPP and the Attacks out of which Plaintiffs' claims "arise." There is accordingly no basis for this Court to exercise specific personal jurisdiction over BNPP.

## BACKGROUND

### I.    STATUTORY BACKGROUND

The ATA provides a private right of action for damages for U.S. nationals injured "by reason of an act of international terrorism." 18 U.S.C. § 2333(a). JASTA amended the ATA to include a form of secondary liability. Pub. L. No. 114-222, 130 Stat. 852. Under JASTA, when "an act of international terrorism" has been "committed, planned, or authorized" by an organization designated as a FTO by the U.S. Secretary of State, injured parties may sue anyone "who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed" the terrorist act. Pub. L. No. 114-222, § 4(a), 130 Stat. 852, 854 (codified at 18 U.S.C. § 2333(d)(2)). Here, the Complaint alleges that BNPP provided banking services to Iran-linked entities (which are not FTOs), and that those entities indirectly made funds available to the Iranian government to fund terrorist groups, including the FTOs that injured Plaintiffs. *See, e.g.*, Compl. ¶ 3.

Unlike other civil liability provisions that simply impose liability for "conspiracy" or "aiding and abetting"—leaving the courts to interpret those standards—Congress in JASTA delineated the scope of secondary liability in three ways.

*First*, Congress limited secondary liability to cases in which plaintiffs have suffered "an injury arising from an act of international terrorism committed, planned, or authorized *by an organization that had been designated as a foreign terrorist organization*" at the time of the attack. 18 U.S.C. § 2333(d)(2) (emphasis added).

*Second*, Congress required plaintiffs to establish a close connection between the secondary-liability-defendant and the party that committed the act of international terrorism injuring a plaintiff. It limited liability only to a person "who aids and abets, by knowingly providing substantial assistance, or who conspires with *the person who committed such an act of international terrorism*." *Id.* (emphasis added).

*Third*, in JASTA's "Findings and Purpose" section, Congress stated that *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)—the leading case interpreting the common law of civil secondary liability—"provides the proper legal framework for how such liability should function." 18 U.S.C. § 2333 note. *Halberstam* outlined three elements for aiding and abetting liability: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance;" and "(3) the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 477.

In clarifying the applicability of the *Halberstam* framework to JASTA claims, the Supreme Court in *Twitter* explained that the elements and factors articulated in *Halberstam* are not a test in themselves. 598 U.S. at 497. Instead, they are relevant insofar as they answer the

"fundamental question of aiding-and-abetting liability": whether the defendants "consciously, voluntarily, and culpably participate[d] in or support[ed] the relevant wrongdoing." *Id.* at 505. As the Supreme Court explained, that question carries two requirements. First, the defendant's assistance must be "conscious and culpable"—that is, it must possess the requisite "scienter." *Id.* at 492. Second, a defendant must have "participated in [the] wrongful act." *Id.* at 493 (alterations omitted) (citation omitted).

## II.    PLAINTIFFS' ALLEGATIONS

The Complaint asserts a single claim for relief under JASTA, alleging that BNPP aided and abetted the Attacks by providing banking services to Iran-linked entities in violation of U.S. sanctions. Because none of the Iran-linked entities with whom BNPP transacted themselves committed any of the Attacks, the Complaint asserts that certain of those entities should be considered "fronts" or "agents" of the Iran Revolutionary Guard Corps ("IRGC"), a branch of the Iranian military. *See, e.g.*, Compl. ¶¶ 3, 7, 10–11, 275, 371. According to the Complaint, the IRGC in turn provided funds to the various terrorist organizations and militias that injured Plaintiffs or to organizations that trained or funded the groups that injured Plaintiffs. *See, e.g.*, Compl. ¶¶ 3, 142–94. As the Complaint acknowledges, the IRGC was not designated an FTO until April 15, 2019, years after the alleged Attacks and banking services by BNPP to Iran-linked entities. *See* Compl. ¶¶ 82–83.

### A.    Alleged Illegal Banking "Scheme"

The non-conclusory allegations in the Complaint concerning BNPP's conduct are drawn from BNPP's 2014 plea agreement and related resolutions with federal and state authorities addressing violations of U.S. sanctions through the provision of U.S. dollar financial services involving entities connected to designated countries (together, the "Agreements"), only a portion of which involved Iran. *See, e.g.*, Compl. ¶¶ 5–7. Notably, the Agreements did not include any

-5-

finding that BNPP engaged in "IRGC-related" transactions or that the transactions processed by BNPP were in any way connected to any terrorists, terrorist organizations, or a terrorist activity. Nor do they support any allegation, and the Complaint contains none, that BNPP transacted with any FTOs or with any entity that directly funded any FTO, let alone any Attack included in the Complaint.

In the Agreements, BNPP acknowledges that between 2002 and November 2012, BNPP "conspired with banks and other entities located in or controlled by countries subject to U.S. sanctions, including . . . Iran," to process U.S. dollar-denominated financial transactions. Statement of Facts ("SOF")[2] to the June 30, 2014 Department of Justice ("DOJ") Plea Agreement (Ex. A),[3] SOF ¶ 14. The Agreements and the Complaint focus on banking services provided in 2009 to an unnamed Iranian oil company, SOF ¶ 48 (Ex. A), and between 2006 and 2012 to a pseudonymized "Iranian Controlled Company 1," incorporated in the United Arab Emirates, which Plaintiffs allege is Caspian Petrochemical FZE ("Caspian"). SOF ¶¶ 42–47 (Ex. A); New York Department of Financial Services ("NYDFS") Consent Order ¶¶ 31–33 (Ex. B); Office of Foreign Assets Control ("OFAC") Settlement ¶¶ 14–15 (Ex. C); see Compl. ¶¶ 356–58. In the Agreements, BNPP acknowledges that Iranian Controlled Company 1 used its BNPP account to receive payments for the sale of Turkmen liquefied petroleum gas to Iraq. OFAC Settlement ¶ 15 (Ex. C); Compl. ¶ 357.

---

[2] The SOF is an exhibit to the 2014 DOJ Plea Agreement, and is attached as Exhibit A to the Declaration of Carmine D. Boccuzzi, Jr. ("Boccuzzi Declaration"), dated October 4, 2024.

[3] Because the Complaint relies heavily on and cites repeatedly to the Agreements, they are appropriately considered by the Court. See Boccuzzi Declaration (attaching certain publicly available documents relied upon in the Complaint); Gagnon v. Alkermes PLC, 368 F. Supp. 3d 750, 762 (S.D.N.Y. 2019) (noting that on a motion to dismiss, the court may consider documents attached to, or referenced in, or integral to the complaint, or any other document "upon which [Plaintiffs] relied in bringing the suit" (quoting Kleinman v. Elan Corp PLC, 706 F. 3d 145, 152 (2d Cir. 2013)). Unless otherwise noted, all exhibits ("Ex.") referenced here are attached to the Boccuzzi Declaration.

While the Complaint seeks to hold BNPP liable for aiding and abetting terrorism based on banking services provided between 2002 and 2012 to Iran-linked entities, as Plaintiffs concede, for most of that period, until November 2008, the U.S. sanctions regime permitted bank clearing services for Iranian entities pursuant to the "U-Turn" exemption. *See* Compl. ¶¶ 3, 325. This exemption allowed U.S. banks to process transactions to and from Iran, so long as (i) non-U.S., non-Iranian banks acted as intermediaries, so that U.S. banks would not have a direct connection to Iranian banks, and (ii) none of the parties to the transaction was individually sanctioned. *See Kemper v. Deutsche Bank AG*, 911 F.3d 383, 387 (7th Cir. 2018). In the SOF, the DOJ expressly acknowledges that BNPP's transactions involving Iranian Controlled Company 1 initially complied with the U-Turn Exemption. SOF ¶ 44 (Ex. A).

Unable to plead any actual transaction with an FTO or any other entity that committed an Attack, the Complaint asserts that the banking services referenced in the Agreements were part of a "sanctions evasion scheme" between BNPP and Iran-linked entities allegedly connected to the IRGC. Plaintiffs assert that Caspian and the Iranian oil company were "agents" or "fronts" for the IRGC because the IRGC allegedly had "market segment monopolies" in the energy, construction, sanctions evasion, finance, import/export and communications sectors beginning in 2007. *See, e.g.*, Compl. ¶¶ 202, 204–05, 315–17. But the Complaint does not allege that Caspian or the Iranian oil company is an FTO or was sanctioned by OFAC for being IRGC "fronts." Nor does the Complaint identify a single transaction by BNPP that involved the IRGC or the perpetrators of the alleged Attacks.

### B. The Complaint Alleges A Series Of Attacks By Multiple FTOs Over A Ten-Year Period

Plaintiffs allege that they or their family members were killed or wounded in Attacks in Israel and Iraq over a ten-year period between 2006 and 2016 (in twelve terrorist Attacks in

Israel over the eight-year period March 6, 2008 to December 23, 2016, and fifty-one Attacks in

Iraq over the nearly five-year period November 16, 2006 to July 7, 2011), allegedly committed,

planned, or authorized by four different FTOs: Hezbollah, Hamas, PIJ, and/or JAM.  Compl.

¶¶ 2, 13, 479–1233.  The alleged Attacks involve disparate and disconnected fact patterns across

multiple countries, including stabbing attacks, kidnappings, rocket attacks, vehicle attacks, and

an assassination.  *See* Compl. ¶¶ 479–1233.  Plaintiffs claim that each of the terrorist

organizations that committed an Attack was a "proxy" for the IRGC on the basis that the IRGC

"suppl[ied] money, weapons, training, technology, and safe haven to terrorists."  *See* Compl.

¶¶ 2, 3.

## ARGUMENT

### I.    THE RULE 12(B)(6) STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The

plausibility standard requires more than a "sheer possibility."  *Id*.  A plaintiff cannot cross the

threshold from "possible" to "plausible" by pleading only "facts that are 'merely consistent with'

a defendant's liability."  *Id*. (quoting *Twombly*, 550 U.S. at 557).  In making the plausibility

determination, a court may consider only well-pleaded factual allegations and must ignore "legal

conclusions[] and threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements."  *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014) (citation

omitted).  This is "a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense."  *Id*. (internal quotation marks and citation omitted).

## II.   THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE THAT BNPP AIDED AND ABETTED ACTS OF INTERNATIONAL TERRORISM

JASTA aiding and abetting requires both that "the defendant [] be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance," and that "the defendant [] knowingly and substantially assist the principal [act of international terrorism]." *Twitter*, 598 U.S. at 486 (quoting *Halberstam*, 705 F.2d at 477).

Here, the Complaint fails to allege that BNPP funded any terrorist group, had general awareness of any terrorist group's or any third party's use of BNPP's banking services to sponsor, in any way, terrorist activities, or that BNPP knowingly and substantially contributed to any of the Attacks. *See id.* at 506. The Complaint accordingly must be dismissed.

### A.   Plaintiffs Fail To Allege That BNPP Was "Generally Aware" Of Any Role In Relevant Terrorist Activity

To plead general awareness, the Complaint must plausibly allege that: (1) BNPP "was aware of [its customers'] connections with [the FTO that committed the attacks] before the relevant attacks," *and* (2) BNPP customers "were so closely intertwined with [that terrorist organization's] violent terrorist activities that one can reasonably infer [the bank] was generally aware of its role in unlawful activities from which the attacks were foreseeable while it was providing financial services to [the relevant customers]." *Honickman*, 6 F.4th at 501. The Complaint fails to plausibly plead either of these requirements.

*First*, the Complaint does not plausibly allege that BNPP was aware that, by providing banking services to certain Iran-linked customers, it was assuming a role in terrorist activities of third parties. Of course, Plaintiffs' mere recitation of the general awareness element is plainly insufficient. *See, e.g.*, Compl. ¶ 1240 (claiming "BNPP was generally aware that it was playing a role in illegal activity, and that the terrorist attacks that injured Plaintiffs were a natural and foreseeable consequence of that activity"); *Pension Benefit Guar. Corp. v. Morgan Stanley Inv.*

-9-

*Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013) (explaining that "labels and conclusions," "formulaic recitation[s] of the elements of a cause of action," and "'naked assertion[s]' devoid of 'further factual enhancement'" must be disregarded on a motion to dismiss) (quoting *Iqbal*, 556 U.S. at 678) (internal citations omitted).

Nor are Plaintiffs helped by their focus on BNPP's Agreements in connection with OFAC sanctions violations. *See, e.g.*, Compl. ¶¶ 4–9, 322–76. Violation of U.S. financial sanctions, even if sanctions are characterized as laws designed to prevent terrorist activity, are insufficient without more to satisfy the general awareness requirement. *See Siegel v. HSBC N. Am. Holdings, In*c., 933 F.3d 217, 224 (2d Cir. 2019) (OFAC sanctions violations did not constitute JASTA general awareness, which demands more than awareness "of the organization's connection to terrorism" writ large); *Freeman v. HSBC Holdings PLC*, 465 F. Supp. 3d 220, 230 (E.D.N.Y. 2020) ("[I]t is not enough for a defendant-bank to be aware that its conduct violates the law—even one intended to prevent terrorism—or that the organization or entity to which it is providing financial services supports terrorist organizations; the bank must be aware that through its own conduct, whether legal or illegal, it is assuming a role in actual terrorist activity."). As this Court has held in dismissing similar claims based on sanctions violations by BNPP and other banks, "[a]llegations regarding Iran's status as a state sponsor of terrorism, as well as allegations regarding the purpose of U.S. sanctions are, on their own, insufficient to allege plausibly that Defendants were 'generally aware' that they had taken a 'role' in the attacks that killed or injured Plaintiffs." *O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709 (LTS) (GWG), 2019 WL 1409446, at *10 (S.D.N.Y. Mar. 28, 2019); *see also Wildman v. Deutsche Bank Aktiengesellschaft*, No. 21-cv-04400 (HG) (RML), 2022 WL 17993076, at *16–18 (E.D.N.Y. Dec. 29, 2022) (allegations of connections between bank's customers and

-10-

FTOs were insufficient to establish general awareness where, "[r]ather than providing specific evidence, [the complaint] cite[d] to a plethora of public sources, some of which were published after the Relevant Period, and none of which linked [the bank] to FTO or FTO affiliates") (emphasis omitted).

In *Siegel*, the Second Circuit affirmed the dismissal of a JASTA aiding and abetting claim against HSBC brought by victims of terrorist attacks in Jordan based on a deferred prosecution agreement ("DPA") that HSBC entered into with U.S. authorities for violating U.S. sanctions. The Court of Appeals held that, "[a]t most, the allegations, even when viewed in the light most favorable to the plaintiffs, assert that HSBC was aware that [its customer] was believed by some to have links to . . . terrorist organizations," which is not enough for general awareness. 933 F.3d at 224; *see Honickman*, 6 F.4th at 501 ("the relationship between the defendant and the FTO should not be so attenuated as in *Siegel*"). There, HSBC allegedly "provid[ed] financial services to Al Rajhi Bank, a prominent Saudi bank alleged to have links to terrorist organizations, including al-Qaeda in Iraq," which were worth "billions of U.S. dollars." *Siegel*, 933 F.3d at 219–21; *id*. at 223 (describing allegations of various media reports connecting HSBC's customer to terrorist groups, including the group that committed the attacks). Here, the allegations are even more attenuated than those rejected in *Siegel*, because there are no well-pleaded allegations that BNPP's customers themselves were reported to have links, at the time of BNPP's banking services, to the FTOs that committed the Attacks. *See also Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 869 (D.C. Cir. 2022) (allegations that HSBC knew customer's accounts "may have been used by terrorists" insufficient for general awareness because "they express only the possibility of a terrorist connection, say nothing about [the

relevant FTO] specifically, and focus on conduct occurring years before the bombing"), *cert. denied sub nom. Bernhardt v. HSBC Holdings PLC*, 144 S. Ct. 280 (2023).

Further undercutting any claim of "general awareness" by BNPP, the Complaint does not include any well-pleaded allegations of reports available to BNPP linking any customer to any terrorist group during the time it provided banking services to that customer. *See Honickman*, 6 F.4th at 501 (to satisfy general awareness, bank must have "had the requisite general awareness *at the time* that it provided" the relevant assistance) (emphasis added). As explained in connection with specific customers *infra*, public sources cited in the Complaint that are dated *after* the relevant Attacks, sources dated *after* the provision of banking services to an Iran-linked customer ceased, and sources unrelated to BNPP's customers, do not support general awareness.[4] *Honickman*, at 501–02 (concluding that the plaintiffs did not satisfy the general awareness element in part because they relied on public sources that post-dated the relevant attacks); *Siegel*, 933 F.3d at 224 (concluding generalized public reports that bank customer was "believed by some" to have links to terrorist groups and allegations relating to banking services that ceased ten months before the relevant attack failed to establish general awareness); *Wildman*, 2022 WL 17993076, at *12 (concluding reports that were not linked to defendant bank's customers did not establish general awareness).

*Second*, Plaintiffs put forward no well-pleaded allegations that BNPP's customers were so closely intertwined with the FTOs that perpetrated the Attacks for the Court to reasonably infer that BNPP was generally aware of its role in their terrorist activity. *Honickman*, 6 F.4th at 501–02. As the D.C. Circuit explained in *Bernhardt*, allegations that Iranian customers were on

---

[4] *See, e.g.*, Compl. ¶¶ 48, 50, 59, 63, 67, 75–86, 95, 142–43, 192, 202–03, 218–20, 224, 228, 231–34, 237, 241, 246–51, 254, 262–63, 274–76, 281, 296–99, 306–08, 379, 396, 444, 452–53, 460–61, 463, 467 (non-exclusive list of cited public sources published after BNPP's banking services and/or unrelated to any BNPP customer).

OFAC's list of sanctioned entities or that Iranian banks "are nationalized Iranian banks and that Iran has historically supported terrorist groups, including [the FTO that committed that attack]," are not sufficient to show that the Iranian banks were "so closely intertwined" with the FTO to infer general awareness, because "sovereign nations invariably maintain legitimate government activities."  47 F.4th at 868; *see also Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013) (no proximate causation between terrorist attacks and transfer of funds to Iran because "the fact remains that Iran is a government, and as such it has many legitimate agencies, operations, and programs to fund").  Similarly here, Plaintiffs focus on the IRGC, an arm of the Iranian military (and which was not an FTO at the time of BNPP's banking services and did not commit the Attacks), and on Ayatollah Khamenei's Supreme Leader's Office ("SLO"), but the Complaint contains no well-pleaded allegations connecting banking services by BNPP to terrorist activities by the IRGC or the SLO, much less connecting such services to the specific FTOs and Attacks that injured Plaintiffs.  *See Linde v. Arab Bank, PLC*, 882 F.3d 314, 329–30 (2d Cir. 2018) (concluding that general awareness requires more than "knowledge of the organization's connection to terrorism").

        None of the references to the BNPP banking services involving Iran-linked entities in the Complaint otherwise satisfies the "general awareness" requirement:

        ***Alleged "IRGC-Facing" Transactions.***  Plaintiffs rely on a statement in the DFS Consent Order that BNPP processed dollar-denominated payments on behalf of "Iranian customers" in nontransparent ways that concealed the connection to Iran.  *See* Compl. ¶¶ 328–33.  Nothing in the Complaint or the Agreements, however, supports Plaintiffs' conclusion that such transactions were "IRGC-facing."  *See, e.g.*, Compl. ¶ 380.  As explained *supra*, an entity's provision of banking services in violation of U.S. sanctions on Iran does not establish that

entity's general awareness of a role in terrorist activity by the Iranian government.  *See also Bernhardt*, 47 F.4th at 868 (allegations that Bank Melli and Bank Saderat were designated Specially Designated Global Terrorists ("SDGTs")[5] "connect the [Iranian banks] to terrorism generally but fail to support an inference that HSBC had general awareness it was playing a role in al-Qaeda's terrorist acts") (emphasis omitted).

As the Complaint acknowledges, BNPP's banking services involving Iranian customers that were the subject of the Agreements with U.S. authorities ended in 2012, *two to four years* before the alleged Attacks that occurred between October 22, 2014 and December 23, 2016, which further undercuts any inference of awareness by BNPP as to those Attacks.  *Siegel*, 933 F.3d at 224; SOF ¶¶ 42–48; Compl. ¶¶ 3, 531–679.  The remaining Attacks, which occurred between November 16, 2006 and June 12, 2014, lack a connection to BNPP's sanctions violations for the reasons identified *supra* and are additionally time-barred.  *See infra* Section III; Compl. ¶¶ 479–530, 680–1233.

***Caspian.***  Allegations that BNPP provided banking services to Caspian between 2006 and 2012, *see* Compl. ¶ 358, similarly lack a sufficient connection to the FTOs alleged to have committed the Attacks to establish BNPP's general awareness.  Plaintiffs' reliance on transactions involving Caspian fails at each step.  First, while the Complaint cites "decades" of governmental reports linking the IRGC to terrorism, *none* is alleged to reference Caspian.  *See, e.g.*, Compl. ¶¶ 403–69.  Faced with that gap, Plaintiffs allege Caspian was a "front" for the IRGC, but no well-pleaded facts support that conclusory assertion, much less that BNPP was aware of any such link.  Compl. ¶ 7.  In addition, the IRGC was not an FTO at the time of

---

[5] SDGT designations are distinct from the designations of FTOs by the United States Secretary of State pursuant to Section 219 of the Immigration and Nationality Act. *See* U.S. Dep't of State, *Foreign Terrorist Orgs.*, available at: https://www.state.gov/foreign-terrorist-organizations/.

BNPP's banking services to Caspian and did not commit the Attacks. *See supra* at 5. Unlike the bank customer in *Honickman*, which was designated as an SDGT shortly after the last alleged attack due to its ties to Hamas, 6 F.4th at 491–92, Caspian has never been designated by OFAC. *Id*. at 501-02 (holding that public sources connecting *the customers* to the FTO that committed the Attack "d[id] not support an inference that [defendant bank] was aware of [its customers'] ties with Hamas prior to the relevant attacks"). And here, as the Complaint acknowledges, BNPP's banking services for Caspian ceased in 2012, Compl. ¶ 403, *two to four years* before the alleged Attacks that occurred between October 22, 2014 and December 23, 2016, further undercutting any inference of awareness by BNPP as to those Attacks. *Siegel*, 933 F.3d at 224; SOF ¶¶ 42–48; Compl. ¶¶ 3, 531–679. The remaining Attacks, which occurred between November 16, 2006 and June 12, 2014, lack a connection to BNPP's sanctions violations for the reasons identified *supra* and are additionally time-barred. *See infra* Section III; Compl. ¶¶ 479–530, 680–1233.

**Iranian Oil Company**. The Complaint asserts that when BNPP provided banking services to an Iranian oil company in 2009, BNPP knew that the company was owned or controlled by either the IRGC, the SLO, the Foundation for the Oppressed, Khatam al-Anbiya ("KAA"), and/or Iran's state-owned National Iranian Oil Company ("NIOC"), "because by 2009 one or more of those Iranian entities controlled every major and minor oil, petroleum, and petrochemical company in Iran." Compl. ¶ 371. Plaintiffs' laundry list of potential connections is telling. These speculations fall far short of a plausible allegation that BNPP was generally aware that the Iranian oil company had any connection to the FTOs at the time of the banking services or prior to the Attacks, much less was so closely intertwined with the FTOs that

-15-

perpetrated the Attacks for the Court to infer that BNPP was aware of its supposed role in the FTOs' terrorist activities. *See Bernhardt*, 47 F.4th at 868; *Honickman*, 6 F.4th at 501.

Moreover, the Complaint alleges that BNPP's banking services for the Iranian oil company occurred in 2009, *five years* before any Attack that is not time-barred (*see infra* Section III). Compl. ¶ 369.

*Other Entities.* The Complaint also makes conclusory claims about several other entities or organizations that BNPP allegedly "knew" played a role in terrorist activities, including KAA, Foundation for the Oppressed, NIOC, and the National Iranian Tanker Company ("NITC"). Compl. ¶¶ 471–73. But the Complaint contains no well-pleaded allegations that BNPP provided banking services to these entities, offering instead conclusory statements that "[o]n information and belief . . . BNPP helped [each organization] access millions of dollars" despite knowledge that they were sanctioned or supported known terrorist groups. *See* Compl. ¶¶ 471–73; *Wildman*, 2022 WL 17993076, at *18 ("The Complaint additionally alleges that [the bank] provided banking services to NIOC and NITC . . . these allegations are conclusory statements that are insufficient to establish general awareness.").

## B. Plaintiffs Fail To Allege That BNPP "Knowingly And Substantially Assisted" The Particular Acts Of Terrorism That Harmed Plaintiffs

Plaintiffs' claims fail for the separate and independent reason that the Complaint does not allege that BNPP "knowingly and substantially assisted" the alleged Attacks. To state a claim, Plaintiffs must allege (1) that the defendant's conduct amounted to "*conscious, voluntary, and culpable participation*" in the act of international terrorism, *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 493 (2023) (emphasis added), and (2) a sufficient "nexus" between that culpable conduct and "*the commission of the actionable wrong*—here, an act of international terrorism," *id*. at 495 (emphasis added), or (3) "*pervasive, systemic, and culpable assistance* to a series of terrorist

-16-

activities that could be described as aiding and abetting *each terrorist act*." *Id.* at 502 (emphasis added). The Complaint contains no well-pleaded allegation that BNPP provided any assistance, much less "knowing and substantial" assistance, to any of the FTOs, let alone the alleged Attacks.

### 1.  Plaintiffs Fail To Allege "Conscious, Voluntary, And Culpable" Participation In The Alleged Attacks

"Knowing" assistance is "not the same general awareness that defines *Halberstam*'s second element," and requires a more specific showing that evaluates "the defendants' state of mind with respect to their actions and the tortious conduct." *Twitter*, 598 U.S. at 503–04. Plaintiffs' allegations highlight that BNPP did *not* consciously, voluntarily, and culpably participate in the alleged Attacks.

*First*, Plaintiffs do not allege, because they cannot, that BNPP consciously and culpably processed any transactions relating to the Attacks. And they do not allege that BNPP consciously and culpably transacted any business with Iranian customers that were designated as FTOs. Plaintiffs' conclusory allegations that BNPP "knew" that its customers were "fronts" for the IRGC are insufficient under the holding of *Twitter*, which focuses the inquiry on specific attacks or such pervasive and intentional assistance to the FTO that the defendant can be held liable for all of that FTO's attacks. *Twitter*, 598 U.S. at 481–82, 503, 506 (despite allegations that social media platforms knew FTOs were using their services, finding no substantial assistance because "plaintiffs [] failed to allege that defendants intentionally provided any substantial aid to the Reina attack or otherwise consciously participated in the Reina attack— much less that defendants so pervasively and systemically assisted ISIS as to render them liable for every ISIS attack"). Here, as in *Twitter*, BNPP's undisputed "lack of intent to support" terrorism weighs heavily against imposing liability for aiding and abetting the Attacks, if not

-17-

foreclosing liability altogether. *See id.* at 504.

*Second*, Plaintiffs try to bridge the gap between BNPP and the alleged Attacks by invoking BNPP's allegedly intentional or "willfully blind" provision of banking services to Iran-linked entities in violation of U.S. sanctions, Compl. ¶¶ 222–38, 410.  But sanctions violations, standing alone, do not establish that BNPP affirmatively "induc[ed], encourage[d], solicit[ed], or advis[ed] *the commission of the [terrorist act]*," as required to support a JASTA claim.  *Twitter*, 598 U.S. at 490 (emphasis added).  On the contrary, the "highly attenuated" alleged link between BNPP and the terrorists cuts strongly against "conscious and culpable" participation.  *Twitter*, 598 U.S. at 506 ("the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort"); *see also Siegel*, 933 F.3d at 224–25 (although plaintiffs alleged that defendant bank provided "nearly $1 billion" in violation of U.S. sanctions to its customer, they "did not advance any non-conclusory allegation that [the terrorist perpetrator] received any of those funds or that [defendant bank] knew or intended that [the terrorist perpetrator] would receive the funds"); *Bernhardt*, 47 F.4th at 871 ("In light of [plaintiff's] failure to allege a close connection between the [] banks and al-Qaeda, we cannot reasonably infer that [defendant] provided any aid to al-Qaeda").[6]

## 2. *Plaintiffs Fail To Plausibly Allege The Requisite Nexus To Support An Aiding And Abetting Claim*

Plaintiffs also fail to allege a concrete "nexus" connecting BNPP's supposed assistance

---

[6] The Supreme Court recently granted certiorari and summarily reversed and remanded a decision in another JASTA aiding and abetting case for further consideration in light of *Twitter*.  Order, *AstraZeneca UK Ltd. v. Atchley*, No. 23–9 (U.S. June 24, 2024).  The D.C. Circuit had held that the "knowing and substantial assistance" element was sufficiently established because "defendants' assistance was knowingly provided with a general awareness that it supported the terrorist acts of a notoriously violent terrorist organization that had overrun [Iraq's] Ministry of Health," among other factors.  *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 223 (D.C. Cir. 2022).  In a brief filed in support of vacating and remanding the D.C. Circuit decision, the Solicitor General explained that when a plaintiff does not allege that the defendant "directly channeled resources" to a terrorist organization, there is reason to doubt the appropriateness of "draw[ing] an inference of conscious and culpable participation."  Brief for the United States as Amicus Curiae at 19–20, *Atchley*, No. 23–9.

and "the *act of international terrorism* that injured [them]." *Twitter*, 598 U.S. at 497 (emphasis added). It is not enough for a plaintiff to allege that a defendant gave "assistance to [the terrorist group's] activities in general." *Id.* at 503. The Complaint, which spans 279 pages, does not contain a single allegation tying any banking services by BNPP to the commission of the Attacks that caused Plaintiffs' injuries.

*First*, the Complaint does not contain a single well-pleaded allegation that the Attacks were committed with BNPP's assistance. In *Twitter*, the Court concluded that the connection was "highly attenuated" because there were no allegations "connecting the Reina attack with ISIS' use of the[] platforms." 598 U.S. at 500. And in *Siegel*, the Second Circuit concluded that substantial assistance was not pleaded, because while "the plaintiffs did allege that HSBC provided hundreds of millions of dollars to [its customer]," they "did not advance any non-conclusory allegation that [the FTO] received any of those funds or that HSBC knew or intended that [the FTO] would receive the funds." 933 F.3d at 225.

The claims here are even more attenuated than those in *Twitter* and *Siegel* because Plaintiffs do not allege that the perpetrators of the Attacks ever used BNPP's banking services or that BNPP's customers had a direct connection to the FTOs, let alone the Attacks. *Cf. Twitter*, 598 U.S. at 501–07 (determining that there was no "concrete nexus" between defendants and the attacks, even though defendants provided services directly to ISIS, the actual perpetrator of the attacks). There are no plausible allegations that any funds involved in any transaction processed by BNPP ever reached the IRGC, let alone any FTO or any Attack. Nor does the Complaint allege anything suggesting that the alleged transactions rendered BNPP "present" during the Attacks. *Siegel*, 933 F.3d at 225. And the Complaint makes no allegations that BNPP took "some 'affirmative act' 'with the intent of facilitating the [] commission'" of the Attacks. *See*

*Twitter*, 598 U.S. at 490 (quoting *Rosemond v. United States*, 572 U.S. 65, 71 (2014)).

*Second*, Plaintiffs cannot fill the gap with broad assertions concerning the IRGC's alleged seizure of monopolistic shares of "key sectors" of Iran's economy. *See, e.g.*, Compl. ¶ 198. As an initial matter, the Complaint contains no well-pleaded allegation that BNPP actually knew about such market monopolies or specific monopoly control of any BNPP customers, much less how that control linked to Hezbollah, Hamas, PIJ, and JAM. Moreover, this aspect of Plaintiffs' theory is additional steps removed from the insufficient allegation, rejected by the Supreme Court in *Twitter*, of purported "substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it." 598 U.S. at 495. Whereas the *Twitter* plaintiffs had relied on alleged services provided by the defendants directly to the FTOs, Plaintiffs here rely on vague allegations about banking services to entities in a speculative chain of intermediaries that is even further removed from the FTOs and the Attacks.

### 3. Plaintiffs Fail To Plausibly Allege That BNPP "Systematically And Pervasively" Assisted The Terrorist Activities At Issue

The Supreme Court in *Twitter* recognized a narrow exception where a defendant gives "pervasive, systemic, and culpable assistance to a series of terrorist activities that could be described as aiding and abetting each terrorist act." 598 U.S. at 502. To meet this exception, the plaintiffs face a "drastically increase[d]" burden to show the defendant "affirmatively gave aid that would assist each of [the] terrorist acts" or "formed a near-common enterprise" with the terrorist group. *Id.* at 502–03. Plaintiffs' invocation of the Supreme Court's "pervasive and systemic" phrasing to describe BNPP's alleged assistance is no more than conclusory labelling that fails *Twombly*. Compl. ¶ 1243.

The Supreme Court observed that such a theory of liability "begins to blur with conspiracy liability" as it seeks to impose liability for "every wrongful act committed by [the]

-20-

enterprise." *Twitter*, 598 U.S. at 496.  Plaintiffs fail to allege that BNPP gave affirmative aid to the operations of any of the perpetrators, much less that it "formed a near-common enterprise" with them "of the kind that could establish such broad liability."  *Id.* at 502.

The Second Circuit also rejected this theory of liability under circumstances similar to those alleged here.  In *Freeman*, the Second Circuit concluded that allegations based on Iranian sanctions violations by other banks did not support conspiracy liability for terrorist attacks by alleged proxies of the IRGC.  *See Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 80 (2d Cir. 2023).  To the extent Plaintiffs try to rely on conspiracy-like aiding and abetting claims for "pervasive and systemic" assistance, the absence of a direct link between any transactions and the attacks that led to dismissal of the JASTA claim in *Freeman* applies here more forcefully.

Plaintiffs' allegations are also nothing like the provision of dangerous wares that the Supreme Court alluded to in *Twitter* when it contemplated circumstances for "pervasive, systemic, and culpable assistance," 598 U.S. at 502 ("There may be, for example, situations where the provider of routine services . . . provides such dangerous wares that selling those goods to a terrorist group could constitute aiding and abetting a foreseeable terror attack.").  Not only do Plaintiffs fail to allege that BNPP provided any services whatsoever to the perpetrators of the Attacks or even the IRGC, but financial services are different in kind from the specialized, terrorism-related services discussed in *Twitter*.  Moreover, nothing in the Complaint suggests that BNPP intended to form an enterprise with any of the alleged perpetrators of the Attacks (all unknown to BNPP) or took any active role in their operations or activities.[7]  Courts analyzing similar aiding and abetting claims against banks have determined that the plaintiffs did not plead

---

[7] *See* Brief for the United States as Amicus Curiae at 18–19, *Atchley*, No. 23-9 (noting that *Twitter* "did not approve imposing liability whenever a plaintiff can identify an atypical transaction with an organization that affiliates with terrorists" and that respondents failed to allege that petitioners "directly channeled" resources to a designated FTO) (citing *Twitter*, 598 U.S. at 502).

substantial assistance, much less participation in a common enterprise. *See, e.g.*, *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 225–26 (2d Cir. 2019) (banking services to customer with alleged terrorist links did not establish substantial assistance to FTO's attack); *Bernhardt*, 47 F.4th at 871 (no substantial assistance where "[plaintiff] alleged that HSBC facilitated over $19 billion in transactions with Iranian institutions and provided almost $1 billion in currency sales to Al Rajhi Bank. Yet she fails to allege how much (if any) of that money indirectly flowed to al-Qaeda").

## III.   THE NOVEMBER 16, 2006 TO JUNE 12, 2014 ATTACKS ARE TIME-BARRED

"Dismissal under Fed. R. Civ. P. 12(b)(6) is appropriate when a defendant raises a statutory bar, such as lack of timeliness, as an affirmative defense and it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015) (dismissing time-barred claims) (internal quotation marks omitted). The Complaint was filed on June 29, 2024. ECF No. 1. Accordingly, the fifty-one alleged Attacks from November 16, 2006 to July 7, 2011 in Iraq, Compl. ¶¶ 680–1233, and the four alleged Attacks from March 6, 2008 to June 12, 2014 in Israel, Compl. ¶¶ 479–544, fall well outside the ten-year limitations period under the ATA. 18 U.S.C. § 2335.

Plaintiffs seek to overcome this threshold defect on the basis that the date their injuries "accrued" should be counted from the date of JASTA's September 28, 2016 enactment. Compl. ¶ 474. Plaintiffs' sweeping argument would mean that no cause of action ever "accrues" until the statute creating the cause of action exists. Consequently, under their theory, any time that Congress creates a new statutory cause of action with a corresponding statute of limitation, any plaintiff would be able to bring a claim no matter how long ago the relevant conduct occurred.

But this theory has no support in the text of the ATA or the case law. Section 2335(a) provides that suits for damages under the ATA must be brought "within 10 years after the date the cause of action accrued." 18 U.S.C. § 2335(a). It is well established that claim accrual occurs upon discovery of the injury. *See, e.g.*, *Pearl v. City of Long Beach*, 296 F.3d 76, 80 (2d Cir. 2002) ("[W]e have ruled that accrual occurs when the plaintiff knows or has reason to know of the injury which is the basis of his action.") (internal quotation marks omitted); *Rotella v. Wood*, 528 U.S. 549, 555 (2000) ("[I]n applying a discovery accrual rule, we have been at pains to explain that discovery of the injury, not discovery of the other elements of a claim, is what starts the clock."). In this case, claim accrual occurred upon the alleged death or physical injuries from the alleged Attacks, meaning claims that accrued in 2011 lapsed in 2021 and, pursuant to a limited exception that is not applicable here, claims that accrued between September 11, 2001 and January 2, 2009 lapsed in 2019.[8]

In the alternative, the Complaint suggests that Plaintiffs may seek to salvage their claims by arguing that the fraudulent concealment doctrine tolls the limitations period until the Agreements became public in June 2014, Compl. ¶¶ 475–78, but the Complaint does not support that argument. Equitable tolling is available only in "extraordinary" circumstances. *Pearl*, 297 F.3d at 85; *see also Smith-Haynie v. District of Columbia*, 155. F.3d 575, 579–80 (D.C. Cir. 1998) (stating that the "hurdle [to toll a statute] is high" and courts will only exercise this power in "extraordinary and carefully circumscribed instances"). "Under federal common law, a statute of limitations may be tolled due to the *defendant's fraudulent concealment* if the plaintiff

---

[8] The relevant statute of limitations is contained in the National Defense Authorization Act, which also provided a limited exception, inapplicable here, that a civil suit under 18 U.S.C. § 2333 arising out of an act that occurred between September 11, 2001, and four years before the passage of the law (*i.e.*, January 2, 2009) could be maintained up to six years after enactment (*i.e.*, January 2, 2019). *See* National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, 126 Stat 1632 (2013); 18 U.S.C.A. § 2333 Note. Thus, plaintiffs injured before January 2, 2009 were required to commence their claims by January 2, 2019.

establishes that: (1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012) (emphasis added) (internal quotation marks omitted).  Further, a plaintiff must plead these elements "with particularity" to meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure, *Fezzani v. Bear, Stearns & Co.*, No. 99-cv-0793 (RCC), 2005 WL 500377, at *8 (S.D.N.Y. Mar. 2, 2005).  Plaintiffs' naked assertions that BNPP "fraudulently concealed its misconduct," Compl. ¶ 475, are insufficient as a matter of law to satisfy their burden of pleading all of the elements of fraudulent concealment with particularity.  Nor is it sufficient to allege that simply because the Agreements were published in June 2014, BNPP "fraudulently concealed" a cause of action from Plaintiffs until that time.  *See Donahue v. Pendleton Woolen Mills, Inc.*, 633 F. Supp. 1423, 1443 (S.D.N.Y. 1986) ("Silence or passive conduct of the defendant is not deemed fraudulent, unless the relationship of the parties imposes a duty upon the defendant to make disclosure.") (quoting *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir. 1978)).

Moreover, this lawsuit was not filed until ten years after the Agreements.  The Complaint does not allege any reason, let alone a plausible particularized reason, for that protracted delay.  "To secure equitable tolling, it is not enough for a party to show that he experienced extraordinary circumstances; he must further demonstrate that those circumstances caused him to miss the original filing deadline."  *Smalls v. Collins*, 10 F.4th 117, 145 (2d Cir. 2021) (internal quotation marks omitted); *see also Wall v. Nat'l Broad. Co., Inc.*, 768 F. Supp. 470, 476 (S.D.N.Y. 1991) ("A number of courts have held that even where applicable, equitable tolling

does not bring about an automatic extension of the statute of limitations by the length of the tolling or any other definite term but merely gives the plaintiff extra time if he needs it." (internal quotation marks omitted)) (collecting cases). Plaintiffs fail to allege any facts showing that, in waiting over eight years from the 2016 enactment of JASTA and ten years from the publication of the Agreements, they (1) "pursue[d][their] rights diligently, and (2) that some extraordinary circumstances stood in [their] way." *Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221, 227 (2012) (internal quotation marks omitted). This is particularly so given that a number of similar claims against BNPP and other banks were brought years ago, for example (in 2017) in *O'Sullivan v. Deutsche Bank AG*, No. 17-cv-8709 (LTS) (GWG), 2020 WL 906153 (S.D.N.Y. Feb. 25, 2020). Indeed, many of the *same plaintiffs* who have brought this case are parties to lawsuits raising JASTA aiding and abetting claims against other banks which were filed *years ago* (but long after BNPP's plea agreement became public).[9] *See also Koch*, 699 F.3d at 157 (holding that "[r]easonable diligence is a prerequisite to the applicability of equitable tolling" and concluding that plaintiff did not apply reasonable diligence where he "did not pursue any investigation for over four years after" learning the facts constituting the alleged violation). The Complaint does not allege any reason, let alone a plausible particularized reason, for Plaintiffs' protracted delay.

## IV.    THE COMPLAINT FAILS TO ALLEGE A BASIS FOR PERSONAL JURISDICTION OVER BNPP

This Court can and should "assume jurisdiction" and dismiss the Complaint on the straightforward substantive grounds detailed above, "as a means of preventing waste of judicial

---

[9] *See* Complaint, *Freeman v. HSBC Holdings PLC*, No. 18-cv-7359 (E.D.N.Y. Dec. 26, 2018), ECF No. 1 ("Freeman II") (filed in 2018, the complaint contains more than half of the Iraq attacks alleged in this Complaint and was brought by many of the same plaintiffs).

resources." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 347 (2d Cir. 2018) (Calabresi, J., concurring).

"A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010). Therefore, "to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Id.* at 34–35 (internal quotation marks omitted). The Complaint fails to allege sufficient facts to establish a prima facie basis for exercising jurisdiction over BNPP.

BNPP is a French bank, incorporated under the laws of France, whose principal place of business is in Paris, France. *See* Compl. ¶ 15. It is therefore not "at home" in New York for general jurisdiction purposes. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (internal citations omitted) (for corporations, "the place of incorporation and principal place of business are paradigm bases for general jurisdiction") (internal quotation marks omitted).

Specific jurisdiction is similarly absent. Specific jurisdiction requires an "'affiliation between the forum and the underlying controversy . . . [A] defendant's general connections with the forum are not enough' to support the exercise of specific jurisdiction." *SPV Osus*, 882 F.3d at 344 (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 264 (2017)); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) ("[S]pecific jurisdiction is confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'") (citation omitted). In order to establish minimum contacts for purposes of specific jurisdiction, therefore, "[t]he defendant's suit-related conduct must create a *substantial connection* with the forum State." *SPV Osus*, 882 F.3d at 344 (emphasis added) (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)).

Here, because of the lack of a nexus between BNPP's banking services and the Attacks, as explained in connection with the aiding and abetting legal standard above, the Complaint also fails to meet the basic statutory and constitutional requirements for claim-related minimum contacts even on a prima facie basis.

*First*, the Complaint alleges generally that BNPP maintains a New York branch and provided "substantial assistance to the IRGC and its terrorist proxies" through BNPP New York branch "U.S. dollar clearing, foreign exchange and trade financing services for BNPP's Iranian customers." Compl. ¶¶ 24–26. But there are no facts in the Complaint (because none exists) linking any BNPP financial services to the FTOs that committed the Attacks, meaning the "necessary connection" for personal jurisdiction to the alleged Attacks is missing. *See Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 865 (D.C. Cir. 2022) (affirming dismissal of foreign HSBC defendants for lack of personal jurisdiction because plaintiffs' allegations showing "possible connections between [clients of HSBC] and terrorism generally" and HSBC's coordination with its U.S. affiliates to violate U.S. sanctions were "not enough to allow [the court] to infer the necessary connection to al-Qaeda specifically, or that the foreign HSBC defendants' conduct was related to [plaintiffs'] injuries at al-Qaeda's hand"); *Sucesores de Don Carlos Nunez y Dona Pura Galvez, Inc. v. Societe Generale, S.A.*, No. 1:20-cv-851 (MKV), 2023 WL 2712505, at *4 (S.D.N.Y. Mar. 30, 2023) (no personal jurisdiction for claims by civil plaintiffs seeking to hold BNPP liable for allegedly "trafficking" property confiscated by the Cuban government because alleged New York contacts did not support a claim for trafficking and remaining alleged trafficking conduct occurred abroad); *supra* at 19–22. Here, as in *Bernhardt*, "without allegations supporting a closer connection between the sanctions evasion

-27-

and [each relevant FTO]'s activities, allowing [Plaintiffs] to sue [BNPP] would collapse the core distinction between general and specific personal jurisdiction."  47 F.4th at 863–66.

It is not enough for personal jurisdiction to assert generalized allegations and speculations that funds were transferred through the New York branch of a foreign bank without alleging *claim-related* conduct.  The allegations here stand in stark contrast to *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, where the Second Circuit found minimum contacts for ATA purposes were met because the defendant bank allegedly carried out transfers for the FTO Hezbollah's financial arm "*in order to assist and advance* [its] terrorist activities," and thus the defendant bank had selected and repeatedly used New York's banking system "for accomplishing the alleged wrongs for which the plaintiffs [sought] redress."  732 F.3d 161, 170–71 (2d Cir. 2013) (emphasis added).  Under *Twitter*, the Complaint falls far short of establishing a nexus between BNPP and the Attacks.  *See supra* at 19–22.

*Second*, allegations that BNPP "made several misrepresentations to New York authorities—principally NYDFS"—regarding banking services in violation of U.S. sanctions, and that this "deceptive conduct" substantially assisted the FTOs that injured Plaintiffs "by preventing law enforcement from discovering and putting an end to the full extent of BNPP's malfeasance," are also insufficient.  Compl. ¶ 27.  BNPP's communications with U.S. authorities cannot give rise to specific personal jurisdiction because Plaintiffs' claims arise from the Attacks and not from any communications.  In *Bernhardt*, the D.C. Circuit found the terrorist attack that injured plaintiff did not "ar[i]se out of or relate[] to" "HSBC's sanctions evasion on behalf of [Iranian] intermediary banks" and affirmed dismissal of ATA claims against foreign HSBC defendants for lack of personal jurisdiction.  47 F.4th at 864.  Similarly here, Plaintiffs' alleged injuries from the Attacks plainly do not "arise out of" BNPP's communications with U.S.

authorities about sanctions-evading conduct. The underlying sanctions-evading conduct in itself also does not establish a nexus to the Attacks and, in any event, the Complaint concedes that any such conduct by BNPP principally occurred outside the United States. *See, e.g.*, Compl. ¶¶ 328–54, 368–71.

The claims against BNPP must be dismissed for lack of personal jurisdiction.

## CONCLUSION

For all of the foregoing reasons, the Court should dismiss the Complaint in its entirety with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) and Federal Rule of Civil Procedure 12(b)(2).

Dated: October 4, 2024
     New York, New York

          Respectfully submitted,

          /s/ *Carmine D. Boccuzzi, Jr.*
          Carmine D. Boccuzzi, Jr.
          Abena Mainoo
          Leila Mgaloblishvili
          cboccuzzi@cgsh.com
          amainoo@cgsh.com
          lmgaloblishvili@cgsh.com
          CLEARY GOTTLIEB STEEN & HAMILTON LLP
          One Liberty Plaza
          New York, New York  10006
          T: 212-225-2000
          F: 212-225-3999

          *Attorneys for Defendant BNP Paribas, S.A.*