**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NAFTALI MOSES, individually, and as co-representative for the estate of AVRAHAM MOSES, RIVKAH MOSES MORIAH, individually, and as co-representative for the estate of AVRAHAM MOSES, CHAI MORIAH, ELISHA MOSES, NOAM MORIAH, AYELET MOSES, ORA MOSES, DAVID MORIAH, IFAT COHEN, CHAGIT GIBOR, ATARA KATZ, AVIAD MORIAH, EYTAN MORIAH, TZUR MORIAH, NAFTALI SHITRIT, GILA SHITRIT, YAACOV SHITRIT, OSHRAT AMIR, AVISHAI SHITRIT, ELYASHIV SHITRIT, MEIRI SHITRIT, NOYA SHITRIT, YEDIDYA SHITRIT, KATHLEEN ALT, individually, and for the estate of KRISTINE LUKEN, LAWRENCE LUKEN, GERALD LUKEN, MARGARET LUKEN, SHMUEL BRAUNER, NECHAMA BRAUNER, C.B. by and through his next friend Shmuel Brauner, ESTHER BRAUNER, MORDECHAI BRAUNER, ABRAHAM FRAENKEL, individually, and for the estate of YAAKOV FRAENKEL, RACHELLE FRAENKEL, AYALA FRAENKEL, NOGA FRAENKEL, N.F. by and through her next friend Abraham Fraenkel, S.F. by and through his next friend Abraham Fraenkel, AVIGAIL FRAENKEL, TZVI FRAENKEL, CHANA BRAUN, individually, and as co-representative for the estate of CHAYA BRAUN, SAMUEL BRAUN, individually, and as co-representative for the estate of CHAYA BRAUN, SARA HALPERIN, SHIMSHON HALPERIN, ESTHER BRAUN, MURRAY BRAUN, YEHUDAH GLICK, individually, and for the estate of YAFFA GLICK, HALLEL GLICK, NERIA GLICK, SHAHAR GLICK, SHLOMO GLICK, RACHEL GLICK, TATIANA GLICK, AVITAL BREUER, MICAH LAKIN, individually, and for the estate of RICHARD LAKIN, MANYA LAKIN, RONEN BOROCHOV, DEVORA BOROCHOV, ELI BOROCHOV, AVRAHAM BOROCHOV, SHIRA BOROCHOV, JOSEF BOROCHOV, SHARI BOROCHOV, YOAV GOLAN, ROTEM GOLAN, YEHUDIT GREEN-GOLAN, RAPHAEL GOLAN, MATAN GOLAN, NOAM SHAMBA, YANA SHAMBA, M.S. by and through his next friend Noam Shamba, N.E.S. by and through his next friend Noam Shamba, N.S. by and through her next friend Noam Shamba, O.S. by and through her next friend Noam Shamba, T.S. by and through her next friend Noam Shamba, HADAR SHAMBA, MENACHEM RIVKIN, BRACHA RIVKIN, M.R. by and through her next friend | Case No. 24-cv-4938-JGLC<br><br><br>JURY TRIAL DEMANDED |

Menachem Rivkin, R.R. by and through her next friend
Menachem Rivkin, S.R. by and through his next friend
Menachem Rivkin, STERNA RIVKIN, S.Z.R. by and through
his next friend Menachem Rivkin, STUART FORCE JR.,
individually, and for the estate of TAYLOR FORCE, ROBBI
FORCE, KRISTEN BOSWELL, RAPHAEL LISKER,
SHOSHANA LISKER, AVITAL LEJZOR, DANIEL
LISKER, JONATHAN LISKER, TAMAR GUTMAN,
CHRISTOPHER COTÉ, individually, and for the estate of
JONATHON COTÉ, FRANCIS COTÉ, NANCY COTÉ,
SAMANTHA DUNFORD, MAXIMILLIAN SHROYER,
BREE REUBEN, CASEY REUBEN, QUINTEN REUBEN,
PATRICK REUBEN, MARTHA ELAINE STEWART,
MARK MUNNS, CRISTA MUNNS, JOHN R. YOUNG,
SHARON DEBRABANDER, NICOLE DEBRABANDER,
JOELLA PRATT, DENNIS DEBRABANDER, SALLY
CHAND, individually, and for the estate of MICHAEL
CHAND SR., MICHAEL CHAND JR., BRENDA CHAND,
RYAN CHAND, CHRISTINA MAHON, JOSHUA WELLS,
LYDIA LANTRIP, BILLIE WELLS JR., DAVID LANTRIP
JR., JEREMY WELLS, BRIDGET JUNEAU, individually,
and for the estate of WILLIAM JUNEAU, STEPHANIE
JUNEAU, MELISSA DOHENY, individually, and for the
estate of MICHAEL DOHENY, KATHY KUGLER,
ROBERT KUGLER, TANYA EVRARD, BILLY
JOHNSON, ELENA SHAW, CASEY SHAW, LILLY-BEAN
SHAW, EMILY SHAW, BRYAN WAGNER, MICHAEL
LUKOW, RIKKI LUKOW, BRUCE LUKOW, KRISTEN
KELLEY, JOSEPH LUKOW, ANDREW LUKOW,
JOSHUA ECKHOFF, DUSTIN BAUER, SOPHIA BAUER,
JAMES FLEMMING III, MICHELLE WEST, MADISON
WEST, NISTASHA PEREZ, NORMAN FORBES IV,
JAMES WILSON JR., JIMMY RUNDELL JR., ANTHONY
GERBER, CHARLES GREGSTON, DAVID
MANGANELLA, JOSUE MOLINA, MANUEL MOLINA,
JEREMY WALLACE, CODY BARHAM, ALEJANDRO
CONTRERASBAEZ, JESSICA CONTRERASBAEZ, JESSE
CONTRERASBAEZ, A.C. by and through her next friend
Alejandro Contrerasbaez, PETER PASILLAS, DORIS
BENNETT, DEMPSEY BENNETT, DARNELL BENNETT,
PATRICK HANLEY, KATHERINE HANLEY, EDWARD
HANLEY, CECELIA HANLEY, KIMBERLY MILLER,
DANA SVENSON, CARL REIHER, ROBERT WINEGAR
JR., PATRICIA CLAVENNA, ROBERT WINEGAR,
MARY JAGELLO, ELYSE WINEGAR, JASON
ROBINSON, FRANCES ROBINSON, EMILY ROBINSON,

MICHAEL WEATHERLY, WILLIAM WEATHERLY, CORY KENFIELD, JORDIEN MCNEAL, RACHELLE IDOL, JENNINE VAUGHN, JAMES VAUGHN, CLIFFORD VAUGHN, VIRGINIA BILLITER, ERIC BILLITER, ADRIANNE KIDD, JOSEPH RICHARD JR., LANI BOGART, DOUGLAS BOGART, CHRISTOPHER BOGART, CANA HICKMAN, LUIS ROSA-VALENTIN, MILINDA ROSA, LUIS ROSA-ALBERTY, ILIANA ROSA-VALENTIN, ALEX ROSA-VALENTIN, MARK THOMSEN, ARDELL THOMSEN, RALPH THOMSEN, CHRISTOPHER VIOLETTE, ANTHONY FARINA, KATHLEEN PIRTLE, BENJAMIN ZIBUTIS, BRANDON JOSEY, ADAM MAGERS, SAMUEL MONTALBANO, SUSAN ARNOLD, individually, and for the estate of RONALD TUCKER, BRANDON ARNOLD, DAISY TUCKER, SAMANTHA TUCKER, DAVID ARNOLD, COLLEEN CZAPLICKI, JOHN DAGGETT, KENDALL RASMUSSON, MICHAEL BRIGGS, TAKARRA BRIGGS, M.B. by and through her next friend Takarra Briggs, M.J.B. by and through his next friend Takarra Briggs, MICHAEL DAVID BRIGGS, ANDRES VAZQUEZ, BARBARA PALACIO-VAZQUEZ, J.V. by and through her next friend Barbara Palacio-Vazquez, MELISSA VAZQUEZ, ALEXANDRA VAZQUEZ, JOHN ARAGON SR., BRETT FARLEY, individually, and for the estate of STEVEN FARLEY, DONNA FARLEY, CHRISTOPHER FARLEY, CAMERON FARLEY, VICKIE MCHONE, individually, and for the estates of NOEL FARLEY and BARBARA FARLEY, DAVID FARLEY, NOEL S. FARLEY, DAVID PROFFITT for the estate of CARLA PROFFITT, DAVID IVERSON, BRENNA MACK, LOWELL THOMPSON, LORAMAY DIAMOND, individually, and for the estate of SEAN DIAMOND, SEAN R. DIAMOND, MADISON DIAMOND, TAYLOR DIAMOND, ATHENA DIAMOND, SALLY WILEY, JASON DIAMOND, KARA CONNELLY, JEAN DAMMANN, MARK DAMMANN, KEVIN CONNELLY, TRISTA MOFFETT, individually, and for the estates of MICHAEL ANAYA and CHERYL ANAYA, OBDULIA MONCADA, ALEXANDRA AGUILAR, MATTHEW MONCADA, DANIELA MONCADA, MIRIAM LOPEZ, STEPHEN EVANS, JOSHUA CRAVEN, HOLLY CRAVEN, MARIA VAZQUEZ, individually, and for the estate of OMAR VAZQUEZ, MARISEL VAZQUEZ, STEPHANIE ZOBAY, individually, and for the estate of STEPHEN EVERHART, LINDSAY EVERHART,

HANNAH EVERHART, HAYDEN EVERHART, JASON RZEPA, and KOHL RZEPA,

        Plaintiffs,

   v.

BNP PARIBAS, S.A.,

        Defendant.

**<u>AMENDED COMPLAINT FOR VIOLATIONS OF THE ANTI-TERRORISM ACT</u>**

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 1

THE PARTIES ................................................................................................... 5

    A.    Plaintiffs ................................................................................................ 5

    B.    BNP Paribas ......................................................................................... 6

JURISDICTION AND VENUE ......................................................................... 7

SOURCING ...................................................................................................... 8

NOMENCLATURE ......................................................................................... 10

FACTUAL ALLEGATIONS ........................................................................... 16

I.     From 1979 Through 2024, the Foundation for the Oppressed, Supreme Leader's Office, and Islamic Revolutionary Guard Corps Sponsored Terrorist Attacks by Iranian Proxies Targeting the United States in the Middle East ...................................... 16

    A.    Iran's History of Sponsoring Terrorist Attacks Targeting the United States........ 17

        1.    1970 – 1981: Formative Years of the Islamic Revolution ........................ 18

            a.    1970 – 1979: Development of the Structures and Networks in Preparation for the Islamic Revolution ............................................ 18

            b.    February 1979: Khomeini and Allies Seize Power in the Islamic Revolution ...................................................................................... 25

            c.    March 1979: The Foundation for the Oppressed is Created .............. 29

            d.    April 1979: The IRGC is Created ..................................................... 30

            e.    November 1979 – January 1981: The U.S. Imposes Sanctions in Response to the Hostage Crisis, and the Terrorist Sponsors Execute their First Counterpressure Campaign .................................. 31

        2.    1980: Iran-Iraq War and Rise of Hezbollah ............................................ 32

            a.    1980: The War Begins ...................................................................... 32

            b.    1982: Hezbollah is Created and Commits Devastating Anti-American Terrorist Attacks................................................................ 34

        3.    1989 – 2000: Ayatollah Khamenei Takes Power and Escalates Iran's Sponsorship of Anti-American Terrorist Attacks.......................... 35

        a.   1988 – 1989: After the Iran-Iraq War Ends, and Ayatollah Khomeini Dies, Ayatollah Khamenei Uses the IRGC to Take Power ........................................................................................... 35

        b.   Khamenei Overhauls the Supreme Leader's Office to Optimize Iran-Sponsored Attacks ........................................................................ 36

        c.   1991 – 2001: The Terrorist Sponsors Direct Hezbollah-Led Terrorist Attacks Targeting the United States, the U.S. Imposes Sanctions, and the Sponsors Respond with their Second Counterpressure Campaign ................................................................ 41

    4.   2001 – 2011: Responding to Increased Hezbollah-Led Terrorist Attacks in Israel and Iraq, the United States Implements Comprehensive Sanctions Targeting the Iranian Regime's Sponsorship of Terrorism ........................................................ 42

        a.   2001 – 2005: The Terrorist Sponsors Cement Economic Support for Hezbollah-Led Terrorist Attacks Targeting the United States in Israel and Iraq .................................................................. 42

        b.   2005 – 2006: The Terrorist Sponsors Direct Hezbollah-Led Attacks Targeting the United States in Israel and Iraq ...................... 43

        c.   2007 – 2011: The United States Implements Comprehensive Sanctions targeting the Iranian Regime's Sponsorship of Terrorism ........................................................................................... 44

B.   The Foundation for the Oppressed, IRGC, Hezbollah, and Supreme Leader's Office Were the Iranian Regime's Four Most Important Sponsors of Terrorist Attacks that Targeted the United States and were Committed by Hezbollah, Hamas, Palestinian Islamic Jihad, and Jaysh al-Mahdi ................ 46

    1.   Foundation for the Oppressed (Bonyad Mostazafan) .............................. 48

    2.   Islamic Revolutionary Guard Corps (IRGC) ............................................ 67

    3.   Hezbollah ...................................................................................................... 85

    4.   Supreme Leader's Office ............................................................................. 91

C.   The Terrorist Sponsors Led a Global Terrorist Alliance Called the "Axis of Resistance," That Committed Terrorist Attacks Targeting the United States ................................................................................................................. 106

    1.   Jaysh al-Mahdi (JAM) ............................................................................... 109

    2.   Hamas .......................................................................................................... 127

3.      Palestinian Islamic Jihad (PIJ) ................................................ 128

4.      North Korean Reconnaissance General Bureau (RGB) ......................... 131

D.    Terrorist Sponsors and Proxies Used Terrorist Fronts to Orchestrate their
Attacks Targeting the United States ................................................. 136

1.      Khatam al-Anbiya Construction Headquarters (KAA), aka
GHORB ................................................................................. 136

2.      National Iranian Oil Company (NIOC) ................................... 142

3.      National Iranian Tanker Company (NITC) .............................. 150

4.      Caspian Petrochemical ......................................................... 154

5.      Iran Electronic Development Company (IEDC) ...................... 156

6.      Irancell ............................................................................... 158

E.    Terrorist Sponsors Seized Sector-Wide Monopolies in Key Iranian
Markets to Fund Terrorist Attacks ................................................. 167

1.      The Energy Sector: Oil, Gas, and Petroleum-Based Products ............... 172

2.      The Construction Sector ...................................................... 180

3.      The Sanctions Evasion Sector: Black Market, Smuggling, and
Shipping ............................................................................. 181

4.      The Financial Sector: Banks, Currency Exchanges, and Hawalas ......... 182

5.      The Import/Export Sector ..................................................... 185

6.      The Communications Sector: Telecoms, Internet, and Related
Technology ......................................................................... 185

II.    BNPP Willfully, Systematically, and Surreptitiously Provided Illegal Banking
Services to Terrorist Sponsors and Their Fronts While Helping Them Evade
Counterterrorism Controls ................................................................ 187

A.    The U.S. Government's Counterterrorism Controls ......................... 188

1.      OFAC's Iran Sanctions ......................................................... 188

2.      Transaction Review and Reporting ...................................... 195

3.      The Terrorist Finance Tracking Program ............................... 204

B.     BNPP Willfully Subverted Counterterrorism Controls Designed to Prevent Terrorist Attacks ................................................................................ 205

    1.     BNPP Deliberately Concealed Transactions with Terrorist Sponsors ............................................................................. 206

    2.     BNPP Helped an Iranian Petrochemical Company Operating as a Front for Terrorist Sponsors to Access the U.S. Financial System While Evading U.S. Counterterrorism Controls .................................... 215

    3.     BNPP Helped an Iranian Oil Company Operating as a Front for Terrorist Sponsors to Access the U.S. Financial System While Evading U.S. Counterterrorism Controls ................................... 222

    4.     BNPP's Other Iran Schemes .................................................... 223

    5.     BNPP Helped the Government of Sudan Access the U.S. Financial System While Evading U.S. Counterterrorism Controls ...................... 225

        a.   BNPP's Wire Stripping Conduct in Sudan in Violation of U.S. Counterterrorism Controls ............................................. 226

        b.   BNPP's Use of Regional "Satellite Banks" to Process Sudanese Transactions in Violation of U.S. Counterterrorism Controls .......... 228

        c.   BNPP's Deliberate Decision to Continue and Conceal its Sudan Business During Government Investigations .................................... 229

        d.   BNPP Engaged in Thousands of Transactions Worth Billions of Dollars Knowing Sudan Sponsored Terrorism ................................. 232

III.    BNPP Knew That Terrorist Attacks Committed By Hezbollah, Hamas, PIJ, and JAM Were a Foreseeable Result of Its Culpable Acts ........................................................ 237

    A.     BNPP Defied Voluminous Warnings That Transacting with Fronts for Terrorist Sponsors Facilitated Terrorist Attacks by Hezbollah, Hamas, PIJ, and JAM .............................................................................................. 238

    B.     BNPP Knew That its Assistance to the Iranian Petrochemical Company Facilitated Terrorist Attacks by Hezbollah, Hamas, PIJ, and JAM .................... 254

    1.     BNPP Knew That an Iranian Petrochemical Company Would Fund Terrorism ........................................................................... 255

        a.   Iran's Own Statements and Actions ................................... 255

        b.   Iran's Government Structure ............................................ 258

        c.   U.S. Government Warnings ............................................. 260

      2.     Other Evidence Further Shows BNPP's Awareness That the Petrochemical Company Funded Terrorism ............................................ 276

IV.    BNPP Substantially Assisted the Terrorist Attacks by Hezbollah, Hamas, PIJ, and JAM that Caused Plaintiffs' Injuries.................................................................. 289

    A.    BNPP's Assistance Flowed Through the Khamenei Cell and Enabled Khamenei Cell-Sponsored, Hezbollah-Directed, Attacks by Hezbollah, Jaysh al-Mahdi, Hamas, and PIJ in Israel and Iraq ............................... 291

        1.     Ayatollah Khamenei Directly Sponsored Terrorist Proxy Attacks Targeting the United States in the Middle East ...................................... 293

        2.     Ayatollah Khamenei and his Terrorist Allies used a Joint Cell Approach to Operationalize their Attacks.................................................. 297

        3.     The Khamenei Cell Comprised a Khamenei-Led, Hezbollah-Managed, Joint Leadership Cell for Hezbollah, the IRGC, and their Key Proxies in the Middle East ............................................................. 301

            a.    Hezbollah: Hassan Nasrallah, Imad Mugniyeh, Ali Mussa Daqduq, Muhammad Kawtharani, Yusuf Hashim, Mohammad 'Abd-al-Hadi Farhat, Khalil Harb, and Muhammad Yusuf Ahmad Mansur.................................................................................. 316

            b.    Foundation for the Oppressed: Ayatollah Ali Khamenei, Parviz Fattah, and Mohsen Rafiqdoost ........................................ 321

            c.    IRGC: Qasem Soleimani, Esmail Qaani, Rostam Qasemi, Mohammad Ali Jafari, and Hossein Taeb.......................................... 334

            d.    Supreme Leader's Office: Mojtaba Khamenei, Mohsen Rezai, and Gholam-Ali Hadad-Adel............................................................. 342

            e.    Jaysh al-Mahdi, including JAM Special Groups Kataib Hezbollah and Asaib Ahl al-Haq: Muqtada al-Sadr, Abu Mahdi al-Muhandis ................................................................................. 346

            f.    Hamas/PIJ: Ismail Haniyeh and Yahya al-Sinwar............................ 349

    B.    BNPP Enabled the Terrorist Sponsors to Fund Joint Logistics and Operations Cells that Led the Terrorist Attacks Against Plaintiffs ................... 350

        1.     The Joint Axis of Resistance Logistics Cells (IRGC-LH-Hamas-PIJ-JAM-RGB) in Iran, Lebanon, Syria, the Palestinian Territories, and North Korea.................................................................................... 351

2.      Joint Hezbollah-Hamas Operations Cells in Iran, Lebanon, Syria, and the Palestinian Territories ................................................ 360

3.      Joint Hezbollah-PIJ Operations Cells in Iran, Lebanon, Syria, and the Palestinian Territories ............................................................ 362

C.    BNPP Helped the Terrorist Sponsors Generate Profits to Fund Terrorist Attacks ................................................................................................ 363

1.      Profits From BNPP's Transactions with the Terrorist Sponsors Systematically Flowed Through Multiple Channels to Fund Terrorist Attacks ...................................................................... 363

a.    The Logistics Policy Directive.......................................... 363

b.    Mandatory Donations (Khums) ........................................ 365

c.    Financial Auditors and Aggregators ................................ 368

d.    The Foundation for the Oppressed................................... 369

e.    The Supreme Leader's Office ........................................... 383

f.    The IRGC ........................................................................... 387

g.    Oil and Gas Fronts ............................................................ 397

h.    Other Fronts ...................................................................... 404

2.      Most of the Profits from BNPP's Transactions Funded Terrorist Attacks ............................................................................... 405

D.    BNPP Helped the Terrorist Sponsors Obtain Critical Access to U.S. Dollars that Funded Terrorist Attacks................................................ 410

E.    BNPP Enabled Essential Financial and Logistical Aid to Terrorist Attacks ...... 413

1.      Attack Incentive and Reward Payments ................................. 413

2.      Bartered Weapons, Training, Logistics, and Tunnel Support from North Korea's RGB ................................................................. 419

3.      Attack-Related Intelligence ..................................................... 421

4.      Weapons Manufacturing.......................................................... 422

F.    BNPP Enabled Thousands of Terrorist Attacks................................ 425

G.    BNPP Supplied Long-Lasting Assistance that Continued Aiding Terrorist Attacks Through at Least 2016 .......................................................................... 428

V.    Hezbollah and its Proxy JAM Used BNPP's Substantial Assistance to Commit Terrorist Attacks in Iraq that Targeted the United States and Injured Plaintiffs ............ 429

    A.    Hezbollah Created, Armed, and Trained Jaysh al-Mahdi to Carry Out Terrorist Attacks Against Americans ..................................................... 430

        1.    Hezbollah Co-Founded Jaysh al-Mahdi with Sadr to Carry Out a Campaign of Terror Against Americans in Iraq ..................................... 431

        2.    Hezbollah Organized Joint Hezbollah/Jaysh al-Mahdi Cells in Iraq to Direct Terrorist Attacks Targeting the United States, in Which Jaysh al-Mahdi Notoriously Served as Hezbollah's Agent ................... 432

        3.    Hezbollah Provided Jaysh al-Mahdi with Weapons to Carry Out Terrorist Attacks Against Americans in Iraq ......................................... 440

        4.    Hezbollah Authorized Jaysh al-Mahdi's Attacks Against Americans in Iraq ................................................................................. 441

        5.    Hezbollah Planned Jaysh al-Mahdi's Terrorist Attacks Against Americans in Iraq ................................................................................. 446

        6.    Hezbollah Jointly Committed Jaysh al-Mahdi's Attacks Against Americans in Iraq ................................................................................. 452

    B.    BNPP's Assistance Aided the Attacks by Hezbollah and Jaysh al-Mahdi in Iraq ................................................................................................................. 457

        1.    BNPP's Culpable Behavior Empowered the Terrorist Sponsors to Provide Unique and Deadly Support To Attacks by Hezbollah and Jaysh al-Mahdi in Iraq .......................................................................... 457

        2.    BNPP Contributed to the Specific Attacks in Iraq that Killed and Injured Plaintiffs by Funding the Individual Hezbollah and Jaysh al-Mahdi Terrorists and Cells that Committed Such Attacks ................. 466

            a.    BNPP's Money Reached Key Khamenei Cell Terrorists Responsible for Attacks in Iraq....................................................... 468

            b.    Khamenei Cell Terrorists Funded By BNPP Directly Participated in the Attacks that Killed and Injured Plaintiffs in Iraq ................................................................................................. 482

VI.    Hezbollah, Hamas, and PIJ Used BNPP's Substantial Assistance to Commit Terrorist Attacks in Israel that Targeted the United States and Injured Plaintiffs ........................ 489

A.      Hezbollah, Hamas, and PIJ Committed Terrorist Attacks Targeting the United States that were Sponsored by the Foundation for the Oppressed, Supreme Leader's Office, and IRGC ................................................. 489

B.      BNPP's Assistance Aided the Attacks by Hezbollah, Hamas, and PIJ in Israel ................................................................................................. 492

1.      BNPP's Culpable Behavior Empowered the Terrorist Sponsors to Provide Unique and Deadly Support To Attacks by Hezbollah, Hamas, and PIJ in Israel ...................................................................... 492

2.      BNPP Contributed to the Specific Attacks in Israel that Killed and Injured Plaintiffs by Funding the Individual Hezbollah, Hamas, and PIJ Terrorists and Cells that Committed Such Attacks ................... 509

a.   BNPP's Money Reached Key Khamenei Cell Terrorists Responsible for Attacks in Israel ...................................... 511

b.   Khamenei Cell Terrorists Funded by BNPP Directly Participated in the Attacks that Killed and Injured Plaintiffs in Israel ................ 519

VII.    Plaintiffs' Claims are Timely .......................................................................... 522

VIII.   Plaintiffs and their Family Members were Killed or Injured in Terrorist Acts in Israel Committed, Planned, or Authorized by Iran-Sponsored Foreign Terrorist Organizations ................................................................................................. 524

A.      The March 6, 2008 Mass Shooting Attack in Israel (Moses and Shitrit Families) .............................................................................................. 524

B.      The December 18, 2010 Kidnapping Attack in Israel (Luken Family) ............. 527

C.      The August 19, 2011 Rocket Attack in Israel (Brauner Family) ....................... 528

D.      The June 12, 2014 Kidnapping Attack in Israel (Fraenkel Family) .................. 529

E.      The October 22, 2014 Vehicle Attack in Israel (Braun Family) ....................... 530

F.      The October 29, 2014 Assassination Attack in Israel (Glick Family) ............... 532

G.      The October 13, 2015 Shooting and Stabbing Attack in Israel (Lakin Family) ........................................................................................................ 534

H.      The November 6, 2015 Sniper Attack in Israel (Borochov Family) .................. 535

I.      The December 14, 2015 Vehicle Attack in Israel (Golan and Shamba Families) ..................................................................................................... 537

J.      The January 27, 2016 Stabbing Attack in Israel (Rivkin Family) ..................... 539

K. The March 8, 2016 Stabbing Attack in Israel (Force Family) ............................ 541

L. The December 23, 2016 Stabbing Attack in Israel (Lisker Family) ................. 542

IX. Plaintiffs and their Family Members were Killed or Injured in Terrorist Acts in Iraq Committed, Planned, or Authorized by Iran-Sponsored Foreign Terrorist Organizations ................................................................................................. 543

 A. The November 16, 2006 Complex Attack in Basra (Coté, Johnson-Reuben, Munns, and Young Families) ................................................ 543

 B. The August 17, 2007 Complex Attack in Amarah (Chand Family) .................. 548

 C. The November 2, 2007 EFP Attack in Kadhimiya (Wells Family)................... 549

 D. The November 26, 2007 IED Attack in Wasit (Juneau Family)........................ 550

 E. The December 9, 2007 EFP Attack in Az Zubayidiyah (Doheny, Evrard, Johnson, and Shaw Families).......................................................... 551

 F. The December 17, 2007 EFP Attack in New Baghdad (Bryan Wagner) ........... 554

 G. The January 30, 2008 EFP Attack in New Baghdad (Lukow Family) ............... 555

 H. The February 6, 2008 EFP Attack in Mansour (Joshua Eckhoff)....................... 556

 I. The February 7, 2008 Mortar Attack in Adhamiyah (Bauer Family)................. 557

 J. The February 10, 2008 IED Attack in Sadr City (James Wilson Jr.) ................. 558

 K. The February 20, 2008 EFP Attack in Adhamiyah (James Flemming III)......... 558

 L. The March 11, 2008 IED Attack in Babil (West Family)................................... 559

 M. The March 17, 2008 EFP Attack in New Baghdad (Norman Forbes IV)........... 560

 N. The March 20, 2008 EFP Attack in Sadr City (James Wilson Jr.) ..................... 561

 O. The March 26, 2008 Sniper Attack in Camp Taji (Rundell Family) ................. 561

 P. The March 27, 2008 Complex Attack in Sadr City (Gerber, Manganella, Molina, Gregston, and Wallace Families) ......................................... 562

 Q. The March 28, 2008 Complex Attack in Sadr City (Barham and Contrerasbaez Families)......................................................................... 565

 R. The March 29, 2008 Complex Attack in New Baghdad (Bennett, Hanley, Miller, Reiher, and Winegar Families) ............................................... 566

S.    The April 1, 2008 Complex Attack in Sadr City (Jeremy Wallace and James Wilson Jr.) ................................................................. 569

T.    The April 3, 2008 EFP Attack in Sadr City (Robinson Family)........................ 570

U.    The April 5, 2008 EFP Attack in New Baghdad (Cory Kenfield)..................... 571

V.    The April 6, 2008 EFP Attack in New Baghdad (McNeal Family).................. 572

W.    The April 7, 2008 RPG Attack in Sadr City (James Flemming III) ................. 573

X.    The April 7, 2008 Complex Attack in New Baghdad (Vaughn Family) ........... 574

Y.    The April 9, 2008 EFP Attack in New Baghdad (Ault Family) ....................... 575

Z.    The April 14, 2008 EFP Attack in New Baghdad (Richard Family)................. 576

AA.   The April 21, 2008 EFP Attack in New Baghdad (Bogart Family)................... 577

BB.   The April 21, 2008 EFP Attack in Adhamiyah (Rosa-Valentin Family) ........... 578

CC.   The April 21, 2008 Indirect Fire Attack in Sadr City (Thomsen Family) .......... 579

DD.   The April 24, 2008 EFP Attack in Sadr City (Christopher Violette)................. 580

EE.   The April 27, 2008 RPG Attack in Sadr City (Farina Family) .......................... 581

FF.   The April 27, 2008 Sniper Attack in Sadr City (Benjamin Zibutis).................. 582

GG.   The April 28, 2008 EFP Attack in New Bagdad (Cory Kenfield)..................... 583

HH.   The April 28, 2008 Complex Attack in Sadr City (Josey, Magers, and Montalbano Families) ........................................................................ 583

II.    The April 29, 2008 Complex Attack in Sadr City (Brandon Josey).................. 585

JJ.    The April 30, 2008 EFP Attack in Al Rashid (Tucker Family)......................... 586

KK.   The May 1, 2008 RPG Attack in Sadr City (Daggett Family)........................... 587

LL.   The May 4, 2008 RPG Attack in Adhamiyah (Briggs and Vazquez Families) ..................................................................................... 588

MM.   The May 9, 2008 EFP Attack in Sadr City (Adam Magers)............................... 590

NN.   The June 12, 2008 EFP Attack in Kadhimiya (Aragon Family)........................ 590

OO.   The June 24, 2008 Bomb Attack in Sadr City (Farley and Suveges Families) ..................................................................................... 591

PP.     The June 25, 2008 EFP Attack in New Baghdad (Plocica Family)................... 593

QQ.     The February 15, 2009 EFP Attack in Basra (Diamond Family) ...................... 594

RR.     The February 26, 2009 EFP Attack in Adhamiyah (Connelly Family)............. 596

SS.     The April 12, 2009 EFP Attack in Saladin (Anaya Family).............................. 597

TT.     The April 13, 2009 EFP Attack in Karbala (Moncada Family)......................... 598

UU.     The October 12, 2009 EFP Attack in Al Amara (Stephen Evans)..................... 599

VV.     The August 4, 2010 EFP attack in Najaf (Craven Family)................................ 600

WW.    The April 22, 2011 EFP Attack in Wasit (Vazquez Family)............................. 600

XX.     The June 23, 2011 EFP Attack in Baghdad (Everhart Family) ........................ 602

YY.     The July 7, 2011 EFP Attack in Adhamiyah (Rzepa Family) ........................... 603

CLAIM FOR RELIEF .......................................................................................................... 604

JURY DEMAND.................................................................................................................... 606

PRAYER FOR RELIEF ........................................................................................................ 606

## INTRODUCTION

1.      This lawsuit seeks damages under the federal Anti-Terrorism Act ("ATA"), 18

U.S.C. § 2333, specifically the aiding-and-abetting cause of action created by the Justice Against

Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, 130 Stat. 852 (2016).

2.      Plaintiffs are American civilians and servicemembers, and their families, who

were killed or wounded in terrorist attacks committed, planned, or authorized by U.S.

government designated foreign terrorist organizations ("FTOs"), including Hezbollah, Hamas,

Palestinian Islamic Jihad, and Jaysh al-Mahdi (including Jaysh al-Mahdi Special Groups Kataib

Hezbollah and Asaib Ahl al-Haq), all of which were proxies for elements of Iran's revolutionary

regime committed to financing terrorist attacks ("the Terrorist Sponsors"), including the Islamic

Revolutionary Guard Corps ("IRGC").

3.      Plaintiffs seek to hold BNP Paribas, S.A. ("BNPP") accountable for aiding and

abetting the terrorists' attacks. From at least 2002 until at least late 2012, BNPP systematically

and knowingly enabled fronts and agents for Terrorist Sponsors to finance terrorist operations by

transferring billions of dollars on their behalf while helping them evade counterterrorism

controls, including sanctions designed to prevent the Terrorist Sponsors from accessing U.S.

dollars and mechanisms designed to alert U.S. law enforcement and intelligence agencies to

terrorist activity. Throughout this period, BNPP received numerous direct warnings from U.S.

government officials and others that the Terrorist Sponsors were using fronts and agents,

particularly in Iran's oil and gas sector, to provide critical financial and logistical support to anti-

American terrorists in Iraq, Israel, and elsewhere. Deliberately defying them, BNPP chose to

prioritize its own profits over American lives. Through a prolonged campaign of deception over

more than a decade, BNPP served customers it knew were fronts for Terrorist Sponsors and went

to shocking lengths to help them hide their identities in order unlock vital access to the U.S.

financial system upon which their terrorist attacks depended. BNPP thus enabled Terrorist Sponsors to supply money, weapons, training, technology, and safe haven to terrorists, who used that support to attack Americans in Israel and Iraq. Given the stockpiling of assets by Terrorist Sponsors, the volume of BNPP's aid, and nature of the fronts that partnered with BNPP, the bank's conduct continued powering terrorist attacks through at least 2016.

4.      On June 30, 2014, several enforcement actions exposed BNPP's misconduct—which, in U.S. Attorney Preet Bharara's words, amounted to ***"criminal support of countries and entities engaged in acts of terrorism."*** (Emphasis added.) BNPP's conduct was as brazen as it was nearly unprecedented.  Indeed, in the nearly quarter-century since 9/11, DOJ has directly leveled such a conclusion against only a few corporate actors, *e.g.*, banana grower Chiquita Banana and French cement company Lafarge. Simply put, BNPP's conduct was ***far outside*** the norm of even the sorts of corporate criminality normally reflected in such pleas.

5.      Specifically, BNPP pleaded guilty to criminal violations of U.S. sanctions laws and to state crimes involving the falsification of business records, entered settlement agreements with federal and state regulators, and agreed to pay nearly $9 billion in penalties, the largest ever imposed in a criminal case. BNPP was also required to terminate several high-ranking employees and temporarily suspend U.S. dollar clearing operations at its New York branch.

6.      BNPP's record-breaking penalties reflected the scale of its criminal support to acts of terrorism, as well as the bank's extraordinary culpability. As Assistant U.S. Attorney General Caldwell remarked: "BNPP deliberately disregarded U.S. law of which it was well aware, and placed its financial network at the services of rogue nations." The "nature and scope of BNPP's criminal conduct far exceeded that in any previous criminal sanctions case resolved

by the Department of Justice."[1] The bank's "criminal conduct" was "years-long and wide-ranging. . . . [BNPP] flouted U.S. sanctions laws to an unprecedented extreme, concealed its tracks, and then chose not to fully cooperate with U.S. law enforcement."[2]

7. As part of BNPP's misconduct, from 2005 through 2012, BNPP processed over a billion dollars in transactions through the U.S. financial system for customers in Iran, including fronts and agents of Terrorist Sponsors.[3] Most significantly, as U.S. government warnings blared that Iran was using its oil and gas sector to fund terrorism, and that Terrorist Sponsors had effectively seized control of the sector, BNPP processed hundreds of millions of U.S. dollars for an Iranian petrochemical company (a/k/a Caspian Petrochemical FZE) and over a hundred million U.S. dollars for an Iranian oil company, both of which BNPP knew were fronts for Terrorist Sponsors. Well aware of the U.S. government's warnings about exactly that activity, BNPP's bankers falsified transaction records, rebuffed inquiries from regulators and other banks, ignored the advice of their own lawyers, and catered to the desire of their Iranian customers to evade counterterrorism controls, enabling BNPP to move money through the U.S. financial system and provide access to prohibited U.S. dollar services. This misconduct allowed Terrorist Sponsors and their proxies to access the resources they needed to carry out vicious terrorist attacks on Americans, including the attacks that injured and killed Plaintiffs.

8. BNPP's violations were not the actions of a few bad apples. Instead, as BNPP admitted in its settlement, the employees who committed these violations were acting fully within the scope of their employment and intended their actions to benefit BNPP. What is more,

---

[1] U.S. Dep't of Justice, *Remarks by Assistant Attorney General Leslie R. Caldwell at BNP Paribas Press Conference* (June 30, 2014).
[2] U.S. Attorney's Office, SDNY, *BNP Paribas Sentenced for Conspiring to Violate the International Emergency Powers Act and the Trading with the Enemy Act* (May 1, 2015).
[3] OFAC Settlement ¶ 19.

BNPP's violations were only possible because the bank maintained a corporate culture that actively flouted U.S. counterterrorism warnings and controls. As the U.S. Department of Justice ("DOJ") concluded, BNPP had a "cavalier—and criminal—approach to compliance with U.S. sanctions laws and regulations."[4] Over many years, BNPP treated the terrorist financing risk in Iran as an acceptable cost of doing business. Plaintiffs thus believe that the severe misconduct exposed in the public enforcement actions constitutes only part of the picture, and that a full investigation of BNPP's business will reveal even more misconduct through which BNPP knowingly assisted terrorist fronts.

9.      The nexus between BNPP's misconduct and the terrorist attacks that killed or injured Plaintiffs and their loved ones is tight and irrefutable. Terrorist Sponsors are—and BNPP knew them to be—the world's foremost sponsors of anti-American terrorism, and they are adept at converting their financial resources into American casualties—both directly and through a robust network of terrorist proxies including Hezbollah, Hamas, Jaysh al-Mahdi, and Palestinian Islamic Jihad. By allowing Terrorist Sponsors and their fronts to make, move, and spend hundreds of millions of dollars, BNPP willfully enabled terrorist violence against Americans.

10.      In sum, BNPP's misconduct easily constitutes aiding and abetting under JASTA. BNPP acted in a highly culpable manner, committing multiple crimes and thwarting counterterrorism controls. It did so for around a decade despite warnings from law enforcement agencies, financial regulators, the United Nations, European governments, terrorism experts, the media, and others—all of which made it crystal-clear that providing Terrorist Sponsors and their fronts access to the U.S. financial system would fuel anti-American terrorist violence, including

---

[4] Statement of Facts ¶ 56, *United States v. BNP Paribas, S.A.*, No. 14-cr-460-LGS (S.D.N.Y. filed July 10, 2014), Dkt. 13-2 ("SOF").

specifically attacks by Hezbollah, Hamas, Jaysh al-Mahdi, and Palestinian Islamic Jihad, which were engaged in ongoing campaigns of violence against Americans in the Middle East. BNPP's misconduct enabled millions of dollars to flow from Terrorist Sponsors to these designated foreign terrorist organizations, arming them with the weapons and other resources they needed to carry out deadly terrorist attacks. Plaintiffs and their families suffered enormously as a result.

11.    Congress enacted JASTA to address exactly this misconduct. It is the "long-standing policy of the United States that civil lawsuits against those who support, aid and abet, and provide material support for international terrorism serve the national security interests of the United States by deterring the sponsorship of terrorism and by advancing interests of justice, transparency, and accountability." Sudan Claims Resolution Act, Pub. L. No. 116-260, div. FF, tit. XVII, § 1706(a)(1), 134 Stat. 3294 (2020). To advance that policy objective, Congress explained that JASTA seeks "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA § 2(b).

## THE PARTIES

### A. Plaintiffs

12.    Plaintiffs are 288 direct and indirect victims of 12 terrorist attacks committed in Israel from 2008 to 2016, and 51 attacks committed in Iraq from 2006 to 2011. In this terminology, direct attack victims are those who were physically injured or killed in the attack. These include American civilians who were in Israel, as well as American civilians and servicemembers who were in Iraq. Indirect attack victims are the direct attack victims' close

family members who suffered financially and emotionally as a result of the attacks. They include spouses, children, parents, siblings, and other close relations of the direct attack victims.

13.     Each Plaintiff is either a U.S. national or the estate, survivor, or heir of a U.S. national.[5]

**B.  BNP Paribas**

14.     BNP Paribas, S.A. is a *société anonyme* incorporated under the laws of France and headquartered in Paris, France. BNPP is a foreign bank with complex operations and multiple business lines and legal entities in dozens of countries worldwide.

15.     Pursuant to a license from the New York State Department of Financial Services, BNPP operates a foreign bank branch in the State of New York. The main corporate office of BNPP in the United States is 787 Seventh Avenue, New York, New York 10019.  BNPP's New York branch is referred to in this Complaint as "BNPP New York."

16.     Among other services, BNPP New York provides U.S. dollar clearing services for international wire payments, which can involve the conversion of payments from a foreign currency into U.S. dollars.

17.     BNPP also has licensed branches throughout the Middle East, including in Bahrain, Kuwait, Qatar, Saudi Arabia, and the United Arab Emirates.

18.     Beginning in or around 1972 until at least late 2007, BNPP had a representative office in Iran.

---

[5] The term "estate" as used herein encompasses established estates, anticipated estates, as well as certain estate-like constructs available under the laws of certain States (such as "heirships"). The process of establishing certain estates is ongoing, and the identified family members or other individuals, as the anticipated personal representatives, bring these claims on behalf of the anticipated estates of such decedents and all heirs thereof. Each person so identified reserves all rights, including the right pursuant to Fed. R. Civ. P. 25, to seek to substitute for itself the decedent's estate, any successor thereto, or any subsequently named and/or designated estate representative.

19.     Beginning in or around 1998 until present, BNPP had a representative office or branch in Israel.

20.     During the relevant period, nearly all of BNPP's relevant transactions were denominated in U.S. dollars and therefore cleared and settled in New York through BNPP New York or other New York financial institutions.

## JURISDICTION AND VENUE

21.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. §§ 2333(a) and (d), and 18 U.S.C. § 2338.

22.     BNPP is subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a), N.Y. C.P.L.R. § 302, and Fed. R. Civ. P. 4(k).

23.     BNPP entered the United States voluntarily and has a long history in the United States. Since the mid-1800s, BNPP has expanded throughout the United States, including in New York and New Jersey.

24.     As explained below, BNPP's substantial assistance to the Terrorist Sponsors and their proxies was facilitated by BNPP New York because of the latter's central role in providing U.S. dollar clearing, foreign exchange, and trade financing services for BNPP's Iranian customers.

25.     BNPP purposefully availed itself of U.S. jurisdiction to commit the tortious acts described in this Complaint, including processing financial transactions through BNPP New York and directing other New York financial institutions to process transactions for the benefit of its Iranian customers, knowing those transactions were enabling the Terrorist Sponsors and their proxies to carry out terrorist attacks that killed or injured U.S. citizens in the Middle East,

including Plaintiffs. BNPP routed hundreds of millions of U.S. dollars to or through financial institutions in the United States.[6]

26.     Moreover, BNPP made several misrepresentations to New York authorities—principally NYDFS and the Manhattan District Attorney's Office—about its conduct. BNPP's deceptive conduct in this District thereby provided substantial ongoing assistance to the terrorists that killed and injured Plaintiffs by preventing law enforcement from timely discovering and putting an end to the full extent of BNPP's malfeasance.

27.     Venue in this District is proper pursuant to 18 U.S.C. § 2334(a) because BNPP New York is here.

28.     Venue in this District is also proper pursuant to 28 U.S.C. § 1391 because, among other things, a material and substantial part of the activity giving rise to Plaintiffs' claims occurred within the District.

## SOURCING

29.     The allegations herein concerning BNPP's behavior are based primarily on the criminal guilty pleas and settlement agreements that BNPP entered with law enforcement and regulatory authorities to resolve criminal cases and related enforcement actions against the bank. BNPP entered criminal guilty pleas with the DOJ and the Manhattan District Attorney's Office.[7] Other resolutions included Settlement Agreements and Consent Orders with the New York Department of Financial Services ("NYDFS"), the Board of Governors of the Federal Reserve, and the Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury

---

[6] *See, e.g.*, Dep't of Treasury Office of Foreign Assets Control, Settlement Agreement ¶ 19, COMPL-2013-193659 (June 30, 2014) ("OFAC Settlement").
[7] *See* Plea Agreement, *United States v. BNP Paribas, S.A.*, No. 14-cr-460-LGS (S.D.N.Y. July 10, 2014), Dkt. 13; Factual Statement, *State of New York v. BNP Paribas, S.A.* (signed June 30, 2014).

("Treasury").[8] Each document contains lengthy and detailed factual recitations regarding BNPP's illegal, sanctions-evading conduct. BNPP, moreover, has stipulated to the truth of the factual allegations.[9] To resolve these criminal cases and regulatory enforcement actions, BNPP paid U.S. and New York law enforcement and financial authorities nearly $9 billion in penalties and forfeitures, terminated or otherwise disciplined scores of employees, and was ordered to substantially overhaul its regulatory compliance efforts.

30.      As a sophisticated multinational financial institution with a substantial presence in the United States and the Middle East, BNPP always actively monitored every official United States sanction designation, press release, report, and findings (including those relating to American sanctions) targeting the IRGC, the Supreme Leader's Office, Hezbollah, Hamas, PIJ, and Jaysh al-Mahdi, including those published by Treasury (including OFAC and the Financial Crimes Enforcement Network) and the U.S Department of State ("State"). BNPP did so through, *inter alia*, automated diligence databases, in-house compliance and intelligence personnel, and BNPP's thousands of employees and agents in the United States, France, Iran, and elsewhere, each of whose knowledge is imputed to BNPP. Accordingly, BNPP had actual knowledge, in real-time, of each United States sanctions designation, press release, report, and findings that any component of the U.S. government published when BNPP engaged in the conduct alleged herein.

---

[8] *See generally* New York State Dep't of Fin. Servs., *In the Matter of BNP Paribas, S.A. New York Branch*, Consent Order Under New York Banking Law § 44 (June 30, 2014) ("NYDFS Consent Order"); Bd. of Governors of the Fed. Res. Sys., Order to Cease and Desist and Order of Assessment of a Civil Monetary Penalty Issued Upon Consent Pursuant to the Fed. Deposit Insurance Act, as Amended, *In the Matter of BNP Paribas S.A., Paris, France*, Nos. 14-022-B-FB & 14-022-CMP-FB (June 30, 2014); OFAC Settlement.

[9] *E.g.*, SOF at 1 ("The parties stipulate that the allegations in Count One of the Federal Information, the allegations in Counts One and Two of the New York State Superior Court Information, and the following facts are true and correct, and that had the matter gone to trial, the United States and New York State would have proved them beyond a reasonable doubt.").

31.     As a sophisticated multinational financial institution with a substantial presence in Israel, BNPP always actively monitored every official Israeli press release, report, findings (including those relating to Israeli sanctions), or announcement targeting the IRGC, the Supreme Leader's Office, Hezbollah, Hamas, PIJ, and JAM. BNPP did so through, *inter alia*, automated diligence databases, in-house compliance and intelligence personnel, and BNPP's employees and agents in Israel, each of whose knowledge is imputed to BNPP. Accordingly, BNPP had actual knowledge, in real-time, of each Israeli press release, report, and findings that any component of the Israeli government published when BNPP engaged in the conduct alleged herein.

## NOMENCLATURE

32.     This Complaint often features nomenclature known to be deployed by Terrorist Sponsors and their proxies, as well as terms that have a widely understood specific meaning in the terrorism setting like "operation." Ayatollah Khomeini, Ayatollah Khamenei, and the IRGC revolutionized propaganda and strategic communications as practiced by radical Islamists and terrorist organizations. Since 1979, under a strategy and nomenclature developed and practiced by Ayatollah Khomeini himself, the Ayatollahs, regime clerics, and IRGC relied upon an extremely limited universe of core propaganda nomenclature comprising about 2,000 words, and consequently, each term assumed outsized, specific meaning as used by such Iranian actors. Thus, words and phrases, as used by the Terrorist Sponsors and their clerical masters, regularly had a well-known, talismanic-like, IRGC-connoted meaning. That was because Terrorist Sponsors directly served the Ayatollah, and both the IRGC and its associated clerics and imams broadly mimicked Ayatollah Khomeini's 2,000-word approach.

33.     The United States has emphasized the importance of understanding Iran's terrorist ideology and nomenclature—for example, key concepts like the United States as the "Oppressor," Muslim populations that have submitted to the Supreme Leader as the

"Oppressed," and "Resistance" as the preferred euphemism for anti-American terrorist operations to "Liberate" such people—when analyzing the Ayatollahs, IRGC, and their associates and proxies. As the U.S. Department of Defense ("DoD") publicly reported in 2010:

> The theocratic leadership's ideological goal is to be able to export its theocratic form of government, its version of Shia Islam, and stand up for the "[O]ppressed" according to their religious interpretations of the law. … Iran seeks to increase its stature by countering U.S. influence and expanding ties with regional actors while advocating Islamic solidarity. It also seeks to demonstrate to the world its "[R]esistance" to the West. Iran is attempting to secure political, economic, and security influence in Iraq … by … furnishing lethal aid to Iraqi Shia militants [via, *inter alia*, Hezbollah and the IRGC Qods Force]. . . . In an attempt to increase influence in the Levant, Iran provides weapons, training and money to Lebanese Hizballah, its strategic partner.

34.     Below, Plaintiffs identify nine specific words and phrases that had a specifically understood meaning when used by Ayatollah- and/or IRGC-affiliated speakers in Iran since 1979. Each such word and phrase had a similar meaning from 1979 through today, as each was one of the words or phrases that Ayatollah Khomeini deployed, which was modeled throughout IRGC and clerical ranks ever since. Plaintiffs' definitions below track regularly published proclamations, speeches, sermons, and commentaries by the Ayatollah, clerics, and/or the IRGC since 1979, as published by both Iranian and Western media. BNPP knew the below meanings because they were regularly published, and BNPP was a sophisticated multinational financial institution with extensive experience in the Middle East, including local agents in Iran, whose knowledge is imputed to BNPP. Unless otherwise indicated, Plaintiffs' use of the above-identified terms in this Complaint comports with the definitions in this section.

35.     **"Asymmetric Warfare"**, including analogues like "proxy warfare", refers to IRGC-sponsored terrorist attacks targeting the United States. Such nomenclature tracks both Iranian and U.S. government custom and practice. For example, as one DoD-published analysis of the IRGC noted in 2011: "The IRGC's strategy of asymmetric warfare and its open advocacy

of terrorism as a pillar of this strategy have cost Iran in the international political sphere. The U.S. Department of State, in its 2010 annual country reports on terrorism, re-designated Iran as a state sponsor of terrorism. This is in keeping with its designation since 1984."

36.    **"Jihad"** refers to the Ayatollah's and the IRGC's purportedly religiously authorized objective of expelling America from the Middle East through IRGC acts of terrorism. As used by the Ayatollah and the IRGC, the concept of jihad is inextricably intertwined with terrorist violence and closely related to the concept of "Resistance" (defined below).

37.    **"Liberation"** refers to any country or community that (a) shared the IRGC's hostility towards America and (b) submitted to the Ayatollah's rule as enforced by the IRGC.

38.    **"Operation"** and **"Operations"** refer to terrorist attacks. The U.S. government, United Nations, U.K., E.U., and terrorism scholars agree and follow the same nomenclature.

39.    **"Oppressed"** and **"Downtrodden"**, including such words' longer or related versions—"Oppressed on Earth"; "Oppressed of Earth"; "Downtrodden"; "The Downtrodden on Earth"; and "The Downtrodden of Earth"—refers to the Muslim populations of any community that had not submitted to the Ayatollah's rule and/or maintains normal relations with the United States. As Ayatollah Khomeini famously instructed the IRGC, when it came to Iran's "Foreign Policy": "We have a duty to support the Oppressed and be inimical to the Oppressors." He famously decreed in 1979: "We should try to export our revolution to the world. We should set aside the thought that we do not export our revolution, because Islam does not regard various Islamic countries differently and is the supporter of all the [O]ppressed peoples of the world. On the other hand, … the [United States government, and other foreign governments] … have risen to destroy us. If we remain in an enclosed environment, we shall definitely face defeat."

40.    **"Oppressor"** and related concepts longer versions—the "Great Satan" and the "Global Arrogance"—refers to the United States government, which the Ayatollah and IRGC maintained were responsible for oppressing the Islamic community around the world by denying the rule of the Ayatollah.

41.    **"Resistance"** refers to terrorist attacks targeting the United States (including through its allies like Israel and Iraq) under the IRGC's constitutional mandate to export Iran's Islamic Revolution. "Resistance" is the preferred euphemism of the IRGC and every IRGC proxy, many of which, including Hezbollah, Hamas, and Palestinian Islamic Jihad, literally feature the word "Resistance" in the Arabic version of their "external operations wing" (in the case of Hezbollah) and name itself (in the case of Hamas). For example, as the Investigative Project on Terrorism observed on December 3, 2012, the term "'resistance'" was an infamous "code word for terrorism."

42.    **"Resistance Economy"**—including its alternative variant, "Economic Jihad"— referred to IRGC-related economic activities that inextricably aided the IRGC's "Resistance" against America, *i.e.*, its acts of terrorism targeting the United States. Since the 1990s, a wide array of terrorist groups has embraced the concept of an "Economic Jihad" as a means through which such group's supporters can enable the group's attacks even if such supporters themselves do not want to, or cannot, fight for the group.

43.    In or about 2011, Ayatollah Khamenei coined the phrase "Resistance Economy" as a short-hand or euphemism for economic activities that help the Iranian regime continue to fund and arm Iranian-sponsored proxy terrorist attacks that were in "resistance" to the United States and its allies in the region, including Israel. From 2012 through present, Iranian actors affiliated with the Supreme Leader, SLO, and IRGC have routinely emphasized the inextricable

connection between "Resistance Economy" activities and IRGC-sponsored jihadist attacks targeting the United States. On May 27, 2016, for example, the SLO- and IRGC-controlled Iranian state media network IRIB reported (as re-reported by *BBC*) that an IRGC-linked cleric sermonized on IRIB during Friday Prayers –a key vehicle for the Ayatollah's and IRGC's propaganda—that that those "focused on implementation of [the IRGC's] Resistance Economy … described [the IRGC's] Resistance Economy as 'a support' for the 'jihad'" against "America and its mercenaries," who "are exerting pressure on Iran…; therefore, people's resistance and Jihad are aimed against such pressures'" from the United States. On January 14, 2019, similarly, U.S. government-published *Radio Farda* reported: "The IRGC has been one of Iran's main economic engines for decades, controlling important sectors," and the "IRGC is also an important tool by the regime to implement its 'Resistance Economy' doctrine – aimed at increasing self-reliance of the Iranian economy and decreasing its vulnerability to external pressures" from the United States, which helped the IRGC "fulfill[] its number one goal – … exporting its revolution to Lebanon, Iraq, Syria, Yemen, and beyond"—*i.e.*, IRGC-sponsored attacks targeting the United States.

44.    **"Resistance Movements"**—including its alternative variants, "Jihad Movements" and "Liberation Movements"—refers to the IRGC's terrorist proxy members in its "Axis of Resistance."

45.    **"Wilayat-e-Faqih"**, including its short-hand or slang variant, **"Wilayat"**, refers to two related concepts: (1) the rule of pious Muslims around the world who submit to the rule of the jurisprudent in the form of the Supreme Leader of the Islamic Republic of Iran as supported by the IRGC as commanded by the Supreme Leader; and (2) the organizations and individuals who operationalized the Supreme Leader's and IRGC's implementation of such rule, including

the Supreme Leader, Supreme Leader's Office, IRGC, and individuals or entities under the control of such persons where such individuals' or entities' function includes exporting the Islamic Revolution to expand the reach of the Supreme Leader and IRGC.

## FACTUAL ALLEGATIONS

I.    **From 1979 Through 2024, the Foundation for the Oppressed, Supreme Leader's Office, and Islamic Revolutionary Guard Corps Sponsored Terrorist Attacks by Iranian Proxies Targeting the United States in the Middle East**

46.    Since 1979, radical Shia terrorists of Iranian origin throughout the Middle East pledged, before Allah, their personal oath of allegiance not to their own nation, but instead to a Shiite Ayatollah who would eventually, in February 1979, become the first Supreme Leader of the Islamic Revolution: Ayatollah Ruhollah Khomeini.[10] When they did so, one of the things they pledged was to support the Ayatollah's embrace of violent jihadist attacks targeting the enemies of the "Islamic Revolution"—most of all, the United States (the "Great Satan") and its allies in the Middle East, including Israel (the "Little Satan"). Their shared objective was to force the Great Satan to exit the Middle East and abandon its allies there through an unrelenting campaign of terrorist attacks against Americans.

47.    To advance this core objective of the Revolution, the Iranian regime developed something previously unheard of—a vast infrastructure of institutions organized within the government to facilitate terrorist attacks by proxies throughout the region. Although these elements permeated Iran's government and society in many ways, Plaintiffs focus on certain key institutions, which Plaintiffs refer to collectively as Terrorist Sponsors. These institutions include (but are not limited to) (1) the Foundation for the Oppressed; (2) the Islamic Revolutionary

---

[10] In this Complaint, Plaintiffs refer to certain religious concepts and describe those concepts from the perspective of Terrorist Sponsors and their supporters and proxies. The terrorists' understanding of, and use of, religious concepts is vital to understanding their actions, strategies, ideology, doctrine, motivations, linguistic choices, financial practices, rules, tactics, techniques, and procedures. For the avoidance of all doubt, however, Plaintiffs wish to emphasize that nothing in this Complaint should be interpreted as suggesting that the terrorists' interpretations of their Islamic faith is correct as a matter of theological doctrine or representative of the views of the vast majority of Muslims around the world who oppose terrorist violence.

Guard Corps (IRGC); (3) Hezbollah; and (4) the Supreme Leader Ayatollah Ali Khamenei and The Supreme Leader's Office (SLO).

48.     To provide context for BNPP's conduct and its consequences, Plaintiffs first summarize some of the most important historical events, persons, and decisions that shaped the development of Iran's terror apparatus. Plaintiffs then explain the role of each Terrorist Sponsor.

### A.    Iran's History of Sponsoring Terrorist Attacks Targeting the United States

49.     History is vital to understanding every aspect of Iran-backed terrorism. As the United States found in 2018, since "the early days of the revolution …, the one constant is that the Iranian regime will do whatever it takes to … spread its revolutionary ideology … primar[ily] … [through] the Islamic Revolutionary Guard Corps (IRGC)." In 2018, State found that, "[s]ince 1979, Iran's Islamic Republic has made it a policy of state to actively direct, facilitate, and carry out terrorist activity globally." Thus, as the U.S. Department of State ("State") found in 2018, "[f]or 40 years, the … Revolutionary Guard Corps has actively engaged in terrorism and created, supported, and directed other terrorist groups." As U.S. official Brian Hook explained on April 8, 2019: "When you study their 40-year history, it's impossible to allow the IRGC to continue to operate under this fiction that it's a benign part of the Iranian Government …, and it has been that way for decades." Equally unmistakable: that such terrorism increased alongside the IRGC's control of Iran's economy; as the DIA reported in 2019, "[t]he past 40 years have seen a growth in … increased IRGC political influence and control of key economic sectors."

50.     Terrorism scholars have confirmed that historical context is vital to understanding Iran-sponsored terrorism during the 2000s and 2010s. In 2015, for example, Suzanne Maloney of the Brookings Institution observed: "It is tempting to view the Islamic Republic in isolation from its antecedents. . . . However, . . . [t]he salience of Iranian history requires that" even a "primary

focus on the postrevolutionary era" in Iran should "begin as any serious analysis of contemporary Iran must, with an examination … of the long history of the Iranian state and the evolution of the economic and political conditions." To that end, Plaintiffs briefly identify key events in Iranian history that, among other things, confirm the plausibility of Plaintiffs' allegations and demonstrate a longstanding IRGC pattern and practice relevant to Plaintiffs' claims. Beyond that, these key events alerted BNPP as to the nature of their counterparties and/or the ultimate beneficial owners of the transactions BNPP facilitated.

### 1. 1970 – 1981: Formative Years of the Islamic Revolution

#### a. 1970 – 1979: Development of the Structures and Networks in Preparation for the Islamic Revolution

51.    In the mid-1970s—years before Iran's Islamic Revolution—Ayatollah Ali Khamenei set out to use terrorism to engineer a series of victories, beginning with using attacks to secure an Islamic safe haven (an "Islamic Republic") that, in turn, would serve as the geographic safe haven from which Khamenei and his allies could safely, securely, methodically, and patiently launch attack after attack against the United States and its allies in the Muslim world. Through such attacks from their safe haven, Khamenei and his allies would build a terrorist movement centered on martyrdom, violence, and the promise that martyrs who die while attacking the United States secure heavenly rewards for themselves and their entire families, immediate and extended alike. By marrying martyrdom with a messianic Shia narrative and emphasis on terrorism as the foundational tactic through which the revolution could be secured, Khamenei hoped to build an alliance of like-minded Islamist terrorists who would, working together, conduct so many successful attacks targeting the United States that the U.S. government would elect to withdraw the United States from the Middle East, after which Khamenei would eventually bring about the final collapse of the United States as a nation,

followed by the eventual collapse of every other nation-state that would not yield to the terrorism he sponsored to bring about his global Islamic Revolution.

52. Ayatollah Khamenei's desired end-state was the formation of what he termed the "Islamic State": a single, global, Shia Islam-derived, Shia-led government ruled by a single (Shia) Supreme Leader, of which his eventual "Islamic Republic of Iran" would be but one province, and for which all the citizens of the world converted to the Shia faith, swore an oath of loyalty to the Islamic State, and agreed to sacrifice their own lives for the Leader—or would be summarily executed as infidels and blasphemers. Khamenei's desired Islamic State was intended to topple the entire international nation-state system and erase the borders between national governments that Khamenei regarded as a creation of infidels.

53. In Ayatollah Khamenei's violent and fanatical vision, a single sect (Shiism) of a single faith (Islam) would establish a single government (the Islamic State) that would rule the entire globe—even though most Shia Muslims rejected such views—and Shias were a tiny fraction of the globe's population and outnumbered even within the Islamic faith, for which Sunnis were always the dominant sect. Once Khamenei's imagined "Islamic State" ruled the world, Khamenei intended to implement a global genocide in which the only humans anywhere in the world who would be allowed to live would be those who were "faithful," *i.e.*, who were Shia Muslims who swore allegiance to the Supreme Leader of the Islamic State. Infidels, blasphemers, and those who "corrupted" the world—an Islamic concept that Khamenei transmogrified into, essentially, anything that was contrary to his views—would be summarily executed if they refused to convert to Shia Islam.

54. Although Ayatollah Khamenei's vision sounds absurd to Western ears—and to nearly all Muslims outside his circle of influence—it became a powerful ideological motor and

organizing doctrine for his followers, as well as a deeply rooted justification for terrorist attacks. This was so for three reasons.

55.    *First*, the fact that Ayatollah Khamenei's scheme contemplated revolutionary stages (first destroy the United States, then take over the world) meant that Khamenei believed, and taught all who followed him, that no act of terrorist violence that targeted the United States (directly or through its allies like Israel) was ever out of bounds as long as the attack in question helped intimidate the U.S. government—the condition precedent to Khamanei's desired end state of an Islamic world government.

56.    *Second*, the primacy of terrorist violence to achieving Ayatollah Khamenei's end-state meant that Khamenei—and those he controlled—***always*** prioritized sponsoring acts of terrorism targeting the United States (including though its allies) above every other consideration as a matter of tactics (use of terrorism), doctrine (belief that attacking the United States was the single most important variable to the success or failure of the enterprise), and religious faith (the heavy emphasis on martyrdom). Thus, under Khamenei's approach—and ideology taught to his followers—every other consideration was subordinate to bringing about the revolution necessary to birth a global Islamic State. Accordingly, as a matter of first principles, Khamenei and any terrorist faithfully following his approach would ordinarily be expected to devote at least the majority—if not all—of their time, money, work, and even family members to supporting Khamenei's efforts to sponsor attacks targeting the United States.

57.    *Third*, Ayatollah Khamenei knew that his ability to sponsor terrorist attacks targeting the United States that would be so effective as to compel America to leave the Middle East would require a cross-cutting combination of terrorist groups, tactics, operatives, skill sets, attack types, geographies, professions, relationships, languages, and more. Khamenei knew, and

taught his followers, that to meet these conditions precedent to their ability to effectively terrorize the United States into submission, Khamenei's terrorist alliance needed vast stores of money, weapons, recruits, intelligence, safe havens, and networked relationships with prospective allies and partners. And, Khamenei knew—and taught his followers—that such operational needs, in turn, meant that his terrorist attacks could only bring about his desired Islamic State if Khamenei and his allies could sustainably raise, store, move, and spend money— most of all, U.S. dollars—needed to pay for the fighters, weapons, logistics, and intelligence upon which every successful attack targeting the United States relied.

58.    Ayatollah Khamenei also knew, however, that even with the best of efforts, he and his terrorist allies would always be outmatched financially and technologically by the United States and its allies like Israel. Khamenei addressed both challenges with a programmatic emphasis on the glory of martyrs and martyrdom, which informed the entire terrorist architecture he built. Khamenei thus sought to change the world through terrorist tactics, and he spent decades developing, nurturing, financing, arming, and leading a transnational, cross-sectarian, alliance of anti-American Islamist terrorists in which sworn terrorist "brothers" from Iran, Iraq, Lebanon, Palestinian territories, Syria, and elsewhere sought to overthrow any government in the Muslim world that was opposed to their vision.

59.    To convert his fantastical ideas into reality, Khamenei would eventually sponsor proxy terrorist attacks targeting the United States to coerce the U.S. government into fleeing the Middle East and abandoning its allies there, most of all, Israel. To accomplish this objective, Khamenei sought to help sworn followers of the Islamic Revolution from Iran, Iraq, Lebanon, and around the world source the funds, weapons, logistical support, training, haven, intelligence, and cover and concealment required to attack and kill Americans around the world. This, in turn,

21

required that Khamenei build, grow, and sustain a global terrorist coalition united in two objectives that were inextricably linked in the eyes (and demands) of the terrorists: the withdrawal of the United States from the Middle East and the destruction of the State of Israel and forced expulsion and/or murder of any Jews that remained.

60.     Ayatollah Khamenei always believed that the U.S. and Israeli governments' roles in the Middle East were inextricably linked. Most of all, Khamenei deployed two primary tactics to accomplish his strategic objective to force the United States out of the Middle East so that the Islamic Revolution would not wilt under the threat of U.S. intervention and would be free to overthrow the dozens of U.S. allies and partners throughout the Muslim world. His first tactic was to sponsor shockingly violent terrorist attacks to kill enough Americans to intimidate the U.S. government and persons in the United States into exiting the Middle East and abandoning Israel. His second tactic was to sponsor similarly brutal terrorist attacks designed to intimidate the U.S. government and U.S. population at large by inflicting unspeakable violence on America's closest Middle Eastern ally: Israel.

61.     Khamenei believed that what he scorned as the "Zionist regime" (or worse) was merely an artificial creation of, and an ongoing arm of, the U.S. government such that attacks that hurt Israel would also terrify U.S. government decisionmakers, demonstrating the inevitability of Khamenei's triumph over what he believed to be a figurative organ of the U.S. government.

62.     Ayatollah Khamenei's grand terrorist ambitions required him to build and lead an equally grand architecture of Terrorist Sponsors. Among the grandest of Khamenei's insights was the recognition that the only possible way for the terrorists to succeed against the might of the U.S. and Israeli governments was by working together regardless of their sectarian or

ideological differences as long as they were (a) Muslim; and (b) committed to killing, maiming, kidnapping, raping, torturing, and summarily executing enough Americans, and victims from nations allied to the United States, to force the U.S. out.

63.     What would eventually become Ayatollah Khamenei's "Axis of Resistance" was birthed in Palestinian terrorist camps in south Lebanon throughout the 1970s, during which period radical Shiite and Sunni Islamist groups comprised of Iranians, Iraqis, Lebanese, and Palestinians lived, trained, and fought together. Future leaders of the IRGC and Hezbollah, including future IRGC founder and senior leader Mohsen Rafiqdoost, future Hezbollah global attack cell leader Imad Mugniyeh, future senior JAM leader Abu Mahdi al-Muhandis, and a coterie of future leaders of Hamas were all co-located in the same camps, at which they built lifelong relationships that integrated these four terrorist groups into one coordinated alliance. For example, infamous Hezbollah operations mastermind Imad Mugniyeh was originally Palestinian terrorist leader Yassir Arafat's personal bodyguard before the IRGC recruited him to join Hezbollah. From these camps, a transnational coalition of Iranian, Lebanese, Iraqi, and Palestinian terrorists supported Ayatollah Ruhollah Khomeini's—who was exiled in France— campaign to overthrow the U.S.- and Israel-supported Shah of Iran.

64.     Throughout this period, and even while Ayatollah Khamenei was imprisoned by the Shah, Khamenei always served a single master: Ayatollah Ruhollah Khomeini, who led what purported to be a broad, democratic, and inclusive movement in opposition to the Shah while Khomeini was exiled in France. That was, however, a fiction. Khomeini schemed the entire time to seize power and impose a radical Islamist vision upon everyone as soon as he could, backed by a robust commitment to terrorism as a first principle for which Ayatollah Khamenei was

Khomeini's top lieutenant, most committed evangelist, and lead relationship manager with terrorists inside, and outside, of Iran.

65.    Khomeini led his revolution from France, for which he recruited and deployed jihadists from Iran, Iraq, Lebanon, Palestinian territories, and throughout most of the Middle East, who were trained in Lebanon by Palestinian Sunni terrorists at camps run by a allied militias comprising a mix of Lebanese, Syrian, Palestinian, Iranian, and Iraqi terrorists, among others, including Lebanese militias that Khamenei and his IRGC followers would eventually construct into Hezbollah, which also shared a common theological (Shia), national (mixed-Lebanese-Iraqi), and familial connection (the Sadr clan), from which future Jaysh al-Mahdi leader Muqtada al-Sadr would later emerge in 2003. During this pre-revolutionary period in the late 1970s, cross-pollination between groups was the order of the day. For example, Khamenei's lieutenants recruited legendary Hezbollah operations mastermind—and dual-hatted IRGC operative—Imad Mugniyeh away from Palestinian Sunni terrorist (and Khamenei ally) Yassir Arafat, the decades-long leader of the Palestinian Liberation Organization. Khamenei's emphasis on extreme violence, martyrdom, and cross-cutting collaboration with other Islamist terrorist groups throughout the Middle East worked.

66.    By 1978, Ayatollah Khamenei's plan for global conquest through terrorism had begun to be put in motion: the U.S. government-backed Shah of Iran, Reza Pahlavi, was being rocked by a wave of Islamist terrorist attacks, kidnappings, assassinations, and acts of intimidation. In 1978, unlike now, such effective, and frequent, attacks by organized radical Islamist terrorists against a sitting U.S.-backed Muslim regime in the Middle East were virtually unheard of. And yet, the attacks that Khamenei and his allies continuously sponsored throughout 1978 worked. Khamenei and his allies therefore elected to intensify the violence. In coordination

with notorious fanatics like Mohsen Rafiqdoost (who had recently been released from prison for murder) and Mohsen Rezai (who likely masterminded a sophisticated cross-border assassination of his own son out of devotion to the Supreme Leader after his son had defected to the United States and criticized the regime), Khamenei helped spearhead a successful wave of attacks that accelerated the demise of the Shah's government.

### b. February 1979: Khomeini and Allies Seize Power in the Islamic Revolution

67.    On February 1, 1979, Ayatollah Khomeini and his followers returned to Tehran and commenced their Islamic Revolution. When Khomeini landed, he was accompanied by Mohsen Rafiqdoost. This ubiquitous image instantly and permanently cemented Mohsen Rafiqdoost's intimate connection to—and key trust from—Khomeini and, by extension, Khamenei. (Rafiqdoost is alive today; he continued directly sponsoring Iranian-sponsored attacks his entire life, including attacks that killed and injured Plaintiffs.)

68.    On February 11, 1979, ten days after returning to Iran, Khomeini had effectively secured power. Upon doing so, he and his allies, including Khamenei, Rafiqdoost, and Rezai, set to work creating the instruments of terror upon which his Islamic Revolution would depend. At this time, Khamenei was, *inter alia*, Khomeini's then-personal representative to external, anti-American, Islamist, terrorist groups throughout the world, including Lebanese, Palestinian, and Iraqi terrorist groups and most ideologically zealous proponent of terrorism; simply put, Khamenei was the first ever Iranian terrorist to whom the regime assigned the role later made famous by Qasem Soleimani: the Iranian regime's lead relationship-manager with leadership elements in other terrorist groups, including Iranian proxies. Similarly, Mohsen Rafiqdoost served at the time as the Supreme Leader's then-most senior operations-facing operative with strong pre-existing financial, personal, recruiting, and logistical networks in Lebanon, Iraq, and

the Palestinian territories, and Mohsen Rezai served at the time as the Supreme Leader's then-most senior ideologically zealous advocate in favor of using intelligence organizations and processes to power terrorist attacks.

69.    Khomeini, Khamenei, Rafiqdoost, and Rezai sought to develop a terrorist arm to launch attacks outside of Iran from day one because they believed that their Islamic Revolution would always be in mortal danger if they simply sat back and played defense against what they expected to be the inevitable pressure from the U.S. and its allies, including Israel. Moreover, their revolution was only months old, they feared that the forces of the "Great Satan" (*i.e.*, the United States) could—and likely were about to—invade Iran at any moment to destroy their Islamic Revolution before it could take root, and replace it with either another monarch like the freshly deposed Shah or—even worse—securing the birth of an American-style liberal democracy that was the antithesis of everything that their Islamic Revolution espoused. The survival of their nascent Islamic Revolution—and potentially, their own life or liberty—depended on building a robust terrorist capability.

70.    Accordingly, Khomeini, Khamenei, Rafiqdoost, and Rezai all believed—and taught their followers—that protecting the Islamic Revolution ***required*** propagating terrorist violence outside of Iran to prevent the United States from having the space and time to devote its resources to toppling the regime, as the U.S. previously had done in 1953. Their identified strategic imperative to attack the United States to protect their Islamic Revolution from being toppled was ***in addition to*** their recognized need to also attack the United States to compel it to abandon the Middle East so that Khomeini, Khamenei and their allies could then topple other governments one by one throughout the region.

71.    To that end, Khomeini installed Khamenei as, in effect, his leader for terrorist coordination, planning, and recruitment: a role that was substantially like that which Khamenei would assign to Qasem Soleimani about 20 years later. And Khomeini complemented that choice by installing Rafiqdoost as his top "security" (code for operations) operative and Rezai as his lead intelligence operative, with Rafiqdoost and Rezai both doing double-duty, in effect, as Khomeini's and Khamenei's two most important logisticians as well. Instructed by Khomeini, Khamenei, Rafiqdoost, and Rezai set out to build an integrated, sustainable, and effective infrastructure that addressed each of the three key nodes upon which the Iranian regime relied to sponsor terrorist attacks by proxies outside of Iran, which Khamenei had identified years earlier.

72.    *First*, Khamenei, Rafiqdoost, and Rezai needed to build an organization that enabled them to leverage the power of their monopolistic control of the Shia faith in Iran to imbue their entire terrorist enterprise with religious fervor. They thus used Friday Prayers to plainly declare Khomeini's, Khamenei's, and their allies' terrorist intentions, issue religious-based calls for violence, celebrate martyrdom, and source donations and recruits for attacks.

73.    *Second*, Khamenei, Rafiqdoost, and Rezai needed to build a reliable, large, diverse, and globally distributed terrorist operations system to supply the funds, logistics, weapons, fronts, and cover needed to plan and execute attacks. This infrastructure required (1) fighters, including both their person and their budgets, salaries, and martyr payments; (2) operations budgets; (3) weapons; (4) transportation to the attack site; (5) pre-attack intelligence expenditures; (6) smuggling operations to facilitate attacks, *e.g.*, moving, securing, and/or hiding illicit vehicles, vessels, or goods; (7) a global network of fronts comprised of the Foundation's offices, charities, affiliates, safe houses, real estate, and business organization, among other forms of support, to enable the Terrorist Sponsors to effectively conduct lethal attacks targeting

the United States and its allies while maintaining plausible deniability to avoid the risk that such attacks eventually prompt an armed conflict between the nations of the United States and Iran.[11] Accordingly, Khamenei, Rafiqdoost, and Rezai were responsible for building the Islamic Revolution's very first purpose-built terrorist operations organization.

74.    *Third*, Khamenei, Rafiqdoost, and Rezai needed to make its terrorist organization cohesive. This required they consolidate the variety of Islamist militias who supported the Revolution into a single, organized, ideologically zealous, tactically proficient, terrorist group.

75.    From February 1979 through April 1979, Khamenei, Rafiqdoost, and Rezai— along with a litany of others—knocked out each of Khomeini's three tasks in rapid order. In so doing, they built three of the key organizations that the Iranian regime deployed as Terrorist Sponsors: the Friday Prayer Leader Organization, Foundation for the Oppressed, and IRGC.

76.    In or about February 1979, and befitting Khomeini's and Khamenei's emphasis on leveraging religious faith for terrorist violence, Khamenei, Rafiqdoost, and Rezai moved to rapidly seize—in Khomeini's name—control of all Friday Prayers in Iran. In the Islamic faith, Friday is when the devout attend Mosque for their most important message of the week from the Imam. Before the Shah fell, regime opponents used Friday prayers to mobilize fighters and funds against him. Having seen the effectiveness of the tactic that they used to devastating effect, Khomeini and Khamenei understood the critical need to shut the door behind them, as well as the opportunity afforded by their monopoly on the delivery of, marketing of, donations sourced, and recruits found, through such services.

---

[11] This aspect of the Iranians' strategy succeeded: from 1979 through 2024, as there has never been an armed conflict between the nations of the United States and Iran.

77.    After having seized control, in effect, of Iran's most important venue for fundraising and recruitment at the time, Khamenei, Rafiqdoost, and Rezai moved onto their second task: standing up a purpose-built external operations front they could use to sponsor attacks targeting the United States and its allies, in order to export (and protect) their Revolution.

### c.   March 1979: The Foundation for the Oppressed is Created

78.    On March 5, 1979, Khomeini, Khamenei, Rafiqdoost, and Rezai birthed their operations front, which Khomeini operationalized through a simple scheme devised by Khamenei, Rafiqdoost, and Rezai under which the Supreme Leader's Office and terrorist militias (that would eventually become the IRGC) seized the Pahlavi Foundation—the Shah's global charitable foundation with assets and facilities all over the world—as well as the assets of Jews, Bahais, and other religious minorities, which they pooled together and renamed the Foundation for the Oppressed on Earth, aka Bonyad Mostazafan ("Foundation for the Oppressed").

79.    That name was not a coincidence, but rather, a deliberate choice by Khomeini, Khamenei, Rafiqdoost, and Rezai to boldly announce the new purpose to which they were devoting the Shah's vast commercial, financial, and real estate holdings: exporting their Islamic Revolution to benefit the "Oppressed of the Earth"—*i.e.*, terrorist attacks targeting the United States and its allies. For Khomeini, the "Oppressed on Earth" comprised Muslims in countries who needed to be "liberated" through Khomeini-sponsored terrorist violence, and his newly seized Foundation was intended for that purpose. To that end, Khomeini installed his most trusted terrorist supporters on the board of the Foundation for the Oppressed from inception, including Ali Khamenei. From inception, and ever since, the Foundation for the Oppressed has been inextricably connected to, and a vehicle for, the senior terrorist leaders who provided the muscle for Khomeini's terrorist agenda.

80.    Accordingly, Khomeini, Khamenei, Rafiqdoost, and Rezai created the Foundation for the Oppressed to sponsor external terrorist attacks by Iranian proxies ***before they had even created the IRGC***. Simply put, the Foundation for the Oppressed became a financial hub that was critical to the regime's ability to sponsor terrorist violence.

### d.   April 1979: The IRGC is Created

81.    About two months after Khomeini, Khamenei, Rafiqdoost, and Rezai established the Foundation for the Oppressed as their first terrorist front, they followed up by creating the organized terrorist group that would be one of—but not the only—intended terrorist groups to be the beneficiary of the Foundation's activities: the IRGC.

82.    On April 22, 1979, Khomeini ordered Rafiqdoost to organize the various terrorist militia that had supported him into one integrated organization that was purpose-built to help Khomeini secure his Islamic Revolution through terrorist violence; Khomeini had his terrorist front (the Foundation for the Oppressed), and now he wanted the organized terrorist group to go with it. As Rafiqdoost himself later boasted in an interview with Iranian state media in 2016:

> I wrote on a piece of paper: "The Islamic Revolution Guards Corps has been formed" and then wrote my name and asked everyone else to write down their names if they wanted to join the corps[] … Then I realized that three other groups have also formed their own IRGC. I invited their leaders to my office, locked the door, took out my gun and told them I would kill them and myself if they did not join the corps[] I had formed. We held meetings for several days, … [after which the] IRGC was officially formed.

Thereafter, by his own hand, Rafiqdoost authored the document creating the IRGC.

83.    Amongst Khomeini's, Khamenei's, Rafiqdoost's, and the IRGC's first orders of business was to create an external operations group that would sponsor terrorist attacks outside of Iran to secure the "liberation" of the "Oppressed of the Earth" through the "export" of their

"Islamic Revolution," which Khomeini, Khamenei, and Rafiqdoost dubbed the "Office of Liberation Movements."[12]

> **e.   November 1979 – January 1981: The U.S. Imposes Sanctions in Response to the Hostage Crisis, and the Terrorist Sponsors Execute their First Counterpressure Campaign**

84.     On November 4, 1979, Iranian students loyal to Khomeini took over the U.S. Embassy in Tehran, taking 52 Americans hostage and leading the U.S. to sever diplomatic relations with Iran. Notably, the hostage takers were widely credited with having been instructed to act by violent calls to action issued by Friday Prayer Leaders in Tehran before the attack. The crisis lasted 444 days before Khomeini released the hostages.

85.     The Iranian regime perceived that it won its hostage standoff with the United States—which formed the basis for all future regime strategy towards America. As Khomeini argued at the time, "this action," *i.e.*, the seizure of the U.S. Embassy and American hostages, "has many benefits" given that "taking hostages has increased our credibility" and "we will get many concessions."

86.     By the end of 1979, Khomeini and his IRGC guard had secured power and set out to murder their enemies. To that end, Khomeini signed a decree—always in force since—instructing the IRGC that purported enemies of the Ayatollah and the IRGC "are infidels and worse than blasphemers" who "have no right to life."

87.     The hostage crisis triggered the Iranian regime's first counterpressure campaign, which it launched in response to U.S. sanctions. During its first, of what would eventually be

---

[12] In 1989, after his ascension to Supreme Leader, Khamenei restructured this effort by replacing the Office of Liberation Movements with the Qods Force and installing his own inner circle allies to lead it, including Qasem Soleimani as the IRGC-QF's Deputy Commander, *i.e.*, the same position Esmail Qaani served under Soleimani after the latter was elevated in 1997 to Commander of the Qods Force.

four, sanctions-related counterpressure campaigns, Iranian terrorists paraded American hostages before the cameras to emphasize that such hostage-taking would continue until the United States yielded to Iranian demands, including the removal of U.S. sanctions.

88.     Certain  sponsors of the attacks against Plaintiffs also led the Iranian regime's first counterpressure campaign. These  included Ayatollah Khamenei, Mohsen Rafiqdoost, and Mohsen Rezai. Rafiqdoost later bragged about such roles during an with IRGC-operated *Holy Defense News Agency* published on October 10, 2017.

89.     Senior Iranian terrorists who directly sponsored attacks against Plaintiffs publicly confirmed that they learned from Iran's first counterpressure campaign: that terrorist violence— and threats of violence—are the most effective tactic to force the United States to yield on sanctions targeting Iran. In November 2018, for example, senior IRGC commander Mohammad Ali Jafari publicly declared: "Had it not been for the American embassy hostage-taking, our revolution would not last for over 40 years and the revolution would be annihilated in the first decade."

### 2.   1980: Iran-Iraq War and Rise of Hezbollah

#### a.   1980: The War Begins

90.     On September 22, 1980, Saddam Hussein's regime in Iraq attacked Iran, launching the Iran-Iraq war. During the Iran-Iraq war, Khomeini appointed two of his most loyal terrorist lieutenants to command IRGC forces: IRGC Brigadier General Ali Khamenei had a battlefield command, and IRGC Commander Mohsen Rafiqdoost was appointed IRGC Minister.

91.     As an IRGC Brigadier General, Khamenei sponsored horrific attacks. Under his strategy, the IRGC deployed hundreds of thousands of children as human mine sweepers, in effect, dressing them in white (for their funeral) and marching them across minefields to their likely death. As was widely reported, tens of thousands of Iranian children brutally died. As

Khomeini said, "Our leader is that 12-year old boy: who, with his small heart, which is greater than hundreds of our tongues and pens, with grenade in hand, threw himself under enemy tank and destroyed it and himself, and thus drank the nectar of martyrdom." (BNPP knew about this because, *inter alia*, Iran plastered imagery of its child "martyrs" on Iran's currency, the rial, while BNPP had a branch there.)

92.     Throughout the Iran-Iraq war's eight-year duration, Khamenei and Rafiqdoost served as the IRGC's two most prominent public faces, became infamous for their terrorism (including use of children), and were the subjects of iconic photographs that were widely displayed throughout Iran, and known to BNPP through its presence there. For example, below (at left), Khamenei visited his IRGC brothers while serving as a battlefield commander, (at right) Khamenei "blessed" an IRGC-drafted Iranian child "martyr":

 

93.     The Iran-Iraq war rapidly solidified the Iranian regime's enduring alliance with North Korea, in particular, North Korea's Reconnaissance General Bureau ("RGB"), which functioned as the North Korean regime's terrorist arm and was highly analogous to the Qods Force. By 1982, Khomeini, Khamenei, Rafiqdoost, Rezai, the IRGC, the Foundation for the Oppressed, and Iran's national oil monopoly, the National Iranian Oil Company ("NIOC"), among others, were all deeply involved in the booming bilateral trade between the Iranian

regime (led by the Foundation for the Oppressed, NIOC, and the IRGC) and the RGB. The Iranians and North Koreans maintained an "oil for weapons" partnership in which the Iranian regime engaged in barter trade with the RGB: the Iranians had lots of gas, the North Koreans had lots of weapons, and they could both meet the others' needs without expending precious currency on the purchase price. Accordingly, their barter relationship furnished a reliable, efficient, means of converting Iranian oil into North Korean-supplied weapons, training, and services to the Iranian regime's terrorist proxies, with the IRGC acting as the intermediary.

### b. 1982: Hezbollah is Created and Commits Devastating Anti-American Terrorist Attacks

94.    Even while it fought Saddam Hussein's army, Ayatollah Khomeini, Ayatollah Khamenei, the Foundation for the Oppressed, and the IRGC remained singularly dedicated to exporting the Islamic Revolution through acts of terrorism targeting the United States, including by targeting America's closest ally in the Middle East: Israel.

95.    In 1982, Khomeini dispatched to Lebanon a team of his most trusted IRGC terrorists, which was led by Mohsen Rafiqdoost, supported by Khomeini's personal representatives, and funded by the Foundation for the Oppressed. They were responsible for organizing a loyal Lebanese Arab Shiite terrorist proxy for the IRGC, so that the IRGC could sponsor attacks targeting the United States (and allies like Israel) throughout the Arab world while having both an Arab face on the attack and plausible deniability for the Iranians. Khomeini, the IRGC, and the Foundation succeeded; they birthed Hezbollah in 1982.

96.    The establishment of Hezbollah inaugurated the IRGC's modern history of anti-American terrorism, of which Hezbollah was the key component. The decades since Hezbollah's creation are replete with examples of the same terrorists and proxy groups committing terrorist attacks, including the attacks that killed and injured Plaintiffs.

97.     On October 23, 1983, Hezbollah detonated a massive bomb provided by the IRGC, which killed 241 U.S. military personnel in a terrorist attack against the Marine Corps barracks in Beirut, Lebanon. On July 21, 1987, in Iranian media, Rafiqdoost famously boasted that he and the IRGC directly enabled this attack: "The U.S. felt our power and knows the explosives mixed with that ideology that sent 400 officers and soldiers to Hell. Both the TNT and the ideology came from Iran. This is very much obvious for the U.S."

98.     On December 12, 1983, Hezbollah and the IRGC jointly committed another terrorist attack by bombing America's embassy in Kuwait. Hezbollah and the IRGC worked closely with Abu Mahdi al-Muhandis, a dual Iranian-Iraqi national and Hezbollah/IRGC asset (who later played a key leadership role in Jaysh al-Mahdi).

### 3. 1989 – 2000: Ayatollah Khamenei Takes Power and Escalates Iran's Sponsorship of Anti-American Terrorist Attacks

#### a. 1988 – 1989: After the Iran-Iraq War Ends, and Ayatollah Khomeini Dies, Ayatollah Khamenei Uses the IRGC to Take Power

99.     On August 20, 1988, the Iran-Iraq War ended. On June 3, 1989, Khomeini died, leaving the Islamic Republic without a Supreme Leader and the IRGC without an overall commander. These two events produced a power struggle. IRGC Brigadier General Ali Khamenei emerged as the IRGC's and hardline clerics' preferred candidate to succeed Khomeini. But Khamenei lacked robust religious credentials.. To overcome his competition, Khamenei threw his lot in with the IRGC, leaned heavily on them, and effectively promised a partnership with the IRGC if they backed him. The IRGC did, and Khamenei succeeded Khomeini as Supreme Leader and overall commander of the IRGC and Hezbollah, a role that Khamenei has held ever since.

100.    Khamenei wooed the IRGC by promising—and later implementing—several structural changes in how the Iranian regime would sponsor terrorism. *First*, Khamenei promised to  massively expand the IRGC's role in Iran's economy, to enable  the IRGC to self-finance. *Second*, Khamenei promised to devote greater regime resources to IRGC sponsorship of terrorism abroad, including through the IRGC's Qods Force, which was created in 1989. *Third*, Khamenei promised to greatly expand the Iranian regime's alliance with Palestinian terrorists, including newly created Hamas. Khamenei delivered on each of these promises and has enjoyed an ironclad, inseparable bond with the IRGC ever since.

### b.  Khamenei Overhauls the Supreme Leader's Office to Optimize Iran-Sponsored Attacks

101.    In 1990, Khamenei determined that the IRGC was not spending enough of the money its fronts and charities raised on the IRGC's mission, *i.e.*, sponsoring terrorist attacks to drive the United States out of the Middle East. To remedy this, and to optimize the amount of cash the Iranian regime could supply to its proxies, including Hezbollah, Hamas, and PIJ, Khamenei developed another organization: the Supreme Leader's Office.

102.    Although Ayatollah Khomeini created a version of a Supreme Leader's office in 1979, it focused on helping Khamenei operate the Friday Prayer Leader Organization—which Khomeini and Khamenei used on a weekly basis to raise funds for terrorist attacks, including by Hezbollah (after they created it in 1982) and, after the IRGC created Hezbollah, helping manage the Supreme Leader's relationship with Hezbollah. After Hezbollah's creation, the SLO's primary task was to serve as one of the Supreme Leader's direct contact points with Hezbollah.[13]

---

[13] Among other reasons, this arrangement afforded Ayatollah Khomeini and Ayatollah Khamenei strategic depth with respect to their operational bench in case the IRGC ever went rogue and turned against them—like a "Team of Rivals" approach, but for Iran-backed terrorists.

103.    In or about 1989 and 1990, Ayatollah Khamenei revolutionized the Supreme

Leader's Office. Khamenei turned the SLO into a far larger and more powerful entity, while

continuing to use it to manage the relationship with Hezbollah (which was always its most

important function after Hezbollah was created in 1982) and operate the Friday Prayer Leader

Organization (which was always its second most important function given the tight nexus to

terrorist violence through fundraising and recruiting).

104.    Khamenei was motivated by his desire to maximize the amount of funds and

support that the Iranian regime (most of all, the IRGC) supplied to the primary mission—export

the Islamic Revolution. In particular, he believed in 1989-1990 that the IRGC was not spending

***enough*** of its resources on exporting the revolution. High-profile corruption scandals—one of

which embarrassingly involved the brother of IRGC founder Mohsen Rafiqdoost, who was then-

Minister of the IRGC[14] and one of the IRGC's on-TV public faces during the Iran-Iraq War.

105.    While Mohsen Rafiqdoost was not charged or convicted, and most Iranian regime

leadership elements—including Ayatollah Khamenei and Rafiqdoost's IRGC brothers—rallied

to Mohsen, his brother was not as lucky.  The difference between Mohsen Rafiqdoost and his

brother was simple: the former was a legendary jihadist who had founded the IRGC, co-founded

Hezbollah, and played a key role in the IRGC's and Hezbollah's iconic 1983 attacks in Lebanon;

---

[14] From 1981-1989, Mohsen Rafiqdoost served as the Iranian regime's first "Minister of the IRGC"; in such capacity, Rafiqdoost's role and function was effectively that of being the equal to the then-IRGC Commander-in-Chief, Mohsen Rezai.  As Minister of the IRGC, Rafiqdoost was officially responsible for, *inter alia*: (1) procuring the IRGC's weapons, including managing relations with North Korea's RGB; (2) establishing and maintaining IRGC logistics and financial networks; and (3) organizing IRGC recruitment efforts; and (4) operating IRGC martyr, salary, disability, orphan, and bounty payments.  Essentially, every core lane that goes into a terrorist attack other than overall command, intelligence, and triggermen.  Throughout, Rafiqdoost was one of the public faces of the IRGC and would regularly take to IRGC-controlled media arms like IRIB to issue terroristic threats, *e.g.*, explicit threats to murder enemies of the revolution.

the latter was a member of the IRGC but had none of the other credentials and was viewed as not being as committed to the cause.[15]

106.   To ensure there was no ambiguity about Mohsen Rafiqdoost's continued key status and role, Ayatollah Khamenei appointed him to formally run the Foundation for the Oppressed, which appointment he announced at the height of the corruption scandal both to ensure he did not run the risk of losing a generational terrorist talent like Mohsen Rafiqdoost, and to operationalize his vision for maximum violence through the Foundation's resources.

107.   Still, the Iranian regime's first widely publicized (inside Iran) "corruption scandal" had terribly vexed Khamenei and his inner-circle—not because they were opposed to graft, but because they had a first principles, no dissent allowed, ultra-hardliner consensus view that the top priority of the IRGC must always remain faithful to their primary mission, which was to export the Islamic Revolution.  More concretely, as a matter of arithmetic, Khamenei and his inner circle had a precise expectation: all or nearly all the resources available to such terrorists and organizations should be allocated towards exporting the Islamic Revolution unless the Supreme Leader said otherwise.  While this did not mean that 100% of all Iranian money was

---

[15] None of this is speculation. Iranians, terrorism scholars, and media outlets have widely described this affair as Iran's "trial of the century," with public airing, and knowledge of, the Iranian regime's view of some of the (whitewashed) sordid details being comparable to the American public's awareness of the O.J. Simpson criminal proceedings and trial during the 1990s. The Iranian regime permitted a sanitized, but still damning, account of corruption to be publicly aired (a rarity) and rallied against the accused, in effect, as part of an effort to suggest (falsely) that it was against corruption when, in reality, Khamenei and his inner circle simply wanted to send an unmistakable message to every member of the IRGC that *priority one* with respect to resource allocation was *always* to export the revolution.

to be spent on terrorism, it did mean that *at least* most—if not all—such IRGC resources would ordinarily be allocated to supporting violent terrorism targeting the United States and its allies.[16]

108.    Ayatollah Khamenei and his inner circle, most of whom were (and remain to this day) in the Khamenei Cell, were a self-selected group who comprised the hardline end of the range amongst even the hardliners—and so even the mere possibility that those under their command were not devoting most of their resources to exporting the revolution was an unacceptable possibility that had to be comprehensively eradicated. Given that Ayatollah Khamenei and his inner circle always prioritized defending and exporting the Islamic Revolution above literally every other consideration on the planet, such outcome was patently unacceptable from their point of view and could never be allowed to happen again.

109.    Enter, Ayatollah Khamenei's newly and dramatically expanded Supreme Leader's Office, through which Khamenei embedded his own hand-selected IRGC officers to serve the SLO as the Khamenei's eyes, ears—and guns—to eliminate any possibility that his volent

---

[16] For the avoidance of all doubt, Plaintiffs do not allege that Iranian missile attacks targeting Iraq during the Iran-Iraq war were attacks targeting the United States, or that Iran was directly or indirectly in conflict with the United States during the Iran-Iraq War, and Plaintiffs expressly disclaim any such allegation. The Iran-Iraq war involved what Plaintiffs believe to be the only category of IRGC "export the revolution" role that did *not* involve IRGC attacks targeting the United States, including by targeting U.S. allies. During the Iran-Iraq War, Ayatollah Khomeini decreed, in effect, that the IRGC's mandate to "export the revolution" authorized the IRGC to sponsor attacks inside Iraq that were conducted by anti-Saddam Shia proxy groups in several parts of Iraq, as well as by IRGC (including IRGC Basij) fighters in areas along the Iran-Iraq border (which is where the IRGC sent so many Iranian children to their death). Ayatollah Khomeini's rationale was, in sum and substance, that the Iranian regime could solve their Iraqi problem by "exporting the revolution" in Iraq and inspiring an Iraqi movement that would eventually topple Saddam and install a Shia government that would be loyal to the Supreme Leader. Plaintiffs are aware of no other instance in Iranian history when either Khomeini or Khamenei issued a similar finding.  For these reasons, the corruption considerations raised by Iran-Iraq war-related allegations directly implicated the Iranian regime's ability to export the revolution by targeting the United States—which was always not just the much broader "use-case" for exporting the revolution, but more than that, the concept's ordinary meaning other than the singular, but important, exception derived from the Iran-Iraq War described herein.

vision—and the mathematical foundations and expectations upon which it was based—was being ignored, and to ensure that every IRGC component and terrorist maximally adhered to it.

110.    Ayatollah Khamenei's overhaul of the Supreme Leader's Office was designed to optimize the Iranian regime's financial and logistical support for Hezbollah-sponsored terrorist attacks, including in Israel. Consistent with this overhaul, Khamenei also dramatically tightened his personal grip on the Foundation for the Oppressed, Hezbollah, the IRGC, and the SLO, including its Friday Prayer Leader Organization—i.e., the Terrorist Sponsors.

111.    To ensure control, Khamenei deployed SLO operatives (who were simultaneously members of the IRGC) serve as his representatives to Hezbollah, the Foundation for the Oppressed, and the IRGC, among others. Under Khamanei's control—exercised through his IRGC terrorist son, Mojtaba Khamenei, the Ayatollah ordinarily operated the SLO to maximize the amount of money spent on terrorism committed by Hezbollah, the Qods Force, Hamas, and PIJ, reflecting Khamenei's obsession with maximizing his ties to Hezbollah and the violence inflicted on innocent Americans.

112.    Ayatollah Khamenei, Mojtaba Khamenei, and their Supreme Leader's Office associates embedded the Khamenei's agents into every Iranian-regime-related organization of consequence (government and business alike) in Iran to serve as eyes and ears for the Ayatollah, his son, and the SLO they jointly operated—including all components of the Foundation for the Oppressed, IRGC, and Hezbollah—through the Supreme Leader's "representatives." They also relied upon iconic IRGC terrorists who served in a multiplicity of lanes on behalf of Khamenei, a paradigmatic example of which was Khamenei inner-circle ally, and then-current IRGC Commander-in-Chief, Mohsen Rezai.

113.    One of Khamenei's top priorities for his newly empowered SLO was to have his own in-house intelligence arm that had every function of the Qods Force (which also has an intelligence arm), including an attack function (which it exercised through Hezbollah). Given these requirements, and Rezai's status as a fanatical Khamenei disciple, IRGC Intelligence Bureau founder, Hezbollah co-founder, and IRGC Commander-in-Chief—and Rezai's programmatic emphasis on intelligence-based attacks combined with mass murder of one's enemies—Khamenei leveraged Rezai's help and networks to build out the SLO's intelligence function, which included its Hezbollah-led attacks personally ordered by Khamenei. Accordingly, Rezai has always played a key role in SLO operations even when Rezai was formally outside the SLO organizational structure. Such an outcome comported with the custom and practice of the IRGC and Supreme Leader's Office, which was heavily network-based, for which informal networks usually trumped formal structures, which approach was at its apex when it came to terrorist attacks targeting the United States.  While the Iranian regime (in theory) had a national security process, in practice, the Khamenei Cell controlled such decision-making. The SLO's approach was similar.

114.    The Supreme Leader's Office, through the same structures, processes, and leadership, also owned firms and foundations, which it usually owned and/or operated jointly with the IRGC, Qods Force, and Hezbollah. The IRGC, Qods Force, and Hezbollah, likewise, had embeds within the SLO. These factors, and others, distinguished the SLO from nearly all other national-level Iranian entities.

       **c.  1991 – 2001: The Terrorist Sponsors Direct Hezbollah-Led Terrorist Attacks Targeting the United States, the U.S. Imposes Sanctions, and the Sponsors Respond with their Second Counterpressure Campaign**

115.    Throughout the 1990s, the IRGC, Supreme Leader's Office, and Foundation for the Oppressed gradually expanded their role in Iran's economy while, in parallel, working through Hezbollah to intensify Hezbollah-directed attacks targeting the U.S. worldwide. These attacks included, but were not limited to, assassinations in Europe from 1991 through 1995; Hezbollah's bombing of an Israeli cultural center in Argentina in 1992; Hezbollah's bombing of a housing complex (Khobar Towers) in Saudi Arabia in 1996; Hezbollah-sponsored al-Qaeda bombings targeting the U.S. embassies in Kenya and Tanzania in 1998; and a Hezbollah-sponsored suicide attack targeting the *U.S.S. Cole* in Yemen in 2000.

116.    Khamenei tripled down on his support for Palestinian terrorists, including Hamas and PIJ, by greatly expanding the (already sizeable) aid the SLO and IRGC sent them; by 2000, some estimate that the Iranian regime supplied Hamas with around $50 million annually.

### 4. 2001 – 2011: Responding to Increased Hezbollah-Led Terrorist Attacks in Israel and Iraq, the United States Implements Comprehensive Sanctions Targeting the Iranian Regime's Sponsorship of Terrorism

#### a. 2001 – 2005: The Terrorist Sponsors Cement Economic Support for Hezbollah-Led Terrorist Attacks Targeting the United States in Israel and Iraq

117.    On September 11, 2001, al-Qaeda attacked the United States, killing nearly 3,000 Americans.  While much of the world united in revulsion against terrorism, the Iranian regime continued its decades-long commitment to terror thereafter. As the *Washington Post* reported on November 11, 2001, "Iran's foreign and security policies" … back terrorist groups such as Hezbollah and Hamas … Ayatollah Mahmoud Hashemi Shahroudi, the head of Iran's judiciary, recently summed up the view of this wing of the government: 'Our national interests lie with antagonizing the Great Satan,' he stated. … It would be a mistake for the Bush administration to warm relations without serious progress in reining in Iran's … terrorist links."

118.    Throughout 2002, the Terrorist Sponsors prepared to intensify their support of terrorist violence targeting the United States in Israel and Iraq (a historical enemy they feared would side with the United States, following an anticipated American invasion.)

119.    By late April 2003, the United States had deposed Saddam's regime. By then, Hezbollah, working with Muqtada al-Sadr, created JAM, which always tightly collaborated with Hezbollah thereafter.

120.    On June 8, 2003, the Iranian regime enshrined a legal requirement that the IRGC reinvest profits realized by the IRGC and its affiliated entities (including the Foundation for the Oppressed) into expenditures that enabled IRGC terrorist attacks. The Iranian regime published an official logistics policy directive ordering the IRGC to dedicate profits earned from commercial fronts to its core mission, *i.e.*, protecting and exporting the Islamic Revolution through terrorist attacks ("Logistics Policy Directive").

121.    Throughout 2004, the Terrorist Sponsors intensified their seizure of key instruments of the Iranian government and vital sectors of Iran's economy. (*See infra* at I E.) The Terrorist Sponsors' strategy for both depended heavily upon the comprehensive deployment of the Foundation for the Oppressed—its companies, personnel, budgets, and networks.

### b.    2005 – 2006: The Terrorist Sponsors Direct Hezbollah-Led Attacks Targeting the United States in Israel and Iraq

122.    By 2005, Khamenei and the IRGC were directing Hezbollah's active sponsorship of terrorist attacks against Americans in Iraq. They soon broaden expanded their focus to Israel. After the Israeli government withdrew forces from inside Gaza, ceding administration of the area to Palestinians, in September 2005, Khamenei, the IRGC, the SLO sponsored a massive surge of resources to Hamas (via Hezbollah) to ensure that Hamas could seize control of Gaza and turn it

into an Iranian striking base. Within a year—and as a direct result of the Iranian regime's sponsorship—Hamas's terrorist attacks against Israelis escalated dramatically.

123.    In 2006 and 2007, the Terrorist Sponsors intensified their support for attacks in Iraq (by Hezbollah and JAM), and attacks in Israel (by Hezbollah, Hamas, and PIJ). In Iraq in 2007, the U.S. conducted a "surge" of military and civilian personnel; in response, the Terrorist Sponsors coordinated an intensified series of terrorist attacks. In Israel in 2007, the Terrorist Sponsors intensified their support for attacks led by Hezbollah and committed by Hamas and PIJ (either jointly with Hezbollah, or on their own). Hamas waged a rapid-fire series of attacks in June 2007 and seized full control of Gaza within a week. The Iranian regime supplied weapons, funding, training, and operational support that made Hamas's attacks successful.

> ### c. 2007 – 2011: The United States Implements Comprehensive Sanctions targeting the Iranian Regime's Sponsorship of Terrorism

124.    In October 2007, the United States responded to the IRGC's and Hezbollah's twinned escalation of IRGC-sponsored terrorism by Hezbollah, Hamas, and Palestinian Islamic Jihad in Israel and by Hezbollah and JAM in Iraq by formally recognizing the Qods Force for its direct, lethal support to acts of terrorism committed by IRGC proxies, including Hezbollah, Hamas, PIJ, and JAM. From 2008 through 2020, the United States also adopted—and caused the U.N. to adopt—a series of additional sanctions that targeted the IRGC's sponsorship of terrorism from 2007 through 2010, which radically transformed the U.S. sanctions regime governing Iran.

125.    Throughout 2011, the Terrorist Sponsors, through Hezbollah and Jaysh al-Mahdi, intensified their attacks against the United States in Iraq. Notably, they did so, in substantial part, as a public communications exercise: the Terrorist Sponsors sought to use joint Hezbollah/JAM attacks targeting the U.S. in Iraq to literally and metaphorically inflict suffering on the United States—bleed America and its servicemembers in Iraq in the months before their pre-scheduled

departure at the end of that year, in order to supply the powerful propaganda victory of being able to publicly tout the violence they inflicted on the Americans as they were leaving so they could claim credit of the departure and justify the enormous expenditures they were widely known amongst the Iranian public to have engaged in by 2011.

126.    Literally, the Terrorist Sponsors were using their attacks in Iraq from June 2011-December 2011 as a form of strategic communications to generate gigantic propaganda win that they would, in turn, leverage to raise more funds and recruits for more attacks.

127.    This was not idle speculation by the Iranians (or Plaintiffs), but merely the Iranians replicating a terrorism business model that Hezbollah used to devastating effect after the end of its terrorist campaign against Israel in 2006, and Israel's incursion in to Lebanon that same year, in which Hezbollah adopted essentially the identical strategy, which was widely credited with being a blockbuster success in terms of new funds and recruits that resulted.

128.    In 2011, the United States completed its withdrawal of nearly all U.S. forces from Iraq, with most of the remainder being the Marines who secured U.S. diplomatic installations. The Terrorist Sponsors, thereafter, executed the previously described propaganda, fundraising, and recruitment campaign.  The Supreme Leader's Office organized such events, as did the IRGC, and Hezbollah.  So did their media outlets, with SLO- and IRGC-controlled IRIB, as well as Hezbollah-operated al-Manar, publicly dedicated substantial coverage to these topics in support of these campaigns.  As a result, the Terrorist Sponsors once again confirmed their core business model: that they could use violence against the United States to raise funds and recruits to counter the pressure exerted by the United States.

129.     From 2007-2011, the Terrorist Sponsors also dramatically intensified their support of attacks by proxies Hezbollah, Jaysh al-Mahdi, Hamas, PIJ, al-Qaeda, and the Taliban in Iraq, Lebanon, Israel, Afghanistan, Yemen, and elsewhere.

**B.     The Foundation for the Oppressed, IRGC, Hezbollah, and Supreme Leader's Office Were the Iranian Regime's Four Most Important Sponsors of Terrorist Attacks that Targeted the United States and were Committed by Hezbollah, Hamas, Palestinian Islamic Jihad, and Jaysh al-Mahdi**

130.     At all times relevant to the events described herein, the Foundation for the Oppressed, the IRGC, Hezbollah, and Supreme Leader's Office (collectively, the "Terrorist Sponsors") operated as the Iranian regime's most important sponsors of terrorist attacks that targeted the United States. Working through the Khamenei Cell, which was the Terrorist Sponsors' shared global operations leadership cell to enable Hezbollah-led attacks through the Terrorist Sponsors' resources, the Terrorist Sponsors directly enabled terrorist attacks by Hezbollah, Hamas, Palestinian Islamic Jihad, and Jaysh al-Mahdi in Israel and Iraq.

131.     Under decades of custom and practice, the Foundation for the Oppressed, IRGC, Hezbollah, and Supreme Leader's Office—coordinating through the Khamenei Cell—relied upon a latticework of terrorist sponsors who closely coordinated with one another to direct proxy attacks led by Hezbollah and jointly committed by Hezbollah alongside local proxies such as Hamas and PIJ in Israel and JAM in Iraq.  The throughline connecting all the Terrorist Sponsors was Ayatollah Khamenei's ideological, doctrinal, and operational support for terrorism and direct control of each Terrorist Sponsor used to support attacks in Israel and Iraq.

132.     The U.S. government regularly published findings that alerted financial institutions, money services businesses, and those involved in those industries—such as BNPP—that the Foundation for the Oppressed, IRGC, Hezbollah, and Supreme Leader's Office *each* supported attacks by Hezbollah, Kataib Hezbollah, the Houthis, Hamas, PIJ, and JAM. For

example, on November 6, 2008, Treasury published a fact sheet that alerted financial institutions

and money transmitters to the extreme risk that illicit Iran-related transactions funded Iran-

sponsored terrorist attacks committed by IRGC proxies, including Hezbollah, Hamas, PIJ, and

Shiite terrorists in Iraq:

### Iran Misuses the International Financial System to Support Terrorism

Iran is the world's most active state sponsor of terror. The support provided by the regime to terrorist groups includes financing that is routed through the international financial system, especially through Iranian state-owned banks.

• **Iran's Support to Terror.** The Department of State designated Iran as a state sponsor of international terrorism in 1984, and Iran remains the most active of the listed state sponsors of terrorism, routinely providing substantial resources and guidance to multiple terrorist organizations. For example, Hamas, Hizballah, and the Palestinian Islamic Jihad (PIJ) maintain representative offices in Tehran to help coordinate Iranian financing and training of these groups.

• **Iran's IRGC and IRGC-Qods Force Support Terrorist Groups**. Elements of Iran's Islamic Revolutionary Guard Corps (IRGC) have been directly involved in the planning and support of terrorist acts throughout the world, including in the Middle East, Europe and Central Asia, and Latin America.  The IRGC-Qods Force, which has been designated under Executive Order 13224 for providing material support to the Taliban and other terrorist groups, is the Iranian regime's primary mechanism for cultivating and supporting terrorist and militant groups abroad.   Qods Force-supported groups include: Lebanese Hizballah; Palestinian terrorists; certain Iraqi Shi'a militant groups; and Islamic militants in Afghanistan and elsewhere.   The Qods Force is especially active in the Levant, providing Lebanese Hizballah with funding, weapons and training.   It has a long history of supporting Hizballah's military, paramilitary and terrorist activities, and provides Hizballah with more than $100 to $200 million in funding each year. …

• **Iran Uses its Banks to Finance Terrorism**. … Iran has used its state-owned banks to channel funds to terrorist organizations. Between 2001 and 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through Bank Saderat's subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts that support acts of violence. Hizballah also used Bank Saderat to send funds to other terrorist organizations, including Hamas, which itself had substantial assets deposited in Bank Saderat . … Treasury … designated Bank Saderat under E.O. 13224 for providing financial services to Hizballah, Hamas and PIJ . . . . Iran's Bank Melli, which has been designated by the United States under E.O. 13382 for proliferation-related activities, was used to transfer at least $100 million to the IRGC-Qods Force between 2002 and 2006.

133.    At least one Terrorist Sponsor played a direct role in every attack where Plaintiffs
(or their loved ones) were killed, kidnapped, and/or maimed, and most attacks prominently
featured support from many, if not all, of the Terrorist Sponsors.

### 1.  Foundation for the Oppressed (Bonyad Mostazafan)

134.    From March 1979 through 2024, the Foundation for the Oppressed of the Earth
(a/k/a. "Bonyad Mostazafan") (the "Foundation") was the Terrorist Sponsors' oldest, largest,
purpose-built terrorist operations front. It was the first such front established by Ayatollah
Khomeini, predating even the IRGC.

135.    In 1979, Ayatollah Khomeini, Ayatollah Khamenei, Mohsen Rafiqdoost, and
Mohsen Rezai established the "Foundation for the Oppressed of the Earth"—a direct reference
to, and recognition of, the Foundation's core terrorist mission. (*See supra* "Nomenclature"). In
1982, Khomeini, Khamenei, Rafiqdoost, and Rezai used the Foundation to stand up the Terrorist
Sponsors' first dedicated foreign terrorist proxy: Hezbollah.[17]

136.    The Foundation for the Oppressed was custom-built to provide funding, weapons,
intelligence support, logistical aid, and a vast transnational footprint of corporate fronts, shell
companies, and real estate to the IRGC Qods Force and Hezbollah.[18] This was part of

---

[17] The group was originally dubbed the "Organization for the Oppressed of the Earth." It added
an additional brand name (Hezbollah) in 1985 but never abandoned its original name.

[18] For the avoidance of all doubt, the Qods Force and Hezbollah did not gradually take control of
the Foundation, nor was the Foundation ever a true charity. The Foundation was purpose-built to
enable Qods Force and Hezbollah acts of terrorism targeting the United States. Accordingly,
from day one—and ever since—the Foundation operated as the Qods Force's and Hezbollah's
transnational terrorist operations slush fund.

     The Foundation had a wide global footprint (which facilitated movement of goods and
personnel across borders), thousands of real estate holdings (which provided safe houses and
logistics sites), hundreds of corporate holdings (which offered cover and concealment for Qods
Force and Hezbollah operatives and transactions), and a presence in every strategic industry
relevant to the Qods Force's and Hezbollah's mission to sponsor acts of terrorism targeting the
United States.

Khamenei's early efforts to build the financial and logistical networks needed to export the Islamic Revolution through Iranian proxy terrorist attacks targeting the United States and its allies, including Israel. Such Khamenei-allied terrorists used the Foundation for the Oppressed to help the IRGC, Hezbollah, and such FTOs' proxies acquire funds, weapons (including components), intelligence, cover, concealment, and logistical aid, so that such terrorists could commit attacks.

137.    The Foundation for the Oppressed served as—and was known for serving as—the primary global external operations front that Ayatollah Khomeini, Ayatollah Khamenei (who helped run the Foundation in the 1980s while also managing the IRGC's proxy terrorist portfolio), the Supreme Leader's Office, the IRGC, and Hezbollah used to provide every relevant category of assistance necessary for Iranian proxy terrorists in Lebanon or Gaza to kill Americans.

138.    From 1979 through present, the Foundation for the Oppressed was always the Qods Force's most important global operations front. The Foundation was always operated for the primary purpose of providing financial, logistical, cover, concealment, intelligence, and safe haven/ratline support for the Iranian regime's external terrorist operatives, including, but not limited to, the Qods Force (inclusive of its predecessor, the Office of Liberation Movements) and the IRGC Intelligence Organization (inclusive of its predecessor, the IRGC Intelligence Bureau)—with the IRGC Intelligence Organization deployed under the Qods Force's umbrella when outside Iran.

139.    From 1982 through 2024, the Foundation for the Oppressed was *also* a Hezbollah front—always serving as one of Hezbollah's most important global operations nodes. Throughout, Hezbollah exercised control of the Foundation alongside the Qods Force and

Supreme Leader's Office. Hezbollah used its control of the Foundation to sponsor terrorist attacks committed by proxies in the Middle East. As *BBC* reported on March 27, 2001:

> the Foundation for the Oppressed … is an organization that gives financial ***support to Iran's … acts of terrorism abroad***. … The organization is ***supervised by … Ayatollah Khamene'i*** …and is a subsidiary of the IRGC [and its investments are] … ***under the control of Hezbollah*** like other large commercial enterprises in Iran. These are organizations ***operating under the supervision of the IRGC*** … [and are] engaged in controlling people visiting Iran, selecting and training people for Iran, financing pro-Iranian people and so on …[,] under the guise of cultural centres and humanitarian structures. (Emphasis added.)

140.    Hezbollah's control over the Foundation for the Oppressed enabled its, the IRGC's, and Supreme Leader's Office's use of Foundation profits to finance proxy attacks committed by Hezbollah and proxies trained, financed, and directed by Hezbollah on the Terrorist Sponsors' behalf—including Hezbollah-led, Hamas- and PIJ-committed, attacks in Israel and the Palestinian territories from at least the early 1990s through present; and Hezbollah-led, JAM-triggered, attacks in Iraq from 2003 through present in Iran.

141.    Ayatollah Khamenei, the IRGC, the Supreme Leader's Office—and ***Hezbollah***—jointly managed the Foundation for the Oppressed for Hezbollah's direct benefit. The Ayatollah's, SLO's, and IRGC's Foundation-related custom and practice, and such Terrorist Sponsors' Foundation-related tactics, techniques, and procedures, ordinarily called for the Foundation to be operated for the substantial, if not primary, benefit of the Ayatollah's, Hezbollah's, IRGC's, and SLO's ability to promote proxy terrorist groups that comprised the jihadists' analogue to the French foreign legion: a program to support foreign fighters from all over the world who, instead of serving their own nation, choose to serve the Supreme Leader of the Islamic Revolution (*i.e.*, Ayatollahs Khomeini and Khamenei) and his designated revolution-propagation agents (*i.e.*, Hezbollah, the IRGC and the SLO).

142.     Ever since, the Terrorist Sponsors have embedded Hezbollah operatives throughout the Foundation for the Oppressed, disguised as Foundation agents and employees.[19] From at least 1983 through present, the Ayatollahs', SLO's, Hezbollah's, and IRGC's Foundation-related custom and practice and Foundation-related tactics, techniques, and procedures ordinarily called for the deployment of Hezbollah operations, logistics, intelligence, and financial operatives inside of the Foundation as embedded, covert terrorists, whom the Terrorist Sponsors caused, as a matter of ordinary practice, to be comprehensively embedded. Hezbollah operatives were embedded both *vertically* (*i.e.*, throughout the Foundation's seniority scale), and *horizontally* (*i.e.*, throughout the Foundation's geographic, industrial, and corporate footprint).

143.     The Qods Force and Supreme Leader's Office also notoriously embedded operatives throughout the Foundation for the Oppressed. Such embeds ensured they could extract maximum financial, operational, intelligence, and logistical value from the Foundation.

144.     The Foundation for the Oppressed helped Hezbollah, the IRGC, and Supreme Leader's Office operationalize their shared control over key monopolies in Iran's economy.

145.     The Foundation for the Oppressed was a front for Hezbollah, the Qods Force, Supreme Leader's Office, and such FTOs' proxies. From at least 2003 through 2024, Foundation for the Oppressed resources, personnel, and profits were redeployed to Hezbollah, the Qods Force, and the SLO; through them, those resources and profits flowed to Hezbollah, Hamas, PIJ, JAM (including Kataib Hezbollah), the Houthis, al-Qaeda (including its branches in east Africa, *i.e.*, al-Shabaab, and Yemen, *i.e.*, al-Qaeda-in-the-Arabian-Peninsula), and the Taliban (including

---

[19] Hezbollah embeds employed by the Foundation for the Oppressed were engaged in sponsoring and conducting terrorist attacks—never lawful commercial activities.

its Haqqani Network). Those resources and profits included the funding, weapons, intelligence, and logistics that enabled proxy attacks in Israel (committed by Hezbollah and/or Hamas and/or PIJ), Iraq (committed by Hezbollah and JAM, including Kataib Hezbollah), Yemen (committed by Hezbollah and the Houthis), Iran (committed by Hezbollah and the IRGC), Afghanistan (committed by the Taliban, including its Haqqani Network), Kenya (committed by al-Qaeda's branch there, al-Shabaab), and Yemen (committed by al-Qaeda's branch there, al-Qaeda-in-the-Arabian Peninsula).

146.    By the mid-1990s, Hezbollah, in turn, operated within the Foundation for the Oppressed for the primary purpose of providing financial, logistical, cover, concealment, intelligence, and safe haven/ratline support for the Iranian regime's external terrorist operatives.

147.    Once Hezbollah established itself as the Terrorist Sponsors' lead external terrorist proxy, Khamenei, Rafiqdoost, Rezai, and others further embedded Hezbollah operatives, finances, logistics, and weapons supply in the Foundation—on its org chart, in its warehouses, at its ports, on its ships, and in its bank accounts. During Hezbollah's first decade of existence, Terrorist Sponsors used the Foundation's resources to, inter alia: (1) establish Hezbollah in 1982; (2) finance Hezbollah's rapid growth thereafter; (3) facilitate Hezbollah's 1982 suicide bomb attack in Lebanon that killed 241 Marines; (4) facilitate the Iranian regime's oil-for-weapons, services, and tunnels barter agreements throughout the decade from 1982 through 1992, in which the Foundation for the Oppressed likely facilitated more than $1 billion (in 1980s dollars) worth of weapons, services, and tunnel construction assistance from the RGB, for which the SLO, Foundation, NIOC, and IRGC coordinate with RGB, on behalf of Hezbollah in Lebanon, to whom the RGB's weapons and services were directly provided as facilitated by the Iranians.

148.    As explained *infra*, BNPP helped the Foundation for the Oppressed generate at least several billion dollars in likely profits between 2000 and at least 2019, including at least several hundred million in profits—and likely more than $1 billion—from 2007 through 2012.

149.    As explained *infra*, BNPP's assistance also directly aided attacks by supplying the money to fully fund—multiple times over—all five types of the Terrorist Sponsor's attack incentive and reward payments, which powered every category of terrorist attack committed by Hezbollah, Hamas, PIJ, and JAM as necessary for each such groups to conduct every attack targeting the United States in Israel, the Palestinian territories, and Iraq that Hezbollah committed, planned, or authorized from 2006 through 2016 (as all were here), when every Plaintiff was attacked.

150.    Notably, the Foundation for the Oppressed publicly admitted its provision of three of the five: martyr payments, disability payments, and orphan payments. For example, the Foundation long stated that one of its main lines of effort was to finance payments to honor Hezbollah, Hamas, PIJ, JAM, and IRGC martyrs and their families. Similarly, the Foundation referenced the fact that it provided comprehensive support to Resistance fighters and their families, or similar such concepts, where the language used, and context of the statements, compelled the conclusion that the Foundation was describing, at least, Hezbollah, Hamas, PIJ, and IRGC martyrs and disabled terrorists.

151.    With respect to the last two—salary payments and bounty payments—the Foundation for the Oppressed strained to avoid publicly addressing or admitting its long-standing role in enabling such payments, but that was merely the Foundation's ineffective attempt to maintain cover and concealment. From the 1980s through 2024, government investigations, NGOs, whistleblowers, and press reports regularly confirmed that the Foundation played a key

role in the network of Terrorist Sponsors that coordinated their efforts to meet the enormous

financial burden that such attack incentive and reward payments imposed each year. Given

Hezbollah's, Hamas's, PIJ's, and JAM's custom and practice, terrorist TTP, and programmatic

emphasis on such payments consistent with their functionally identical IRGC and Hezbollah

training regime, it is highly likely that such payments constituted ***more than half*** of all the value

of all financial transfers from the Foundation to Hezbollah, Hamas, and PIJ from 2000 through at

least 2019, and JAM from 2003 through at least 2019.

152.    The impact of Foundation money was amplified by the Foundation's long-

standing coordinating role in facilitating NIOC-RGB oil-for-weapons, services, and tunnels

barter trades, which began in the early 1980s, endured ever since, and resulted in anywhere from

$100 million to several billion dollars ***per year*** in bartered oil-for-weapons, services, and tunnels

that the Terrorist Sponsors caused to flow through to Hezbollah, Hamas, PIJ, and JAM to

directly enable such groups' attacks. This freed up precious U.S. dollars that the Terrorist

Sponsors could—and did, as a matter of each group's custom and practice, and tactics,

techniques, and procedures—supply to Hezbollah, Hamas, PIJ, and JAM to finance each of their

five types of attack incentive and reward payments.

153.    The Foundation for the Oppressed notoriously operated as a **terrorist operations**

**slush fund** for Hezbollah, the Qods Force, Khamenei Cell, and their proxies. Although the

Foundation's inner workings were notoriously opaque, its opacity only confirmed its terrorist

operations purposes; it was the single blackest hole in the entire Iranian regime, controlled

exclusively by the Supreme Leader and his inner circle. U.S. government reports confirm the

point. As Treasury explained when it sanctioned the Foundation for the Oppressed in 2020:

"Bonyads [foundations] are opaque, quasi-official organizations controlled by current and former

government officials and clerics that report directly to the Supreme Leader. . . . Bonyads receive

benefits from the Iranian government, including tax exemptions, but are not required to have

their budgets publicly approved." Similarly, as U.S.-government-published *Radio Farda*

reported on February 18, 2022, "The [Iranian regime's] foundations [*i.e.*, bonyads] are widely

believed to be used to funnel revenue to groups that support the regime, including mercenaries

working closely with the IRGC's Quds Force" for "operations abroad." Likewise, as scholars

Engin Sune and Gazi Baki noted in 2019, "commentators claim[ed] that bonyads assist[ed] in

fueling international terrorism," such as how "Mohsen Rafiqdoost, who was the minister of the

Revolutionary Guards in the 1980s and served as the head of several bonyads, as a key player in

sponsoring Hezbollah in Lebanon." Indeed, the Foundation was always Iran's most notorious

bonyad and bonyads—as a category—were amongst the absolute most notorious of all the

Iranian regime's terrorist fronts. As State publicly reported to Congress on March 1, 2007:

> Iran's "bonyads," or charitable religious foundations, … stifle entrepreneurs not
> affiliated with them due to the bonyads' favored status, which includes exemption
> from taxes, the granting of favorable exchange rates, and lack of accounting
> oversight by the Iranian government. … ***Bonyads have been involved in funding
> terrorist organizations and serving as fronts for the procurement of*** nuclear
> capacity and ***prohibited weapons and technology***. (Emphasis added.)

154.    From 1979 through 2024, the Foundation for the Oppressed's role as a terrorist

slush fund was complemented by the Terrorist Sponsor's custom and practice, and tactics,

techniques, and procedures, in which the terrorists used the Foundation as a terrorist finance and

logistics **aggregator** and **aggregation site** for an array of streams of financial and logistical

support from IRGC- and SLO-controlled organizations and firms: "aggregators" were entities or

senior terrorist leaders who were, in effect, active blockbuster financiers or logisticians with

wide reach across many fronts; "aggregation sites" were the terrorist group's commercial,

financial, governmental, and/or religious fronts at which the group co-mingled various streams of

finance and logistics to be logically redistributed to optimize the terrorist group's ability to commit attacks.[20]

155.    From 2000 through 2024, Ayatollah Khamenei, Hezbollah, the Qods Force, and Supreme Leader's Office used the Foundation for the Oppressed as an aggregation site and deployed Foundation-related persons Mohsen Rafiqdoost, Mohsen Rezai, Parviz Fattah, and Mojtaba Khamenei as aggregators. Throughout, the Terrorist Sponsors' use of the Foundation and such Foundation-related persons was consistent with the customs and practices, and tactics, techniques, and procedures, of the Terrorist Sponsors. Reports by respected NGOs confirmed the point in real-time. On September 28, 2016, for example, IFMAT—an Iran-oriented NGO focused on anti-corruption and human rights—published a due diligence database that identified the "Bonyad e-Mostazafan Foundation" (*i.e.*, Foundation) as presenting an extreme counterterrorism risk. Thus, IFMAT concluded that, with respect to the "Bonyad e-Mostazafan Foundation," "entities that engage[d] in transactions with [the Foundation] … [or] [w]ork[ed] with [the Foundation] … support[ed] Iranian Regime … Terrorist Activities."

156.    In 2018, IFMAT published a diagram showing how the Foundation for the Oppressed (labeled here as "Mostazafan Foundation") was both aggregator and aggregation site, dominating the central nodes of Khamenei's financial and logistical support to the attacks committed by Hezbollah and their terrorist proxies Hamas, Palestinian Islamic Jihad, Jaysh al-Mahdi (including Kataib Hezbollah), the Houthis, al-Qaeda, and the Taliban:

---

[20] An entity can be both an aggregator and aggregation site. The Foundation for the Oppressed is a paradigmatic example of an entity serving both functions for terrorist groups.



157.     The Foundation for the Oppressed used its resources to fund—multiple times over—attack incentive and reward payments, that powered the terrorist attacks committed by Hezbollah, Hamas, PIJ, and other proxy groups as necessary for every attack against Plaintiffs that Hezbollah committed, planned, or authorized from 2006 through 2016.

158.     The Foundation for the Oppressed has notoriously sponsored Hezbollah-committed and -led terrorist attacks ever that terrorist group was founded.

159.    The killing power of the Foundation for the Oppressed's money was amplified by the Foundation's long-standing role coordinating the Terrorist Sponsors' oil-for-weapons, services, and tunnels barter trades between Iranian entities and North Korea's RGB, which began in the early 1980s, endured ever since, and resulted in anywhere from $100 million to several billion dollars *per year* in bartered oil-for-weapons, services, and attack tunnels that the Terrorist Sponsors caused to flow through to Hezbollah and the Qods Force and, through them (usually Hezbollah), to JAM, including Kataib Hezbollah, the Houthis, Hamas, PIJ, al-Qaeda, and the Taliban, including its Haqqani Network, to fuel their attacks.

160.    When every Plaintiff was attacked between 2006 and 2016, Ayatollah Khamenei, Hezbollah, the Qods Force, the Supreme Leader's Office, and members of the Khamenei Cell controlled the leadership of the Foundation for the Oppressed. Khamenei, Hezbollah, the Qods Force, SLO, and Khamenei Cell members accomplished this through, *inter alia*, their appointment of notorious Hezbollah, Qods Force, SLO, and/or Khamenei Cell leaders or members to officially, or unofficially, run the Foundation and its Board of Trustees, also known as its Board of Directors, including, but not limited to, Mojtaba Khamenei, Hassan Nasrallah, Mohsen Rafiqdoost, Mohsen Rezai, Mohammad Forouzandeh, and Parviz Fattah. From 2006 to 2016, Hezbollah, the IRGC, and Supreme Leader's Office always had at least several senior terrorists installed as leaders of the Foundation who were tasked to help the Foundation sponsor attacks by Hezbollah and its proxies, including, but not limited to:

a.    **Mohsen Rafiqdoost**, who was the Foundation for the Oppressed's co-founder, IRGC's founder, Hezbollah's co-founder, the first Minister of the IRGC, public face of the IRGC during the Iran-Iraq war, and Khamenei's longest-tenured loyalist, always served as the Foundation's senior most Trustee;

b.    **Mohsen Rezai**, who was the Foundation for the Oppressed's co-founder, Hezbollah's co-founder, the IRGC Intelligence Bureau's (IRGC-IO predecessor's) co-founder, IRGC Commander-in-Chief, Khamenei's long-standing confidant, and who programmatically

partnered with Rafiqdoost for decades to, in effect, split the duty as the IRGC's most important logistician;

c.   **Hassan Nasrallah**, who was Hezbollah's Secretary General and represented Hezbollah's interests in the Foundation directly or through a designated Hezbollah terrorist member of the Khamenei Cell acting on Nasrallah's behalf;

d.   **Qasem Soleimani** and **Esmail Qaani**, who were Qods Force Commanders and represented the IRGC-QF's interests in the Foundation directly or through a designated IRGC member of the Khamenei Cell acting on Soleimani's or Qaani's behalf;

e.   **Mojtaba Khamenei**, who was the co-leader of the Supreme Leader's Office and represented the SLO's interests in the Foundation directly or through an ally in the Khamenei Cell (*e.g.*, Qasem Soleimani, Esmail Qaani, and Hossein Taeb); and

f.   **Parvis Fattah**, who was the Foundation for the Oppressed's Dedicated Operations Bridge to Qasem Soleimani and Esmail Qaani and—like all Fattah's predecessors as Foundation Director and most of his predecessors as Foundation Trustee—was a senior IRGC terrorist who was simultaneously a: (a) Qods Force leader; (b) Khamenei Cell member; (c) experienced IRGC logistician with pre-existing networks and relationships with Hezbollah, Hamas, Palestinian Islamic Jihad, and Jaysh al-Mahdi; (d) Iran-Iraq war veteran; and (e) brutal terrorist with substantial experience enabling attacks targeting the United States, including attacks in Israel, Iraq, or Lebanon.

161.   From 2000 through 2024, the IRGC and SLO directly routed the Foundation for the Oppressed's profits to Ayatollah Khamenei's inner-circle allies—each of whom had a direct, personal relationship with Khamenei, swore fealty to him, and was directly funded by the IRGC and Khamenei—including Rafiqdoost, Rezai, Nasrallah, Soleimani, Qaani, Mojtaba Khamenei, and Fattah.

162.   The SLO and IRGC (including the Qods Force) always had veto rights—based upon Iranian law and practice—over any Foundation-related issue—so long as Ayatollah Khamenei agreed. This was accomplished, among other means, through the Ayatollah's practice of always appointing a trusted member of the IRGC's leadership network (and Ayatollah's inner circle) to head the Foundation for the Oppressed.

163.   The Foundation for the Oppressed helped the IRGC and SLO operationalize their shared control over key monopolies in Iran's economy, including their monopolies over the

energy, communications, import/export, and financial sectors. In 2008 and 2009, for example, State reported to Congress: "Iran's 'bonyads,' or charitable religious foundations, were originally established at the time of the Iranian revolution to help the poor. They have rapidly expanded beyond their original mandate. Although still funded, in part, by Islamic charitable contributions, today's bonyads monopolize Iran's import-export market as well as major industries including petroleum, automobiles, hotels, and banks."

164.    In 2006, Treasury counterterrorism personnel conducted a roadshow throughout Europe and the Middle East where they warned banks, including on information and belief BNPP, about prominent IRGC, Hezbollah, and Qods Force fronts. During this period, the United States warned European firms—memorialized in a cable, as published by *WikiLeaks*—that transacting with the Foundation for the Oppressed was tantamount to transacting with an entity that was "fully owned by the IRGC":

> Treasury Under Secretary for Terrorism … Stuart Levey … stressed that the U.S. is trying to … persuade its allies to target [the IRGC's] bad conduct through ***targeted financial measures*** against supporters of destabilizing policies (***such as terrorism*** and weapons of mass destruction programs) … [Levey discussed] U.S. thinking on combating Iran's use of the international financial system ***to transfer funds to terrorists*** … [A Turkish official] described the important role of Bonyads, state-linked foundations. He said that the Revolutionary Guard's share of Bonyad-controlled business was increasing but that the Revolutionary Guard did not control the entire economy. Stating increased USG concern about the IRGC's resurgence under Ahmadinejad's authority, U/S Levey cautioned that the IRGC's growing role in the Iranian economy was not limited to the public sector, but included the private sector as well. ***Levey recalled the IRGC's interference with [] major … deals [through the Foundation, including] …the IRGC's involvement in … [a] deal … [for] Irancell [controlled by the Foundation and therefore] … fully owned by the IRGC*** … (Emphasis added.)

165.    BNPP always knew the above facts about the Foundation for the Oppressed. On June 22, 2006, for example, senior Treasury counterterrorism official Pat O'Brien testified publicly that "Iran [] actively sponsors terrorism and violence across the Middle East …

[through] [t]he Islamic Revolutionary Guard Corps (IRGC)," which was "directly involved in the planning and support of terrorist acts by non-state actors and continue to sponsor and train a variety of violent groups that act as surrogates on Iran's behalf," which "posed" a "very real threat" to the United States "by Iran's sponsorship of terrorism" and depended upon "the lines of support that fuel terrorist activities" for which the IRGC's "money flows" from "a large network of state-owned banks and parastatal companies"—*i.e.*, bonyads or foundations. (As BNPP knew, the Foundation for the Oppressed was always Iran's largest and most notorious bonyad).

166.    Additionally, on July 27, 2010, the E.U. found that, *inter alia*: (i) "Bonyad-e Mostazafan" was among the IRGC fronts that "contributes to the financing of the strategic interests of the regime and of the Iranian parallel State." That same E.U. finding confirmed that such support aided attacks by "IRGC" proxies like Hezbollah and the Taliban.

167.    From 2018 through 2024, a mine run of published, official U.S. government findings provided further confirmation that the Foundation for the Oppressed was a front for Hezbollah- and Qods Force-directed attacks sponsored by Khamenei and members of his inner circle, *i.e.*, the Khamenei Cell. On September 25, 2018, for example, President Trump told the U.N. General Assembly in a globally televised address that "Iran's leaders sow chaos, death, and destruction" by "plunder[ing] the nation's resources to enrich themselves and to spread mayhem across the Middle East and far beyond," "seiz[ing] valuable portions of the economy, and loot[ing] the people's religious endowments"—the largest of which was always the Foundation for the Oppressed—"all to line their own pockets and send their proxies to wage war."

168.    On November 18, 2020, the United States formally designated the Foundation for the Oppressed, confirmed that it served as a "bridge to the IRGC," and announced:

> OFAC … act[ed] … against a key patronage network for the Supreme Leader of Iran, the … Bonyad Mostazafan [Foundation for the Oppressed] … While Bonyad

Mostazafan is *ostensibly* a charitable organization charged ..., its holdings are expropriated from the Iranian people and are used by [Ayatollah] Khamenei to ... enrich his office, reward his political allies, and persecute the regime's enemies. ... "Iran's Supreme Leader uses Bonyad Mostazafan to reward his allies under the pretense of charity," said Secretary Steven T. Mnuchin. ...

**PARVIZ FATTAH, BONYAD MOSTAZAFAN'S BRIDGE TO THE IRGC**

Bonyad Mostazafan maintains close ties to the IRGC, personified by current Foundation president and former IRGC officer Parviz Fattah. Appointed to the presidency of the Foundation by the Supreme Leader in July 2019, Fattah previously . . . . served as head of the Imam Khomeini Relief Committee, whose Lebanon branch was designated pursuant to counterterrorism authorities in 2010 for being owned or controlled by, and for providing financial and material support to, Hizballah. Known for his loyalty to the Supreme Leader, Fattah has also forged ties to senior IRGC-Qods Force (IRGC-QF) officials. According to Fattah, former IRGC-QF commander Qassem Soleimani sought Fattah's assistance to finance the Fatemiyoun Brigade, an IRGC-QF-led militia composed of Afghan migrants and refugees in Iran coerced to fight in Syria under threat of arrest or deportation. . . . The Fatemiyoun Brigade, like the IRGC-QF itself, is designated pursuant to [] counterterrorism ... authorities.

169.    In the same designation, Treasury confirmed that the Foundation for the Oppressed served primarily as a front for terror and performs little legitimate charitable work: "[w]hile the Supreme Leader enriches himself and his allies, the Foundation's primary mission to care for the poor has become a secondary objective. According to the Foundation's previous president, in past years as little as seven percent of the Foundation's profit has been spent on projects aimed at reducing poverty."

170.    In the November 2020 designation, Treasury also included the "network association chart" reproduced below.[21] The chart details the Foundation for the Oppressed's relationships—including with the IRGC, Iran's Ministry of Defence and Armed Forces Logistics ("MODAFL"), and Martyrs Foundation—and commercial holdings—including its ownership and/or control of entities like Iran Electronic Development Company and Sina Bank:

---

[21] A higher-resolution version of the Foundation for the Oppressed "Network Association Chart" is available here: https://ofac.treasury.gov/media/49741/download?inline.



171.    The Foundation for the Oppressed's holdings included stakes in several commercial entities that used the "Sina" moniker. Sina is a notorious naming convention that Foundation used for enormous cross-section of its holdings. Sina-named companies included, but were not limited to, Sina Bank, Sina Currency Exchange Company, Sina Financial and Investment Holding Company, Sina Energy Development Company, Sina ICT Group, and Sina Paya Sanat Development Company. In addition to being affiliated with the Foundation for the Oppressed, those Sina-labeled entities were also affiliated with the IRGC. Several Sina-named entities have been sanctioned by Treasury. At least some Sina-named entities and their affiliates were involved in currency exchange, which, on information and belief, included the exchange of cryptocurrency.

172.    On January 13, 2021, likewise, Treasury imposed more sanctions on bonyads, and again confirmed the Foundation's role in Khamenei-sponsored terrorism:

> [P]urportedly charitable organizations (bonyads) …control large swaths of the Iranian economy … to the benefit of Supreme Leader Ali Khamenei and senior Iranian … officials. Alongside the previously designated Bonyad Mostazafan, itself controlled by the Supreme Leader, and the IRGC-owned Khatam al-Anbiya, bonyads are said to control more than half of the Iranian economy.
>
> "These institutions enable Iran's elite to sustain a corrupt system of ownership over large parts of Iran's economy," said Secretary Steven T. Mnuchin. "The United States will continue to target those who enrich themselves while claiming to help the Iranian people." …
>
> This action follows Treasury's November 2020 designation of the Bonyad Mostazafan [Foundation for the Oppressed], an immense conglomerate with holdings in key sectors of Iran's economy. … Bonyad Mostazafan has been the beneficiary of favorable treatment by Iran's corrupt leadership, and its assets have been used by the Supreme Leader Ali Khamenei to enrich his office, reward his political allies, and persecute the regime's perceived enemies.
>
> **IRANIAN BONYADS**
>
> Bonyads are opaque, quasi-official organizations generally controlled by current and former government officials and clerics that report directly to the Supreme Leader. Bonyads receive benefits from the Iranian government, including tax exemptions, but are not required to have their budgets publicly approved. This lack of accountability has enabled the bonyads to expand their

economic activities far beyond their original remit and has led to the accumulation of vast amounts of wealth without …benefit to the people of Iran.

173.    The U.S. government statements confirming the Foundation for the Oppressed's direct connection to IRGC sponsored, proxy-committed, acts of terrorism targeting the United States described a consistent pattern of conduct. These sources show that the Foundation was closely intertwined with terrorist violence because the Qods Force and Hezbollah used Foundation revenues to finance terrorist attacks.

174.    U.S. Government enforcement actions confirmed, and alerted BNPP, that the Foundation for the Oppressed was a direct front for Hezbollah and the Qods Force and, through them, an indirect front for terrorist proxies, including Hamas, PIJ, and JAM. On December 17, 2008, for example, DOJ, Treasury, and State all announced enforcement actions and sanctions against the Bonyad Mostazafan, and the U.S. Department of State's Counterterrorism Office issued a press release calling attention to U.S. sanctions against entities affiliated with Bonyad Mostazafan. The heightened U.S. crackdown on the Foundation caused a new round of media coverage highlighting its status as a front for terrorists like the Qods Force and Hezbollah.

175.    U.S. Government-funded reports confirmed that the Foundation for the Oppressed served as a front for Hezbollah and the Qods Force, and alerted BNPP to the same. On October 12, 2011, an analysis published by DoD warned:

> The IRGC influences or controls a vast network of bonyads, or foundations though which it exerts its economic and social influence. These foundations account for 20% of Iran's Gross Domestic Product. … [T]he Foundation for the Oppressed, Bonyad Mostazafan, is the nation's largest and is chaired by Mohammad Forouzandeh, a former IRGC officer.

176.    U.N. Security Council reports confirmed, and alerted BNPP, that the Foundation for the Oppressed financed IRGC-sponsored operations. On June 4, 2012, for example, the U.N. Security Council's panel of experts relating to the IRGC reported:

The Islamic Revolutionary Guards Corps is an ***overwhelmingly important actor in the Iranian economy*** and has expanded into various sectors, mainly through its civilian arms. Although experts find it difficult to determine the extent of its influence on the economy, conservative estimates suggest that it exercises control of between 25 and 40 per cent of the Iranian gross domestic product. … [T]he Corps a***lso controls informal economic channels. In particular, some Iranian charitable organizations (foundations) controlled by the Corps are believed to support the Corps' economic activities***, including provision of informal channels for business transactions. Such foundations include the [IRGC] Cooperative Foundation (Bonyad-e Taavon-e Sepah) and the ***Foundation of the Oppressed (Bonyad-e Mostazafan)***, both of which include ***incumbent and/or former officers of the Corps as board members***. (Emphasis added.)

177.    Public decrees by Ayatollah Khamenei confirmed that the Foundation for the Oppressed served as a front for Hezbollah and the Qods Force, and alerted BNPP to the same. In 1989, 2012, and other occasions when he appointed a new executive director of the Foundation, the Ayatollah publicly touted how the Foundation promoted "Resistance," supported "martyrs," and helped liberate the "Oppressed"—which were all widely known, infamous, euphemisms for IRGC-sponsored attacks targeting America. (*See supra* at "Nomenclature.")

178.    The Foundation for the Oppressed's public website confirmed that the Foundation served as a front that sponsored jihadist violence. In 2018, the official website of the Foundation alerted BNPP, *inter alia*, as follows:

a.    The Foundation's "Characteristics" were "based on the principles and strategic objectives derived from the Resistance Economy" and "focus[ed] on empowering the Oppressed."

b.    The Foundation's "Slogan" emphasized "commit[ment] to … Jihadi [ideology] in social and economic arena by relying on [Jihadi] ideals and its existential goals."

c.    The Foundation's "Outlook" emphasized "the path of achieving the existential goals of the Foundation for the Oppressed … and the implementation of Resistance Economy policies and Statutes."

d.    The Foundation's "Main Strategies" included, *inter alia*, "empowering," "developing," and "emphasizing … Jihadi spirit."

179.    The Foundation for the Oppressed's bylaws, which it published by no later than 2018, confirmed that the Foundation served to support IRGC operations. IRGC admissions also

confirmed that the Foundation for the Oppressed enabled acts of terrorism by Hezbollah and the Qods Force and their proxies, including Hamas and PIJ. On November 3, 2012, for example, a "reporter" for IRGC-controlled media outlet *Aftab* acknowledged that the Foundation supported IRGC proxies "[i]n countries like Syria and Palestine, where Iran's interests are outside the country... that means the activities of the Foundation [for the Oppressed] to help [IRGC proxies like] Bashar al-Assad's government."

180.    The Foundation for the Oppressed was never a normal charity: it was fully captured by the Qods Force and Hezbollah, led and staffed by outspoken, virulent supporters of such organization's terrorist attacks, and operated for the benefit of their shared mission to sponsor attacks targeting the United States to coerce U.S. government decisionmakers in the United States to exit the Middle East and abandon its allies there, including Israel and Iraq.

181.    BNPP knew about, or was willfully blind to, these copious warnings from the U.S. government, international community, mainstream media, scholars, and others about the role the Foundation for the Oppressed played in targeting Americans in terrorist attacks and supporting terrorist groups, such as Hezbollah, Hamas, PIJ, and the IRGC in committing terrorist attacks targeting Americans.

### 2.  Islamic Revolutionary Guard Corps (IRGC)

182.     From April 1979 through 2024, the IRGC—also known as the "Sepah" and "Pasdaran," "Guards," and "Corps," and "Guardians"—operated as a global terrorist organization.

183.    The IRGC's primary mission was—and is—to target the United States for terrorist violence. Since 1979, the IRGC regularly engaged in and supported terrorist attacks directed at the United States, seeking to coerce the U.S. government into changing U.S. policy,

including by prompting America's exit from the Middle East and abandonment of its allies there, including Israel.

184.    The IRGC's doctrinal and institutional targeting of the United States was a product of Iran's history with America, and the IRGC founders' understanding that the United States threatened their nascent terrorist enterprise. As Qasem Soleimani publicly enthused in his posthumous autobiography, "All of you loved Imam," *i.e.*, Ayatollah Khomeini, "and believed in his path. [Ayatollah Khomeini's] path was the path of fighting against the U.S. and supporting the Islamic Republic and the Muslims, who are [O]ppressed by the Arrogant Powers," *i.e.*, the United States government and its allies, including Israel, "under the flag of *Wilayat-e-Faqih*", *i.e.*, Ayatollah Khomeini's system of rule of the jurisprudent.

185.    Ayatollah Khomeini established the IRGC to target the United States, in line with his own view that the U.S. government posed the greatest threat to the IRGC's transnational terrorist agenda. Representative examples of Ayatollah Khomeini's pronouncements to that effect included, but were not limited to, as follows:

a.    "America is the number one enemy."

b.    "America is the archenemy of the Oppressed people of the world."

c.    "Let brotherly Arab nations and the Palestinian and Lebanese brothers know that all their miseries are caused by America."

d.    "Cold and warm weapons, that is, pens, words and machineguns should all be aimed at the enemies of mankind, headed by America."

e.    "Confronting America is presently above all our problems. If today our forces become divided, it benefits America. Right now, America is the enemy and all our equipment should be aimed at this enemy."

186.    Indeed, the preamble of Iran's constitution—as translated and interpreted by the Defense Intelligence Agency in a 2019 report to Congress—provided that the IRGC was "An Ideological Army" and further provided:

68

In establishing and equipping the defense forces of the country, it shall be taken into consideration that faith and ideology are the basis and criterion. Therefore, the Army of the Islamic Republic of Iran and the Revolutionary Guards Corps will be formed in conformity with the above objective, and will be responsible not only for protecting and safeguarding the frontiers [of the Islamic Revolution] but *also for the ideological mission, that is, Jihad*, for God's sake and struggle for promoting the rule of God's law in the world. (Emphasis added.)

187.     Under Iran's constitution, as interpreted by the Ayatollah and the IRGC, it is the IRGC's responsibility to protect and export the Islamic Revolution, and sponsor terrorist attacks targeting the United States. For the IRGC, exporting the revolution meant sponsored terrorist attacks, usually committed by proxy terrorist groups, targeting the United States in the Middle East. As confirmed in a 2011 DOD-published analysis:

The Pasdaran [IRGC] derives its legal authority from Article 150 of the Islamic Republic of Iran's constitution. In accordance with Ayatollah Khomeini's intent, Iran's Revolutionary Council tasked the IRGC in [] broad categories [that included, *inter alia*]: [1] Apprehending or liquidating counter-revolutionary elements[;] [2] Battling armed counterrevolutionaries[;] [3] Defending against attacks and the activities of foreign forces inside Iran[;] … [4] Training subordinate IRGC personnel in moral, ideological, and politico-military matters[;] [5] Assisting the Islamic Republic in the implementation of the Islamic Revolution[;] [6] Supporting liberation movements and their call for justice of the oppressed people of the world under the tutelage of the leader of the Revolution [*i.e.*, Ayatollah Khamenei from 1989 through 2024] … [;] [and] [7] Utilizing the human resources and expertise of the IRGC to deal with national calamities and unexpected catastrophes and supporting the developmental plans of the Islamic Republic to completely maximize the IRGC's resources.

188.     Since 1979, the imagery and text of the IRGC's flag and logo always confirmed that the IRGC's primary mission was to conduct terrorist attacks to export the Islamic Revolution in service of the Supreme Leader of the Islamic Revolution, *i.e.*, Ayatollah Ruhollah Khomeini from 1979 through 1989, and Ayatollah Ali Khamenei from 1989 through present:



|                 |                 |
|:---------------:|:---------------:|
| IRGC Flag       | IRGC Logo       |

189.    With respect to the imagery, the IRGC's flag and logo depicted a clenched fist

grasping an AK-47—the iconic weapon of choice for every Islamist terrorist group in the world,

since the 1960s—against the backdrop of a globe. The IRGC's unmistakable message

communicated to everyone who saw its flag or logo—including BNPP from at least the 1990s

through 2014, through BNPP's agents and employees in Iran, the United Kingdom, the United

States—was that the IRGC would use violence to ensure the Islamic Revolution it served

conquered the entire globe.

190.    Ayatollah Khomeini, Ayatollah Khamenei, and the IRGC they commanded were

not subtle in their messaging. Their terrorist propaganda often featured dramatic, violent,

messianic, anti-American imagery paired with explicit textual calls for terrorist attacks

(sometimes, but not always, using "resistance" or similar euphemisms).

191.    At all relevant times, the IRGC targeted the United States through terrorist attacks

against U.S.-linked targets worldwide. As State reported in 2023, for example, "[t]hroughout

2022, … the IRGC-QF … provided funding, training, weapons, and equipment to several U.S.-

designated terrorist groups" and "Iran-backed militias continued sporadic attacks on bases

hosting U.S. … forces in Iraq and Syria," "[s]enior al-Qa'ida members continued to reside in Iran." At the same time, the IRGC "plotted attacks against dissidents and other perceived enemies of the regime based abroad."

192.    While the IRGC targeted the United States, it did so through channels that were intended to obscure its role, and thus provide plausible deniability for the Iranian regime. This was to prevent the IRGC's terrorist violence from escalating into all-out conflict between the United States and Iran. Accordingly, IRGC doctrine has focused on conducting terrorist attacks through proxies. In April 2010, for example, the Defense Intelligence Agency reported to Congress that the "[IRGC] have provided direct support to terrorist groups, assisting in the planning of terrorist acts or enhancing terrorist group capabilities," and "through its longstanding relationship with Lebanese Hizballah, maintains a capability to strike … and threaten … U.S. interests worldwide." This reliance on proxies endured throughout the IRGC's existence. On September 17, 2020, for example, State confirmed that "the long history of the Islamic Republic's support for terrorism" emphasized proxy attacks:

> Since 1979, Iran has made it a policy of the state to actively direct, facilitate, and carry out terrorist activity globally. Unlike almost any other country, the Islamic Republic has supported terrorism as a method of asymmetric warfare via its own military and intelligence apparatuses: the IRGC-QF and the Ministry of Intelligence and Security (MOIS). Today, the IRGC-QF is active across the Middle East and has plotted or carried out terrorist attacks on five out of seven continents. Where it does not act directly, the Iranian regime has used partner and proxy groups such as Hizballah, Hamas, Palestine Islamic Jihad, … and the Iraqi Shia militia groups Kata'ib Hizballah and Asa'ib Ahl al-Haq to conduct attacks.

193.    From 2000 through 2024, the Iranian regime relied upon the IRGC's profits to finance Iranian proxy terrorist attacks. As State explained on September 17, 2020:

> Since the establishment of the Islamic Republic, the regime has deployed a revolutionary ideology to justify the export of terrorism and instability throughout the Middle East. The primary tool to execute this hegemonic mission has been the Islamic Revolutionary Guard Corps (IRGC). The IRGC is the most powerful

conglomerate in Iran, spreading and consolidating its control over much of Iranian life. As the Iranian government's primary means of directing and implementing its global expansionist campaign, the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft. … The IRGC Qods Force (IRGC-QF), whose activities have an extraterritorial focus, leads the Islamic Republic's destabilizing support for militias and terrorist groups, supplying arms, training, and operational guidance to armed groups across the region

194.    In doing so, the Terrorist Sponsors were comporting with a terrorist version of best financial practices. As FATF reported in 2015:

Terrorist financial management requires planning and accounting for all resources and assets that the group controls, as well as its liabilities. Analysis of publicly-available financial documents originally from a variety of terrorist organisations demonstrates that financial management practices (such as documenting revenue levels and sources, expenditure reporting, accounting) are particularly important for terrorist groups with advanced capabilities, and particularly those that are territorially based. Large terrorist groups will often rely on terrorist financial managers to accumulate revenue, establish financial shelters (such as bank accounts, front and holding entities), and oversee financial disbursements. Their activities also include provisioning funds to the group's leadership, members, and operators and considering opportunities to invest any excess capital. Groups… have actively recruited … accountants, and other financial professionals, specifically to monitor the activities of financial entities within their areas of control in order to better manage revenues and minimise losses.

195.    Accordingly, FATF concluded that an "area of focus" for counterterrorism practitioners "could include identifying and targeting financial collection/aggregation/accounting points within a terrorist organisation."

196.    The IRGC was always an integrated terrorist organization. The IRGC had several divisions, led by an overall command under Mohammad Ali Jafari and his co-equal leadership partner, IRGC-QF leader Qasem Soleimani. Both reported directly to Ayatollah Khamenei, shared similar stakes in the same front companies, and relied upon the front companies alleged herein to finance IRGC terrorist operations.

197.    From 2009 through April 2019, Mohammad Ali Jafari served as IRGC Commander-in-Chief. In April 2019, Ayatollah Khamenei appointed Hossein Salami to succeed

Jafari as IRGC Commander-in-Chief; Salami has served in such role ever since. While in such roles, Jafari and Salami were the equal to the Commander of the Qods Force and reported directly to Ayatollah Khamenei.

198.    From 2011 through 2024, the IRGC had eight branches, all of which were ultimately accountable to Ayatollah Khamenei, and all of which but the Qods Force also reported to IRGC Commander-in-Chief Mohammad Ali Jafari (from 2011 through 2019) and Hossein Salami (from 2019 through present) and their respective deputies (Salami as Jafari's deputy from 2011 through 2019), and Ali Fadavi as Salami's deputy from 2019 through present:

a.    **The IRGC Qods Force (or "IRGC-QF")** was always the IRGC's primary external operations arm and had lead responsibility for the IRGC's terrorist attacks outside Iran. Qassem Soleimani led the IRGC-QF from 2011 through his death on January 2, 2020, after which Ayatollah Khamenei handed leadership to Esmail Ghaani, who led the IRGC-QF from 2020 through present. From 1979 through the present, the IRGC's Qods Force comprised the IRGC's primary Iran-based external terrorist operations arm.

b.    **The IRGC Intelligence Organization (or "IRGC-IO")** was always the Iranian regime's largest, most powerful, and most lethal intelligence arm and played a key role alongside the Qods Force (for whom it embedded in operations outside of Iran) in IRGC attacks outside Iran, and had lead responsibility for attacks committed, in part, inside Iran, *e.g.*, hostage taking of dual nationals. Hossein Taeb led the IRGC-IO from 2009 through June 23, 2022, when he was transferred to serve as a senior advisor to the SLO and was replaced by Mohammad Kazemi, who has always led the IRGC-IO since.

c.    **The IRGC Basij**, meaning "mobilization" was the IRGC's chief recruitment, propaganda, morality police, and mass mobilization arm, and was commanded by Gholamreza Soleimani.

d.    **The IRGC Aerospace Force** (or "IRGC-ASF") was the IRGC's arm jointly responsible (alongside the IRGC-QF and IRGC-IO) for executing IRGC-supported missile and unmanned aerial vehicle attacks, as well as other air attack functions. The IRGC-AF included the IRGC-Aerospace Force Al-Ghadir Missile Command (or "IRGC-ASF-AGMC"), which shared responsibility for missile attacks alongside the IRGC-QF and IRGC-IO. From 2009 through present, Amir Ali Hajizadeh commanded the IRGC-ASF, Mahmud Bagheri commanded the IRGC-ASF-AGMC, and Mohammad Agha Ja'fari served as a senior IRGC-ASF-AGMC who helped lead it alongside Bagheri—who were tasked with optimizing every facet of the IRGC's development of, logistics for, and transfer of, IRGC missiles to IRGC branches and IRGC proxies, including Hezbollah and Hamas.

e.    **The IRGC Ground Resistance Force** was the IRGC's border and internal armored organization, and was commanded by Mohammad Pakpour.

f.    **The IRGC Navy** was the IRGC's naval organization that smuggled terrorists, weapons, and funds, and harassed of U.S. military vessels, in the Persian Gulf, and was commanded by Alireza Tangsiri.

g.    **The IRGC Counterintelligence Organization** was the IRGC's counterintelligence arm tasked with preventing the U.S. intelligence community, including but not limited to the CIA and DIA, from acquiring actionable intelligence that could prevent IRGC-sponsored attacks targeting the United States, and was commanded by Mohammad Kazemi.

h.    **The IRGC Intelligence Protection Organization** (or "IRGC-IPO"), which was sometimes also called the IRGC Security Force, was the IRGC's arm responsible for securing key locations of interest for the IRGC, *e.g.*, airports secured by the IRGC-IPO so that operatives from the IRGC-IO can maximize the ability of the IRGC to use an airport as a location to conduct hostage-taking attacks and gather intelligence in support of the same, and was led by Fathollah Jomeiri.

199.    The United States has long confirmed that the Iranian regime's lead terrorist operations arms were terrorist organizations that sponsored terrorist attacks: Hezbollah (designated FTO in 1997) and the Qods Force (designated SDGT in 2007 and FTO in 2019).

200.    The IRGC was not part of the nation of Iran's regular armed forces.  Properly understood given the totality of its conduct, doctrine, statements, and history, the IRGC was a transnational terrorist organization that captured, and spent decades organizing, certain implements of the Iranian government as a means to pursue the IRGC's primary mission to export the Islamic Revolution through terrorist attacks targeting the United States, including by attacking U.S. allies like Israel and Iraq. Indeed, the IRGC always expressly disclaimed the notion that it was a part of the armed forces for the nation of Iran. For example, as Qasem Soleimani stated in his autobiography published in 2023, "I wish to address a brief word in my dear, self-sacrificing brothers in the Islamic Revolutionary Guard Corps … Naturally, I do not mention Wilayat [*i.e.*, the Supreme Leader and the IRGC], because Wilayat is not a part or a component of the Armed Forces."

201.    Because the IRGC's only obligation was to protect the Islamic Revolution, the IRGC was structured to operate as a transnational terrorist organization for that purpose—whether IRGC allies controlled the Government and, if the Ayatollah and IRGC lost control of Iran's government, the IRGC would operate as a terrorist group armed and later retake Iran.

202.    The IRGC regularly violated the laws of war when it committed its barbaric terrorist attacks. Among other examples:

a.    The IRGC, inclusive of Hezbollah as its proxy and ordinary training and operational interlocutor with IRGC proxies, instructed the IRGC's and Hezbollah's own operatives, and those of their proxies, to intentionally use hospitals, clinics, schools, and mosques as cover, storage sites, weapons caches, and locations from which to launch attacks. The IRGC, through Hezbollah with respect to its proxies, did so as a matter of doctrine, based on Iranian tradecraft and the concept of leveraging attack doctrines that took advantage of the United States' desire to avoid striking such sites and the potent, built-in, operational aid supplied by such civilian locations.

b.    The IRGC, usually acting through Hezbollah, sponsored hostage-taking attacks in Iraq, Iran, Israel, Syria, Yemen, and the United States against civilians who did not participate in hostilities, including Plaintiffs.

c.    The IRGC, usually acting through Hezbollah, sponsored rocket, missile, and UAV attacks targeting U.S. diplomatic facilities in the Middle East, including Iraq, like when the IRGC supplied rockets to Hezbollah for the latter, alongside Kataib Hezbollah, to direct rocket attacks targeting the U.S. Embassy in Baghdad in late December 2019, including attacks that injured Plaintiffs or their loved ones.

d.    The IRGC, sometimes acting through Hezbollah, systematically deployed children as fighters in Iraq, Syria, and elsewhere, trained their proxies in such countries to do the same. Indeed, the IRGC affirmatively touted such war crimes as both lawful and righteous, and infamously sponsored the deaths more than 90,000 Iranian children used as human mine sweepers, in effect, during the Iran-Iraq War.

e.    The IRGC funded and sustained its attacks, in part, through the IRGC's, and Hezbollah's, programmatic child sex trafficking. The IRGC, on its own and through its proxy Hezbollah, forced large numbers of children into sex trafficking rackets that the IRGC and Hezbollah built to directly fund, and reward, terrorist operatives. To accommodate this, the IRGC and Hezbollah developed a pretextual theological doctrine, under which any terrorist who swore loyalty to Khamenei (including the IRGC, Hezbollah, and Kataib Hezbollah, among others), would ask the child whom they were about to rape to say a prayer before the rape began as a purported theological blessing for such heinous crime.

203.    Since 2007, the IRGC was always a U.S.-designated terrorist organization. On October 25, 2007, the United States designated the Qods Force under Executive Order 13224 for its support of terrorism, including its sponsorship of terrorist attacks by Hezbollah, Hamas, PIJ, and Jaysh al-Mahdi. In so doing, the U.S. government confirmed that the Qods Force was "seeking to inflict casualties on U.S. … forces" and, *inter alia*, "had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support" and continued to do so, provided ongoing key support to "Iraqi Shi'a militants who target and kill Coalition and Iraqi forces"—all of which efforts relied upon joint Qods Force-Hezbollah training cells at which the "Qods Force operate[d] training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran." That same day the United States also designated every component of the IRGC for sanctions under Executive Order 13382 for its proliferation-related activities.

204.    After 2007, the United States regularly imposed additional sanctions targeting the IRGC as part of the its broader strategy to impose targeted sanctions against Iran-related actors to reduce the Iranian regime's ability to sponsor terrorist attacks targeting the United States.

205.    On February 10, 2010, Treasury imposed substantial additional sanctions on the IRGC and its economic fronts, and stated, *inter alia*:

a.      "Treasury today took further action to implement existing U.S. sanctions against [the] IRGC … by designating an individual and four companies affiliated with the IRGC pursuant to Executive Order (E.O.) 13382, which freezes the assets of designated proliferators of weapons of mass destruction (WMD) and their supporters."

b.      "Khatam al-Anbiya …, the engineering arm of the IRGC that serves to help the IRGC generate income and fund its operations. … Treasury also today designated [] companies that are owned or controlled by, or that act on behalf of, [KAA]."

c.      "'As the IRGC consolidates control over broad swaths of the Iranian economy, displacing ordinary Iranian businessmen in favor of a select group of insiders, it is hiding behind

companies like Khatam al-Anbiya and its affiliates to maintain vital ties to the outside world,' said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. 'Today's action … will help firms worldwide avoid business that ultimately benefits the IRGC and its dangerous activities.'"

d.   "The IRGC has a growing presence in Iran's financial and commercial sectors and extensive economic interests in [*inter alia*] the … construction, and oil industries, controlling billions of dollars of business. The profits from these activities … support the full range of the IRGC's illicit activities, including … support for terrorism."

e.   "Elements of the IRGC have also been designated for UN sanctions pursuant to UN Security Council Resolutions (UNSCRs) 1737 and 1747. … The European Union has also designated IRGC-affiliated companies, including [KAA]…."

206.   On June 9, 2010, the U.N. Security Council adopted Resolution 1929, which created a comprehensive sanctions regime that was directly based upon, referred to, and targeted, among others, Iran and the IRGC. Resolution 1929's sanctions primarily targeted the IRGC and the IRGC's commercial transactions and use of Iran's banks to finance weapons purchases and exports.

207.   A wide array of subsequent U.S. and U.N. reports and statements confirmed the tight nexus between violations of Resolution 1929 and IRGC-sponsored acts of terrorism. On June 22, 2010, for example, Treasury Under Secretary for Terrorism and Financial Intelligence Levey testified before Congress that violations of Resolution 1929 directly supported IRGC-sponsored terrorism (emphases added):

a.   Resolution 1929 "is intended to hold Iran accountable for its continued refusal to address the international community's concerns regarding its nuclear program, *as well as its support for terrorism*."

b.   "Resolution 1929 enhances the international community's obligation to impose measures on Iran's financial sector, businesses owned or controlled by the … IRGC … Implementation of the financial provisions of the Resolution and its predecessors will be consequential, provided that countries implement them robustly and faithfully. The implementation of these provisions will also assist financial institutions around the world to avoid the risks associated with business that supports the Iranian government's proliferation activity *and support for terrorism*."

c.  "Implementation of the financial provisions of the Resolution and its predecessors will be consequential, provided that countries implement them robustly and faithfully. The implementation of these provisions will also assist financial institutions around the world to ***avoid the risks associated with business that supports*** the Iranian government's proliferation activity ***and support for terrorism.***"

d.  "Resolution 1929 highlights. . . . the risks associated with providing financial services to Iran, makes it nearly impossible for financial institutions and governments to assure themselves that transactions with Iran could not contribute to [illegal IRGC] activities."

208.    On July 1, 2010, President Obama signed the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 ("CISADA"), Pub. L. No. 111-195, 22 U.S.C. § 8501, *et seq.*, which provided, *inter alia*, that the United States should "persistently target Iran's Revolutionary Guard Corps and its affiliates with economic sanctions for its support for terrorism."

209.    On July 17, 2017, for example, the United States announced new IRGC-related sanctions and warned that "[t]he United States remains deeply concerned about" how the "Islamic Revolutionary Guard Corps (IRGC)" enabled "Iran's malign activities across the Middle East," because the IRGC "continues to support terrorist groups such as Hizballah."

210.    On August 2, 2017, Congress enacted, and the President signed, the Countering America's Adversaries Through Sanctions Act, an amendment to the U.S. Code that formally codified that "Congress makes the following findings: ... (2) The Iranian Revolutionary Guard Corps–Quds Force (in this section referred to as the ''IRGC–QF'') … support[s] terrorist and insurgent groups [by] … provid[ing] material, logistical assistance, training, and financial support to militants and terrorist operatives throughout the Middle East and South Asia"; and "(3) The IRGC, not just the IRGC–QF, is responsible for implementing Iran's international program of … support for acts of international terrorism …." § 105, 22 U.S.C. § 9404, Pub. L. No. 115-44, 131 Stat. 892 (2017). Moreover, the updated U.S. Code noted "the IRGC, including the Quds Force … [provided] support, including funding, lethal and nonlethal contributions, and

training, … to Hezbollah, Hamas, special groups in Iraq, … and other violent groups across the Middle East." § 103(b)(5), 22 U.S.C. § 9402, Pub. L. No. 115-44, 131 Stat. 889 (2017).

211.    On October 13, 2017, similarly, the United States designated every other component of the IRGC as a Specially Designated Global Terrorist (like the IRGC-QF, an SDGT since 2007) "for providing support to a number of terrorist groups, including Hizballah and Hamas, as well as to the Taliban" and for "provid[ing] material support to the IRGC-QF, including by providing training, personnel, and military equipment."  In so doing, the United States emphasized, among other things, as follows:

a.    Treasury: "'The IRGC has played a central role to Iran becoming the world's foremost state sponsor of terror. … Treasury will continue using its authorities to disrupt the IRGC's destructive activities,' said Treasury Secretary Steven T. Mnuchin. 'We are designating the IRGC for providing support to the IRGC-QF, the key Iranian entity enabling … the lethal activities of Hizballah, Hamas, and other terrorist groups. We urge the private sector to recognize that the ***IRGC permeates much of the Iranian economy***, and those who transact with IRGC-controlled companies do so at great risk.'" (Emphasis added.)

b.    White House: "[T]he Iranian regime continues to fuel … terror … throughout the Middle East and beyond" through "[t]he Revolutionary Guard['s]" deployment as "the Iranian Supreme Leader's corrupt personal terror force."

c.    White House: "In Iraq and Afghanistan, groups supported by Iran have killed hundreds of American military personnel. The Iranian dictatorship's aggression continues to this day. The regime remains the world's leading state sponsor of terrorism, and provides assistance to … Hezbollah, Hamas, and other terrorist networks."

d.    White House: "The Revolutionary Guard … has hijacked large portions of Iran's economy and seized massive religious endowments [*i.e.*, bonyads or foundations, *e.g.*, the Foundation for the Oppressed] to fund … terror abroad. This includes … supplying proxies and partners with missiles and weapons to attack civilians in the region …"

212.    On October 16, 2017, Treasury Under Secretary Sigal Mandelker publicly confirmed how the entire IRGC was involved in supporting terrorist attacks in the Middle East committed by Hezbollah, Hamas, PIJ, and JAM:

a.    "[T]here are few more pressing national security concerns for the United States and the international community right now than the growing threat posed by … [t]he Iranian

regime," which was "wreaking havoc on the Middle East and beyond" and providing "state support of terrorism" that was "second-to-none" by "financ[ing] and support[ing] Hizballah, Hamas, and … Iraqi … militant groups" by "seed[ing] these terror groups with increasingly destructive weapons as they try to establish footholds from Iran to Lebanon and Syria" and such "aid [was] primarily delivered by … the IRGC[] and its Quds Force, which … [existed as] vehicles to cultivate and support terrorists abroad."

b.    "The IRGC provides the organizational structure that allows them to export their militant extremism across the globe. It has been the Iranian regime's main weapon in pursuit of its radical goals and is a lifeline for Hizballah, … Shia militant groups in Iraq, and others. The IRGC's control over large portions of the Iranian economy furthers its ability to support these groups and enrich its members. In order to deny the IRGC the resources and financing it needs to spread instability, we must and we have been engaging our allies and partners, including those in the private sector."

c.    "[T]o deny the IRGC the resources and financing it needs to spread instability, we … have been engaging … the private sector. We have consistently raised concerns regarding the IRGC's malign behavior, the IRGC's level of involvement in the Iranian economy, and its lack of transparency. We have pointed out that the IRGC continues to be an integral part of the Iranian economy, including in the energy, construction, mining, and defense sectors. And as we have urged the private sector to recognize that the IRGC permeates much of the Iranian economy, we have told them that those who transact with IRGC-controlled entities do so at their own risk."

213.    On May 8, 2018, the United States announced new sanctions against the IRGC confirming:

The Iranian regime is the leading state sponsor of terror. It exports dangerous missiles … and supports terrorist proxies and militias such as Hezbollah [and] Hamas …. Over the years, [the IRGC] and its proxies have bombed American embassies and military installations, murdered hundreds of American servicemembers, and kidnapped, imprisoned, and tortured American citizens. The Iranian regime has funded [the IRGC's] long reign of chaos and terror by plundering the wealth of its own people.

214.    On October 1, 2018, the United States published its counterterrorism strategy, confirming that the IRGC continued to seek to leverage its global networks of financiers, logisticians, and recruits, including persons in the United States, to sponsor acts of terrorism targeting the United States:

Iran remains the most prominent state sponsor of terrorism, supporting militant and terrorist groups across the Middle East and cultivating a network of operatives that pose a threat in the United States and globally. These groups, most

notably Lebanese Hizballah (Hizballah), use terrorism … in partnership with Iran
to expand their influence in Iraq, Lebanon, [and] the Palestinian territories ….
Hizballah fields powerful military and intelligence elements, possesses large
stocks of sophisticated arms, and maintains extensive networks of operatives and
sympathizers overseas, including individuals in the [United States] homeland.

215.    On October 11, 2018, FinCEN published its *Advisory On The Iranian Regime's*

*Illicit And Malign Activities And Attempts To Exploit The Financial System*, in which FinCEN

warned multinational companies and banks, including BNPP, that whenever a bank enables the

IRGC's "Abuse of the International Financial System … to access the financial system through

covert means and to further [the IRGC's] malign activities [by] … misusing banks and exchange

houses, operating procurement networks that utilize front or shell companies, exploiting

commercial shipping, and masking illicit transactions using senior officials, … ***[o]ften, these***

***efforts serve to fund the regime's nefarious activities, including providing funds to the Islamic***

***Revolutionary Guard Corps (IRGC) and its Islamic Revolutionary Guard Corps-Qods Force***

***(IRGC-QF), as well to Lebanese Hizballah, Hamas, and other [IRGC proxy] terrorist groups.***"

(Emphasis added.) Treasury's rollout confirmed, *inter alia*:

a.    "[T]he Iranian regime has masked illicit transactions using senior officials of the CBI,
who used their official capacity to procure hard currency and conduct transactions for the
benefit of the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its
terrorist proxy group, Lebanese Hizballah. Accordingly, financial institutions are advised
to exercise appropriate due diligence when dealing with transactions involving exchange
houses that may have exposure to the Iranian regime and/or designated Iranian persons,
and the advisory details examples of exchange house-related schemes. Iran-related actors
use front and shell companies around the world in procurement networks through which
the Iranian regime has gained goods and services related to currency counterfeiting, dual-
use equipment, and the commercial aviation industry."

b.    "In order to help financial institutions identify deceptive activity potentially linked to the
Iranian regime, FinCEN has included red flags in its advisory. For example, CBI
officials' routing transactions to personal accounts rather than central bank or
government-owned accounts, and individuals or entities with no central bank or
government affiliation withdrawing funds from such accounts, may be a red flag for
financial institutions to investigate. Similarly, wire transfers or deposits that do not
contain any information on the source of funds, contain incomplete information about the
source of funds, do not match the customer's line of business, or that involve jurisdictions

where there is a higher risk of dealing with entities linked to the Iranian regime may be red flag indicators of illicit Iranian attempts to gain access to the U.S. financial system or evade sanctions."

216.    On April 8, 2019, the United States announced its intention to formally designate the entire IRGC as an FTO, which the U.S. did on April 15, 2019.  On April 15, 2019, the United States designated every component of the IRGC—including the IRGC-QF, IRGC Basij, and IRGC-IO—as an FTO. That designation, per State, was in direct response to, *inter alia*, the Iranian regime's historic and "continue[d]" use of the IRGC to "provide financial and other material support, training, technology transfer, advanced conventional weapons, guidance, or direction to a broad range of terrorist organizations, including Hizballah, Palestinian terrorist groups like Hamas and Palestinian Islamic Jihad, [and] Kata'ib Hizballah in Iraq," and because "[t]he Iranian regime is responsible for the deaths of at least 603 American service members in Iraq since 2003"—which "accounts for 17% of all deaths of U.S. personnel in Iraq from 2003 to 2011."  In support, State concluded that the IRGC "has engaged in terrorist activity since its inception 40 years ago," that "its support for terrorism is foundational and institutional," that it "has killed U.S. citizens," and that it "has the greatest role among Iran's actors in directing and carrying out a global terrorist campaign." Announcing the designation, Secretary of State Pompeo emphasized that the IRGC "plans, organizes, and executes terror campaigns all around the world," and that the "IRGC institutionalized terrorism shortly after its inception, directing horrific attacks . . . alongside the terror group it midwifed, Lebanese Hizballah." Secretary Pompeo described the designation as "simply recognizing a basic reality," placing the IRGC in "its rightful place on the same list as terror groups it sponsors."

217.    During its rollout of the IRGC's designation as an FTO in April 2019, the American officials confirmed, among other things, as follows:

a. <u>President Donald J. Trump, April 2019</u>: "This designation will be the first time that the United States has ever named a part of another government as a FTO. It underscores the fact that Iran's actions are fundamentally different from those of other governments. … If you are doing business with the IRGC, you will be bankrolling terrorism."

b. <u>Secretary of State Michael R. Pompeo, April 2019</u>: [T]he Iranian regime's use of terrorism as a tool of statecraft makes it fundamentally different from any other government. This historic step will deprive the world's leading state sponsor of terror the financial means to spread misery and death around the world. … Our [IRGC FTO] designation makes clear to the world that Iranian regime not only supports terrorist groups, but engages in terrorism itself. This designation also brings unprecedented pressure on figures who lead the regime's terror campaign, individuals like Qasem Soleimani. He is the commander of the Qods Force and oversees Iran's forces deployed to advance the Islamic Revolution through terrorism and other forms of violence. He doles out the regime's profits to terrorist groups across the region and around the world. … [T]he mission of this [U.S.] designation [of the IRGC as a Foreign Terrorist Organization is] … to achieve the outcomes that we laid out back in May [2018] to … [stop the IRGC from] … risking American lives each and every day."

c. <u>State, April 2019</u>: "The IRGC – primarily through its Qods Force – is the primary arm of the Iranian government that carries out and directs Tehran's dangerous and destabilizing global terrorist campaign. The IRGC provides funding, equipment, training and logistical support to a broad range of terrorist and militant organizations, totaling approximately one billion dollars annually in assistance. The IRGC has also been directly involved in terrorist plotting and related activity in many countries … The IRGC is integrally woven into the Iranian economy, operating front companies and institutions around the world that engage in both licit and illicit business activity. The profits from what appear to be legitimate business deals could end up … supporting Iran's terrorist agenda."

218.    On January 14, 2020, President Trump implemented Executive Order 13902,

which imposed additional counterterrorism sanctions on the IRGC, and found, *inter alia*:

a. "[The President] find[s] that Iran continues to be the world's leading sponsor of terrorism and that Iran has threatened United States military assets and civilians through the use of military force and support to Iranian-backed militia groups. It remains the policy of the United States to …counter the totality of Iran's malign influence in the region. In furtherance of these objectives, it is the policy of the United States to deny the Iranian government revenues, including revenues derived from the export of products from key sectors of Iran's economy, that may be used to fund and support its … terrorism and terrorist proxy networks …."

b. "[The President] hereby determine[s] that the making of donations of the types of articles specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 1 of this order would seriously impair the President's ability to deal with the national

83

emergency declared in Executive Order 12957 [*i.e.*, the IRGC's sponsorship of acts of terrorism targeting the United States]."

219.    On March 26, 2020, Treasury announced new counterterrorism sanctions against

the IRGC pursuant to E.O. 13324 and reported findings as follows:

a.    "OFAC … today designated 20 Iran- and Iraq-based front companies, senior officials, and business associates that provide support to or act for or on behalf of the Islamic Revolutionary Guards Corps-Qods Force (IRGC-QF) in addition to transferring lethal aid to Iranian-backed terrorist militias in Iraq such as Kata'ib Hizballah (KH) and Asa'ib Ahl al-Haq (AAH). Among other malign activities, these entities and individuals perpetrated or supported: smuggling through the Iraqi port of Umm Qasr; money laundering through Iraqi front companies; selling Iranian oil to the Syrian regime; smuggling weapons to Iraq …; promoting propaganda efforts in Iraq on behalf of the IRGC-QF and its terrorist militias …. The terrorist militias supported by the Iranian regime such as KH and AAH have continued to engage in attacks on U.S. and Coalition forces in Iraq."

b.    "'Iran employs a web of front companies to fund terrorist groups across the region, siphoning resources away from the Iranian people and prioritizing terrorist proxies over the basic needs of its people,' said Treasury Secretary Steven T. Mnuchin."

220.    On May 1, 2020, the United States announced new counterterrorism sanctions

against the IRGC and confirmed that "senior officials of [the] Islamic Revolutionary Guard

Corps-Qods Force (IRGC-QF)" were "involved in IRGC-QF efforts to generate revenue and

smuggle weapons abroad" through an IRGC front "company owned, controlled, or directed by"

an IRGC member, thereby "violat[ing] [U.S.] sanctions and money laundering laws" by

committing "crimes" that caused valuable "assets" to flow to "a foreign terrorist organization."

221.    On June 1, 2023, the United States imposed counterterrorism sanctions" pursuant

to E.O. 13224 against numerous" members and affiliates of" the "IRGC-QF" and "IRGC-IO"

based on Treasury's determination that such persons "participated in a series of terrorist plots

including assassination plots targeting former United States government officials, dual U.S. and

Iranian nationals, and Iranian dissidents"; with respect to IRGC-IO, Treasury targeted two senior

officials of the IRGC-IO "who have been involved in plotting [such collaborative IRGC-

QF/IRGC-IO] external lethal operations against [U.S. national] civilians including journalists

and activists." In its finding, Treasury also noted: "Treasury has consistently acted to address external terrorist plotting by the IRGC-QF and Iran's intelligence service [*i.e.*, IRGC-IO].

222.    BNPP knew about, or were willfully blind to, these copious warnings from the U.S. government, international community, mainstream media, scholars, and others about the role the IRGC played in targeting Americans in terrorist attacks and supporting proxy terrorist groups—including, but not limited to Hezbollah, Hamas, and PIJ—in committing terrorist attacks targeting Americans.

### 3.    Hezbollah

223.    In 1982, the IRGC founded Hezbollah (Arabic for "Party of God"). Ever since, Hezbollah has served as the IRGC's most important terrorist proxy.

224.    From 1982 through 1989, Hezbollah members swore their loyalty to Ayatollah Khomeini. Ever since, Hezbollah members have sworn their loyalty to Ayatollah Khamenei. As Iran scholar Nader Uskowi testified before Congress on April 17, 2018, a "typical LH [*i.e.*, Hezbollah] member wears insignia resembling the IRGC's and believes in the primacy of the *velayat-e faghih* religious doctrine, which translates in accepting Iran's Ayatollah Khamenei as their own supreme leader[]."

225.    From 1982 through 1985, Hezbollah did not call itself Hezbollah. Instead, it called itself the name the IRGC gave it: "***The Organization of the Oppressed of the Earth.***"

226.    In 1985, Hezbollah published what it entitled an "Open Letter Addressed by Hezbollah to the Oppressed in Lebanon and the World," which is commonly referred to as Hezbollah's Manifesto. In it, Hezbollah announced, among other things:

a.    "We, the sons of Hezbollah's nation, whose vanguard God has given victory in Iran and which has established the nucleus of the world's central Islamic state, abide by the orders of a single, wise, and just command represented by the guardianship of the jurisprudent (*vali-e faqih*), currently embodied in the supreme Ayatollah … Khomeini. …"

b.      "No one can imagine the importance of our military potential as our military apparatus is not separate from our overall social fabric."

c.      "[The] first root of vice is America. … Imam Khomeini, our leader, has repeatedly stressed that America is the cause of all our catastrophes and the source of all malice."

227.    After this, the group primarily called itself Hezbollah, although it continued to refer to itself as the Organization for the Oppressed as well as the Islamic Resistance, among other euphemisms.

228.    Hezbollah's geographic power base was in Lebanon, where it operated a parallel shadow government. Hezbollah's activities, however, stretched far beyond Lebanon's borders. Hezbollah's primary stated goal was the destruction of the United States and Israel, which it called the "Great Satan" and the "Little Satan," respectively.

229.    Hezbollah ordinarily functioned as a terrorist proxy for Iran, committing and orchestrating terrorist attacks abroad with Iran's support, including support from Ayatollah Khamenei, the Qods Force, and Supreme Leader's Office. Hezbollah has trained and equipped local terrorist proxies to carry out terrorist attacks on its behalf—successfully employing this strategy to facilitate terrorist attacks by its proxies in (among other places) Paris, France (1985-86); Buenos Aires, Argentina (1992); and Khobar, Saudi Arabia (1996).

230.    Hezbollah's flag always broadly mimicked that of the IRGC; the most distinctive difference being Hezbollah's iconic yellow palette:



231.    From 2003 through 2024, Hezbollah always provided direct assistance to, and was often involved in, terrorist attacks targeting the United States in Iraq that were committed by Jaysh al-Mahdi, including Jaysh al-Mahdi Special Groups like Kataib Hezbollah.  On June 9, 2010, for example, Assistant Secretary of State Jeffrey D. Feltman testified before Congress as follows: "In Iraq, we are also aware of Hizballah providing training and other support to Shia militant groups. As of early 2007, an Iran-based individual by the name of Abu Mahdi al-Muhandis formed a militia group, employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi Special Groups for attacks against Coalition Forces in Iraq."

232.    Hezbollah, like its IRGC patrons, viewed attacks targeting Israel and Israeli civilians as inextricably connected to its efforts to target the *United States* to withdraw from the Middle East. Among other reasons, Hezbollah believed that the United States controlled Israel, that the United States could be punished, in effect, through attacks against its ally.

233.    The IRGC and the SLO provided most of Hezbollah's budget, and directly financed Hezbollah attacks through a range of vehicles, including salary and bonus payment to Hezbollah leaders and attack cells, bounties for successful attacks, and martyr payments to the families of dead Hezbollah terrorists. The Iranian regime funded acts of terrorism committed by Hezbollah through an array of channels, including the SLO, IRGC (including Qods Force), Foundation for the Oppressed (controlled by the IRGC and the SLO), the National Iranian Oil Company ("NIOC"), the National Iranian Tanker Company ("NITC"), and Khatam al-Anbiya ("KAA"), including KAA's fronts. Since 2007, the Iranian regime collectively routed at least $200-$300 million per year—and sometimes much more than that—to Hezbollah, most of which flowed through the above organs.

234.    Hezbollah General Secretary Hassan Nasrallah has publicly admitted, "Hezbollah's budget, its income, its expenses, everything it eats and drinks, its weapons and rockets, come from the Islamic Republic of Iran." Indeed, Iran accounted for around 70%-80% of Hezbollah's budget in any given year, with Hezbollah supplying the rest through criminal activities and contributions from a global diaspora community. Such facts were true throughout 2000 through 2024. As State reported to Congress in 2023: "Iran's annual financial backing to Hizballah . . . estimated to be hundreds of millions of dollars annually . . . accounts for the overwhelming majority of the group's annual budget" and "Hizballah also receives funding in the form of private donations from some Lebanese Shia diaspora communities worldwide, including profits from legal and illegal businesses."

235.    Hezbollah's various subunits were closely interconnected, worked in tandem, shared common sources of financing, and were run by the same people. There was never any meaningful firewall between the intertwined components of Hezbollah. As Hezbollah spokesman Ibrahim Mussawi publicly stated in 2013: "Hezbollah is a single large organization, we have no wings that are separate from one another." U.S. government sanctions findings from 2010 through 2024 also regularly rejected any suggestion that Hezbollah had a "terrorist wing" that was separate from any other wing, repeatedly emphasizing that every component of Hezbollah directly or indirectly supported Hezbollah's terrorist attacks.

236.    Hezbollah ordinarily acted as the IRGC's interlocutor with its terrorist proxies, including Hamas and PIJ in Israel and JAM in Iraq. Hezbollah provided expert training, technical assistance, and in-country support, often through joint cells co-located with Hamas and PIJ in, *inter alia*, Gaza, Lebanon, and Syria, and with JAM in, *inter alia*, Baghdad and Basra.

237.    When every Plaintiff or their loved one was attacked in Iraq from 2006 through 2011, Hezbollah routed its support to attacks by Jaysh al-Mahdi there through a number of key terrorists, including, but not limited to, Hezbollah operatives: (1) Hassan Nasrallah; (2) Imad Mugniyeh; (3) Ali Mussa Daqduq; (4) Muhammad Kawtharani; (5) Yusuf Hashim; (6) Mohammad 'Abd-al-Hadi Farhat; and (7) Adnan Hussein Kawtharani.

238.    When every Plaintiff or their loved one was attacked in Israel from 2008 through 2016, Hezbollah routed its support to attacks by Hamas and Palestinian Islamic Jihad there through an array of key terrorists, including, but not limited to, Hezbollah operatives: (1) Hassan Nasrallah; (2) Imad Mugniyeh; (3) Khalil Harb; and (4) Muhammad Yusuf Ahmad Mansur.

239.    Hezbollah's ideology, doctrine, customs and practices, and terrorist tactics, techniques, and procedures were all substantially identical to those of the IRGC.  Among other reasons, Hezbollah and the IRGC both pursued such approach. As Iran scholar Dr. Mark D. Silinsky confirmed in an analysis published by Marine Corps University in 2019, "training at an IRGC camp" was "a prerequisite for membership in Hezbollah" since its creation in 1982.

240.    Hezbollah pioneered several signature attacks, including kidnapping, roadside bomb attacks using sophisticated devices known as explosively formed penetrators, and rocket attacks using 107mm rockets. The IRGC relied upon Hezbollah's experience and technical expertise to train other proxies, including Hamas, PIJ, and JAM, with respect to how to effectively conduct such attacks. Hezbollah played a vital planning role for IRGC proxies, including Hamas and JAM. Hezbollah had vast experience that the other groups lacked, and it drew on such experience to help such groups devise specific attack types, locations, and tactics. For example, Hezbollah taught Hamas, PIJ, and JAM how to effectively kidnap targets.

241.     Hezbollah also jointly committed some attacks alongside other Axis of Resistance members. For example, joint Hezbollah-Jaysh al-Mahdi cells committed every attack against Plaintiffs in Iraq from 2006 through 2011.  And joint Hezbollah-Hamas and Hezbollah-Palestinian Islamic Jihad cells committed many of the attacks against Plaintiffs in Israel from 2008 through 2016.

242.     Hezbollah regularly violated the laws of war when they committed their barbaric attacks in Iraq, Syria, Yemen, and Israel. Among other examples: Hezbollah terrorists did not wear uniforms while committing attacks; intentionally used civilian hospitals, clinics, schools, and mosques as cover, storage sites, weapons caches, and locations from which to launch attacks. Hezbollah did so as a matter of doctrine, based on Iranian tradecraft and the concept of, in sum and substance, leveraging attack doctrines that took advantage of (a) the United States' general desire to avoid striking such sites; and (b) the potent, built-in, operational cover supplied by such civilian locations.

243.     Hezbollah sponsored hostage-taking attacks targeting civilians in Israel and Iraq who did not participate in hostilities, including Plaintiffs.  Hezbollah sponsored rocket, missile, and UAV attacks targeting United States diplomatic facilities in the Middle East, including Israel and Iraq.

244.     Hezbollah systematically deployed children as fighters in Iraq, Syria, Yemen, and Israel, and trained their proxies in such countries to do the same. Governmental reports confirmed this.  On May 16, 2018, for example, the U.N. Security Council reported: "In Lebanon, the United Nations continued to document the recruitment and use of children by armed groups, including … cases of recruitment … by Hizbullah." On June 20, 2019, likewise, the U.N. Security Council reported: "The recruitment and use of children by armed groups [in Lebanon] continued,

[including] with … Hizbullah …. They were mostly used as guards or in support roles, for carrying weapons or food." Indeed, Hezbollah used children to help commit attacks since its creation.

245.    Hezbollah funded and sustained its attacks, in part, through Hezbollah's programmatic child sex trafficking. Hezbollah forced large numbers of children into sex trafficking rackets that Hezbollah built to directly fund, and reward, terrorist operatives. To accommodate this, Hezbollah developed a pretextual theological doctrine, under which the Hezbollah or allied terrorist would ask the child whom they were about to rape to say a prayer before the rape began as a purported theological blessing for such heinous crime. A colloquy between Representative Ann Wagner former senior U.S. official Dr. David Asher, during the latter's testimony before Congress on June 8, 2017, confirmed such Hezbollah crimes.

246.    Hezbollah has been an FTO since 1997.

247.    BNPP knew about, or was willfully blind to, these copious warnings from the U.S. government, international community, mainstream media, scholars, and others about the role that Hezbollah played in targeting Americans in terrorist attacks and supporting proxy terrorist groups, such as Hamas, PIJ, and JAM, in committing terrorist attacks targeting Americans.

### 4.  Supreme Leader's Office

248.    Since 1989, Ayatollah Khamenei's official title has been "Supreme Leader of the Islamic Revolution," which reflected his—and the SLO's—transnational scope. As Iran scholar Hooman Majd reported in 2008: "The Supreme Leader of the Islamic Revolution, not Republic, is his official title, but in Iran he is known simply as Rahbar, or 'Leader.'"

249.    Consistent with this approach, the Supreme Leader's Office served as a multi-faceted operations, finance, and logistics front for Hezbollah, the IRGC, and Khamenei's allies.

250.    The Supreme Leader's Office was a Hezbollah front. Among other reasons, Hezbollah operatives worked under cover of SLO employment, Hezbollah operatives used SLO facilities for their operations, and Hezbollah benefitted from profits derived by the SLO, due to Hezbollah's (including Hassan Nasrallah's) close relationship with Ayatollah Khamenei.

251.    The Supreme Leader's Office was a Qods Force front. Among other reasons, Qods Force operatives worked under cover of SLO employment, Qods Force operatives used SLO facilities for their operations, and the Qods Force benefitted from profits derived by the SLO, due to the Qods Force's (including Qasem Soleimani's) close relationship with Ayatollah Khamenei.

252.    To optimize its terrorist agenda, the Supreme Leader's Office embedded agents throughout the IRGC, Hezbollah, and the Foundation for the Oppressed, among others. The SLO relied upon notorious IRGC terrorists to personally support terrorist operations sponsored by the IRGC and its terrorist proxies.

253.    Like the IRGC, the Supreme Leader's Office depended upon the profits it generated from fronts it controlled to finance the IRGC and proxy terrorism it sponsored.

254.    The IRGC, Qods Force, and Hezbollah leveraged the Supreme Leader's Office to provide a financial slush fund for their terrorist activities by, for example, financing attack cells, martyr payments, bounty payments, weapons purchases, and payments to the leadership of IRGC proxies, including leadership of Hezbollah, Hamas, PIJ, and JAM.

255.    From at least 2003 through 2024, Ayatollah Khamenei, Hezbollah, the IRGC, and the Foundation for the Oppressed programmatically redeployed Supreme Leader's Office resources, personnel, and profits to assist terrorist attacks by Iranian proxies, including by routing SLO resources to support attacks in Israel and Palestinian territories by Hamas and PIJ

(routed through Hezbollah), attacks in Iraq by Hezbollah and JAM, including Kataib Hezbollah (routed through Hezbollah), attacks in Yemen by Hezbollah and the Houthis (routed through Hezbollah), and attacks in Kenya, Afghanistan, Yemen and the United States by al-Qaeda (routed through Hezbollah with respect to Kenya, Yemen, and the United States, and through the Qods Force with respect to Afghanistan), in order to finance terrorist attacks in such places by such groups. At all relevant times, the SLO provided key resources to Hezbollah and the Qods Force and, through them, to the attacks committed by Hezbollah and proxies Hamas, PIJ, JAM (including Kataib Hezbollah), the Houthis, al-Qaeda, and the Taliban (including its Haqqani Network). Throughout, the Supreme Leader's Office played a direct operational role in Hezbollah- and IRGC-sponsored attacks and associated decision making, including their proxies' attacks.

256.    From 2012 through 2024, the United States and European Union repeatedly confirmed that the Supreme Leader's Office was inextricably connected to Iran-sponsored terrorist violence. On June 26, 2019, for example, President Trump signed Executive Order 13876; that order reflected a formal determination that U.S. economic sanctions targeting the Supreme Leader's Office—including its companies, agents, and fronts—protected U.S. national security and American citizens from "the actions of the Government of Iran and Iranian-backed proxies, particularly those taken to . . . promote international terrorism."

257.    On November 5, 2019, likewise, Treasury designated the Supreme Leader's Office under its counterterrorism authorities "pursuant to E.O. 13876" – through which, the Executive sought to protect the United States from "the actions of the Government of Iran and Iranian-backed proxies, particularly those taken to destabilize the Middle East" and "promote international terrorism" – based upon findings that included as follows:

OFAC … act[ed] … against … individuals who are appointees of, or have acted for or on behalf of, Ali Khamenei, the Iranian regime's unelected Supreme Leader whose office is responsible for advancing Iran's radical agenda. This action seeks to block funds from flowing to a ***shadow network of Ali Khamenei's military and foreign affairs advisors who have for decades oppressed the Iranian people, exported terrorism***, and advanced destabilizing policies around the world. Specifically, the action targets Ali Khamenei's appointees in the Office of the Supreme Leader ….

"Today the Treasury Department is targeting the unelected officials who surround Iran's Supreme Leader, Ayatollah Khamenei, and implement his destabilizing policies," said Treasury Secretary Steven T. Mnuchin. "These individuals [in the SLO] are linked to a wide range of malign behaviors by the regime, ***including bombings of the U.S. Marine Barracks in Beirut in 1983 and the Argentine Israelite Mutual Association in 1994, as well as torture, extrajudicial killings, and repression of civilians. This action further constricts the Supreme Leader's ability to execute his agenda of terror*** and oppression."

This action is being taken pursuant to President Donald J. Trump's Executive Order (E.O.) 13876, signed on June 24, 2019. The E.O. imposed sanctions on the Supreme Leader of the Islamic Republic of Iran and the Supreme Leader's Office (SLO), and authorized sanctions on others associated with the Supreme Leader or the SLO. …

Mojtaba Khamenei, the second son of [Khamenei], is designated today for representing the Supreme Leader in an official capacity despite never being elected or appointed to a government position aside from work in the office of his father. The Supreme Leader has delegated a part of his leadership responsibilities to Mojataba [sic] Khamenei, who ***worked closely with the commander of the … Qods Force [i.e., Qasem Soleimani] … to advance [Ayatollah Khamenei]'s destabilizing regional ambitions ….***

Also designated today is Gholam-Ali Hadad-Adel, father-in-law of Mojtaba Khamenei, a member of the Expediency Council and also an advisor to Ali Khamenei. Hadad-Adel is known to be among those in the Supreme Leader's inner circle. … Gholam-Ali Hadad-Adel is being designated [pursuant to E.O. 13876] for having acted or purported to act for or on behalf of, directly or indirectly, the Supreme Leader of Iran. (Emphasis added.)

These findings, by their terms, were applicable to the Supreme Leader's Office's activities from the early 1980s through at least 2019. Among other reasons, U.S. officials publicly confirmed this, as Treasury, and State (through Secretary of State Pompeo) both did on November 4, 2019.

258.    On November 3, 2022, the United States imposed additional IRGC counterterrorism-related sanctions against the SLO to target its direct and indirect sponsorship of

acts of terrorism committed by the Qods Force, Hezbollah, and their proxies, based upon

findings that included as follows:

> [OFAC] designated members of an international oil smuggling network that
> facilitated oil trades and generated revenue for Hizballah and the … Qods Force
> … in support of Hizballah and the IRGC-QF.
>
> "The individuals running this illicit network use a web of shell companies
> and fraudulent tactics including document falsification to obfuscate the origins of
> Iranian oil, sell it on the international market, and evade sanctions," said Under
> Secretary of the Treasury for Terrorism … Brian E. Nelson. "Market participants
> should be vigilant of Hizballah and the IRGC-QF's attempts to generate revenue
> from oil smuggling to enable their terrorist activities around the world." …
>
> [An] Iranian national … oversaw … the network's illegal … exportation
> of Iranian oil in support of Hizballah and the IRGC-QF … [and] received orders
> from high-ranking Iranian officials associated with the U.S.-designated []
> Supreme Leader's Office to direct the network's oil smuggling operation profits
> to companies and bank accounts associated with Hizballah and the IRGC-QF.

259.    That same day, Secretary of State Antony J. Blinken confirmed that the U.S. had

sanctioned this SLO-directed, Hezbollah- and Qods Force-operated "sanctions evasion network"

and "11 vessels" because the United States determined that they "provid[ed] support to Hizballah

and the Islamic Revolutionary Guard Corps-Qods Force" when they "facilitate[d] the sale of

hundreds of millions of dollars' worth of oil for these organizations [*i.e.*, Hezbollah and the Qods

Force]" through the use of "shell and front companies established to facilitate the illegal blending

and exportation of Iranian oil around the world," which the United States determined "provid[ed]

support to terrorists or acts of terrorism" by Hezbollah and the Qods Force.

260.    From at least 2021 through 2024, the United States publicly sanctioned "Ali

Husseini Khamenei, Supreme Leader, for support of the IRGC, a Foreign Terrorist

Organization," and "Mojtaba Khamenei, son of Supreme Leader," which identified Ayatollah

Khamenei and Mojtaba Khamenei as persons whom the U.S. had sanctioned for "support for

international terrorism," among other reasons.

261.    The U.S. government statements confirming the Supreme Leader's Office's direct connection to IRGC sponsored, Hezbollah-directed proxy-committed, terrorist attacks targeting the United States in the Middle East described a consistent pattern of conduct that existed at all relevant times throughout BNPP's assistance to Hezbollah, the Qods Force, and their proxies. These sources show that the SLO was closely intertwined with terrorist violence because Hezbollah and the Qods Force used the SLO's profits to finance terrorist attacks.

262.    Given the Supreme Leader's Office's status as a front for Hezbollah, the Qods Force, and those organizations' proxies, any funds, weapons (including weapons components), intelligence, cover and concealment, and logistical support obtained by the SLO through its (or its controlled companies' and/or investments') commercial transactions, resources, and profits with, or generated by, the SLO inevitably flowed through the SLO to the Qods Force and Hezbollah and, through them, to Hamas, PIJ, and JAM. Thus, the SLO underwrote the finance, weapons, intelligence, and logistics of enabled IRGC-sponsored attacks in Israel (committed by Hezbollah and/or Hamas and/or PIJ) and Iraq (committed by Hezbollah and JAM).

263.    The Supreme Leader's Office funded the attacks it sponsored through a range of income streams including, but not limited to, the SLO's: (1) share of the commercial profits derived from the Foundation for the Oppressed and other entities controlled, or owned, by the SLO; (2) direction of the Terrorist Sponsors' programmatic use of martyr payments; (3) fundraising and recruitment campaigns; (4) mandatory donations (*khums*) and charitable donations (*zakat*); and (5) leveraging the Friday Prayer Leader Organization to raise money.

264.    **Commercial Profits.** The Supreme Leader's Office optimized Ayatollah Khamenei's and his IRGC allies (e.g., Qasem Soleimani's) ability to ensure that most of the commercial profits realized by SLO-held investments, including those of the Foundation for the

Oppressed, were spent supporting terrorist attacks consistent with Ayatollah Khamenei's doctrinal emphasis on terrorist attacks Above all else to achieve his desired end-state of the "Islamic State."

265.    **Martyr Payments.** The Supreme Leader's Office played a vital role financing and coordinating the Terrorist Sponsors' programmatic use of martyr payments to the families of dead terrorists killed while committing proxy attacks to reward the attack in question and incentivize future attacks. Khamenei himself personally led these efforts, and often spoke of the need to promote martyrs and celebrate martyrdom—i.e., one of the cornerstone reasons recognized by the U.S. government to explain why persons who funded martyr directly aided terrorist attacks. On June 25, 2016, for example, Khamenei publicly stated:

> I have always said that our martyrs are on the front lines defending Islam and that their families including fathers, mothers, wives and children stand, immediately, behind them; this should be appreciated. … [T]he issue, with regard to families of martyrs, is not that they have merely lost a martyr on the path of truth; their patience has mountains of value. The fact that a martyr's father, mother, spouse, or children endure the loss of their dear one is a lofty value.

266.    On June 18, 2017, likewise, Khamenei gave a widely publicized address to the families of martyrs, in which he proclaimed:

> Today, there is a war which our people do not feel with their flesh and blood, but at the same time, they participate. They go to the war, even though, they do not feel it at home, why? Because they understand the situation. This is the miracle of the revolution. … [T]he main reasons for the endurance of the Islamic Revolution and its might are great concepts and values such as martyrdom, jihad, patience and perseverance of the families of martyrs and the enemy tries to dispossess the society of these values and unfortunately some people participate in this framework.

267.    **Fundraising and Recruitment Campaigns.**  The Supreme Leader's Office financed Hezbollah, Hamas, Palestinian Islamic Jihad, and Jaysh al-Mahdi attacks through the SLO's programmatic operation of fundraising and recruitment campaigns designed to source the

finances and jihadists needed to launch attacks. The Supreme Leader's Office spent money to make terrorist violence by organizing all-channel propaganda campaigns messaging—transmitting video, online, social media, billboard, pamphlet, event, festival and clerical messaging paths to reach hundreds of millions of potential audience members who were fundraising, recruitment, or intelligence targets in Iran, Iraq, Lebanon, Syrian, the Unites States, and dozens of countries on every continent but Antarctica, and in a wide array of languages—to request donations for use by Hezbollah, the IRGC, Jaysh al-Mahdi (including Kataib Hezbollah), the Houthis, Hamas, and PIJ—all of whom programmatically benefited from, participated in, and were identified as an intended beneficiary of, such SLO campaigns.

268.    The Supreme Leaders' Office's marketing efforts designed to source funds for attacks had a linear, scalable, relationship with SLO funds not unlike that of a corporation or political campaign that required public outreach to succeed: more money usually had a greater impact on the intended objective, and the SLO followed a similar approach.

269.    When companies illicitly supplied the SLO with income, they powered the SLO's ability to amplify the reach of its marketing campaigns, which provided a linear-return-on-investment that powered SLO-sponsored terrorist attacks.

270.    The Supreme Leader's Office regularly publicly touted its close relationship with the Qods Force, like a campaign depicting Qasem Soleimani as a peaceful "freedom fighter":



271.    The Supreme Leader's Office also coordinated recruitment efforts for the IRGC and Hezbollah. For example, the SLO sponsored advertisements on behalf of the IRGC that promoted martyrdom and the deployment of child terrorists, such as the Tehran billboard below from 2008, which stated, "Our mission is to raise a generation of committed basijis" – i.e., pious Muslim warriors who have been mobilized to fight for the Ayatollah:



272.    **Mandatory Donations (*Khums*) and Charitable Donations (*Zakat*).** The

Supreme Leader's Office also financed Hezbollah, Hamas, Palestinian Islamic Jihad, and Jaysh

al-Mahdi attacks through the SLO's programmatic receipt of mandatory donations (known as

*khums*, also spelled *khoms*), and charitable donations (known as *zakat*), both of which allowed

doctrinal-based allocation of a percentage of all such *khums* received towards operations that

export the Islamic Revolution through violent attacks typically directed by Hezbollah.

273.    Iran scholars have underscored the key role played by such donations. In 2015,

for example, Suzanne Maloney of the Brookings Institution observed:

> Khomeini consistently recognized the importance of financial resources to his
> agenda. He appreciated the powerful historical precedents, including the role that
> the centralization of religious tax collection played in enabling the 1891 Tobacco
> Revolt. And he understood that resources were needed to advance the revolution.
> Cultivating and expanding his network required the collection and distribution of
> vast charitable alms and religious taxes given in Khomeini's name.

274.    From 1979 through 2024, the IRGC relied upon mandatory donations, or *khums*,

comprising 20 percent (20%) of all income, which flowed up to the Ayatollah and then back to

the IRGC to finance IRGC-sponsored acts of terrorism targeting the United States.

275.    Shiite theological traditions call for donations (*khums*), usually equal to twenty

percent (20%) of a person's income on every transaction, to support the cause. The IRGC,

however, has twisted this religious tradition into something far different.

276.    Under the longstanding IRGC doctrine that Hezbollah teaches to Iranian proxies

like JAM, the IRGC emphasizes the need to consistently collect donations (or taxes) as

something that is universally required from all profit-generating activities and transactions –

***without exception*** – including, but not limited to, profits generated through official business,

criminal rackets, bribery and kickbacks, and a broad array of other illicit cash flow schemes. The

IRGC's "no exceptions" rule ensures an administratively simple scheme (analogous to a terrorist

flat tax), which ensures ease of implementation, and comports with the broader IRGC emphasis on its terrorists and proxies embracing administrative simplicity in their jihad.

277.    Under IRGC doctrine, *khums* donations are mandatory on multiple different transaction types, all of which ultimately flow back to fund the IRGC, including its Hezbollah Division and the Qods Force. *First*, if income flows through an IRGC-controlled front to the IRGC shareholders behind that front (i.e., the IRGC, including its Hezbollah Division and the Qods Force), the respective shareholders provide a donation to the others.

278.    *Second*, if a member of the IRGC – or a cutout acting on their behalf – receives a substantial economic benefit, such as a $400,000 bribe, IRGC doctrine mandates that the bribe recipient kick back, mafia-style, twenty percent of their income to the IRGC.

279.    The IRGC's universal practice of tithing a portion of each IRGC member's income back to the leadership of the IRGC was under the direct, public, widely known, edict of Ayatollah Khomeini. Indeed, it was decreed in Ayatollah Khomeini's seminal 1975 instruction-manual-for-terror titled *Velayat-e Faqeeh* – which was always the IRGC's doctrinal foundation.

280.    Under long-standing doctrine enunciated by Ayatollah Khomeini, *khums* were specifically extracted from the petroleum sector. As Khomeini publicly decreed: "Those who work in oil deposits, or gold, silver, lead, copper, iron, turquoise, salt or other mines must pay the *khoms*" – *i.e.*, the tax in the amount of one-fifth of one's income – "to the Islamic Treasury if the profit made by him from such activities."

281.    Turning charitable donations (*zakat*) into terrorist attacks comprised another core strategy led by the Supreme Leader's Office for which the IRGC and the Foundation for the Oppressed also extracted, passed along, and served as the beneficiaries of, programmatic practices. *Zakat* is a religious-inspired donation that is separate from *khums*; the former usually

ranged between 1% and 5% (with 2.5% being a common number), while the latter was almost always around 20%.

282.    From 1979 through 2024, the Supreme Leader's Office worked hand-in-glove with the IRGC and Foundation for the Oppressed – both of which extracted, passed along, and were the beneficiaries of – the programmatic *khums* paid, and *zakat* donated, under the Ayatollah's decree. Under the IRGC's, Foundation's, and SLO's common (mafia-like) custom and practice, such *khums* and *zakat* programmatically benefited each recipient in the payment chain, and ultimately benefited Hezbollah and its proxies Hamas, PIJ, and JAM. Such flow-through to violence was the intended purpose of *khums* and *zakat* as practiced by Ayatollah Khomeini, Ayatollah Khamenei, and their IRGC and Hezbollah followers – all of whom prioritized exporting the Islamic Revolution through violence above every other financial, religious, and policy priority.

283.    Under the Supreme Leader's Office's and IRGC's shared approach to *khums*, *zakat*, and other means of raising funds, the SLO and IRGC – and, by extension, the Foundation for the Oppressed given the key role played by both in it – emphasized simplicity in terms of percentages, analogous to terrorist flat taxes.

284.    **Friday Prayer Leader Organization**. Ayatollah Khamenei and the Supreme Leader's Office also controlled the Friday Prayer Leader Organization. On October 3, 2024, for example, BBC reported that Ayatollah Khamenei's official title included the designation "Tehran Friday prayer leader." Armed with such power, the Supreme Leader's Office also financed Hezbollah, Hamas, Palestinian Islamic Jihad, and Jaysh al-Mahdi attacks through the SLO's programmatic use of the Friday Prayer Leader Organization to source funds and recruits for such attacks. The SLO always operationalized its monopoly over every aspect of Friday Prayers in

Shia mosques in Iran to source funds and recruits to support attacks led by Hezbollah and its

allies in Iraq and the Palestinian territories.

285.    As BNPP well knew, the Supreme Leader's Office under Ayatollah Khomeini and

Ayatollah Khamenei alike always notoriously used their control of Friday Prayers in Iran to

sponsor terrorist attacks committed by their followers. BNPP's employees in Iran, like all other

Iranians, were intimately familiar with the content of Ayatollah Khomeini's seminal guide, *The*

*Little Green Book.* Given that, BNPP had actual knowledge that Friday Prayer Leaders in Iran

had one mission: promote terrorism. As Ayatollah Khomeini himself explained at pages 1-2 of

*The Little Green Book*:

> Our one and only remedy is to bring down these corrupt and corrupting systems
> of government, and to overthrow the traitorous, repressive, and despotic gangs in
> charge. This is the duty of Muslims in all Islamic countries; this is the way to
> victory for all Islamic revolutions.
> Muslims have no alternative, if they wish to correct the political balance of
> society, and force those in power to conform to the laws and principles of Islam,
> to an **armed Jihad against profane governments. …**
> Jihad means the conquest of all non-Muslim territories. . . .
> **The Friday prayers were the means of mobilizing the people, of inspiring them**
> **to battle. The man who goes to war straight from the mosque is afraid of only**
> **one thing - Allah. Dying, poverty, and homelessness mean nothing to him; an**
> **army of men like that is a victorious army.** (Emphasis added.)

286.    In another message, Ayatollah Khomeini also emphasized the violent nature of his

approach to Friday Prayers: "The Friday prayers were an opportunity to ***bring people together***

***and call them to arms.*** The man who goes to war straight from the mosque fears only one thing:

the Almighty. Death, material needs and homelessness are insignificant to him. ***An army of such***

***men is an army of heroes.***" (Emphasis added.)

287.    Moreover, in his 1975 treatise, *Velayat-e Faqeeh: Governance Of The Jurist*,

Khomeini explained that the purpose of Friday Prayers – as he saw it – was to encourage

jihadists to fight on the battlefield:

The Friday sermon was more than a surah from the Qur'an and a prayer followed by a few brief words. ***Entire armies used to be mobilized by Friday sermon and proceed directly from the mosque to the battlefield—and a man who sets out from the mosque to go into battle will fear only God, not poverty, hardship, or his army will be victorious and triumphant.*** When you look at the Friday sermons given in that age and the sermons of the Commander of the Faithful ('a), you see that their purpose was to set people in motion, to arouse them to fight and sacrifice themselves for Islam, to resolve the sufferings of the people of this world. If the Muslims before us had gathered every Friday and reminded themselves of their common problems, and solved them or resolved to solve them, we would not be in the position we find ourselves in today. Today we must start organizing these assemblies in earnest and make use of them for the sake of propagation and instruction. The ideological and political movement of Islam will thus develop and advance toward its climax. (Emphasis added.)

288.    The Supreme Leader, Supreme Leader's Office, and Hezbollah all had a long and notorious history of leveraging their control over Friday Prayers to raise money, source recruits, and even launch attacks. In 1979, for example, Khomeini-backed terrorists seized the U.S. Embassy after having been encouraged to do by the Tehran Friday Prayer Leader at the time. Similarly, Hezbollah has famously used Friday Prayers as a main tool to grow their ranks and raise funds since the 1980s.

289.    BNPP always knew that the Supreme Leader's Office was a direct sponsor of terrorist attacks in Israel and Iraq by Hezbollah, Hamas, PIJ, and JAM. For starters, the Supreme Leader's Office loudly proclaimed its intentions through regular statements delivered by SLO representatives at Friday Prayers (as rebroadcast on Iran's state-owned, SLO and IRGC controlled, mass media arm, IRIB), on IRIB TV "News" shows, and in IRIB online and radio platforms.

290.    Through at least 2007, BNPP had personnel on the ground in Iran, who would have been inundated with such messaging on a weekly (if not daily) basis, through which the Supreme Leader's Office's representatives also routinely alerted BNPP that they intended to pour their profits into terrorist attacks by Hezbollah, Hamsa, PIJ, and Hamas in the Palestinian

territories and Iraq. In 2004, for example, IRGC media arm Islamic Republic News Agency reported about a "memorial ceremony" for "the martyred founder and spiritual leader of the Islamic Resistance Movement of Palestine (Hamas) Shaykh Ahmad Yasin at Tehran Ark Mosque" at which "the deputy head of the international department of the supreme leader's office, Hojjat ol-Eslam Mohammad Hassan Akhtari said that Shaykh Yasin's martyrdom would reinforce the Palestinians popular uprising (intifadah)." In 2010, similarly, SLO operative Mohammad Hassan Rahimian publicly bragged: "We have manufactured missiles that allow us, when necessary to replace [sic] Israel in its entirety with a big holocaust." In 2012, likewise, Ayatollah Khamenei's personal representative to IRGC leadership Ali Saeedi Shahroudi publicly stated, as reported by IRGC-controlled *Fars News Agency*: "The enemy intends to drag us into its own café, but we have lots of strategic differences of opinion with the United States, including Hezbollah, Palestine, [and] the Shiite governance in Iraq, … none of which can be resolved in the framework of negotiations." In 2013, SLO operative Hojateleslam Alireza Panahian boasted: "The day will come when the Islamic people in the region will destroy Israel and save the world from this Zionist base." An IRIB broadcast on July 25, 2014 was broadly representative of such direct appeals – and the Iranian regime's wide rebroadcast of them through the SLO- and IRGC-controlled state media monopoly led by IRIB, an Iranian media "[r]eport on participation of people in Quds Day rallies:" in Iran

> shows demonstrators marching on the streets and chanting 'Death to Israel' and 'Death to America'. … Commenting on the International Quds Day, ***Deputy Head for the Cultural and Publicity Affairs of Iranian Supreme Leader's office at the [IRGC] Mohammad Ali Asudi said that 'the Zionist regime' has been crippled by Hamas as well as Palestinians' resistance***." (Emphasis added.)

291.    BNPP also new that the Supreme Leader's Office sponsored terrorist attacks by Hezbollah, Hamas, Palestinian Islamic Jihad, and Jaysh al-Mahdi in Israel and Iraq because,

among other reasons, and in addition to the above-described sources, decades of reports and statements published by the United States, Iranian regime, Iranian opposition, mainstream media, terrorism scholars, and NGOs alerted BNPP that its transactions with, and value flow-through to, the SLO fueled IRGC-sponsored terrorist attacks by Hezbollah, Hamas, PIJ, and JAM.

292.    The SLO was never a normal Iranian state entity: it was fully captured by avowed supporters and financiers of the Qods Force, Hezbollah, Hamas, PIJ, and JAM, and operated for the benefit of their shared mission to sponsor terrorist attacks targeting the United States to coerce U.S. government decisionmakers to exit the Middle East and abandon its allies there, including Israel and Iraq.

293.    BNPP knew about, or was willfully blind to, these copious warnings from the U.S. government, international community, mainstream media, scholars, and others about the role the Supreme Leader's Office played in targeting Americans in terrorist attacks and supporting terrorist groups, such as Hezbollah, Hamas, PIJ, and the IRGC, in committing terrorist attacks targeting Americans.

### C.  The Terrorist Sponsors Led a Global Terrorist Alliance Called the "Axis of Resistance," That Committed Terrorist Attacks Targeting the United States

294.    Since 1979, the IRGC has led an alliance of anti-American terrorist organizations, united by their shared mission of conducting terrorist attacks targeting the United States— directly, by targeting Americans, or indirectly, by targeting United States allies—to coerce U.S. government decisionmakers in Washington, D.C. and elsewhere to choose to withdraw from the Middle East. Since 1990, that effort has been directly assisted by the SLO.

295.    The IRGC's and SLO's global terrorist alliance functioned as a jihadist analogue to NATO and similar western alliances. It included, among others: (1) Lebanese terrorist group Hezbollah, a global terrorist organization that has been an FTO since 1997, which was founded

by the IRGC in 1982 and has been its most reliable and notorious proxy ever since;

(2) Palestinian terrorist groups Harakat al-Muqawama al-Islamiya ("Hamas") and Palestinian

Islamic Jihad ("PIJ"), global terrorist organizations that have been FTOs since 1997; (3) Iraqi

terrorist group Jaysh al-Mahdi (or "JAM"), which was founded by Hezbollah, publicly identified

as Hezbollah's "striking arm in Iraq," operated in Baghdad through a joint Hezbollah-JAM cell,

and led by Muqtada al-Sadr, including notorious JAM Special Groups, the most infamous of

which were Kataib Hezbollah (or "KH"), and Asa'ib Ahl al-Haq (or "AAH"), FTOs since 2009

and 2020, respectively; and (4) the Reconnaissance General Bureau of the Democratic People's

Republic of Korea.

296.    Since 2003, this terrorist alliance proudly called itself the "Axis of Resistance."

297.    The Axis of Resistance was not merely a slogan: it had nearly every jihadist

function that would parallel a western alliance, including joint attacks—which the terrorists,

U.S., U.N., and E.U. all called "operations"—that were committed through the work of joint

cells in which two or more FTOs were co-located with one another for a common anti-American

purpose, supported by joint training, procurement, financial support, logistics, basing, and

intelligence. In Iran, for example, the regime maintained multiple complexes in which the IRGC,

Qods Force, Hezbollah, Hamas, PIJ, and JAM trained, studied, and plotted together as one

coordinated syndicate of terrorists who worked together to target the United States and sought to

coerce the U.S. government to withdraw from the Middle East.

298.    Its members "resist" the U.S. presence in the Middle East. Part of this "resistance"

included sponsoring waves of attacks against Israelis. But even that targeted the United States

because the terrorists believed Israel to be an agent of the United States and believed that the

United States was key to whether they could overthrow the Israeli government and replace it

107

with their shared goal of an Islamic caliphate that governed Jerusalem, which they called
"Qods."

299.    In 2019, the Defense Intelligence Agency confirmed in a report to Congress that
Hezbollah, Iraqi Shia terrorists (*e.g.*, JAM), Hamas, Palestinian Islamic Jihad, the Houthis, and
the Taliban all served as Iranian proxy members of the Axis of Resistance:



300.    The Iranian regime's leadership of the Axis of Resistance was open and
notorious. On June 1, 2015, for example, the U.N.'s Panel of Experts "note[d] media reports
pointing to continuing [Iranian regime] military support and alleged arms transfers to the Syrian
Arab Republic, Lebanon, Iraq, and Yemen, and to Hizbullah and Hamas" and noted that "Iranian
officials" did "not deny[]" giving such "military support." On May 21, 2018, likewise, Secretary
of State Pompeo observed Iran was "known for, for being a co-conspirator with Hizballah,

Hamas, the Taliban, and al-Qaida." Indeed, Khamenei's personal representatives regularly

bragged about Khamenei's control of the Axis of Resistance and deployment of Axis proxies to

target the United States. In 2019, for example, Ayatollah Ahmad Alam al-Hoda, Supreme Leader

Ayatollah Khomeini's Representative in Khorasan Razavi Province, publicly declared:

> The Iran of today does not have the geographical constraints of the past. Today
> Iran is also the PMU of Iraq [*i.e.*, Kataib Hezbollah], Lebanon's Hizbullah,
> Ansarullah in Yemen [*i.e.*, the Houthis], Syria's National Front, Palestinian
> Islamic Jihad and Hamas. All of these have come to represent Iran and therefore
> Iran is no longer just us. The sayyid of the resistance declared that the region's
> resistance has one leader and that leader is the Supreme Leader of the Islamic
> Revolution of Iran.

301.    Congress has foreclosed any suggestion that Hezbollah and the IRGC did not play

a key role funding, arming, and directing attacks by Jaysh al-Mahdi in Iraq and Hamas in Israel,

among others.  On August 2, 2017, Congress codified the U.S. government's official finding that

the Iranian regime supplied key aid to proxy attacks by such groups when it enacted the

Countering America's Adversaries Through Sanctions Act ("CAATSA"), § 103(b)(5), Pub. L.

No. 115-44, 131 Stat. 906, which called for an "assessment of Iran's asymmetric activities in the

region, including" the "size, capabilities, and activities of the IRGC, including the Quds Force"

and "the types and amount of support, including funding, lethal and nonlethal contributions, and

training, provided to Hezbollah, Hamas, special groups in Iraq, . . . and other violent groups

across the Middle East."

302.    Each Plaintiff was injured in an attack that was funded by the IRGC, and

committed, planned, or authorized by Hezbollah, Jaysh al-Mahdi, Hamas, and/or Palestinian

Islamic Jihad. Some attacks were committed jointly by Hezbollah and JAM (in Iraq), or by

Hezbollah and/or Hamas and/or PIJ (in Israel).

### 1.  Jaysh al-Mahdi (JAM)

303. By the fall of 2002, Ayatollah Khamenei and the IRGC correctly anticipated a U.S. military intervention in Iraq the following year. In September 2002, anticipating U.S. military intervention in Iraq, Khamenei convened Iran's Supreme National Security Council in Tehran to develop countermeasures against the American presence. The IRGC, its Qods Force, and the SLO collaborated with Hezbollah to establish Jaysh al-Mahdi—a Shiite terrorist organization modeled after and trained by Hezbollah to serve as its Iraqi proxy. Accordingly, the IRGC, including its Qods Force, and the SLO worked closely with Hezbollah to stand up a Shiite terrorist organization in Iraq that was modeled after Hezbollah, trained by Hezbollah, and functioned as Hezbollah's notorious Iraqi branch, in effect. That Hezbollah branch in Iraq was Jaysh al-Mahdi.

304. In April 2003, Muqtada al-Sadr founded Jaysh al-Mahdi with the assistance of Hezbollah's chief terrorist strategist Imad Mugniyeh. Jaysh al-Mahdi's primary declared objective was the expulsion of Americans from Iraq. In July 2003, Sadr publicly announced the founding of Jaysh al-Mahdi by calling for a "general mobilization to fight" the so-called "American and British occupiers." During Sadr's Friday sermons on March 26, 2004, among other things:

a.   Sadr praised "[t]he date of September 11th," which he explained "is the date of the collapse of the Two Towers, and therefore is a miracle from God, who never disappoints his servants but allows infidels time before striking them."

b.   Sadr pledged his fealty to Hezbollah, which he couched in Shi'a Islamic terms such that he was communicating to his followers that support for Hezbollah is a religious duty, stating at one point, "our victorious party, Hezbollah."

c.   Sadr called for violent resistance to, and "jihad" against, the American "occupiers" and "invaders" of Iraq, invoking multiple passages from the Koran to provide a purported religious justification for attacking Americans in Iraq.

In a later sermon delivered by an aide on August 6, 2004, Sadr called America "the greatest of Satans" and proclaimed: "America is our enemy and the enemy of the people, and we will not accept its partnership."

305.    From 2003 through 2007, Jaysh al-Mahdi expanded from a fledgling group concentrated in Shi'a areas to a terrorist organization with a significant presence throughout Iraq. What began as a small group of 300 fighters in April 2003 grew to a terrorist organization of between 6,000 and 10,000 fighters by June 2004 and boasted at least 60,000 fighters by January 2007.  Jaysh al-Mahdi operated throughout Iraq, with regional command centers in Kirkuk, Diyala, Baghdad, Wasit, Hillah, Karbala, Amarah, Basra, Diwaniyah, and Nasiriyah.  Jaysh al-Mahdi maintained an especially strong presence in the Al Rashid, Karkh, and Kadamiyah Districts of western Baghdad, nearly all of eastern Baghdad (including the areas in and around Sadr City and Rustamiyah), Baqubah, Hillah, Najaf, Basra, and Wasit (though its power extended well beyond those areas).

306.    From the beginning, Jaysh al-Mahdi's publicly stated, primary goal was to expel the United States from Iraq. When Hezbollah and the other Terrorist Sponsors supported JAM's attacks in Iraq, it was for the same purpose. As DoD reported to Congress in 2009, with respect to "Iranian-sponsored Shi'a militant groups," including JAM Special Groups "Asa'ib Al-Haq (AAH), Ketaib Hezbollah (KH)," and "the newly-formed Promised Day Brigade" (*i.e.*, a re-brand for what was previously the operational component of JAM most affiliated with Muqtada al-Sadr's person network), "Iran continues to host, train, fund, arm, and guide militant groups that seek to bleed the U.S. in Iraq."

307.    Like many terrorist organizations, Jaysh al-Mahdi was structured as an integrated network of cells, militias, and "Special Groups," each of which served the mission of the broader

organization. As Dr. David E. Johnson, a former Army Colonel who has studied Jaysh al-Mahdi's tactics, noted in 2013, "[Jaysh al-Mahdi] was mostly a franchise operation, nationally integrated in support of al-Sadr's political program, but locally owned and operated." The two most prominent Jaysh al-Mahdi Special Groups (or "JAM-SG") were known as: (1) Jaysh al-Mahdi Special Group Asaib Ahl al-Haq (aka "AAH"; "JAM-SG-AAH"; "League of the Righteous"); and (2) Jaysh al-Mahdi Special Group Kataib Hezbollah (aka "KH"; "JAM-SG-KH"; "Hezbollah Brigades"; "Iraqi Hezbollah"). Regardless of their naming conventions, all were part of an integrated terrorist organization, i.e., Jaysh al-Mahdi, in which all components substantially benefited in a common manner from the Terrorist Sponsors' comprehensive support, collaborated together as part of a shared terrorist enterprise, and leveraged one another's' networks, personnel, intelligence, logistics, funding sources, safehouses, and ratlines, among other modalities that aided their commonly desired attacks targeting the U.S. in Iraq.

308.    Despite its cellular structure, Jaysh al-Mahdi maintained a basic hierarchical command structure. As counterterrorism scholars Daveed Gartenstein-Ross & Bill Roggio explained on June 9, 2008, "although Sadr frequently gives [Jaysh al-Mahdi cells] autonomy over their local actions, he maintains the ability to control them when he chooses." Formally separate Jaysh al-Mahdi cells also shared membership and leadership, relied on common sources of financing and institutional support from the broader Sadrist organization, and frequently operated together in coordinated attacks.

309.    Jaysh al-Mahdi cells were also unified ideologically by radical Shi'a ideology, devotion to Sadr, and violent opposition to American presence in Iraq. According to an unclassified (as redacted) summary of an interview with a detained Jaysh al-Mahdi operative from 2008, the operative "look[ed] to Muqtada al-Sadr (MAS) for guidance . . . [and] ha[d] no

knowledge of who would replace MAS as the leader of [Jaysh al-Mahdi] should anything happen to MAS," because "[t]here is no one who can replace MAS." A March 2008 U.S. State Department cable (as published by *WikiLeaks*) similarly reported that Jaysh al-Mahdi's various elements "are different faces of the same group controlled by a single hand, who assigns each a role." And a U.S. military-intelligence officer told the *Washington Post* on May 21, 2008 that Jaysh al-Mahdi's various cells "all have direct communication with [Sadr]."

310.    Jaysh al-Mahdi's cellular structure prevented Coalition forces from engaging Jaysh al-Mahdi in a conventional military manner, especially in urban settings. For example, when Coalition forces took control of Sadr City in 2008, Jaysh al-Mahdi cells disappeared underground and hid among civilians while continuing to attack American forces. Jaysh al-Mahdi's cellular structure also provided each Jaysh al-Mahdi cell with the tactical agility to adapt to rapidly changing conditions. For example, individual Jaysh al-Mahdi cells were able to react to passing American convoys by setting up roadside bombs quickly without explicitly seeking permission to do so, safe in the knowledge that they had been given broad authorization to carry out such strikes against any Americans in Iraq.

311.    One notable aspect of Jaysh al-Mahdi's cellular structure was that JAM operated joint cells with Hezbollah in key parts of Iraq, through which JAM jointly committed some attacks alongside Hezbollah, like the one that killed Dr. Everhart, whose estate and loved ones are Plaintiffs. It did so as part of the joint infrastructure built for Khamenei Cell operations in Iraq by the Terrorist Sponsors, Khamenei Cell, and Khamenei Cell members, e.g., Imad Mugniyeh and Muqtada al-Sadr, and such joint Hezbollah-JAM cells in Iraq, which were directly funded by each Terrorist Sponsor.

312.     Hezbollah often jointly committed attacks alongside Jaysh al-Mahdi throughout Iraq in areas where Hezbollah and JAM maintained a joint cell, including western Iraq (which Hezbollah and JAM could target from joint cells in both Iraq and Syria). Hezbollah's role as a joint offender was the result of the Iranian regime's long-standing joint cell approach, which emphasized embedding Hezbollah operatives inside key JAM cells operating in Baghdad, Basra, Diyala, and Kirkuk, among other places, so that Hezbollah could directly manage such joint Hezbollah/JAM cell's attacks targeting the United States in the most important areas for the Iranian regime in Iraq.

313.     Throughout Jaysh al-Mahdi's existence, the Terrorist Sponsors worked closely with Hezbollah—which served as the Terrorist Sponsors' face, agent, and primary interlocutor with JAM—to intensify Hezbollah-direct, JAM-enabled terrorist attacks targeting the United States in Iraq. Hezbollah recruited, trained, armed, and directed JAM terrorists, who carried out terrorist attacks against Americans on Hezbollah's behalf as Hezbollah's agent in Iraq—as al-Sadr put it, JAM was Hezbollah's "striking arm" in Iraq. Among other things, Hezbollah intensified JAM's deployment—under Hezbollah's in-country supervision—of explosively formed penetrators, a bomb type that the U.K. government concluded in 2005 was associated "exclusively" with Hezbollah, meaning that Hezbollah played a direct role in every attack in Iraq that involved an EFP, which was based on Hezbollah designs and had been field-tested at scale by Hezbollah for the first time during its 2006 hostilities with Israel.

314.     Jaysh al-Mahdi and Sadr publicly embraced their fusion with Hezbollah. After helping to create Jaysh al-Mahdi in April 2003, Hezbollah began a wide-ranging public propaganda campaign to authorize and incite Shi'a in Iraq to join Jaysh al-Mahdi's campaign of terrorism against Americans in Iraq. Hezbollah's message of authorization was effective because

many Jaysh al-Mahdi members looked to Hezbollah as a moral and religious authority on par with Sadr himself. As early as 2004, propaganda posters picturing Sadr side-by-side with Secretary-General Nasrallah appeared throughout Baghdad. In furtherance of this campaign, Secretary-General Nasrallah made repeated and direct communications to Iraqi Jaysh al-Mahdi members to attack Americans. Hezbollah's leaders leveraged their moral and religious authority over Jaysh al-Mahdi by publicly calling for "jihad" and issuing *fatwas* against Americans in Iraq, which media outlets reported in real-time, *e.g.*, as the *New York Post* did on February 5, 2007.

315.    Jaysh al-Mahdi flags also confirmed their tight association with Hezbollah. For example, the flags for JAM Special Groups Kataib Hezbollah (below at left) and Asaib Ahl al-Haq (below at right) mimicked Hezbollah's flag's iconic; like Hezbollah, KH's and LH's flags also featured a fist grasping an AK-47:

 

316.    The IRGC, Supreme Leader's Office, Hezbollah, and Foundation for the Oppressed collectively provided about half of JAM's budget, including about half of Kataib Hezbollah's budget,[22] and directly financed JAM attacks through a range of vehicles, including

---

[22] Jaysh al-Mahdi, including Kataib Hezbollah, also extracted substantial funds for its attacks through its control of key Iraqi ministries and its operation of associated criminal rackets in Iraq, *e.g.*, monetizing then endemic bribery at such ministries. Throughout, JAM's (including Kataib Hezbollah's) top two funding sources were: (1) Terrorist Sponsor-related sources; and (2) Iraqi ministry-corruption-related sources, most of all, the Iraqi Ministry of Health, including Iraq's state-owned medical supply import/export monopoly, Kimadia.

payment to JAM leaders and attack cells, bounties for successful attacks, and martyr payments to the families of dead JAM terrorists.

317.    As BNPP knew, Jaysh al-Mahdi served as Hezbollah's notorious terrorist agent in Iraq from 2003 through 2024.

318.    Through Hezbollah's in-country direction of JAM, including JAM Special Groups like Kataib Hezbollah, the Terrorist Sponsors ensured that Jaysh al-Mahdi remained a loyal Hezbollah proxy—and, by extension, a Khamenei proxy as well. When it came to "Iraqi Shia Militias," as DIA reported to Congress on November 19, 2019:

> One of Tehran's strongest levers of influence in Iraq is through the many Iran-backed Shia militias. Iran has provided financial backing for some of these groups for decades. The Badr Organization, Asaib Ahl al-Haq, and Kataib Hizballah have long served as reliable partners for Tehran, including conducting attacks on U.S. military personnel in Iraq from 2003 to 2011 using Iranian-provided munitions.

319.    From 2003 through 2024, Jaysh al-Mahdi recruits travelled to Hezbollah training camps in Lebanon and Iran through meticulously planned routes.

320.    Although Hezbollah training in Iran often occurred in conjunction with Iranian Terrorism Sponsors—including the IRGC Qods Force, IRGC Intelligence Organization, and Supreme Leader's Office, among others—Hezbollah's role was crucial to Jaysh al-Mahdi for at least four reasons. *First*, Hezbollah operatives had considerably more experience with terrorist tactics and explosives than their Iranian counterparts, even their Qods Force counterparts. *Second*, Hezbollah operatives typically spoke Arabic, the language spoken by most Jaysh al-Mahdi members, while members of the Qods Force and other Terrorist Sponsors usually did not. *Third*, Hezbollah and Jaysh al-Mahdi shared a cultural affinity; captured Iraqi fighters have expressed their strong preference for training with Hezbollah over the Quds Force. *Fourth*,

Hezbollah and Jaysh al-Mahdi shared common familial networks derived centuries of cross-relations between Shia Arabs clans with extensive networks in both Iraq and Lebanon.

321.    Hezbollah and Jaysh al-Mahdi deployed various signature weapons and tactics against Americans in Iraq, including:

322.    **IEDs.**  Improvised explosive devices ("IEDs") are homemade bombs that are often used as booby traps by terrorist organizations.  Frequently, IEDs are set up as roadside bombs that terrorists can detonate when a vehicle passes.  According to an October 18, 2013 *New York Times* report, at times IEDs have caused as many as 80% of Coalition casualties in Iraq. IEDs were a signature weapon of Jaysh al-Mahdi.  Baghdad, the location of Jaysh al-Mahdi's Sadr City headquarters, experienced more than 1,500 IED attacks between January 2007 and June 2008.  In raids within Sadr City in 2008, Coalition forces discovered numerous weapons caches containing IEDs and bomb-making materials.  One specific IED technique reportedly used by Jaysh al-Mahdi involved "daisy-chains" of multiple 122mm or 155mm artillery shells.

323.    **EFPs.**  Explosively formed penetrators ("EFPs") are an advanced type of IED with a specially shaped explosive charge designed to penetrate tank armor, which is impervious to more traditional weapons.  According to an October 18, 2013 *New York Times* report, EFPs were the "single most lethal weapon American forces faced in Iraq."  A declassified CENTCOM study documented at least 1,534 EFP detonations in Iraq between July 2005 and December 2011, killing at least 196 Americans wounding at least 861 Americans.  Jaysh al-Mahdi typically used EFPs by placing them on public roadways.

324.    EFP production demanded sophisticated machinery, materials, and expertise not indigenous to Iraq. Hezbollah, which introduced EFPs to Iraq in 2004, provided Jaysh al-Mahdi with the manufacturing technology. By 2007-2008, Coalition forces had discovered EFP

factories in Jaysh al-Mahdi strongholds like Sadr City, demonstrating that Jaysh al-Mahdi had acquired from Hezbollah the technological capability to produce these deadly devices.

325.    **Mortars.**  A mortar is an artillery-like weapon that fires explosives at short ranges.  Jaysh al-Mahdi frequently used mortars against Americans in Iraq, launching over 1,500 mortar attacks in Baghdad alone between January 2007 and June 2008.  October 2008 raids on Jaysh al-Mahdi stronghold Sadr City revealed substantial mortar caches.

326.    **RPGs.**  Jaysh al-Mahdi used rocket-propelled grenades ("RPGs") against Coalition forces on numerous occasions.  In one such attack in May 2007, Jaysh al-Mahdi fighters killed 12 people and wounded another 75.  Iraqi forces discovered numerous weapons caches containing RPGs in raids within Sadr City in October 2008.

327.    **Rockets.**  Jaysh al-Mahdi's arsenal included 107mm and 122mm rockets, surface-to-air missiles, and man-portable air-defense systems. The group successfully destroyed at least one American helicopter with Misagh-1 missiles and, in March 2008, launched coordinated attacks from Sadr City against Baghdad's International Zone ("Green Zone"), targeting American civilian and political personnel.

328.    The purpose of those attacks was to terrorize the civilian residents of the Green Zone – including American political and civilian personnel.  The rocket attacks were a key part of the broader Jaysh al-Mahdi terror campaign, as Jaysh al-Mahdi agents boasted about America's alleged inability to protect civilians in the Green Zone.  These attacks prompted Coalition forces to enter Sadr City to deny Jaysh al-Mahdi the ability to fire freely on the civilian Green Zone.

329.    When Coalition forces entered Sadr City—as a direct response to Jaysh al-Mahdi's terrorist attacks on civilians in the Green Zone that were planned and authorized by

Hezbollah—they encountered ambushes and traps that Jaysh al-Mahdi had set for them. Officials estimated that the ensuing violence—all directly caused by Jaysh al-Mahdi's attacks on the Green Zone and often collectively called the "Battle of Sadr City"—killed 925 people and injured 2,605 others.

330.    **Complex Attacks.**  Jaysh al-Mahdi militants frequently carried out so-called "complex attacks" against American peacekeeping forces, with multiple teams of terrorists using different weapons and tactics in concert.  In March 2008 for example, a Jaysh al-Mahdi operative explained to the *Washington Post* that, to attack a vehicle, one group of Jaysh al-Mahdi militants would attack it with a barrage of small-arms fire to distract the soldiers while another group of Jaysh al-Mahdi militants planted an IED underneath the vehicle.  In another attack type that several Plaintiffs personally witnessed, Jaysh al-Mahdi detonated EFPs and followed up by immediately attacking the disoriented victims with small-arms fire.

331.    The United States repeatedly confirmed Hezbollah's direct role in Jaysh al-Mahdi attacks, including attacks by Kataib Hezbollah. Treasury did so on July 2, 2009, when it designated the latter as an FTO. Treasury again recognized the links between Hezbollah and Jaysh al-Mahdi on November 19, 2012, when it found that "Hizballah, along with its Iranian allies, trained and advised Iraqi militants to carry out numerous terrorist attacks." According to Treasury's 2012, in 2005, "Iran asked Hizballah to form a group to train Iraqis to fight Coalition Forces in Iraq. In response, Hassan Nasrallah established a covert Hizballah unit to train and advise Iraqi militants in Jaysh al-Mahdi (JAM) and JAM Special Groups."

332.    Treasury again recognized the links between Hezbollah and Jaysh al-Mahdi on November 19, 2012, finding that "Hizballah, along with its Iranian allies, trained and advised Iraqi militants to carry out numerous terrorist attacks."

333.    Jaysh al-Mahdi was not a military force; rather, as the Pentagon's press service recognized on November 13, 2009, it acted as "the Jaysh al-Mahdi terrorist organization." General George Casey, who served as Commanding General of the Multi-National Force in Iraq from 2004-2007, described Jaysh al-Mahdi in a March 25, 2006 U.S. State Department cable (as published by *WikiLeaks*) as "[t]errorists and killers murdering innocent people."  Members of both parties in Congress have also publicly recognized Jaysh al-Mahdi as a terrorist organization. Although Jaysh al-Mahdi is sometimes also called a "militia" in the colloquial sense—a term Plaintiffs sometimes use in this Complaint—it was not a legal "militia" under Iraqi law.  Indeed, as one Iraqi military officer observed to the *Washington Post* on April 6, 2004:  "Mahdi Army! They're not an army! . . . They're a bunch of looters."  A U.S. commander concurred, as recorded in the same *Washington Post* report, that Jaysh al-Mahdi's unlawful violent tactics made it a "mob with a lot of weapons" rather than a legitimate military force.

334.    Jaysh al-Mahdi's campaign of terror against Americans differed from conventional military conflicts in important ways:

a.    Unlike a conventional military force, Jaysh al-Mahdi was supported and directed by an international terrorist organization, Hezbollah, whose aim was to inflict mass casualties on Americans in Iraq and around the world.

b.    Unlike conventional military conflicts, Jaysh al-Mahdi's campaign of terror did not take place during a declared war:  Coalition forces ousted Saddam Hussein in April 2003 and remained in Iraq only to help the country rebuild its government.

c.    Unlike conventional military conflicts, Jaysh al-Mahdi's campaign of terror was not limited by geography or time.  Although this lawsuit focuses on violence within Iraq, Jaysh al-Mahdi fighters have fought with Hezbollah in Lebanon as well.  Similarly, although this lawsuit focuses on violence from 2007-2016, Jaysh al-Mahdi's campaign of terror against Americans in Iraq (and Syria) has continued indefinitely.  In July 2016, Sadr announced that his militias would once again target U.S. forces after the battle against ISIS is over.  As Sadr described his goal in a May 2015 speech: "If America persists then it will cease to exist."

d.    Unlike in conventional military conflicts, Jaysh al-Mahdi did not simply engage in combat against a single defined enemy or enemies, but rather engaged in calculated

sectarian violence designed to sow instability and undermine the legitimacy of the democratic government (and thus undermine U.S. objectives in Iraq). As the Department of Defense observed in 2006, Jaysh al-Mahdi "replaced al-Qaeda in Iraq as the most dangerous accelerant of potentially self-sustaining sectarian violence in Iraq."

e.  Unlike in the 2006 Israel-Lebanon conflict (even assuming that should be classified as a military conflict), Jaysh al-Mahdi engaged in violence against the very government whose ministries it controlled. Jaysh al-Mahdi never declared "war" on the Iraqi government, and the Sadrists never formally seceded from the Iraqi government; rather, they engaged in a terrorist campaign in part against the U.S.-supported Iraqi government to cement their own power and coerce policy changes.

335.    Following the return of sovereignty to the Iraqi government in July 2004, Coalition forces—including the U.S. military units of which many Plaintiffs were a part—functioned primarily not as combat forces but as stabilization forces aiding the Iraqi government in rebuilding the country's civil institutions. As then-U.S. Secretary Colin Powell explained on June 7, 2004 in connection with U.N. Resolution 1546, which authorized the creation of the Multi-National Force in Iraq ("MNF-I"), the "goal" of the military presence in Iraq was "to help the Iraqi people to complete the political transition" and "permit the United Nations and the international community to work to facilitate Iraq's reconstruction." Per Secretary Powell, this mission required U.S. troops to "participate in the provision of humanitarian assistance, civil affairs support, and relief and reconstruction assistance." Governance, economics, capacity building, and rule of law became major lines of effort for the U.S. military's stability operations, and U.S. troops cooperated with civilians and local officials in their day-to-day efforts to facilitate Iraqi reconstruction. The U.S. military also worked regularly in hybrid teams involving civilian members of the U.S. government, including from the State Department.

336.    Jaysh al-Mahdi sought to undermine U.S. reconstruction efforts by terrorizing the population, killing Sunni civilians, and commandeering the instruments of local government. The U.S. military thus had to fight Jaysh al-Mahdi in an effort to prevent it from derailing the United States' broader project of civilian reconstruction in Iraq.

337.     As a terrorist organization, Jaysh al-Mahdi routinely committed acts that would violate the laws of war, sometimes referred to as international humanitarian laws, if Jaysh al-Mahdi were subject to those laws.  For example, they attacked from mosques in their initial assault on American and Coalition forces in April 2004 in Najaf, and again in Baghdad in 2007 and 2008 after the "surge" of U.S. forces.  In August 2004, Sadr was accused of violating the laws of war by using a holy site, the Shrine of Imam Ali, as a headquarters from which to launch attacks.  Jaysh al-Mahdi also used weapons in a manner that could kill indiscriminately and thus violate the laws of war.  For example, Jaysh al-Mahdi used EFPs that included passive infrared sensors that would be triggered by any nearby movement (including civilians).  On many occasions, those EFPs did kill and injure civilians.  Jaysh al-Mahdi also used children to attack Coalition forces and attempted to provoke Americans into killing Iraqi children.  Jaysh al-Mahdi put bounties on U.S. medics, and specifically targeted medics during ambushes and other firefights.  Jaysh al-Mahdi also massacred thousands of civilians in Iraq.

338.     Jaysh al-Mahdi did not follow the required practices of a military force.  Although its members commonly dressed in all-black garb for propaganda purposes (particularly during public demonstrations, and in and around MOH), they rarely wore uniforms while staging attacks on Americans.  Their civilian garb allowed them to camouflage their presence and blend in with civilians to avoid counterattacks from U.S. forces.  They also infiltrated the Iraqi Police and wore police uniforms to disguise their presence while committing attacks.  Jaysh al-Mahdi members routinely attacked Americans in Iraq (both civilian and military) without wearing a fixed distinctive sign recognizable at a distance and without carrying their arms openly. Moreover, on direct orders from Muqtada al-Sadr, Jaysh al-Mahdi terrorists did not distinguish

between uniformed American military personnel and American civilians – Jaysh al-Mahdi considered both illegitimate and attacked both indiscriminately.

339.    Jaysh al-Mahdi combined violations of the laws of war with street crimes, engaging in ethnic-cleansing massacres of Sunnis at roadside checkpoints and in neighborhood sweeps; fighters also stole victims' property, including cars and homes.  In May 2008, Iraqis in Baghdad accused Jaysh al-Mahdi members of robbery, kidnapping for ransom, rape, and murder.

340.    At all times relevant to this Complaint, BNPP knew that Jaysh al-Mahdi was a violent, anti-American terrorist organization that was massacring both American soldiers and American and Iraqi civilians.  They knew this not only because it was common knowledge on the Iraqi street – a common understanding of which BNPP's Middle Eastern agents were aware – but also because it was widely reported both by the U.S. government and in the Western press.

341.    At all times relevant to this Complaint, BNPP knew that Jaysh al-Mahdi was Hezbollah's agent in Iraq, and that aiding Hezbollah would foreseeably aid attacks involving Jaysh al-Mahdi in Iraq.  Among other reason, BNPP's personnel in the Middle East, France, and United States knew about it, including through their in-house corporate security, intelligence, and research arms, for which these events were vital developments that had a material impact on their core functions. BNPP also knew because Hezbollah's and JAM's propaganda materials and chanted declarations of loyalty and service to Hezbollah vividly confirmed JAM's status as Hezbollah's agent in Iraq and were reported in real-time by wall-to-wall coverage in Middle Eastern media outlets, and front-page, top-of-the-hour news treatment everywhere else, which further alerted BNPP that their transactions benefiting Hezbollah and Jaysh al-Mahdi had a tight nexus to such groups' attacks targeting the U.S. in Iraq, that JAM served as Hezbollah's agent in Iraq, and that aiding Hezbollah would foreseeably enable attacks by JAM because they regularly

featured the above (or similar) descriptions, and one or more of the above images, an image like it, and/or videos showing similar imagery. Such sources included, but were not limited to, separate reports published on: (1) July 22, 2006 by the *Associated Press* and *Los Angeles Times* (among others); (2) August 4, 2006 by the U.S.-government's *Voice of America* and by the *Associated Press*, *NBC News*, *New York Times*, PBS, and *al-Jazeera* (among others); and (3) August 5, 2006 by the *Washington Post*, *Washington Times*, *New York Times*, and *Los Angeles Times* (among others).

342.   Notwithstanding Jaysh al-Mahdi's frequent attacks against Americans in Iraq, the Secretary of State did not officially designate Jaysh al-Mahdi as a Foreign Terrorist Organization ("FTO") under 8 U.S.C. § 1189.  That decision reflected a concern among some U.S. policymakers about the best way to influence Sadr, who wielded significant political clout as an Iraqi kingmaker and enjoyed a cult-like following among millions of Iraqi Shi'a.  Sadr's power led some U.S. policymakers to caution against overly antagonizing his followers, which caused the U.S. government to refrain from formally designating Jaysh al-Mahdi as an FTO.  This was primarily a strategic diplomatic decision geared at preserving flexibility for members of the U.S. government to engage with the Sadrists if doing so would serve the national interest (something an FTO designation could have inhibited).  It was not intended to signal the U.S. government's approval of the Sadrists' activities, nor was it intended to allow private companies to deliver support to Jaysh al-Mahdi.  Indeed, the diplomatic decision to refrain from designating Jaysh al-Mahdi as an FTO (which allowed U.S. officials to engage with the Sadrists when necessary) is not inconsistent with the reality that Jaysh al-Mahdi acted and functioned as a terrorist group.  Plaintiffs' claims hinge on the latter point; they expressly disclaim any challenge to the former.

343.    The U.S. strategy of preserving the option of diplomatically engaging with the Sadrists depended on simultaneously degrading Jaysh al-Mahdi's infrastructure and undermining its ability to mount terrorist attacks.  That strategy partially succeeded by mid-2008 after Coalition forces dealt Jaysh al-Mahdi heavy losses in Basra and in the Battle of Sadr City, which pressured Muqtada al-Sadr into turning toward the political process.  But BNPP's conduct – by supplying Jaysh al-Mahdi with corrupt resources it could use to attack Americans – undermined that strategy by bolstering Jaysh al-Mahdi's capacity to mount terrorist attacks and correspondingly reducing the Sadrists' incentives to engage in legitimate political activity.

344.    Jaysh al-Mahdi, including Kataib Hezbollah, regularly violated the laws of war when JAM committed its barbaric attacks in Iraq. Among other reasons, JAM terrorists did not wear uniforms, and intentionally used civilian hospitals, clinics, schools, and mosques as cover, storage sites, weapons caches, and locations from which to launch attacks. Consistent with its Hezbollah training, JAM did so as a matter of doctrine, based on Hezbollah (and Iranian) tradecraft and the concept of, in sum and substance, leveraging attack doctrines that took advantage of (a) the United States' general desire to avoid striking such sites; and (b) the potent, built-in, operational cover supplied by such civilian locations.

345.    Jaysh al-Mahdi sponsored hostage-taking attacks targeting civilians in Iraq who did not participate in hostilities, including Plaintiffs.

346.    Jaysh al-Mahdi sponsored rocket, missile, and UAV attacks targeting United States diplomatic facilities in the Middle East, including Iraq. As the U.K. House of Commons reported in 2007, "in August 2007 the commander of the Multi-National Force-Iraq said that Iran had supplied Shi'a militias with 122mm mortars that were increasingly being used against the International Zone in Baghdad."

347.     The United States designated two Jaysh al-Mahdi Special Groups as FTOs. *First*, on July 2, 2009, Treasury designated "Iraq-based Shia extremist group Kata'ib Hizballah" as an FTO, and "under Executive Order (E.O.) 13438, which targets insurgent and militia groups and their supporters," upon the United States finding, *inter alia*, that:

a.     "Kata'ib Hizballah ha[s] committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces and as a result [is] designated [under E.O. 13438]."

b.     This designation plays a "critical role in our efforts to protect Coalition troops, Iraqi security forces, and civilians from those who use violence against innocents to intimidate and to undermine a free and prosperous Iraq, said Stuart Levey, Under Secretary for Terrorism and Financial Intelligence."

c.     "[T]he IRGC-Qods Force provides lethal support to Kata'ib Hizballah and other Iraqi Shia militia groups who target and kill Coalition … Forces."

d.     "Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training—to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks—to Kata'ib Hizballah members in Iran."

e.     "As of early 2007, … [Hezbollah established] [c]ertain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces ... received training in guerilla warfare, handling bombs and explosives, and employing weapons [such as] missiles, mortars, and sniper rifles" from Hezbollah instructors.

This July 2009 designation by the U.S. government was widely reported throughout the world.

348.     *Second*, on January 3, 2020, the United States designated JAM Special Group Asa'ib Ahl al-Haq as an FTO, designated two of its leaders as SDGTs, and published detailed findings confirming AAH's close operational relationship with Hezbollah and the Qods Force. Treasury's January 2020 designation was widely reported throughout the world.

349.     BNPP knew about, or was willfully blind, to these copious real-time warnings from the U.S. government, international community, mainstream media, scholars, and others about the role Jaysh al-Mahdi played in targeting Americans in terrorist attacks in Iraq and

supporting proxy terrorist groups—including, but not limited to, Hezbollah, Hamas, and PIJ—in committing terrorist attacks targeting Americans.

### 2. Hamas

350.     Hamas established itself in or about 1989 as a violent, global, Sunni Islamist group dedicated to destroying Israel and killing every Jewish person there.

351.     In or about 1990, Khamenei and the IRGC cemented a deep bond with Hamas. Ever since, Hamas has been the IRGC's second most notorious proxy, behind only Hezbollah.

352.     Hamas, like Hezbollah, viewed the United States and Israel as two inextricably connected enemies. For example, Hamas leaders regularly blamed Israeli counterterrorism operations targeting Hamas on the United States by pointing out that Israel buys most of its advanced weapons from America.

353.     The IRGC, Supreme Leader's Office, Hezbollah, and the Foundation for the Oppressed collectively provided most of Hamas's budget, and directly financed Hamas attacks through a range of vehicles, including salary and bonus payments to leaders and attack cells, bounties for successful attacks, and martyr payments to the families of dead terrorists. From 2007 through 2020, they did so by collectively routing between $50 million and $250 million per year to Hamas through the above organs.

354.     The IRGC also provided vital training to Hamas, often using both Hezbollah and the Qods Force to provide extensive, multi-month, multi-location training to Hamas operatives. The IRGC's and Hezbollah's provision of training to Hamas made Hamas more lethal and had a direct impact on Hamas's ability to conduct attacks in Israel.

355.     The IRGC was also Hamas's most important source of weapons, for which the IRGC usually used Hezbollah as its interlocutor with Hamas. For example, Hezbollah smuggled IRGC-supplied weapons to Hamas and trained Hamas terrorists how to use them. The IRGC's

and Hezbollah's provision of weapons to Hamas made Hamas more lethal and had a direct impact on Hamas's ability to conduct attacks in Israel.

356.    Hamas and Hezbollah have long cooperated on shared operations. Hamas jointly planned some attacks with Hezbollah. For example, Hamas heavily leveraged Hezbollah's technical skills, experience, training, and in-country operatives to plan and execute its kidnapping operations.

357.    Like its IRGC patron, Hamas regularly violated the laws of war when it committed its barbaric attacks. Among other examples:

a.    Hamas operatives usually did not wear uniforms while committing attacks.

b.    Hamas intentionally used hospitals, clinics, schools, and mosques as cover, storage sites, weapons caches, and locations from which to launch attacks. Hamas did so as a matter of doctrine, based on Hezbollah (and Iranian) tradecraft and the concept of leveraging attack doctrines that took advantage of: (1) the United States' general desire to avoid striking such sites; and (2) the potent, built-in, operational aid supplied by such sites.

c.    Hamas, alongside Hezbollah, kidnapped civilians in Israel who did not participate in hostilities, including Plaintiffs.

d.    Hamas sponsored rocket, missile, and UAV attacks targeting civilians in Israel, including attacks that injured Plaintiffs or their loved ones.

e.    Hamas systematically deployed children as fighters in Israel.

f.    Hamas selected conducted attacks for the stated purpose of terrorizing civilian populations into conceding to Hamas's demands. Hamas has confirmed, for example, that its October 7 Attack, was designed to target and terrorize, among others, civilians in Israel and the United States, including Plaintiffs.

g.    "Hamas was a brutal enemy" that, per Hamas scholar Jonathan Schanzer. "engaged in "'extra-judicial and willful killing,' including incidents in which Hamas fighters pushed [captured rivals] off tall buildings."

358.    Hamas has been an FTO since 1997.

### 3.  Palestinian Islamic Jihad (PIJ)

359.     Palestinian Islamic Jihad established itself in 1979 as a violent, global, Sunni Islamist group dedicated to destroying Israel.

360.     In or about 1990, Khamenei and the IRGC cemented a deep bond with PIJ. Ever since, PIJ has been one of the IRGC's most notorious proxies and was regularly mentioned by U.S. and Israeli officials alongside Hamas as a well-known IRGC proxy.

361.     The Iranian regime's relationship with PIJ was substantially like its relationship with Hamas. In short, anything the Iranian regime did for Hamas, it likewise did for PIJ. Accordingly, and as BNPP knew, the United States regularly described Iranian support for Hamas and PIJ in the same public warnings, and often collectively referred to both as "Palestinian terrorist groups" or something similar.

362.     The Iranian regime has spent decades promoting the close collaboration between Hezbollah, Hamas, and PIJ. In 1998, for example, State reported to Congress:

> Iran continued to provide support—in the form of training, money, and/or weapons—to a variety of terrorist groups, such as Lebanese Hizballah, HAMAS, and the PIJ. The Iranian Government continues to oppose recognition of Israel and to encourage violent rejection of the Middle East Peace Process. In the fall of 1997, Tehran hosted numerous representatives of terrorist groups—including HAMAS, Lebanese Hizballah, [and] the PIJ…—at a conference of "Liberation Movements." Participants reportedly discussed the jihad, establishing greater coordination between certain groups, and an increase in support for some groups.

363.     In the decades since, the Iranian regime continued similar efforts. In 2010, for example, State reported to Congress that the "Qods Force" was "the regime's primary mechanism for cultivating and supporting terrorists abroad" and "provided weapons, training, and funding to HAMAS and other Palestinian terrorist groups, including Palestine Islamic Jihad (PIJ)."

364.     PIJ, like Hezbollah and Hamas, viewed the United States and Israel as two inextricably connected enemies.

365.    The IRGC, Supreme Leader's Office, Hezbollah, and the Foundation for the Oppressed collectively provided most of PIJ's budget, and directly financed PIJ attacks through a range of vehicles, including salary and bonus payments to PIJ leaders and attack cells, bounties for successful attacks, and martyr payments to the families of dead PIJ terrorists. From 2007 through 2024, they did so by collectively routing at least tens of millions of dollars per year to PIJ through the above organs.

366.    Senior U.S. officials confirmed that the Iranian regime, including the IRGC, was vital to financing PIJ's attacks—usually routing its aid through its most trusted proxy, Hezbollah. On September 29, 2006, for example, Frank C. Urbancic, Principal Deputy Coordinator at State, testified before Congress that "Hezbollah supports … Palestinian terrorist organizations"—which, as BNPP knew, referred to both Hamas and PIJ—"[through] the covert provision of weapons, explosives, training, funding, and guidance, as well as overt political support . . . since at least 2000 . . . Hizballah actively foments terrorist activity that directly undermines [the peace process]."

367.    The IRGC also provided vital training to PIJ, often using both Hezbollah and the Qods Force to provide extensive, multi-month, multi-location training to PIJ operatives. The IRGC's and Hezbollah's provision of training to PIJ made PIJ more lethal and had a direct impact on PIJ's ability to conduct attacks in Israel.

368.    The IRGC was also PIJ's most important source of weapons, for which the IRGC usually used Hezbollah as its interlocutor with PIJ. For example, Hezbollah smuggled IRGC-supplied weapons to PIJ and trained PIJ terrorists how to use them. The IRGC's and Hezbollah's provision of weapons to PIJ made PIJ more lethal and had a direct impact on PIJ's ability to conduct attacks in Israel.

369.     PIJ and Hezbollah have long cooperated on shared operations.

370.     Like its IRGC patron, PIJ regularly violated the laws of war when it committed its

barbaric attacks. Among other examples:

a.     PIJ operatives usually did not wear uniforms while committing attacks.

b.     PIJ intentionally used hospitals, clinics, schools, and mosques as cover, storage sites, weapons caches, and locations from which to launch attacks. PIJ did so as a matter of doctrine, based on Hezbollah (and Iranian) tradecraft and the concept of leveraging attack doctrines that took advantage of: (1) the United States' general desire to avoid striking such sites; and (2) the potent, built-in, operational cover supplied by such sites.

c.     PIJ, alongside Hezbollah, kidnapped civilians in Israel who did not participate in hostilities, including Plaintiffs.

d.     PIJ sponsored rocket, missile, and UAV attacks targeting civilians in Israel, including attacks that injured Plaintiffs or their loved ones.

371.     PIJ selected conducted attacks for the stated purpose of terrorizing civilian

populations into conceding to PIJ's demands. PIJ has confirmed, for example, that its October 7

Attack, was designed to target and terrorize, among others, civilians in Israel and the United

States.

372.     PIJ has been an FTO since 1997.

### 4. North Korean Reconnaissance General Bureau (RGB)

373.     From 1980 through 2019, the RGB of the Democratic People's Republic of Korea

("DPRK" or "North Korea") always comprised the North Korean regime's primary external

terrorist operations arm. The RGB specialized in the full panoply of terrorist operations,

weaponry, tactics, techniques, and procedures associated with modern terrorist organizations,

including, but not limited to, hostage-taking, bombings, assassinations, rocket attacks, and tunnel

fortifications.

374.     The RGB, and the North Korean security services for which it committed its terrorist acts, enjoyed a close, high-level partnership with the Terrorist Sponsors for decades— which was cemented by contacts by key Iranian and IRGC leaders.

375.     The RGB was a founding member of the Axis of Resistance. The RGB's Joint Logistics Cells with the IRGC and Hezbollah, *see infra*, pre-date the Ayatollah Khamenei's public proclamation of the Axis's existence, which occurred in 2003. The RGB had operated its Joint Logistics Cells with the IRGC and Hezbollah since the 1980s, which expanded in the late 1990s to include Hamas and PIJ, and in 2003 to include JAM. Every one of these relationships pre-dated the Axis. While North Korea's terrorist apparatus was occasionally omitted from public discussions about Axis membership, an avalanche of contemporaneous reports confirmed both North Korea's membership in the Axis and vital role powering terrorist attacks targeting the United States committed by Axis FTOs.

376.     The RGB was strikingly similar to the IRGC, Hezbollah, Hamas, PIJ, and JAM with respect to the profile of operations (types and threats), history of conducting high-profile mass casualty attacks (*e.g.*, shooting down a civilian airliner), training regimen, terrorist tactics, techniques, and procedures, sanctions evasion techniques, use of barter trade, cash equivalents, and black market trade to finance operations, and—most importantly of all—their shared status as notorious anti-American terrorist organizations. Indeed, the IRGC, Hezbollah, and RGB have, essentially, identical strategic doctrine regarding the United States: all see it as their foundational enemy; all were specially built to target the United States; and all regularly publicly threatened to inflict unspeakable violence against Americans throughout the world.

377.     Despite not sharing a common religion with the Terrorist Sponsors, the RGB and the Terrorist Sponsors overcame that difference to advance their shared goal of sponsoring

terrorist violence against the United States and its allies. For example, even though the DPRK banned all religions, the RGB allowed the IRGC, Hezbollah, the Foundation for the Oppressed, and the SLO to build and operate a Mosque in a multi-building joint logistics cell compound in Pyongyang—the only mosque in North Korea. The Terrorist Sponsors, in turn, regularly worked to facilitate travel by RGB agents throughout the Middle East, which was both in the Terrorist Sponsors' own self-interest (since the RGB was helping them prepare for attacks) and a valuable service to the RGB.

378.    Why? Because North Korean-based cover and concealment was much harder for the RGB to obtain when it operated in the Middle East, which was its most important weapons export market from 2000 through at least 2019. So the Terrorist Sponsors worked with the RGB to secure fake Chinese passports and then hired the RGB operatives on their own corporate fronts' payrolls with the doubly false cover and concealment provided by: (a) concealing their terrorist identity through the cover of a false janitorial, housekeeper, or other similar fake work persona designed to minimize suspicion (which was textbook IRGC-developed, Hezbollah-enhanced tradecraft); and (b) concealing their North Korean nationality—which was an unmistakable, if not almost conclusive indicator of RGB terrorist operative identity in the Middle East from 2000 through at least 2019—through the use of a false Chinese persona.[23]

---

[23] From 2000 through at least 2019, North Korea did not permit its citizens to travel outside of the country, other than for very limited purposes to parts of China. The only North Korean citizens who were permitted to travel were, in effect: (1) RGB operatives; (2) Foreign Ministry personnel; and (3) RGB-managed victims of human trafficking, whom the RGB effectively leased for pennies on the dollar to certain friendly regimes. The first category reflected—by far—the most economic activity, security activity, and intelligence activity for the regime, and therefore, the highest concentration of personnel deployed outside of North Korea. The second category was about the same size in most regions, but smaller than the first in the Middle East owing to the outsized presence of RGB operatives scattered throughout the Joint Logistics Cells located in Iran, Syria, Lebanon, and Egypt. And the third category necessarily involved the RGB.

379.     The RGB was always an internationally infamous terrorist organization—a

reputation it acquired through a series of catastrophic terrorist attacks. The United States has

designated the DPRK as a State Sponsor of Terrorism from 1988 until 2008. In 2008, the United

States rescinded the DPRK's State Sponsor of Terrorism designation for diplomatic reasons

related to an attempted nuclear deal with the North Korean regime. But at no point did the U.S.

government ever clear the RGB—*i.e.*, assert it did not propagate terrorist attacks, nor did the

U.S. government contradict the abundant evidence in the public domain from 2008 through 2017

that RGB support for Hezbollah and Hamas had dramatically intensified from 2009 onwards in

comparison to previous eras. A flood of real-time reports and criticisms confirmed that the

rescission decision did not in any way reflect the nature, impact, or duration of RGB-supplied

weapons, training, and tunnels to Hezbollah, Hamas, PIJ, JAM, and the IRGC.

380.     On May 8, 2008, for example, the Minority Staff of the House Foreign Affairs

Committee published a confidential analysis of the Iran-North Korean- Hezbollah relationship by

Larry Niksch, who worked for the Congressional Research Service at the time:

> **Terrorist Groups ... Hezbollah.** French, Israeli, and South Korean sources have
> reported ***an extensive program by North Korea to provide arms and training to
> Hezbollah.*** The French publication, Paris Intelligence Online, published a report
> on North Korean training of Hezbollah in September 2006. Paris Intelligence
> Online reported that North Korean training of Hezbollah cadre reportedly began
> in the late 1980s and early 1990s, including training in North Korea. ***Three
> current top Hezbollah officials were said to have received training in North
> Korea: Hassan Nasrallah, Hezbollah's secretary-general and head of
> Hezbollah's military organization; Ibrahim Akil, the head of Hezbollah's
> security and intelligence service, and Mustapha Badreddine, Hezbollah's
> counter-espionage chief.*** According to Paris Intelligence Online, the North
> Korean program reportedly expanded after 2000 when Israeli forces withdrew
> from southern Lebanon and Hezbollah forces [2] occupied the area. North Korea

---

Accordingly, from 2000 through at least 2019, an observer with any knowledge of North Korean
security and economic practices could conclude, based on nothing more than a person's North
Korean identity, that if such person was in Lebanon, the Palestinian territories, Syria, Iran, Iraq,
or Egypt, such person was likely an RGB operative or reporting to one.

is said to have dispatched trainers to southern Lebanon where they instructed Hezbollah cadre in the development of extensive underground military installations (North Korea is believed to have constructed extensive military facilities inside North Korea) One such North Korean-assisted facility in southern Lebanon reportedly was a 25 kilometer underground tunnel that Hezbollah used to move troops. Hezbollah's underground facilities, according to reports, significantly improved Hezbollah's ability to fight the Israelis during the 2006 Israel-Lebanon war.

In November 2007, Professor Moon Chung-in, a professor at South Korea's Yonsei University and adviser to the Roh Moo-hyun Administration, reported assessments from the Israeli intelligence agency, Mossad, that **"vital missile components" of Hezbollah missiles fired into Israel during the 2006 war came from North Korea.** Dr. Moon stated that Mossad believes that the missiles with North Korean components were assembled in Iran and were transported to Hezbollah in Lebanon via Syria. According to Professor Moon, Mossad **"partially blames North Korea" for the effectiveness of Hezbollah's missile strikes into Israel.** …

In 2008, it has been reported that Hezbollah has received new missiles from Iran with longer ranges than the missiles that Hezbollah used in the 2006 war. The Israeli government reported that Hezbollah now has an arsenal that includes 10,000 long-range missiles and 20,000 short-range rockets in southern Lebanon. … If the Israeli estimate is correct and if the reported Mossad assessment of North Korea's role in providing components to missiles supplied to Mossad prior to the 2006 war is correct, **it would appear possible that North Korea is continuing to supply parts to the missiles that Iran is supplying to Hezbollah.** (Emphasis added.)

381.    On November 20, 2017, after nearly a decade of North Korean support for its

Axis of Resistance partners—most of all the IRGC, Hezbollah, and Hamas—the United States

reinstated the DPRK's designation as a State Sponsor of Terrorism. In 2017, State reported to

Congress in *Country Reports on Terrorism 2019*, that the "the Secretary of State" had

determined that the DPRK, *inter alia*: (1) "repeatedly provided support for acts of international

terrorism, as the DPRK was implicated in assassinations on foreign soil"; (2) "repeatedly

provided support for acts of international terrorism since its State Sponsor of Terrorism

designation was rescinded in 2008"; and (3) " failed to take action to address historical support

for acts of international terrorism," including decades-long unresolved hostage-taking and

hijacking attacks.

### D. Terrorist Sponsors and Proxies Used Terrorist Fronts to Orchestrate their Attacks Targeting the United States

382.    Terrorist Sponsors and their proxies used a multitude of terrorist fronts to fund, support, and coordinate terrorist attacks. Several notable fronts are discussed below.

### 1. Khatam al-Anbiya Construction Headquarters (KAA), aka GHORB

383.    Khatam al-Anbiya (or "KAA"), Persian for "Seal of the Prophet," was a front for the IRGC, including the Qods Force.

384.    Khatam al-Anbiya was a front for Hezbollah.

385.    Ostensibly a construction company, Ayatollah Khamenei created Khatam al-Anbiya in 1990 to serve as a vehicle for the IRGC, Hezbollah and their proxies to be financially self-sustaining and in direct response to concerns that the Iranian state could not, on its own, afford to rebuild after the Iran-Iraq war while simultaneously funding terrorist proxies outside Iran. Per its charter, KAA's purpose was to "efficiently utilize the available construction and economic resources, capacities and talents of the IRGC to continue the Islamic Revolution"—*i.e.*, IRGC-sponsored acts of terrorism targeting the United States. KAA's primary purpose was always to maximize the amount of money spent on terrorism committed by the Qods Force, Hezbollah, and their shared proxies. KAA did so through its wide array of companies, personnel, agents, deals, and facilities inside and outside of Iran. KAA operations inside Iran were controlled by the IRGC, while operations outside Iran were controlled by the Qods Force and Hezbollah. These factors, and others, distinguished KAA from nearly all other Iranian firms, aside from fronts controlled by the IRGC or the SLO.

386.    KAA notoriously owned a wide array of companies in the Iranian oil, gas, construction, and logistics spaces—all of which were part of the IRGC's terrorist machine. Such notorious fronts included, but were not limited to: (1) Oil Industries Engineering & Construction

(Sherkat-e Sakhteman-e Sanaye' Naft); (2) Iranian Offshore Engineering & Construction Company (Sherkat-e Mohandesi Va Sakht-e Ta'sisat-e Daryayi) ("IOEC"); (3) Persian Gulf Petrochemical Industries Company ("PGPIC"); and (4) Bandar Imam Petrochemical Company. (KAA jointly owned IOEC alongside fellow IRGC front NIOC.)

387.    The IRGC, Qods Force, and Hezbollah, and their proxies, including Hamas and PIJ, leveraged KAA resources, including KAA profits, to serve as a source of funds, logistical aid, cover, and safe houses in Iraq, Lebanon, Syria, and Gaza, among other places. KAA was the ideal cover because it had extensive offices, projects, and facilities inside and outside of Iran, including in Lebanon, Syria, Iraq, and Gaza. Among other uses, the Qods Force, Hezbollah, Hamas, PIJ, and JAM used KAA to stockpile and pre-position weapons earmarked for attacks, including EFPs, rockets, and communications technologies. KAA also worked closely with other IRGC fronts, including the SLO, Foundation for the Oppressed, NIOC, and NITC.

388.    KAA was a front for the Qods Force, Hezbollah, and such FTOs' proxies. Thus, funds, weapons (including weapons components), intelligence, cover and concealment, and logistical support obtained by KAA through its (or its controlled companies' and/or investments') commercial transactions, resources, and profits with, or generated by, KAA inevitably flowed through KAA to reach the Qods Force and Hezbollah and, through them, to Hamas and JAM, to provide the funding, weapons, intelligence, and logistics that enabled IRGC-sponsored attacks in Israel (committed by Hezbollah and/or Hamas) and Iraq (committed by Hezbollah and JAM).

389.    From at least 2000 through present, the Qods Force and Hezbollah used KAA to finance terrorist attacks in Israel that were committed by Hezbollah, Hamas, and PIJ, and funded and supplied by the Qods Force. From 2003 through present, the Qods Force and Hezbollah used

KAA to finance terrorist attacks in Iraq that were committed by Hezbollah and JAM and were funded and supplied by Hezbollah and the Qods Force. At all relevant times, KAA was controlled by the Qods Force and Hezbollah, and used by the Qods Force and Hezbollah to flow funds, logistics, and weapons; provide safe houses for forward-deployed operatives; and conceal terrorist funds, weapons, and supplies moved through transnational construction-related shipments. KAA support flowed from Iran to recipients in Iraq, Lebanon, Syria, and Gaza, among other places, including to Hamas and PIJ (through Hezbollah) and JAM (through Hezbollah) attack cells, to finance terrorist attacks in Israel and Iraq committed by such groups.

390.    Indeed, KAA profits provided a key funding source for the IRGC's tunnel-related support to IRGC proxies throughout the world, including Hezbollah in Lebanon and Hamas and PIJ in Israel and Gaza. Moreover, KAA activities also provided valuable intelligence benefits to the IRGC and SLO in every geography in which KAA operated, including Iran, Iraq, Afghanistan, Lebanon, and Yemen, among others.

391.    On October 25, 2007, the United States sanctioned KAA under U.S. weapons-related sanctions targeting the IRGC and concerning, *inter alia*, missiles and drones; listed KAA as an "IRGC-owned or -controlled compan[y]"; and warned banks contemplating doing business with Iranian counterparties—including BNPP—that the IRGC had seized a monopolistic share of Iran's oil sector, the IRGC used KAA to operationalize such tactics, and the IRGC used some of the resulting profits to finance IRGC-sponsored weapons programs that threatened the United States. (The latter finding was needed to impose U.S. weapons sanctions against the IRGC.)

392.    On June 24, 2008, the E.U. sanctioned "Khatem-ol Anbiya Construction Organisation" (*i.e.*, KAA) for direct facilitation of illicit IRGC weapons acquisition and proliferation efforts, which focused on IRGC acquisition, development, and export of weapons

like missiles, rockets, and UAVs (drones), and in recognition of KAA's role as a vital supporter of the IRGC's ballistic missile operations.

393.    On July 27, 2010, the E.U. announced sanctions that targeted, *inter alia*, IRGC ballistic missiles, proxy terrorism, and fundraising through KAA:

a.    "Islamic Revolutionary Guard Corps (IRGC) … Reasons: Has operational control for Iran's ballistic missile programme" and "[h]as undertaken procurement attempts for to support Iran's ballistic missiles";

b.    "Parviz FATAH … Reasons: Deputy Commander of Khatam al Anbiya";

c.    "Rostam QASEMI (a.k.a. Rostam GHASEMI) … Reasons: Commander of Khatam al-Anbiya"; [and]

d.    "IRGC Qods Force … Reasons: Iran's Islamic Revolutionary Guard Corps (IRGC) Qods Force is responsible for operations outside Iran and is Tehran's principal foreign policy tool for special operations and support to terrorists and Islamic militants abroad. Hizballah used Qods Force-supplied rockets, anti-ship cruise missiles (ASCMs), man-portable air defense systems (MANPADS), and unmanned aerial vehicles (UAVs) in the 2006 conflict with Israel and benefited from Qods Force training on these systems, according to press reporting. According to a variety of reporting, the Qods Force continues to re-supply and train Hizballah on advanced weaponry, anti-aircraft missiles, and long-range rockets. The Qods Force continues to provide limited lethal support, training, and funding to Taliban fighters in southern and western Afghanistan including small arms, ammunition, mortars, and short-range battlefield rockets. Commander [*i.e.*, Qasem Soleimani] has been sanctioned under UNSCR[.]"

394.    On March 28, 2012, Treasury imposed additional sanctions against KAA and reiterated that KAA's profits funded IRGC-sponsored terrorism:

> Today's actions further expose IRGC … continued involvement in illicit activities and deceptive behavior.
>
> Pursuant to Executive Order (E.O.) 13382 – an authority aimed at freezing the assets of proliferators of weapons of mass destruction (WMD) and their supporters and thereby isolating them from the U.S. financial and commercial systems – Treasury today designated the following entities and individuals.
>
> Iran Maritime Industrial Company SADRA (SADRA), an entity owned by the IRGC's Khatam al-Anbiya …
>
> "By designating the individuals and entities today, Treasury is sending a clear signal to the international community that Iran's attempts to evade international sanctions will not go unnoticed. We will continue to target the Iranian regime and specifically the IRGC as it attempts to continue its nefarious infiltration of the Iranian economy," said Adam Szubin, Director of [OFAC].

> The IRGC continues to be a primary focus of U.S. and international sanctions against Iran because of the central role the IRGC plays in … [*inter alia*] Iran's … support for terrorism …. The IRGC has continued to expand its control over the Iranian economy – in particular in the defense production, construction, and oil and gas industries – subsuming increasing numbers of Iranian businesses and pressing them into service in support of the IRGC's illicit conduct.

395.    On May 31, 2013, Treasury sanctioned KAA affiliate Bandar Imam Petrochemical Company as part of a package that, per Treasury, comprised "Actions [that] Target the Iranian Petrochemical Industry as well as the Iranian Regime's Attempts to Evade Sanctions and Support Terrorism."

396.    On November 17, 2017, the United States designated KAA (inclusive of KAA's alter egos) as an SDGT when it also designated the entire IRGC as an SDGT.

397.    On June 7, 2019, the United States imposed IRGC counterterrorism-related sanctions that targeted, *inter alia*, KAA, KAA affiliate PGPIC (also an IRGC front), and the IRGC's monopoly on Iran's oil and gas sector:

> OFAC … act[ed] … against Iran's largest and most profitable petrochemical holding group, Persian Gulf Petrochemical Industries Company (PGPIC), for providing financial support to Khatam al-Anbiya …, the engineering conglomerate of the [IRGC]. In addition to PGPIC, OFAC is designating PGPIC's vast network of 39 subsidiary petrochemical companies and foreign-based sales agents. PGPIC and its group of subsidiary petrochemical companies hold 40 percent of Iran's total petrochemical production capacity and are responsible for 50 percent of Iran's total petrochemical exports.
>
> "By targeting this network we intend to deny funding to key elements of Iran's petrochemical sector that provide support to the IRGC," said Treasury Secretary Steven T. Mnuchin. "This action is a warning that we will continue to target holding groups and companies in the petrochemical sector and elsewhere that provide financial lifelines to the IRGC."
>
> "The IRGC systemically infiltrates critical sectors of the Iranian economy to enrich their coffers, while engaging in a host of other malign activities," said Under Secretary for Terrorism and Financial Intelligence Sigal Mandelker.
>
> The IRGC and its major holdings, such as … Khatam al-Anbiya, have a dominant presence in Iran's commercial and financial sectors, controlling multi-billion dollar businesses and maintaining extensive economic interests in the defense, construction, aviation, oil, banking, metal, automobile and mining industries, controlling multi-billion dollar businesses. The profits from these

activities support the IRGC's full range of nefarious activities, including …
support for terrorism ….

In 2018, Iran's Ministry of Petroleum awarded the IRGC's Khatam al-
Anbiya ten projects in oil and petrochemical industries worth the equivalent of 22
billion dollars, a value four times the official budget of the IRGC.

398.    On July 6, 2022, the United States imposed additional counterterrorism sanctions

targeting the IRGC through KAA, PGPIC, and their affiliates under Executive Order 13846.

399.    On September 15, 2023, Treasury imposed counterterrorism sanctions "pursuant

to E.O. 13224" upon "Abdolreza Abedzadeh" who was "the newly appointed Commander" of

KAA, and confirmed that KAA continued to enable IRGC attacks through at least 2022 when it

observed that "the U.S.-designated Khatam ol Anbia Gharargah Sazandegi Nooh (Khatam al-

Anbiya Construction Headquarters) [is] an IRGC-controlled construction conglomerate that

undertakes multi-billion-dollar projects in the oil, petrochemical, and various infrastructure

sectors, generating revenue for the IRGC and expanding its control across multiple industries."

400.    From 2009 through 2024, senior Qods Force leader Rostam Qasemi led, or helped

lead, KAA. On November 17, 2017, the United States designated Qasemi as an SDGT when it

also designated the entire IRGC as an SDGT.

401.    The U.S. government and U.N. statements confirming KAA's direct connection to

IRGC sponsored, proxy-committed, acts of terrorism targeting the United States described a

consistent pattern of conduct that existed at all relevant times throughout BNPP's scheme with

the IRGC and Hezbollah. These sources show that KAA was closely intertwined with terrorist

violence because the Qods Force and Hezbollah used KAA's profits to finance terrorist attacks.

402.    BNPP always knew the above facts. Among other reasons, Treasury sanctions

designations alerted financial institutions, like BNPP, that its transactions with, and value flow-

through to, KAA fueled IRGC-sponsored acts of terrorism.

403.    KAA was never a normal company: it was fully captured by the IRGC, led by,

and comprised of, avowed supporters and financiers of the Qods Force, Hezbollah, Hamas, PIJ,

and JAM, and operated for the benefit of their shared mission to sponsor terrorist attacks

targeting the United States to coerce U.S. government decisionmakers in the United States to exit

the Middle East and abandon its allies there, including Israel and Iraq

## 2. National Iranian Oil Company (NIOC)

404.    NIOC was the entity responsible for exploring and exporting Iran's oil. It was a

government-owned business overseen by the Iranian Ministry of Petroleum, and it exercised a

monopoly over the petroleum trade in Iran and with respect to exports of Iranian petroleum-

based products (*e.g.*, oil and natural gas). NIOC had affiliates, including the Naftiran Intertrade

Company Ltd. ("NICO"), to handle much of its overseas trade.

405.    By no later than 2007, the IRGC seized NIOC and converted it to an IRGC front.

Since the IRGC seized NIOC, NIOC's express purpose has always been the same: to source

funds and weapons (including weapons components) for Hezbollah, the Qods Force, and their

proxies to use to commit acts of international terrorism targeting the United States. From 2009

onward, NIOC was a notorious front for Hezbollah and the Qods Force, which relied upon NIOC

to help finance acts of terrorism committed by Hezbollah, Hamas, PIJ, and other IRGC proxies.

Accordingly, NIOC was not a normal oil company: it was fully captured by the IRGC and

operated for the benefit of the IRGC's mission—*i.e.*, sponsoring acts of terrorism targeting the

United States.

406.    At all relevant times, NIOC provided key financial and logistical aid to acts of

terrorism committed by Hezbollah and the Qods Force and, through Hezbollah, to IRGC proxies

including Hamas, PIJ, and JAM. NIOC did so by directing funds to the IRGC through a web of

contracting arrangements with other IRGC businesses. NIOC's revenues thus flowed through to

the IRGC, the Qods Force, and Hezbollah—and, at those organizations' direction, to the IRGC's

terrorist proxies elsewhere, including to JAM in Iraq and to Hamas and PIJ in Israel.

407.    Given NIOC's status as a front for the Qods Force, Hezbollah, and such FTOs'

proxies, funds obtained by NIOC through its or its controlled companies' and/or investments'

(including Petropars') commercial transactions, resources, and profits with, or generated by,

NIOC inevitably flowed through NIOC to reach the Qods Force and Hezbollah and, through

them, to Hamas, PIJ, and JAM, to finance Hezbollah and the Qods Force's provision of fighters,

funds, and weapons that enabled IRGC-sponsored attacks in Israel (committed by Hezbollah

and/or Hamas and/or PIJ) and Iraq (committed by Hezbollah and JAM).

408.    The nexus between NIOC and IRGC-sponsored attacks committed by Hezbollah,

Hamas, and PIJ was especially tight because NIOC's shipments, oil, gas, and profits comprised

one of the IRGC's primary means of paying their North Korean allies in the RGB so that the

IRGC could trade such NIOC goods and services to the RGB and, in return, receive North

Korean weapons, training, and technical support for delivery to, and on behalf of, IRGC proxies

Hezbollah, Hamas, and PIJ.

409.    NIOC notoriously owned a wide array of companies in the Iranian oil, gas,

construction, and logistics spaces—all of which were part of the IRGC's terrorist machine. Such

notorious IRGC fronts, through NIOC, included, but were not limited to: (1) NICO; (2) Petropars

Ltd. ("Petropars"); and (3) IOEC, which was a joint venture between NIOC and Idro, a

subsidiary of the Iranian Ministry of Heavy Industry, in which KAA also had a stake. As such,

the IRGC fully controlled IOEC like it did NIOC.

410.    NIOC's investment in South Pars was a notorious front for Iran-backed proxy

attacks committed by Hezbollah, Hamas, and PIJ. On November 3, 1997, for example, Senator

Sam Brownback, who chaired the Senator Foreign Relations Subcommittee relating to Iran at the time, publicly warned:

> In the foreign policy arena, there are few hard and fast rules. One of them is this: American investors should not fund Iranian ballistic … missile development. And yet, that is essentially the deal that the Russian company Gazprom will be offering to unsuspecting American investors when it launches a new convertible bond … to invest $2 billion in Iran's South Pars gas field.
>
> The South Pars deal poses two big problems. First, by providing a steady stream of new revenues, it will help finance Tehran's … terrorist activities. Iran is a terrorist nation. It is committed to undermining the Middle East peace process [between Israel and Palestinians], wreaking death and destruction in Lebanon and on the South Lebanese border, and acquiring a nuclear capability. By exploiting Iran's South Pars field and helping Tehran foot the bill for terrorist activities, Gazprom will be squarely on the side of the terrorists.
>
> Second, the deal runs afoul of the Iran-Libya Sanctions Act (ILSA). ILSA limits investment in the Iranian energy sector to $40 million a year and provides sanctions for companies that exceed the limit. ILSA's underlying premise is simple: Assisting Iran's energy sector means financing a campaign against Mideast peace and stability. …
>
> If there is money to be made on such a venture, it is blood money. Gazprom is short on the cash it needs for investments such as South Pars. The company is planning to get U.S. investors to pony up by selling convertible bonds on Wall Street. …
>
> We should not stand by and watch U.S. … dollars bankroll an enterprise that subsidizes barbarism in the Middle East and is a threat to world peace. Trading peace for profit is a lousy investment.

411.    High-profile investigations confirmed in real-time that the Qods Force used NIOC-related transactions to provide cover for IRGC weapons purchases, and alerted BNPP to the same. In 2004 and 2005, for example, the Ukrainian government brought high-profile charges that targeted IRGC weapons purchases routed through Ukrainian middlemen in which the IRGC used NIOC, which prompted a wave of reports by the global press alerting BNPP to the risk. On March 26, 2005, for example, the *BBC* reported that prominent Ukrainian member of parliament Hryhoriy Omelchenko publicly "point[ed] out … that 'a bogus contract between the Iranian company SATAK Co. Ltd of NIOC [*i.e.*, National Iranian Oil Company] and Hyder Sarfraz's S.H. Heritage Holding Limited for the supply of gas turbine equipment for oil refineries

was used to cover the accounts for the missiles smuggled into Iran'." In 2009, similarly,

authorities in Thailand interdicted an aircraft transporting a shipment containing 35 tons of

explosives and weapons, including RPGs, which the IRGC – through NIOC oil – had purchased

from the RGB, and which the IRGC was subsequently smuggling – through an aircraft cloaked

with the cover of a NIOC-related purported end user from Iran that was ostensibly purchasing oil

drilling equipment, which was ultimately destined for delivery to Hezbollah, Hamas, and PIJ.

The foregoing was major international news from 2009 through 2011 and prompted waves of

reporting both years concerning the above facts.

412.    United States designations and reports repeatedly confirmed that NIOC-related

transactions powered IRGC-sponsored violence. On November 26, 2008, Treasury "identified

the National Iranian Oil Company (a.k.a. NIOC), Naftiran Intertrade Company Ltd. (a.k.a.

NICO), and Naftiran Intertrade Co. Sarl as entities owned or controlled by the Government of

Iran," and warned (emphases added):

> The inclusion of the National Iranian Oil Company, Naftiran Intertrade Company
> Ltd., and Naftiran Intertrade Co. Sarl marks the first non-financial institutions to
> be added to the appendix. Moving forward, OFAC will continue to list both
> financial institutions and other entities that are determined to be owned or
> controlled by the Government of Iran.
>
> While the ITR do not impose an asset freeze, they do prohibit most
> commercial and financial transactions with entities owned or controlled by the
> Government of Iran, regardless of where such entities are located or incorporated.
> ***Most transactions with any branches or subsidiaries of these entities are also
> prohibited***, regardless of where such branches or subsidiaries are located and
> incorporated.
>
> This appendix serves as a tool to ***assist U.S. persons in complying*** with
> the ITR. The identified entities are considered to be owned or controlled by the
> Government of Iran when they operate not only from the locations listed in the
> appendix, but also from any other location. The ITR prohibitions apply to all
> entities owned or controlled by the Government of Iran, regardless of where they
> are located or incorporated, even if they are not listed in the appendix. The
> prohibitions in the ITR also apply to transactions with entities located in Iran that
> are not owned or controlled by the Government of Iran.

Naftiran Intertrade Company Ltd. is a subsidiary of the National Iranian Oil Company that is registered in the United Kingdom and located in Jersey, Channel Islands, United Kingdom. NICO, in turn, has a subsidiary, called Naftiran Intertrade Co. (NICO) Sarl, which is incorporated and located in Switzerland. The ITR prohibit most transactions with NIOC, NICO and NICO Sarl, in any locations worldwide, because these companies are entities owned or controlled by the Government of Iran.

413.    On June 16, 2010, Treasury sanctioned NIOC's subsidiaries, and their associated investments, including Petropars, again warning that the IRGC seized Iran's energy sector.

414.    On November 15, 2011, terrorism experts testified to Congress that "NIOC operates as the ultimate front company obscuring the role of the IRGC in the oil trade," and warned of deepening ties between NIOC and the IRGC. Expert organization United Against Nuclear Iran ("UANI") wrote that "working with NIOC and the IRGC" would "directly contribut[e] to Iran's capabilities to sponsor terrorism, kill and maim NATO servicemen and develop its weapons of mass destruction programs"—for example, by bankrolling "groups in Iraq … that execute attacks against American and NATO servicemen" while "being actively supported by Iran." The United States responded by increasing sanctions pressure on the IRGC to prevent the IRGC from using oil revenues to support terrorism.

415.    On December 31, 2011, Congress in the 2012 National Defense Authorization Act blacklisted CBI/Markazi. Congress also, with limited exceptions, subjected to sanctions foreign financial institutions doing any significant financial transactions with CBI/Markazi, as well as several other IRGC-affiliated financial institutions. These sanctions were imposed because CBI/Markazi—which was a principal repository of Iranian oil revenue—was participating actively in the IRGC's illicit transactions, including transferring funds used to support IRGC-backed terrorism. Through this legislation, Congress reaffirmed the connection between Iranian oil revenue and IRGC terrorism.

416.    In August 2012, Congress enacted the Iran Threat Reduction and Syria Human Rights Act of 2012 ("ITRSHRA"), Section 312 of which directed Treasury to determine whether NIOC was acting as an agent or affiliate of the IRGC. A month later, Treasury publicly announced that the answer was "yes."

417.    The finding that NIOC was effectively a front for the IRGC triggered additional sanctions on NIOC. Specifically, under the ITRSHRA, NIOC was sanctioned for providing support to the IRGC. And under CISADA and the Iranian Financial Sanctions Regulations, foreign financial institutions determined to knowingly facilitate significant transactions or provide significant financial services for NIOC were subject to sanctions, including the prohibition or imposition of strict conditions on the opening or maintaining of correspondent or payable-through accounts in the United States.

418.    NIOC was also listed on the Specially Designated Nationals ("SDN") list (a list of sanctioned entities), specifically with an "IRGC" identifier after its name. As the Foundation for Defense of Democracies explained on September 23, 2012 after Treasury's determination, "U.S. law now makes it explicitly clear that NIOC's business partners are doing direct business with the world's most dangerous terrorist organization and nuclear proliferator."

419.    By threatening to cut foreign financial institutions off from the U.S. financial system if they continued to deal in any significant way with CBI/Markazi and NIOC, these sanctions essentially forced foreign financial institutions to choose between dealing with IRGC fronts or maintaining access to U.S. dollar trading—and prompted most financial institutions to curtail their services for IRGC companies. This made it extremely difficult for the IRGC to access revenue from its oil sales, and the international financial system more generally.

420.    On September 24, 2012, Treasury sanctioned NIOC as an "agent or affiliate" of the IRGC.

421.    On May 31, 2013, Treasury sanctioned NIOC subsidiaries as part of a package that "Target[ed] the Iranian Petrochemical Industry as well as the Iranian Regime's Attempts to Evade Sanctions and Support Terrorism," and warned:

> As part of its ongoing efforts to intensify sanctions pressure on Iran, … Treasury took a series of related actions to disrupt efforts to evade sanctions on the Iranian regime … [and] sanctioned a company that has aided Iran's efforts to evade sanctions by attempting to conceal oil transactions with the Government of Iran … These actions, which were taken under a number of different authorities, apply sanctions to companies operating in several countries that are aiding Iran's support for terrorism ….
>
> Treasury…, acting in concert with … State, … act[ed] … to target Iran's petrochemical industry. As Iran's oil revenues continue to fall due to international sanctions, the Iranian government has increasingly turned to other industries to make up for lost profits. One of these sectors is the petrochemical industry, which is now the second largest source of revenue for the Iranian Government. The Administration is taking action today to target this revenue stream by both designating companies involved in transactions with the sector and identifying several petrochemical companies as subject to sanctions because they are controlled by the Iranian government.
>
> "We are committed to intensifying the pressure against Iran, not only by adopting new sanctions, but also by actively enforcing our sanctions and preventing sanctions evasion. Today's actions take aim at revenues from Iran's petrochemical sector, as well as deceptive schemes Iran has employed in an effort to evade sanctions on its oil sales and its airlines," said Treasury Under Secretary for Terrorism … David S. Cohen. …
>
> Treasury … is also identifying eight Iranian petrochemical companies that are owned or controlled by the Government of Iran, including Bandar Imam Petrochemical Company, Bou Ali Sina Petrochemical Company, Mobin Petrochemical Company, Nouri Petrochemical Company, Pars Petrochemical Company, Shahid Tondgooyan Petrochemical Company, Shazand Petrochemical Company, and Tabriz Petrochemical Company. These identifications made pursuant to E.O. 13599, which targets the government of Iran.

422.    From 2018 through 2024, the United States repeatedly confirmed that the Iranian regime used commercial transactions with, and profits from, NIOC and its affiliates, including NICO, to fund Hezbollah-led terrorist attacks by IRGC proxies. On August 6, 2018, for example,

President Trump signed Executive Order 13846, which included the finding that "financial, material, or technological support for, or goods or services in support of, the National Iranian Oil Company" and "Naftiran Intertrade Company" directly enabled "threats posed by Iran, including Iran's … network and campaign of regional aggression, its support for terrorist groups, and the malign activities of the Islamic Revolutionary Guard Corps and its surrogates."

423.   On January 23, 2020, likewise, OFAC described NIOC as "instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's Islamic Revolutionary Guard Corps – Qods Force (IRGC-QF) and its terrorist proxies," necessarily including Hezbollah, Hamas, PIJ, and JAM. In that same release, the Treasury Secretary commented that "Iran's petrochemical and petroleum sectors are primary sources of funding for the Iranian regime's global terrorist activities," *i.e.*, IRGC-sponsored acts of terrorism targeting the United States and committed by one or more IRGC proxy.

424.   On October 26, 2020, OFAC designated NIOC's related Ministry, the Iranian Ministry of Petroleum, and NIOC's subsidiary, NICO, among others, under E.O. 13,324 (counterterrorism) "for their financial support to Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF)," noted that "[t]he cooperation and coordination between the IRGC-QF and these entities extends well beyond the simple sale of oil," and the Treasury Secretary observed that "[t]he regime in Iran uses the petroleum sector to fund the destabilizing activities of the IRGC-QF," *i.e.*, acts of terrorism targeting the United States, which was a required finding for the legal designation announced. Treasury justified the counterterrorism sanctions against NIOC under E.O. 13,324 by observing that NIOC services were inextricably connected to Hezbollah-sponsored acts of terrorism targeting the United States, finding, *inter alia*, that: (1) "Senior NIOC … personnel have worked closely with Rostam Ghasemi, a senior IRGC-QF official and

former Minister of Petroleum who was designated in 2019, and who has assumed a portion of former IRGC-QF Commander Qasem Soleimani's role in facilitating shipments of oil and petroleum products for the financial benefit of the IRGC-QF" through, inter alia, IRGC-controlled "front companies"; and (2) "NIOC" facilitated "oil deals used to generate revenue for the IRGC-QF and Hizballah" through its "coordination" with such terrorists by working with the IRGC-QF, Hezbollah, and NITC to route IRGC-QF oil to Hezbollah through trades in other Middle Eastern countries to raise funds for Hezbollah and the Qods Force to distribute to IRGC proxies to sponsor acts of terrorism targeting the United States.

425.    The U.S. government statements confirming NIOC's direct connection to IRGC sponsored, proxy-committed acts of terrorism targeting the United States described a consistent pattern of conduct that existed at all relevant times throughout BNPP's scheme with the IRGC and Hezbollah. These sources confirm that NIOC was closely intertwined with terrorist violence because the IRGC used revenues from NIOC oil sales to finance terrorist attacks.

426.    NIOC ceased to be a normal oil company by 2007, when the IRGC completed its capture of NIOC and thereafter operated NIOC for the benefit of the IRGC's mission to sponsor terrorist attacks targeting the United States to coerce U.S. government decisionmakers in the United States to exit the Middle East and abandon its allies there, including Israel and Iraq.

### 3.  National Iranian Tanker Company (NITC)

427.    NITC was responsible for transporting NIOC's oil. It was a government-owned business overseen by the Iranian Ministry of Petroleum, and it exercised a monopoly over the transportation aspects of petroleum trade in Iran and with respect to exports of Iranian petroleum-based products (*e.g.*, oil and natural gas).

428.    By 2007, the IRGC took control of NITC by seizing its sole customer, NIOC, and the IRGC has controlled NITC as an IRGC front ever since. Since the IRGC seized NITC in

2007, NITC's purpose—like NIOC's—has been to source funds and weapons (including weapons components) for Hezbollah, the Qods Force, and their proxies to use to commit acts of terrorism targeting the United States. From 2009 onward, NITC has been a notorious front for Hezbollah and the Qods Force, which relied upon NITC to help finance acts of terrorism committed by Hezbollah, Hamas, PIJ, and other IRGC proxies. Accordingly, NITC was not a normal oil tanker company: it was fully captured by the IRGC, and operated for the benefit of, the IRGC's mission, *i.e.*, sponsoring acts of terrorism targeting the United States.

429.    At all relevant times, NITC provided key financial and logistical aid to acts of terrorism committed by Hezbollah and the Qods Force and, through Hezbollah, to IRGC proxies including Hamas, PIJ, and JAM. NITC did so by coordinating oil shipments with NIOC, the Qods Force, and Hezbollah to flow funds to the Qods Force, Hezbollah, and their proxies through NIOC's web of contracting arrangements with other IRGC businesses, all of which depended upon NIOC's ability to reliably export IRGC-QF owned oil, in contravention of U.S. counterterrorism sanctions, to customers outside of Iran. NITC's conduct was thus intended to, and did, flow tens of millions in revenues through NIOC to the IRGC, the IRGC-QF, and Hezbollah—and, at those organizations' direction, to the IRGC's terrorist proxies elsewhere, including Iraq (to its Shiite terrorist proxy groups) and Israel (to Hamas and PIJ).

430.    Given NITC's status as a front for the Qods Force, Hezbollah, and such FTOs' proxies, including Hamas and PIJ, funds obtained by NITC through its or its controlled companies' and/or investments' commercial transactions, resources, and profits inevitably flowed through NITC to reach the Qods Force and Hezbollah and, through them, to Hamas, PIJ, and JAM, to finance Hezbollah and the Qods Force's provision of fighters, funds, and weapons

that enabled IRGC-sponsored attacks in Israel (committed by Hezbollah and/or Hamas and/or PIJ) and Iraq (committed by Hezbollah and JAM).

431.    True, Treasury did not characterize NITC as an IRGC "agent or affiliate" in 2012. That decision, however, was based on Treasury's narrow definition of "agent or affiliate," for which only direct agency mattered. Treasury thus deemed NIOC an IRGC agent, but it did not deem NITC an IRGC agent. In practice, however, transacting with NITC was no different than transacting with NIOC directly: NITC was always a known NIOC agent, and NIOC was always NITC's only customer. Accordingly, when Treasury declined to formally confirm that NITC was an IRGC "agent or affiliate" for purposes of complying with an edict from Congress, BNPP knew that such decision did not authorize its NITC-related transactions because BNPP understood that NITC was an agent for NIOC and NIOC was an agent for the Qods Force and Hezbollah.

432.    On May 31, 2013, Treasury imposed sanctions on NITC to "Target the Iranian Petrochemical Industry as well as the Iranian Regime's Attempts to Evade Sanctions and Support Terrorism," and warned:

> Treasury imposed sanctions on [a European firm] because it has facilitated deceptive transactions for or on behalf of the [NITC], which was identified by Treasury as a Government of Iran entity in July 2012. This Treasury action is the first use of sanctions pursuant to Executive Order (E.O.) 13608, which targets Foreign Sanctions Evaders, including those that facilitate deceptive transactions for or on behalf of persons sanctioned in connection with Iran …
>      In March 2013, Ferland and NITC cooperated in a scheme to sell Iranian crude oil deceptively in order to help Iran evade international sanctions …. The scheme involved ship-to-ship transfers of oil between three oil tankers … working on behalf of Iran in March 2013. …

433.    The United States has confirmed that the Iranian regime used profits generated by NITC to fund terrorist attacks by Hezbollah, Hamas, PIJ, and JAM. On August 6, 2018, for example, Executive Order 13846 included findings that "financial, material, or technological

support for, or goods or services in support of, the National Iranian Oil Company (NIOC)"
including services provided by any "person" who was "a part of the energy, shipping, or
shipbuilding sectors of Iran"—all of which described NITC—directly enabled "threats posed by
Iran, including Iran's … network and campaign of regional aggression, its support for terrorist
groups, and the malign activities of the Islamic Revolutionary Guard Corps and its surrogates."

434.    On October 26, 2020, likewise, OFAC designated NITC "for [its] financial
support to Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF)," noted that "[t]he
cooperation and coordination between the IRGC-QF and [NITC] extends well beyond the simple
sale of oil," and the Treasury Secretary himself observed that "[t]he regime in Iran uses the
petroleum sector to fund the destabilizing activities of the IRGC-QF"—*i.e.*, terrorist attacks
targeting the United States, which was a required finding for the legal designation announced.
Treasury justified the counterterrorism sanctions against NITC by observing that NITC services
were inextricably connected to Hezbollah-sponsored acts of terrorism targeting the United States
by finding, *inter alia*, that: (1) "Senior … NITC personnel have worked closely with Rostam
Ghasemi, a senior IRGC-QF official and former Minister of Petroleum who was designated in
2019, and who has assumed a portion of former IRGC-QF Commander Qasem Soleimani's role
in facilitating shipments of oil and petroleum products for the financial benefit of the IRGC-QF"
through, *inter alia*, IRGC-controlled "front companies"; and (2) "NITC has also played a
significant role in oil deals used to generate revenue for the IRGC-QF and Hizballah. NITC
personnel coordinated with the IRGC-QF on the loading of oil provided by NIOC, and NITC
Managing Director Nasrollah Sardashti (Sardashti) worked with Hizballah on logistics and
pricing for oil shipments to Syria. Sardashti also worked with Qatirji Group representative Viyan

Zanganeh (Zanganeh) and a senior IRGC-QF official to facilitate the shipment of millions of dollars of oil by NITC."

435.    The U.S. government statements confirming NITC's direct connection to IRGC sponsored, proxy-committed, acts of terrorism targeting the United States described a consistent pattern of conduct that existed at all relevant times throughout BNPP's scheme with the IRGC and Hezbollah. These sources show that NITC was closely intertwined with terrorist violence because the IRGC used revenues from NITC shipments, including but not limited to the profits NITC itself realized as well as the income NITC helped other IRGC fronts, including NIOC, earn, to finance terrorist attacks.

436.    NITC was no longer a normal company by 2007, when the IRGC had completed its capture of NITC's only customer, NIOC, and the IRGC thereafter operated NIOC, and by extension NITC, to sponsor terrorist attacks targeting the United States to coerce U.S. government decisionmakers in the United States to exit the Middle East and abandon its allies there, including Israel and Iraq.

### 4. Caspian Petrochemical

437.    Caspian Petrochemical FZE, inclusive of its predecessor entity, the Iranian Petrochemical Company (collectively, "Caspian Petrochemical") helped ship petroleum products, including oil and gas, that IRGC energy fronts extracted from IRGC-controlled areas, including the IRGC's South Pars field and the IRGC's energy claims in the Caspian Sea. (Unless otherwise indicated, all references to Caspian Petrochemical in this Complaint are inclusive of its predecessor entity, and inclusive of such entity's conduct from at least 2007 through 2011, when the IRGC rebranded it as "Caspian Petrochemical.")

438.    Caspian Petrochemical was subordinate to the Supreme Leader's Office, via SLO entity Petro Nahad, and handled much of the Iranian regime's overseas oil and gas shipments.

439.    By no later than 2007, the SLO and IRGC seized Caspian Petrochemical's predecessor when they seized their monopoly in the Iranian energy sector. The SLO and IRGC have controlled Caspian Petrochemical as an IRGC front ever since. Since being seized by the SLO and IRGC, Caspian Petrochemical's express purpose has always been to source funds and weapons (including weapons components) for Hezbollah, the Qods Force, and their proxies to use to commit acts of international terrorism targeting the United States. From 2007 onwards, Caspian Petrochemical was a known front for Hezbollah and the Qods Force (given Caspian Petrochemical's responsibility for shipping the IRGC's most lucrative financial asset). Hezbollah and the Qods Force relied upon Caspian Petrochemical to help finance acts of terrorism committed by Hezbollah, Hamas, and other IRGC proxies. Caspian Petrochemical was not a normal energy or shipping company: it was fully captured by the IRGC, and it supported the IRGC's mission—*i.e.*, sponsoring acts of terrorism targeting the United States to export the Islamic Revolution.

440.    At all relevant times, Caspian Petrochemical provided key financial and logistical aid to acts of terrorism committed by Hezbollah and the Qods Force and, through Hezbollah, to IRGC proxies including Hamas, PIJ, and JAM. Caspian Petrochemical did so by directing funds to the IRGC through a web of contracting arrangements with other IRGC businesses. Caspian Petrochemical's revenues thus flowed through to the IRGC, the Qods Force, and Hezbollah— and, at those organizations' direction, to the IRGC's terrorist proxies elsewhere, including Iraq (to its Shiite terrorist proxy groups) and Israel (to Hamas and PIJ).

441.    Caspian Petrochemical was never a normal company: it was fully captured by the Supreme Leader's Office and IRGC, led by, and comprised of, avowed supporters and financiers of Hezbollah, the Qods Force, Hamas, PIJ, and JAM, and operated for the benefit of their shared

mission to sponsor terrorist attacks targeting the United States to coerce U.S. government decisionmakers in the United States to exit the Middle East and abandon its allies there, including Israel and Iraq.

### 5.  Iran Electronic Development Company (IEDC)

442.    From 2004 through 2024, Iran Electronic Development Company ("IEDC") was managed by the Foundation for the Oppressed as front for the IRGC, Hezbollah, and Supreme Leader's Office.

443.    In or about 2004, the Foundation for the Oppressed, Supreme Leader's Office, and IRGC established IEDC as a joint venture between the Foundation for the Oppressed (jointly operated by the SLO and IRGC alongside Hezbollah as one of the Terrorist Sponsors' transnational operations, logistics, and financial fronts operated by the SLO, IRGC, and Hezbollah), and Iran Electronics Industries ("IEI"), which functioned as the IRGC's, Hezbollah's, and their proxies' primary, high-end electronics-, communications-, and optics-related weapons manufacturer (jointly operated by the IRGC and Iran's Ministry of Defence and Armed Forces Logistics ("MODAFL")).

444.    From 2004 through 2024, the SLO, IRGC, and Hezbollah operated IEDC as a shared front that supplied key weapons and intelligence to the attacks they sponsored. Throughout this period, the SLO and IRGC operated IEDC overtly, while Hezbollah operated covertly through positions such as "Hezbollah liaison" to IEDC portfolio companies. The Terrorist Sponsors created IEDC in or about 2004 as part of their comprehensive strategy to intensify their support for attacks targeting the United States in the Middle East. They used IEDC to ensure the SLO's, IRGC's, and Hezbollah's direct involvement in, and control of, the Iranian regime's – and, by extension, Hezbollah's and their shared proxies' – development of next-generation telecoms- and computing-derived weapons and technologies that the terrorists

specifically designed for, intended to, and did use to, optimize the lethality of terrorist attacks targeting the United States in the Middle East, including attacks on ally Israel.

445.    In 2005, Iranian terrorists publicly flexed their control of IEDC and simultaneously confirmed their control of – and intention to use – IEDC to supply logistics to their terrorist operations when the IRGC led an intervention on behalf of MTN Group Limited of South Africa, and adverse to Turkcell (of Turkey), in which the IRGC publicly vetoed an award of a mobile telecommunications license for Irancell to Turkcell, in favor of MTN Group. Notably, their intervention was openly defended on the grounds that the IRGC and its allies needed to control Irancell to protect Iranian national security.

446.    On November 18, 2020, Treasury designated "Iran Electronic Development Company (IEDC), a joint venture between Bonyad Mostazafan and MODAFL-controlled Iran Electronic Industries" under its counterterrorism authorities "pursuant to E.O. 13876" – through which, the Executive sought to protect the United States from "the actions of the Government of Iran and Iranian-backed proxies, particularly those taken to destabilize the Middle East" and "promote international terrorism" – given IEDC's status as "being owned or controlled by, directly or indirectly, Bonyad Mostazafan" and, in so doing, found observed that "IEDC is the majority owner of Irancell, Iran's second largest telecommunications company."

447.    IEDC was never a normal company: it was fully captured by the Supreme Leader's Office and IRGC, led by, and comprised of, avowed supporters and financiers of Hezbollah, the Qods Force, Hamas, PIJ, and JAM, and operated for the benefit of their shared mission to sponsor terrorist attacks targeting the United States to coerce U.S. government decisionmakers in the United States to exit the Middle East and abandon its allies there, including Israel and Iraq.

### 6.  Irancell

448.    From 2004 through 2024, Irancell was Iran's second largest telecommunications, data, and communications firm, doing business as MTN Irancell or Irancell ("Irancell"). As OFAC explained on June 26, 2020 (while penalizing a firm that knowingly helped Irancell evade U.S. sanctions), "Irancell" was "a joint venture between the South African company MTN Group and [IEDC]," which was "the majority owner of Irancell" with a 51% ownership share (with MTN Group owning 49%).

449.    From 2004 through 2024, the Foundation and IEI managed Irancell as a front for the IRGC, Hezbollah, and Supreme Leader's Office. During that period, the SLO, IRGC, and Hezbollah operated Irancell as a shared telecoms front that supplied key weapons and intelligence to the attacks they sponsored. Throughout this period, the SLO and IRGC operated Irancell overtly, while Hezbollah operated covertly through positions such as "Hezbollah liaison" to Irancell.

450.    Terrorist Sponsors created Irancell as part of their comprehensive strategy to intensify their support for attacks targeting the United States in the Middle East. They used Irancell to ensure the SLO's, IRGC's, and Hezbollah's direct involvement in, and control of, the Iranian regime's—and, by extension, Hezbollah's and their shared proxies'—development of next-generation telecoms- and computing-derived weapons and technologies that the terrorists specifically designed for, intended to, and did use to, optimize the lethality of terrorist attacks targeting the United States in the Middle East, including attacks on ally Israel.

451.    From 2005 through 2024, Irancell was always one of the Terrorist Sponsors' primary fronts upon which Hezbollah relied to source key telecoms-related weapons to assist attacks propagated by the operations cells of Hezbollah and its proxies, including Hamas, Palestinian Islamic Jihad, and Jaysh al-Mahdi. Hezbollah accomplished this objective by

coordinating with, among others, Irancell leadership (*e.g.*, its CEO), Irancell's owners (*i.e.*, the

Foundation for the Oppressed and Iran Electronics Industries), and Irancell's ultimate

supervisors (*i.e.*, the IRGC and Supreme Leader's Office). In so doing, Hezbollah followed the

same tradecraft it had honed for decades through its embedded role in the Foundation for the

Oppressed: presence under commercial cover, coordination with representatives of the IRGC and

Supreme Leader's Office, and role that complemented that of the other Terrorist Sponsors.

452.    The events surrounding the Israeli military's successful "beeper attack" targeting

Hezbollah in Lebanon in 2024 provided a vivid example of Irancell's long-standing role as

Hezbollah's procurement arm. In short, credible reports based in public comments made by three

different groups of well-placed sources, indicated that Irancell served as a technical advisor and

procurement arm for Hezbollah, and that it was Irancell personnel who had suggested Hezbollah

purchase the beepers in question while simultaneously failing to vet the resulting goods for

potential compromise by a hostile intelligence service. Such reports were republished in

respected Iran-facing media sources, including by *Iran Wire* on October 14, 2024:

> Masoud Asadollahi … revealed on October 11, [2024,] "An Iranian company
> facilitated the purchase of Hezbollah pagers that exploded in Beirut." . . .
>
> Asadollahi claimed, "Hezbollah couldn't buy pagers due to international
> sanctions.". He added, "At Hezbollah's request, an Iranian company purchased
> about 5,000 pagers from a well-known Taiwanese brand and supplied them to
> Hezbollah."
>
> According to Asadollahi, the Iranian company responsible for purchasing
> the pagers gave 3,000 pagers to Hezbollah without conducting security checks.
> He said the devices should have been inspected to ensure they didn't contain
> "microphones or listening devices," but "no one imagined that these pagers would
> turn into bombs." …
>
> Although Asadollahi didn't specify the "company" involved in purchasing
> Hezbollah pagers, several media outlets, including The Times of Israel, alleged
> the involvement of "a relative of an Islamic Republic official." …
>
> Telegram channels . . . citing anonymous Hezbollah sources, claimed that
> Iran was the source of the pagers sent to Lebanon, implicating some prominent
> political figures in the country.

A channel called "Quds Force," while not officially affiliated with the IRGC but covering military and security news, reported that Hezbollah negotiated with Islamic Republic officials after deciding to ban its members from using mobile phones.

The channel claimed that Mohammad Reza Aref, a vice president, tasked Bijan Abbasi, the CEO of Irancell Telecom Company, with finding an alternative communication method. Abbasi then assembled a team to address this issue.

The "Quds Force" Telegram channel also alleged that Kambiz Mehdizadeh, Hassan Rouhani's son-in-law, was introduced as Irancell's liaison to Hezbollah for the project and suggested Motorola pagers as a suitable alternative. Mehdizadeh, however, denied this claim in an interview with the Rooidad 24 news website.

453.    From 2005 through 2024, several factors confirmed Irancell's status as a front operated by the IRGC for the benefit of the Qods Force, Hezbollah, Regular IRGC, and such FTOs' proxies, to enable the Qods Force's, Hezbollah's, and such FTOs' proxies' acts of terrorism targeting the United States; each factor also alerted BNPP to the same.

454.    The Qods Force and Hezbollah always controlled the leadership of the Foundation, which notoriously served as the real decision maker behind Irancell. Hezbollah and the Qods Force accomplished through, among other things, their appointment of notorious Hezbollah and/or Qods Force leader to officially, or unofficially, run the Foundation and, by extension, Irancell, including, but not limited to, Mohsen Rafiqdoost, Mohammad Forouzandeh, and Parviz Fattah.

455.    The Qods Force and Hezbollah, through the Foundation, always comprised Irancell's largest Iranian beneficiary, and Regular IRGC, through Iran Electronics Industries, always comprised Irancell's second Iranian beneficiary. Accordingly, the Qods Force and Hezbollah, and Regular IRGC were the primary beneficiaries of any goods, services, revenues, income, data, or other aid provided to Irancell, as such aid flowed through to reach then.

456.    The Qods Force and Hezbollah (through their control of the Foundation), and Regular IRGC (through its control of Iran Electronics Industries) always had veto rights—based upon Iranian "law" and practice—over any and all Irancell-related issue.

457.    On behalf of Hezbollah, the Qods Force, and Regular IRGC, the IRGC always embedded IRGC operatives and supporters, including IRGC-IO operatives, throughout Irancell's corporate structure, including its headquarters in Tehran. Such IRGC-IO embeds ensured the Qods Force's and Hezbollah's ability to extract maximum financial, operational, intelligence, and logistical value from their ultimate control of Irancell. Indeed, as early as 2008, the E.U. sanctioned Irancell Board of Directors Chairman Ebrahim Mahmudzadeh in recognition of his vital support to IRGC missile-related operations.

458.    Irancell was always one of Iran's largest and most important telecoms, communications, and big data companies. Per an MTN Group statement in 2019, "Irancell" was "a major business" that "serv[ed] more than 40 million customers and" was "the largest data operator in Iran." In 2022, likewise, the U.K. Home Office reported that "Irancell" had "about 46.8 million subscribers in" Iran.

459.    On April 5, 2012, likewise, the *Mail & Guardian* published an extensive investigation about the IRGC-IO's (inclusive of MOIS operatives assigned to it) had an embedded unit with its own offices at Irancell's Tehran headquarters, which senior Irancell employees—including longstanding Irancell CEO, and notorious IRGC sponsor, Alireza Dezfouli—enthusiastically helped the IRGC wield Irancell data as a weapon to help IRGC terrorists identify, locate, track, target, torture, and murder IRGC enemies by alerting BNPP, *inter alia*, that:

a.    "Sources close to [Irancell] … described an Orwellian environment in [its] Tehran headquarters, where [Irancell] allegedly gave military intelligence [IRGC-IO] officials

'open' access. … Fifty-one percent [of Irancell] is held by [a] … consortium [that included] … a subsidiary owned by … Iran Electronics Industries. [IEI] is subject to US and European Union sanctions …. [IEI] also holds a share in [] Arya Hamrah, which owns and runs [] Irancell's data centre that houses [Irancell's] servers and hardware."

b.    "Sources close to [Irancell] … claimed: … [1] Because [] Irancell and its data centre were part-owned by the Iranian military [IRGC], [Irancell] subscriber data was shared 'on a collegial basis' with the intelligence sector [IRGC-IO]; [2] A shadowy 'second floor' in [Irancell]'s [headquarters] building [in Tehran] was populated by military intelligence [IRGC-IO] officials, the volunteer [IRGC] militia known as the Basij ('morality police') and clerics; [3] During the 2009 and 2010 … protests [in Iran], men [IRGC-IO operatives] from the second floor [of Irancell's Tehran headquarters, *i.e.*, IRGC-IO], accompanied by Irancell chief executive Alireza Dezfouli, allegedly approached [Irancell] data warehouse staff regularly to demand detailed records for individuals; [4] In one case, [IRGC-IO operatives] demanded the number of a known Green Party activist, who could not be reached after his information had been given [by Irancell] to military intelligence [IRGC-IO]; [and] [5] Third parties listened in to [Irancell] staff calls over Irancell SIMs and would intervene and demand that the [Irancell] staff speak in English and not in other South African languages."

c.    Military intelligence[:] The sources familiar with [Irancell] … said that, because of [the IRGC's role in Irancell's] ownership structure[], Irancell readily gave information about subscribers to intelligence officials [IRGC-IO operatives]. … One of the sources said: 'MTN's data centre in Iran is effectively run by the military [IRGC] and military intelligence [IRGC-IO]. None of the intelligence organisations needs to go through normal procedures to access [Irancell] subscriber data and track individuals.' Describing the climate at [Irancell's] headquarters [in Tehran], a senior [Irancell] official said it was dominated by the presence of Iran's military intelligence [IRGC-IO] officials and the 'morality police' [IRGC Basij]. 'There was a tea lady who just stood at the printer all day. Her job was to watch us.' The woman, understood to be a member of the 'morality police' [IRGC Basij], would scold female [Irancell] staff whose clothing was considered too revealing and signaled her displeasure over 'inappropriate' behaviour."

d.    "[An Irancell official] said: 'The people on the second floor are from military intelligence [*i.e.*, IRGC-IO] and the [IRGC's] Basij and some clerics [*i.e.*, SLO representatives]. They oversee the intelligence [IRGC-IO] and moral [IRGC Basij] activities of the employees of Irancell. All emails, telephone conversations and SMSes [*i.e.*, text messages] of employees are monitored on an ongoing basis. This is then exposed to MTN [Group] against the threat that they [*i.e.*, the IRGC] will kick out MTN when they need concessions from it.' The [Irancell] staffer described how [IRGC-IO operatives] from the second floor would accompany [Irancell CEO Alireza] Dezfouli to collect [Irancell customer and network] data on individuals and political dissidents: 'On several occasions someone from the second floor [*i.e.*, the embedded IRGC-IO office at Irancell's headquarters in Tehran] and [Irancell CEO Dezfouli] would come to [Irancell's] managed services group and say 'give us all the details for this number', and they would have to.' The [Irancell] staffer said [Irancell] subscription and location data and call and SMS histories were handed over [by Irancell to the IRGC-IO]."

On information and belief, the *Mail & Guardian*'s investigative report accurately described the IRGC-IO's operations at Irancell and Dezfouli's associated support to the IRGC, including the IRGC-IO. On December 28, 2012, for example, *Reuters* corroborated the sum and substance of the *Mail & Guardian*'s investigation, while also reporting that the IRGC-IO partnered with MTN Group to corruptly steal the Irancell license from Turkcell from 2004 onward. Indeed, Irancell and Dezfouli publicly touted the key role that Irancell and Dezfouli played in turning Irancell into the most important mass data depository for Iran in the entire world, in effect, like when Dezfouli did while acting as Irancell CEO in a September 2, 2015 interview with *Total Telecom*.

460.    Senior IRGC and SLO operatives' and supporters' control at every level of Irancell ensured that transactions that aided Irancell directly enabled IRGC-sponsored attacks. From 2005 through 2022, for example, Mohammad Mokhber served as one if Ayatollah Khamenei's closest confidents, played a key leadership role at the Foundation for the Oppressed, Irancell, and the SLO, including with IRGC fronts that the U.S. government sanctioned in 2018 for enabling IRGC terrorism through child recruitment. As Saeed Ghasseminejad of the Foundation for Defense of Democracies explained in 2024, Mohammad Mokhber "came to national notice when he moved to Tehran to join the Mostazafan Foundation, which handles much of Khamenei's business," for which Mokhber "managed the foundation's" affairs when the Foundation for the Oppressed "facilitated the creation of Irancell" and "also served as chair of Mostazafan's Sina bank, which the United States sanctioned in 2018 as part of a financial network that was supporting the Basij, an IRGC-controlled paramilitary force, that recruits and trains child soldiers." Notorious IRGC supporter—and proud champion who helped the IRGC operationalize Khamenei's "Resistance Economy" through Irancell—Alireza Dezfouli, similarly, served as Irancell's CEO from 2005 through 2019.

461.    Irancell's leadership ensured that Irancell's operations, profits, data, network, and personnel enabled IRGC terrorist attacks, including by using Irancell to source funds, data, intelligence, and recruits to support: (1) IRGC-committed attacks; (2) IRGC-sponsored attacks by IRGC proxies Hezbollah, Hamas, PIJ, the Houthis, Kataib Hezbollah, and the Taliban; (3) IRGC-IO-committed attacks involving IRGC intelligence; (4) IRGC hostage-taking and torture; (5) weapons that supported IRGC and IRGC proxy bomb, rocket, complex, and kidnapping attacks; and (6) drones and missiles for IRGC and IRGC proxy attacks involving the same.

462.    U.S. government statements confirmed that Irancell was an IRGC front, and alerted BNPP to the same. In 2006, for example, Stuart Levey—the Treasury Department's top IRGC-facing counterterrorism official—advised companies considering the Middle Eastern telecoms marketplace, that Irancell was "fully owned by the IRGC." The U.S. government's conclusion that Irancell was "fully owned by the IRGC," was widely reported in the media, beginning in 2010 with the initial *WikiLeaks* reporting, and continuing thereafter. As legal news commentator Greta Van Susteren noted in 2012 on her widely watched *Fox News* show:

> we're talking about Iran, which is trying to wipe … Israel off the map, … and ***this joint venture*** with [Irancell], ***it was not a mystery***. In fact, the [U]ndersecretary of [the Treasury, Stuart Levin in] 2006 according to [] WikiLeaks … said that the Iran Cell was [] ***fully owned by the Iranian Revolutionary Guard*** [Corps]. (Emphasis added.)

463.    NATO publications confirmed that Irancell was a terrorist front. In 2020, NATO published a peer-reviewed analysis that Irancell was a front to finance IRGC-sponsored operations. NATO's Strategic Communications Centre of Excellence published a detailed, peer-reviewed, analysis confirming the IRGC's control of key internet, telecoms, and communications companies in Iran, including Irancell and TCI, authored by Dr. Monika Gill—titled "Capitalism,

Communications, and the Corps: Iran's Revolutionary Guard and the Communications

Economy"—which reported, *inter alia*:

a.    "IRGC-backed institutions[] include[ed] … the Mostazafan Foundation … [T]he IRGC … us[ed] IEDC [*i.e.*, the Irancell-related majority Iranian shareholder comprised of the Foundation for the Oppressed and IEI] as a front … in 2005, [when] the IRGC … purchased a majority stake in" Irancell.

b.    "[T]he IRGC asserted their role in the communications economy through [] significant developments … involving [] Irancell[,] … [a] joint venture between … MTN Group and the Iran Electronic Development Company (IEDC). … IEDC maintained close ties with the Revolutionary Guard. Following the IRGC's opposition to foreign involvement in Iran's strategic telecommunications sector, IEDC negotiated 51% ownership of … Irancell …, ensuring that the [IRGC] had a majority stake in the newly formed telecommunications infrastructure."

c.    "The IRGC acts as a business fraternity within which members of the Guard can progress along a prescribed career path. Following active service, IRGC members are offered senior positions in state-affiliated media organisations and telecommunications networks such as IRIB, TCI, and MTN Irancell. Accordingly, 'no one ever leaves the IRGC'; its senior officers are viewed as an Iranian 'freemasonry' and 'Ivy League network', signalling that the IRGC exceeds ideological devotion."

464.    From at least 2012 through 2023, Irancell and its senior leadership, including

Irancell CEO and notorious IRGC supporter Alireza Dezfouli, regularly emphasized that Irancell

comprised a cornerstone of the SLO- and IRGC-led "Resistance Economy," which was always a

notorious IRGC euphemism for economic activities that directly support IRGC-sponsored acts of

terrorism targeting America and committed by the Qods Force, Hezbollah, or the proxies. On

November 22, 2014, for example, IRGC-controlled media outlet ICTNA documented how

Irancell supported IRGC-sponsored "resistance" as part of Irancell's "social responsibility"

efforts because, Irancell's "development … will make some of the objectives pursued by the

resistive economy come true" including by promoting, *inter alia*: (i) "Resistance against the

threatening elements," *i.e.*, the United States and its allies; (ii) "Safety of the strategic … goods,"

*i.e.*, the IRGC's control of telecoms as a strategic necessity for its agenda; and (iii) "Combat

against corruption," *i.e.*, efforts by America to oppose the IRGC-led Islamic Revolution.

465.    Indeed, IRGC-operated media organs regularly touted that the Resistance Economy was constructed to specifically enable IRGC-sponsored jihadist attacks targeting the United States, as reported by IRGC-controlled *Mehr News Agency* on September 17, 2016.

466.    Leaked IRGC audio also confirmed that Irancell profits supplied key funding for IRGC- and Hezbollah-backed attacks throughout the Middle East, including Iraq and Israel. On February 18, 2022, *Radio Free Europe* published a leaked recording of a conversation between IRGC Commander-in-Chief Mohammad Ali Jafari and a top IRGC financier, which confirmed that IRGC Leadership Cell members like "Mohammad Ali Jafari," "Qasem Soleimani," and "Hossein Taeb," were part of IRGC "mafia networks" and "systematic corruption" who were direct financial beneficiaries of the IRGC's "telecommunications"-related profits and used such profits to "funnel revenue to groups that support the regime, including mercenaries working closely with the IRGC's Quds Force … for military operations abroad" and "support[] the activities of the so-called Resistance Front -- a term used by Iranian officials and media to refer to an anti-Israel alliance including Iran, Lebanese Hizballah, Syria, and Palestinian groups."

467.    Non-governmental organizations confirmed that the IRGC controlled Irancell and used it as a terrorist front, and alerted BNPP to the same. From 2009 through 2016, for example, Freedom House regularly reported the IRGC's control of, and use of, Irancell to facilitate attacks. On April 18, 2011, for example, Freedom House reported that "IranCell … is owned in part by a web of proxy companies controlled by the IRGC (there are a number of high-profile IRGC ex-commanders among its management)." Freedom House published similar reports, with similar warnings about IRGC control of Irancell, on September 24, 2012, October 3, 2013, October 5, 2014, October 30, 2015, and November 16, 2016. From 2006 through 2024, similarly, other NGOs published similar reports, which also alerted BNPP that the Foundation for the

Oppressed operated Irancell as a front for the IRGC and its proxies, including, but not limited to: (1) American Enterprise Institute in September 2006; (2) Reporters Without Borders on June 6, 2013; (3) Iran Human Rights Documentation Center in September 2014; and (4) Government Accountability Project on October 20, 2023.

468.    Media coverage of MTN Group's and Irancell's direct connections to the IRGC were so pervasive that even a quick search on Google, LexisNexis, or the Treasury Department's sanctions database immediately yielded such copious "red flags" such that a person would have to be willfully blind to not know that Irancell was an IRGC front, as a fact-checker for the *Tampa Bay Times* who performed such a search reported on September 25, 2012.

469.    Irancell was never a normal company: it was fully captured by the Supreme Leader's Office and IRGC, led by, and comprised of, avowed supporters and financiers of Hezbollah, the Qods Force, Hamas, PIJ, and JAM, and operated for the benefit of their shared mission to sponsor terrorist attacks targeting the United States to coerce U.S. government decisionmakers in the United States to exit the Middle East and abandon its allies there, including Israel and Iraq.

### E. Terrorist Sponsors Seized Sector-Wide Monopolies in Key Iranian Markets to Fund Terrorist Attacks

470.    From 2007 through 2024, Terrorist Sponsors notoriously controlled ***well over half*** of the entire Iranian economy; some estimates ranged ***as high as 85%***. Indeed, the U.S. government has concluded similarly. In 2021, for example, Treasury observed that the Supreme Leader's and IRGC's collaborative post-2007 economic takeover alerted banks, like BNPP, that Terrorist Sponsors were collectively "said to control more than half of the Iranian economy." This provided the context for the Supreme Leader's and IRGC's shared strategy to support violence by funneling profits from monopolies to IRGC proxies.

471.    Between 2005 and 2009, using fronts they controlled, the IRGC and SLO

orchestrated a monopolistic takeover of key components of Iran's economy. Contemporaneous

reports confirmed as much. For example, per a DoD analysis published on October 12, 2011:

> The IRGC's expansion beyond the roles and tasks traditionally associated with
> military or security services is most pronounced in its dominant role in Iran's
> economy. Speaking at the change of command at the *Khatam ol-Anbia* Base
> Complex, IRGC commander [Mohammad Ali] Jafari bluntly summarized his
> position, "The IRGC must play a leading role in the nation's economic fronts."
> Referencing the IRGC's role in the Iran-Iraq war, Jafari further rationalized the
> IRGC's economic responsibilities, "The IRGC actually goes into areas of activity
> the other sectors cannot do, as in [Iran-Iraq] war where … the IRGC had the duty
> to go on the battlefield with all its being. We are doing the same thing today in
> economic areas." …
>
> Through [the IRGC's] complex network of foundations and their
> subsidiary banks, assisted by generous subsidies, the IRGC has diligently
> expanded its business holdings at a deep discount. The true private sector only
> gained 19% of the "privatized" public assets, while the cooperatives consumed
> 68% of the resources. The IRGC has systematically militarized rather than
> privatized the Iranian economy.

472.    After the U.S. inaugurated the new era of sanctions targeting Terrorist Sponsors

with its designations of the IRGC, Bank Saderat, Bank Melli, and associated persons in October

2007, the SLO and the IRGC responded to the new sanctions era by leaning heavily into Iran's

longstanding tolerance of monopolies, by seizing entire economic sectors and awarding them to

the IRGC. Ayatollah Khamenei's strategy was simple: keep the IRGC loyal through industrial

sector-scale bribes in the form of the Ayatollah's provision of monopolies to the IRGC in key

Iranian industrial sectors that overlapped with the IRGC's terrorist mission. As the *Christian

Science Monitor* reported in 2009, "[Ayatollah] Khamenei … had to pay dearly for such [IRGC]

backup, however, says [Ali] Alfoneh [of the American Enterprise Institute]. 'The IRGC's

support for [Ayatollah] Khamenei does not come cheap, and he has had to bribe the IRGC with

economic monopolies,' [said Alfoneh]. … The result has been a 'very deep and symbiotic

relationship with the supreme leader, and [the IRGC] have used the Ahmadinejad administration

to not just solidify their hold on power, but to enrich themselves at the same time,' says [Alireza] Nader of RAND." Others reported similar findings. Ayatollah Khamenei's strategy leveraged a pre-existing feature of Iran's economy: the heavy tendency towards monopolies dating back to the Shah, which trend continued at all relevant periods. As the *Economist* alerted BNPP in 2011, "Iran's economy" was "[a]lmost entirely reliant on oil receipts, unproductive and monopolistic" at the same time "the Revolutionary Guard's commercial divisions [took] over ever larger bits of the economy."

473.    From 2007 through 2009, the SLO and the IRGC rapidly seized monopolistic shares of key sectors of Iran's economy, which seizures were all complete by the end of 2009.

474.    U.S. government-published statements alerted BNPP to such risks in real time. On July 26, 2006, for example, Dr. Kenneth Katzman, a Middle East Specialist at the Congressional Research Service, testified before Congress that "key [Iranian] leaders and factions have gained a substantial measure of control over major segments of the Iranian economy, avoiding virtually any official transparency or accountability," which allowed "Iran's leaders … to steer the proceeds of parts of the economy to provide patronage." In 2009, similarly, seven (U.S. government-funded) RAND Corporation Iran scholars publicly observed "the IRGC's … monopolization of key business sectors" in Iran. Likewise, in 2009, a State report about Iran warned that its "hard-line clerical establishment … grew wealthy through its control of bonyads … that monopolize[d] many sectors of [Iran's] economy …."

475.    Such real-time warnings also directly warned BNPP that the IRGC's ability to leverage its control of entire sectors of Iran's economy directly funded IRGC-sponsored terrorist attacks committed by Hezbollah, Hamas, and other IRGC proxies. On October 6, 2009, for example, Treasury Under Secretary Levey testified before Congress that:

In the name of privatization, the IRGC has taken over broad swaths of the Iranian economy. Former IRGC members in Iranian ministries have directed millions of dollars in government contracts to the IRGC for myriad projects, including developing the South Pars gas field …. Furthermore, the IRGC seeks to monopolize black-market trade of popular items, funneling the proceeds from these transactions through a patronage system and using them to help subsidize the government's support for terrorist groups.

476.     On June 22, 2010, Treasury Under Secretary Levey testified before Congress that "the Revolutionary Guards … has provided material support to … Lebanese Hizballah, Hamas, Palestinian Islamic Jihad, and others," the needed funding for which compelled the IRGC to "assume[] control over broad areas of the Iranian economy."

477.     Terrorism scholars also concluded that the IRGC seized monopolies during this period to support its proxies' acts of terrorism.

478.     The Supreme Leader and IRGC strategy for monopolization focused on key sectors: they did not seek to control the entire economy, just those sectors that were inextricably connected to the IRGC's ability to sponsor terrorism. Consequently, from 2007 through 2020, the IRGC notoriously exercised a monopoly over certain IRGC "exclusive sectors" of Iran's economy, including Iran's oil, gas, construction, import/export, and communications sectors. As Dr. Michael Rubin testified on April 19, 2016:

[T]he IRGC … maintains a stranglehold over trade and the economy and so has become the chief if not sole beneficiary from the hard currency now flowing into Iran. Here the problem is … Khatam al-Anbiya, the IRGC's economic wing. To understand what Khatam al-Anbiya is, picture the U.S. Army Corps of Engineers combined with Bechtel, Halliburton, KBR, Shell, Exxon, Boeing, and Northrop-Grumman, all rolled up into one. Today, Khatam al-Anbiya monopolizes heavy industry, shipping, electronics, manufacturing as well as import-export. All together, it controls perhaps 40 percent of the Iranian economy. …

Under former President Mahmoud Ahmadinejad, IRGC-linked companies received upwards of $50 billion in no-bid contracts in the oil industry alone. In short, even if President Hassan Rouhani were to take the IRGC's official budget to zero, it would be facing less of a budget cutback proportionately than the U.S. military has through sequestration. …

170

> Iran today has at its disposal a hard currency windfall which will enable it to support proxies to pursue its ideological goals with an ease that it has not enjoyed in decades.
>
> Against this backdrop of Iranian empowerment, it is important that the United States recognize that responding to Iranian bluster and complaints with incentive and greater access to the U.S. and European investment and financial markets is counterproductive to regional security. It is also essential to recognize the depth of IRGC involvement in almost every sector to which U.S. and European firms might consider investing. To bolster both U.S. security and that of Israel and other American regional allies requires draining rather than augmenting IRGC coffers. This will ultimately mean ... greater vigilance absent diplomatic subjectivity to IRGC commercial involvement and terror finance.

479.    On October 22, 2017, the *New York Times* likewise reported that "Khatam Al Anbiya … is the most important economic arm of Iran's elite Islamic Revolutionary Guards Corps." It is, the *New York Times* reported, "a giant construction company [that] direct[ed] its operations across Iran, building mosques, airports, oil and gas installations, hospitals and skyscrapers," "led by a military commander" (*i.e.*, IRGC Commander Mohammad Ali Jafari), and was part of the IRGC's "monopoly on large sectors of the economy."

480.    Despite the substantial nature of the IRGC's and SLO's involvement throughout Iran's economy from 2007 through present, Plaintiffs do not allege that the IRGC monopolized every—or even most—segments of Iran's economy. While the IRGC and SLO had substantial interests in every Iranian economic sector, they only exercised a monopoly in certain sectors, including the six sectors alleged herein. Among other Iranian market sectors, the IRGC exercised influence but ***did not*** have a monopoly in, *inter alia*: (1) Accounting; (2) Agriculture; (3) Domestic Retail; (4) Foodstuffs and Groceries; (5) Legal Services; (6) Music; (7) Publishing; (8) Real Estate; (9) Restaurants and Hookah Bars; and (10) Textiles.

481.    Below, Plaintiffs identify six relevant IRGC market segment monopolies that provided the context for BNPP's transactions alleged herein: (1) Energy; (2) Construction; (3) Sanctions Evasion; (4) Finance; (5) Import/Export; and (6) Communications.

### 1. The Energy Sector: Oil, Gas, and Petroleum-Based Products

482.    The Supreme Leader's provision of monopolies to the IRGC began in the energy sector, and for good reason: as a U.S. government-published analysis of the IRGC later warned, "[b]y far, the IRGC's greatest economic instrument is its influence over the energy sector, which accounts for over 80% of the regime's revenue."

483.    In June 2006, the Supreme Leader and the IRGC effectively announced their intention to monopolize Iran's energy sector when they caused the awarding of the largest energy project in Iranian history—its South Pars field, which connected to Caspian routes via pipeline—to notorious IRGC firm Khatam al-Anbiya.

484.    Indeed, an IRGC general signed for the cameras on behalf of Khatam al-Anbiya, which photo was then circulated throughout global media by the IRGC's *Mehr News Agency*:



485.    Public testimony by U.S. officials confirmed that the IRGC seized South Pars as part of its plan to monopolize Iran's oil sector. On July 26, 2006, for example, Dr. Katzman, a Middle East Specialist at the Congressional Research Service, testified before Congress that "the Revolutionary Guard['s] … motivations for expanding its economic role are apparently to provide rewards for senior officers, and to generate revenue to supplement the budget allocated

to the Guard by the government. The Guard has formed contracting firms to bid on government projects, using its strong political influence to win business. In one recent example, one of the firms owned by the Guard, called 'Ghorb,' [*i.e.*, Khatam al-Anbiya] is being awarded a $2.3 billion deal to develop two phases of Iran's large South Pars gas field. Most of the other phases have been awarded to well-known multi-national energy firms, and the work given to Ghorb [KAA] had originally been awarded to Norway's Aker Kvaerner, but was re-tendered. This suggests that the Guard exerted political influence to win the [South Pars] contract and take it away from what most industry experts would consider a more capable firm."

486.    In June 2008, the SLO and IRGC further cemented their monopoly over all Iranian petroleum-related assets when Ayatollah Khamenei decreed that the Foundation for the Oppressed—which was a front shared by the SLO and IRGC—would be responsible for negotiating, collecting, and redistributing all funds associated with Iranian petroleum exports.

487.    When BNPP deliberately helped Iranian entities evade sanctions targeting their sponsorship of terrorism, BNPP knew that the Supreme Leader and IRGC had seized a monopoly in Iran's energy sector, operationalized through, *inter alia*, the SLO, the Foundation for the Oppressed, and Khatam al-Anbiya (including their respective agents and affiliates). Having seized their energy monopoly in 2006, the SLO and the IRGC aggressively sought to expand their respective reach into their newfound monopoly from 2007 through 2011 by vertically integrating the SLO's and IRGC's fronts, operatives, and agents throughout all energy firms and projects in Iran or subject to Iranian investment outside of Iran.

488.    By spring of 2011, the SLO's and IRGC's shared monopoly over Iran's entire oil and gas industry—including associated construction, financing, shipping, and logistics—was

173

officially enshrined in a new joint SLO/IRGC entity that had full control, supervision, and ownership of all Iranian companies operating in Iran's oil and gas sector.

489.    On March 10, 2011, Ayatollah Khamenei decreed that ***all*** oil and gas contracts would be awarded by Petro Nahad, a newly created front established by the SLO and operated jointly by, and for the benefit of, the SLO and the IRGC, including IRGC leaders like Commander of the Qods Force Qasem Soleimani (who received a direct cut of SLO/IRGC oil profits) and Soleimani's counterpart, Commander of the IRGC Mohammad Ali Jafari (who was a direct, and publicly identified, beneficiary of SLO/IRGC oil profits derived from trades routed through the UAE, necessarily including all of BNPP's UAE-related oil and gas-related transactions alleged herein). They did so by creating Petro Nahad, which was a supervisory entity under the SLO's auspices that was assigned complete authority over all energy projects, deals, companies, and decisions in Iran. Simply put, on March 10, 2011, Ayatollah Khamenei made official the SLO's and IRGC's previously understood effective monopoly on the Iranian oil and gas sector, which the IRGC and SLO had fully accomplished by 2006.[24]

490.    Real-time reports by the United States, terrorism scholars, human rights groups, and Iranian media outlets alerted BNPP that the SLO and IRGC created Petro Nahad and used it to exercise a full monopoly over Iran's energy sector, and directly financed the activities of overall IRGC commander—and notorious Hezbollah, Hamas, and JAM supporter—Mohammad Ali Jafari. On May 3, 2011, for example, *Iran Press News* reported:

> On March 10, 2011, ***Khamenei decreed that all oil field projects, contracts and oil purchase agreements must be made exclusively by Petro Nahad***. All existing companies and organizations responsible for such deals – Petro Sina Arya, Petro Pars, National Iranian Drilling Company (a subsidiary of the National Iranian Oil

---

[24] To be clear: The IRGC seized control of the energy sector by 2006, and the SLO joined in control by 2008 when the Foundation for the Oppressed—jointly controlled by the IRGC and the SLO—assumed a leadership role in all Iranian oil sales.

Company), and the Industrial Development and Renovation Organization (IDRO) – would henceforth operate under Petro Nahad's direct control.

All contracts relating to gas and oil would now be awarded solely by Petro Nahad. All revenues would be deposited exclusively into an account belonging to Petro Nahad.

Khamenei further directed that ***all of Petro Nahad's financial and administrative affairs*** be assigned to a three-man board of directors, two of whom are members of his family. Those members are: Mojtaba Khamenei, the Supreme Leader's son; Gholamali Haddad Adel, a member of the regime's Expediency Council who happens to be Mojtaba Khamenei's father-in-law; and Majid Hedayatzadeh.

Fazel Larijani, a member of the famous family allied with the Supreme Leader and former diplomat in Ottawa, and Hojatollah Ghanimi Fard, a deputy oil minister since 1997 in charge of marketing for crude oil and NIOC's overseas divisions, were appointed as international affairs directors for Petro Nahad. …

Any Petro Nahad contract is considered confidential, with strict prohibitions against their disclosure. Even though Petro Nahad is a government entity, the contracts are not available to parliament's budget committee.

### ***Revolutionary Guards commander gets some of the spoils***

***Fazel Larijani recently brought Revolutionary Guards (IRGC) Commander Mohammad Ali Jafari in on Petro Nahad deal*** with the United Arab Emirates. The deal reportedly would sell the UAE oil products below market price in exchange for $89 billion in cash and $89 billion in imported consumer goods from Dubai over a 23-year period.

Opportunity for the opposition

The upside to this opaque, corrupt, nepotistic control of Iran's oil wealth is that the scheme makes it easier for Western democracies to impose sanctions on the regime's oil sector. All they have to do is embargo Petro Nahad and its subsidiaries. (Emphasis added.)

491.    On May 24, 2012, State publicly warned that "The oil sector was embroiled in financial scandal throughout the year." In so doing, State effectively vouched for the *Iran Press News* May 3, 2011 report above:

In May [2011,] [Iranian] opposition Web sites reported that on March 10, [2011,] [Ali] ***Khamenei decreed that all oil and gas contracts would be awarded by Petro Nahad, a new entity established within his office*** [*i.e.*, SLO] and not subject to parliamentary or regulatory oversight. ***All revenues would be deposited into an account belonging to that organization. Further, according to these reports, all administrative and financial decisions of Petro Nahad were to be controlled by a three-person board of directors, whose members included***

175

***Khamenei's son, Mojtaba Khamenei, and Gholamali Haddad Adel***, a member of
the Expediency Council and Mojtaba's father-in-law. (Emphasis added.)

492.    Terrorism scholars also publicly reported, in real-time, that the SLO and IRGC

used Petro Nahad to deepen and optimize their extraction of cash from their energy monopoly in

order to finance acts of terrorism. On June 4, 2013, for example, IRGC scholars Emanuele

Ottolenghi and Saeed Ghasseminejad warned that the Supreme Leader had appointed "Gholam

Ali Haddad Adel, … the father-in-law of the Supreme Leader's son, Mojtaba Khamenei …[,]to

the board of directors of Petro Nahad alongside his son Mojtaba" when "Khamenei himself

recently established Petro Nahad to control all energy-sector contracts, thereby evading any

parliamentary oversight or public scrutiny" throughout the "country's energy sector" in response

to "the weight of" American counterterrorism "sanctions."

493.    The United States publicly confirmed the SLO's and IRGC's seizure of a

monopoly over the Iranian energy sector as a tool for financing terrorism. On October 13, 2011,

for example, Treasury Under Secretary David S. Cohen testified before Congress that:

> Sanctions have also led to the IRGC taking over key aspects of Iran's economy,
> exacerbating the cronyism and corruption that pervades the Iranian regime. We
> have seen this in a number of areas. Khatam al-Anbiya, the U.S.-, EU-, and [U.N.
> Security Council]-designated engineering arm of the IRGC, has been recruited to
> develop key energy resources. The IRGC, through its sanctioned affiliates Bonyad
> Tavon Sepah and Mehr Bank, took over Tidewater, a port operator that until a few
> years ago had been privately owned. And President Ahmadinejad recently
> appointed Rostam Ghasemi, a U.S. and EU-designated IRGC commander and
> former leader of Khatam al-Anbiya, as Minister of Oil. This appointment was
> applauded by the IRGC, which characterized Ghasemi's new role as a
> "meaningful and critical response to the attacks against the [IRGC] from the
> west[]. . . . " . . . Furthermore, the inclusion of the IRGC throughout the Iranian
> [energy] economy has opened up Iran to greater pressure through sanctions.

494.    Looking back on this era in 2019, Iran scholar Khosrow Semnani observed that

Khamenei's sponsored "power and money grab by the … IRGC" was completed by "2009":

176

Under the guise of evading sanctions, an oil mafia with ties to the IRGC, and acting with the blessing of Iran's supreme leader, consolidated its grip over the Iranian state. Billions in no-bid contracts were awarded to the IRGC by the Petroleum Council … established in the Oil Ministry in 2006. Yet, despite the significance, scale and volume of these contracts, Iran's oil and gas sector operated as a closed and incestuous system rigged in favor of insiders. Under the guise of 'destroying Israel' …, IRGC cronies positioned themselves to benefit from sanctions. All they had to do was to sell Iran's oil, in unknown quantities, at a discount and pocket the difference by importing goods at a premium. For these thieves of state, … the shadow of sanctions … served as both the excuse and opportunity for pillaging Iran's oil sector.

495.    The United States has formally confirmed that the Iranian regime exercised a monopoly over Iran's petroleum sector and used such monopoly to fund terrorist attacks by IRGC proxies. On August 6, 2018, for example, President Trump signed Executive Order 13846, which imposed sector-wide sanctions targeting the energy sector in Iran based on a formal finding that all revenue generated by Iran's petroleum industry funded Iranian regime-sponsored terrorist attacks committed by IRGC proxies in the Middle East:

a.    "[T]o advance the goal of applying financial pressure on the Iranian regime in pursuit of a comprehensive and lasting solution to the full range of the threats posed by Iran, including Iran's … network and campaign of regional aggression, its support for terrorist groups, and the malign activities of the Islamic Revolutionary Guard Corps and its surrogates, [I] hereby order as follows: …"

b.    "Sec. 2. Correspondent and Payable-Through Account Sanctions Relating to Iran's Automotive Sector; Certain Iranian Persons; and Trade in Iranian Petroleum, Petroleum Products, and Petrochemical Products. (a) The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to impose on a foreign financial institution the sanctions described in subsection (b) of this section upon determining that the foreign financial institution has knowingly conducted or facilitated any significant financial transaction: (i) on or after August 7, 2018, for the sale, supply, or transfer to Iran of significant goods or services used in connection with the automotive sector of Iran; (ii) on or after November 5, 2018, on behalf of any Iranian person included on the SDN List (other than an Iranian depository institution whose property and interests in property are blocked solely pursuant to Executive Order 13599) or any other person included on the SDN List whose property and interests in property are blocked pursuant to subsection 1(a) of this order or Executive Order 13599 (other than an Iranian depository institution whose property and interests in property are blocked solely pursuant to Executive Order 13599); (iii) on or after November 5, 2018, with NIOC or NICO, except for a sale or provision to NIOC or NICO of the products described in section 5(a)(3)(A)(i) of ISA provided that the fair market value of such products is lower

177

than the applicable dollar threshold specified in that provision; (iv) on or after November 5, 2018, for the purchase, acquisition, sale, transport, or marketing of petroleum or petroleum products from Iran; or (v) on or after November 5, 2018, for the purchase, acquisition, sale, transport, or marketing of petrochemical products from Iran."

496.    Since 2006, reports and statements published by the United States, Iranian regime, Iranian opposition, media, terrorism scholars, and NGOs alerted BNPP that its energy sector-related transactions concerning an Iranian deal, project, and/or counterparty (including oil, gas, and associated financing, construction, shipping, and logistics) that participated in the IRGC's monopoly over the oil and gas sector, including South Pars, supported IRGC-sponsored terrorist violence committed by IRGC proxies given the IRGC's monopoly on the sector. Such warnings included, but were not limited to (emphases added):

a.    _Sharq_ (Iranian Newspaper), June 30, 2006: "Some members of [Iran's parliament] … sent a written note to [President Ahmadinejad] with regard to the reason for the award of a 2 billion dollars contract for the expansion of phases 15 and 16 of [South] Pars… to the [IRGC]. This note was read out at yesterday's open session of [parliament]. Recently, a 2 billion dollars contract for the expansion of phases 15 and 16 of [South] Pars …, was signed between the Petroleum Ministry and the IRGC, without inviting any tenders. The [Iranian parliamentarians] … called for an inquiry into the manner of the award of the above contract, and its financial sources. ... ***In conclusion, the members of [parliament] … have elaborated: Will not the delegation of economic projects, be construed as a monopoly of oil-sector projects in the hands of the IRGC, and the awarding of political privileges by the government?***"

b.    _Inter Press Service_, December 29, 2009: "News that [the] … Revolutionary Guard Corps is withdrawing a billion dollars from the country's Foreign Reserve Fund in order to complete Phases 15 and 16 of the gigantic South Pars gas project has generated concern among Iranian analysts, who believe the move reveals the [IRGC]'s excessive power over Iran's economy. In view of looming sanctions from the United States and the United Nations Security Council … , the IRGC's control over the country's sensitive oil, and gas and nuclear industries could provoke a serious crisis, they warn. … In 2006, … [Khatam al-Anbiya] took on the National Gas Company's 90-kilometre Asalouyeh-Iranshahr pipeline project in Iran's Sistan and Baluchistan provinces, a contract worth 1.3 billion dollars. Another large project the Oil Ministry awarded to IRGC is the South Pars Gas Field Development Project's Phases 15 and 16. At 2.97 billion dollars, the contracts were awarded to [KAA] two years ago, bypassing the tender process. However, the IRGC firm was unable to finish the project in time. Jamshid Asadi, an economics professor at the American University in Paris, said that the latest action by IRGC culminates its aggressive efforts to ***monopolise key state projects*** over the last six years. … [KAA] … is currently under sanctions by the European Union and the United States. 'The economic

dominance of the IRGC over gigantic gas and oil projects has made Iran's economy extremely vulnerable towards [a] new round of sanctions on the country's financial institutions and oil industry,' the source said."

c. *Economist Intelligence Unit*, April 30, 2010: "Under President Ahmadinejad, the … IRGC … has enjoyed a substantial increase of its economic power. On several occasions, the IRGC won lucrative contracts in fields ranging from oil and gas to telecommunications. For example, … in 2005, [Ahmadinejad] granted a no-bid development contract for Phases 15 and 16 of South Pars …, the world's largest gasfield. The contract amounted to over US$7bn, to [KAA], the construction arm of the IRGC. The contract was in violation of government norms that require a competitive process. … [Iran's] Foreign Investment Promotion and Protection Act (FIPPA) specifically prohibits foreign investors from having a monopoly over any specific sector or market … [but grants] ***state monopolies in such industries as oil***, defence, … and [the] state-sanctioned monopolies of bonyads …."

d. *APS Diplomat News Service*, January 9, 2012: "[T]he IRGC runs its own economy which is totally independent and booming. … ***IRGC's Khatem ul-Anbia' …, a huge engineering and construction company, now has a quasi monopoly on key sector[s] such as that of petroleum.*** … Petroleum Minister Gen Rustam Qassemi is a former IRGC chief and until he took up the oil portfolio he was the head of [KAA]."

e. Ali Alfoneh (American Enterprise Institute), April 1, 2013: "The IRGC … has become a moneymaking machine … [in part through] ***Iran's oil and gas sector, which has hitherto been the monopoly of the National Iranian Oil Company, [and] has become the ultimate prize of the IRGC***."

f. *Australian*, March 25, 2014: "[The IRGC's energy monopoly extends] beyond petroleum production to [encompass] ***all aspects of the Iranian energy sector, which is fully controlled by the congressionally blacklisted Islamic Revolutionary Guards Corps***."

g. *Iran Briefing*, September 22, 2014: "Oil and Gas Sectors: The IRGC has a major stake in the petrochemical industry, including oil refineries, drilling companies, the National Iranian Oil Company (a/k/a 'NIOC'), Arvandan Oil & Gas Company, and the National Iranian Tanker Company. It has ***almost full control over the oil ministry and oil trading, and most aspects of the wider oil industry. Khamenei's immediate family members own a major portion of this sector.***"

h. *APS Review Downstream Trends*, December 22, 2014: "[Iranian President Hassan] Rowhani added: 'Continuation of corruption and the spread of corruption [in Iran] would mean the system and fundamentals of the revolution are in danger'. Iran … [was] a country where state institutions such as the IRGC exert control in businesses [transacting] … oil sales. Rowhani went on to say: '***Monopoly is the cause of corruption and we must fight against monopolies***. Anything which does not have rivalry or whose management is monopolised is flawed'."

i. Barak Seener (Jerusalem Center for Public Affairs), December 2018: "The IRGC stands to benefit [from transactions with Western companies and banks] … due to its ***monopoly of [] Iranian econom[ic] …… sectors including oil and gas [and] petrochemicals*** …."

497.    Additional public reports subsequently confirmed what had already been clear, *i.e.*, that the IRGC had a complete monopoly over Iran's energy sector, including oil and gas.

498.    From 2007 through 2020, the SLO and IRGC continuously, and notoriously, exercised their monopoly over all Iran-related energy transactions, including every such transaction processed by BNPP alleged herein. When BNPP facilitated transactions that BNPP knew were on behalf of Iran-related persons, and concerned energy, BNPP knew, or was willfully blind, that it was directly or indirectly supplying the IRGC with funds and financing that the IRGC could, and did, use to sponsor acts of terrorism that targeted the United States and were committed by Hezbollah, Hamas, PIJ, and JAM.

### 2. The Construction Sector

499.    By late 2007, the Supreme Leader and IRGC had seized a monopoly in Iran's construction sector, operationalized through Terrorist Sponsors. Having seized their linked monopolies in these sectors by 2007, the SLO and the IRGC aggressively sought to expand their respective reach into these monopolies from 2007 through 2011 by vertically integrating Terrorist Sponsors throughout every significant construction firm and project in Iran or subject to Iranian investment outside of Iran.

500.    The United States has formally confirmed that the Iranian regime exercised a monopoly over Iran's construction sector and used such monopoly to fund terrorist attacks by IRGC proxies. On January 10, 2020, for example, President Trump signed Executive Order 13902, imposing sector-wide sanctions targeting Iran's construction sector based on a formal finding that all revenue generated by the "construction … sector[] of the Iranian economy" funded Iranian regime-sponsored attacks by IRGC proxies in the Middle East.

501.    Beginning around 2007, the SLO and IRGC continuously, and notoriously, exercised their monopoly over all Iran-related construction transactions, including every such transaction processed by BNPP alleged herein. When BNPP facilitated transactions that BNPP knew were on behalf of Iran-related persons, and concerned construction, BNPP knew, or was willfully blind, that it was directly or indirectly supplying the IRGC with funds and financing that the IRGC could, and did, use to sponsor acts of terrorism that targeted the United States and were committed by Hezbollah, Hamas, PIJ, and JAM.

### 3.   The Sanctions Evasion Sector: Black Market, Smuggling, and Shipping

502.    In Iran, sanctions evasion was an industrial sector with dedicated practitioners, firms, strategies and the like and primarily comprised three sub-sectors: (1) the black market; (2) smuggling and port operations; and (3) transnational shipping and logistics. The SLO and IRGC always exercised a monopoly over the sanctions evasion sector of Iran's economy, as Plaintiffs define it herein, which they operationalized through Terrorist Sponsors.

503.    The United States has formally confirmed that the Iranian regime exercised a monopoly over Iran's inextricably linked sanctions evasion, smuggling, and black market sectors, and used such monopoly to fund terrorist attacks by IRGC proxies. On April 8, 2011, for example, State reported to Congress that "[t]he IRGC is [] widely considered to control the vast majority of [Iran's] underground and black market economy" and "[u]p to 80 percent of illegal goods enter [Iran] through unregistered ports and jetties controlled by the IRGC."

504.    Reports and statements published by the United States, Iranian regime, Iranian opposition, media, terrorism scholars, and NGOs alerted BNPP that its Iranian black market- and smuggling-related transactions supported IRGC-sponsored terrorist violence committed by IRGC proxies given the IRGC's monopoly on the Iranian black market and smuggling. As RAND scholars reported in 2009, "the IRGC" exercised "control of Iran's shadow economy" including

"the illicit smuggling networks." Other such warnings came from mainstream media sources like *CNBC* (on December 8, 2010) and *DT News* (on August 14, 2018).

505.    From 2007 through 2024, the SLO and IRGC continuously, and notoriously, exercised their monopoly over all Iran-related black market, smuggling, and shipping transactions, including every such transaction processed by BNPP alleged herein. When BNPP facilitated transactions that BNPP knew were on behalf of Iran-related persons, and concerned black market, smuggling, or shipping, BNPP knew, or was willfully blind, that it was directly or indirectly supplying the IRGC with funds and financing that the IRGC could, and did, use to sponsor acts of terrorism that targeted the United States and were committed by Hezbollah, Hamas, and JAM.

### 4.    The Financial Sector: Banks, Currency Exchanges, and Hawalas

506.    For decades, Iran's major financial institutions—including BNPP's customers CBI/Markazi, Bank Saderat, and Bank Melli—played essential roles in facilitating the IRGC's support to terrorist organizations including but not limited to Hezbollah, Hamas, and JAM. Indeed, that is why these institutions were sanctioned by the United States in 2007. Over time, the IRGC's influence over Iran's financial sector only grew.

507.    By late 2007, the Supreme Leader and IRGC had seized a monopoly in Iran's financial sector, which comprised Iranian banks, currency exchanges, and hawalas, operationalized through Terrorist Sponsors. These entities, collectively, owned and/or exercised direct or indirect control over all banks, currency exchanges, and hawalas in Iran.

508.    The United States has formally confirmed that the Iranian regime exercised a monopoly over Iran's banks and used such monopoly to fund terrorist attacks by IRGC proxies. On August 6, 2018, for example, President Trump signed Executive Order 13846 based upon the Executive branch's finding that U.S. dollar-denominated transactions with any person supervised

by "the Central Bank of Iran"—Iran's financial regulator, which always controlled all Iranian banks—directly enabled "threats posed by Iran, including Iran's … network and campaign of regional aggression, its support for terrorist groups, and the malign activities of the Islamic Revolutionary Guard Corps and its surrogates."

509.    On September 20, 2019, similarly, Treasury sanctioned CBI, and confirmed its findings that the Qods Force and Hezbollah controlled CBI and used it to finance their attacks as well as those of their proxies, including Hamas and PIJ:

> [OFAC] … act[ed] against the Central Bank of Iran (CBI) … under its counterterrorism authority, Executive Order (E.O.) 13224. Iran's Central Bank has provided billions of dollars to the Islamic Revolutionary Guards Corps (IRGC), its Qods Force (IRGC-QF) and its terrorist proxy, Hizballah. …
> "Treasury's action targets a crucial funding mechanism that the Iranian regime uses to support its terrorist network, including the Qods Force, Hizballah, and other militants that spread terror and destabilize the region. … Iran's repressive regime … attempts to achieve its revolutionary agenda through regional aggression while squandering the country's oil proceeds," said Treasury Secretary Steven T. Mnuchin. "Iran's Central Bank … [was] ostensibly intended to safeguard the welfare of the Iranian people, but have been used instead by this corrupt regime to move Iran's foreign currency reserves for terrorist proxies." …
>
> **CENTRAL BANK OF IRAN FUNDS THE IRGC, ITS QODS FORCE AND HIZBALLAH**
> Today's action targets the CBI for its financial support to the IRGC-QF and Hizballah. In May 2018, OFAC designated the CBI's then-Governor Valiollah Seif, and the Assistant Director of the International Department Ali Tarzali, for facilitating financial transfers for the IRGC-QF and Hizballah. Also, in November 2018 and as part of Treasury's disruption of an international oil-for-terror network, OFAC designated the CBI's International Department Director Rasul Sajjad, and the CBI's International Department Director, Hossein Yaghoobi, for conducting financial transactions for the IRGC-QF.
> Since at least 2016, the IRGC-QF has received the vast majority of its foreign currency from the CBI and senior CBI officials have worked directly with the IRGC-QF to facilitate CBI's financial support to the IRGC-QF. In 2017, the IRGC-QF oversaw the transfer of tens of millions of euros to Iraq from the CBI. Then-Governor of the CBI Valiollah Seif directed the transfer. …
> CBI has [] coordinated with the IRGC-QF to transfer funds to Hizballah.
> OFAC is designating the CBI today for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to, the IRGC-QF and Hizballah.

> The IRGC-QF, … is … responsible for [the IRGC's] external operations and has provided material support to numerous terrorist groups, including … Hizballah, HAMAS, and the Palestinian Islamic Jihad ….

510.   On February 14, 2024, similarly, Treasury imposed additional counterterrorism sanctions against the Central Bank of Iran pursuant to E.O. 13,324, and confirmed, *inter alia*:

> OFAC … sanctioned a procurement network responsible for facilitating the illegal export of goods and technology from over two dozen U.S. companies to end-users in Iran, including the Central Bank of Iran (CBI), which is designated for its role in providing financial support to the … [Qods Force] and Hizballah. …
>
> "The Central Bank of Iran has played a critical role in providing financial support to the IRGC-QF and Hizballah, two key actors intent on further destabilizing the Middle East," said Under Secretary of the Treasury for Terrorism … Brian E. Nelson. "The United States will continue to use all available means to disrupt the Iranian regime's illicit attempts to procure sensitive U.S. technology and critical inputs."

511.   From 2009 through 2024, reports and statements published by the United States, Iranian regime, Iranian opposition, media, terrorism scholars, and NGOs alerted BNPP that transactions with Iranian banks supported IRGC-sponsored terrorist violence committed by IRGC proxies given the IRGC's assumption of total control over all Iranian banks after 2007. Examples of such reports included: a 2009 report by several RAND scholars; an August 19, 2010 report by *Al Arabiya*; an August 12, 2016 report by Dr. Majid Rafizadeh; and reports in April 2019 and April 2022 by the National Council of Resistance of Iran.

512.   From 2007 through 2024, the SLO and IRGC continuously, and notoriously, exercised their monopoly over all Iran-related bank, currency exchange, and hawala transactions, including every such transaction processed by BNPP alleged herein. When BNPP facilitated transactions that BNPP knew were on behalf of Iran-related persons, and concerned banks, currency exchanges, or hawalas, BNPP knew, or was willfully blind, that it was directly or indirectly supplying the IRGC with funds and financing that the IRGC could, and did, use to

sponsor acts of terrorism that targeted the United States and were committed by Hezbollah, Hamas, PIJ, and JAM.

### 5.  The Import/Export Sector

513.    By late 2007, the Supreme Leader and IRGC had seized a monopoly in Iran's import/export sector, which was comprised of Iranian importers and exporters who typically had affiliated entities outside of Iran, operationalized through the Terrorist Sponsors.

514.    Reports and statements published by the United States, Iranian regime, Iranian opposition, media, terrorism scholars, and NGOs alerted BNPP that its import- and export-related transactions concerning Iranian counterparties, deals, or projects supported IRGC-sponsored terrorist violence committed by IRGC proxies given the IRGC's and SLO's assumption of a monopoly over Iran's import/export sector. Examples of such warnings from 2013 to 2024 included, but were not limited to, reports from the *Economist* on February 2, 2013; Dr. Michael Rubin on April 19, 2016; the National Council of Resistance of Iran in April 2019 and April 2022; *Eurasia Review* in August 2020.

515.    From 2007 through 2024, the SLO and IRGC continuously, and notoriously, exercised their monopoly over all Iran-related import/export companies, including every such transaction processed by BNPP alleged herein. When BNPP facilitated transactions that BNPP knew were on behalf of Iran-related persons, and concerned imports to Iran and/or exports from Iran, BNPP knew, or was willfully blind, that it was directly or indirectly supplying the IRGC with funds and financing that the IRGC could, and did, use to sponsor acts of terrorism that targeted the United States and were committed by Hezbollah, Hamas, PIJ, and JAM.

### 6.  The Communications Sector: Telecoms, Internet, and Related Technology

516.    The SLO and IRGC began their seizure of the communications sector when they seized control of Irancell—Iran's most important internet and telecoms company—in 2005. The SLO and IRGC completed their seizure of the communications sector in 2009, when they collaborated to help the IRGC purchase the Telecommunications Company of Iran. By 2009, the Supreme Leader and IRGC had seized a monopoly in Iran's communications sector, which was comprised of Iranian telecoms, internet, social media, and computing, and communications technologies firms, operationalized through Terrorist Sponsors. These entities, collectively, owned and/or exercised direct or indirect control over all communications companies in Iran.

517.    From 2009 through 2024, reports and statements published by the United States, Iranian regime, Iranian opposition, media, terrorism scholars, and NGOs alerted BNPP that its communications-related transactions (including landline and mobile telecoms, internet, computing, social media, and associated technologies) concerning Iranian counterparties, deals, or projects supported IRGC-sponsored terrorist violence committed by IRGC proxies given the IRGC's assumption of a monopoly over the Iranian communications sector. Examples of such warnings from 2007 to 2024 came from, but were not limited to: Ali Alfoneh, of the American Enterprise Institute, in October 2007; *APS Diplomatic News Service* in November 2009; *UPI* in November 2009; the *Guardian* in November 2009; and scholar Dr. Monika Gill in October 2020.

518.    From 2007 through 2024, the SLO and IRGC continuously, and notoriously, exercised their monopoly over all Iran-related telecoms, internet, social media, computing, and communications technology-related transactions, including every such transaction processed by BNPP alleged herein. When BNPP facilitated transactions that BNPP knew were on behalf of Iran-related persons, and concerned Iran's communications sector, BNPP knew, or was willfully blind, that it was directly or indirectly supplying the IRGC with funds and financing that the

IRGC could, and did, use to sponsor acts of terrorism that targeted the United States and were committed by Hezbollah, Hamas, PIJ, and JAM.

## II.   BNPP Willfully, Systematically, and Surreptitiously Provided Illegal Banking Services to Terrorist Sponsors and Their Fronts While Helping Them Evade Counterterrorism Controls

519.   To participate in the global economy, Terrorist Sponsors and their fronts needed the ability to reliably access America's financial system.  As Assistant Attorney General Leslie R. Caldwell confirmed in 2014 at the press conference announcing BNPP's criminal charges in 2014, terrorists like Hezbollah and their proxies required criminal allies in the financial system to propagate their deadly attacks because such violence depended upon whether the terrorists could:

> gain access to the U.S. financial market—because they need to send or 'clear' the U.S. dollars they have—and require—through the United States. U.S. sanctions, however, cut off that access. . . . And that's why countries like . . . Iran . . . seek out insiders in the financial community—trusted by their counterparts to play fair and by the rules—to escape the effects and reach of those sanctions. ***That is where BNPP came in***. (Emphasis added.)

520.   BNPP's terrorist finance crime spree inflicting devastating harm on the United States, for which Plaintiffs suffered. For almost a decade, BNPP conspired with clients owned and/or controlled by Terrorist Sponsors—Ayatollah Khamenei, the Foundation for the Oppressed, IRGC, Hezbollah, and Supreme Leader's Office—to perform massive volumes of financial transactions for those clients in violation of U.S. sanctions, while helping them evade counterterrorism controls. BNPP aided the attacks  its terrorist-sponsor clients sought to propagate through a variety of means, including systematically concealing and/or misrepresenting critical Iran-related information from its wire transactions (*i.e.*, wire stripping), which BNPP knew would inhibit reporting and surveillance systems that the U.S. and other governments relied upon to combat terrorism. BNPP helped its clients evade counterterrorism controls not only to hide its own sanctions violations from U.S. regulators, but also to protect its

terrorist-sponsor clients from unwanted scrutiny that might jeopardize their operations and the bank's lucrative business as the U.S. and other governments were ratcheting up their concern over terrorism financing by Iran, the IRGC, and Iran's other terrorist sponsors. By providing dollar clearing services to Terrorist Sponsors and their fronts in clear violation of U.S. law, BNPP helped those entities gain illegal access to the U.S. financial system. And in doing so, BNPP aligned its interests with those of the terrorists: both had a unity of interest in extracting profits from their collaborative efforts to evade the U.S. financial sanctions that stood in the way.

521.    Plaintiffs learned of the specific instances of misconduct below without access to BNPP's files; discovery is likely to reveal additional examples of BNPP's deliberate enabling of U.S. sanctions evasion by Terrorist Sponsors and affiliated customers like those alleged herein.

## A. The U.S. Government's Counterterrorism Controls

522.    The U.S. government's counterterrorism controls in the banking system included three key elements: (1) economic sanctions that prohibited certain transactions at high risk for terrorism financing; (2) review and reporting of suspicious transactions by financial institutions; and (3) direct monitoring of transactions by the government. Before discussing BNPP's scheme, Plaintiffs first provide relevant background on these counterterrorism controls.

### 1. OFAC's Iran Sanctions

523.    Financial transactions with Iran have been subject to U.S. economic sanctions since 1979. The U.S. government's sanctions regime aims to identify and block those who attempt to use the U.S. financial system in contravention of U.S. foreign policy, as well as foreign countries, entities, and individuals who may present a threat to national security. In particular, the sanctions are intended to prevent U.S. dollars from being used to finance terrorist organizations, proliferators of weapons of mass destruction, drug traffickers, and other hostile enterprises. With respect to Iran, these measures were strengthened in 1995 when President

Clinton found that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declared "a national emergency to deal with that threat." Through the issuance of Executive Order 12957 in March 1995 and Executive Order 12959 in May 1995, President Clinton imposed comprehensive trade and financial sanctions on Iran.

524.   A key purpose of these sanctions was to prevent Iran from using its petroleum resources to fund terrorism. As President William J. Clinton explained to Congress on September 18, 1995, "I issued Executive Order 12957. . . to prohibit the financing, management, or supervision by United States persons of the development of Iranian petroleum resources. This action was in response to actions and policies of the Government of Iran, including support for international terrorism, efforts to undermine the Middle East peace process, and the acquisition of weapons of mass destruction and the means to deliver them." However, "[f]ollowing the imposition of these restrictions with regard to the development of Iranian petroleum resources, Iran continued to engage in activities that represent a threat to the peace and security of all nations, including Iran's continuing support for international terrorism." To "further respond to the Iranian threat," President Clinton explained that he issued Executive Order 12959, which imposed comprehensive sanctions prohibiting exportation from the United States to Iran or to the Government of Iran of goods, technology, or services, as well as prohibiting transactions by United States persons in goods and services of Iranian origin or owned or controlled by the Government of Iran. These comprehensive sanctions were intended in part to limit the flow of

funds to terrorism, and thus in the President's words, "advance[d] important objectives in promoting the nonproliferation and antiterrorism policies of the United States."

525.    In a subsequent message to Congress on August 19, 1997, President Clinton explained that he was issuing another Executive Order (E.O. 13059) to "confirm[] that United States persons are prohibited from engaging in any trade- or investment-related activities with Iran." He added, "I want to make clear that this means all direct or indirect involvement in such activities wherever those activities occur."

526.    The sanctions regime is primarily administered by OFAC, which implemented the President's Executive Orders through its Iran Transaction Regulations (ITRs) and related guidance. Until November 2008, OFAC rules permitted U.S. financial institutions, under limited circumstances and with close regulatory supervision, to process certain transactions for Iranian banks, individuals, and other entities.   These were called "U-Turn" transactions because such transactions originated and terminated with foreign banks, passing through U.S. banks or branches as part of the clearing process. U-Turn clearing transactions, although not categorically prohibited by OFAC's regulations, posed an exceedingly high risk that required stringent scrutiny under applicable regulatory standards. For example, OFAC regulations required that "[b]efore a United States depository institution initiates a payment on behalf of any customer, or credits a transfer to the account on its books of the ultimate beneficiary, the United States depository institution must determine that the underlying transaction is not prohibited by this part." And beyond OFAC, other regulations required heightened due diligence and reporting of suspicious transactions as part of a bank's Anti-Money Laundering/Countering the Financing of Terrorism (AML/CFT) program.  The obligation to determine that a U-Turn complied with U.S. law, and to review and report suspicious U-Turn transactions to the government, thus fell

squarely on U.S. clearing banks and U.S.-based compliance personnel. In satisfying this obligation, U.S. clearing banks and U.S.-based compliance personnel relied heavily on the accuracy and completeness of wire transfer messages they received from correspondent banks and overseas branches.

527.    OFAC began to revoke the U-turn exception on September 7, 2006, when it prohibited all transactions, directly or indirectly, involving Bank Saderat. In announcing this action, Treasury Under Secretary for Terrorism and Financial Intelligence Stuart Levey explained, "The bank is used by the Government of Iran to transfer money to terrorist organizations, including Hizballah, Hamas, the Popular Front for the Liberation of Palestine-General Command and Palestinian Islamic Jihad. A notable example of this is a Hizballah-controlled organization that has received $50 million directly from Iran through Bank Saderat since 2001."

528.    What remained of the U-Turn exception did not permit U-Turn transactions involving persons that had been designated by OFAC. As relevant here, OFAC designated numerous Iranian entities on October 25, 2007, for supporting terrorism and proliferation: the IRGC; the IRGC's Qods Force; the MODAFL; nine IRGC-affiliated companies involving the IRGC in a wide array of activities, including in the petroleum and construction sectors; five IRGC leaders; and three Iranian banks—Bank Saderat, Bank Mellat, and Bank Melli.

529.    A fact sheet accompanying Treasury's October 25, 2007, designations contained detailed information about Iran's use of IRGC-affiliated entities and banks to finance terrorism and other illicit activity. According to the fact sheet, "FATF called on its members to advise institutions dealing with Iran to seriously weigh the risks resulting from Iran's failure to comply with international standards." Bank Melli, Bank Saderat, along with various IRGC-affiliated

entities and individuals were designated under E.O. 13382. Bank Melli was cited as using

deceptive banking practices to provide banking services for the IRGC, IRGC-QF, as well as

entities owned or controlled by them. Bank Saderat was identified as being used by Hezbollah

"to send money to other terrorist organizations," as well as being used by the Iranian government

to "channel funds to terrorist organizations." The IRGC "has significant political and economic

power in Iran, with ties to companies controlling billions of dollars in business and construction

and a growing presence in Iran's financial and commercial sectors. Through its companies, the

IRGC is involved in a diverse array of activities, including petroleum production and major

construction projects across the country." Although OFAC did not formally designate

CBI/Markazi until September 20, 2019, Treasury warned in the 2007 fact sheet (and would

continue to warn) that CBI/Markazi was facilitating terrorist financing: "For example, from 2001

to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its

subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts in Lebanon that

support acts of violence."

530.    On November 6, 2008, Treasury revoked authorization for U-Turn transactions in

their entirety. An accompanying fact sheet explained that it was "revoking the U-turn general

license today to protect U.S. financial institutions individually, and the U.S. financial system as a

whole, from the significant terrorist financing and proliferation risks posed by Iran. This

regulatory action will close the last general entry point for Iran to the U.S. financial system."

531.    Treasury's November 6, 2008, fact sheet provided a detailed explanation and

warning about how Iran and the IRGC were using the international financial system to evade

counterterrorism controls and finance acts of terrorism by their proxies in the Middle East:

> Iran's access to the international financial system enables the Iranian regime to
> facilitate its support for terrorism and proliferation. The Iranian regime disguises

its involvement in these illicit activities through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection by responsible financial institutions and companies. Iran also is finding ways to adapt to existing sanctions, including by turning to non-designated Iranian banks to handle illicit transactions. . . .

## Iran Misuses the International Financial System to Support Terrorism

Iran is the world's most active state sponsor of terror. The support provided by the regime to terrorist groups includes financing that is routed through the international financial system, especially through Iranian state-owned banks.

• **Iran's Support to Terror.** The Department of State designated Iran as a state sponsor of international terrorism in 1984, and Iran remains the most active of the listed state sponsors of terrorism, routinely providing substantial resources and guidance to multiple terrorist organizations. For example, Hamas, Hizballah, and the Palestinian Islamic Jihad (PIJ) maintain representative offices in Tehran to help coordinate Iranian financing and training of these groups.

• **Iran's IRGC and IRGC-Qods Force Support Terrorist Groups.** Elements of Iran's Islamic Revolutionary Guard Corps (IRGC) have been directly involved in the planning and support of terrorist acts throughout the world, including in the Middle East, Europe and Central Asia, and Latin America. The IRGC-Qods Force, which has been designated under Executive Order 13224 for providing material support to the Taliban and other terrorist groups, is the Iranian regime's primary mechanism for cultivating and supporting terrorist and militant groups abroad. Qods Force-supported groups include: Lebanese Hizballah; Palestinian terrorists; certain Iraqi Shi'a militant groups; and Islamic militants in Afghanistan and elsewhere. The Qods Force is especially active in the Levant, providing Lebanese Hizballah with funding, weapons and training. It has a long history of supporting Hizballah's military, paramilitary and terrorist activities, and provides Hizballah with more than $100 to $200 million in funding each year. …

• **Iran Uses its Banks to Finance Terrorism.** In a number of cases, Iran has used its state-owned banks to channel funds to terrorist organizations. Between 2001 and 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through Bank Saderat's subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts that support acts of violence. Hizballah also used Bank Saderat to send funds to other terrorist organizations, including Hamas, which itself had substantial assets deposited in Bank Saderat as of early 2005. The Treasury Department designated Bank Saderat under E.O. 13224 for providing financial services to Hizballah, Hamas and PIJ. Australia has also designated Bank Saderat. Iran's Bank Melli, which has been designated by the United States under E.O. 13382 for proliferation-related activities, was used to transfer at least $100 million to the IRGC-Qods Force between 2002 and 2006.

193

532.    Treasury's November 6, 2008, fact sheet also provided an additional explanation

and warning about how Iran was seeking to evade counterterrorism controls:

**Iran Uses Deceptive Financial Practices to Evade Sanctions**

• **Iranian Commercial Banks.** It has been a standard practice for Iranian
financial institutions to conceal their identity to evade detection when conducting
transactions. For example, Bank Sepah has requested that its name be removed
from transactions in order to make it more difficult for intermediary financial
institutions to determine the true parties to a transaction. Following the
designation of Bank Sepah under UNSCR 1747, Bank Melli took precautions not
to identify Bank Sepah in transactions. Bank Melli also has employed similar
deceptive practices to obscure its involvement from the international banking
system when handling financial transactions on behalf of the IRGC. In addition,
when Iranian assets were targeted in Europe, branches of Iranian state-owned
banks in Europe took steps to disguise ownership of assets on their books in order
to protect assets from future actions.

• **Central Bank of Iran.** The Central Bank of Iran (CBI), the sole Iranian entity
that regulates all Iranian banks, has not only engaged in deceptive practices itself
– such as asking for its name to be removed from transactions – but has also
encouraged such practices among Iran's state-owned banks. For example, prior to
EU and UN sanctions, the CBI attempted to help Banks Sepah and Melli protect
their assets from being frozen. Later, the CBI instructed non-sanctioned Iranian
state-owned banks to issue payment instructions on behalf of Sepah in order to
circumvent sanctions. In the case of Bank Melli, the CBI provided substantive
assistance to minimize the impact of sanctions. In fact, between January and
March 2008, the CBI handled tens of millions of dollars in transactions to and
from the accounts of U.S.- and UN-designated banks held at the CBI.

• **Use of Front Companies and Misuse of Bank Accounts.** Iran hides behind
front companies and intermediaries to engage in ostensibly legitimate financial
and commercial transactions that are actually related to its nuclear or missile
programs. Iranian entities form front companies outside of Iran for the sole
purpose of exporting dual-use items to Iran that can be used in these programs.
These front companies enable the regime to obtain materials that the country of
origin would typically prohibit from being exported to Iran. Iran also has a history
of using accounts set up for one purpose to facilitate activities with designated
entities.

533.    In remarks accompanying the revocation of the U-Turn exception, Treasury

Under Secretary for Terrorism and Financial Intelligence Stuart Levey explained that the action

was the culmination of a campaign that had been launched in November 2006 "to warn the world

about how Iran's threat to our security also posed a threat to the integrity of the international financial system." Since that time, he explained, "we have shared information with foreign governments and financial institutions about how Iran is using its banks to finance its nuclear and missile programs and terrorist groups. We have provided reliable information to back up our words, demonstrating that even seemingly benign business with Iran should be cause for concern." Levey went on to explain that most financial institutions had heeded the warnings:

> At the same time, many private financial institutions and companies worldwide have voluntarily shunned business with Iran. Banks see Iran's behavior as posing an unacceptable risk to their reputations, and they would rather forgo the business and preserve their integrity[.] Back in September 2006, I could count on one hand the major banks that had cut off or dramatically reduced their business with Iran. Now, there are only a few that have not done so.
>
> There is now a global consensus that Iran poses an unacceptable threat to the international financial system. The Financial Action Task Force (FATF), which has members representing 32 jurisdictions and is the world's premier standard-setting body on combating money laundering and terrorist financing, issued its fourth warning on Iran last month, calling for countries worldwide to strengthen measures to protect their financial sectors from this threat. …
>
> As members of the FATF, we are fulfilling our obligation to strengthen measures to protect our financial sector from those risks. Therefore, today we are revoking the U-turn license for Iran, thus terminating the last general entry point for Iranian banks – both state-owned and private – to the U.S. financial system. U-turn transactions allowed U.S. banks to indirectly process payments involving Iran if they began and ended with a non-Iranian foreign bank. Given Iran's conduct, it is necessary to close even this indirect access.
>
> In recent months, many U.S. institutions have refused to host these U-turn transactions for Iran. Still, the exemption was used by Iran as a hook to solicit foreign banks to process transactions through the United States on its behalf, sometimes with requests to substitute another bank or code word for the Iranian institution. With today's action, Iran's potential to manipulate U.S. financial institutions has been significantly curtailed.

534.    The sum and substance of this avalanche of sanctions was simple: the entire landscape of U.S. policy towards Iran was transformed through a series of actions that sought to isolate Iran and its terrorist financing from the U.S. and international financial system.

## 2.  Transaction Review and Reporting

535.    Separate and apart from sanctions, U.S. banks and foreign banks with U.S. branches are subject to an additional set of regulations under the Bank Secrecy Act (BSA) and state and federal banking laws to prevent money laundering and the financing of terrorism. These Anti-Money Laundering/Countering the Financing of Terrorism (AML/CFT) regulations are administered by Treasury's Financial Crimes Enforcement Network (FinCEN), along with the banking regulators. At the heart of these regulations is an obligation by financial institutions to carefully review the transactions they process, and to promptly report suspicious activity— including terrorist financing—to FinCEN, which disseminates these reports to law enforcement agencies and the intelligence community.

536.    The critical importance of BSA reporting as a counterterrorism control was explained in findings Congress made when it bolstered BSA requirements in the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, part of the USA PATRIOT Act. In the Act, Congress found that "money laundering, and the defects in financial transparency on which money launderers rely, are critical to the financing of global terrorism and the provision of funds for terrorist attacks." Such money launderers "subvert legitimate financial mechanisms and banking relationships by using them as protective covering for the movement of criminal proceeds and the financing of crime and terrorism, and, by so doing, can threaten the safety of United States citizens and undermine the integrity of United States financial institutions and of the global financial and trading systems upon which prosperity and growth depend." And in particular, "correspondent banking facilities are one of the banking mechanisms susceptible in some circumstances to manipulation by foreign banks to permit the laundering of funds by hiding the identity of real parties in interest to financial transactions."

537.     Among other things, the Act amended the BSA's declaration of purpose (31

U.S.C. 5311) to emphasize counterterrorism: "It is the purpose of this subchapter (except section

5315) to require certain reports or records where they have a high degree of usefulness in

criminal, tax, or regulatory investigations or proceedings, *or in the conduct of intelligence or

counterintelligence activities, including analysis, to protect against international terrorism*."

(emphasis added). Congress also added language in another section (31 U.S.C. 5319) making

clear that BSA reports shall be made available to any "United States intelligence agency."

538.     To underscore the importance of BSA reporting in countering terrorist attacks,

President George W. Bush visited FinCEN on November 7, 2001, and gave a speech to "put the

world's financial institutions on notice." He explained that the War on Terrorism was "not a war

just of soldiers and aircraft. It's a war fought with diplomacy, by the investigations of law

enforcement, by gathering intelligence and by cutting off the terrorists' money." He explained

how certain terrorist financiers "present[ed] themselves as legitimate businesses. But they skim

money from every transaction, for the benefit of terrorist organizations. They enable the

proceeds of crime in one country to be transferred to pay for terrorist acts in another." President

Bush did not mince words in delivering his "clear message to global financial institutions": "you

are with us or you are with the terrorists. And if you're with the terrorists, you will face the

consequences."

539.     FinCEN explains on its website that BSA reports have "proven to be of

considerable value in money laundering, terrorist financing and other financial crimes

investigations by law enforcement."

540.     BSA requirements and regulatory expectations are summarized in the Federal

Financial Institutions Examination Council (FFIEC) *Bank Secrecy Act (BSA) /Anti-Money*

*Laundering (AML) Examination Manual* (FFIEC Manual), which was developed by federal and state banking agencies, FinCEN, and OFAC to provide guidance to banks and their examiners, and to ensure consistency in the application of BSA/AML requirements. The FFIEC Manual was first released in 2005, but it summarized requirements and expectations in effect since before 2001. The FFIEC Manual was commonly regarded by U.S. bank personnel as an authoritative source of guidance on BSA compliance.

541.   BSA compliance required two principal components. First, banks had to establish and maintain an effective AML/CFT program that assessed the banks' AML/CFT risk and monitored transactions for suspicious activity. Second, banks had to investigate transactions for potential illicit activity and report suspicious transactions to FinCEN.

542.   As part of a bank's risk assessment, according to the FFIEC Manual, a bank had to "first, identify the specific risk categories (*i.e.*, products, services, customers, entities, and geographic locations) unique to the bank; and second, conduct a more detailed analysis of the data identified to better assess the risk within these categories." The FFIEC Manual explained that high-risk products and services included the following:

- funds transfers

- electronic banking

- foreign correspondent accounts

- trade finance (letters of credit)

High-risk customers and entities included the following:

- foreign financial institutions

- foreign individuals

- foreign corporations

High-risk geographic locations included the following:

- countries subject to OFAC sanctions, including state sponsors of terrorism

- countries identified as supporting international terrorism under section 6(j) of the Export Administration Act of 1979

- jurisdictions determined to be "of primary money laundering concern" by the Secretary of the Treasury, and jurisdictions subject to special measures imposed by the Secretary of the Treasury, through FinCEN, pursuant to section 311 of the Patriot Act

- jurisdictions or countries identified as non-cooperative by the Financial Action Task Force on Money Laundering (FATF)

543.    The second step of the risk assessment required considering more specific data regarding the purpose of an account, actual or anticipated activity in the account, the nature of the customer's business, the customer's location, and the types of products and services used by the customer, with the bank's Customer Due Diligence (CDD) information having an important role in the process.

544.    The FFIEC Manual further explained that the risk assessment process needed to be "an ongoing process, not a one-time exercise." Banks were expected to update their risk assessments to identify changes in the bank's risk profile, and this required banks to continually monitor information from a variety of sources. The FFIEC Manual included a list of sources, including U.S. Government threat assessments, FinCEN guidance, and FATF publications.

545.    A bank's risk assessment was expected to inform its reporting obligations: "For example, the bank's monitoring systems to identify, research, and report suspicious activity should be risk-based, with particular emphasis on high-risk products, services, customers, and geographic locations as identified by the bank's BSA/AML risk assessment."

546.    The next step was to establish a set of internal controls reasonably designed to ensure ongoing compliance with BSA requirements. The FFIEC Manual explained that a bank's

"board of directors, acting through senior management, is ultimately responsible for ensuring that the bank maintains an effective BSA/AML internal control structure, including suspicious activity monitoring and reporting," and the "board of directors and management should create a culture of compliance to ensure staff adherence to the bank's BSA/AML policies, procedures, and processes."

547.    The FFIEC Manual explained that the "cornerstone of a strong BSA/AML compliance program is the adoption and implementation of comprehensive CDD policies, procedures, and processes for all customers, particularly those that present a high risk for money laundering and terrorist financing." The FFIEC Manual explained that CDD policies, procedures and processes "provide the critical framework that enables the bank to comply with regulatory requirements and to report suspicious activity," as well as aiding the bank in "[a]voiding criminal exposure from persons who use or attempt to use the bank's products and services for illicit purposes." Where customers pose high risk, the FFIEC Manual contemplates an intensive review of relevant customer information, including:

- Purpose of the account.

- Source of funds and wealth.

- Beneficial owners of the accounts, if applicable.

- Customer's (or beneficial owner's) occupation or type of business.

- Financial statements.

- Banking references.

- Domicile (where the business is organized).

- Proximity of the customer's residence, place of employment, or place of business to the bank.

- Description of the customer's primary trade area and whether international transactions are expected to be routine.

- Description of the business operations, the anticipated volume of currency and total sales, and a list of major customers and suppliers.

- Explanations for changes in account activity

548.    The FFIEC Manual specifically warned about terrorist financing risks associated with trade finance (e.g., letters of credit): "[S]ince trade finance can be more document-based than other banking activities, it can be susceptible to documentary fraud, which can be linked to money laundering, terrorist financing, or the circumvention of OFAC sanctions or other prohibitions." Trade finance is highly susceptible to abuse because "double invoicing, partial shipment of goods, and the use of fictitious goods" can make "[i]llegal proceeds transferred in such transactions . . . appear sanitized and enter the realm of legitimate commerce." Parties may also "substitute third-party nominees, such as shell companies, to disguise [their] role in a trade finance agreement." Those risks necessitated "a thorough understand of the customer's underlying business and locations served," and "may require the use of background checks or investigations, particularly in higher risk jurisdictions." The FFIEC Manual included the following as warranting particular scrutiny:

- Customers conducting business in high-risk jurisdictions

- Customers shipping items through high-risk jurisdictions, including transit through non-cooperative countries.

- Customers involved in potentially high-risk activities (e.g., dealers in weapons, nuclear materials, chemicals, precious gems; or certain natural resources such as metals, ore, and crude oil).

549.    The FFIEC Manual also alerted BNPP that "[t]rade finance transactions frequently use Society for Worldwide Interbank Financial Telecommunication (SWIFT)

messages" and that banks are expected to "monitor the names of the parties contained in these messages" to detect suspicious activity.

550.    The final element of BSA compliance, and the culmination of a bank's AML/CFT controls, was suspicious activity reporting, which the FFIEC Manual explained was "critical to the United States' ability to utilize financial information to combat terrorism, terrorist financing, money laundering, and other financial crimes." Under BSA regulations, banks were required to file a Suspicious Activity Report (SAR) for any transaction conducted or attempted by, at, or through the bank (or an affiliate) and aggregating $5,000 or more, if the bank or affiliate knows, suspects, or has reason to suspect that the transaction involves money laundering or illegal activity. The FFIEC Manual specified that this included any suspected "terrorism financing." Indeed, although SARs were normally required to be filed no more than 60 days after the date of initial detection, the FFIEC Manual instructed banks to act immediately upon any suspected link between a customer and terrorist activity:

> If a bank knows, suspects, or has reason to suspect that a customer may be linked to terrorist activity against the United States, the bank should immediately call FinCEN's Financial Institutions Terrorist Hotline at the toll-free number: 866-556-3974. . . . [T]he bank must also file a SAR.

551.    Under BSA regulations, SARs are highly confidential. No bank, and no director, officer, employee, or agent of a bank, that reports a suspicious transaction may notify any person involved in the transaction that the transaction has been reported.

552.    More generally with respect to terrorist financing, the FFIEC Manual contained an appendix entitled "Money Laundering and Terrorist Financing 'Red Flags,'" wherein examples of potentially suspicious activity that may indicate terrorist financing were listed. The examples included:

- Funds are generated by a business owned by persons of the same origin or by a business that involves persons of the same origin from high-risk countries (*e.g.*, countries designated by national authorities and FATF as non-cooperative countries and territories).

- Funds transfers do not include information on the originator, or the person on whose behalf the transaction is conducted, when the inclusion of such information would be expected.

- Banks from high-risk locations open accounts.

- Funds are sent or received via international transfers from or to high-risk locations.

In explaining these red flags, the FFIEC Manual referenced Guidance for Financial Institutions in Detecting Terrorist Financing that had previously been issued in 2002 by the Financial Action Task Force (FATF) and listed similar red flags.

553.    The FFIEC Manual also explained that terrorist financing can happen through legitimate business activity, even where the transactional activity itself contains no red flags: "Other legitimate sources have also been found to provide terrorist organizations with funding; these legitimate funding sources are a key difference between terrorist financiers and traditional criminal organizations. In addition to charitable donations, legitimate sources include foreign government sponsors, business ownership, and personal employment."

554.    FATF issued a report on Terrorist Financing in February 2008 specifically explaining that "[d]etecting terrorist involvement in otherwise legitimate financial activity requires financial institutions to implement the FATF standards through strong application of the 'know your customer' principle and of customer due diligence (CDD) policies and procedures." This report also clearly stated that "financial information" including "suspicious transaction reporting . . . has a central role in identifying terrorist financing and the movement of terrorist funds through the financial system."

203

### 3. The Terrorist Finance Tracking Program

555.    A third key counterterrorism control was the U.S. government's ongoing monitoring of payment messages sent through the Society for Worldwide Interbank Financial Telecommunication (SWIFT) system. The SWIFT system was the primary means by which payments were processed through the international banking system. At all relevant times beginning in 2001, the Treasury Department monitored SWIFT payment messages through the Terrorist Finance Tracking Program (TFTP).

556.    Treasury explains the history and importance of this program on its website: "After the terrorist attacks on September 11, 2001, the United States Department of the Treasury (Treasury) initiated the Terrorist Finance Tracking Program (TFTP) to identify, track, and pursue terrorists — such as Al-Qaida, Hizballah, HAMAS and their networks. This was an important part of Treasury's larger effort to track terrorist money flows and assist in broader U.S. government efforts to uncover terrorist cells and map terrorist networks here at home and around the world."

557.    Since the start of the program in 2001, Treasury's website reports that "the TFTP has provided hundreds of thousands of valuable leads to U.S. government agencies and other governments that have aided in the prevention or investigation of many of the most visible and violent terrorist attacks and attempted attacks of the past decade. . . . SWIFT information greatly enhances our ability to map out terrorist networks, often filling in missing links in an investigative chain. . . . By following the money, the TFTP has allowed the United States and our allies to identify and locate operatives and their financiers, chart terrorist networks, and help keep money out of their hands."

558.    Although the TFTP began as a covert program, it was revealed and widely publicized by the press in June 2006, including in a *New York Times* article by Eric Lichtblau

and James Risen. The following month, Treasury Under Secretary for Terrorism and Financial

Intelligence Levey confirmed and explained the importance of the program in testimony before

the House Financial Services Subcommittee on Oversight and Investigations:

> As this Committee knows well, tracking and combating terrorist financing are critical facets of our overall efforts to protect our citizens and other innocents around the world from terrorist attacks. This is true for two main reasons. First, when we block the assets of a terrorist front company, arrest a donor, or shut down a corrupt charity, we deter other donors, restrict the flow of funds to terrorist groups and shift their focus from planning attacks to worrying about their own needs. While any single terrorist attack may be relatively inexpensive to carry out, terrorist groups continue to need real money. They depend on a regular cash flow to pay operatives and their families, arrange for travel, train new members, forge documents, pay bribes, acquire weapons, and stage attacks. Disrupting money flows stresses terrorist networks and undermines their operations. In recent months, we have seen at least one instance of what we look for most - a terrorist organization indicating that it cannot pursue sophisticated attacks because it lacks adequate funding.
>
> Second, "following the money" is one of the most valuable sources of information that we have to identify and locate the networks of terrorists and their supporters. If a terrorist associate whom we are watching sends or receives money from another person, we know that there's a link between the two individuals. And, while terrorist supporters may use code names on the phone, when they send or receive money through the banking system, they often provide information that yields the kind of concrete leads that can advance an investigation. For these reasons, counter-terrorism officials place a heavy premium on financial intelligence. . . .
>
> The Terrorist Finance Tracking Program has been a key part of these overall efforts. . . . I have on my staff a group of intelligence analysts who spend their days in a secure room poring over information to unmask the key funders and facilitators of terrorist groups. If you spoke with them, they would point to this program as one of the most important and powerful tools they have to follow the money.

## B.  BNPP Willfully Subverted Counterterrorism Controls Designed to Prevent Terrorist Attacks

559.    From at least 2002 until late 2012, BNPP willfully subverted U.S.

counterterrorism controls on behalf of its terrorist-sponsor clients. "The nature and scope of

BNPP's criminal conduct *far exceeded* that in any previous criminal sanctions case resolved" by

DOJ, and the "total volume of provable criminal conduct" was "*staggering*," according to

Assistant Attorney General Caldwell. "BNPP's conduct was uniquely sophisticated, involving the manipulation of documents, records and transactions, and the use of other 'satellite' banks as 'fronts' to evade detection." "Not only did BNPP commit *severe criminal acts*, but then, BNPP hindered [DOJ's] ability to prosecute the individuals that engaged in that wrongdoing."[25]

### 1.    BNPP Deliberately Concealed Transactions with Terrorist Sponsors

560.    Beginning no later than 2002 and continuing through at least November 2012, BNPP "developed and implemented policies and procedures to systematically conceal at least *$160 billion* in U.S. dollar-denominated payments on behalf of Iranian customers."[26] BNPP's conduct allowed "Specially Designated Nationals" to "access the U.S. financial system and engage in billions of dollars worth of U.S. dollar-based financial transactions, significantly undermining the U.S. sanctions."[27] BNPP's conduct harmed "U.S. national security."[28]

561.    Between July 15, 2005 and November 27, 2012, BNPP processed at least 318 electronic funds transfers amounting to over $1 billion through the U.S. financial system in violation of U.S. sanctions on Iran.[29]

562.    Even where BNPP's conduct did not violate sanctions (for example, because it was permitted by the U-turn exception before that exception was repealed), BNPP knew that the U.S. government's counterterrorism controls would pose a major impediment to BNPP's business with its Iranian customers. Not only did U-turn transactions need to be reviewed to ensure that they complied with the U-turn exception, but U.S. banks or branches involved in the transaction (including BNPP's own New York branch) also had an obligation under the BSA to

---

[25] U.S. Dep't of Justice, *Remarks by Assistant Attorney General Leslie R. Caldwell at BNP Paribas Press Conference*, *supra* note 1.
[26] NYDFS Consent Order ¶ 28.
[27] NYDFS Consent Order at 2.
[28] NYDFS Consent Order at 2.
[29] OFAC Settlement ¶ 19.

review and report suspicious transactions. BNPP knew that all transactions involving Iran would be viewed by U.S. regulators and banks as entailing an extraordinarily high risk of terrorist financing, which would necessitate intensive review by BSA compliance personnel in New York. BNPP and its Iranian clients also knew that New York banks and branches would be required to report suspicious terrorist financing activity to FinCEN for dissemination to law enforcement and the intelligence community.

563.    BNPP knew that its Iranian customers, many of whom were fronts or agents for Terrorist Sponsors, did not want their transactions reported to the U.S. government because it would allow the U.S. government to gain information about how they were funding terrorist attacks. BNPP was accordingly "instruct[ed]" by "co-conspirator Sanctioned Entities not to mention their names in U.S. dollar payment messages," and BNPP "followed" those instructions.[30]

564.    To satisfy the requests of sanctioned parties to omit or obscure identifying information payment messages, BNPP developed an elaborate scheme. BNPP's illicit transactions were "processed by [BNPP New York] and other New York-based financial [institutions] by use of a cover payment method."[31]

565.    BNPP's cover-payment scheme involved falsifying payment messages communicated between banks through the SWIFT system. SWIFT is the primary communications channel for correspondent banking worldwide. SWIFT is an international network for banks to exchange electronic wire transfer messages with other institutions. SWIFT messages contain various informational fields, including the name and address of the originator

---

[30] SOF ¶ 16.
[31] NYDFS Consent Order ¶ 28.

and beneficiary. And the SWIFT network offers various message types that can be used to transfer funds between banks. Financial institutions worldwide rely on the accuracy of SWIFT payment messages both to ensure the successful processing of any transaction and to ensure compliance with relevant banking laws.

566.    BNPP, however, abused the SWIFT payment-message system to accomplish its deception. BNPP "concealed, removed, omitted, or obscured references to, or the interest or involvement of, sanctioned parties" in U.S. dollar SWIFT payment messages.[32] BNPP thus "conceal[ed] the involvement" of sanctioned Iranian entities in "U.S. dollar transactions processed through BNPP New York and other financial institutions in the United States."[33]

567.    BNPP's actions were deliberate, and its deception was accomplished through several tactics, used individually and in combination:

568.    BNPP "replaced the names of sanctioned parties" in payment messages "with BNPP's name or SWIFT Business Identifier Code ('BIC') in outgoing payments, including those destined for the United States."[34]

569.    "BNPP simply omitted (and did not replace) sanctioned parties' names from payment messages pursuant to specific instructions from the sanctioned parties themselves."[35]

570.    BNPP conspired with "other financial institutions to structure payments in highly complicated ways, with no legitimate business purpose, to conceal the involvement" of Iranian entities "to prevent the illicit transactions from being blocked when transmitted through the United States."[36]

---

[32] OFAC Settlement ¶ 3.
[33] SOF ¶ 16.
[34] OFAC Settlement ¶ 4; *see* SOF ¶ 16.
[35] OFAC Settlement ¶ 4; *see* SOF ¶ 16.
[36] SOF ¶ 16; *see* OFAC Settlement ¶ 3.

571.    BNPP used different and "less transparent payment message types for transactions that involved sanctioned countries or entities." Specifically, BNPP used "less transparent cover payment messages (such as SWIFT MT202 payment messages) for transactions involving sanctioned parties."[37]

572.    BNPP "issued instructions (to other employees, to BNPP entities, and to sanctioned banks) to conceal the involvement of sanctioned parties in transactions transiting the United States."[38]

573.    BNPP's sanctions-evasion scheme was systematic and formalized. BNPP "develop[ed] and implement[ed] policies and procedures for processing U.S. dollar-denominated transfers through [BNPP New York] and unaffiliated U.S. financial institutions in a manner that was designed to conceal relevant information" regarding "Iran" and other sanctioned entities, to prevent "institutions and their regulators" from "determin[ing] whether the transactions were lawful and consistent with New York State and U.S. laws and regulations."[39]

574.    BNPP also concealed relevant information from payment messages to prevent them from being reported as suspicious transactions.

575.    When "carrying out these illicit transactions, BNPP's agents and employees were acting within the scope of their duties."[40]

576.    As NYDFS found: BNPP "engaged in a systematic practice, as directed from high levels of the Bank's group management, of removing or omitting . . . Iranian . . . information from U.S. dollar-denominated payment messages that it sent through [BNPP New York] and

---

[37] OFAC Settlement ¶ 5.
[38] OFAC Settlement ¶ 4; *see* SOF ¶ 16.
[39] NYDFS Consent Order at 2.
[40] SOF ¶ 15.

other nonaffiliated New York-based U.S. financial institutions to 'guarantee the confidential[ity] of the messages and to avoid their disclosure to any potential investigatory authorities.'"[41]

577. BNPP's scheme was "systematic"—"spanning many years and involving multiple BNPP branches and business lines."[42]

578. "From as early as 1995 through at least 2007 memoranda were circulated to the Bank's operations staff with the blanket directive for U.S. dollar denominated transactions involving Iran: 'Do not stipulate in any case the name of Iranian entities on messages transmitted to American banks or to foreign banks installed in the U.S.A.'"[43]

579. Another BNPP "policy directive[]" was "contained in the February 2007 *Operating Application for Filtering of Transactions under the Group Policy on Iran*."[44] That policy directed employees to "ensure that SWIFT MT 202 cover payment messages meant to be processed through New York from BNPP reflected only the identity of the '**receiving** institution (and not the [ultimate] Iranian beneficiary institution!)'"[45]

580. Throughout the life of the scheme, BNPP knew that its conduct was illegal.

581. In 2004, New York regulators identified "systemic failures in BNPP's compliance with the Bank Secrecy Act, and specifically highlighted deficiencies in BNPP New York's monitoring of transactions with overseas clients, including the processing of U.S. dollar transactions for overseas clients." In September 2004, BNPP agreed to enter into a memorandum

---

[41] NYDFS Consent Order ¶ 3.
[42] OFAC Settlement ¶ 7.
[43] NYDFS Consent Order ¶ 5.
[44] NYDFS Consent Order ¶ 29.
[45] NYDFS Consent Order ¶ 29 (emphasis in original).

of understanding (MOU) with New York regulators that required BNPP New York to improve its systems for BSA compliance.[46]

582.    Despite promising to improve the BSA compliance in its New York branch, BNPP did not begin properly identifying or reporting its Iran transactions. Instead, it conspired to continue evading U.S. counterterrorism controls by **circumventing its own New York branch**. Shortly after BNPP entered into the MOU with New York regulators, two senior BNPP Paris and BNPP Geneva executives met in Geneva and "decided in that meeting to switch to an unaffiliated bank in the United States . . . to process payments for countries subject to U.S. sanctions." Following that meeting, "BNPP Geneva employees were instructed to have U.S. dollar payments involving Sanctioned Entities cleared through [the other U.S. bank] instead of BNPP New York."[47]

583.    As indicated in meeting minutes outlining the new policy for U.S. dollar payments involving sanctioned countries, BNPP's circumvention of its own New York branch was adopted "following problems BNP NY encountered with the U.S. authorities."[48] The "problems," as BNPP understood them, were that BNPP's New York branch was required to review and report suspicious transactions under the BSA.

584.    BNPP's senior compliance officials knew that BNPP's wire stripping conduct was wrong. After a Dutch bank that had committed such wire stripping settled with U.S. regulators for sanctions violations, BNPP's Head of Ethics and Compliance for North America emailed a colleague: "**the dirty little secret isn't so secret anymore, oui?**"[49]

---

[46] SOF ¶ 28.
[47] SOF ¶ 29.
[48] SOF ¶ 30.
[49] NYDFS Consent Order ¶ 8.

585.    BNPP persisted with the concealment scheme over the concerns of employees, expressed internally. When one employee raised concerns about "employing cover payments to make a transaction nontransparent," BNPP "compliance officers" "weighed the costs and benefits" of continuing the practice by deceiving either BNPP New York or another U.S. financial institution: "If [the New York head of ethics and compliance] only offers the choice between abandoning the [cover payments] for movement in favor of clientele or promising BNPP NY we do not wire transfer in USD concerning Cuba, Iran, Sudan or Syria, I only see the solution of going through another bank than BNPP NY for all transactions to these destinations. The other, less gratifying alternatives are to stop working in USD in these zones or to disguise the reality with the no win situation between telling stories to BNPP NY or to [the unaffiliated U.S. bank]."[50]

586.    BNPP elected to "tell stories"—*i.e.*, lie—to an unaffiliated U.S. bank., shifting some U.S. dollar clearing activity away from BNPP New York to the U.S. bank. BNPP's concealment scheme deliberately left other U.S. financial institutions "helpless to detect payments" that should have been reviewed, blocked, or reported to the U.S. government.[51]

587.    BNPP admitted in its guilty plea that it was warned repeatedly about the illegality of its scheme:

588.    "In May 2006, BNPP received an additional legal opinion from a U.S. law firm" that "specifically warned BNPP that if the bank were to omit relevant identifying information in U.S. dollar payments sent to the United States, with the objective of avoiding U.S. economic sanctions, BNPP could be subjecting itself to various U.S. criminal laws."[52]

---

[50] NYDFS Consent Order ¶ 9 (brackets in original).
[51] NYDFS Consent Order ¶ 30.
[52] SOF ¶ 35.

589.    "In March and June 2006, BNPP received two additional legal opinions" that "informed BNPP that (a) U.S. sanctions could apply to BNPP even when the transactions were processed by [an unaffiliated U.S. financial institution] instead of BNPP New York, and (b) U.S. authorities had become especially sensitive to the use of 'cover payments' by foreign banks that omitted underlying descriptive details about the nature of transactions, and advised BNPP to 'ensure that they have adequate procedures in place to guard against any abuses of cover payment messages that could cause their U.S. operations to engage in prohibited transactions under U.S. sanctions.'" Accordingly, "[i]n July 2006, BNPP issued a policy across all its subsidiaries and branches that acknowledged the applicability of U.S. sanctions to non-U.S. banks. The policy stated that 'if a transaction is denominated in USD, financial institutions outside the United States must take American sanctions into account when processing their transactions.'"[53]

590.    Thus, "by July 2006 at the latest, it was clear that BNPP could no longer justify its transactions with [sanctioned Iranian entities] based upon an incorrect assertion that U.S. sanctions law did not apply to banks located outside the United States. Nevertheless, BNPP **continued to willfully process** thousands of transactions" with the sanctioned Iranian entities "while taking steps to hide the true nature of these transactions from both BNPP New York and other U.S. correspondent banks."[54]

591.    BNPP's illicit conduct even "continued for several years **after OFAC contacted the bank directly** (in 2007)" to communicate its concerns about BNPP's U.S. dollar business involving Iranian entities.[55]

---

[53] SOF ¶ 35.
[54] SOF ¶ 36.
[55] OFAC Settlement ¶ 17.

592.     As further evidence of its culpability, BNPP hid its scheme from the public. In or around 2007, BNPP publicly represented (falsely) that it had "severely curtailed" its business with Iran, according to an October 25, 2007 article published in *Agence France Presse*. That year, BNPP's "president told staff that the bank would stop doing business with . . . Iran," according to a July 1, 2014 article in *The Guardian*.

593.     *Oil Daily* reported in March 2008 that "BNP Paribas . . . suspended activities" with Iran.

594.     Testifying before the U.S. Senate in April 2008, Phillip Gordon of the Brookings Institution similarly noted that BNPP had "largely stopped doing business with Iran."

595.     A BNPP spokesperson even told the *New York Times* in or around March 2010 that "[t]he bank stopped writing new business in Iran as of 2007 and has since been winding down its existing activities" because "***BNP Paribas respects the embargo on Iran***."

596.     BNPP also hid its scheme from law enforcement and regulators—and actively impeded investigations into its behavior.

597.     In December 2009, BNPP was notified of "law enforcement concerns regarding its potential sanctions violative conduct . . . when it was contacted by the New York County District Attorney's Office." While BNPP subsequently agreed to "conduct an internal investigation into business conducted with" sanctioned countries, BNPP "failed to provide" law enforcement and regulatory officials "with meaningful materials" for years—and the materials it did provide were "heavily redacted." "BNPP's delay in producing these materials significantly impacted the Government's ability to bring charges" against BNPP's co-conspirators in the sanctions-evasion scheme.[56]

---

[56] SOF ¶¶ 71-72.

598.    BNPP also concealed that a BNPP executive facilitated illegal transactions with the Iranian government. In 2006, a "a BNPP whistleblower in London raised concerns internally about a U.S. citizen who served as a BNPP executive and was facilitating transactions with the government of Iran, in direct contravention of IEEPA." BNPP "did not disclose any information to the Government about the whistle blower or the executive until December 2011, almost two years after BNPP began its internal investigation and eight months after the statute of limitations against this individual expired."[57]

599.    More broadly, BNPP's scheme "rendered [BNPP New York] and other New York-based financial institutions incapable of making and maintaining records of any such U.S. dollar payment transaction that cleared through the institution, and accordingly prevented review of such records by regulators and authorities."[58]

### 2.    BNPP Helped an Iranian Petrochemical Company Operating as a Front for Terrorist Sponsors to Access the U.S. Financial System While Evading U.S. Counterterrorism Controls

600.    BNPP consciously and culpably helped Terrorist Sponsors and their fronts finance their operations while evading U.S. counterterrorism controls.

601.    One such front for Terrorist Sponsors was an Iranian petrochemical company, (hereinafter, the "Iranian Petrochemical Company" a/k/a "Caspian Petrochemical FZE") described in official documents as an "Iranian-controlled petrochemical client."[59]

602.    The Iranian Petrochemical Company's "activities involved selling and transporting petroleum products to, from, or through Iran," including "utiliz[ing] its account at BNPP Paris to receive payments related to its sale of Turkmen liquefied petroleum gas to Iraq."[60]

---

[57] SOF ¶ 73.
[58] NYDFS Consent Order ¶ 30.
[59] NYDFS Consent Order ¶ 31.
[60] OFAC Settlement ¶ 14-15; *see* SOF ¶ 42.

BNPP "processed payments" for the Iranian Petrochemical Company "in connection with three letters of credit that facilitated the provision of liquefied petroleum gas."[61] "BNPP issued" those "three letters of credit . . . in 2006, 2008 and 2011."[62]

603.    To complete those unlawful transactions, BNPP used various "concealment practices"—such as falsifying or obscuring information in SWIFT payment messages—to allow the Iranian Petrochemical Company to transact through the U.S. financial system without its activities being subject to scrutiny or reporting.[63] For example, to route transactions through the United States, BNPP omitted "references to Iran" and "to the company's Iranian ownership" and "connections" in payment messages.[64]

604.    BNPP had unique situational awareness of the corruption, smuggling, and organized crime prevalent in the Iraqi oil sector due to its role as the bank that handled Iraqi Oil for Food payments from 1996 through 2001. BNPP was chosen for this role because of one of its key shareholders at the time, Nadhi Auchi, was a cousin of Saddam Hussein.[65] Due to this connection, as *UPI* reported in June 2004, "Iraq insisted that [BNP] Paribas handle the oil-for-food escrow account." During the relevant period, the United States was actively investigating BNPP's role in the Oil for Food scandal. A U.N. investigation "found evidence that more than half the 4,500 companies from 60 countries involved paid a total of $1.8bn in kickbacks or surcharges to the Iraqi government" according to a 2005 article from *Financial News London*.

---

[61] SOF ¶ 42.
[62] NYDFS Consent Order ¶ 31.
[63] NYDFS Consent Order ¶ 31.
[64] OFAC Settlement ¶ 15.
[65] As the *New York Times* reported in April 2003, "One of the largest private shareholders in BNP Paribas, the French bank that holds more than $13 billion in Iraqi oil funds administered through the United Nation's oil-for-food program, is an Iraqi-born businessman who once helped to arm Iraq in the 1980's and brokered business deals with Saddam Hussein's government, according to public records and interviews."

605.    A U.S. government-commissioned independent inquiry, the Volcker Commission, published its findings in October 2005 (the Volcker Report), which found that "BNP[P] was uniquely positioned to probe such payments—but failed to do so." BNPP provided letters of credit while serving as the escrow account holder and failed to notify authorities of corrupt transactions. BNPP played a key role in criminal cases related to Oil for Food and was also one of the companies sued by the Iraqi government in the United States in 2008 for violating U.S. racketeering and money laundering laws. BNPP's senior managers did not just know of these investigations and their results—they were deeply engaged in them. For example, BNPP-North America CEO Everett Schenk was subject to extensive questioning by the House Subcommittee on Oversight and Investigations, which held a hearing on April 28, 2005 entitled "THE ROLE OF BNP-PARIBAS SA IN THE UNITED NATIONS OIL-FOR-FOOD PROGRAM."

606.    BNPP's conduct in the Oil for Food program was an initial impetus of U.S. government investigations of BNPP's counterterrorism sanctions violations, in part because Oil for Food corruption enabled Iraqi government officials to divert funds to Al Qaeda and other terrorist groups. For example, on November 16, 2004, the *Associated Press* explained that:

> Saddam Hussein diverted money from the U.N. oil-for-food program to pay millions of dollars to families of Palestinian suicide bombers who carried out attacks on Israel, say congressional investigators who uncovered evidence of the money trail. . . . Investigators examining the oil-for-food program felt it was 'important for us to determine whether the profits from his corruption were put toward terrorist purposes,' committee chairman Henry Hyde, R-Ill., said of Saddam's well-known financial support of suicide bombers.

On April 28, 2004, likewise, Claudia Rosett, a fellow with the Foundation for the Defense of Democracies, confirmed—in an article entitled "Oil-for-Terror"—that the Oil for Food program "set up a vast and intricate global network of illicit finance" and supplied funds to, *inter alia*, the Taliban and al Qaeda.

217

607.    According to Professor Phil Williams on July 1, 2009 (*supra*), under the Oil for Food program, Iraqi officials and their "growing underground network of trade intermediaries, front companies, and international suppliers" exchanged oil and bribes for weapons, and as a consequence, they developed "sophisticated skills in criminality combined with methods of smuggling and repatriating funds that survived the downfall of the regime." Williams adds that "members of the post Hussein elite" imitated and built on the Baath regime's profiteering, corruption, and crime, which led to the "creation of regional linkages in smuggling and other criminal activities", including "[s]muggling oil using 'routes through the northern Arabian Gulf,' as facilitated by the Iranian Revolutionary Guard Navy 'in return for a fee.' It was estimated in 2000 that Iran was taking about 25 percent of the profit from smuggled Iraqi oil[]."

608.    With this background in mind, BNPP indisputably knew that the Iranian petrochemical company was a front controlled from Iran. A mountain of evidence in BNPP's own files confirmed this:

609.    BNPP's Know-Your-Customer documentation for the Iranian Petrochemical Company "demonstrated that while" the company "was registered as a corporation in Dubai, it was wholly owned by an Iranian energy group based in Tehran, Iran, which was in turn fully controlled and owned by an Iranian citizen."[66]

610.    BNPP possessed an "organizational chart" that "indicated that" the Iranian Petrochemical Company "was part of a network of eight companies—four of which were incorporated in Iran—that comprised an Iranian energy group owned and controlled by an Iranian citizen ordinarily resident in Iran, who was also the sole beneficial owner of the

---

[66] NYDFS Consent Order ¶ 32; *see* SOF ¶ 43.

company."[67] BNPP's "customer profile form" even "included a handwritten note for the company that read 'Iranian ownership.'"[68]

611.    The Iranian Petrochemical Company's "account opening materials" and "a report the company produced to BNPP Paris in 2007" confirmed that "many of the company's activities involved selling and transporting petroleum products to, from, or through Iran."[69]

612.    BNPP possessed The Iranian Petrochemical Company's "General Business Plan", which "described its goals to increase a number of Iran-related activities over the following three years (2007-2010)."[70]

613.    And, when BNPP employees communicated with representatives of the Iranian Petrochemical Company, the company responded from an "email address belonging to [an] Iranian energy group."[71]

614.    On information and belief, BNPP also knew that the Iranian Petrochemical Company's ultimate beneficial owner was the Government of Iran, based on the government's involvement in the oil and gas sector.

615.    On information and belief, the Iranian Petrochemical Company reincorporated on November 15, 2011, as a new company named Caspian Petrochemical FZE, which it registered in Dubai, UAE, and London, U.K. that same day by using cut-outs who incorporated Caspian Petrochemical.

616.    Caspian Petrochemical FZE's corporate filings publicly identified the "Objects of the company" as "Trade of gas, oil and petrochemicals" and listed its officers as Phati Sebua and

---

[67] OFAC Settlement ¶ 14.
[68] OFAC Settlement ¶ 15.
[69] OFAC Settlement ¶ 14.
[70] OFAC Settlement ¶ 14.
[71] OFAC Settlement ¶ 14.

Seyedasadoollah Emamjomeh (a/k/a Seyed Asadollah Ememjome), who was identified as its

Chairman. As BNPP knew, the surname "Emamjome" was a direct reference to Ayatollah

Khamenei and the Supreme Leader's Office because "Emamjome" was a religious title in Iran

referring to the imam appointed who leads Tehran's Friday prayers, which regularly included

slogans condemning the United States, Israel, and other enemies of the Ayatollah's regime.

"Seyed" and "Asadollah" are also common religious honorific titles in Iran translating to

"Descendant of Prophet Mohammed – Lion of God." Since 1979, by decree of Aytollah

Khomeini, the "Emamjome" was the Supreme Leader of the Islamic Revolution, or someone the

Supreme Leader delegated for the task.  Khamenei continued this approach.  Accordingly, from

1989 through 2016, the most literal—and correct—interpretation of "Emamjome" was as a ***direct***

***reference to Ayatollah Khamenei or someone in his inner circle.***  BNPP knew this for a host of

reasons, including, but not limited to, BNPP's presence in Iran, and in-house corporate security

personnel, among other reasons.

617.    BNPP has admitted that by December 2011 it was "on notice"—"to the extent

that it was not before"—that "transactions with" the Iranian Petrochemical Company "were

impermissible."[72] That month, a U.K. bank "blocked a payment" involving the Iranian

Petrochemical Company and informed BNPP that it "would no longer do business" with the

company "because of its ties to Iran."[73] Soon after, in January 2012, a U.S. branch of a German

bank similarly "rejected a payment made by BNPP" on the Iranian Petrochemical Company's

---

[72] SOF ¶ 46.
[73] SOF ¶ 46.

behalf because the German bank discovered that the Iranian Petrochemical Company was "'controlled from Iran.'"[74]

618.    In June 2012, "a BNPP Paris compliance officer noted" that the Iranian Petrochemical Company "was sending payments from its account at BNPP Paris to its account at an Indian bank" that had "'known links to Iran.'"[75]

619.    Despite these clear connections, BNPP actively continued processing illegal transactions for the Iranian Petrochemical Company, brazenly violating U.S. sanctions designed to prevent the IRGC from accessing U.S. dollars.

620.    Indeed, BNPP's malfeasance was not limited to just "facilitat[ing]" the Iranian Petrochemical Company's "ability to trade in U.S. dollars" for years "by covertly processing U.S. dollar transactions" for the company.[76]

621.    BNPP also *lied to regulators* in America about its ongoing provision of banking services to the Iranian Petrochemical Company. In 2007, OFAC "contacted the bank directly" about its USD business with Iran.[77] And again in early 2010, "the New York County District Attorney's Office and the U.S. Department of Justice jointly approached BNPP regarding its involvement in transactions with sanctioned entities."[78] Consequently, BNPP "agree[d] to commence an internal investigation into its compliance with U.S. sanctions and cooperate fully

---

[74] SOF ¶ 46. That payment was a "$500,000 wire transfer on behalf of the company, destined for a refinery in Turkmenistan." OFAC Settlement ¶ 15.
[75] SOF ¶ 46.
[76] NYDFS Consent Order ¶ 31 n.5.
[77] OFAC Settlement ¶ 17.
[78] SOF ¶ 45.

with U.S. and New York authorities."[79] BNPP also "pledg[ed] immediate remedial efforts and its full cooperation with U.S. and New York regulators and authorities."[80] That pledge was a lie.

622.    Despite its promise to law enforcement officials, BNPP "continued to process U.S. dollar-denominated transactions on behalf of [the Iranian Petrochemical Company]" through November 2012.[81]

623.    In sum, BNPP's transactions for the Iranian Petrochemical Company began in approximately December 2006, continued through the revocation of the U-turn exemption in November 2008, and continued further through the warnings of another bank, regulators, and its BNPP's own compliance officials until at least November 2012. Between November 2008 and November 2012, BNPP processed **hundreds of millions** in illegal transactions for the Iranian Petrochemical Company.[82] For just the period from late 2011 through November 2012, BNPP "knowingly, intentionally and willfully processed" **at least $586.1 million** illegal transactions for the Iranian Petrochemical Company.[83]

### 3. BNPP Helped an Iranian Oil Company Operating as a Front for Terrorist Sponsors to Access the U.S. Financial System While Evading U.S. Counterterrorism Controls

624.    BNPP also pleaded guilty to helping another energy company (the "Iranian Oil Company") access the U.S. financial system while evading U.S. counterterrorism controls. Like the Iranian Petrochemical Company, this company was also a front for Terrorist Sponsors.

625.    In 2009, "BNPP knowingly, intentionally and willfully processed approximately **$100.5 million** in U.S. dollar payments involving an Iranian oil company . . . in violation of U.S.

---

[79] SOF ¶ 45.
[80] NYDFS Consent Order ¶ 33.
[81] NYDFS Consent Order ¶ 33; *see* SOF ¶¶ 45, 47.
[82] *See* OFAC Settlement ¶ 15; SOF ¶ 47; NYDFS Consent Order ¶ 31 & n.5.
[83] SOF ¶ 47.

sanctions."[84] Those U.S. dollar "payments were in connection with six letters of credit issued by BNPP that financed Iranian petroleum and oil exports."[85]

626.    BNPP deliberately made these payments in violation of U.S. sanctions. As BNPP confessed in its guilty plea, the payments to the Iranian Oil Company "were made even after compliance personnel at BNPP Paris alerted [other BNPP] employees that the U.S. dollar payments associated with these letters of credit '[were] no longer allowed by American authorities.'"[86]

627.    On information and belief, BNPP used wire stripping tactics or other similar schemes to obscure or omit identifying information about the Iranian Oil Company when its U.S. dollar payments transited through New York.

628.    On information and belief, BNPP knew that the Iranian Oil Company for which BNPP made payments was owned or controlled by Terrorist Sponsors. This is a reasonable inference because by 2009 one or more of those Iranian entities controlled and/or beneficially owned every major and minor oil, petroleum, and petrochemical company in Iran, and BNPP knew that its letters of credit financed Iranian petroleum and oil exports for the Iranian Oil Company.

### 4.  BNPP's Other Iran Schemes

629.    Overall, BNPP provided roughly *$160 billion* in financial services to Iranian entities from around 2002 to late 2012.[87] At least *$1.1 billion* of those transactions occurred from

---

[84] SOF ¶ 48 (emphasis added).
[85] SOF ¶ 48.
[86] SOF ¶ 48.
[87] NYDFS Consent Order ¶ 28.

July 2005 through November 2012, were routed "to or through financial institutions located in the United States," and violated U.S. sanctions.[88]

630.    While BNPP's guilty plea and its regulatory resolutions do not identify the full range of Iranian counterparties for which BNPP provided illicit banking services, BNPP's misconduct necessarily extended to sanctioned entities ***other than*** the Iranian Petrochemical Company and the Iranian Oil Company. This is because the illegal services provided to the Iranian Petrochemical Company (roughly $586 million) and the Iranian Oil Company (roughly $100 million) represent only a portion of the overall illicit, sanctions-evading banking services that BNPP provided for Iranian entities for nearly a decade, and only a small fraction of the billions of dollars in financial services BNPP provided to its Iranian customers at a time when their connection to Terrorist Sponsors was well known.

631.    For example, BNPP branches in Switzerland and Paris "negotiated a variety of trade finance instruments on behalf of or that involved parties subject to U.S. sanctions on . . . Iran . . . and routed [U.S. dollar] payments to or through the United States pursuant to these instruments."[89] BNPP branches in Switzerland, Paris, Rome, and Milan "all processed correspondent banking or retail banking transactions to or through the United States that involved the interest of a person subject to U.S. sanctions on Sudan, Iran, Cuba, or Burma."[90] And BNPP's Swiss branch "processed a number of payments to or through the United States related to syndicated loans involving Iranian parties."[91]

---

[88] OFAC Settlement ¶ 19.
[89] OFAC Settlement ¶ 16.
[90] OFAC Settlement ¶ 16.
[91] OFAC Settlement ¶ 16.

632.    On information and belief, BNPP directly and/or indirectly provided banking services to one or more additional Iranian entities that held dominant positions in Iran's economy from 2002 to 2012, including but not limited to the IRGC, the SLO, KAA, the Foundation for the Oppressed, NIOC, NITC, and/or Iranian banks, including CBI/Markazi, Bank Saderat, and Bank Melli.

633.    Nonetheless, because BNPP concealed the full scope of the Iranian entities with which it did business and failed to disclose the full scope of its malfeasance in its criminal guilty pleas and related regulatory settlements, discovery is necessary to reveal additional examples of BNPP's deliberate facilitation of U.S. sanctions evasion by IRGC fronts and affiliated customers similar to the ones alleged herein.

### 5.    BNPP Helped the Government of Sudan Access the U.S. Financial System While Evading U.S. Counterterrorism Controls

634.    From 2002 through at least 2007, BNPP engaged in thousands of illicit financial transactions with Sudanese entities, while helping them evade counterterrorism controls. These transactions were valued at least $6 billion dollars, and were accomplished primarily using two means: (1) using unaffiliated, regional banks as fronts to process transactions with Sudan and therefore hide the connection between Sudan and BNPP, and (2) wire stripping, where BNPP deliberately withheld or provided misleading information for transactions to conceal their connection to Sudan. These activities were orchestrated by BNPP Geneva in connection with BNPP Paris to access the U.S. financial system in violation of U.S. sanctions.

635.    BNPP Geneva occupied a unique place in Sudanese funding: after sanctions were imposed on Sudan by the United States in 1997 due to Sudan's sponsorship of terrorism, BNPP Geneva established relationships with unaffiliated regional banks to process payments for Sudanese clients. One of these clients was a Sudanese Government Bank which was designated

as a Specially Designated National ("SDN") by OFAC (referred to as "Sudanese Government Bank 1"). This bank "directed all major commercial banks located in Sudan to use BNPP Geneva as their primary correspondent bank in Europe," resulting in "all or nearly all major Sudanese banks ha[ving] U.S. dollar accounts with BNPP Geneva."[92]

636.    This was not the only SDN that BNPP worked with; BNPP serviced at least 18 Sudanese SDNs during this period, and 6 of those were ***BNPP clients***, resulting in "***over*** $***6 billion dollars in transactions processed for SDNs***." (Emphasis added.)[93] BNPP knew that these transactions involved the Government of Sudan because "[f]or the most part, these transactions were processed for a financial institution owned by the Government of Sudan."[94]

637.    BNPP Geneva was also responsible for developing letters of credit for these Sudanese banks starting in 2000, and took on "a central role in Sudan's foreign commerce market" because it helped finance the export of oil from Sudan. "By 2006, letters of credit managed by BNPP Geneva represented approximately a quarter of all exports and a fifth of all imports for Sudan. Over 90% of these…were denominated in U.S. Dollars…the deposits of Sudanese Government Bank 1 at BNPP Geneva represented about 50% of Sudan's foreign currency assets during this time period."[95] During this period, BNPP chose "over and over again . . . to act as a ***defacto central bank*** for the government of Sudan . . . ."[96] (Emphasis added.)

> **a.  BNPP's Wire Stripping Conduct in Sudan in Violation of U.S. Counterterrorism Controls**

---

[92] SOF ¶ 19.
[93] NYDFS Consent Order ¶ 14.
[94] NYDFS Consent Order ¶ 14.
[95] SOF ¶ 19.
[96] Remarks by Deputy Attorney General Cole at Press Conference Announcing Significant Law Enforcement Action, Justice News, June 30, 2014, https://www.justice.gov/opa/speech/remarks-deputy-attorney-general-cole-press-conference-announcing-significant-law.

638.    Starting at least in 2002 and continuing through at least 2007, BNPP worked with Sudanese entities to ensure their U.S. dollar transactions could be processed without identifying their roles in the transactions. Sudanese entities would specifically request to have their information omitted from transactions: "due to the US embargo on Sudan, please [debit our U.S. dollar account] without mentioning our name in your payment order" and "transfer the sum of USD 900,000 . . .without mentioning our name – repeat without mentioning our name under swift confirmation to US."[97] BNPP employees would stamp such messages: "ATTENTION: US EMBARGO" and BNPP front office employees would direct bank office employees processing these transactions to omit references to Sudan: "! Payment in $ to [French Bank 1] without mentioning Sudan to N.Y. !!!"[98]

639.    BNPP knew that mentioning Sudan in payment messages transiting the U.S. would cause New York compliance staff at BNPP or unaffiliated U.S. banks to flag, block, and/or report the transactions to the U.S. government, contrary to the wishes of BNPP's Sudanese customers. Indeed, until 2004, BNPP's published internal policy for U.S. dollar transactions with Sudan stated: "Do not list in any case the name of Sudanese entities on messages transmitted to American banks or to foreign banks installed in the U.S."[99] This was confirmed by statements made by senior compliance officers as well, such as a 2003 observation by a BNPP Paris senior compliance officer that "in practice, *in all kinds of ways*, the headers of messages seem to have been *amended* in Geneva."[100] (Emphasis added.) When the U.S. government analyzed the BNPP Geneva payments for Sudanese entities, it confirmed that those

---

[97] SOF ¶ 22.
[98] SOF ¶ 22.
[99] SOF ¶ 22.
[100] SOF ¶ 27.

payments were ***not*** processed the same way as payments involving non-sanctioned entities. This was, therefore, a deliberate, intentional, and accepted process within BNPP for evading U.S. sanctions against Sudan.

### b. BNPP's Use of Regional "Satellite Banks" to Process Sudanese Transactions in Violation of U.S. Counterterrorism Controls

640.     In addition to wire stripping, BNPP Geneva used "unaffiliated, non-Sudanese, non-U.S. banks (referred to internally at BNPP Geneva as 'satellite banks')" to process transactions with Sudanese entities in violation of U.S. counterterrorism controls.[101] This satellite bank structure began in 1997, after the imposition of U.S. sanctions on Sudan. BNPP Geneva would use these satellite banks to process U.S. dollar transactions for Sudanese entities.

641.     To transfer money out of Sudan, a Sudanese bank would first transfer funds within BNPP Geneva to an account maintained by one of the satellite banks. The satellite bank would then transfer the funds through a U.S. bank to the intended recipient "without reference to the Sudanese bank," therefore making it appear that "the transaction was coming from the satellite bank rather than a Sudanese bank."[102]

642.     In order for Sudanese entities to receive money, the process was reversed – the payor would send "a wire transfer through the United States to the satellite bank's account at BNPP Geneva without reference to Sudan, and the satellite bank then transferred the money to the Sudanese bank via internal transfer at BNPP Geneva."[103]

643.     To ensure the success of these illicit wire transfers, BNPP Geneva instructed satellite banks to wait one to two days before processing the transactions with Sudanese entities, so that the connection to BNPP Geneva would severed. BNPP employees internally discussed

---

[101] SOF ¶ 23.
[102] SOF ¶ 24.
[103] SOF ¶ 24.

having the satellite banks become "accustom[ed] . . . to spacing out the gap between covers they execute with their U.S. correspondents to the extent possible."[104]

644.    Again, just as with wire stripping, these actions were part and parcel of a deliberate, intentional, widespread practice on the part of BNPP Geneva. A 2004 email from a satellite bank to a BNPP Geneva employee, for example, requested "to open an account at BNP Paribas Genev[a] to be used mainly for the USD Transfers to and from Sudanese banks."[105] This was forwarded to another BNPP Geneva employee "who recommended opening the account, as 'the opening of this account fits in the framework of our activity in Sudan."[106] Another BNPP employee referring to this request stated that "we have advised [this satellite bank] *for a long time* to open a VOSTRO account to facilitate the transactions which this institute has with countries with which we are also active."[107] (Emphasis added.)

645.    According to the Government, a 2005 BNPP compliance report clearly outlined this policy to evade U.S. counterterrorism controls:

> The main activity of certain BNPP customers is to domicile cash flows in USD on our books on behalf of Sudanese banks. ***These arrangements were put in place in the context of the U.S. embargo against Sudan.*** . . . The accounts of these banks were therefore opened with the aim of "***facilitating transfers of funds in USD for Sudanese banks***." This comment was made on the account opening application forms of these banks. The funds in question were then transferred, on the same day, or at the latest D+1 or 2 by the [satellite banks] to [U.S. correspondent banks].[108] (Emphasis added.)

### c.    BNPP's Deliberate Decision to Continue and Conceal its Sudan Business During Government Investigations

---

[104] SOF ¶ 24.
[105] SOF ¶ 25.
[106] SOF ¶ 25.
[107] SOF ¶ 25.
[108] SOF ¶ 26.

646.    In 2004, facing regulatory inquiries for its transaction monitoring deficiencies with overseas clients, BNPP attempted to circumvent U.S. counterterrorism controls by switching to an unaffiliated U.S. bank to process Sudanese transactions. Thus, instead of discontinuing the transactions, BNPP doubled down and sought to find a way to continue to profit from its Sudan business.

647.    In a July 2006 Credit Committee Meeting with BNPP management, the decision to continue the Sudan business was described as follows: "[t]he relationship with this body of counterparties is a historical one and ***the commercial stakes are significant. For these reasons, Compliance does not want to stand in the way of maintaining this activity for ECEP and [BNPP Geneva]***."[109] (Emphasis added.) Compliance personnel recommended strict adherence to the U.S. embargo rules, but BNPP chose to continue its Sudan business instead.

648.    In that same month, BNPP received legal advice that made it clear this attempt to evade U.S. counterterrorism controls was not allowed. BNPP then updated its policy "***across all its subsidiaries and branches***" to state that "if a transaction is denominated in USD, financial institutions outside the United States must take American sanctions into account when processing their transactions."[110] (Emphasis added.)

649.    Four months later, a November 2006 BNPP Geneva memo explained the benefit of the Sudan business for BNPP: "the 'clearing' activity of USD correspondents . . . is of real significance in relation to our activity in Sudan. . . . The fundamental importance of these [satellite bank] accounts lies in the fact that they allow us to receive incoming funds from Sudanese banks as cover for their commercial transactions on our books."[111] In February 2007, a

---

[109] SOF ¶ 37.
[110] SOF ¶ 35.
[111] SOF ¶ 38.

BNPP Paris senior compliance officer explained that "Sudan has traditionally generated a major source of business for BNPP Geneva…[this business has] over the years led to a major source of income, which is now recurring income."[112]

650.    BNPP employees at this time were expressing concerns that this continuation of the Sudan business was in violation of U.S. law. In February 2007, BNPP Paris and BNPP Geneva compliance officers warned that the use of an unaffiliated U.S. bank to process Sudanese transactions could be viewed as a "serious breach" and a "grave violation."[113] At this same time, in February 2007, a diplomatic cable summarized BNPP's crucial role in Sudan's oil business:

> *El Hassan said that money from the sales of oil are first deposited at the Central Bank of Sudan account at [BNPP Geneva]. From there, the money is transferred to the Bank headquarters in Khartoum, the amount due to the [Government of Sudan] is transferred to the Bank of Southern Sudan (BOSS).* BOSS is simply the southern branch of the Central Bank.[114] (Emphasis added.)

651.    Only once OFAC stepped in and asked for an internal investigation in June 2007 did BNPP discontinue its U.S. dollar business with Sudan.

652.    Thus, despite a clear internal policy and the legal advice received in 2006, "BNPP continued to willfully process thousands of transactions with Sanctioned Entities through the United States *for nearly another year, with a total value in excess of $6 billion, while taking steps to hide the true nature of these transactions from both BNPP New York and other U.S. correspondent banks.*"[115] (Emphasis added.) To be very clear – BNPP processed *$6.4 billion* in U.S. dollar denominated transactions involving Sudan from July 2006 until June 2007, in the

---

[112] SOF ¶ 38.
[113] SOF ¶ 39.
[114] Diplomatic Cable from U.S. Embassy, Sudan to Intergovernmental Authority on Development and U.S. Secretary of State, Oil Revenue: 2007 GNU Budget Based on Questionable Assumptions, (Feb. 9, 2007), at 5, https://wikileaks.jcvignoli.com/cable_07KHARTOUM194?amp=1 ("Feb. 9 Cable").
[115] SOF ¶ 36.

face of U.S. regulatory investigations, internal compliance policies, and continued warnings from employees about the decision to continue to transact in U.S. dollars with Sudanese entities.

### d. BNPP Engaged in Thousands of Transactions Worth Billions of Dollars Knowing Sudan Sponsored Terrorism

653.    BNPP's conduct on behalf of Sudan confirms its disregard for U.S. counterterrorism controls and indifference to the risk that its conduct was funding terrorism. While BNPP was knowingly using deceptive practices to process thousands of transactions with Sudanese entities, it was also aware of numerous warnings about Sudan's support for terrorism. Sudan's role in supporting terrorism was widely known as early as 1993, when State designated Sudan as a state sponsor of terrorism. State Department Spokesman Michael McCurry stated on August 18, 1993:

> [T]he cumulative weight of the evidence establishes that Sudan is providing *repeated support for international terrorism*. . . . Sudan allows the use of its territory as *sanctuary for terrorists, including . . . members of Hezbollah, and Palestine Islamic Jihad*." (Emphasis added.)

654.    In 1997, the U.S. imposed sanctions on Sudan, which were further extended in 2006. On November 4, 1997, Secretary Albright announced that the sanctions were for Sudan's "continued sponsorship of international terror" and that the objective of the sanctions was to "deprive the regime in Khartoum of the financial and material benefits of U.S. trade and investment, including investment in Sudan's petroleum sector." On May 15, 1997, then-Senator John Ashcroft testified to the Senate Foreign Relations Africa Subcommittee that "Sudan has risen quickly in the ranks of infamy to join Iran as the worst of state sponsors of terrorism."

655.    In 1997, after Sudan instructed its banks to use BNPP as their sole correspondent bank, one of the banks transacting with BNPP was Al-Shamal, a bank that received tens of millions of dollars in investments from Osama bin Laden and al-Qaeda and maintained

232

numerous al-Qaeda accounts. According to the Wall Street Journal on November 2, 2001, U.S.

prosecutors said al Shamal "was used to funnel large amounts of money to al Qaeda operatives."

656.    Indeed, a plethora of U.S. government statements during the time of BNPP's

transactions warned BNPP about Sudan's connections to terrorism (emphases added):

a.    <u>President Clinton, August 21, 1998</u>: "Sudan ha[s] been ***warned for years*** to stop harboring and supporting these terrorist groups."

b.    <u>*Patterns of Global Terrorism Report*, 1998 (State Department Annual Report on Terrorism)</u>: "Sudan provides ***safehaven to some of the world's most violent terrorist groups***, including Usama Bin Ladin's al-Qaida, Lebanese Hizballah, the PIJ . . . and HAMAS."

c.    <u>*Patterns of Global Terrorism Report,* 1999 (State Department Annual Report on Terrorism)</u>: "Sudan in 1999 continued to serve as a central hub for several international terrorist groups, including Usama Bin Ladin's al-Qaida organization. ***The Sudanese Government also condoned Iran's assistance to terrorist and radical Islamist groups operating in and transiting through Sudan***. Khartoum served as a meeting place, safehaven, and training hub for members of the Lebanese Hizballah . . . the Palestinian Islamic Jihad, [and] HAMAS . . . ."

d.    <u>DoD Press Release, March 13, 2002</u>: ***"[T]errorists continue to use Sudan as a safe haven***. These include people from al Qaeda, Egyptian and Palestinian terrorist organizations."

e.    <u>Dr. Michael Rubin, July 22, 2002</u>: "Omar al-Bashir has played his cards masterfully since September 11. . . . ***Bashir's government handed over a few low-ranking terrorists but allowed scores to escape***. On October 4 [2001], Sudanese Vice President Ali Uthman Taha declared, '***The jihad is our way and we will not abandon it and will keep its banner high***.' . . . Sudanese television reported, '***Training camps are ready to receive volunteer fighters***.' Demonstrators at a state-organized rally chanted, '***Strike back, Bin Laden!' and 'Down! Down with the U.S.A.!***'"

f.    <u>*Washington Post*, October 2, 2002</u>: "European intelligence sources said ***one of the hubs of bin Laden's organization continues to be Sudan*** . . . A senior European intelligence official said there was growing evidence that ***Khartoum was again serving as 'a sort of hub' for al Qaeda business transactions***. 'He has banking contacts there, he has business contacts there and he is intimately familiar with the political and intelligence structure there . . . *[h]e never fully left Sudan* despite moving to Afghanistan."

g.    <u>*Voice of America Report*, June 5, 2003</u>: "***U.S. officials say Al-Qaida also has a continuing presence in Sudan, despite recent claims by Sudanese authorities that the group's members have all left***. . . . Sudan remains on the State Department list of countries that support terrorism."

h.      *Associated Press*, October 23, 2003: "'***Sudan's position toward Hamas and [Palestinian Islamic] Jihad is clear: these are two Islamic forces struggling for the sake of (liberation of) their homeland***,' the African country's official news agency, SUNA, and three daily papers quoted Omar [the secretary general of the ruling National Congress Party] as saying during a Wednesday press conference. '***They are not involved in any terrorist activities***.'"

i.      *Africa News*, August 8, 2006: "In the Horn, al Qaeda's presence in Sudan . . . is an ***open secret***."

657.    A September 23, 2021 *Reuters* article described how Sudan "became a centre for money laundering and terrorism financing" – specifically, at least a dozen companies in Sudan were linked to Hamas, and that "Bashir openly supported Hamas." The article detailed that Hamas leaders "got preferential treatment in tenders, tax forgiveness, and they were allowed to transfer to Hamas and Gaza with no limits," and that these networks remained in place to funnel money to Hamas until Bashir's fall from power in 2019.

658.    Omar al-Bashir, Sudan's head of state from 1989 until he was deposed in 2019, used Col. Abdelbasit Hamza as his intermediary with terrorist organizations.

659.    Hamza was a member of the National Islamic Front who rose to the rank of colonel and ran the Department of Special Operations in the Sudanese military. After Bashir came to power, he enabled Hamza to take over a growing network of business enterprises, including both military-industrial companies, real estate, construction, telecommunications, oil, gold, and agriculture. On October 28, 1998, the *Wall Street Journal* reported that Hamza "once oversaw a road construction project of an Osama bin Laden company" and that "Hamza now builds military factories for Sudan's fundamentalist regime."

660.    Hamza utilized these businesses as conduits for terrorist finance. According to a 2023 *International Consortium of Investigative Journalists* investigation, "[n]ews reports dating back more than ***two decades*** have detailed Hamza's links to extremists" and that he acted as the "financial manager of Omar al-Bashir's family." (Emphasis added.) Hamza leveraged this

position to accumulate over $2 billion in assets, including an ownership interest in at least ten large companies moving significant amounts of money through foreign bank accounts to finance Hamas. Hamza was designated by the US in October 2023, and in that designation, the State Department stated that Hamza "was previously involved in the transfer of almost $20 million to Hamas," including funds sent to a senior Hamas official. Hamza's businesses were large, multi-national companies, and they were not secretive; on the contrary, they relied on Hamza's perceived legitimacy as a business partner for Western and Gulf Arab companies and his access to the mainstream international economy, including its banking system. Because of BNPP's central role in Sudan's economy, and its critical role in foreign transactions with Sudan, BNPP was precisely placed to see the connections between Bashir, Hamza, and Hamas. Rather than disrupt those relationships, BNPP chose to finance them.

661.    Sudan served as a hub for the IRGC-QF to train terrorist proxies and to manufacture and traffic weapons to Hamas and Hezbollah for decades. Starting in the mid-1990s, Hamza played a key role in these dealings through the Military Industrial Corporation which built a weapons factory in cooperation with the IRGC-QF (this factory was destroyed by an Israeli military air strike in 2012 due to its key role in supplying weapons to Hamas). Hamza also ensured that Hamas terrorist finance officials were given membership roles in his companies. Sudan also served as a key intelligence gathering base for the IRGC-QF.

662.    Over the course of 2007 and 2008, the IRGC-QF dramatically expanded its presence in Sudan, creating training camps and utilizing infrastructure projects as cover for increased weapons shipments to Hamas, PIJ, and other terrorist groups. A January 14, 2007 *BBC* article stated, "IRGC commander [Yahya-Rahim Safavi] described the Islamic Republic of Iran as a good role-model for the government of nation and Sudan. . . . [Safavi said] 'we are fully

prepared to cooperate with Sudan and let the country benefit from our experiences." On March 1, 2007, *Agence France Presse* reported that "Iran and Sudan's presidents, whose hardline regimes are under intense international scrutiny, struck a defiant pose . . . in the face of Western pressure vowing to defeat the 'enemies of Islam.'"

663.    By virtue of Hamza's privileged access to state resources and takeover of high value sectors of the economy, BNPP's banking services, to include trade finance, would have directly benefited Bashir and Hamza's enterprises. These resources were used as sources of terrorist finance and to fund weapons production. For example, a 2018 *Sudan Democracy First Group* report explained how BNPP had a direct role in weapons production in Sudan: "The most devastating and harmful deals that have adversely affected operating banks to date were those executed by the [Omdurman National Bank of Sudan] to import raw materials for weapons' manufacturing and other prohibited commodities . . . [t]hese deals were executed by BNP-Paribas."

664.    These public warnings were accompanied by internal warnings about BNPP's Sudan business. In March 2007, a senior BNPP Paris compliance officer "reminded other high-level BNPP compliance and legal employees that certain Sudanese banks with which BNPP dealt 'play a pivotal part in the support of the Sudanese government which . . . has hosted Osama Bin Laden and refuses the United Nations intervention in Darfur."[116] Indeed, in the stipulated statement of facts for BNPP's plea agreement, it specifically states that BNPP engaged in billions of dollars of transactions with Sudanese SDNs "despite the Government of Sudan's role

---

[116] SOF ¶ 20.

in supporting international terrorism and committing human rights abuses during this time period."[117]

665.    The Second Circuit has found that BNPP "conceded that it had knowledge of the atrocities being committed in Sudan and of the consequences of providing Sudan access to U.S. financial markets."[118] Yet "despite BNPP's understanding of the likely consequences of its involvement with Sudan, it persisted in illegal conduct on a wide scale because its business with Sudan was profitable."[119]

666.    In sum, BNPP acted as the de facto central bank in Sudan, and the Government of Sudan instructed its banks to use BNPP as the sole correspondent bank. Thus, BNPP was directly responsible for providing the Government of Sudan with access to ***billions of U.S. dollars over the course of thousands of transactions***, at a time when BNPP knew that Sudan supported terrorists, had a large network of links to Hamas, provided support to Al-Qaeda and Hezbollah, and maintained a longstanding partnership with Iran. Just as BNPP did with its Iranian customers, BNPP chose to provide financial services for many years to Sudanese customers it knew were funding terrorist attacks. In so doing, BNPP prioritized its own profitable business, and currying favor with its corrupt clients, over the lives of terrorism victims.

### III.    BNPP Knew That Terrorist Attacks Committed By Hezbollah, Hamas, PIJ, and JAM Were a Foreseeable Result of Its Culpable Acts

667.    As explained above, BNPP engaged for almost a decade in an intentional and systematic scheme to move billions of dollars for Terrorist Sponsors while helping them evade counterterrorism controls. From 2006 through at least November 2012, BNPP helped the IRGC evade U.S. counterterrorism sanctions by facilitating transactions for Caspian Petrochemical

---

[117] SOF ¶ 17.

[118] *Kashef v. BNP Paribas S.A.,* 925 F.3d 53 (2d Cir. 2019).

[119] *Id*. at 57 (quotation omitted).

(from 2011 through at least 2012), and for Caspian Petrochemical's predecessor shell entity ("the Iranian Petrochemical Company") (from at least 2006 through 2011). Similarly, in 2009, BNPP also helped an Iranian Oil Company evade U.S. counterterrorism controls.

668.    None of BNPP's activities for the Iranian Petrochemical Company or the Iranian Oil company can fairly be described as routine banking. Throughout the period, BNPP used atypical—and illegal—mechanisms and tactics to transact for the Iranian Petrochemical Company and the Iranian Oil Company. This included opening and maintaining accounts for sanctioned entities with known connections to the Terrorist Sponsors, and also taking affirmative steps to obscure the nature of those entities' transactions so that otherwise-prohibited transactions could proceed.

669.    At the time BNPP engaged in this culpable conduct, it knew that its conduct financed Terrorist Sponsors, and that terrorist attacks on Americans by the IRGC's Qods Force, Hezbollah, Hamas, PIJ, and JAM were a foreseeable result.

## A. BNPP Defied Voluminous Warnings That Transacting with Fronts for Terrorist Sponsors Facilitated Terrorist Attacks by Hezbollah, Hamas, PIJ, and JAM

670.    BNPP's knowledge was informed by a deafening chorus of U.S. government warnings that BNPP received throughout the relevant period—and that increased in intensity as BNPP's culpable conduct continued through at least late 2012. This chorus reached a crescendo during the U.S. government's "financial pressure campaign" to warn banks about Iran's funding of terrorism between 2006 and 2008.

671.    In his memoir of the period, Treasury's former Assistant Secretary for Terrorist Financing and Financial Crimes Juan Zarate explained that the "cornerstone" of the financial pressure campaign was to share information about "Iran's own conduct" with the private sector. Because Iran's economy had become so intertwined with its terrorist activity and other malign

conduct, knowledge of that state of affairs would "spur the private sector to stop doing business with Iran." In the U.S. government's estimation, "No reputable bank would want to be caught facilitating Iran's nuclear program or helping it make payments to Hezbollah terrorist cells around the world." The fact that Iran often used front companies and layers of entities to accomplish these goals would only make things worse, as "[t]he more the Iranians tried to hide their identities or evade sanctions, the more suspect their transactions would appear and the riskier it would become for banks and other financial institutions to deal with them."

672.    Zarate elaborated on the state of Iran's intertwined economic and terrorist activity in 2006 (emphasis added):

> [The Iranians] were blending legitimate business transactions with illicit ones by funneling them through similar conduits. The Iranian regime often tried to hide the nature of its transactions and the identities of the Iranian government entities involved. Importantly, the predominant economic player was Iran's Islamic Revolutionary Guard Corps (IRGC), the elite military and security unit founded in 1979. The IRGC had gained more power and influence over time as the protector and exporter of the revolution and reported directly to the Supreme Leader, Ayatollah Ali Khamenei.
>
> The IRGC—with its vast network—had embedded itself into more industries within Iran, ultimately building what has been called a veritable business empire. . . . The IRGC is an economic juggernaut, with responsibilities relating to the development of weapons of mass destruction, missile systems, and overseas operations. It is deeply involved in the Iranian nuclear program, and its international arm, the Qods Force (IRGC-QF), is responsible for providing support for terrorist proxies and exporting the Iranian Revolution. . . .
>
> From Treasury's perspective, this blend of activities created the ultimate vulnerability, particularly the blurred lines between legitimate industry and support for Iran's nuclear program and terrorist groups. ***The nefarious nature of the activities, tied with the IRGC's attempts to hide its hand in many of its economic dealings and operations, made Iran's financial activity inherently suspect.*** . . .

673.    The fundamental message of the U.S. government's financial pressure campaign could thus be summed up simply: If you did business with Iranian companies in sectors

controlled by the IRGC—even ostensibly legitimate transactions with business entities—terrorist attacks by IRGC-funded proxies are a foreseeable result. That sharp warning was emphasized and reiterated repeatedly by the U.S. government throughout the financial pressure campaign.

674.    As a European bank with a major presence in the Middle East and a history of serving Iranian clients, BNPP was a prime target of the U.S. government's financial pressure campaign, during which BNPP received warnings through a variety of means, including public statements by U.S. officials and regulatory agencies and, on information and belief, private outreach directly to BNPP.

675.    On information and belief, the private warnings that BNPP received were even more detailed and urgent than the public ones, and included direct warnings to BNPP, that transacting with Iranian banks, Iranian fronts, or companies in Iran's oil and gas sector would facilitate IRGC-sponsored acts of terrorism committed by Hezbollah, Hamas, and Iraqi Shiite terrorist groups. Although Plaintiffs expect discovery to reveal more about these private warnings, Zarate's memoir explains the form they took:

> Treasury—led by [Under Secretary for Terrorism and Financial Intelligence] Levey—would launch the financial pressure campaign . . . in large part by demonstrating to CEOs and compliance officers around the world that the risk of doing business with Iran was too high. Iranian obfuscation was too ubiquitous to be handled through normal compliance efforts. . . . It was better to stop doing business with Iran altogether than to risk facilitating Iran's support for terror or its development of a nuclear program. . . .
>
> Levey began his meetings with bank officials around the world with a briefing on Iranian illicit activity and how it coursed through the international financial system. He would take this argument from board room to board room, often meeting with bank CEOs before and after meeting with foreign government counterparts. Steve Hadley called it the 'whisper campaign,' because the mission entailed meeting quietly with bank executives to explain the risks of doing business with Iran. At the heart of these meetings was a presentation on what Iran was doing with front companies and layered financial transactions to facilitate activity that was considered either illegal or risky. . . .

Levey would meet over one hundred times with bank officials around the world. At each stop, he made the case that doing business with Iran was too risky— because the banks could not be sure they knew who they were doing business with. . . . For each country and institution, the Treasury team would provide specific tidbits of data about Iranian transactions through a bank. The briefing packets would have general information about the Iranian economy, structure, and financial system. The packets would contain information about how the Iranian government and the IRGC used front companies and obfuscation to finance and acquire what they needed for their military and nuclear apparatus. The briefing would conclude with an explanation of what was happening in the bank and how the Iranians were hiding their activity. This would inevitably be a surprise to any bank CEO, though some banks would be caught later trying to hide transactions with Iran.

676.    Treasury Secretary Paulson increased the prominence of the warnings by emphasizing them in his own private meetings with bank executives:

The former Wall Street executive could convincingly make a case to fellow bankers about the danger of doing business with Iran. When Paulson talked, financial leaders around the world listened. . . . [Paulson] made a point of putting the issue of Iran's suspect financial activity on the agenda of his meetings with foreign government officials and banking friends with whom he met. . . . One would expect such talk from the director of the CIA or FBI, but to hear this coming from the former CEO of Goldman Sachs and the treasury secretary caused officials to take notice. The treasury secretary was speaking a new language of national security that resonated with the CEOs of the world's biggest banks and businesses.

677.    Publicly available warnings were also numerous, even well before the financial pressure campaign began. Decades of U.S. government statements confirmed the tight nexus between transacting with Iranian fronts and IRGC-sponsored acts of international terrorism targeting the United States. In particular, decades of public U.S. government findings, reports, statements, and warnings (often, all four in one item) alerted BNPP that: (1) the Government of Iran was a prolific funder and supporter of terrorist attacks against Americans; (2) Terrorist Sponsors facilitated terrorist attacks by fronts and proxies, including the Qods Force, Hezbollah, Hamas, PIJ, and JAM; (3) the Government of Iran systematically used a large proportion of its profits from ostensibly ordinary business transactions, especially in its oil sector, to fund those

terrorist attacks; (4) the Government of Iran routinely used front companies and layered financial transactions to do so while evading sanctions; and (5) by at least 2006, the IRGC's control and influence over key industries meant that any significant transaction with an Iranian front company, especially in the oil and gas sector, would foreseeably fund those terrorist attacks. The U.S. government's voluminous warnings made explicit what its comprehensive sanctions implied: No country in the world had a major economy as saturated with terrorist finance as Iran.

678.    From 1990 through 2015, such U.S. government findings, reports, statements, and warnings included, but were not limited to:

a.    <u>State, April 1990</u>: "In its various forms -- direct involvement, instigation and encouragement, support to terrorist groups through provision of safehaven, financial resources, arms, technical expertise, and documentation -- state sponsorship makes a significant contribution to international terrorism. … Support in its various forms enhances the capabilities of a … radical Shia groups throughout Western Europe, the Middle East, and Africa; … Iran was the most active state sponsor … The United States … designat[ed] … [Iran] … as [a] state supporter[] of terrorism … pursuant to Section 6 (j) of the Export Administration Act of 1979, which imposes certain trading restrictions on countries determined by the Secretary of State to have repeatedly provided support for acts of international terrorism."

b.    <u>The President, 1995:</u> "From the beginning of our administration, we have moved to counter Iran's support of international terrorism and in particular its backing for violent opponents of peace in the Middle East. … Our policy has helped to make Iran pay a price for its actions. The nation has effectively been cut off from receiving credit from international financial institutions. … Even as prospects for the peace in the Middle East have grown, Iran has broadened its role as an inspiration and paymaster to terrorists. … I am convinced that instituting a trade embargo with Iran is the most effective way our Nation can help to curb that nation's drive to acquire devastating weapons and its continued support for terrorism … It would be wrong to stand pat in the face of overwhelming evidence of Tehran's support for terrorists that would threaten the dawn of peace."

c.    <u>State, April 1998</u>: "The Secretary of State has designated [the Iranian] government[] as [a] state sponsor[] of terrorism … by providing arms, training, safehaven, diplomatic facilities, financial backing, logistic and/or other support to terrorists. The US policy of bringing maximum pressure to bear on state sponsors of terrorism and encouraging other countries to do likewise … [depends upon] [a] broad range of bilateral and multilateral sanctions [that] serves to discourage state sponsors of terrorism from continuing their support for international acts of terrorism, but continued pressure is essential. ... Iran

remains the most active state sponsor of terrorism … Iran continues both to provide significant support to terrorist organizations."

d.  White House, *National Strategy for Combating Terrorism*, September 2006: "State sponsors are a critical resource for our terrorist enemies, often providing funds, weapons, training, safe passage, and sanctuary. Some of these countries have developed or have the capability to develop WMD and other destabilizing technologies that could fall into the hands of terrorists. The United States currently designates [Iran as a] state sponsor[] of terrorism … We will maintain sanctions against [Iran] and promote [the Iranian regime's] international isolation until they end their support for terrorists …. To further isolate these regimes and persuade other states not to sponsor terror, we will use a range of tools and efforts to delegitimate terrorism as an instrument of statecraft. Any act of international terrorism, whether committed by a state or individual, is reprehensible, a threat to international peace and security, and should be unequivocally and uniformly rejected. Similarly, states that harbor and assist terrorists are as guilty as the terrorists, and they will be held to account. Iran remains the most active state sponsor of international terrorism. Through its Islamic Revolutionary Guard Corps …, the regime in Tehran plans terrorist operations and supports groups such as Lebanese Hizballah, Hamas, and Palestine Islamic Jihad (PIJ)…. Most troubling is the potential WMD-terrorism nexus that emanates from Tehran. … We will continue to stand with the people of Iran … against the regime[] that oppress[es] them at home and sponsor[s] terror abroad."

e.  Treasury (OFAC), September 2006: "Bank Saderat facilitates Iran's transfer of hundreds of millions of dollars to Hizballah and other terrorist organizations each year. We will no longer allow a bank like Saderat to do business in the American financial system, even indirectly, said Stuart Levey, Under Secretary for Terrorism and Financial Intelligence (TFI). Bank Saderat is one of the largest Iranian-owned banks, with roughly 3400 branch offices. The bank is used by the Government of Iran to transfer money to terrorist organizations, including Hizballah, Hamas, the Popular Front for the Liberation of Palestine-General Command and Palestinian Islamic Jihad. A notable example of this is a Hizballah-controlled organization that has received $50 million directly from Iran through Bank Saderat since 2001. … By prohibiting U-turn and all other transactions with Bank Saderat, the bank is denied all direct and indirect access to the U.S. financial system."

f.  Treasury (Levey), March 2007: "Iran's Revolutionary Guard Corps, or IRGC, is used by the regime to provide a `train and equip program' for terrorist organizations like Hizballah, as well as to pursue other military objectives of the regime. The IRGC's control and influence in the Iranian economy is growing exponentially under the regime of Ahmadinejad. More and more IRGC-associated companies are being awarded important government contracts. An IRGC company, for example, took over management of the airport and runways in Tehran, while another company won the contract to build the Tehran metro. When corporations do business with IRGC companies, they are doing business with organizations that are providing direct support to terrorism. . . . Iran sends hundreds of millions of dollars each year to terrorist groups like Hizballah and other organizations. When a country has a nine-digit line item in its budget

243

for support to terrorist organizations and is actively seeking a WMD program, there is no way to know how the regime will use its revenues. Corporations are in the process of reconsidering their investments in Iran because they do not want revenue generated from their projects diverted towards . . . terrorism."

g.   <u>Treasury (Paulson), June 2007</u>: "It is well known that Iran is pursuing nuclear weapons in violation of international agreements and channeling hundreds of millions of dollars to terrorist groups. . . . We explained how Iran uses front companies and other mechanisms that make it difficult, if not impossible, for businesses dealing with Iran to 'know their customer' or counterparty. We also explained how the Iranian regime uses its state-owned banks to pursue its missile procurement and nuclear programs, as well as fund terrorism. Repeatedly, state-owned Iranian banks, including the Central Bank of Iran, ask other financial institutions to remove their names from global transactions. . . . To those banks that have decided to stop dollar-based business, but continue to transact Iran's business in other currencies, I would say that the risk of transacting Iran's business is present in every currency. . . . The IRGC, a paramilitary arm of the regime, has been directly involved in the planning and support of terrorist acts, as well as funding and training other terrorist groups to pursue the military objectives of the regime. . . . The IRGC is so deeply entrenched in Iran's economy and commercial enterprises, it is increasingly likely that if you are doing business with Iran, you are somehow doing business with the IRGC."

h.   <u>Treasury (OFAC), October 2007</u>: "The Financial Action Task Force, the world's premier standard-setting body for countering terrorist financing and money laundering, recently highlighted the threat posed by Iran to the international financial system. FATF called on its members to advise institutions dealing with Iran to seriously weigh the risks resulting from Iran's failure to comply with international standards. … Bank Melli also provides banking services to the IRGC and the Qods Force. … When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions. … The IRGC has significant political and economic power in Iran, with ties to companies controlling billions of dollars in business and construction and a growing presence in Iran's financial and commercial sectors. Through its companies, the IRGC is involved in a diverse array of activities, including petroleum production and major construction projects across the country. In 2006, Khatam al-Anbiya secured deals worth at least $7 billion in the oil, gas, and transportation sectors, among others.… Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hizballah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence. Hizballah has used Bank Saderat to send money to other terrorist organizations, including millions of dollars on occasion, to support the activities of Hamas. As of early 2005, Hamas had substantial assets deposited in Bank Saderat, and, in the past year, Bank Saderat has transferred several million dollars to Hamas."

i.   Treasury (Paulson), October 2007: "Iran also funnels hundreds of millions of dollars each year through the international financial system to terrorists. . . . We are also designating the Islamic Revolutionary Guard Corps for proliferation activities and its Qods Force for providing material support to the Taliban and other terrorist organizations. The IRGC is so deeply entrenched in Iran's economy and commercial enterprises, it is increasingly likely that if you are doing business with Iran, you are doing business with the IRGC. We call on responsible banks and companies around the world to terminate any business with Bank Melli, Bank Mellat, Bank Saderat, and all companies and entities of the IRGC. As awareness of Iran's deceptive behavior has grown, many banks around the world have decided as a matter of prudence and integrity that Iran's business is simply not worth the risk. It is plain and simple: reputable institutions do not want to be bankers to this dangerous regime."

j.   Treasury (FinCEN), October 2007: "The Financial Crimes Enforcement Network is issuing this advisory to U.S. financial institutions so that they may guard against threats of illicit Iranian activity related to money laundering, terrorist financing and weapons of mass destruction proliferation financing. . . . [F]inancial institutions should be particularly aware that there may be an increased effort by Iranian entities to circumvent international sanctions and related financial community scrutiny through the use of deceptive practices involving shell companies and other intermediaries or requests that identifying information be removed from transactions. Such efforts may originate in Iran or Iranian free trade zones subject to separate regulatory and supervisory controls, including Kish Island. Such efforts may also originate wholly outside of Iran at the request of Iranian-controlled entities."

k.   Treasury (FinCEN), March 2008: "The Financial Crimes Enforcement Network (FinCEN) is issuing this advisory to supplement information previously provided on serious deficiencies present in the anti-money laundering systems of the Islamic Republic of Iran. . . . Iran's AML/CFT deficiencies are exacerbated by the Government of Iran's continued attempts to conduct prohibited proliferation related activity and terrorist financing."

l.   Treasury (Glaser), April 2008: "[The] Threat of Iran's Support of Terrorism … [includes] its provision of financial and material support to terrorist groups. Iran has long been a state sponsor of terrorism and continues to support an unparalleled range of terrorist activities. For example, Tehran arms, funds, and advises Hizballah, an organization that has killed more Americans than any terrorist network except for al-Qa'ida, and does so via the Qods Force, a branch of the Islamic Revolutionary Guard Corps. In addition, Iran provides extensive support to Palestinian terrorist organizations, including the Palestinian Islamic Jihad (PIJ) and Hamas. In the case of PIJ, Iran's financial support has been contingent upon the terrorist group carrying out attacks against Israel. And we are all familiar with Iran's funding, training, and equipping of select Shi'a extremist groups in Iraq, further destabilizing that country and resulting in deaths of Americans. … Iran utilizes the international financial system as a vehicle to fund these terrorist organizations. As Under Secretary Levey has previously testified, the Iranian regime operates as the central banker of terrorism, spending hundreds of millions of dollars each year to fund terrorism. … Iran uses its global financial ties to pursue [] the threat of

terrorism … through an array of deceptive practices specifically designed to avoid suspicion and evade detection from the international financial community. Iran uses its state-owned banks for … for financing terrorism. … [One] method Iranian banks use to evade controls is to ask other financial institutions to remove their names when processing transactions through the international financial system. This practice is intended to elude the controls put in place by responsible financial institutions and has the effect of potentially involving those institution [sic] in transactions they would never engage in if they knew who, or what, was really involved. This practice allows Iran's banks to remain undetected as they move money through the international financial system to pay for the Iranian regime's … terrorist-related activities."

m.   <u>Treasury (OFAC), November 2008</u>: "Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation. The Iranian regime disguises its involvement in these illicit activities through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection by responsible financial institutions and companies. Iran also is finding ways to adapt to existing sanctions, including by turning to non-designated Iranian banks to handle illicit transactions. … Iran is the world's most active state sponsor of terror. … Elements of Iran's Islamic Revolutionary Guard Corps (IRGC) have been directly involved in the planning and support of terrorist acts throughout the world, including in the Middle East, Europe and Central Asia, and Latin America. … In a number of cases, Iran has used its state-owned banks to channel funds to terrorist organizations. … It has been a standard practice for Iranian financial institutions to conceal their identity to evade detection when conducting transactions. … Iran hides behind front companies and intermediaries to engage in ostensibly legitimate financial and commercial transactions that are actually related to its nuclear or missile programs."

n.   <u>Treasury (FinCEN), July 2009</u>: "On June 26, 2009 the Financial Action Task Force (FATF) issued a statement concerning these jurisdictions that reiterates previous FATF concerns and calls for action on the part of its members. The FATF statement is copied below and can be found on the FATF website. . . . 'The FATF remains particularly concerned about Iran's failure to address the risk of terrorist financing and the serious threat this poses to the integrity of the international financial system. . . . The FATF reaffirms its call on members and urges all jurisdictions to advise their financial institutions to give special attention to business relationships and transactions with Iran, including Iranian companies and financial institutions.'"

o.   <u>Treasury (Levey), October 2009</u>: "[T]he international private sector has amplified the impact of [U.S., U.N., and E.U.] government actions, as banks and companies around the world have come to understand that, if they are dealing with Iran, it is nearly impossible to protect themselves against becoming entangled in [the IRGC]'s illicit conduct … [because] [IRGC] companies, some of which have been designated by the United States and the UN Security Council …, operate under names that obscure their IRGC affiliation, so many unwitting non-Iranians are in fact doing business with the IRGC. In the name of privatization, the IRGC has taken over broad swaths of the Iranian economy. Former IRGC members in Iranian ministries have directed millions of dollars in government contracts to the IRGC for myriad projects …There is broad acknowledgment that the

Iranian government engages in a range of deceptive financial and commercial conduct in order to obscure … and facilitate its support for terrorism. International understanding of these practices – underscored by the UN Security Council resolutions on Iran and six warnings issued by the [FATF] about the risks Iran poses to the financial system – has been brought about in part by our efforts to share information about Iran's deception with governments and the private sector around the world. These deceptive practices taint all Iranian business because they make it difficult to determine whether any Iranian transaction is licit. Iranian banks request that their names be removed from transactions so that their involvement cannot be detected; the government uses front[s] … and intermediaries to engage in ostensibly innocent commercial business to obtain prohibited … goods … To a greater extent than ever, private companies across industries are now alert to these kinds of risks. Banks worldwide have been repeatedly warned by regulatory and standard-setting bodies to regard Iranian transactions with caution. Traders and shippers know that transactions with innocent-sounding Iranian counterparts can expose them to risk – both reputational and legal. Energy companies have put Iranian investments on indefinite hold, cautious of the political risk of investing too heavily in Iran. And exporters of sensitive and dual-use technologies know that supplying Iran can lead to severe sanctions and even prosecution. Across the board, then, transactions with Iran are already handled differently than transactions with any other country … engendering either heightened suspicion or outright refusal to engage in them."

p.  Treasury (FinCEN), October 2009: "On October 16, 2009, the Financial Action Task Force ("FATF") issued a statement concerning these jurisdictions that explains its concerns regarding each jurisdiction and calls for action on the part of its members. The FATF statement is copied below and can be found on the FATF website. . . . 'The FATF reaffirms its call on members and urges all jurisdictions to advise their financial institutions to give special attention to business relationships and transactions with Iran, including Iranian companies and financial institutions.'"

q.  Treasury (Levey), June 2010: "Because "[t]he IRGC plays a key role in Iran's … support for terrorism and [the IRGC] has taken over broad portions of the Iranian economy, … [n]o IRGC entity should have any place in the world's legitimate financial system."

r.  Treasury (FinCEN), March 2011: "On February 25, 2011, the Financial Action Task Force ("FATF") issued a statement concerning these jurisdictions that explains its concerns regarding each jurisdiction and calls for action on the part of its members. The FATF statement is copied below and can be found on the FATF website. . . . 'The FATF reaffirms its call on members and urges all jurisdictions to advise their financial institutions to give special attention to business relationships and transactions with Iran, including Iranian companies and financial institutions.'"

s.  Treasury (OFAC), February 2012: "What activities by foreign financial institutions can subject them to CISADA sanctions? As described in the Iranian Financial Sanctions Regulations, the sanctionable activities of a foreign financial institution are: Facilitating the efforts of the Government of Iran (GOI) to acquire or develop Weapons of Mass Destruction (WMD) or delivery systems for WMD or to provide support for terrorist organizations or acts of international terrorism; Facilitating the activities of a person

subject to financial sanctions pursuant to UNSCRs 1737, 1747, 1803, or 1929, or any other Security Council resolution that imposes sanctions with respect to Iran; Engaging in money laundering, or facilitating efforts by the Central Bank of Iran or any other Iranian financial institution, to carry out either of the facilitating activities described above; or Facilitating a significant transaction or transactions or providing significant financial services for: (i) the Islamic Revolutionary Guard Corps or any of its agents or affiliates whose property and interests in property are blocked pursuant to the International Emergency Economic Powers Act (IEEPA), or (ii) a financial institution whose property and interests in property are blocked pursuant to IEEPA in connection with Iran's proliferation of WMD, Iran's proliferation of delivery systems for WMD, or Iran's support for international terrorism."

t.   <u>State, April 2014</u>: "In 2013, Iran's state sponsorship of terrorism worldwide remained undiminished through the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) … and Tehran's ally Hizballah, which remained a significant threat to the stability of Lebanon and the broader region. The U.S. government continued efforts to counter Iranian and proxy support for terrorist operations via sanctions and other legal tools. The United States also welcomed the EU's July 2013 designation of Hizballah's military wing as a terrorist organization. … Designated as a State Sponsor of Terrorism in 1984, Iran continued its terrorist-related activity, including support for Palestinian terrorist groups in Gaza, and for Hizballah. … Iran used the [Qods Force] and its regional proxy groups to implement foreign policy goals, provide cover for intelligence operations, and create instability in the Middle East. The IRGC-QF is the regime's primary mechanism for cultivating and supporting terrorists abroad."

u.   <u>Representative Ted Poe (Chairman of the House Subcommittee on Terrorism, Non-Proliferation and Trade), October 2015</u>: "[The] Islamic Revolutionary Guard Corps (IRGC) has funded, planned and executed terrorist attacks against the United States … for decades … Treasury … has repeatedly cited the IRGC's support for terrorism and destabilizing activity throughout the Middle East and beyond. …There is also growing concern that the IRGC is engaging in financial evasion practices that erode the efficacy of the sanctions currently in place. Treasury currently sanctions companies that are 50% owned or controlled by the Iranian government or in which Iran wields a controlling interest. However, through control of a company's board of directors, the IRGC can exercise the same level of power over a company without meeting Treasury's designation trigger. By exploiting this … legal loophole, the IRGC has managed to become so deeply entrenched in the Iranian economy to the point that, as former Treasury Secretary Henry Paulson pointed out, 'it is increasingly likely that if you are doing business with Iran, you are somehow doing business with the IRGC.'"

679.    On November 25, 2011, Treasury took official action to determine that Iran was a Jurisdiction of Primary Money Laundering Concern. This determination summarized the message that had been delivered to banks throughout the financial pressure campaign and represented the U.S. government's formal conclusion that it was impossible for any bank,

248

including BNPP, to conduct any Iran-related financial transaction without running a substantial

risk of financing IRGC-sponsored acts of terrorism committed by Hezbollah, Hamas, or other

proxies of Terrorist Sponsors. Among other things, Treasury's finding alerted BNPP that

(emphases added):

> "In recent years, many international financial institutions have severed ties with Iranian banks and entities because of a growing body of public information about their illicit and deceptive conduct designed to facilitate the Iranian government's support for terrorism …. This illicit conduct by Iranian banks and companies has been highlighted in a series of … UN Security Council … resolutions related to Iranian proliferation sensitive activities. [FATF] has also warned publicly of the risks that Iran's deficiencies in countering money laundering and, particularly, terrorism finance . . . . FinCEN has reason to believe that Iran directly supports terrorism … and uses deceptive financial practices to facilitate illicit conduct and evade sanctions. All of these factors, when taken together, make the international financial system increasingly vulnerable to the risk that otherwise responsible financial institutions will unwittingly participate in Iran's illicit activities."

> "**<u>Support for Terrorism</u>**: . . . ***Iran remains the most active of the listed state sponsors of terrorism, routinely providing substantial resources and guidance to multiple terrorist organizations. Iran has provided extensive funding, training, and weaponry to Palestinian terrorist groups, including Hamas and the Palestinian Islamic Jihad ("PIJ"). In fact, Hamas, PIJ, and Hizballah have maintained offices in Tehran to help coordinate Iranian financing and training of these groups.***"

> "Iran's Islamic Revolutionary Guard Corps ("IRGC") was founded in the aftermath of the 1979 Islamic Revolution to defend the government against internal and external threats. Since then, it has expanded far beyond its original mandate and evolved into a social, military, political, and economic force with strong influence on Iran's power structure. ***In addition, elements of the IRGC have been directly involved in the planning and support of terrorist acts throughout the Middle East region.***"

> "In particular, Iran has used the IRGC-Qods Force ('Qods Force') to cultivate and support terrorists and militant groups abroad. ***The Qods Force reportedly has been active in the Levant, where it has a long history of supporting Hizballah's … terrorist activities***, and provides Hizballah with as much as $200 million in funding per year. … [O]n October 11, 2011, the Department of Justice charged two individuals for their ... participation in a plot directed by the Qods Force to murder the Saudi ambassador to the United States with explosives while the Ambassador was in the United States. …"

"Finally, *Iran is known to have used state-owned banks to facilitate terrorist financing.* In 2007, the Treasury designated Bank Saderat under E.O. 13224 for its [10] financial support of terrorist organizations, noting that *from 2001 to 2006 Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence.*"

"As a result of the strengthened U.S. sanctions and similar measures taken by the [U.N.] and other members of the global community, Iran now faces significant barriers to conducting international transactions. In response, Iran has used deceptive financial practices to disguise both the nature of transactions and its involvement in them in an effort to circumvent sanctions. *This conduct puts any financial institution involved with Iranian entities at risk of [] facilitating transactions related to terrorism* …"."

"**The IRGC**: The IRGC, which was designated by the Department of State as a primary proliferator under E.O. 13382 in October 2007, owns and/or controls multiple commercial entities across a wide range of sectors within the Iranian economy. For example, *the IRGC established Khatam al-Anbiya, the largest major Iranian construction conglomerate, to generate income and fund IRGC operations while presenting the company as a legitimate company working on civilian projects."*

"*The IRGC has continued to expand its control over commercial enterprises within Iran. … [T]he IRGC and the IRGC-QF engage in seemingly legitimate activities that ... support terrorist groups such as Hizballah [and] Hamas …*". "Iran's serious deficiencies with respect to anti-money laundering/countering the financing of terrorism ('AML/CFT') controls has long been highlighted by numerous international bodies and government agencies. . . ."

680.    On November 28, 2011, Treasury published its proposed special measure under

Section 311 of the USA PATRIOT Act, in which it found that a complete U.S. prohibition on all

Iranian banks' correspondent account access to the U.S. financial system was necessary to

protect the United States from IRGC-sponsored acts of terrorism, including attacks committed by

Hezbollah, Hamas, PIJ, and other IRGC proxies:

"The Effect of the Proposed Action on United States National Security …[.] The exclusion from the U.S. financial system of jurisdictions that serve as conduits for … the financing of terrorism … enhances U.S. national security by making it more difficult for terrorists … to access the substantial resources of the U.S. financial system. To the extent that this action serves as an additional tool in preventing Iran from accessing the U.S. financial system, the proposed action

supports and upholds U.S. national security … goals. More generally, the imposition of the fifth special measure would complement the U.S. Government's worldwide efforts to expose and disrupt international … terrorist financing."

"The fifth special measure sought to be imposed by this rulemaking would prohibit covered financial institutions from opening and maintaining correspondent accounts for, or on behalf of, Iranian banking institutions. As a corollary to this measure, covered financial institutions also would be required to take reasonable steps to apply special due diligence, as set forth below, to all of their correspondent accounts to help ensure that no such account is being used indirectly to provide services to an Iranian banking institution. FinCEN does not expect the burden associated with these requirements to be significant given that U.S. financial institutions have long been subject to sanctions regulations prohibiting the provision of correspondent account services for banking institutions in Iran."

681.    Moreover, decades of reports published and re-published throughout the United States, Europe, and the Middle East by media outlets, scholars, NGOs, and IRGC victims themselves confirmed the tight nexus between IRGC-facing sanctions violations and IRGC-sponsored acts of international terrorism targeting the United States. Such reports included, but were not limited to (all emphases added):

a.    _Cleveland Plain Dealer_, May 23, 1996: "Secretary of State Warren Christopher is publicly flaying U.S. allies for not doing enough to isolate Tehran. … In preparation for [a] … meeting of the 'Group of Seven' …, Christopher … urged Congress to tighten economic sanctions against Iran, charging Tehran' s ayatollahs are behind the terrorist attacks in the Middle East. 'The United States believes Iran will change its behavior when the world makes it pay a sufficiently high … economic price,' Christopher said."

b.    _Independent_, October 26, 2007: "Washington justified the new sanctions by accusing the elite Quds division of the Revolutionary Guard Corps of the devastating campaign of roadside bombs by Shia militias against its troops in Iraq [and] supporting [JAM] in Iraq and [other] terrorist[] [groups] in … Lebanon and the Palestinian territories, and denying the existence of a fellow member of the United Nations, threatening to wipe Israel off the map. … The sweeping new US sanctions affect Iranian banks, companies, officials and government agencies which the White House says … ***support[ed] acts of terrorism abroad***. The sanctions specifically targeted [IRGC] finances and eight affiliated companies. They also named five [IRGC] officials as well as the Quds Force …. The US hopes to cripple Iranian trade by isolating the banks from the world financial system."

c.    Prof. Raymond Tanter (University of Michigan), December 6, 2007: "I strongly concur in the sanctioning for proliferation activities of IRGC-affiliated entities and individuals as derivatives of the IRGC … The raison d'etre of the Islamic Revolutionary Guards Corps

251

is to … ***export the regime's revolutionary ideology via acts of terrorism*** … [through] the Islamic Revolutionary Guards Corps."

d. <u>Danny Eisen (Canadian Coalition Against Terror), February 10, 2010</u>: "[T]he IRGC is anything but a normal military body or state entity. The IRGC is hardly a conventional branch of the military. … [T]he IRGC's primary constitutional duty is not to protect Iran from conventional military threats but to 'protect the revolution and its ideals.' This amorphous and borderless mandate allows the IRGC to take on any … terrorist role [] that is required to ensure the continued export of Khomeini's Islamic revolution. Given its unconventional mandate and its extraordinary level of operational independence from government hierarchy, the Guards are too autonomous to be []considered a normal state agency. It therefore can and must be held accountable for its own actions like any other terrorist body that ***commits acts of terrorism on its own initiative*** … [and there was no] doubt as to the value of sanctioning the IRGC [to prevent acts of terrorism]."

682.    BNPP also knew about U.N. and E.U. sanctions targeting the IRGC, and knew

that such sanctions were designed to, and did, prevent IRGC-sponsored violence by impeding the

IRGC's ability to develop, sell, and deploy sophisticated weapons like missiles, rockets, drones,

and next-generation RPGs. For example, the United Nations, European Union and their member

states sanctioned the IRGC and KAA from 2007 through 2024. Examples of reports of such

sanctions included, but were not limited to:

a. <u>U.K. House of Commons, October 13, 2010</u>: "[O]n 24 March 2007 the Security Council broadened the sanctions. It imposed an embargo on all of Iranian arms exports and an asset freeze and travel ban on further people it considered to be involved in the nuclear programme, including top members of the [IRGC], listed in an annex to the Resolution. … On 9 June 2010, the UN Security Council passed Resolution 1929 imposing a fourth round of sanctions on Iran. … The Resolution decides that: … • All states shall prevent the supply, sale or transfer to Iran of battle tanks, armoured combat vehicles, large calibre artillery systems, combat aircraft, attack helicopters, warships, missiles or missile systems. • States will take all necessary measures to prevent the transfer to Iran of technology or technical assistance related to ballistic missiles capable of delivering nuclear weapons. • Steps will be taken to block Iran's use of the international financial system, particularly its banks when they may be used to fund proliferation and nuclear activities. …. At least 15 of the companies and groups named in the new sanctions list are linked to the [IRGC]. Most of the remainder are associated with the nuclear and ballistic missile programmes, which are directly controlled by the Revolutionary Guard. … EU sanctions[:] Some UN sanctions against Iran are partly implemented through EU law. Like the US, however, the EU went further than the latest Security Council resolution demanded. … On 26 July [2010], the new [E.U. Iran-related sanctions] measures were announced. They consisted of: … [inter alia] restrictions in the financial sector, including additional asset freezes against banks and restrictions on banking and insurance …[;]

trade restrictions, including a broad-ranging ban on dual use goods … [;] [and] new visa bans and asset freezes, especially on the [IRGC]."

b.   U.N. Security Council, June 4, 2012: "[A] number of key [IRGC] figures have been identified by the Security Council as involved in … missile programmes and are subject to asset freeze[s] … Activities related to the [IRGC] are also made subject to vigilance exercised by States and their nationals, persons and firms if they have information that provides reasonable grounds to believe that such business could contribute to the [Iranian regime]'s proliferation-sensitive … activities … Such vigilance over business activities extends to entities and individuals acting on behalf of the [IRGC] or at its direction, and entities owned or controlled by it, including through illicit means."

c.   U.K. House of Commons, December 8, 2020: "Although no part of the IRGC has been proscribed under this Act, its members and activities have more broadly been the targets of UK and EU sanctions. Qasem Soleimani was designated under the terrorism and terrorist financing regime and, as the Minister for the Middle East and North Africa noted in correspondence to us, there are more than 200 sanctions in place through the EU targeting Iran's ballistic missiles and nuclear activities, many of which cover the activities of the IRGC."

683.   As contemporaneous reports by the government, media, terrorism scholars, and others warned, BNPP knew that the IRGC's use of front companies and layered transactions, and its pervasive role in major sectors of the Iranian economy, made it impossible to determine with any confidence that an Iranian company in one of those sectors was not funding the IRGC's terrorist activities. Under these circumstances, BNPP knew that customer due diligence focused on the company's nominal owners and formal corporate structure would provide no more than a pretext of deniability. It could not provide any reasonable assurance that the company's transactions were insulated from terrorism.

684.   BNPP also knew about the involvement of Terrorist Sponsors in key economic sectors because of its intimate involvement in the development of Irancell, as explained *supra*, including the ouster of Turkcell. Given the significant role of the Foundation for the Oppressed and Terrorist Sponsors in those events and in the operation of Irancell, BNPP knew that they used ostensibly legitimate businesses to fund terrorist attacks.

685. BNPP knew that, given the IRGC's monopolization of large sectors of Iran's economy, it was highly likely that any U.S. dollar services it provided to large Iranian businesses operating in those sectors would flow resources through to the IRGC and its terrorist proxies.

686. BNPP knew that if designated terrorist groups, like Hamas and Hezbollah, received money because of BNPP's conduct, it was a near certainty that those groups would kill and injure innocent victims, as happened here against Plaintiffs.

687. Given these facts, BNPP knew that its culpable conduct on behalf of its IRGC customers risked violent, real-world consequences.

## B. BNPP Knew That its Assistance to the Iranian Petrochemical Company Facilitated Terrorist Attacks by Hezbollah, Hamas, PIJ, and JAM

688. Specifically with respect to the Iranian Petrochemical Company (a/k/a Caspian Petrochemical FZE), BNPP knew that its culpable conduct from at least 2006 through at least 2012—processing hundreds of millions of dollars in payments while helping the company evade counterterrorism controls—provided direct and indirect assistance to the Qods Force, Hezbollah, Hamas, PIJ, and JAM.

689. In addition to the extensive warnings about Iran and the IRGC's funding of terrorism discussed above, BNPP had specific knowledge that the Iranian Petrochemical Company was generating money to fund terrorist attacks by the IRGC and its proxies. When BNPP serviced the Iranian Petrochemical Company, BNPP knew, among other things: (1) the company was identified as owned by an Iranian citizen ordinarily resident in Iran; (2) the company was part of an Iranian energy group with other companies incorporated in Iran; (3) the company had substantial operations in Iran's oil and gas sector, which had been monopolized by the IRGC and SLO to fund terrorist attacks; (4) the Iranian Petrochemical Company was registered in Dubai as a front for its Iranian operations; and (5) the individual identified as the

company's owner used a name associated with the SLO and the Supreme Leader's calls for terrorist violence.

### 1. BNPP Knew That an Iranian Petrochemical Company Would Fund Terrorism

690.    The fact that the Iranian Petrochemical Company (and the Iranian Oil Company) was an Iranian oil and gas company was all BNPP needed to know in order to see clearly that it was a conduit for funding terrorist attacks. This was made inescapable to BNPP in a series of events and warnings over many years relating to Iran's oil and gas industry, of which BNPP was aware. These events and warnings included: (1) Iran's own statements about its policy to fund terrorism with oil and gas revenue and its own well-publicized actions demonstrating it was doing so; (2) public reports of how the Iranian government was enshrining its terrorist-financing policy in the structure of the institutions that controlled its oil and gas industry; and (3) numerous warnings from the U.S. government and others specifically singling out Iran's oil and gas industry as a primary source of its terrorist financing.

### a. Iran's Own Statements and Actions

691.    Although Iran's statements of support for terrorism were frequent (and are discussed elsewhere), Iranian leaders publicly explained with great specificity how Iran's most valuable economic resources would be used to finance the Ayatollah's most steadfast objective to "export the Islamic Revolution" through IRGC-sponsored acts of terrorism committed by IRGC proxies. From those statements, BNPP knew that Ayatollah Khamenei and the IRGC followed a pattern and practice of earmarking a certain percentage of *all* Iran's oil revenue for redistribution to IRGC proxies, including Hezbollah, Hamas, and JAM. From 2000 through 2020, Ayatollah Khamenei regularly publicly touted his and the IRGC's effective monopoly over Iran's oil and gas sector—and attendant lucrative export base—and that this control comprised

one of the Ayatollah's and IRGC's greatest strategic weapons. In this context, Terrorist Sponsors, and Iranian officials who had to toe their line, always treated all Iran-based oil revenues uniquely amongst all Iranian industry sectors by specifically earmarking a fixed percentage of revenue from *every* oil-related transaction in Iran to directly flow to Hezbollah, Hamas, and the IRGC's other proxies in the Middle East.

692.    BNPP knew this for a host of reasons, including, but not limited to, because OFAC contacted BNPP directly in 2007 to voice concerns about its U.S. dollar transactions concerning Iranian entities, and because media outlets reported on them. For example, a *Reuters* report published on May 30, 2006—after Hamas seized control of the Gaza Strip—alerted BNPP that former Iranian President Khatami publicly called for every oil-producing Muslim government to follow Iran's lead and earmark for Hamas a fixed percentage of every oil dollar that their regime's own respective oil resources generated, which the Iranians would help ensure reached Hamas notwithstanding U.S. counterterrorism sanctions seeking to deprive Hamas of the funds to pay for attacks:

> Former Iranian President Mohammad Khatami called on Muslim oil-producing countries to give 1 percent of their oil revenues to the cash-strapped Palestinian government led by Hamas. …
> Khatami said the [U.S.] and Israel were depriving Palestinians of their rights by withholding funds and that Islamic states needed to do more to help. ….
> Hamas … is cash-strapped because the United States and its allies have cut off aid to the body to pressure Hamas to renounce violence and recognise Israel. Hamas's charter calls for the destruction of the Jewish state.
> "Given the rise in oil prices the producer countries should expect to deposit 1 percent of their oil revenues," Khatami said.
> Iran [is among the countries that] … have pledged funds totalling more than $200 million. But the [Hamas] cannot access the money because local, regional and international banks have balked at making the transfers, fearing sanctions by Washington, which considers Hamas a terrorist group.

693.    On December 20, 2006, similarly, Iranian President Ahmadinejad—whom BNPP knew was an outspoken supporter of Hamas's terrorist attacks in Israel—gave a speech broadcast

on Iranian state TV, which *BBC* then annotated as follows: "[Mahmoud Ahmadinejad:] The believers and worshippers of God, who are in charge of the oil resources, put aside their own personal needs, to present and donate their assets in order to help others, to elevate society and to bring comfort to other people who share their faith [[*BBC*:] presumably, he is trying to justify donating Iran's oil money to the Palestinians and the Lebanese Hezbollah]."

694.    Iran's words were confirmed by vivid public reports of its deeds. As just one example, on October 17, 2006, the Wall Street Journal reported that "the potent political forces that roil Iranian business, including the heavy hand of elements close to Iran's hard-line president," were exposed when the IRGC—"in a scene like something you . . . see only on television"—raided a Romanian drilling rig off the coast of Iran in August and seized control of the company that holds the rig's lease, Oriental Oil. The Wall Steet Journal reported that this seizure was emblematic of the IRGC's "aggressive push into the backbone of Iran's economy, its oil and gas fields." The Wall Street Journal also reminded its readers in the global business community, including BNPP, of the obvious connection between the IRGC's role as "an active player in business" in the oil sector and its sponsorship of terrorist attacks throughout the region:

> The Guard has a long history of activity abroad, having helped set up Lebanon's Hezbollah militia in the early 1980s. More recently, it has reached into neighboring Iraq. There, according to a senior Israeli security official, its quest for influence is spearheaded by a special unit of the Guard called the Ramadan Headquarters, which trains and funds Iraq Shiite fighters.

> The Guard's business activities include engineering, media, trading and energy. 'They are taking positions everywhere,' says Mohsen Sazegara, a former aide to the late Ayatollah Khomeini and a founder of the paramilitary force in 1979. The Guard, says Mr. Sazegara, who broke with Iran's regime a few years ago and now lives in the U.S., is a 'unique organization in the world: a political body, a military force and big, complex company.'

695.    BNPP was aware of Iran's statements and actions, particularly in the oil and gas sector, because BNPP's analysts closely followed developments in that sector and geopolitical

developments related to Iran. BNPP's analysts understood the close connection between Iran's oil sector and terrorist attacks by Iran's proxies in the Middle East. On August 8, 2006, for example, *USA Today* reported that "fighting between Israel and Hezbollah and tensions with Iran about its nuclear program" were "another blow to the market," according to BNPP's senior energy analyst. On July 13, 2006, *Reuters* reported "after Lebanese Hizbollah guerrillas captured two soldiers in a border clash," that BNPP's head of interest rate strategy saw "some pressure on the equity market" and believed the market was driven in part by "the geopolitical situation." On July 14, 2006, the *Associated Press* reported on the possibility that Iran would "withhold[] oil from the market in a sign of solidarity with Hezbollah." Analysis viewed this fact as "weigh[ing] on the market's psychology," and a BNPP broker agreed, observing, "I don't think we're done on the upside." On July 17, 2006, *Reuters* reported a BNPP economist remarked on "the importance of geopolitics to the market" and predicted that "prices will see-saw with the news flow." The news reported in the *Reuters* article on that day alone included the fact that "Hizbollah rockets struck deeper than ever into Israel," that the conflict "threatens to suck in Hizbollah's Syrian and Iranian allies," and that the head of Iraq's oil company "was kidnapped in the capital, the second high-profile abduction in two days." On August 22, 2006, *Bloomberg* quoted a BNPP analyst warning that "Iran has made statements in the past that they would use oil as a weapon if sanctions are placed against them."

696.    Although BNPP's analysts viewed oil prices as a major concern, BNPP's attitude toward terrorist attacks by Iran's proxies was indifferent. In the words of a BNPP broker quoted in a July 17, 2006 *Associated Press* article: "At some point the market is going to ***become immune to every little attack***." (emphasis added)

### b.  Iran's Government Structure

697.    BNPP knew that the elements of Iran's government responsible for facilitating terrorist attacks by the IRGC's proxies—including the SLO, the IRGC, and the Foundation for the Oppressed (collectively, "Terrorist Sponsors")—were formalizing and institutionalizing their control over petroleum industry profits.

698.    BNPP knew that IRGC front KAA had been awarded multi-billion-dollar contracts to develop South Pars in June 2006.

699.    BNPP knew that the Supreme Leader ordered that the Foundation for the Oppressed be given a substantial role in the negotiation for, and receipt of payment relating to, Iranian oil exports in 2008. This further alerted BNPP that any Iran-related energy transactions directly aided the Qods Force, Hezbollah, Hamas, PIJ, and JAM because the Supreme Leader's decision inextricably connected the Foundation to Iran's oil sector. BNPP knew about the Supreme Leader's decision for several reasons, including contemporaneous media reports that discussed the decision and its implications. On April 30, 2010, for example, the *Economist*'s flagship due diligence publication, the *Economist Intelligence Unit*, reported that the "political influence" of the "Bonyad-e Mostazafan (Foundation of the Oppressed)" "among [Iranian] decision-makers" who were "accountable only to the Supreme Leader" was "exemplified by the extension of a lucrative privilege to this entity: the minister of oil announced in June 2008 Bonyad-e Mostazafan's newly acquired right as Iran's oil seller on international markets."

700.    BNPP knew that Ayatollah Khamenei decreed in March 2011 that all oil and gas contracts would be awarded to Petro Nahad, an entity established by the SLO and operated jointly by, and for the benefit of, the SLO and the IRGC.

701.    BNPP knew that IRGC commander Ghasemi was appointed in August 2011 to be Minister of Petroleum, with control of the agency that controls NIOC. Public sources reported

that Ghasemi, speaking in parliament, described himself as a "soldier[] of the Islamic Republic's Revolutionary Guards." President Ahmadinejad similarly described Ghasemi as a "child of the revolution," who would "transform" the oil industry "in line with national interests"

### c.  U.S. Government Warnings

702.    In the fact sheet accompanying OFAC's October 25, 2007, designation of the IRGC and its Qods Force, OFAC warned that they used the oil industry to finance terrorism. The fact sheet alerted BNPP that the IRGC and its Qods Force provided "material support to the Taliban, Lebanese Hizballah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC)." The fact sheet also explained that the IRGC "had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701." The fact sheet also specifically alerted BNPP that this support contributed to attacks on civilians in Iraq: "In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians." At the same time, the fact sheet alerted BNPP to how the IRGC used Iran's oil industry to fund its operations: "It . . . has numerous economic interests involving . . . the oil industry. . . . The IRGC has significant political and economic power in Iran, with ties to companies controlling billions of dollars in business and construction and a growing presence in Iran's financial and commercial sectors. Through its companies, the IRGC is involved in a diverse array of activities, including petroleum production and major construction projects across

the country. In 2006, Khatam al-Anbiya secured deals worth at least $7 billion in the oil, gas, and transportation sectors, among others." OFAC's designated several companies, including Oriental Oil Kish, "on the basis of their relationship with the IRGC."

703.    In speeches and meetings with government officials during the U.S. government's financial pressure campaign, discussed *supra*, officials routinely emphasized how Iran's oil and gas industry funded terrorism.

704.    Under Secretary of State Nicholas Burns, for example, in March 6, 2007, testimony to Congress explained: "In recent weeks, we have engaged relevant companies and countries about their potential investment in Iran's oil and gas sector," and we have been "making clear our opposition to such deals." Burns emphasized that "[n]o discussion of Iran would be complete without mentioning the regime's record of supporting terrorism." He added, that "Tehran has long been the world's leading state sponsor of terrorism," who is "responsible for the deaths of scores of Americans," that Iran was seeking to "rearm Hizballah," and that "[r]ecognizing Iran's role as the central banker of global terrorism, the Departments of State and the Treasury have enlisted foreign support in efforts to deny suspect Iranian individuals and entities access to the international financial system."

705.    Over the course of 2010 and 2011, the U.S. government issued a clarion call consisting of at least sixteen events that warned BNPP specifically about Iran's oil and gas sector, its use of fronts, the dominance of the IRGC, and its funding of terrorism. These 2010-2011 warnings are especially notable because they accompanied BNPP's active assistance to the Iranian Petrochemical Company. From late 2011 through November 2012, BNPP processed at least $586.1 million in illegal transactions for the Iranian Petrochemical Company.[120] BNPP

---

[120] SOF ¶47.

processed these transactions even though they admitted that by December 2011 they were "on notice" that transactions with the Iranian Petrochemical Company were impermissible. Thus, at the same time they were alerted to specific concerns about the Iranian Petrochemical Company, BNPP was also receiving some of the sharpest and most sustained warnings from the U.S. government about Iran, and specifically about *the IRGC's use of front companies in the petrochemical sector to fund terrorism*. BNPP's response was to ignore the warnings and to continue processing transactions for the Iranian Petrochemical Company through November 2012.

706.    BNPP received the first of these warnings on February 10, 2010, when OFAC designated IRGC General Rostam Qasemi and four companies associated with KAA, explaining (emphasis added):

> As the IRGC consolidates control over broad swaths of the Iranian economy, displacing ordinary Iranian businessmen in favor of a select group of insiders, it is hiding behind companies like Khatam al-Anbiya and its affiliates to maintain vital ties to the outside world, said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. Today's action exposing Khatam al-Anbiya subsidiaries will help firms worldwide avoid business that ultimately benefits the IRGC and its dangerous activities. . . .

> The IRGC has a growing presence in Iran's financial and commercial sectors and extensive economic interests in the defense production, construction, and *oil industries*, controlling billions of dollars of business. The profits from these activities are available to support the full range of the IRGC's illicit activities, including WMD proliferation and *support for terrorism*.

OFAC also reiterated that the Qods Force had previously been designated in 2007 for "terrorism support activities," as described *supra*.

707.    BNPP received the second warning on June 9, 2010, when the U.N. Security Council adopted Resolution 1929, and formally "[n]oting with serious concern the role of elements of the … IRGC … in Iran's proliferation sensitive … activities" and "noting the

potential connection between Iran's revenues derived from its energy sector and the funding of

Iran's proliferation-sensitive … activities." Paragraph 12 of Resolution 1929 provided: "The

Security Council … Decides that the measures specified in paragraphs 12, 13, 14 and 15 of

resolution 1737 (2006) shall apply also to the Islamic Revolutionary Guard Corps (IRGC, also

known as 'Army of the Guardians of the Islamic Revolution") individuals and entities specified

in Annex II, and to any individuals or entities acting on their behalf or at their direction, and to

entities owned or controlled by them, including through illicit means, and calls upon all States to

exercise vigilance over those transactions involving the IRGC that could contribute to Iran's

proliferation-sensitive … activities …." Paragraph 22 of Resolution 1929 provided: "The

Security Council … Decides that all States shall require their nationals, persons subject to their

jurisdiction and firms incorporated in their territory or subject to their jurisdiction to exercise

vigilance when doing business with entities incorporated in Iran or subject to Iran's jurisdiction,

including those of the IRGC …, and any individuals or entities acting on their behalf or at their

direction, and entities owned or controlled by them, including through illicit means …." Annex

II of Resolution 1929, in turn, alerted BNPP that "Entities owned, controlled, or acting on behalf

of the Islamic Revolutionary Guard Corps" included KAA and a broad array of IRGC oil fronts

similar to the Iranian Petrochemical Company.

708.    BNPP received the third warning on June 16, 2010, when OFAC its "First Set of

Actions in Response to President Obama's Call for Vigorous Enforcement of … Resolution

1929," designating numerous entities and individuals associated with the IRGC and identifying

20 companies and 98 vessels in the shipping and petrochemical industries as fronts for the

Iranian government. Several entities were located and/or incorporated outside of Iran, including

in Dubai, and many used a variety of names to evade scrutiny. Of the vessels, 71 had also

changed their names to avoid scrutiny. For example, OFAC identified the following

petrochemical company owned by NIOC and using a variety of names:

> **MSP KALA NAFT CO. TEHRAN** (A.K.A. KALA NAFT CO SSK; A.K.A. KALA NAFT COMPANY LTD; A.K.A. KALA NAFT TEHRAN; A.K.A. KALA NAFT TEHRAN COMPANY; A.K.A. KALAYEH NAFT CO; A.K.A. M.S.P.-KALA; A.K.A. MANUFACTURING SUPPORT & PROCUREMENT CO.-KALA NAFT; A.K.A. MANUFACTURING SUPPORT AND PROCUREMENT (M.S.P.) KALA NAFT CO. TEHRAN; A.K.A. MANUFACTURING, SUPPORT AND PROCUREMENT KALA NAFT COMPANY; A.K.A. MSP KALA NAFT TEHRAN COMPANY; A.K.A. MSP KALANAFT; A.K.A. MSP-KALANAFT COMPANY; A.K.A. SHERKAT SAHAMI KHASS KALA NAFT; A.K.A. SHERKAT SAHAMI KHASS POSHTIBANI VA TEHIYEH KALAYE NAFT TEHRAN; A.K.A. SHERKATE POSHTIBANI SAKHT VA TAHEIH KALAIE NAFTE): MSP Kala Naft Co. Tehran is a Tehran-based entity that is responsible, along with other entities, for procurement on behalf of the National Iranian Oil Company ('NIOC'), which is an entity that is owned or controlled by the Government of Iran.

In the same notice, OFAC warned about the IRGC's control of the Iranian economy:

> The IRGC maintains significant political and economic power in Iran. It has ties to companies controlling billions of dollars in business and construction projects and it is a growing presence in Iran's financial and commercial sectors. The IRGC has numerous economic interests related to defense production, construction, and the oil industry.

709.    In announcing OFAC's action, Treasury Secretary Geithner personally delivered

the clarion call, emphasizing the IRGC's support for terrorism and sanctions evasion (emphasis

added):

> Our actions today are ***designed to deter*** other governments and ***foreign financial institutions*** from dealing with these entities and thereby supporting Iran's illicit activities. . . .
>
> [W]e are adding two individuals and four entities that are part of Iran's Revolutionary Guard, which plays a key role in Iran's missile programs and support for terrorism. . . .
>
> [W]e are identifying 22 petroleum, ***energy*** and insurance ***companies – located inside and outside Iran – that are owned or controlled by the Iranian government***. . . .

In the coming weeks, we will continue to increase the financial pressure on Iran.

*We will continue to target Iran's support for terrorist organizations.*

*We will continue to focus on Iran's Revolutionary Guard.*

And we will continue to expose Iran's efforts to evade international sanctions. . . .

When major international institutions find out they're actually working with a company that supports Iran's nuclear or missile programs, they realize it's not worth the risk.

They cut off their business.

And over the years, this has made a major difference in limiting Iran's ability to use the global financial system to pursue illicit activities.

We have made important progress. But we cannot stop. Iran will never cease looking for new ways to evade our sanctions. So our efforts must be ongoing and unrelenting.

We will keep working to intensify financial pressure on Iran.

710.    Under Secretary Levey delivered a similarly pointed warning on the same day

(emphasis added):

Second, we are taking action against Iran's national maritime carrier, IRISL. Since we sanctioned IRISL in 2008, it has desperately attempted to evade those sanctions, setting up new front companies, renaming and even repainting vessels to hide their true ownership. Despite its deceptive maneuvers, IRISL has had to struggle to obtain insurance and other services.

Third, we are taking further action against the IRGC, or Islamic Revolutionary Guards Corps. *The IRGC plays a key role in Iran's* missile program and *support for terrorism and it has taken over broad portions of the Iranian economy*, to the detriment of the Iranian people. With today's designations, we have now sanctioned 26 entities and individuals connected to the IRGC, and we will continue to do so. *No IRGC entity should have any place in the world's legitimate financial system*. . . .

Finally, we are identifying 22 *petroleum*, energy, and insurance *companies owned or controlled by the Government of Iran, including 17 located outside Iran and many that are not easily identifiable as Iranian*. Americans have long been forbidden to do business with Iranian entities. Companies around the world are increasingly deciding not to do business with the government of Iran because

265

of its illicit conduct and because, as President Obama said last week, it is a government that brutally suppressed dissent and murdered the innocent. . . .

We know that officials in Iran have been anxious about this new round of sanctions. If the Iranian Government holds true to form, it will scramble to identify work-arounds – hiding behind front companies, doctoring wire transfers, falsifying shipping documents. ***We will continue to expose this deception thereby reinforcing the very reasons why the private sector is increasingly shunning Iran.***

711.    BNPP received its fourth warning on June 22, 2010, when Treasury Under Secretary Levey and State Under Secretary Burns testified before Congress. Under Secretary Levey explained that the U.S. government "intended to hold Iran accountable for its continued refusal to address the international community's concerns regarding its nuclear program, ***as well as its support for terrorism***." (emphasis added) He noted that U.N. Resolution 1929 marked an "inflection point" in the U.S. government's strategy for addressing "the Iranian threat," including Iran's "support for terrorism" and "abuse of the financial system." He added (emphasis added):

As you know, we have been working to address Iran's illicit conduct and to protect the international financial system from Iranian abuse for the past several years. . . . Our strategy to hold Iran accountable for its failure to meet its international obligations has two major fronts. . . . The first front is governmental action . . .

Perhaps as important as government action is the second front: private sector action. The steps private sector firms around the world have taken in recent years to protect themselves from Iran's illicit and deceptive activity are extremely important. We have found that when we use reliable financial intelligence to build cases against Iranian actors engaged in illicit conduct, many members of the private sector go beyond their legal requirements regarding their interactions with these and other Iranian actors because they do not want to risk handling illicit business. This behavior is a product of good corporate citizenship and a desire to protect their institutions' reputations. The end result is that the voluntary actions of the private sector amplify the effectiveness of government-imposed measures. Thus, as we have taken action to target illicit Iranian conduct, we have shared some of the information that forms the basis for our action s with our partners in the private sector and, in response, virtually all major financial institutions have either completely cut off or dramatically reduced their ties with Iran . We are now starting to see companies across a range of sectors, including insurance, consulting, ***energy***, and manufacturing, make similar decisions. Once some in the

private sector decide to cut off ties to Iran, it becomes an even greater reputational risk for others not to follow, and so they often do. . . .

The impact of these actions on Iran has been significant, and is deepening as a result of Iran's own conduct. As international sanctions on Iran have increased, Iran's response has been to attempt to evade those sanctions. . . . We have used this conduct to our advantage by exposing it and making it public, reinforcing the private sector's pre-existing fears about doing business with Iran. In this way, Iran's own evasion and deceptive conduct is increasing its isolation.

712.    At the same time as Levey and Burns testified in Congress, BNPP received a fifth

warning in the form of a June 22, 2010, advisory from FinCEN amplifying the U.S.

government's message and directly advising banks about the need for extreme caution in the face

of the "serious threat of money laundering, terrorism finance, and proliferation finance

emanating from the Islamic Republic of Iran." The advisory described the recent UN Security

Council Resolution 1929 regarding Iran's proliferation activities and emphasized "the increasing

risk to the integrity of the international financial system posed by . . . commercial enterprises that

are owned or controlled by the IRGC." The advisory explained (emphasis added):

Iran's record of illicit and deceptive activity, coupled with its extensive integration into the global financial system, increases the risk that responsible financial institutions will unwittingly become involved in Iran's illicit activities. Many of the world's major financial institutions have either cut off or dramatically reduced their relationships with Iranian banks, leaving Iran's financial institutions increasingly isolated. Despite the degradation in Iran's access to correspondent and other financial relationships with major international financial institutions, Iran continues to maintain a visible presence in the international financial system and is constantly seeking to expand its banking presence internationally. . . . FinCEN continues to advise all U.S. financial institutions to take commensurate risk-mitigation measures to diminish threats emanating from Iran. . . .

As required under 31 CFR § 103.176(a), covered financial institutions [including U.S. branches of foreign banks] should ensure that their due diligence programs, which address correspondent accounts maintained for foreign financial institutions, include appropriate, specific, risk-based, and, where necessary, enhanced policies, procedures, and controls that are reasonably designed to detect and report known or suspected money laundering activity conducted through or

involving any correspondent account established, maintained, administered, or managed in the United States.

With respect to correspondent accounts held with financial institutions that maintain
relationships with Iran, FinCEN reminds institutions of the *increasing likelihood that Iran will use its existing correspondent relationships to hide illicit conduct in an attempt to circumvent existing sanctions*. *Financial institutions should be vigilant in dealing with banks that might have a connection to Iran*. . . .

The increasing infiltration of Iran's legitimate economy by designated entities, including
especially the IRGC, exposes . . . international financial institutions and companies to entities owned, controlled, or otherwise affiliated with the IRGC and other designated entities. . . .

Iran's demonstrated use of deceptive practices makes it difficult to determine whether designated entities . . . are associated with any particular transaction involving Iran. . . . FinCEN remains concerned that Iranian financial institutions are seeking to compensate for the loss of access to financial sectors by establishing new financial relationships, including the opening of new foreign branches, subsidiaries, representative offices, or correspondent or other accounts either outside or within Iran, and the pursuit of joint ventures. . . .

Additionally, as required under 31 CFR §§ 103.15 - 103.21, if a financial institution knows, suspects, or has reason to suspect that a transaction involves funds derived from illegal activity or that a customer has otherwise engaged in activities indicative of money laundering, terrorist financing, or another violation or attempted violation of law or regulation, the financial institution shall then file a Suspicious Activity Report.

713.    BNPP received its sixth warning on July 1, 2010, when President Obama signed

into law the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010

(CISADA), which passed unanimously in the Senate and near-unanimously in the House (408-

8). CISADA reauthorized the Iran Sanctions Act of 1996, which had passed unanimously in both

houses of Congress, and in which Congress found that Iran's "support for acts of international

terrorism endanger the national security and foreign policy interests of the United States" and

declared it "the policy of the United States to deny Iran the ability to support acts of international

terrorism . . . by limiting the ability to explore for, extract, refine, or transport by pipeline

petroleum resources of Iran." In CISADA, Congress added a number of new provisions targeting

Iran's energy sector and made additional findings that Iran's "support for international terrorism"

is "a threat to the security of the United States" and that Iran was engaged in "ongoing arms

exports to, and support for, terrorists." It also noted "the involvement of Iran's Revolutionary

Guard Corps in . . . international terrorism."

714.    Upon CISADA's signing, Secretary Geithner issued a statement emphasizing

"Iran's continued . . . support for terrorists" and explaining that the new law would "strengthen

Treasury's ongoing efforts to protect the international financial system from abuse." To

underscore the message even more, Treasury issued guidance—a seventh warning to BNPP—

summarizing the new Iran sanctions in *five* languages, including Arabic. The guidance explained

that the new law

> strengthened existing U.S. sanctions with respect to the Iranian energy industry,
> and adds the potential for the imposition of serious limits on foreign financial
> institutions' access to the U.S. financial system if they engage in certain
> transactions involving Iran. CISADA is consistent with the global consensus
> regarding Iranian behavior and is in line with the U.S. Government's core role of
> protecting its domestic financial system from exposure to Iran's illicit and
> deceptive financial practices.

715.    In an eighth warning, on July 26, 2010, the European Union and Canada adopted

new sanctions against Iran, including measures targeting its trade and energy sectors, as well as

the IRGC. Treasury Secretary Geithner and Secretary of State Clinton announced that they

welcomed those steps to restrict Iran's ability to use its "energy proceeds" to support its illicit

activities, and observed that "companies around the world refuse to do business with Iran rather

than risk becoming involved in" those activities.

716.    A ninth warning arrived on August 3, 2010, when OFAC issued a set of

designations "targeting the Government of Iran's support for terrorism and terrorist

organizations, including Hizballah, Hamas, Palestinian Islamic Jihad (PIJ), the Popular Front for the Liberation of Palestine-General Command (PFLP-GC) and the Taliban." The accompanying fact sheet warned that "Iran is the primary funder of Hizballah and has long been recognized as the most active state sponsor of terrorism." It explained how Iran uses "its state apparatus— including the Islamic Revolutionary Guard Corps-Qods Force—and state-run social service organizations to support terrorism under the guise of providing reconstruction and economic development assistance or social services." It also explained that the IRGC's Qods Force was "the Government of Iran's primary arm for executing its policy of supporting terrorist and insurgent groups" and was providing "material, logistical assistance, training and financial support to militants and terrorist operatives throughout the Middle East and South Asia."

717.  Also on August 3, 2010, BNPP received a tenth warning when OFAC identified another 21 entities in various economic sectors, often located or incorporated outside Iran, that were Iranian fronts. The purpose of identifying these entities, according to the announcement, was to make people "better able to identify Iranian Government entities and protect themselves against the risks posed by such entities." Under Secretary Levey also warned: "As its isolation from the international financial and commercial systems increases, the Government of Iran will continue efforts to evade sanctions, including using government-owned entities around the world that are not easily identifiable as Iranian to facilitate transactions in support of their illicit activities . . . ."

718.  An eleventh warning alerted BNPP to the urgency when OFAC announced its regulations implementing CISADA on August 16, 2010, well ahead of the 90-day deadline mandated by Congress. Treasury's announcement emphasized that CISADA "buil[t] on continued efforts by the United States and our allies to protect the international financial system

from abuse by Iran. We are already seeing the private sector adjusting business practices in response to CISADA in order to ensure that their access to the U.S. financial system is not put at risk."

719.    A twelfth warning, an August 16, 2010, op-ed by Under Secretary Levey in the *Financial Times*, reminded BNPP that "[s]ubstantial attention has already been paid to sanctions in Iran's banking and energy sector," while the latest round of measures focused on shipping. Levey also emphasized that the "broader private sector is restricting business with Iran, rather than risk facilitating Iran's illicit activities."

720.    On information and belief, BNPP received a thirteenth warning (and likely more) during a three-week August campaign by senior Treasury officials. A Treasury summary published on August 20, 2010, reported that Treasury's three "leading officials on U.S. sanctions crisscrossed the globe" for three weeks to conduct "face-to-face global engagement on Iran with governments and the private sectors" in a number of countries, including the UAE. The officials highlighted the impact of the latest financial pressure on Iran's ability to "develop its oil and gas fields, acquire financial services and maintain financial relationships with the international community." The report added (emphasis added):

> At roundtable discussions with banking associations, Treasury continued its dialogue with the private sector on the need for enhanced vigilance with respect to Iran's continued efforts to engage in a range of deceptive measures to conduct illicit transactions and evade sanctions. U.S. officials also highlighted the need for ***intense scrutiny*** from both regulators and financial institutions of all transactions involving Iran to combat attempts by Iran to establish new and expand existing financial relationships as sanctions tighten.

721.    BNPP received a fourteenth warning on December 21, 2010, when OFAC announced yet another round of designations targeting the IRGC, and again warned (emphasis added): "With the IRGC's expanding influence and control over broader segments of the Iranian

economy—including the defense production, construction, and *oil and gas industries*—
*increasing numbers of Iranian businesses are subsumed under the IRGC's umbrella* and
identified with its illicit conduct." OFAC identified Pars Oil & Gas Company as an entity
controlled by the government of Iran and again highlighted the IRGC's role in development of
the South Pars gas field.

722.    BNPP received a fifteenth warning on June 20, 2011, when OFAC designated ten
shipping companies, including several based in the UAE, highlighting "Iran's continued efforts
to evade sanctions and its ongoing creation and use of new front companies, subsidiaries, and
affiliates." An accompanying announcement by New York District Attorney Cyrus R. Vance, Jr.
explained that, as part of investigations into "the misuse of banks in Manhattan by those seeking
to evade sanctions to support terrorism," eleven corporations and five individuals had been
indicted for using "alias names and corporate alter egos," including in the UAE, to obscure the
Iranian government's involvement in shipping companies.

723.    BNPP received a sixteenth warning on November 21, 2011, when OFAC
announced expanded sanctions on the development of Iran's petroleum resources and its
petrochemical industry, along with Treasury's finding that Iran was a jurisdiction of primary
money laundering concern (discussed *supra*).

724.    In sum, over the course of 2010 and 2011—as BNPP was receiving no less than
sixteen different warnings about the IRGC's use of front companies in the petrochemical sector
to fund terrorism—BNPP was regularly processing fund transfers amounting to at least $586.1
million in transactions for a petrochemical company it knew to be an Iranian front.

725.    In addition, decades of other reports and statements by the United States,
terrorists, media outlets, terrorism scholars, and ordinary citizens alerted BNPP that every time it

provided illicit financial services to any customer in connection with Iranian oil- or gas-related transaction, it ran an extreme risk that the other side was funding the Qods Force, Hezbollah, Hamas, and JAM and, moreover, even if such person was not, the end revenues would likely flow to such terrorists, given the Iranian regime's long-standing and unique treatment of the revenues it realized from its oil and gas monopoly. Such reports included, but were not limited to:

a. *Agence France Presse English Wire*, February 6, 2006: "Iran … formally notified the [IAEA] of its decision to restart sensitive nuclear work at the centre of concerns the hardline regime could acquire nuclear weapons. Senior [Iranian] officials also played down the threat of sanctions … emphasising [Iran]'s vast oil wealth … in an interview with *Handelsblatt*, US Defence Secretary Donald Rumsfeld said the United States does not rule out using military force against Iran. 'All options, including the military one, are on the table,' Rumsfeld [said], repeating his fears that weapons of mass destruction could fall into the hands of terrorists and branding Iran 'the main sponsor of terrorist organisations such as Hezbollah and Hamas.' But [regime spokesman Gholam Hossein] Elham said oil-rich Iran still had the upper hand when it came to enduring any eventual sanctions. … 'Any decision in this regard [*i.e.*, for the United States to impose sanctions targeting the IRGC, responsible for Iran's nuclear program] will not hurt us. It will hurt the consumers and not the producers. We are in a position of power when it comes to energy, and it will not have any affect [sic] on our budget,' he said."

b. White House Press Secretary Scott McClellan, February 22, 2006: "[Reporter:] Iran, as you probably know, has now said that it would help fund Hamas, has said that its oil revenues ... will help amply pay for Hamas as needed. What's the U.S. reaction? And does this undercut any sanctions against Iran? [McClellan:] Well, … the regime in Iran … [has] been a destabilizing force in the … Middle East. Our views are very clear when it comes to the regime. ... And in terms of Hamas, ... we've made it very clear that ... they continue to engage in terrorism and continue to advocate the destruction of Israel."

c. President of Israel Shimon Peres, March 18, 2008: "Iranian oil money is funding world terror, including Hamas and Hezbollah terror."

d. *Agence France Presse English Wire*, March 18, 2008: "After meeting [German Chancellor Angela] Merkel, [Israeli President Shimon] Peres stressed that … 'the money earned from oil enables Iran to finance international terrorism, particularly the terrorism of Hezbollah and Hamas.'"

e. *Jerusalem Post*, March 19, 2008: "German Chancellor Angela Merkel told the Knesset ... 'I say it in a clear voice - the [Hamas and PIJ] Kassam [rocket] fire [targeting Israeli civilians] must stop,' Merkel said. 'Terror attacks are a crime, and do not resolve political disputes.' Prime Minister Ehud Olmert praised Merkel's 'strong and determined position

against the horrific calls from the president of Iran to wipe Israel off the map ….' ... Merkel, … also met with President Shimon Peres, who said … that Iranian oil revenue was funding world terrorism - including Hamas and Hizbullah."

f.  *Reuters*, May 5, 2008: "Israeli President Shimon Peres … said … 'Oil ... is [] promoting terror,' said the 84-year-old Nobel Peace Prize winner … Peres argued that manifold increases in oil prices in recent years had contributed to a rise in financing for terrorism in the Middle East … Peres took particular aim at Iran, repeating recent comments that Tehran's nuclear programme and its rhetoric against Israel may pose a greater threat than the Nazis in the 1930s and 40s. Israel accuses Iran, a major oil and gas producer, of financing Hezbollah, the Lebanese guerrilla movement, and Hamas, which controls the Palestinian Gaza Strip, both of which are sworn enemies of Israel."

g.  *Joplin Globe*, January 17, 2009: "Make no mistake; Iran is a strong and tenacious adversary. Fueled with petro dollars from their abundance of oil reserves, Iran supports strong anti-Israeli and anti-Western militias such as Hamas and Hezbollah. Iran is responsible for many thousands of American and Iraqi deaths."

h.  Senator John Kerry, May 12, 2009: "[A] massive continuous transfer of American wealth to oil exporting nations ... [flowed] revenues and power and sustained … global terror funded indirectly by our expenditures on oil … Too often the presence of oil multiplies threats ... Iran uses petrol dollars to fund Hamas and Hezbollah ...."

i.  *Newsweek*, June 29, 2009: "In 2005 … Khamenei backed Ahmadinejad …, a veteran of the … Revolutionary Guards and willing to kiss the Supreme Leader's feet. Ahmadinejad won. In the four years since, taking advantage of billions in windfall revenues from high oil prices, Iran has … funded Hamas as it took over Gaza, and supported and armed Lebanon's Hizbullah in its 2006 war with Israel."

j.  *APS Review Oil Market Trends*, April 5, 2010: "Without money from oil, [Israeli Infrastructure Minister Uzi] Landau argued, Iran would fade as a regional power and 'terror groups' such as Hamas … and Hizbullah … would cease to exist."

k.  Dr. Abdallah al-Nafisi (Academic; *Al Jazeera* Commentator), June 16, 2010: "Iran gets on every boat to reach power and influence in the Arab region. A country very rich with … oil revenues, Iran uses its establishment of and support for Hezbollah … and its support for Hamas and … as bridges to get to its objectives. What harms Iran if it gives Hamas $23 million monthly to run things in Gaza? What harms Iran if it gives the Islamic Jihad $5 million or so to maintain the Palestinian gun? But in return, Iran gains much. It is as if Iran is telling Israel: My border is in Gaza, not in Tehran, and my border is in Al-Urqub [in south Lebanon] through Hezbollah, not in Tehran. So, Iran is gaining a great deal of ... physical influence through its support for Hezbollah and Hamas. ... We welcome Iran's support for [Hezbollah] and its support for Hamas and others."

l.  Elliot Bartky and Allon Friedman (Jewish American Affairs Committee of Indiana), August 1, 2011: "[D]eprive Iran of the oil revenue they've used to support terrorist groups such as Hezbollah and Hamas, … and … kill American troops in Iraq."

726.    Decades of government reports and speeches published by the United States, United Kingdom, European Union, and United Nations confirmed that Iran's oil industry was inextricably connected with IRGC-sponsored acts of terrorism targeting the United States that were committed by the Qods Force and the Axis of Resistance it led, including Hezbollah, Hamas, and JAM. Such U.S., U.K., E.U., and/or U.N. government findings, reports, statements, and warnings included, but were not limited to:

a.    Treasury, June 16, 2010: "KAA … [is] the engineering arm of the IRGC that serves to help the IRGC generate income and fund its operations. … The IRGC maintains significant political and economic power in Iran. It has ties to companies controlling billions of dollars in business and construction projects and it is a growing presence in Iran's financial and commercial sectors. The IRGC has numerous economic interests related to … the oil industry."

b.    State, April 8, 2011: "Official Corruption … [:] … [T]he supreme leader continued to transfer a large portion of the country's … oil and gas … sectors to the IRGC. In recent years [Khamenei] gave control over state enterprises to the IRGC through the granting of special privileges. IRGC companies were large enough to underbid competitors and were generally favored in the bidding process for large contracts."

c.    Treasury, March 28, 2012: "'Treasury is sending a clear signal … that … [w]e will continue to target the Iranian regime and specifically the IRGC as it … continue[s] its nefarious infiltration of the Iranian economy,' said Adam Szubin, Director of [OFAC]. The IRGC continues to be a primary focus of U.S. and international sanctions against Iran because of the central role the IRGC plays in Iran's … support for terrorism …. The IRGC has continued to expand its control over the Iranian economy – in particular in the … oil and gas industries – subsuming increasing numbers of Iranian businesses and pressing them into service in support of the IRGC's illicit conduct."

d.    State, May 24, 2012: "The IRGC operated numerous front companies that were engaged in illicit trade and business activities. The IRGC includes a construction arm (Khatam ol-Anbiya) that had extensive economic operations and ties to the oil sector and benefited from corruption within that sector."

727.    Terrorism scholars also confirmed that KAA-related directly financed IRGC-sponsored attacks committed by IRGC proxies, including Hezbollah, Hamas, and PIJ, and alerted BNPP to the same. On June 15, 2010, for example, IRGC scholars Mark Dubowitz and Emanuele Ottolenghi publicly warned:

[KAA] is an integral part of the IRGC power structure. Its head is the IRGC's Commander in Chief, … Mohammad Ali Jafari, and its CEO, under his authority, is always a high-ranking IRGC officer. Many IRGC projects are military in nature, and the group diverts much of the technology and expertise it acquires from Western companies for seemingly innocuous projects to unsavory ends. … Any company that does business in Iran risks becoming an unwitting accomplice to the IRGC's nefarious activities, tarnishing its reputation in the process. Yet even when companies provide services and technologies that cannot be diverted to illicit projects, partnering with the IRGC entails some complicity with its activities. In June 2006, then-[KAA] deputy head [IRGC] Brigadier General Abdol Reza Abed confirmed in an interview with a local daily that [KAA]'s funds finance various national defense projects, including arming and training Hezbollah. …

[B]oth the Iranian people and the Western companies that do business with the regime end up paying the price for the IRGC's cronyism, inefficiency and incompetence.

No matter how you look at it, it's clear that when [KAA] wins, everyone else loses. … And the entire [Middle East] region loses, because the richer the IRGC becomes, the more resources it has to perpetuate Iranian subversion and repression at home and abroad.

The United States, and other western allies, have only just begun designating the IRGC front companies that operate in the Iranian energy sector. Business with the Iranian regime is going to get even riskier.

### 2. Other Evidence Further Shows BNPP's Awareness That the Petrochemical Company Funded Terrorism

728. As explained *supra*, the name of the individual purporting to be the Iranian Petrochemical Company's nominal owner, on information and belief, was the name for Iran's Friday Prayer Leader, Imam Jomeh—a role closely associated with the SLO and Ayatollah Khamenei himself.

729. BNPP also received organization charts and other customer due diligence information about the Iranian Petrochemical Company's corporate structure, affiliates, facilities, offices, business activities, personnel, and organization. On information and belief, BNPP knew based on this material and its knowledge from public sources that the Iranian Petrochemical Company was directly connected to South Pars, NIOC, and/or NITC.

730.    BNPP knew that Dubai, where the Iranian Petrochemical Company was formed, was a hotbed of IRGC sanctions evasion and terrorist financing. It was well known in the financial industry that Dubai front companies were a primary means for Iran to access the international financial system, and the fronts were often readily apparent to locals on the ground. In the words of the Chairman of the American Business Council of the Gulf Countries, as reported by Forbes Global on April 19, 2004, "[w]hen you blow off the dust, the Dubai region sometimes means Iran and Libya."

731.    The *New York Post* on February 21, 2006 noted a "white-hot spotlight on the UAE, a country long considered the arms-smuggling and money-laundering capital of the Middle East," with "[t]ens of billions of dollars . . . laundered every year through [its] banks" and a "shady" record in the war on terrorism, according to U.S. officials. As the Wall Street Journal reported on February 23, 2006, Dubai was "the most free-wheeling of the Emirates," and "Iran uses Dubai to evade U.S. economic sanctions."

732.    On March 7, 2007, Treasury Under Secretary for Terrorism and Financial Intelligence Stuart Levey visited Dubai to deliver a sharp warning to the business community about how "Iran's nuclear program and support for terrorism poses a great threat to our safety and security." Noting that the world is well aware of Iran's "sponsorship of terrorist organizations that maim and murder innocent civilians," Levey warned that "Iran disguises its activities through an array of deceptive techniques specifically designed to evade the controls of responsible financial institutions and avoid suspicion," including requesting that "financial institutions take their names off of transactions when processing them in the international financial system." Levey's message then focused directly on the IRGC:

> In addition, I want to tell you about another area of concern about how Iran does business. Iran's Revolutionary Guard Corps, or IRGC, is used by the regime to

provide a `train and equip program' for terrorist organizations like Hizballah, as well as to pursue other military objectives of the regime. The IRGC's control and influence in the Iranian economy is growing exponentially under the regime of Ahmadinejad. More and more IRGC-associated companies are being awarded important government contracts. An IRGC company, for example, took over management of the airport and runways in Tehran, while another company won the contract to build the Tehran metro. When corporations do business with IRGC companies, they **are doing business with organizations that are providing direct support to terrorism.**

Levey explained that many banks had "conclude[ed] that they did not wish to be the banker for a regime that deliberately conceals the nature of its business"—where it is "too often the business of funding terrorism." He ended with another warning:

As you make your business decisions, I urge you to consider whether it is wise for your company to focus its efforts on doing business with Iran. I recognize that it may be tempting to step into the void that is being created by other companies pulling back their business in Iran, but they are pulling back for a reason. The world's top financial institutions and corporations are re-evaluating their business with Iran because they are worried about the risk and their reputations. You should worry too and be especially cautious when it comes to doing business with Iran.

733.    In addition, on information and belief, BNPP knew that the Iranian Petrochemical Company's transactions concerned, among other things, petroleum deals relating to the South Pars project, which BNPP knew was fully controlled by the IRGC and a direct funding source for Hezbollah, Hamas, PIJ, and JAM. Terrorism scholars warned that facilitating transactions for Iranians that involved South Pars directly financed IRGC-sponsored terrorist attacks committed by Hezbollah, Hamas, and JAM. On March 15, 2007, for example, former Treasury official Dr. Matthew Levitt testified before Congress that:

[T]he IRGC is precisely the element within Iran that should be targeted. … The IRGC is … responsible for providing funds, weapons, improvised-explosive-device technology and training to terrorist groups like Hezbollah and Hamas and insurgents attacking coalition and Iraqi forces in Iraq. …
[T]he IRGC's business and industrial activities -- especially those connected to the oil and gas industries -- are heavily dependent on the international financial system. Consider, for example, the $2.09 billion contract to develop parts of the

South Pars natural-gas field, or the $1.3 billion contract to build parts of a pipeline, both meted out to the IRGC's engineering arm, the Khatam-ol-Anbia.

734.     Public admissions by IRGC leaders confirm the key role that funding from fronts like the Iranian Petrochemical Company played in the South Pars project. On December 22, 2009, for example, an IRGC-controlled news agency reported (as summarized by the *BBC*):

> [IRGC] Commander of Khatam al-Anbia base informed about the delay in completing phases 15 and 16 of South Pars oil field …
> Commenting on the latest updates on the development of phases 15 and 16 of common South Pars field, Islamic Revolution Guards Corps [IRGC] General Rostam Qasemi said that the level of progress in both phases in the sea and land is about 43 per cents. He added: Inability of the Ministry of Oil in providing necessary financial resources in proper time was one of the most important difficulties faced with regard to phases of South Pars field. Expressing hopes for rapid resolution of the project's financial troubles, he clarified: Employer (Pars Oil and Gas Company) has not succeeded in injecting financial resources to the project in accordance with its pace. …
> According to [IRGC-controlled] *Mehr* news agency, at the moment the construction of five phases of South Pars - 12, 15, 16, 17 and 18 - are in progress and due to lack of financial resources, the operation has been delayed.

735.     On August 6, 2011, similarly, *Reuters* reported that:

> Iran will need some $40 billion this year to spur the development of oil and gas fields it shares with neighbouring countries, Oil Minister Rostam Qasemi said in his first interview since being appointed …
> Qasemi, a Revolutionary Guards commander … vow[ed] to prioritise jointly owned fields, notably the giant South Pars gas reservoir …
> "In order to launch the announced development plans (on the joint fields) there is need for more than $40 billion in investment in the current (Iranian) year (ending late March 2012)," Qasemi said in an interview with *Iran*, a state-owned daily newspaper.
> While Iran might seek foreign capital to finance energy projects, it did not need foreign know-how, he said.
> "There are currently very competent contractors domestically on which we can rely for the development of oil and gas can be done ... For the development of oil and gas fields we don't need foreign contractors."
> One of those domestic companies is Khatam al-Anbia itself, which took over parts of the South Pars development when European firms Royal Dutch Shell and Total SA pulled out due to sanctions on Iran.
> Both Khatam al-Anbia and Qasemi himself are under U.S. and European Union sanctions …

Qasemi said Iran would seek foreign capital … for the energy projects, as well as tapping … Iranian banks …
"We will be pursuing an active diplomacy to absorb foreign capital as they form part of the required financial resources for the projects to be developed," Qasemi said.

736.    Media reports about South Pars alerted BNPP that U.S. sanctions were crushing the IRGC's ability to maximize the cash flow the IRGC received from South Pars and alerted BNPP that South Pars-related sanctions evasion directly aided IRGC efforts to raise money to finance IRGC operations. On June 29, 2006, for example, *Reuters* reported that while "Iran ha[d] awarded the Revolutionary Guards corps a contract to develop two phases of the … giant South Pars gas field," industry analysts confirmed that the Iranian regime could not "develop" its "oil and gas industry," including at South Pars, "without foreign companies' help." Moreover, on May 28, 2010, *Agence France Presse* reported:

Iran [] awarded a business unit of the elite Revolutionary Guards the rights to develop phases 13 and 14 of the giant South Pars gas field …
Guards unit Khatam al-Anbiya would form a consortium with the Sadra and Khatam al-Ocia companies and the national drilling and national maritime installation companies to undertake the work. … [P]hases 22, 23 and 24 were [also] to be awarded to Khatam al-Anbiya. …
The development of the giant offshore field has been delayed amid a lack of investment …
Khatam al-Anbiya … is under US and UN sanctions related to Iran's refusal to abide by UN Security Council resolutions … Global energy majors have come under increased pressure against doing business with Iran as Washington has stepped up efforts to impose new sanctions on [Iran].

737.    From 2005 through 2020, reports and statements by the United States, terrorists, media outlets, due diligence resources, terrorism scholars, and ordinary citizens alerted BNPP that the IRGC had seized control of Iran's interests in the South Pars petroleum and that everything relating to any Iran-related party's direct or indirect involvement in South Pars was inextricably connected to, and ultimately financially benefited, the IRGC. Such reports included, but were not limited to:

280

a.    *Islamic Republic News Agency*, January 5, 2005: "A consortium … has won the tender for Phases 15 and 16 of the giant South Pars gas field development project, … [which] consortium [] includes Sadra and Khatam ol-Anbiya … companies of Iran."

b.    *Agence France Presse*, June 27, 2006: "[T]he Revolutionary Guards ... is set to enter the oil and gas sectors in a move that would increase their stake in [Iran]'s economy. 'The Revolutionary Guards have obtained the contract to develop phases 15 and 16 of South Pars,' … General Abdolreza Abed said in an interview with the Shargh newspaper. Abed, who heads up [KAA], said the contract was worth 2.09 billion dollars. The deal would be a major boost to the operations of the [IRGC] .... It comes on the back of a string of advances into Iran's economy: several weeks ago ... the [IRGC] ... were awarded a 1.3-billion-dollar contract to construct a 900-kilometre (570-mile) pipeline between South Pars and southeastern Iran. In both South Pars cases, the projects were awarded after the usual tendering process was abandoned. For the South Pars development deal, the [IRGC] -- under the name of their economic nerve centre of [KAA] -- entered a partnership with [a] Norwegian firm …, although this firm subsequently pulled out. The oil ministry then moved to open another tender process, but this was cut short. ... For many observers, the wave of lucrative deals going to the [IRGC] is connected to last year's shock presidential election win by hardliner Mahmoud Ahmadinejad -- a veteran of the [IRGC] -- who promised to favour domestic entrepreneurs. ... [IRGC] General Abed [head of KAA] told the centrist Shargh newspaper that there was nothing wrong with the [IRGC] … branching out. 'Since when do the [IRGC] have to stick to building roads, dams, small tunnels or short pipelines?" he argued. "If we take on big projects we can put small entrepreneurs to work.' ... [W]ith foreign investment in the oil sector limited, the Guards appear ready to shift into top gear by filling the gap -- with General Abed also revealing [the IRGC]'s involvement in a new petrochemical port. 'Thirty percent of the [IRGC]'s engineering capacity is dedicated to economic activities, and 70 percent to military,' [IRGC General Abed] said."

c.    *Reuters*, June 29, 2006: "Iran has awarded the Revolutionary Guards corps a contract to develop two phases of [Iran]'s giant South Pars gas field … The two phases were originally awarded to a consortium of international and domestic companies led by Norway's Aker Kvaerner, which quit the deal in May 2005. 'It is a $2.09 billion contract. Phases 15 and 16 will produce 56.6 million cubic meters of natural gas,' state radio said. … Khatam al-Anbia firm, the engineering arm of the [IRGC], will take charge of the onshore work for the two phases. Iran is in dispute with the international community over its nuclear programme and Tehran could face United Nations sanctions, which would make operating there even more difficult for foreign companies. Signing big contracts with foreign firms is politically toxic in Iran, which sits on the world's second largest reserves of natural gas but has been slow to develop it for export. … Earlier this month, the [IRGC] won a $1.3 billion project to build a … pipeline from South Pars to the eastern province of Sistan-Baluchestan, the route for Iran's gas export to Pakistan."

d.    *Economist Intelligence Unit*, July 21, 2006: "The engineering arm of the … IRGC … has made further inroads into the oil and gas sector, having been selected as the main contractor for the development of Phases 15 and 16 of the South Pars gas scheme. Sharg, a local newspaper, quoted General Abdolreza Abed, head of the IRGC's [KAA], as

saying that the order will be worth some US$2bn. The order follows a US$1.3bn contract to build a … pipeline linking South Pars fields to southeastern Iran. … IRGC will be working with local partners on the two South Pars phases, which envisage production of some 1.8bn cu ft/day of natural gas, 1m tonnes/year of liquefied petroleum gas, a similar quantity of ethane and 80,000 barrels/day of condensates. … Much of the work in Iran's oil and gas sector is now being allocated to local firms, because of the difficulty facing foreign companies in concluding financial and commercial terms."

e.    *Economist Intelligence Unit*, August 3, 2006: "Evidence of any direct consequences of the changed political and economic environment on the amount of foreign trade and investment in Iran is hard to come by. The re-awarding of contracts such as those related to the giant South Pars gasfield … [by] the Revolutionary Guards … ha[s] undoubtedly made foreign companies cautious. … [T]here have been reports in the Western press that four European banks, under pressure from the US government, have reduced their presence in Iran (May 2006, Foreign trade and payments) … It is expected that bank charges for doing business in or with Iran will have risen, possibly in response to a perceived increase in the complications of doing trade."

f.    *Economist Intelligence Unit*, August 3, 2006: "Mahmoud Ahmadinejad … appears to be increasingly favouring domestic companies when awarding government contracts, and giving a growing role to those linked to the … IRGC … in particular. In June a US$1.3bn contract for a gas pipeline linking Assalouyeh, Bandar Abbas and Iranshah was awarded to the [KAA]. The pipeline is to supply gas from the South Pars field to Sistan-Baluchestan, Hormuzgan and Kerman, and the contract was signed in the uniformed presence of Major-General Yahya Rahim-Safavi, the IRGC's commander. In June the IRGC also scooped the main exploration contract for phases 15 and 16 of South Pars. The deal was originally made in January 2005 with a consortium of Aker Kvaerner (Norway), Sadra (Iran) and the [IRGC]. It now seems—the news emerged from an interview given by General Abdolreza Abed to Shargh, a reformist daily, before a signing ceremony at South Pars—that the IRGC has edged out Aker Kvaerner. [KAA] will lead a local consortium that includes Saaf Offshore, Isolco (the Iran Shipbuilding and Offshore Industries Company) and IOEC (the Iran Offshore Engineering and Construction Company). Phases 15 and 16 are scheduled to involve the production of 50m cu metres/day of treated gas for domestic use, 1m tonnes/year (t/y) of liquefied petroleum gas for export, 80,000 barrels/day (b/d) of condensates for export and 1m t/y of ethane for domestic petrochemical works. The news prompted fears among local contractors that the government would award other contracts to [KAA]."

g.    *Investor's Business Daily*, November 8, 2006: "Mahmoud Ahmadinejad's terrorist regime needs billions in foreign investment in the coming years to compete with other OPEC countries. That means serious international sanctions can be a powerful weapon. The Islamofascists … have repeatedly made it clear they're … the backers of terrorist outfits like Hezbollah …. Iran may have lots of oil and natural gas in the ground, but if it doesn't get ahold of tens of billions of dollars in outside capital in the years ahead, it won't be able to extract and refine those commodities. … The world has plenty of leverage available: … European and Asian companies run gas and petrochemical plants in South Pars …, the largest natural gas field in the world. Shut all that down, along with

all energy-related exports and imports, and Ahmadinejad and supreme leader Ayatollah Ali Khamenei just might find themselves fighting for survival."

h.   *Washington Times*, August 16, 2007: "The [U.S.] … decision to designate [the] … IRGC [Qods Force] … as a 'specially designated global terrorist' (SDGT) organization strikes a huge blow against one of the world's most deadly jihadist groups. The IRGC, through its longstanding relationship with Hezbollah, has the blood of hundreds of Americans on its hands … Earlier this year, [Dr.] Matthew Levitt … (a former deputy assistant secretary of the treasury specializing in terrorism-finance issues) wrote in *The] Washington Times* that … 'the IRGC's business and industrial activities - especially those connected to the oil and gas industries - are heavily dependent on the international financial system.' In other words, these are precisely the kind of projects where Iranian regime elites are vulnerable to American and international economic pressure. These [IRGC] projects include a contract worth $1.3 billion to build parts of a pipeline and another worth more than $2 billion to develop part of [] South Pars …. [R]ecently, the IRGC - and in particular, a section known as the Quds Force - has been heavily involved in aiding Hezbollah, as well as … Hamas …. At a press conference last month, U.S. military officials in Iraq said that the Quds Force is bringing groups of up to 60 Iraqi insurgents at a time to training facilities near Tehran, where they are taught how to carry out kidnappings and use rockets and improvised explosive devices to kill and maim American troops. American officials also say that the IRGC is responsible for smuggling explosively formed penetrators (EFPs) into Iraq. The EFPs, which can penetrate the armor of a Humvee and are used almost exclusively by Shi'ite militias, accounted for one-third of the combat deaths suffered by coalition forces last month. The 99 strikes that occurred with EFPs in July were the highest total since the war began. Earlier this year, Mr. Khamenei vowed to hit back at U.S. interests worldwide if Iran were attacked. … By hitting the Revolutionary Guards with sanctions, the Bush administration is weakening their capacity to finance more terror, and clearly it hopes to shame the Europeans and the Japanese in cutting their financial ties to these serial killers of Americans."

i.   *Washington Times*, August 16, 2007: "[The] Revolutionary Guard Corps, which faces the prospect of severe U.S. financial sanctions as a 'terrorist organization,' represents a tempting target given its multibillion-dollar commercial empire ranging from oil fields to honeybee farms. … The U.S. terrorist designation would freeze any U.S. assets of the IRGC, but financial analysts say its greater practical effect would be to discourage companies and banks from other nations from working with the corps' various subsidiaries. … the IRGC's financial scope has expanded dramatically with the election of Islamic hard-liner Mahmoud Ahmadinejad as president in 2005. According to a survey by the … International Crisis Group, [KAA] won a string of major contracts from the Ahmadinejad government, including … a $1.3 billion oil pipeline contract, and a no-bid $2.09 billion commission to develop parts of the vast South Pars natural gas field. … U.S. officials say such profits matter because it is IRGC's foreign military arm, known as the Quds Force, that is suspected of providing funds, training and equipment to anti-U.S. forces in Iraq, … Lebanon and the Palestinian territories."

j.   *Christian Science Monitor*, August 6, 2009: "The Bush administration regularly accused the Guards of supplying advanced explosives to insurgents in Iraq … In a rare disclosure,

businesses were put at 30 percent of IRGC 'capacities' in a 2006 interview by Brig. Gen. Abdol-Reza Abed, an IRGC deputy commander and head of Khatam-ol-Anbia, one of its many companies. The IRGC's economic role has clearly increased with projects awarded by Ahmadinejad. Within a year of his taking office, [KAA] won a $1.3 billion contract for a gas pipeline …, and … for developing part of the South Pars gas field."

k.  *Economist Intelligence Unit*, August 19, 2009: "The [Iranian regime] has approved an additional US$1bn investment to be allocated to [KAA], a company owned by the [IRGC], to develop Phases 15 and 16 of the giant South Pars gasfield. … Total said in 2008 that it could not proceed …, in the face of increased costs and the tense international situation over Iran."

l.  Rasool Nafisi (IRGC Scholar and Author), September 18, 2009: "Symbiotic Relationship[:] Upon becoming president, Ahmadinejad wasted no time in awarding the juiciest government contracts to the IRGC. [KAA], the industrial and construction wing of the IRGC, was given no-bid contracts to develop the 15th and 16th phases of the South Pars Gas Field, and to build a … pipeline to Pakistan and India. It was also allowed to take over the Kish Oil Company. These deals turned the already massive [KAA] into one of the largest conglomerates in the Middle East."

m.  *Mehr News Agency*, April 18, 2010: "[A]n all-Iranian consortium will be vested with developing the South Pars … phases 22-24. … The consortium is consisted of [KAA], Industrial Development and Renovation Organization of Iran (IDRO), and some offshore contractors such as Iran Shipbuilding & Offshore Industries Complex Co (ISOICO), Sadaf, Sadra, and Iranian Offshore Engineering and Construction Company … Iran, having the world's second largest gas reserves and third largest oil reserves, is trying to play a more active role in oil and petrochemical transactions in international markets."

n.  *Agence France Presse*, May 28, 2010: "Iran has awarded a business unit of the elite Revolutionary Guards the rights to develop phases 13 and 14 of the giant South Pars gas field, the *Mehr* news agency … Guards unit [KAA] would form a consortium with the Sadra and Khatam al-Ocia companies and the national drilling and national maritime installation companies to undertake the work. He also confirmed reports earlier this week that phases 22, 23 and 24 were to be awarded to [KAA]. … The development of the giant offshore field has been delayed amid a lack of investment in a country faced with severe gas needs of its own and because of difficulties in procuring the technology to develop these fields. [KAA] … is under US and UN sanctions … Global energy majors have come under increased pressure against doing business with Iran as Washington has stepped up efforts to impose new sanctions on [Iran] …."

o.  *Agence France Presse*, June 15, 2010: "Iran … signed contracts worth 21 billion dollars with local firms to develop six gas fields, some of them awarded to the [IRGC], state media reported. The state television website said the 'contracts to develop the South Pars gas fields -- phases 13, 14, 19, 22, 23 and 24 -- were inked with three consortia including [KAA],' the [IRGC's] industrial conglomerate. … Iran previously discussed handing over phases 13 and 14 to Royal Dutch-Shell and Spain's Repsol YPF, but the two giants held off on a final decision as new UN sanctions loomed against Tehran … The [IRGC]

… has been targeted in the fresh UN sanctions … Last month the [IRGC] said it was ready to take over energy projects in Iran if Western firms stayed away ….”

738.    On information and belief, BNPP knew that the Iranian Petrochemical Company's transactions concerned NIOC. Media reports alerted BNPP to the key role that funding from fronts like the Iranian Petrochemical Company played in facilitating NIOC's activities. On April 26, 2010, for example, *IHS Global Insight* reported that IRGC companies were "increasingly being awarded tenders by NIOC and its subsidiaries . . . creating potential significant problems for . . . foreign firms" dealing with NIOC and its subsidiaries "given the specific international sanctions against dealing with Revolutionary Guards affiliates and the U.S. classification of the outfit as a terrorist organisation."

739.    Congressional testimony confirmed the well-known fact that NIOC-related transactions directly enabled IRGC-sponsored terrorist attacks. On November 15, 2011, for example, Mark Dubowitz, president of the Foundation for Defense of Democracies, testified in front of the House Subcommittee on National Security, Homeland Defense, and Foreign Operations. Dubowitz advocated for stronger sanctions against Iran, specifically targeting the IRGC's control of the oil industry. Dubowitz testified that the IRGC was "unquestionably the dominant force throughout Iran's energy sector, including the sale of Iran's oil," and that "the United States should also consider designating Iran's state-owned National Iranian Oil Company (NIOC). NIOC is a party to every Iranian oil transaction. Leveraging its position as a state-owned institution, NIOC operates as the ultimate front company in obscuring the role of the IRGC in the oil trade." Dubowitz further testified that "[t]he Central Bank of Iran, like the National Iranian Oil Company, and other IRGC entities discussed above—are critical links in the IRGC-dominated oil supply chain and key enablers of the IRGC's proliferation activities, terrorist operations and human rights abuses."

740.    NGO public pressure campaigns also alerted BNPP that its NIOC-related transactions enabled IRGC-sponsored terrorist attacks. In November 2011, for example, UANI publicly called on Italian energy company Edison SpA to stop doing business in Iran, and stated that "[t]he IRGC is a known terrorist entity in control of Iran's oil, gas, and petrochemical sectors. . . . The IRGC also 'bankrolls' groups in Iraq and Afghanistan that execute attacks against American and NATO servicemen. . . . By working with NIOC and the IRGC to develop Iran's oil sector, Edison is directly contributing to Iran's capabilities to sponsor terrorism, kill and maim NATO servicemen and develop its weapons of mass destruction programs."

741.    On information and belief, BNPP knew that the Iranian Petrochemical Company's transactions concerned NITC. Media reports alerted BNPP that the IRGC effectively controlled NITC. In 2012, for example, *Reuters* reported that "[s]upporters of tougher Iran sanctions measures are aiming to get NITC on a U.S. blacklist for what they say are links to the Iranian Revolutionary Guards Corps (IRGC)." In 2014, *Iran Briefing* reported that "[t]he IRGC has a major stake in the petrochemical industry, including … the National Iranian Tanker Company."

742.    Terrorism scholars alerted BNPP that the IRGC effectively controlled NITC. In 2012, for example, Mark Dubowitz, of the Foundation for Defense of Democracies, warned that "NITC is a critical element of the IRGC-controlled oil supply chain. Its tankers enjoy free access to global ports around the world despite the IRGC's reputation as an international outlaw."

743.    Congressional hearings alerted BNPP that the IRGC effectively controlled NITC. In 2012, for example, Congresswoman Ileana Ros-Lehtinen and Mark Dubowitz confirmed in an exchange that NITC played a key role in the logistics chain upon which the IRGC relied to sponsor acts of terrorism:

> ROS-LEHTINEN: Now, Iranian tankers [operated by the NITC] have been
> turning off their outboard/onboard vessel tracking system even though the

International Maritime Organization requires that those systems stay on. Can multilateral actions be taken against the National Iranian Tanker Company to penalize Iran for its activities? And what specific role does the National Iranian Tanker Company play within the IRGC supply chain? ...

DUBOWITZ: We -- we've -- there already is existing authority under U.S. law. The president has the power to really crack down on the Iranian economy, on the Iranian oil sector.

We should be designating the National Iranian Oil Company and all its subsidiaries. We should be designating the National Iranian Tanker Company and make it very difficult for the Iranians to ship [oil].

744. Decades of reports by the media, United States, United Nations, NGOs, terrorism scholars, and others confirmed that transactions on behalf of, or for the benefit of, NITC directly enabled IRGC-sponsored acts of terrorism targeting the United States and committed by the Qods Force, Hezbollah, and their proxies.

745. For example, the international news agency *Reuters* consistently warned about such risk since the 1990s, as it did in 1995:

Iran has minimised the impact of a U.S. trade ban by finding alternative markets for its crude oil in Europe, Asia and South America, an Iranian oil source said …

"We have had a general policy of trying to diversify our customers and only a few months after the ban was imposed we have been successful to a large extent in lowering the effects of the embargo," the source told Reuters.

"The National Iranian Oil Company (NIOC) has done its best to seek other markets in countries such as South Asia, Europe and South America. The feedback has been good," said the source …

"We have been successful in selling our crude oil and keeping its price almost intact and competitive. This shows that NIOC has been able to tolerate the situation," the source said.

***Washington accuses Iran of sponsoring international terrorism*** …

The trade ban has pushed Iran … to … resort to the international shipping market.

***The source said the efforts to offset the U.S. trade ban was reflected in the fact that Iran's National Iranian Tanker Co. (NITC) has ordered new tankers … and accelerated chartering activity.***

"[NITC] has ordered new vessels such as double hull tankers and other types of ships. NITC has also been scrapping its old vessels and chartering tankers," the source said. (Emphasis added.)

Other *Reuters* reports similarly warned about NITC's direct enabling of Iranian evasion of U.S. counterterrorism sanctions targeting Iran. *Reuters* even specifically warned that NITC-related transactions in Dubai were designed to evade U.S. counterterrorism sanctions.

746.    Terrorism scholars also alerted BNPP that transactions with NITC foreseeably enabled IRGC-sponsored acts of terrorism. In 2011, for example, Mark Dubowitz warned "IRGC companies that are part of the crude oil supply chain" included "National Iranian Tanker Company (NITC)" such that transactions with such IRGC companies furnished "Iran's oil revenues" and provided "the regime the hard currency it needs to operate" by financing "companies doing business with Islamic Revolutionary Guard Corps (IRGC) entities in the crude oil trade" that directly enabled Iranian efforts "supporting … terrorism."

747.    Public advocacy campaigns also alerted BNPP that transactions with NITC foreseeably enabled IRGC-sponsored acts of terrorism. In 2012, for example, UANI sponsored a public campaign alerting European entities that the IRGC had seized NITC and was using it to sponsor terrorism.

748.    On information and belief, BNPP knew that the Iranian Petrochemical Company's transactions concerned the Caspian. Regular reports of IRGC terrorist activity in the vicinity of, and connected to the IRGC's desire to dominate, the Caspian alerted BNPP that Caspian petroleum-related transactions foreseeably involved the IRGC. On February 10, 2008, for example, the *L.A. Times* reported that the IRGC had been conducting operations in the area near the Caspian as part of the Ayatollah's strategy to dominate the region.

749.    Ayatollah Khamenei specifically, and regularly, touted that Iran was inextricably connected to all things relating to Caspian Sea-related petroleum issues. On May 3, 2001, for

example, Iranian state TV covered a speech by Khamenei, contemporaneously reported upon by

*BBC*, as follows:

> Ayatollah Khamenei, … [said] "[T]he Islamic Republic of Iran will defend its
> rights and the rights of the Iranian nation on every front. … The Caspian Sea is
> a[n] enclosed sea which belongs to its littoral states. No power from anywhere in
> the world has the right to interfere in or exert influence on … the affairs of that
> sea. According to international laws there are five littoral states. The fate of that
> sea lies in the hands of those five countries. And, here and now, I take this
> opportunity to declare that the legal status of the Caspian Sea and the balance
> between the various activities of the five countries in that sea should be
> maintained between those five countries - all the five countries. It cannot be done
> through bilateral contacts and agreements."
> Stressing the importance of realizing Iran's rights in the Caspian Sea in the
> fields of oil and gas, … Khamenei added: "Everybody knows that the Iranian
> nation and the Islamic system do not permit their right be undermined in the
> slightest, whether on land or at sea."

750.    On May 4, 2001, similarly, media outlets reported that Ayatollah Khamenei

repeated this message, and underscored Iran's—and Khamenei's—direct connection to all issues

relating to the development, extraction, and trade of petrochemical products in the

Caspian.BNPP knew that providing illegal atypical banking services to the Iranian Petrochemical

Company (a/k/a Caspian Petrochemical FZE) would directly facilitate terrorist attacks funded,

supplied, and encouraged by the SLO and IRGC, including attacks by Hezbollah, Hamas, PIJ,

and JAM; BNPP knew that its Iranian Petrochemical Company transactions flowed funds to the

SLO and IRGC, and that the SLO and the IRGC used such funds to sponsor attacks by

Hezbollah, Hamas, PIJ, and JAM.

## IV.    BNPP Substantially Assisted the Terrorist Attacks by Hezbollah, Hamas, PIJ, and JAM that Caused Plaintiffs' Injuries

751.    BNPP's historic criminal scheme directly enabled the terrorist attacks by

Hezbollah and its proxies Hamas, PIJ, and JAM that killed and injured Plaintiffs or their loved

ones.  Indeed, the United States essentially confirmed the point when it criminally charged

BNPP. As U.S. Attorney Preet Bharara confirmed in DOJ's press release announcing BNPP's

guilty plea on June 30, 2014, BNPP's misconduct amounted to ***"criminal support of countries and entities engaged in acts of terrorism."*** (Emphasis added.)

752.    As U.S. government officials emphasized on September 24, 2001, and have reiterated since, "[m]oney is the lifeblood of terrorist operations" (President Bush), "[t]errorists require a financial infrastructure" (Secretary of State Powell), and "financial institutions around the world" involved in financing terrorist organizations "provid[e] the resources that make these evil acts [of terrorism] possible" (Treasury Secretary O'Neill).

753.    BNPP's conscious, voluntary, and culpable conduct in processing hundreds of millions of dollars in illegal transactions for the Terrorist Sponsors substantially assisted the attacks committed by Hezbollah, Jaysh al-Mahdi, Hamas, and Palestinian Islamic Jihad in Iraq and Israel that injured Plaintiffs. As set forth below, money is vital to terrorist attacks, and BNPP's illicit financial services provided a litany of potent benefits for the FTOs who received support as a result of BNPP's conduct. BNPP financed attacks by Hezbollah, Jaysh al-Mahdi, Hamas, and PIJ by supplying such terrorist groups with the funds needed to pay for every link in the terrorist attack kill chain: recruiting, training, arming new fighters, securing logistics and communications support, financing martyr payments and disability payments to incentivize terrorism, making post-attack bounty payments to reward attacks that resulted in a dead American, purchasing American hostages taken by other groups, and buying non-public attack-related intelligence on a target.

754.    Every FTO alleged herein shares a common terrorist tradecraft intellectual foundation, based on commonly developed doctrine.[121] This section therefore lays out the

---

[121] In the 1980s, the Iranian regime, including the IRGC, developed a terrorist doctrine in the 1980s that they refined throughout by using Lebanese Hezbollah to develop, beta-test, built-out,

common ways that BNPP substantially assisted the FTOs' attacks. The following sections allege how the FTOs used BNPP's assistance to commit attacks specifically in Iraq and Israel.

755.    From 2017 through 2024, the U.S. government explicitly confirmed that transactions with sanctioned Iran entities like BNPP's financed terrorist attacks committed by Hezbollah, Hamas, PIJ, and JAM from 2006 through 2020.

756.    Official United States sanctions announcements, legislative findings enshrined by Congress in the U.S. code, and Executive Branch reports to Congress under penalty of perjury operated as a one-way ratchet to increase pressure on Iran and the international community, while Iran was subject to comprehensive sanctions. While such U.S. reports can confirm a point, the absence of a report (or a particular finding or designation) is not regarded in the normal custom and practice of counterterrorism practitioners to mean that there is no reason for concern that an entity may sponsor terrorist violence.

**A.    BNPP's Assistance Flowed Through the Khamenei Cell and Enabled Khamenei Cell-Sponsored, Hezbollah-Directed, Attacks by Hezbollah, Jaysh al-Mahdi, Hamas, and PIJ in Israel and Iraq**

---

and then expand to their other allies, new terrorist tactics, techniques and procedures. In the 1990s, the IRGC, Hezbollah, and Sudanese regime sponsored a series of training camps and exchanges that were designed to promote joint-learning, training, and networking between the IRGC, Hezbollah, the Sudanese regime, Hamas, PIJ, and at least several other major FTOs, e.g., al-Qaeda. The Taliban hosted some sessions in Afghanistan, and the Sudanese regime hosted some sessions in Africa; both were coordinated by dual-hatted IRGC/Hezbollah operative Imad Mugniyeh (among others) working with bin Laden and his lieutenants. Accordingly, by 2000, Hezbollah, Hamas, PIJ, al-Qaeda, and the Taliban ordinarily employed common terrorist tactics, techniques, and procedures with respect to core functions such as operations, logistics, finance, and cover and concealment, with such TTP being functionally identical for Hezbollah and the IRGC. Al-Qaeda and Taliban TTP, in turn, were heavily influenced by Hezbollah and IRGC tradecraft (which al-Qaeda and the Taliban literally studied under and trained under), and al-Qaeda's tradecraft supplied the core TTP for al-Qaeda-in-Iraq (which was al-Qaeada's branch there); AQI, in turn, became ISIS in 2014, which continued to employ AQI's TTP. Around that same time, Hezbollah and the IRGC dramatically intensified their support for Houthis, whom they trained under the same TTP. Accordingly, the TTP of every FTO alleged herein, as well as other FTOs that served as TTP role models (e.g., how the IRGC drew lessons learned from ISIS) shares a common intellectual pedigree, training regime, and operations history.

757.    Ayatollah Khamenei, Foundation for the Oppressed, IRGC, Hezbollah, and Supreme Leader's Office—*i.e.*, the Terrorist Sponsors—flowed all or nearly all of the profits that BNPP helped them generate to directly or indirectly sponsor terrorist attacks targeting the United States and its allies in the Middle East that were usually supported by Ayatollah Khamenei's inner circle, funded by the Terrorist Sponsors, and committed, planned, and authorized by Hezbollah.

758.    From 2000 through 2024, Ayatollah Khamenei directly funded, logistically supported, and organized the "**Khamenei Cell**"—a **Joint IRGC/Hezbollah Leadership Cell** that coordinated the deployment of operatives, weapons, logistics, pre-attack intelligence, and associated finances and fronts to keep everything off-books as was the Ayatollah Khamenei's, the SLO's, Qods Force's, and Hezbollah's common tradecraft with respect to their role in attacks intended to intimidate the United States and potentially kill or maim Americans. That attack qualifier mattered because any such contemplated attack posed unique and potentially life- and group-ending consequences that few (if any) other attacks raised. Accordingly, such attacks were the most carefully coordinated, vetted, and planned by Khamenei, the SLO, the Qods Force, and Hezbollah. To that end, the Khamenei Cell operated a shared Hezbollah/IRGC/SLO Leadership Cell with respect to Iranian regime-sponsored terrorist attacks targeting the United States, including U.S. ally Israel, that were committed, planned, or authorized by Hezbollah in the Palestinian territories and Iraq.

759.    Consistent with Khamenei's long-standing preference for outsourcing terrorist attacks to Hezbollah and local proxies like Hamas, PIJ, and JAM, Hezbollah served managed and coordinated of the terrorist attacks sponsored by the Khamenei Cell, for which Hezbollah was ordinarily responsible for the attack itself, either through Hezbollah's own operatives, or

through other Iranian proxies led by Hezbollah, like Hezbollah did in Iraq through Jaysh al-Mahdi, including Kataib Hezbollah.

760.     As set forth below, the Khamenei Cell was the operational outgrowth of Khamenei's decades-long operations-focused inner circle, followed the IRGC's and Hezbollah's long-standing "joint cell" terrorism business model, and included dozens of senior terrorist leaders who served Khamenei through their roles in the Foundation for the Oppressed, Hezbollah, the IRGC, and Supreme Leader's Office.

### 1. Ayatollah Khamenei Directly Sponsored Terrorist Proxy Attacks Targeting the United States in the Middle East

761.     Ayatollah Khamenei was always a notorious, and key, sponsor of attacks by the IRGC, Hezbollah, and Hamas since shortly after the inception of each in 1979, 1982, and 1989, respectively. From the outset of the Islamic Revolution in 1979—and always since—Ali Khamenei has been a notorious IRGC terrorist. After the IRGC was created, Ayatollah Khomeini installed Ali Khamenei to supervise the IRGC. Thereafter, Khamenei was Khomeini's personal representative to the IRGC and associated bodies. From 1979 onward, Khamenei intensely cultivated his relationship with IRGC leaders. Khamenei also seized the spotlight in high-profile events that tightly connected him to the IRGC, like when he—not the Iran's president—announced the start of the Iran-Iraq War.

762.     Ayatollah Khomeini was the IRGC's founder and leader but was never an IRGC "member" who was himself responsible for IRGC-sponsored attacks. In contrast, Ayatollah Khamenei was always a sworn brother of the IRGC, with the rank of Brigadier General, who led IRGC forces during the Iran-Iraq war, before he became leader of the Islamic Revolution and overall commander of the IRGC as the Supreme Leader. As a lifelong IRGC member and supporter, Khamenei, among other things, previously served as Supervisor of the IRGC, as

Ayatollah Khomeini's Representative in the High Security Council, and as an active IRGC commander at the frontlines of the Iran-Iraq War. For example, as *Iran Briefing* reported on September 22, 2014: "Khamenei himself is a former IRGC member. His son Mujtaba is the main link between his office [*i.e.*, the Supreme Leader's Office] and the IRGC, as well as dozens of Khamenei's advisors and [SLO] office staff."

763.    Unsurprisingly given his IRGC pedigree, Khamenei was widely known as a staunch supporter of terrorism. On June 29, 2009, for example, *Newsweek* reported:

> Since his early days immersed in scripture and poetry, [Khamenei] had loved to identify with "the [O]ppressed," and he built his base of support in those institutions—the clergy, the military and the bureaucracy …. Since the war years in the 1980s, he had also forged close relations with the intelligence apparatus, perhaps convincing himself, as many a revolutionary has done, that the best way to prevent oppression is to eliminate enemies. In an article published [in 2008] in *Foreign Affairs*, Iranian dissident Akbar Ganji claimed that at Khamenei's very first meeting with cabinet leaders after taking his post as Supreme Leader in 1989, he put forth a 'theory of terror' that would define his approach to security issues. "The majority of the people in the state are silent," he is supposed to have said. But "a selfless group of individuals can make the state endure by using terror."

764.    At all times, Khamenei was a prominent, and important, direct sponsor of acts of terrorism in his capacity as leader of the Foundation for the Oppressed, Hezbollah, the IRGC, and the SLO. To that end, Khamenei appointed representatives who served in key IRGC divisions and the IRGC's leadership and financed attacks committed or sponsored by the Khamenei Cell or any of its members.

765.    Ayatollah Khamenei was an infamous supporter of Hezbollah, who personally met with—and financially supported—Hezbollah's leadership, including very close, decades-long, direct-access relationship with Hassan Nasrallah. As Hezbollah Secretary General Nasrallah publicly admitted on October 1, 2019 in an on-the-record interview with an IRGC media outlet: the "Leader"—*i.e.*, Khamenei—"focused on the issue of resistance and its

progress. He always insisted that resistance should progress, grow, and ultimately take back occupied lands. Hence, he always diligently encouraged the Resistance to persist on the path it had taken. … Even inside Hezbollah, there were some of our brothers who were inclined to get involved with domestic politics. But the Leader always emphasized the need to give priority to the mission of resistance and Jihadi tasks." Moreover, Khamenei—and his financial resources—played an especially pivotal role sponsoring attacks by Hezbollah and, through Hezbollah.

766.   Ayatollah Khamenei was bonded at the hip with Nasrallah and continually signaled their alliance in fighting America. In 2019, for example, the Defense Intelligence Agency reported a similar observation to Congress, as reflected into SLO-funded mobilization rallies featuring imagery of Khamenei and Nasrallah:



Supporters wave Hizballah flags in front of portraits of Hizballah Secretary General Hassan Nasrallah (left) and Supreme Leader Khamenei (right).

767.   Ayatollah Khamenei always proudly identified as a key, and direct, sponsor of attacks committed by Hamas and PIJ in Israel. On August 4, 2014, for example, IRGC-run *Fars* reported: "A few days ago and following first-time remarks by Supreme Leader of the Islamic Revolution Ayatollah Seyed Ali Khamenei, a large number of … IRGC Commanders underlined the necessity for all Islamic countries to supply weapons and military tools and equipment to the Palestinians to help them defend themselves against the Israeli attacks."

768.    As a member of the IRGC who built its power to insulate his own, and actively

sponsored its terrorist attacks, Ayatollah Khamenei always emphasized the global nature of his

terrorism, and infamously led the "Axis of Resistance." Ayatollah Khamenei was a direct—and

key—financial sponsor of each Axis of Resistance member. As he publicly stated in 2015, "we

will never stop supporting our friends in the region and the people of Palestine, Yemen, Syria,

Iraq, Bahrain, and Lebanon." "Basically," Congressman Duncan observed on May 12, 2016,

Khamenei meant IRGC proxies like "Hezbollah [and] Hamas."

769.    Ayatollah Khamenei was an infamous sponsor of Hezbollah and JAM attacks

targeting the United States in Iraq. For example, the U.S. government has confirmed that

Khamenei used the Friday Prayer Leader Organization that he controlled (through the Supreme

Leader's Office) to incite attacks targeting Americans in Iraq. As State told Congress in 2004:

> Shortly after the fall of Saddam Hussein, individuals with ties to the
> Revolutionary Guard may have attempted to infiltrate southern Iraq …. In a
> Friday Prayers sermon in Tehran in May, Guardian Council member Ayatollah
> Ahmad Jannati publicly encouraged Iraqis to follow the Palestinian model and
> participate in suicide operations against Coalition forces.

770.    Ayatollah Khamenei was an infamous sponsor of Hezbollah, Hamas, and PIJ

attacks targeting the United States in Israel. In June 2015, for example, State reported:

> Although Hamas's ties to Tehran have been strained due to the Syrian civil war,
> in a November 25 speech, Supreme Leader Khamenei highlighted Iran's military
> support to "Palestinian brothers" in Gaza and called for the West Bank to be
> similarly armed. In December, Hamas Deputy Leader Moussa Abu Marzouk
> announced bilateral relations with Iran and Hamas were "back on track."

771.    Ayatollah Khamenei was a notorious supporter of IRGC-sponsored hostage-

taking attacks targeting the United States. Among other things, he infamously personally

interviewed one or more American hostages for Iranian broadcasts in 1980, and later touted that

hostage-taking was a key, and effective, tactic that he could, and would, yield.

772.    Ayatollah Khamenei was famously obsessed with America and viewed the U.S. government as the source of all the Iranian regime's problems. Ayatollah Khamenei was also a notorious micro-manager, especially with respect to attacks targeting the United States.

### 2. Ayatollah Khamenei and his Terrorist Allies used a Joint Cell Approach to Operationalize their Attacks

773.    From the 1980s through 2024, Hezbollah, the IRGC, and the proxies they trained, including Hamas, PIJ, and JAM, relied heavily on a "joint cell" model of terrorist attacks, under which two or more terrorist groups combine one or more of their cells in a certain location, or for a certain competency, to optimize the lethality of their shared attacks.

774.    The widespread prevalence of dual-hatted Hezbollah/Qods Force terrorists further reinforced the centrality of joint cells. In 2005, for example, Dr. Daniel Byman, of Georgetown University, explained:

> Iran's ties are particularly strong to Hizballah's terrorist wing … [C]ertain Lebanese clans that are prominent in Hizballah's terrorist operations, such as the Musawis and the Hamiyehs, work directly with the Iranians as well as affiliating with Hizballah. Similarly, … Imad Mugniyah, Hizballah's terrorist mastermind, reports directly to the Iranians. Such individuals are thus both members of Hizballah and terrorists who report directly to the Iranians. Unlike many senior Hizballah members, some of Iran's favored Hizballah terrorists hold Iranian diplomatic passports.

775.    U.S. government reports to Congress, publications, and studies also confirmed Hezbollah's, the IRGC's, and their proxies' programmatic reliance on the joint cell model of terrorism. Nowhere was this warning more appropriate than with respect to Hezbollah. In January 2019, for example, Colonel Joel D. Rayburn (U.S. Army, ret.) and Colonel Frank K. Sobchak (U.S. Army, ret.), published the official DoD history of the U.S. Army's experiences in Iraq, which observed: "The Qods Force used members of Lebanese Hizballah, the Badr Corps, and, later, Jaysh al-Mahdi to establish Iranian surrogate military cells throughout Iraq that could increase or reduce violent attacks against the coalition on order." On May 9, 2019, for example,

an analysis released by U.S. government-published *Radio Farda* observed that the "Quds Force, led by Qassem Soleimani" served as a "'command' and headquarters for [IRGC] and Shia forces operating throughout the [Middle East] region" and was "[r]esponsible for dozens of terror attacks in the region and beyond." On September 16, 2019, similarly, Marine Corps University published Dr. Mark D. Silinsky's observation that the "Qods Force maintains a joint command-and-control structure with Hezbollah, in which Hezbollah assists the Qods Force in its program to advise, support, and train other Shia militia groups." In February 2023, likewise, State reported to Congress that Hizballah was "responsible for multiple large-scale terrorist attacks, including" throughout the period from 2003 through 2023 when "Hizballah assisted Iraqi Shia militant and terrorist groups in Iraq," during which time Hezbollah notoriously sponsored the "killing" of "American soldiers" there.

776. U.N. Security Council reports confirmed the Iranian Terror Sponsor's emphasis on using joint cells to manage terrorist operations. On July 12, 2016, for example, the Council's Panel of Experts reported that "an Iranian news agency reproduced photographs showing the Commander of the Quds Force . . . Qasem Soleimani in a joint cell's "'Fallujah operations room' in Iraq" in which triple-hatted IRGC, Hezbollah, and JAM (Kataib Hezbollah) terrorist operative "Abu Mahdi al-Muhandis . . . appeared in the same photograph":



General Soleimani in the "Fallujah operations room"

777.    Hezbollah and IRGC terrorists have regularly confirmed their joint cell approach. For example, as State informed Congress in *Country Reports on Terrorism 2014*: In late November 2014, IRGC "General Amir Ali Hajizadeh … admitted that 'The IRGC and Hizballah are a single apparatus jointed together.'" On November 9, 2017, similarly, an IRGC- and SLO-controlled media outlet published an interview with Hezbollah Deputy Secretary General Sheikh Naim Qassem in which Qassem boasted about the combined attack power of Hezbollah's Iranian-backed joint cells, which he credited for terrorizing the United States.

778.    Terrorism scholars also confirmed Hezbollah's, the IRGC's, and their proxies' widespread reliance on a joint cell approach and combined command-and-control. In 2021, for example, Dr. Matthew Levitt confirmed that "Hezbollah's activities in Iraq following the 2003 U.S. invasion were a function of the group's close alliance with Iran in general and the IRGC-QF in particular." In 2018, likewise, Iran scholar Nader Uskowi testified to Congress:

> ***The Quds Force maintains a joint command-and-control structure with Hezbollah.*** The Quds Force commander, General Qasem Soleimani, frequently meets with the Hezbollah's leader, Hassan Nasrallah, and his senior aides. The Quds Force senior officers also participate in Hezbollah's decision-making process at its highest levels regarding all … terrorist operations carried out by the organization, almost certainly as part of Quds Force's larger campaigns. This practice began in the first days of the founding of Hezbollah. (Emphasis added.)

779.    In 2021, similarly, scholar and former Treasury official Dr. Matthew Levitt observed that Hezbollah's and the Qods Force's share tradecraft, and custom and practice, emphasized that the use of joint cells involving, at least, Hezbollah and one other Qods Force proxy (*e.g.*, Hamas or JAM) was vital to such groups' ability to maximize the lethality, and operational tempo, of their attacks targeting the United States.

780.    From at least 2004 through 2024, the IRGC, Hezbollah, Jaysh al-Mahdi (including JAM Special Groups Kataib Hezbollah and AAH), Hamas, and Palestinian Islamic

Jihad all relied upon shared sites in Syria, which served as the Axis of Resistance's regional logistics, recruitment, logistics, and operations hub for attacks targeting the United States in Syria, Iraq, and Israel consistent with Terrorist Sponsors' (and their proxies') borderless approach, including sites run by the Joint Logistics Cell.

781.     Key Axis of Resistance leaders confirmed the key role that joint cell sites in Syria played in Hezbollah-sponsored attacks in Syria, Iraq, and Israel since at least the early 2000s. On February 15, 2017, for example, IRGC-controlled IRIB broadcast an interview with Hezbollah Deputy Secretary-General Naim Qassem featuring the following exchange:

> [IRIB:] Syria, the backbone of Resistance, is now witnessing a global struggle on its soil. How important is Syria for Hezbollah so that Secretary-General Sayyed Hassan Nasrallah himself expressed willingness to fight there if necessary?
>
> [Naim Qassem:] Syria is the only Arab state that still works on to liberate Palestine and exerts all efforts and potentials needed for that end. It hosted the Palestinian leaders and ferried arms to Palestinian as well as Lebanese territories, thus politically backing up the Resistance and acting as an essential partner in the victories achieved in 2006 and 2008. In other words, Syria is the link binding together the Axis of Resistance and the key pillar in defending it. Hence, by fighting alongside the Syrian government, we've been fighting for the Resistance, Lebanon, Palestine, Syria and the entire region. For us, Syria is more than just a country, it's the stronghold which for long hosted the Resistance, provided the logistical, political and strategic support.

782.     Terrorism scholar and former senior U.S. officials confirmed Syria's key status for joint cells comprised of the IRGC, Hezbollah, Kataib Hezbollah, and their proxies, including their use of sites in Syria to help commit attacks targeting the United States in Syria, Iraq, and Israel. Testifying on April 11, 2013, for example, former CIA Director R. James Woolsey explained that "Syria has long been Iran's main portal to the Arab and Sunni worlds, and, most importantly, Tehran's forward base on the Mediterranean," "Iran has used Syria to develop Hezbollah into the threat it constitutes today" and "Syria" was "the primary conduit of logistical support from Iran to Hezbollah." In 2006, per Director Woolsey, "Iran and Syria, announced that

they had signed a joint military agreement to counter 'common threats' from Israel and the US"

and one "manifestation of this close cooperation was the installment of two Iranian-Syrian

signals intelligence listening stations (SIGINT)," which was "funded by" the "IRGC" and

"reportedly active since 2006." Such Iran-Syria cooperation also powered Hezbollah's, Hamas's,

Palestinian Islamic Jihad's, and Kataib Hezbollah's acquisition, maintenance, and resupply of the

weapons they used to attack Plaintiffs in Israel and Iraq, including, but not limited to, the rockets,

missiles, drones, and mortars that such FTOs fired against Plaintiffs.

### 3. The Khamenei Cell Comprised a Khamenei-Led, Hezbollah-Managed, Joint Leadership Cell for Hezbollah, the IRGC, and their Key Proxies in the Middle East

783.   Khamenei's programmatic emphasis on terrorism, fanatical inner circle, and

transnational joint cell approach all supplied the basis for the Khamenei Cell, which was an

expression of—and reliant upon—each of these aspects.

784.   The Khamenei Cell included Hezbollah and/or IRGC operatives based in Iran,

Iraq, and Lebanon, and was remarkably stable, with every member being a senior terrorist who

had sworn allegiance to the Supreme Leader, was a long-standing ally of Khamenei and part of

his "inner circle" or a key lieutenant of such person, and who had directly sponsored successful

attacks targeting the United States in the past.[122]

785.   From 1989 through 2024, the Khamenei Cell was the Hezbollah-managed

operations-arm that supplied the attack-related funding and logistics to attacks that were usually

committed, planned, and authorized by Hezbollah with Khamenei's mission: use Hezbollah and

the Axis proxies to target the United States for terrorist violence. Under the custom and practice

of the Khamenei Cell, Khamenei identified the objective (launch attacks), for which Hezbollah

---

[122] Some Khamenei Cell members were dual-hatted terrorists, meaning they were members of two allied groups, *e.g.*, Abu Mahdi al-Muhandis.

took the lead operationalizing into acts of terrorism that Hezbollah committed, planned, and authorized, and for which Hezbollah and its proxies Kataib Hezbollah, the Houthis, Hamas, and PIJ depended upon the funds, personnel, logistics, and cover provided by the commercial and charitable fronts controlled by the Terrorist Sponsors, including those described herein.

786.    While Ayatollah Khamenei and members of the IRGC played a key organizing role in the Khamenei Cell, Hezbollah ***always*** played the lead role in committing, planning, and authorizing the specific attacks sponsored by the Khamenei Cell. In so doing, the Khamenei Cell was merely a high-level, leadership-oriented, reflection of the Iranian regime's longstanding custom and practice of delegating attack-specific responsibilities to Hezbollah to simultaneously supply the Iranians with plausible deniability (under the fiction that Hezbollah was an independent actor) while also leveraging Hezbollah's unparalleled effectiveness, experience, and resources as a transnational terrorist organization.

787.    The Khamenei Cell functioned, in effect, as the Hezbollah-led terrorist attack network that operationalized Ayatollah Khamenei's and the Supreme Leader's Office's directives to execute on the most complex attacks, which almost always meant high-profile rocket, missile, UAV, bomb, and hostage-taking attacks targeting the United States that were led by Hezbollah and sponsored by the Khamenei Cell and its members. Khamenei and the Supreme Leader's Office directed Hezbollah-led attacks for decades through the personal involvement of Khamenei, the SLO, and senior members of Khamenei's inner circle, *e.g.*, Hassan Nasrallah, Qasem Soleimani, and Mohsen Rezai. From 2017 through 2024, a litany of U.S. sanctions designations (including of the SLO in 2019) and Iranian statements confirmed such fact, and alerted BNPP of the same.

788.    U.S. government-published reports corroborated Plaintiffs' allegations about the Khamenei Cell by documenting the Supreme Leader's Office's key operations-facing role in Iranian regime-sponsored terrorist violence—for which the Khamenei Cell was its Hezbollah-led striking arm. For example, on October 12, 2011, DOD published an analysis of Iran-sponsored terrorist attacks, which confirmed that:

> the [IRGC] answers directly only to Ali al Khamenei, [Iran]'s Supreme Leader. This **direct access to the Supreme Leader and his consistent and considerable support for the IRGC makes the [IRGC] peerless** among military, intelligence, law enforcement, intelligence, and security services in Iran. …
> The IRGC answers only to the Supreme Leader rather than an elected official, a higher military command, or any other political or clerical entity within the government of Iran. The IRGC supports and advocates for the Supreme Leader and Khamenei responds in kind. During the height of the 1997 student riots, twenty-four senior IRGC officers sent a letter to reformist president Mohammad Khatami, issuing an ultimatum that he take action against the protestors, or the IRGC would take matters into their own hands.

789.    Likewise, U.S. government-funded *Radio Farda* reported on April 8, 2019 that the "structure" of "the IRGC" included "important offices in IRGC" that "belong[ed] to the Supreme Leader's [Office's] representative to the corps [*i.e.*, IRGC] (a trusted cleric) and the [IRGC] counter-intelligence office which operates under direct supervision by Khamenei's office," *i.e.*, the SLO. In context, *Radio Farda* was describing the roles that Mojtaba Khamenei and Hossein Taeb played in the Khamenei Cell, the latter of whom did double duty for Ayatollah Khamenei from 2011 through 2022, effectively serving as both head of the IRGC-IO and Khamenei's personal intelligence enforcer throughout.

790.    Terrorism scholars also confirmed that the Supreme Leader's Office played a vital operations-facing role in the terrorist attacks sponsored by the Iranian regime, which the SLO operationalized through Hezbollah-led attacks sponsored by the Khamenei Cell and its members. For example, Dr. Michael Rubin, a Senior Lecturer at the Naval Postgraduate School, publicly

observed on July 23, 2009 that "Iran's … terrorist sponsorship" was "the purview of the Islamic

Revolutionary Guard Corps and the Office of the Supreme Leader." Similarly, an analysis by Dr.

Michael Knights as published in 2023 by the U.S. Army's Combatting Terrorism Center,

confirmed that the SLO played a direct leadership role with respect to the direction and support

that the Iranian regime provided to JAM Special Group Kataib Hezbollah. The SLO played a

similar role with respect to Hezbollah, Hamas, and PIJ.

791.    Those sources, and decades of other reports published by the United States,

Iranian regime, Iranian opposition, mainstream media, terrorism scholars, and NGOs, confirmed

that the Supreme Leader's Office—for which the Khamenei Cell served as the SLO's Hezbollah-

led, in-house terrorist operations arm—sponsored Hezbollah-led attacks by Hamas, PIJ, JAM,

the Houthis, al-Qaeda, and the Taliban. Decades of such reports confirmed that the SLO supplied

vital aid to proxy attacks, including, but not limited to (emphases added):

a.    Ahmad Rezai, Son of IRGC Commander Mohsen Rezai (*Reuters*), July 5, 1998: "Ahmad
      Rezaei, … son of former Revolutionary Guards commander Major-General Mohsen
      Rezaei, told the [*L.A.*] *Times* he fled to the United States so he would be free to talk about
      Iranian-sponsored terrorism …[, including how] ***the Iranian government gave extremist
      groups, such as … Hizbollah, money to purchase weapons, and sometimes it simply
      sent weaponry to the groups …[;] [and] the office of supreme leader Ayatollah Ali
      Khamenei [i.e., the SLO] was responsible for ordering attacks.***"

b.    *New Yorker*, October 2002: "Until [9/11], [Imad] Mugniyah was considered by American
      officials to be the world's most dangerous terrorist, and many terrorism experts still
      believe this to be true. … Mugniyah's operation—known as the external security
      apparatus—is Hezbollah's most lethal weapon. It is commonly believed that Mugniyah is
      behind nearly every major act of terrorism that has been staged by Hezbollah during the
      last two decades. … ***It is believed that Mugniyah takes orders from the office of Iran's
      supreme leader, Ayatollah Khamenei [i.e., the SLO], but that he reports to a man
      named [Qasem] Soleimani,*** the chief of a branch of the [Qods Force]—the arm of the
      [IRGC] responsible for sponsoring terror attacks on Israeli targets."

c.    *BBC*, April 29, 2003: SLO-funding Iraqi radio coverage "***featured protesters chanting
      'No to colonialism, no to occupation' and 'Death to America, death to Israel.'*** … On
      19 April, the [SLO-funded] radio warned that the Iraqi people would teach the 'usurper
      Americans' a lesson; it stated two days later that 'cooperation with the invading forces is
      prohibited and rejected'. The new station frequently leads its news summaries with

positive items on Iran's relationship with Iraq. The lead item in the 18 April bulletin reported *a 'cable of gratitude' from Abd al-Aziz al-Hakim, chief of SCIRI's Jihadist Office, to Iran's Supreme Leader Khamene'i for 'his call to the Iranian people to stand by the Iraqi people and extend assistance to them*.'"

d.   *Investor's Business Daily*, September 23, 2010: "Tehran has trained Shiite Iraqi militants to attack American combat forces [and] supplied Iraqi insurgents with advanced IED technology." The IRGC "have even *partnered with Hezbollah terrorists to kill U.S. soldiers*, as in Karbala, Iraq, in 2007. … The examples of Iranian-guided or financed attacks against the U.S. are legion. The late Lebanese-born [Hezbollah terrorist mastermind] *Imad Mughniyah, for instance, took orders 'from the office of Iran's supreme leader, Ayatollah Khamenei*,' according to Jeffery Goldberg, writing in the *New Yorker* in 2002."

e.   *Israel National News*, December 30, 2011: "Hizbullah … is using American banks … U.S. Attorney Preet Bharara noted, *'It puts into stark relief the nexus … [to] terrorism.'* … The money is allegedly laundered through a complex chain of accounts around the globe using pseudonyms. Millions of dollars are periodically funneled from the accounts of Hizbullah leaders or those of their wives, to those of senior members of the Iranian Revolutionary Guards, the sources said. The money is then *transferred back to Hizbullah from the office of Supreme Leader Ayatollah Ali Khameini*."

f.   National Council of Resistance of Iran, 2018: "The regime's decision-making and executive agencies for terrorist operations[:] *All decisions on terrorist attacks abroad*, particularly those targeting Iranian dissidents, are made at the highest levels of the Iranian regime. *Such sensitive and sophisticated operations require high levels of intelligence, coordination, logistics, and operational skills, as well as the political and diplomatic cover terrorist operatives need.* Here are key decision-making and executive agencies involved for terrorist operations. The Special Affairs Office of the Supreme Leader: Following the death of the regime's former Supreme Leader, Ruhollah Khomeini, Ali Khamenei appointed mullah Ali-Asghar Mirhejazi, then-head of the foreign office of the Foreign Ministry, to establish a *special intelligence and security apparatus called the "Special Affairs Office" to operate out of Khamenei's office. The Special Affairs Office coordinates the regime's intelligence, security and terrorist organs within Khamenei's office.* All terrorist operations are conducted under the supervision of the Special Affairs Office after Khamenei's personal approval."

g.   Hossein Abedini (National Council of Resistance of Iran), August 23, 2019: "The Iranian regime … [has] become more involved in continuing mass killings inside Iran as well as their aggressive foreign policy in different countries. For example, … *supporting … Hezbollah* … The IRGC has to be prescribed as a terrorist organisation … And also, *the supreme leader of the regime, and the office of the supreme leader of the regime, which is the centre of all these terrorist activities*. ... The IRGC is the main force carrying all these terrorist attacks … in the region."

h.   *Voice of America*, November 18, 2019: "Two days of intense fighting [in] Israel … once again highlights Iran's expansionist ambitions in the Middle East, experts say. … Iran has

managed to sponsor both [Hamas and PIJ] at the same time, 'because both groups are committed to Israel's destruction — a goal cherished by … Ayatollah Khamenei and the … IRGC,' said Sam Bazzi, director of the Islamic Counterterrorism Institute ... *'The arrangement in Gaza [for] Hamas and PIJ suits Tehran and fits into the mold it had frequently applied in the region: Iran-friendly governments accountable in front of the international community and secretive striking arms directly controlled by the … Quds Force and the Supreme Leader's Office*,' said Bazzi."

792.    The Khamenei Cell supplied attack cells responsible for operationalizing Khamenei's desired Hezbollah-led attacks with the funds they needed, for which the Khamenei Cell programmatically received a share of, and relied upon, the money that Khamenei Cell members realized through sanctions evasion, commercial front company profits, criminal activities, and donations, including *khums* and *zakat*. Under the terrorists' custom and practice, such funds—including at least 20% of all profits generated by BNPP—flowed directly to the Supreme Leader's Office as *khums*; under Khamenei's and the SLO's custom and practice, once such funds were received, Ayatollah Khamenei and Mojtaba Khamenei usually flowed them to Qasem Soleimani, to whom they the authority to redistribute to Hezbollah and its proxies to facilitate Hezbollah-led attacks consistent with the Terrorist Sponsors' general preference for to put a Hezbollah face on Iran-backed violence. Soleimani, in turn, regularly redistributed such funds—including the BNPP-fueled profits—to Khamenei Cell members, *e.g.*, Hassan Nasrallah, Abu Mahdi al-Muhandis, or Yahya al-Sinwar, to finance attacks.

793.    Senior United States officials have confirmed the gist of this framework and that Soleimani was the primary beneficiary of the illicit profits realized by the Iranian regime through sanctions evasion—profits he programmatically redeployed to sponsor proxy attacks by Hezbollah, Hamas, PIJ, Jaysh al-Mahdi (including Kataib Hezbollah), the Houthis, al-Qaeda, and the Taliban (including its Haqqani Network). On May 21, 2018, for example, Secretary of State Pompeo publicly confirmed (emphasis added):

The JCPOA [Joint Comprehensive Plan of Action] permitted the Iranian regime to use the money from the JCPOA to boost the economic fortunes of a struggling people, but the regime's leaders refused to do so. Instead, the government spent its newfound treasure fueling proxy wars across the Middle East and lining the pockets of the Islamic Revolutionary Guard Corps, Hizballah, Hamas, and the Houthis. Remember: Iran advanced its march across the Middle East during the JCPOA. ***Qasem Soleimani has been playing with house money that has become blood money. Wealth created by the West has fueled his campaigns.*** …

***

[REPORTER]: It's clear through your comments this morning that you truly want tough sanctions. ... [C]an you ***explain for us the sanctions structure and how you intend to target the Iranian regime without hurting our European friends?***

POMPEO: Well, any time sanctions are put in place, countries have to give up economic activity. So the Americans have given up economic activity now for an awfully long time, and ***I'll concede there are American companies who would love to do business with the Islamic Republic of Iran***. There's a huge market there. It's a big, vibrant, wonderful peoples. ***But everyone is going to have to participate in this. Every country is going to have to understand that we cannot continue to create wealth for Qasem Soleimani. Right, that's what this is. At the end of the day, this money has flowed to him. The economics have permitted them to run roughshod across the Middle East. Our effort is to strangle his economic capacity to do harm to the Middle East and to the world***.

794.    The Foundation for the Oppressed was one of the Terrorist Sponsors' key fronts for funding the Khamenei Cell, which was essentially Khamenei's core terrorist leadership and operations inner circle. As Treasury confirmed in 2020, the Foundation was "an economic conglomerate controlled by the Supreme Leader" and "presided over by former … IRGC" leaders, and maintained "subsidiaries in key sectors such as … information technology." Accordingly, as Treasury found in 2020, the "Foundation" was "a source of power, wealth, and influence for the Supreme Leader and his inner circle" that served as "a key patronage network for the Supreme Leader … used by … Khamenei to enrich" the SLO and "reward" his "allies"— which perfectly described Khamenei's inter-related network of inner-circle leadership allies at the IRGC, Hezbollah, Foundation for the Oppressed, and their proxies, *i.e.*, the Khamenei Cell.

795.    Former senior United States officials confirmed that U.S. sanctions targeting the Foundation for the Oppressed recognized that its profits financed attacks sponsored by the Khamenei Cell. On March 3, 2022, for example, Gabriel Noronha, Former Special Advisor for Iran at the State Department, publicly observed: "sanctions on some of the regime's worst terrorists" included "sanctions on Khamenei's personal slush funds known as 'bonyads,' including" "[s]anctions … on Bonyad Mostazafan [Foundation for the Oppressed], a massive conglomerate that" that was "enmeshed with the IRGC and is a corruption network used to enrich top Iranian terrorists." As Mr. Noronha recalled, State's "lawyers were clear when [the United States] released" an Executive Order in 2020 sanctioning entities like the Foundation—"it was a response to actions by Iran & its proxies to …. promote international terrorism" and sponsor "attack[s] against US military assets [and] civilian vehicles."

796.    Financial transactions that benefited the Foundation for the Oppressed directly financed Hezbollah- and Qods Force-sponsored terrorist attacks in which the Khamenei Cell played a key role because that was, always, such Foundation's primary reason for being: to supply the all-purpose transnational operations front controlled directly by the Supreme Leader, IRGC and (by the 1980s) Hezbollah to operationalize Iranian-regime sponsored attacks targeting the United States in the Middle East and worldwide. Indeed, at least two of the Foundation for the Oppressed's formal and informal leaders have publicly admitted that the Foundation funds Hezbollah and the Qods Force: Fattah, who currently (publicly) runs the Bonyad Mostazafan, did so in 2020, and Rafiqdoost did so, at least, in 2014.

797.    A substantial percentage of the Foundation for the Oppressed's profits was earmarked for, and channeled to, Hezbollah and Qods Force operations, logistics, and finance cells that powered Hezbollah-sponsored attacks in Iraq, consistent with operative Iranian regime

rules, customs and practices, and tactics, techniques, and procedures, including the Logistics Policy Directive, mandatory donations (*khums*), and legion of in-house IRGC auditors and accountants.

798.    The Foundation for the Oppressed was purpose-built to finance Iran-backed terrorist proxy attacks, and was developed over time as one of Hezbollah's primary transnational operations, logistics, and finance fronts by providing a global funding, asset, real estate, corporate, and personnel structure that was tailor-made to access U.S. banks, markets, and institutions and purpose-built for to enable terrorist attacks by Hezbollah sponsored by the Qods Force throughout the footprint of both groups' hared, interlocking, complex, global, terrorist enterprise. The Foundation for the Oppressed was designed to provide complete financial, logistical, and operational sustenance and cover to the Qods Force and Hezbollah by supporting the Supreme Leader's inner circle of terrorist supporters (which would eventually become the Khamenei Cell), and Hezbollah's key leaders, logisticians, operatives, and their associated logistics, fundraising, recruitment, weapons procurement, intelligence, and operational (triggermen) cells.

799.    Accordingly, from 1979 through at least 2024, Foundation profits flowed up through the Foundation (including, if necessary, through applicable Hezbollah- or IRGC-operated fronts, agents, and "orbits") to ultimately reach, among others, the Khamenei Cell, and then back down from the Khamenei Cell to Khamenei Cell-backed operations, logistics, finance, and intelligence cells responsible for sponsoring and conducting attacks targeting the United States. Indeed, such an outcome was the entire reason the IRGC seized the Pahlavi Foundation in 1979 and converted its assets into the Foundation. Accordingly, value transfers to the Foundation ultimately flowed through to, and were deployed by, senior terrorists who played key roles in the

attacks in Iraq, including those against Plaintiffs, including, but not limited to: (1) Qasem Soleimani; (2) Hassan Nasrallah; (3) Muqtada al-Sadr; (4) Abu Mahdi al-Muhandis; (5) Qais Khazali and Laith Khazali; (6) Mohsen Rafiqdoost; (7) Mohsen Rezai; (8) Mohammad Forouzandeh; (9) Parviz Fattah; and (10) Esmail Ghani.

800.    IRGC and Hezbollah commercial front profits, *khums*, and *zakat* also financed attacks by the Khamenei Cell. Indeed, the Khamenei Cell and IRGC have notoriously used the IRGC's commercial, off-books, profits to finance Hezbollah-directed attacks sponsored by the Khamenei Cell. On November 24, 2013, for example, Afshon Ostovar warned that the IRGC "support[ed] militant groups abroad," "[t]he IRGC [was] also an economic powerhouse, benefiting from lucrative state contracts … in … telecommunications," which supplied the IRGC with "combined power" that the IRGC used to fulfill its mandate. On February 16, 2017, likewise, the Counter Extremism Project publicly warned: "IRGC-controlled companies [] play[ed] a dominant role in the … banking … and telecommunications sectors in Iran" and which financed the IRGC's efforts "for exporting the ideology of the Islamic Revolution worldwide, done principally through the Quds Force, an IRGC unit that specializes in foreign missions and providing training, funding, and weapons to extremist groups like Hezbollah, Hamas, the Houthis, and Iraqi Shiite militias." In 2019, likewise, CSIS scholar Alex Vatanka warned that "the Guards" were Iran's "largest conglomerate with various ownerships of economic enterprises in such fields as … telecommunication," which powered IRGC activities "[i]n volatile places like Afghanistan or Iraq, [where] it was the Guards and its arm on foreign operations—the Quds Force headed by General Qassem Soleimani—that called the shots."

801.    From 2017 through 2024, the Khamenei Cell and its members operationalized the Terrorist Sponsors' financing of attacks by Hezbollah, the IRGC, Jaysh al-Mahdi, including

Kataib Hezbollah, the Houthis, Hamas, PIJ, al-Qaeda, and/or the Taliban (including its Haqqani Network) in Iraq, Syria, Iran, Lebanon, Israel, Yemen, Afghanistan, Kenya, and the United States, including the attacks against Plaintiffs and their loved ones. Such Khamenei Cell responsibilities including operating as an aggregator (in FATF terrorist finance parlance) by serving as a centralized network that collected, invested and re-invested, stored, laundered, and recycled back to Hezbollah, IRGC, and their Axis proxies' operations cells to enable Khamenei-sponsored, Hezbollah-led, IRGC-supplied attacks targeting the United States in the Middle East.

802.    During this period, the Khamenei Cell had vast financial needs in order to sustain, and intensify, its sponsored attacks targeting the United States by Hezbollah, the IRGC, Jaysh al-Mahdi, including Kataib Hezbollah, the Houthis, Hamas, PIJ, al-Qaeda, and the Taliban. In 2018, for example, State reported to Congress that the Iranian regime spent at least several billion dollars *each year* financing attacks by Axis of Resistance proxies:



Since 2012, Iran has spent over **$16 billion** propping up the Assad regime and supporting its other partners and proxies in Syria, Iraq, and Yemen.

803.    Notably, even that number understated things, because it was limited to the actual dollars the Terrorist Sponsors flowed to proxies like Kataib Hezbollah and Hamas. The Terrorist Sponsors, however, used BNPP's dollars to access to other non-dollar-based sources of finance that were even more potent than money: (1) the IEI-manufactured weapons that BNPP financed, which the Terrorist Sponsors usually gave away to their Axis proxies, for which BNPP's money supplied the inputs and capital needed for such weapons production; and (2) the Foundation for

the Oppressed- and Supreme Leader's Office-sourced "oil-for-weapons, training, and tunnels" barter deals with North Korea's terrorist arm, the RGB, on behalf of Axis proxies like Hezbollah, Kataib Hezbollah, the Houthis, Hamas, and PIJ, among others, which BNPP's profits supplied the funds needed for the Terrorist Sponsors to implement their barter deals, *e.g.*, pay for shipping and port fees.

804.    The Khamenei Cell, and its members, allowed Ayatollah Khamenei to ensure that Khamenei-backed attacks by Hezbollah, the IRGC, Jaysh al-Mahdi (including Kataib Hezbollah, Houthis, Hamas, PIJ, al-Qaeda, and the Taliban (including its Haqqani Network) received the full complement of logistics support such Axis proxy needed from every organ that Khamenei controlled. That mattered because logistics drove lethality: amongst counterterrorism professionals, it is axiomatic that terrorists like Hezbollah, the IRGC, Hamas, and al-Qaeda can *only* inflict a successful violent attack on the United States and its allies if it has robust logistics networks supporting every aspect of its attack. In 2005, for example, Dr. Daniel Byman, of Georgetown University, explained how terrorist attacks required complex logistics:

> A successful terrorist act is often the culmination of months, at times even years, of planning and preparation. For understandable reasons, the world focuses on the man who seizes a hostage or the woman who plants a bomb. These people, however, are often only part of a larger organization. Such operatives are often supported by a vast apparatus of people who are false documents, run safe houses, offer training on explosives and procure surveillance, and take care of the terrorist's family should they die or go to prison. Indeed, the actual attacker may be far more replaceable than the other specialized cogs in the terrorist group's machine. . . . Simply put, it is far harder for the terrorist group to replace logisticians than operatives.

805.    In 2019, likewise, an analysis authored by a U.S. Army officer and published by DOD's Joint Special Operations University observed:

> an individual, group, or state that provides funds, travel documents, training, or other support for terrorist activity is no less important to a terrorist network than the operative who executes the attack. A key lesson learned from 9/11 is that

counterterrorism efforts must target financial and logistical cells with the same vigor as operational cells.

806.    As Khamenei and the Khamenei Cell recognized, and counterterrorism scholars confirmed, logistics were an area where state sponsorship had an outsized impact on the lethality of terrorist attacks. As Dr. Byman explained in 2005: "States can also help a group conduct operations indirectly through logistical assistance" by "fund[ing] front companies or non-government organizations that offer jobs and legitimate documentation for terrorists masquerading as employees."

807.    From 1989 through 2024, Ayatollah Khamenei was a direct sponsor of every member of the Khamenei Cell, including through his decades long, inner-circle, direct-access, personal relationships with the leaders and key leadership cell members of every terrorist organization Khamenei sponsored through any entity he controlled, including the persons identified above.

808.    The Khamenei Cell played a direct role in every attack against Plaintiffs, which typically featured multiple separate touchpoints with the Khamenei Cell.

809.    When Ayatollah Khamenei flowed financial support to members of the Khamenei Cell, he relied upon, *inter alia*, the Foundation for the Oppressed, the IRGC, and the SLO.

810.    BNPP knew about, or was willfully blind, to these copious warnings from the U.S. government, international community, mainstream media, scholars, and others about the role the Khamenei Cell played in targeting Americans in terrorist attacks and supporting proxy terrorist groups, such as Hezbollah, Hamas, PIJ, and the IRGC, in committing terrorist attacks targeting Americans.

811.    BNPP's transactions helped the Khamenei Cell play a key role in the attacks that killed and injured Plaintiffs. From 2000 through 2024, the Khamenei Cell typically captured

about 20% of the income generated through any entity he controlled, such as the Foundation for the Oppressed, SLO, IRGC, and Hezbollah—including the profits caused by BNPP's transactions. Given this standard practice, and the volume of profits generated by BNPP, BNPP's illicit conduct likely delivered well in excess of $20 million per year to the Khamenei Cell from 2006 through 2016, when every Plaintiff was attacked by an Iran-funded Axis of Resistance proxy.

812.    While Hezbollah led the Khamenei Cell's operations-facing aspects (inclusive of such attacks' logistics), other key Khamenei-loyalist terrorists also played key roles supporting its deployment of Hezbollah as the tip of the spear. Most such non-Hezbollah members of the Khamenei Cell were terrorist leaders who swore their oath of allegiance personally to Khamenei as Supreme Leader of the Islamic Revolution; some did not swear such oath but were still personally bonded to Ayatollah Khamenei through their shared relationship with, and support of, Hezbollah and equally shared hatred of the United States. As such, the Khamenei Cell comprised, leadership-level members of Ayatollah Khamenei's inner circles, *inter alia*: (1) Hezbollah itself, upon which Khamenei and the other Khamenei Cell members relied to commit, plan, and authorize the attacks they sponsored; (2) the Foundation for the Oppressed, upon which Khamenei and the other Khamenei Cell members relied as a primary front to finance, logistically sustain, and provide cover for, attacks they sponsored; (3) the IRGC, upon which Khamenei relied upon to support Hezbollah's propagation of attacks sponsored by the Khamenei Cell; (4) the Supreme Leader's Office, upon which Khamenei relied to optimize the coordination between the various Khamenei Cell members and functions necessary to maximize the lethality of the attacks they sponsored; and (5) Hamas, Palestinian Islamic Jihad, and Jaysh al-Mahdi, which

comprised the Khamenei Cell's three longest-tenured, most lethal, and most effective Hezbollah-directed proxies. Below, Plaintiffs identify Khamenei Cell members on a group-by-group basis.

> **a. Hezbollah: Hassan Nasrallah, Imad Mugniyeh, Ali Mussa Daqduq, Muhammad Kawtharani, Yusuf Hashim, Mohammad 'Abd-al-Hadi Farhat, Khalil Harb, and Muhammad Yusuf Ahmad Mansur**

813. The Khamenei Cell was established to sponsor attacks by Hezbollah and, accordingly, senior Hezbollah leadership, finance, logistics, and operations-facing terrorists played an outsized role in the Cell provided, however that such personnel had direct operations experience on their terrorist resume.

814. The Khamenei Cell was fueled by every Hezbollah terrorist's fanatical devotion to Hezbollah's "Leader"—Ayatollah Khamenei. As State confirmed reported to Congress on November 30, 2023: "Hizballah" took "its ideological inspiration from the Iranian Revolution and the teachings of the late Ayatollah Khomeini" and "generally follow[ed] the religious guidance of the Iranian supreme leader, Ali Khamenei." The Khamenei Cell reflected this.

815. The Khamenei Cell also reflected Hezbollah's custom and practice of usually launching attacks targeting the United States only after Ayatollah Khamenei, the Supreme Leader's Office, and/or the IRGC instructed Hezbollah to do so. As Hezbollah scholar Matthew Levitt testified before Congress on October 27, 2011:

> According to former FBI Deputy Director for Counterterrorism Dale Watson, … whose tenure at the FBI spanned twenty-four years and included a stint as the Unit Chief for the Iran- Hezbollah unit at FBI Headquarters, "Hezbollah does not carry out terrorist attacks internationally on its own. It must be sanctioned, it must be ordered, and it must be approved and somebody has to fund it," Watson noted in explaining Iran`s role in [such] attack[s]. According to former CIA officer Bruce Tefft, the [Hezbollah-led] Khobar Towers attack [targeting the United States in Saudi Arabia in 1996] was planned and overseen by Iran`s Islamic Revolutionary Guard Corp (IRGC) and Ministry of Intelligence and Security (MOIS) "acting on the orders of the Supreme Leader of Iran."

816.    Hezbollah's involvement in—and operations leadership of—the Khamenei Cell reflected that Hezbollah's leaders and operations commanders responsible for Iraq, Syria, Israel, Yemen, and Afghanistan comprised Ayatollah Khamenei's most vital Hezbollah ties. As Treasury confirmed on August 22, 2013, for example, "members of Hizballah's leadership"—which included Hassan Nasrallah, Muhammad Kawtharani, Yusuf Hashim, Mohammad 'Abd-al-Hadi Farhat, Khalil Harb, and Muhammad Yusuf Ahmad Mansur from 2017 through 2024—were "responsible for operations throughout the Middle East," "ranging from assisting fighters from Iraq" to "making payments to various factions within Yemen, and to military leaders responsible for terrorist operations" in "Israel, the Palestinian territories, and Iraq." On September 16, 2019, likewise, Marine Corps University published an analysis by Dr. Mark D. Silinsky, which confirmed that "Hezbollah now recruits, trains, and leads other groups of fighters in Syria, Iraq, and Yemen, espousing the same ideology as the Iranian regime and pledging its allegiance to Khomeini"—the essence, and operationalization of, the Khamenei Cell. In September 2022, similarly, the U.S. Office of the Director of National Intelligence confirmed that "Lebanese Hizballah … worked with Iranian officials to provide training and other military support to Shia militants in Iraq, Syria, and Yemen" and "conducted lethal attacks globally."

817.    Hezbollah's involvement in—and operations leadership of—the Khamenei Cell comported with decades of Ayatollah Khamenei, Foundation for the Oppressed, IRGC, Hezbollah, and Supreme Leaders's Office operations-related custom and practice, including such Terrorist Sponsors' programmatic reliance on joint cells for which Hezbollah served as the "managing partner" tasked with operationalizing the specific attacks consistent with broad tactical direction provided by the other Terrorist Sponsors, *e.g.*, "launch rockets against Americans in Iraq." As Hezbollah scholar Matthew Levitt confirmed on July 26, 2021:

Today, Hezbollah acts as the managing partner for Iran's network of militant proxies. And in the wake of Soleimani's death, the group has taken on still more leadership responsibilities. Speaking after Soleimani's death, it was Hezbollah leader Nasrallah who called on Iran's proxies the "Axis of Resistance," as he called them to step up operations to force the U.S. military out of the region. Looking ahead, Iranian proxies may operate in an even more coordinated fashion, with Houthi rockets targeting southern Israel and foreign terrorist operations carried out by Shi'a militants of varying nationalities operating at Iran's behest and Hezbollah's direction.

818.    Hezbollah's central role in the Khamenei Cell was consistent with its central role in the Axis of Resistance. In 2015, for example, a Hezbollah commander publicly boasted, while referencing Hezbollah's Arabic name, *i.e.*, the Party of God, that Hezbollah was leading attacks on the ground in Iraq, Syria, the Palestinian territories, and Yemen:

We shouldn't be called Party of God. We're not a party now, ***we're international. We're in Syria, we're in Palestine, we're in Iraq and we're in Yemen. We are wherever the [O]ppressed need us.*** ... Hezbollah is the school where every freedom-seeking man wants to learn. (Emphasis added.)

819.    The Khamenei Cell was fueled by Hezbollah's, Khamenei's, and the IRGC's identical interests in sponsoring anti-American attacks. As the DIA reported to Congress in 2019:

Shared goals, ongoing personal relationships, and enduring ideological, cultural, and religious ties have contributed to the strength of the partnership [between Ayatollah Khamenei, Hezbollah, and the IRGC]. The IRGC-QF has collaborated closely with Hizballah to grow Iran's influence and capacity throughout the region and beyond, using the group to help train and equip other proxies. Iran has attempted to help temper international perceptions of Hizballah as a terrorist organization and increase Hizballah's legitimate political standing in Lebanon. In recent years, both groups have focused their cooperation on immediate needs in Syria and Iraq. Hizballah, a highly adaptable and malleable organization, has evolved from its insular origins as a sectarian actor in Lebanon into a far more complex regional actor … [through its] involvement in Syria, Iraq, and Yemen.

820.    From 1989 through 2024, such Hezbollah members of the Khamenei Cell committed, planned, and authorized each attack sponsored by the Cell, often jointly committing such attacks with Hezbollah's local proxies in Israel and the Palestinian territories, *e.g.*, Hamas and Palestinian Islamic Jihad, and Iraq, *e.g.*, Jaysh al-Mahdi. From 1989 through 2024,

Hezbollah operatives who served in the Khamenei Cell included, but were not limited to, the Hezbollah operatives identified herein.

821.    **Hassan Nasrallah** was a member of the Khamenei Cell from around 1992 until his death in 2024. Khamenei appointed Nasrallah as Secretary General of Hezbollah in 1992, which title directly acknowledged Khamenei's direct supervisory role over Nasrallah and, by extension, Hezbollah. Throughout, Nasrallah was always one of Hezbollah most senior Khamenei-facing, operations-related, liaisons tasked with Hezbollah's direction of attacks targeting the United States in Iraq, Israel, Syria, Lebanon, Yemen, and elsewhere. For example, as the U.S. Office of the Director of National Intelligence and National Counterterrorism Center confirmed in 2022, "Hassan Nasrallah" was always one of Hezbollah's "KEY LEADERS" and was always a "charismatic leader who" had "overseen all sectors of Hizballah's operations since" when Ayatollah Khamenei named him "Secretary General" of Hezbollah in "1992."

822.    Along with Ayatollah Khamenei, Hassan Nasrallah was the face of the "Resistance" targeting the United States, which status Nasrallah leveraged to source funds and recruits to enable attacks by the Khamenei Cell through the high-profile multi-channel Hezbollah fundraising and recruitment campaigns that he led—which always targeted the Great Satan and the Little Satan. In 2011, for example, Nasrallah publicly stated: "We must not confuse the enemy with the friend. The enemy is the U.S. administration, and Zionist regime is its tool in the Middle East. … [T]he regional resistance movements [including Hezbollah] and deterrent states such [as] Iran … stopped the U.S. government plan for creating a new Middle East." On October 1, 2019, likewise, he publicly declared that "the main problem is the United States."

823.    **Imad Mugniyeh** was a member of the Khamenei Cell from 1989 until his death in 2008. Throughout, Mugniyeh was a dual-hatted member of the IRGC-QF and Hezbollah, who

served as Khamenei's, Hezbollah's, and the IRGC's lead terrorist attack planner from the 1980s through his death in 2008, and was responsible for establishing the joint Hezbollah-local proxy cells in Iraq, *i.e.*, joint Hezbollah-JAM cells, and Gaza, *i.e.*, joint Hezbollah-Hamas and Hezbollah-PIJ cells. Mugniyeh (along with Mohsen Rafiqdoost) masterminded Hezbollah's 1983 attacks targeting the United States in Lebanon, which killed hundreds of Americans. From 2003 through 2008, Mugniyeh was always one of Hezbollah most senior Khamenei-facing, operations-related, liaisons specifically tasked with Hezbollah's sponsorship of attacks targeting the United States in Iraq, Israel, and elsewhere.

824. **Ali Mussa Daqduq** was a member of the Khamenei Cell from, at least, 2003 through 2011, played a key role as Mugniyeh's lieutenant, helped stand up JAM, coordinated Hezbollah's creation, and training, of JAM Special Groups, and led key joint Hezbollah/JAM cells and attacks in Iraq, including attacks against Plaintiffs.

825. **Muhammad Kawtharani** was a member of the Khamenei Cell from, at least, 2007 until 2024. Throughout, Kawtharani was always one of Hezbollah most senior Khamenei-facing, operations-related, liaisons tasked with Hezbollah's sponsorship of attacks targeting the United States in Iraq. Kawtharani worked closely with, and was a Hezbollah liaison for, Khamenei, Nasrallah, Mugniyeh, and Daqduq, among others.

826. **Yusuf Hashim** was a member of the Khamenei Cell from, at least, 2007 until 2024. Throughout, Hashim was always one of Hezbollah most senior Khamenei-facing, operations-related, liaisons specifically tasked with Hezbollah's sponsorship of attacks targeting the United States in Iraq, including EFP, IED, and other complex bomb-related attacks.

827. **Khalil Harb** was a member of the Khamenei Cell from, at least, 2007 until 2024. Throughout, Hashim was always one of Hezbollah most senior Khamenei-facing, operations-

related, liaisons specifically tasked with Hezbollah's sponsorship of attacks targeting the United States in Israel, including, but not limited to, hostage, rocket, and complex attacks.

828.    **Muhammad Yusuf Ahmad Mansur** was a member of the Khamenei Cell from, at least, 2000 until 2024. Throughout, Mansur was always one of Hezbollah most senior Khamenei-facing, operations-related, liaisons specifically tasked with Hezbollah's sponsorship of attacks targeting the United States in Israel, including, but not limited to, hostage, rocket, and complex attacks.

829.    The United States imposed counterterrorism sanctions-based designations on Ali Mussa Daqduq, Muhammad Kawtharani, Yusuf Hashim Khalil Harb, and Muhammad Yusuf Ahmad Mansur following the U.S. government's inter-agency finding that each played a key role helping lead Hezbollah's in-country, and external, direction of Hezbollah's, JAM's, Hamas's, and/or PIJ's attacks targeting the United States in Iraq and/or Israel, including many of the attacks against Plaintiffs. Based upon such findings, Treasury designated Daqduq, Kawtharani, Harb, and Hashim as SDGTs on November 19, 2012, August 22, 2013, August 22, 2013, November 13, 2018, and August 22, 2013, respectively. Hassan Nasrallah and Imad Mugniyeh were already subject to a wall of American counterterrorism sanctions years prior to the U.S. invasion of Iraq, upon findings that Nasrallah and Mugniyeh sponsored lethal terrorist attacks targeting the United States (including U.S. allies) in the 1980s and 1990s; such sanctions included, *inter alia*, U.S. designations, rewards, and INTERPOL red notice arrest warrants. Treasury's above-described designations of Daqduq, Kawtharani, and Hashim further confirmed Nasrallah's and Mugniyeh's key role in the same Iraq attacks and schemes for which the former three were sanctioned.

**b.  Foundation for the Oppressed: Ayatollah Ali Khamenei, Parviz Fattah, and Mohsen Rafiqdoost**

830.    Reflective of the IRGC's and Hezbollah's direct, embedded, role throughout the Foundation for the Oppressed, Ayatollah Khamenei always afforded the Foundation a level of respect comparable to the care he showed in nurturing his relationships with the IRGC and Hezbollah. Unsurprisingly, then, Khamenei loaded up his inner circle with Foundation for the Oppressed members. (Or, just as accurately, Khamenei installed his inner circle members to run the Foundation.) Accordingly, the leadership of the Foundation for the Oppressed always played a key role in the Khamenei Cell. Given Khamenei's emphasis on augmenting Hezbollah attacks through the Foundation's leadership, resources, logistics, and funds, Foundation for the Oppressed operatives played an outsized role in the attacks sponsored by the Khamenei Cell because such terrorists *always* had Hezbollah-facing experience both on the logistics and operations side, *e.g.*, Mohsen Rafiqdoost. From 1989 through 2024, such Foundation for the Oppressed members of the Khamenei Cell—many of whom were also sworn IRGC (including Qods Force) operatives—helped Hezbollah commit, plan, and authorize each attack sponsored by the Cell, often supplying the weapons, funds, and/or intelligence upon which the attack depended, which aid the Foundation ordinarily routed to its proxies through Hezbollah as its interlocutor, trainer, and in-country attack coordinator. The Foundation for the Oppressed did all the foregoing to sponsor attacks that Hezbollah jointly committed alongside Hezbollah's local proxies in Israel and the Palestinian territories, *e.g.*, Hamas and Palestinian Islamic Jihad, and Iraq, *e.g.*, Jaysh al-Mahdi. From 1989 through 2024, Foundation for the Oppressed operatives who served in the Khamenei Cell included, but were not limited to, the Foundation operatives identified herein.

831.    The Foundation for the Oppressed's roles and functions in the Khamenei Cell comported with: (1) Khamenei's, the Foundation's, Hezbollah's, the IRGC's, and the Supreme

Leader's Office's respective long-standing customs and practices relating to Khamenei-sponsored, Hezbollah-led attacks; (2) the Foundation's own published charter to export the revolution by supporting the Terrorist Sponsors' "Resistance Economy" activities; and (3) the Foundation's longstanding dual "terrorist offensive/terrorist fallback" roles as Khamenei's transnational terrorist organization replete with funds, logistics, and locations to be used offensively to export terrorism while the Supreme Leader controlled the government of Iran, and be used defensively (in the eyes of the terrorists) to launch a terrorist campaign from outside Iran if the Supreme Leader were to ever lose control of the government, like the Taliban's 20-year, post-9/11, terrorist campaign to retake Afghanistan.

832.    This context informed how the Foundation for the Oppressed bolstered Hezbollah and the Qods Force throughout the period from 2000 through 2024.  Simply put, Ayatollah Khamenei used Foundation for the Oppressed transfers to Khamenei Cell Hezbollah and Qods Force members as a double win: they sponsored attacks, which was his immediate objective, but they also empowered the specific transnational leadership network upon which Ayatollah Khamanei and/or his likely successor Mojtaba Khamenei (for whom Khamanei notoriously planned), would rely if they ever lost their grip on power.

833.    Ayatollah Khamenei and Mojtaba Khamenei—who played an outsized role in the Foundation via his role as Khamenei's gatekeeper and the Supreme Leader's Office's role in it—therefore *prioritized the payments to Hezbollah and Qods Force members of the Khamenei Cell above every other expenditure*.  For them, nothing was more important because it was the foundation of their survival and succession planning. Accordingly, Ayatollah Khamenei, Mojtaba Khamenei, and the Foundation for the Oppressed they controlled ordinarily spent most of their profits on the specific terrorist-related lanes directed by Hezbollah and IRGC members

of the Khamenei Cell money they raised.  In this context, Ayatollah Khamenei and Mojtaba Khamenei, and the entities and agents at their control, ensured that the Foundation: (1) directly sponsored the Hezbollah-, Qods Force-, and Kataib Hezbollah-side of the attacks; (2) indirectly sponsored the Houthi, Hamas, PIJ, al-Qaeda and Taliban side of the attacks through Hezbollah or the Qods Force, usually the former everywhere but Afghanistan, where the roles were reversed, in effect; and (3) supplied the weapons, logistics, networks, fronts, covers, intelligence, and personnel necessary to enable both sides of the equation in each such attack. Simply put, the Foundation provided a turnkey financial, logistics, and network solution for the Khamanei Cell's (usually) Hezbollah-led attacks.

834.    BNPP also had unparalleled, first-hand, knowledge that the Foundation for the Oppressed was operated by the IRGC, Hezbollah, and the Supreme Leaders's Office as a vital terrorist front because BNPP had a front row seat to when they seized it in the first place. BNPP provided significant financial services to facilitate the development of Irancell and was directly involved in the efforts by the Foundation for the Oppressed, the Supreme Leader's Office, and the IRGC to seize control of Irancell by stripping Turkcell of a telecommunications license and delivering it to MTN Group for "security" reasons, as explained *supra*. According to a February 18, 2004, Reuters report, BNPP "advised Iran on the tender" for the license and viewed it as a "big success." According to Turkcell on a March 1, 2007 earnings call, BNPP collected a "success fee" from both Turkcell and MTN Group, but agreed to pay back the success fee to Turkcell after its ouster. According to a February 27, 2007 Turkcell press release, the success fee received by BNPP was approximately $15.5 million.

835.    When the IRGC, Hezbollah, and Supreme Leader's Office used the Foundation for the Oppressed to seize control of Irancell for the Terrorist Sponsors, BNPP had direct

visibility into every aspect of that sordid affair, including most of all, that it unambiguously confirmed that the Foundation for the Oppressed was a Terrorist Sponsor, not a normal entity.

836. **Ayatollah Ali Khamenei—** alongside the IRGC, Hezbollah, and Supreme Leader's Office—directly controlled the Foundation for the Oppressed as his personal foundation. He exercised such control through his trusted lieutenants, including Qasem Soleimani, Parviz Fattah, Mohsen Rafiqdoost, and Mojtaba Khamenei, among others.

837. **Parviz Fattah** was a member of the Khamenei Cell from, at least, 2007 through 2024. Throughout, Fattah served as an active sponsor of Hezbollah and senior Qods Force commander. From at least 2010 through 2024, Fattah served in a leadership role at the Foundation for the Oppressed as either trustee, board member, or director, as well as a litany of other Supreme Leader Office-owned or controlled organizations.[123] As Iran scholar Behnam Ben Taleblu explained on July 25, 2019 after Ayatollah Khamenei announced his selection of Parvis Fattah to run the Ayatollah's personal terror slush fund, i.e., the Foundation for the Oppressed:

> Supreme Leader Ali Khamenei appointed Parviz Fattah … to lead the Mostazafan Foundation (Bonyad-e Mostazafan), one of the ***main pillars of the Supreme Leader's business empire…. Fattah's employment record reads as a veritable who's who of sanctioned entities.*** These reportedly included: the Islamic Revolutionary Guards Corps (IRGC), the Ministry of Defense, Imam Hussein University, Khatam al-Anbiya Construction Base, and the IRGC Cooperative Foundation (Bonyad Taavon Sepah). … In 2015, Khamenei appointed Fattah to lead … the Imam Khomeini Relief Foundation. (Emphasis added.)

838. Ayatollah Khamenei's appointment of Parviz Fattah to run the Foundation for the Oppressed reflected Fattah's fanatical, and total, devotion to Khamenei as Supreme Leader. Simply put, it demonstrated that Fattah "maxed out" his score when it came to IRGC fanaticism,

---

[123] Some Hezbollah fronts alleged herein were entities for which both the IRGC and SLO extracted substantial value for their shared sponsorship of attacks by Hezbollah, Hamas, PIJ, and JAM, *e.g.*, the Foundation the Oppressed, NIOC, and Petro Nahad.

which informed how Fattah deployed the Foundation's profits fueled by BNPP's illicit schemes.

Simply put, Fattah was a violent terrorist with who could ordinarily devoted most resources over

which he had access to sponsoring terrorist attacks targeting the United States, including the

Foundation's commercial profits. On July 1, 2020, for example, non-partisan think tank the

Middle East Institute reported (emphasis added):

> Parvis Fattah … has been described as a ***"symbol of revolutionary leadership."*** … [T]he 59-year-old has a wealth of practical experience. This includes … heading Khamenei's richly endowed ideological-charitable foundations: the Imam Khomeini Relief Foundation (2015-19) and the Mostazafan Foundation (his current position). But ***underpinning all this experience are his ties to the IRGC. Fattah is a product of the IRGC.*** He began his career as a Guardsman on the frontlines of the Iran-Iraq War (1980-88), but his links extend well beyond the battlefield. …  As an ideological purist, Fattah has rejected the notion that the Islamic Revolution's ideology can or should evolve. There is only one "school of Imam [Khomeini]," in his view, based on ***"devotion to the system, supporting the supreme leader, following the path of the martyrs, and never forgetting Imam [Khomeini]."*** He describes himself as having the ***"culture of the frontline,"*** which itself is a reflection of the core tenets of his beliefs: a militant blend of Shi'a Islamism, hinged on divine submission to the supreme leader and supporting the so-called "downtrodden" (mostazafin) class [i.e., the "Oppressed"]. Fattah has attested to his total faith in Khamenei. ***"We must obey the supreme leader like during the war,"*** he has asserted, recalling how soldiers would ***volunteer to cross minefields for their love of Ayatollah Ruhollah Khomeini. His militaristic obedience to the supreme leader is emblematic of his IRGC DNA*** and is rooted in the Guard's "Alavi [Imam Ali] Doctrine." This doctrine, which calls for ***blind obedience to Khamenei and is at the heart of the IRGC's military strategy***, is based on the belief that the first divinely ordained Shi'a Imam, Ali ibn Abi Talib, was defeated in 657 CE because of the disloyalty of his troops. … ***Fattah … is [] akin to his close friend, the late Qassem Soleimani***, former IRGC Quds Force commander. Like Soleimani, … ***Fattah is, as he has described himself, merely a "soldier of the velayat"*** [Supreme Leader].

839.    Parviz Fattah worked closely with Khamenei Cell Qods Force members Qasem

Soleimani, Rostam Qasemi, and Esmail Qaani, and Abu Mahdi al-Muhandis, and Khamenei Cell

Hezbollah members Hassan Nasrallah, Muhammad Kawtharani, Yusuf Hashim, Mohammad

'Abd-al-Hadi Farhat, and Khalil Harb, among others, to programmatically direct Foundation for

the Oppressed profits—including from the Foundation sources herein—to Hezbollah and the

Qods Force to supply financial and logistical support to attacks, including, but not limited to, to finance martyr payments, salary payments, and weapons/logistics-related payments. Fattah was a notorious subject matter expert in such areas,[124] and he thus played a key role in the Foundation-controlled and -funded charity fronts used to route such payments to Hezbollah and their proxies. In 2023, Afshin Sajedi, of the International Organization to Preserve Human Rights, concluded: "The Mostazafan Foundation played a role in ***assisting the IRGC and the Quds Force in paying salaries and benefits to foreign fighters of various terrorist proxy groups***. Perviz Fattah, the head of Mostazafan Foundation, admitted in a television interview that the foundation occasionally pays the salaries of Quds Force-affiliated forces."[125] (Emphasis added.)

840.    Parviz Fattah was always one of Ayatollah Khamenei's, the Qods Force's, and Hezbollah's top terrorist operative-logistician-leaders—and played the same role for the Khamenei Cell. On September 8, 2005, for example, the *Economist*'s due diligence arm, the *Economist Intelligence Unit*, reported that "Parviz Fattah" was appointed to operate "economic

---

[124] Fattah was infamous as one of the IRGC's top terrorist operative-logistician-leaders. In 2005, for example, the Economist's due diligence arm, the Economist Intelligence Unit, reported that "Parviz Fattah" was appointed to operate "economic portfolios" on behalf of the IRGC and Supreme Leader, which "raised concerns that the process of encroachment by the Revolutionary Guard into economic (as well as political) affairs" was "accelerating" because "Fattah" was "deputy head for technical affairs in the Revolutionary Guard."

[125] Parviz Fattah's admission here did double work as something that both (a) angered other Khamenei Cell members because Fattah was speaking truly, but in contravention of the IRGC's mafia-like omerta; and (b) still dramatically understated the full extent of the Foundation's support for such proxy terrorist salary and martyr payments because it could be deliberately misrepresented by the IRGC in tis rhetorical clean-up exercise after Fattah's comments to suggest that payment of such salaries was unusual for the Foundation. Properly understood, Fattah's comments were about how the Qods Force and Foundation were both already strained because of their enormous salary obligations (for themselves, and most of their proxies, in effect), and in such context, Qassem Soleimani asked the Foundation to provide even more aid to the Terrorist Sponsors by picking up the cost of Afghan fighters recruited by, and fighting for, Hezbollah and the Qods Force in Syria and Iraq, among other places. (True, the particular quote referred to Syria alone, but such Afghan fighters, and the funds supplied by the Foundation, also supported the same activities in Iraq.)

portfolios" on behalf of the IRGC and Supreme Leader, which "raised concerns that the process of encroachment by the Revolutionary Guard into economic (as well as political) affairs" was "accelerating" because "Fattah" was "deputy head for technical affairs in the Revolutionary Guard." More than 15 years later, on October 12, 2020, the *Economist Intelligence Unit* reported that, "[i]n line with the increasing footprint and favourable conditions for the IRGC, its former members and supporters have increased their hold over key political positions" after the "reimposition of US sanctions" in 2017 led to "the subsequent collapse of the economy" and "widespread protests in 2018 and 2019, which were violently suppressed by the IRGC" and, in such context, "Parviz Fattah, who" was "strongly linked to the IRGC and heads the Mostazafan Foundation," *i.e.*, Foundation for the Oppressed, was known to ensure that "the IRGC will benefit to an even greater extent from favourable government contracts to expand its growing economic network" to enable "an IRGC-controlled government" in which "[f]oreign policy will" be "wholly decided by IRGC-affiliated personnel, while domestically, such control will allow the IRGC to crack down on vocal opponents" until the IRGC succeeds its "creeping coup" and a "militarised state" under which the Iranian government's "decision-making will be heavily led by IRGC objectives and interests."

841.    Ayatollah Khamenei's appointment of Parviz Fattah to lead the Foundation for the Oppressed in 2019 confirmed—ineluctably—that Fattah played an indispensable role enabling terrorist attacks sponsored by the Khamenei Cell. On August 2, 2019, for example, non-partisan think tank American Enterprise Institute ("AEI") published an analysis by two Iran scholars, which reported that one "Key Takeaway" was that the "IRGC" was "expanding its economic influence and role in the Iranian regime's effort to mitigate US sanctions," after "Qassem Soleimani restructured his economic arm in Iraq, emphasizing the need to 'neutralize'

sanctions" which came "shortly after Supreme Leader Ayatollah Ali Khamenei appointed IRGC financier and hardline industrialist Parviz Fattah as head of the Foundation of the Oppressed (Bonyad-e Mostazafan)" even though "Treasury" had "sanctioned Fattah in 2010 due to his close ties to the IRGC and its economic network." Accordingly, per AEI, "Fattah's control over this economic giant may mitigate the impact US sanctions have on the IRGC's finances" and the "IRGC may also begin to assert itself as the most central and influential Iranian body in countering sanctions, increasing the economy's reliance on the Guards."

842.    United States sanctions findings confirmed that Parviz Fattah programmatically deployed Foundation for the Oppressed resources, including commercial profits, to sponsor terrorist attacks by Hezbollah, the Qods Force, and their proxies.  On November 18, 2020, Treasury confirmed that "Parviz Fattah's" function while at the Foundation for the Oppressed (aka Bonyad Mostazafan) was always to serve as "**BONYAD MOSTAZAFAN'S BRIDGE TO THE IRGC**" through which the Foundation flowed Hezbollah's, the IRGC's, and their terrorist proxies' salary and martyr payment funds, weapons, and logistics, to "Hizballah" and the "IRGC-QF" as a reflection of his "loyalty to the Supreme Leader" and "ties to senior IRGC-Qods Force" leaders, including "[a]ccording to Fattah, former IRGC-QF commander Qassem Soleimani," whom Fattah publicly admitted (in 2020) had successfully "sought Fattah's assistance to finance the Fatemiyoun Brigade, an IRGC-QF-led militia composed of Afghan" nationals who helped Hezbollah and the Qods Force commit terrorist attacks targeting the United States in Syria (among other places) while operating under the Qods Force's banner as spart of

the IRGC's "Fatemiyoun Brigade," which "like the IRGC-QF itself," was "designated" by the United States "pursuant to" U.S. "counterterrorism … authorities."[126]

843.    Parviz Fattah has publicly admitted that the IRGC routed money from the Foundation for the Oppressed and the IRGC Cooperative Foundation to Qasem Soleimani to pay the salaries of tens of thousands of IRGC proxy terrorist fighters whom the IRGC recruited from throughout the Middle East and whom the IRGC attached (as part of a joint cell) to Hezbollah, Qods Force, and Kataib Hezbollah cells that actively sought to commit acts of terrorism targeting the United States in places like Iraq, Syria, Israel, Yemen, and Afghanistan. For example, during a nationally televised on-camera interview on IRIB in February 2020 that was featured in an IRGC propaganda broadcast commemorating Qasem Soleimani's "martyrdom" by the United States one month prior, Fattah admitted that both Foundations funded the salaries of tens of thousands of IRGC Afghan Fatemiyoun terrorists, whom the IRGC recruited from the ranks of impoverished Shi'a Afghan children at refugee camps in Iran.

844.    Fattah's admission was widely viewed in real time via IRIB's simulcasts in Iran and in dozens of countries worldwide, quickly went "viral" on social media throughout the Iran- and terrorism-facing world, and was reported in real-time by media outlets and NGOs, included, but was not limited to: IRGC media arm *Shargh*—which confirmed the gist of Fattah's admission by criticizing him for, in effect, breaking the IRGC's mafia code of silence—on April

---

[126] Treasury's network diagram accompanying its November 18, 2020 designation of the Foundation for the Oppressed confirmed the Foundation's direct operational connections to multiple core mechanisms through which the Terrorist Sponsors funded martyr payments when they were not doing so directly through the Foundation, including, but not limited to, the Martyr's Foundation, which also funded many such payments to Hezbollah, the Qods Force, and their Axis proxies.

5, 2020; U.S. government-published *Radio Farda* on April 5, 2020; *Al Arabiya* on April 6, 2020; and the International Organization to Preserve Human Rights in 2023.

845.    Properly understood, Parvis Fattah communicated two separate admissions in his February 2020 interview. *First*, while preening to his IRGC base (Fattah was a politically active terrorist), Fattah admitted that **both** Foundations with which Fattah was associated, *i.e.*, the Foundation for the Oppressed and the IRGC Cooperative Foundation, on his watch, directly financed terrorists deployed by Qasem Soleimani to propagate IRGC-sponsored acts of terrorism in the Middle East that Fattah knew targeted the United States, and Fattah admitted that both Foundations, on Fattah's watch, were making vast financial contributions to the Qods Force's terrorist operations consistent with the Foundation's mission of helping the IRGC "export the revolution," *i.e.*, the Foundations' provision of funds to the Qods Force so that the latter could pay the salaries of tens of thousands of IRGC-controlled terrorists who were operations-oriented (i.e., attack oriented) and deployed throughout the Middle East.

846.    *Second*, and more subtly to laypeople—but not Fattah's intended IRGC audience in Iran and U.S. government audience in America and the Middle East—Fattah admitted that his commitment to funding IRGC terrorism was even more zealous than normal IRGC practice called for, essentially saying that he went above and beyond what was called for.  That was for a simple reason: under the IRGC's decades-long approach, the IRGC was notorious for typically funding the Qods Force and Qods Force-proxies like Lebanese Hezbollah and Ka'taib Hezbollah through transactions that involved (but were not necessarily limited to) the Foundation for the Oppressed, whose primary purpose and reason for being was to serve as the IRGC's purpose-built transnational terrorist finance, logistics, operations, and intelligence front for financing Qods Force-sponsored acts of terrorism targeting the U.S. around the world.  While the IRGC

331

Cooperative Foundation also funded the Qods Force and Hezbollah, that was a secondary purpose: while the primary purpose of the Foundation for the Oppressed was to fund the Qods Force and Hezbollah, the primary purpose of the IRGC Cooperative Foundation was to fund Regular IRGC, including its weapons development programs that benefited Regular IRGC, Qods Force, and IRGC proxies alike. This distinction matters because Fattah effectively admitted that the Foundations spent all or nearly all their profits to enable Hezbollah-led, Qods Force-sponsored acts of terrorism. That was because the point of Fattah's story was that Soleimani was running low on funds from the Qods Force's Foundation (*i.e.*, the Foundation for the Oppressed) so Fattah stepped up to help Soleimani secure funds for the Qods Force from Regular IRGC's terrorist-slush-fund Foundation, *i.e.*, the IRGC Cooperative Foundation, rather than the Qods Force's terrorist-slush-fund Foundation, *i.e.*, the Foundation for the Oppressed.

847.    Parviz Fattah was always a key sponsor of Hezbollah attacks throughout the Middle East, for which he supplied key funds, recruits, logistical aid, and intelligence support. Terrorism scholars confirmed the point. In August 2021, for example, Dr. Saeid Golkar confirmed that Parviz Fattah sat at the nexus of Hezbollah's, the IRGC's, and such FTOs' proxies' salaries, martyr payments, and logistical aid since the 2000s:

> The IRGC's economic activities … includes the plethora of bonyads that are affiliated with the IRGC, from the directly controlled Bonyad-e Taavon-e Sepah to those with indirect ties to the Guard, such as the Martyrs Foundation, which provides ***financial support to the families of those killed in military operations***. IRGC ranks connected with this vertex are mostly interested in Iran's economic issues and the Guard's interventions in domestic and overseas economic activities. … Parviz Fattah, director of the Foundation for the Oppressed and the Disabled (Bonyad-e Mostazafan), [is a] good representative[] of this group … [which] focused ***primarily on the IRGC's economic expansion in the countries of the so-called resistance axis of Iraq, Lebanon and Syria***. (Emphasis added.)

848.    From 2017 through 2024, Fattah always played a senior leadership role at the Foundation as its Trustee, President, and lead of its religious charities that were notorious

Foundation fronts for Hezbollah and the Qods Force, and served to help supply the funds that paid both FTO's salary and martyr payments. When Fattah directed Foundation resources to Hezbollah and Qods Force attacks in the Middle East as described above, Fattah ordinarily did so because of Khamenei Cell-sponsored, (usually) Hezbollah-led, operations for which Fattah coordinated with inter alia, the above-described Khamenei Cell members.

849.    The United States repeatedly sanctioned Parviz Fattah, each time finding that transactions involving Fattah foreseeably enabled IRGC violence. On December 21, 2010, the U.S. designated Fattah under IRGC-related sanctions for Fattah's direct involvement in the IRGC's ballistic missile- and unmanned-aerial-vehicle ("UAV")-related acquisition and sales efforts, which the U.S. government determined foreseeably enabled IRGC-sponsored violence involving such weapons. On November 17, 2017, Treasury designated "Parviz Fattah" as an SDGT "pursuant to the global terrorism Executive Order 13224" based upon the finding that Fattah had been "providing support to the IRGC-Qods Force, which previously had been designated for its support to various terrorist groups" that served as the IRGC's proxies. On November 18, 2020, the U.S. government updated its prior designations of Fattah to include his relationship with the Foundation for the Oppressed after Fattah had been elevated (on paper) to leader of the Foundation (throughout, he effectively shared such role with Mohsen Rafiqdoost). Reporting Parviz Fattah's 2020 designation on November 18, 2020, *Reuters* explained that "Fattah" was "among those blacklisted" by the United States on from 2017 through 2020 when the U.S. government "restored harsh economic sanctions designed to force Tehran" to "curb[]" the IRGC's "development of ballistic missiles and [IRGC] support for regional proxy forces." In the same article, *Reuters* reported that, in response to Treasury's announcement of new U.S. counterterrorism sanctions targeting the Foundation for the Oppressed in 2020, the "head of the

blacklisted foundation, Parviz Fattah, tweeted: 'The struggle of the declining U.S. government cannot impact the foundation's anti-sanction activities and its productivity.'"

850.    **Mohsen Rafiqdoost** was a member of the Khamenei Cell from 1989 through 2024. Rafiqdoost was the former personal bodyguard and driver of Khomeini; presided over the largest *bazaari* network in Iran, Iraq, Lebanon, and Syria; founded the IRGC in 1979; co-founded Hezbollah in 1982; masterminded (alongside Imad Mugniyeh) Hezbollah's 1983 attacks targeting the United States in Lebanon, which killed hundreds of Americans; and served as de-facto leader of the Foundation for the Oppressed from 1989 through 2024.

851.    Regardless of title, Mohsen Rafiqdoost always served as one of Khamenei's key inner circle operatives responsible for securing weapons for Hezbollah, the IRGC, Hamas, Palestinian Islamic Jihad, and Jaysh al-Mahdi, which included acquisitions secured through Iranian arms, training, and tunnel purchases supplied by North Korea's terrorist arm, the RGB *and* via Iranian-developed weapons built by firms controlled by the Foundation for the Oppressed, IRGC, and Supreme Leader's Office. For both lanes of Hezbollah, Hamas, PIJ, and JAM weapons acquisition, Rafiqdoost sat at the intersection of both relationships (*i.e.*, he knew the key players in North Korea, Lebanon, Iraq, and the Palestinian territories), transportation (*i.e.*, he knew how to move weapons from North Korea to places like the Palestinian territories), and logistics (*i.e.*, he knew how to distribute such weapons in a methodical way once they were in-country in order to maximize the killing power that the terrorists could extract from their use of the weapons he helped supply).

### c.  IRGC: Qasem Soleimani, Esmail Qaani, Rostam Qasemi, Mohammad Ali Jafari, and Hossein Taeb

852.    The Khamenei Cell featured a cross-section of senior IRGC terrorists with demonstrated loyalty to Khamenei, especially who were known to sponsor Hezbollah. Given

Khamenei's emphasis on augmenting Hezbollah attacks through the Qods Force's resources, senior IRGC-QF leadership, logistics, finance, and operations-facing terrorists played an outsized role in the Cell provided, however that such personnel had direct operations experience on their terrorist resume, *i.e.*, they needed to have been involved in violence in the past. From 1989 through 2024, such Qods Force members of the Khamenei Cell helped Hezbollah commit, plan, and authorize each attack sponsored by the Cell, often supplying the weapons, funds, and/or intelligence upon which the attack depended, which aid the Qods Force ordinarily routed to its proxies through Hezbollah as its interlocutor, trainer, and in-country attack coordinator. The Qods Force did all the foregoing to sponsor attacks that Hezbollah jointly committed alongside Hezbollah's local proxies in Israel and the Palestinian territories, *e.g.*, Hamas and Palestinian Islamic Jihad, and Iraq, *e.g.*, Jaysh al-Mahdi. From 1989 through 2024, Qods Force operatives who served in the Khamenei Cell included, but were not limited to, the Qods Force operatives identified herein.

853.     **Qasem Soleimani** was a member of the Khamenei Cell from 1989 until his death in 2020. In or about 1989, Khamenei appointed Soleimani to a senior role in the newly created Qods Force, which the Iranian regime established to replace the Office of Liberation Movements as the IRGC's primary external operations, Hezbollah-support, arm. In 1997, Khamenei named Soleimani the Commander of the IRGC Qods Force, which status endured through Soleimani's death in 2020. In 1997, Soleimani was appointed the Commander (*i.e.*, the leader) of the Qods Force (subordinate only to the Ayatollah), which role Soleimani served continuously until his death in a U.S. counterterrorism strike in Baghdad on January 3, 2020.

854.     Qasem Soleimani was a hands-on micromanager, famous for his constant travels to, and coordination of, attacks by Hezbollah and, through Hezbollah, Hamas, Palestinian

Islamic Jihad, and Jaysh al-Mahdi. As senior State official Brian Hook observed on April 8, 2019, "Qasem Soleimani said in March 2009, 'The battlefield is mankind's lost paradise.'" From 2006 through 2016, when every Plaintiff or their loved one was attacked in Iraq and Israel, Qasem Soleimani played a vital role coordinating Iranian support to such attacks as routed through Hezbollah and his long-time Hezbollah allies, many of whom were members of the Khamenei Cell. For example, as *Arab Press Service* reported on July 17, 2017, with respect to the "advisory roles" that were "being assumed by specialists from" the "IRGC's external arms - the Quds Force (QF) of Maj-Gen Qassem Suleimani and Lebanon's Hizbullah" in "Iraq, Lebanon, Syria and Yemen where they pose[d] as 'advisers'" and, in Soleimani's own words, such IRGC-QF and Hezbollah operatives' roles in these countries was to serve as, per Soleimani, "the Iranian counterpart to the [U.S.] Central Command which [sic] is in charge of the Greater Middle East [] and the Horn of Africa." Likewise, as the Defense Intelligence Agency reported to Congress on September 9, 2018:

> As commander of the IRGC-QF, IRGC Major General Qasem Soleimani is a key architect and chief executor of Iran's foreign policy in … Afghanistan, Iraq, the Levant [*i.e.*, Lebanon, Jordan, Syria, and the Palestinian territories], and Yemen. He is one of the most recognized and popular military leaders in Iran and wields significant influence in Iranian foreign policy decisionmaking. His close relationship with Khamenei allows him to often directly advise and receive orders outside the traditional chain of command.

855.    From 2007 through 2020, Qasem Soleimani served as the ultimate decider of how, and where, the Khamenei Cell would deploy its resources to sponsor attacks led by Hezbollah. Simply put, Qasem Soleimani effectively controlled all or nearly all the profits generated by the Khamenei Cell from 2007 until his death in 2020, and the Terrorists Sponsors' custom and practice meant that they programmatically managed such profits to ensure they ultimately flowed to Qasem Soleimani to spend on terrorist attacks by Hezbollah, the IRGC

(including the Qods Force and IRGC Intelligence Organization), Jaysh al-Mahdi (including Kataib Hezbollah), the Houthis, Hamas, PIJ, al-Qaeda, and the Taliban (including its Haqqani Network). As Secretary of State Pompeo confirmed in his public warning on May 21, 2018 when he announced the full re-imposition of sanctions under the U.S. government's "Maximum Pressure" campaign, Qasem Soleiman ultimately controlled all or nearly all the profits generated by "companies" that did "business with the Islamic Republic of Iran" in violation of U.S. sanctions because the Terrorist Sponsors' roles, customs and practices, networks, and structures ensured that,"[a]t the end of the day, this money has flowed to him," *i.e.*, Soleimani.

856.    Qasem Soleimani was always a key supporter of the Terrorist Sponsor's programmatic emphasis on martyrdom and martyr payments, which Soleimani viewed (correctly) as the most important doctrinal and operational item to maximize the potency and lethality of IRGC attacks. Per Dr. Silinsky's analysis published by Marine Corps University in 2019: "By his own account, Soleimani yearns for martyrdom: 'In light of the prestige earned by the martyrs, I pray to God for my own end to be martyrdom as well, and that He will not deny me this mighty blessing granted to outstanding individuals.'"

857.    Qasem Soleimani famously published a statement, which he caused to be transmitted through intermediaries to General Davis Petraeus, that admitted (emphasis added):

> ***I, Qassem Soleimani, control the policy for Iran with respect to Iraq, Lebanon, Gaza, and Afghanistan.*** And indeed, the ambassador in Baghdad is a Qods Force member. The individual who's going to replace him is a Qods Force member.

Thereafter, Soleimani's 2008 admission to General Petraeus was widely reported upon, and republished, by governmental and media outlets in the U.S., Europe, and the Middle East, as well as by General Petraeus and the IRGC.

858.    Soleimani was always a key sponsor of Hezbollah attacks worldwide, for which he supplied key funds, recruits, logistics, and intelligence support. Indeed, Soleimani admitted it in his infamous letter to General Petraeus. A litany of other reports during that period also confirmed the point. On April 17, 2018, for example, Iran scholar Nader Uskowi testified before Congress that "Quds Force commander, General Qasem Soleimani, frequently meets with the Hezbollah's leader, Hassan Nasrallah, and his senior aides"—*i.e.*, the other Hezbollah members of the Khamenei Cell—and ensured that "Quds Force senior officers also participate[d] in Hezbollah's decision-making process at its highest levels regarding all … terrorist operations carried out by" Hezbollah "as part of Quds Force's larger campaigns," which was pursuant to the Terrorist Sponsors' decades-long "practice" that "began in the first days of the founding of Hezbollah" of executing Khamenei- and IRGC-sponsored attacks through a "joint command-and-control structure" operated by the "Qods Force" and "Hezbollah." Testifying before Congress on June 8, 2017, Dr. Mara Karlin explained that "Qassem Soleimani is the decider now of Hizballah's future not Hassan Nasrallah" such that it "is now clear that Soleimani says jump and Hizballah asks how high" and, accordingly, "Iran is willing to fight to the last Hizballah member" and "it appears Hizballah is, too."

859.    Qasem Soleimani was always a key sponsor of attacks by Hezbollah and the Houthis in Yemen, for which he supplied key funds, recruits, logistics, and intelligence support. Among other ways, Soleimani organized meetings in Iran, Lebanon, Syria, and Yemen, in which IRGC, Hezbollah, and Houthi fighters or supporters coordinated their sponsorship of Houthi attacks to optimize the Houthis' efficiency (more attacks working), lethality (when attacks work, more killings), and operations tempo (more attacks at a quicker clip). As *Arab Weekly* would reported on January 15, 2020, after "the Houthis claimed responsibility for a drone and cruise

missile attack on a large Saudi Aramco facility" in September 2019, incredulous "Saudi and US officials dismissed the [Houthi] rebels' claim and blamed Iran." Moreover, per *Arab Weekly*, a "few hours following the attack on Aramco's oil facilities, [Qasem] Soleimani posted a video" to his then-widely-followed social media channels "using religious imagery to praise the Houthis as part of Iran's 'expanding' network of followers." On January 15, 2020, likewise, terrorism scholar Dr. Matthew Levitt explained to U.S.-published *Voice of America* that Qasem "Soleimani had his touch on each specific proxy group"—including the "Houthis" "—and built a network of support for the Houthis that would outlast him. Further, *Arab Weekly* reported on January 15, 2020:

> A March 2017 report by *Thomson Reuters* quoted a senior Iranian official saying Soleimani had met with top [IRGC] officials the previous month in Tehran to find ways to "empower" the Houthis. "At this meeting, they agreed to increase the amount of help, through training, arms and financial support," the official said. "Yemen is where the real proxy war is going on and winning the battle in Yemen will help define the balance of power in the Middle East."

860.    Qasem Soleimani was always a key sponsor of attacks by al-Qaeda, al-Qaeda branches, and al-Qaeda bonded allies like the Taliban, for which he supplied key funds, recruits, logistics, and intelligence support. Indeed, Soleimani admitted his vital role propagating attacks in Afghanistan in his infamous letter to General Petraeus.

861.    Qasem Soleimani was a U.S.-listed Specially Designated Global Terrorists from October 17, 2011 until his death in 2020. He was also a U.N.-sanctioned proliferator who violated embargoes meant to stop the "IRGC" from enabling "violence" from weapons like "missiles" from March 24, 2007 until his death in 2020. For example, when the U.N. Security Council designated "Qasem Soleimani (Commander of Qods force)" in 2007, it did so upon finding that his conduct was "clearly a grave threat" to civilians in "a region that had known too much … violence" by enabling IRGC "development of sensitive technologies" like "missiles or

missile systems" and "unmanned aerial vehicles (UAVs))," which the "IRGC" had "boasted of using" as "part of its asymmetric warfare doctrine."

862.    **Esmail Qaani** was a member of the Khamenei Cell from 1998 through 2024. From 1998 through 2020, Ghaani served as Deputy Commander of the Qods Force, second only to Soleimani himself. After Soleimani's death in 2020, Khamenei named Ghaani as Khamenei's successor, which role he continued to serve through 2024. Throughout, the United States treated Qaani and Soleimani similarly, including with respect to sanctions.

863.    After Qasem Soleimani's death in 2020, Esmail Qaani assumed Khamenei's roles Qods Force Commander and associated lanes of responsibility in the Khamenei Cell. In the post-Soleimani era, Qaani used his control of, involvement in, and profits from, commercial transactions involving the IRGC fronts with which he was associated to facilitate Khamenei Cell-sponsored, Hezbollah-led, terrorist attacks by providing funds, logistical support, and intelligence supporting such attacks, including IRGC and IRGC proxy attacks involving rockets, missiles, bombs, UAVs, and/or hostage-taking attacks targeting perceived U.S. government-backed, enemies of the IRGC residing in Iraqi Kurdistan and Iran, including Plaintiffs. When Qaani assumed Soleimani's role after the U.S. strike on January 3, 2020, Khamenei and Qaani both publicly affirmed that Qaani's strategy and tactics would mirror those of Soleimani.

864.    Esmail Qaani was always a key sponsor of attacks by Hezbollah worldwide, for which he supplied key funds, recruits, logistical aid, and intelligence support. After he took over for Soleimani in 2020, Qaani performed the same general functions as Soleimani had done with respect to Hezbollah's global attacks.

865.    Esmail Qaani was always a key sponsor of attacks by Hezbollah and Jaysh al-Mahdi, including Kataib Hezbollah, in Iraq and Syria, for which he supplied key funds, recruits,

logistics, and intelligence support. After he took over for Soleimani in 2020, Qaani performed

the same general functions as Soleimani had done with respect to Hezbollah's and JAM's

(including Kataib Hezbollah's) attacks in Iraq and Syria.

866.     Esmail Qaani was always a key sponsor of attacks by Hezbollah and the Houthis

in Yemen, for which he supplied key funds, recruits, logistics, and intelligence support. After he

took over for Soleimani in 2020, Qaani performed the same general functions as Soleimani had

done with respect to Hezbollah's and the Houthis' attacks in Yemen.

867.     Esmail Qaani was always a key sponsor of attacks by al-Qaeda, al-Qaeda

branches, and al-Qaeda bonded allies like the Taliban, for which he supplied key funds, recruits,

logistics, and intelligence support. Qaani had extensive, decades-long, Afghanistan-specific

experience. Accordingly, Qaani's Afghanistan facing role was always dominant both before and

after Soleimani's death in 2020.

868.     The United States sanctioned Esmail Qaani as a "Specially Designated Global

Terrorist" on April 3, 2012 upon finding him responsible for supervising financial disbursements

and weapons shipments to Hezbollah and Qods Force operations cells throughout the Middle

East (including Iraq, Israel, and Lebanon) and Africa (including Gambia); he remains so today.

869.     **Rostam Qasemi** was a member of the Khamenei Cell from, at least, 2007 through

his death in 2022. Throughout, Qasem served as an active sponsor of Hezbollah and member of

the IRGC Qods Force with the rank of Deputy Commander, and the specific lane of helping

coordinate sanctions evasion with Hezbollah to support Hezbollah attacks. In such capacity,

Qasemi served as Minister of Oil and/or de facto leader of Qods Force and Hezbollah petroleum

smuggling from 2011 through 2020, which were designed to, and did in fact, directly enable

terrorist attacks by Hezbollah throughout the Middle East, including Iraq and Israel.  On

September 4, 2019, Treasury designated Rostam Qasemi as an SDGT for supporting terrorist attacks by Hezbollah, the Qods Force, and their proxies throughout the Middle East.

### d. Supreme Leader's Office: Mojtaba Khamenei, Mohsen Rezai, and Gholam-Ali Hadad-Adel

870.    The Khamenei Cell featured a cross-section of senior Supreme Leader's Office terrorists with demonstrated loyalty to Ayatollah Khamenei or his son Mojtaba (who acted as his gatekeeper), especially who were known to sponsor Hezbollah. Given Khamenei's emphasis on augmenting Hezbollah attacks through a dramatically expanded Supreme Leader's Office after 1989, senior SLO leadership, logistics, finance, and operations-facing terrorists played an important role in the attacks sponsored by the Khamenei Cell provided, however that such personnel had direct operations experience on their terrorist resume, *i.e.*, they needed to have been involved in violence in the past. From 1989 through 2024, such SLO members of the Khamenei Cell helped Hezbollah commit, plan, and authorize each attack sponsored by the Cell, often helping the Foundation for the Oppressed, Qods Force, and Hezbollah supply the weapons, funds, and/or intelligence upon which the attack depended, which aid the SLO ordinarily routed to its proxies through Hezbollah as its interlocutor, trainer, and in-country attack coordinator. The SLO did all the foregoing to sponsor attacks that Hezbollah jointly committed alongside Hezbollah's local proxies in Israel and the Palestinian territories, *e.g.*, Hamas and Palestinian Islamic Jihad, and Iraq, *e.g.*, Jaysh al-Mahdi. From 1989 through 2024, Supreme Leader's Office operatives who served in the Khamenei Cell included, but were not limited to, the SLO operatives identified herein.

871.    **Mojtaba Khamenei** was a member of the Khamenei Cell from 1989 through 2024. Ayatollah Khamenei's son, and widely assumed heir, always served as de facto leader of the Supreme Leader's Office and IRGC Intelligence Organization, Khamenei's gatekeeper, and

one of Khamenei's coordinators with Hezbollah, the IRGC, Hamas, Palestinian Islamic Jihad, and Jaysh al-Mahdi, including such groups' terrorists who served in the Khamenei Cell.

872.   **Gholam-Ali Hadad-Adel** was a member of the Khamenei Cell from, at least, 2007 through 2024. Hadad-Adel was also Mojtaba's father-in-law, key Khamenei gatekeeper, and general "fixer" for Khamenei with his allies.

873.   **Mohsen Rezai** was a member of the Khamenei Cell from 1989 through 2024. Rezai was a Khamenei inner-circle guy since 1979, found the IRGC Intelligence Bureau, *i.e.*, the predecessor to IRGC Intelligence Organization (in 1979), co-founded Hezbollah (in 1982), served as IRGC Commander-in-Chief (from 1981 through 1999), and served for decades thereafter as a senior "security" advisor to Khamenei and the Supreme Leader's Office through a variety of titles. Rezai was an exceptionally brutal terrorist, even by IRGC standards. For example, he spearheaded the use of children during the Iran-Iraq war (alongside Khamenei and Rafiqdoost), and he was publicly credited with organizing the mass killing of 30,000 political prisoners during the 1980s. And, of course, Rezai was widely suspected of having orchestrated the murder of his own son, Ahmed, for defecting to the United States. Since 2007, Rezai has also been subject to international arrest pursuant to a Red Notice issued by INTERPOL.

874.   From 1979 through 2024, Mohsen Rezai was one of the IRGC's most important transnational terrorist intelligence and logistics leaders, among its most important and prolific overall fundraisers, and one of the IRGC's four most publicly-facing and notoriously violent terrorists of all time (alongside Soleimani, Rafiqdoost, and Muhandis).

875.   In addition to being a member of Khamenei's inner circle, Mohsen Rezai was also a member of the inner circles of other key sponsors of Hezbollah-backed attacks, including, but not limited to, Qasem Soleimani, Mohsen Rafiqdoost, Hassan Nasrallah, and Abu Mahdi al-

Muhandis. For example, Iran scholar Ali Alfoneh reported on March 3, 2011 that "Mohsen Rezai" was part of Qasem "Suleimani's Network within the IRGC" as demonstrated by Soleimani's signature in a public letter of protest on Rezai's behalf in which Soleimani "thank[ed] God for having had the opportunity to 'soldier and study' with Rezai 'for almost two decades,' and stress[ed] that Rezai was liked both by Khomeini and Khamenei."

876.    Mohsen Rezai was also a key aggregator for the Terrorist Sponsors' money and ensured that the BNPP's profits fueled violence. Indeed, Rezai was known as one of the intellectual fathers of Iran's Logistics Policy Directive that ensured that profits realized by the Foundation for the Oppressed, Supreme Leaders's Office, and IRGC-controlled companies— including Nobitex, Irancell, Iran Electronics Industries—programmatically flowed back into the IRGC to enable IRGC-sponsored operations by funding Hezbollah and IRGC weapons and logistics, among other means. In 2015, for example, Suzanne Maloney of the Brookings Institution explained that about half a decade after the enactment of Logistics Policy Directive in 2003, "the Guards' economic role commanded influential support, based on claims of constitutionality, ideology, national security, and economic efficiency" because "Mohsen Rezaei" persuaded other Iranian leaders "that the Constitution stipulated the use of the military for development projects during peacetime, according to Rezaei, adding that" such IRGC deals generated value to the IRGC equal to, in Rezai's own words as quoted by Maloney, "'a large amount of the country's budget,'" which benefits the IRGC could not extract "if these institutions," i.e., IRGC fronts like Irancell "did not take part" in lucrative profit-generating commercial transactions. Other reports confirmed Rezai's key role coordinating and aggregating terrorist funds raised by the Terrorist Sponsors, including reports by the Joint History Office of

the Joint Chiefs of Staff of the U.S. Armed Forced in 2019, Jewish Press on March 3, 2022, and New York Post on December 17, 2022.

877.    Mohsen Rezai was always a key sponsor of Hezbollah attacks worldwide, for which he supplied key funds, recruits, logistics, and intelligence support. Mohsen Rezai co-founded Hezbollah (alongside Mohsen Rafiqdoost) and was a notorious Hezbollah sponsor from 1982 through 2024. Rezai notoriously planned Hezbollah's wave of hostage-taking attacks in Lebanon in the 1980s and was credited with being one of the masterminds of Hezbollah's 1994 attack in Argentina, for which Rezai was—and remains—the subject of an Interpol Red Notice. As U.S.-funded *Radio Free Europe/Radio Liberty* reported on June 1, 2013, "former chief of the Islamic Revolutionary Guards Corps (IRGC) Mohsen Rezaei" was listed on an "Interpol" arrest "warrant" for being directly involved in IRGC/Hezbollah 1994 attack in Argentina. IRGC-controlled media touted Rezai's close relationship with Hezbollah terrorists and key role in Hezbollah operations. On August 27, 2014, for example, IRGC- and SLO-controlled IRIB reported that "Head of Lebanese Hezbollah Bureau in Tehran Seyed Abdullah Safioddin" met with "Mohsen Rezaei," at which he "conveyed the appreciation of Hizbullah Secretary General Seyed Hassan Nasrallah for Iran's support of resistance" and "Mohsen Rezaei underlined the necessity of strengthening resistance in Lebanon and other resistance groups in the region" and "Safioddin, for his part, presented a report" on "the promotion of resistance position in the region," in which "he lauded Iran's help and support for Hezbollah." As Rezai himself explained during an interview with IRGC media arm *Fars* on October 6, 2006:

> Iran has shared [its] experiences with other[s]. . . such as the Lebanese, the Iraqis, Afghans . . . in the form of training contacts and military training. Hizballah's military operations in Lebanon are similar to the kind of war that we fought against the Iraqi military. In fact, these experiences were transferred to Lebanon, were transferred to the front in northern Afghanistan, and were transferred to the Badr Army in Iraq…. We can see two influences at work here; one is the spirit

and spiritual qualities that our Hizballah brothers have adopted from our warriors. They display the same human characteristics that existed among our warriors at that time, the same trust, the same sense of brotherhood, and the same spirit for seeking martyrdom. The other has to do with military tactics and the defense-related rules and principles that they have received in training.

878.    The United States confirmed that Rezai played a key role sponsoring Iranian proxy terrorist attacks throughout the Middle East. On January 10, 2020, Treasury sanctioned "Mohsen Reza'i" (*i.e.*, Mohsen Rezai) for helping supply "sources of revenue used by the Iranian regime" (including the Supreme Leader's Office) "to fund and support its nuclear program, missile development, terrorism and terrorist proxy networks."

       **e.  Jaysh al-Mahdi, including JAM Special Groups Kataib Hezbollah and Asaib Ahl al-Haq: Muqtada al-Sadr, Abu Mahdi al-Muhandis**

879.    The Khamenei Cell featured Jaysh al-Mahdi leadership, all of whom served as Hezbollah's agents in Iraq, and most of whom (aside from Muqtada al-Sadr) also directly pledged loyalty to Ayatollah Khamenei himself as Hezbollah's overall commander and Supreme Leader of the Islamic Revolution. Given Khamenei's emphasis on sponsoring Hezbollah-directed, Jaysh al-Mahdi-involved attacks in Iraq, senior Jaysh al-Mahdi SLO leaders played an important role in the attacks sponsored by the Khamenei Cell provided, however that such personnel had direct operations experience on their terrorist resume, *i.e.*, they needed to have been involved in violence in the past. From 1989 through 2024, such Jaysh al-Mahdi members of the Khamenei Cell helped Hezbollah commit, plan, and authorize each attack sponsored by the Cell, while serving as Hezbollah's "striking arm in Iraq," as Jaysh al-Mahdi leader Sadr infamously boasted at the time. Jaysh al-Mahdi did all the foregoing to help Hezbollah jointly commit attacks alongside it in Iraq from 2003 through 2024. From 2003 through 2024, Jaysh al-Mahdi operatives who served in the Khamenei Cell included, but were not limited to, the JAM terrorists identified herein.

880.    **Muqtada al-Sadr** was a member of the Khamenei Cell from 2003 through 2024. When every Plaintiff was attacked in Iraq, Sadr led Jaysh al-Mahdi (inclusive of its various rebrands) as Hezbollah's terrorist agent in Iraq, to whom Sadr publicly pledged his fealty. While Sadr made a jihadist-politician's choice to not publicly swear allegiance to Ayatollah Khamenei, Sadr met with Khamenei, accepted funds from Khamenei (delivered by Hezbollah), and received shelter from Khamenei after U.S. forces obliterated most of Hezbollah's and Jaysh al-Mahdi's infrastructure in Iraq in 2008.

881.    **Abu Mahdi al-Muhandis** (aka Jamal Ja'far al-Ibrahimi) was a member of the Khamenei Cell from 1989 until he was killed in the same U.S. airstrike in 2020 against Qasem Soleimani. Throughout, Muhandis was a dual-hatted member of IRGC-QF (since the 1980s) and Jaysh al-Mahdi (since 2003), who functioned as Hezbollah's, Ayatollah Khamenei's, and Qasem Soleimani's longest serving Iraqi asset, having played a direct role in Hezbollah-led attacks beginning no later than 1983, when Khamenei (who was the IRGC's liaison with proxy groups at the time), Hezbollah (including Imad Mugniyeh), and Muhandis collaborated to execute an audacious attack in 1983 that targeted the United States in Kuwait.

882.    Abu Mahdi al-Muhandis was also an infamous agent of Hezbollah, who notoriously helped Hezbollah commit attacks for decades. On information and belief, Muhandis was also a member of Hezbollah, or was otherwise embedded within Hezbollah such as to be treated comparable to a member. For the avoidance of all doubt, Plaintiffs allege that Muhandis was likely a triple-hatted terrorist, *i.e.*, Muhandis was a: (1) Jaysh al-Mahdi leader, including as commander of JAM Special Group Kataib Hezbollah; (2) an Iranian-diplomatic-passport-carrying member of the IRGC who notoriously served as a key Qods Force asset directly under

Qasem Soleimani; and (3) on information and belief, *de jure* or *de facto* member of Hezbollah.[127]

883.    **Qais Khazali** and **Laith Khazali** were members of the Khamenei Cell from, at least, 2006 through 2024. Brothers Qais and Laith were iconic Iraqi terrorists who served as key allies of Hezbollah, Khamenei, and Jaysh al-Mahdi founder Muqtada al-Sadr. From 2003 through 2005, Qais and Laith helped Sadr and Hezbollah operationalize Jaysh al-Mahdi. In or about 2006, Hezbollah, Sadr, and Khamenei tasked Qais and Laith with standing up a so-called Jaysh al-Mahdi Special Group that would leverage Hezbollah's, Jaysh al-Mahdi's, the Khazali's, and Khamenei's networks and resources to promote specially trained, Hezbollah-directed, joint Hezbollah/Jaysh al-Mahdi cells known as "Jaysh al-Mahdi Special Groups," one of the two most notorious of which was always Jaysh al-Mahdi Special Group Asaib Ahl al-Haq, which was commonly called "AAH" or "League of the Righteous" (which was its Arabic translation).

884.    From 1989 through 2024, Ayatollah Khamenei was a direct sponsor of every member of the Khamenei Cell, including through his decades long, inner-circle, direct-access, personal relationships with the leaders and key leadership cell members of every terrorist

---

[127] Even amongst a network of terrorists that featured interlocking relationships, Abu Mahdi al-Muhandis stood out as an operative who was unusually with, and directly involved in, a cross-section of Hezbollah-directed attacks from 1983 through 2020. Given his decades-long history of playing a key role in Hezbollah attacks, and seamless integration with Hezbollah "brothers" in attacks ranging from Kuwait in 1983 to Iraq in 2009 to Israel in 2019, Plaintiffs believe Muhandis was likely also a member of Hezbollah or, at a minimum, had a Hezbollah-supplied cover consistent with Hezbollah tradecraft. The totality of the indicators associated with Muhandis on their own support the conclusion that he was a Hezbollah agent – either as a sworn Hezbollah brother or as a Hezbollah agent acting under identity-related cover support supplied by Hezbollah. Plaintiffs believe that the United States government likely has additional information relevant to Muhandis's decades-long connections to Hezbollah, and that access to unclassified information supplied by the United States would further corroborate Plaintiffs' allegations regarding Muhandis's status as a triple-hatted operative of the IRGC Qods Force, Jaysh al-Mahdi, *and* Hezbollah.

organization Khamenei sponsored through any entity he controlled, including the persons identified above.

885.    The Khamenei Cell played a direct role in every attack against Plaintiffs, which typically featured multiple separate touchpoints with the Khamenei Cell.

886.    When Ayatollah Khamenei flowed financial support to members of the Khamenei Cell, he relied upon, *inter alia*, the Foundation for the Oppressed, the IRGC, and the SLO.

887.    BNPP knew about, or was willfully blind to, these copious warnings from the U.S. government, international community, mainstream media, scholars, and others about the role the Khamenei Cell played in targeting Americans in terrorist attacks and supporting proxy terrorist groups, such as Hezbollah, Hamas, PIJ, JAM, and the IRGC, in committing terrorist attacks targeting Americans.

### f.    Hamas/PIJ: Ismail Haniyeh and Yahya al-Sinwar

888.    The Khamenei Cell featured Hamas and PIJ leadership, all of whom served as Hezbollah's agents in Israel and the Palestinian territories. PIJ members pledged allegiance to Khamenei; Hamas members usually did not. Both, however, were dedicated followers of Khamenei's terrorist missions, doctrines, teachings, and nomenclature, as transmitted to Hamas and PIJ, and operationalized on-the-ground in the Palestinian territories, Lebanon, and Syria, by Hezbollah. Given Khamenei's emphasis on sponsoring Hezbollah-directed, Hamas- and PIJ-involved attacks in Israel and the Palestinian territories—both as a tactic to challenge the United States in Israel, and as a tool to source funds, recruits, and intelligence worldwide by leveraging the power of an anti-American, anti-Israeli message—senior Hamas and PIJ leaders played an important role in the attacks sponsored by the Khamenei Cell provided, however that such personnel had direct operations experience on their terrorist resume, *i.e.*, they needed to have been involved in violence in the past. From 1989 through 2024, such Hamas and PIJ members of

the Khamenei Cell helped Hezbollah commit, plan, and authorize each attack sponsored by the Cell. Hamas and PIJ did all the foregoing to help Hezbollah jointly commit attacks alongside it in Israel from 2000 through 2024. From 2000 through 2024, Hamas and PIJ operatives who served in the Khamenei Cell included, but were not limited to, the Hamas and PIJ terrorists identified herein.

889.   **Ismail Haniyeh** was a member of the Khamenei Cell from at least 2000 until his death in 2024 and used BNPP's funds routed to him through Terrorist Sponsors and the Khamenei Cell to sponsor attacks in Israel by Hezbollah, Hamas, and PIJ, for which he supplied key funds, recruits, logistical aides, and intelligence support.

890.   **Yahya al-Sinwar** was a member of the Khamenei Cell from 1989 until his death in 2024 and used BNPP's funds routed to him through Terrorist Sponsors and the Khamenei Cell to sponsor attacks in Israel by Hezbollah, Hamas, and PIJ, for which he supplied key funds, recruits, logistical aides, and intelligence support.

**B.   BNPP Enabled the Terrorist Sponsors to Fund Joint Logistics and Operations Cells that Led the Terrorist Attacks Against Plaintiffs**

891.   Consistent with the joint cell-related customs and practice, and tactics, techniques, and procedures, as emphasized by Ayatollah Khamenei and practiced by Hezbollah, the IRGC, Hamas, Palestinian Islamic Jihad, and Jaysh al-Mahdi (among others), regularly conducted joint operation planned or committed by joint cells of terrorists, Terrorist Sponsors established the Khamenei Cell to optimize their ability to direct terrorist attacks targeting the United States.

892.   While the Khamenei Cell's status as the global coordination mechanism through which Khamenei passed along his instructions to Hezbollah to operationalize on his and the IRGC's behalf in Israel and Iraq, the Khamenei Cell was not the only joint cell that played an important role in the attacks that killed and injured Plaintiffs or their loved ones. Such joint cells

included, but were not limited to: (a) the joint logistics cell financed and logistically sustained jointly by the IRGC and nearly all its Axis of Resistance allies that had sites in Iran, North Korea, Syria, Lebanon, and Iraq, among other places; (b) joint Hezbollah/Hamas and Hezbollah/JAM operations cells in Lebanon, Syria, and the Palestinian territories; and (c) joint Hezbollah/Jaysh al-Mahdi operations cells in Iraq.

      1.   **The Joint Axis of Resistance Logistics Cells (IRGC-LH-Hamas-PIJ-JAM-RGB) in Iran, Lebanon, Syria, the Palestinian Territories, and North Korea**

893.    From 2000 through at least 2024, the IRGC, Hezbollah, Hamas, PIJ, JAM, and North Korea's RGB maintained a **Joint Logistics Cell** that coordinated the development, distribution, testing, and training of the common terrorist weapons, tactics, and objective that united the Axis of Resistance, including, but not limited to: (1) rocket and missile research, development, and deployment; (2) specialized training by the RGB to the other Axis members concerning kidnapping, rocket attacks, and tunnel attacks – three of the RGB's signature attack types; (3) shared ratlines, safehouses, and sites for meetings and operational planning; and (4) collaboration to promote weapons-related interoperability between all the members of the Axis of Resistance ("Joint Logistics Cell"). Each of these features benefit all members of the Joint Logistics Cell.

894.    The IRGC, Hezbollah, Hamas, PIJ, JAM, and North Korea's RGB Joint Logistics Cell had cell locations in at least the following locations:

a.    **Iran.** The Joint Logistics Cell operates in Tehran out of a massive, multi-building complex that Iranian regime built out to promote cross-pollination amongst allies and logistics cooperation at a vast scale. Indeed, the RGB deployed up to 1,000 people at a time to the Joint Logistics Cell in Tehran – so many North Korean terrorists were on site that the Iranian regime at one point elected to procure *an entire resort on the Caspian Sea* to accommodate them all.

b.    **North Korea.** The Joint Logistics Cell's oldest site in Pyongyang, which has hosted trilateral logistics and training efforts with the Hezbollah, the IRGC, and the RGB for

decades. Prior to 2024, Hezbollah's top leadership trained there, including Hassan Nasrallah.

c. **Syria.** The Joint Logistics Cell's newest location is in Syria, near the Syrian/Iraqi border. While the other two locations primarily emphasize logistics cooperation and training, the Joint Logistics Cell's Syria location also served as a key transit node for Axis terrorists seeking to travel to, or from, Lebanon, Gaza, and Iraq, because the Syrian site was ideally located for all such uses. Moreover, Axis terrorists sometimes launched rocket attacks directly from the Joint Logistics Cell location, as the IRGC-QF did in 2018, when they fired rockets at Israel from Syria.

d. **Egypt.** The Joint Logistics Cell leveraged the RGB's long-standing presence in Egypt, which allowed Hezbollah to flow funds and weapons to Hezbollah and Hamas operations cells in Gaza.

895.   The Joint Logistics Cell was a decades-long construct for which there were media reports as early as the 1990s. In 1993, for example, the *Washington Post* reported: "Across from the Foreign Ministry in north Tehran is an old government building housing protocol offices for foreign diplomats and branch offices for two radical Islamic movements -- Hezbollah, from Lebanon, and Hamas, from the Israeli-occupied West Bank and Gaza Strip."

896.   Such practices endured throughout the relevant period. In 2008, for example, Treasury reported as to the substantial activities at the Joint Logistics Cell's site in Tehran: "Iran remains the most active of the listed state sponsors of terrorism, routinely providing substantial resources and guidance to multiple terrorist organizations. For example, Hamas, Hizballah, and the Palestinian Islamic Jihad (PIJ) maintain representative offices in Tehran to help coordinate Iranian financing and training of these groups."

897.   On information and belief, the Joint Logistics Cell played a direct role in every attack against Plaintiffs, each of which featured one or both of (a) weapons that were likely supplied by the RGB to Hamas and/or PIJ (*e.g.*,, rockets); and/or (b) an attack that was directly or indirectly enabled by RGB-construction terror tunnels for Hamas and PIJ in Gaza and Hezbollah in South Lebanon.

898.    From the early 1980s through at least 2019, the Foundation for the Oppressed always helped coordinate the Terrorist Sponsors' decades long partnership with RGB, including through the efforts of Foundation leaders (and Khamenei Cell members) Mohsen Rafiqdoost and Parviz Fattah, among others. Throughout, The Terrorist Sponsors and their RGB allies engaged in a consistent custom and practice, and used the same general tactics, techniques, and procedures: in sum and substance, The Terrorist Sponsors ordinarily traded (as barter) their NIOC-supplied, NITC-transported, Foundation-financed, SLO-supervised, Hezbollah and Qods Force-smuggled, petroleum products to the RGB and, in exchange, the RGB provided the following to Hezbollah, Hamas, PIJ, and JAM:

a.    **weapons**, including, but not limited to, rockets, missiles, mortars, explosives, small arms, and communications equipment;

b.    **terrorist training and equipment maintenance services**, including, but not limited to, services provided in the country in which the terrorist group was based (*e.g.*, Lebanon for Hezbollah), in addition to related training and technical support services provided at the Joint Logistics Cell locations in North Korea, Iran, and Syria; and

c.    **construction of state-of-the-art, military-grade, attack tunnels** modeled after the RGB's tunnel network adjacent to the DPRK's border with South Korea.[128]

This shared logistics partnership began in the early 1980s, endured ever since, and resulted in anywhere from $100 million to several billion dollars ***per year*** in bartered oil-for-weapons, services, and tunnels that The Terrorist Sponsors caused to flow through to Hezbollah, Hamas, PIJ, and JAM to directly enable such groups' attacks.

---

[128] On information and belief, the Terrorist Sponsors engaged in substantially similar trades, for substantially similar weapon types, training, and technical support services, and attack tunnel construction with the RGB on behalf of JAM in a similar manner as they did with respect to Hezbollah, Hamas, PIJ, and JAM. In Iraq, JAM's attack-related operations sites relied upon JAM's control of the Ministry of Health and attendant ability to benefit from the copious German-engineered, military-grade, command-and-control bunkers that Saddam installed in the basements of most major hospitals throughout Iraq from 1990 through 2003. Hezbollah's commitment to tunneling is so foundational and the utility of attack tunnels in Iraq so obvious, that it is likely that the RGB provided substantial attack-tunnel related services to JAM in Iraq.

899.    Indeed, the U.S. government directly warned financial institutions and money transmitters that Iran-facing sanctions violations foreseeably enabled IRGC-sponsored arms purchases from North Korea. As early as 2005 and 2006, for example, media outlets in the United States (*e.g.*, the *New York Times*) and Asia (*e.g.*, *Xinhua News Agency*), reported that U.S. officials had met with foreign bankers to warn them about the related risks posed by the IRGC and North Korea.

900.    Those warnings were well founded: RGB-supplied weapons and services comprised a substantial percentage of all weapons that Terrorist Sponsors delivered to Hezbollah, Hamas, PIJ, and JAM throughout this period. Indeed, numerous high-profile weapons seizures and intelligence reports since the early 2000s confirmed that Terrorist Sponsors used their oil-for-barter deals with the RGB (sometimes directly, sometimes routed through China) to pay for around half of all weapons and technical training they provided to Hezbollah, Hamas, and PIJ, which services were ordinarily coordinated with the Qods Force and Hezbollah, paid for by oil-based barter trading, and complementary to previous training supplied by the IRGC. Indeed, much of IRGC field tactics and tradecraft, and therefore the tactics that govern Hezbollah, Hamas, and PIJ doctrine, were ripped straight from the RGB's playbook, which had decades of relevant operational experience that it eagerly shared with the IRGC and Hezbollah as such organizations grew.

901.    From 2009 through 2024, the Terrorist Sponsors likely engaged in at least more than $1 billion per year in oil-for-weapons, services, and tunnels trades on behalf of Hezbollah, Hamas, PIJ, JAM, the IRGC, the Foundation for the Oppressed, NIOC, NITC, and KAA; indeed, some estimates place the Hezbollah- and Hamas-related oil-for-weapons expenditures at several

billion per year (which was primarily conducted through the oil-for-guns barter arrangement rather than cash).

902.     Why did the Foundation for the Oppressed, NIOC, NITC, and KAA need to purchase industrial-scale quantities of weapons, training, and tunnels supplied by the RGB and paid for with NIOC oil barter trade as facilitated by the Foundation for the Oppressed and NITC? Because their conduct makes plain, they knew two facts. *First*, The Terrorist Sponsors knew that the Foundation for the Oppressed, NIOC, NITC, and KAA were terrorist fronts that maintained vital stores of key operations-facing assets that keyed Hezbollah's, the Qods Force's, Hamas's, PIJ's, and JAM's ability to conduct terrorist attacks targeting the United States, including by attacking U.S. ally Israel. Such vital attack power for Hezbollah and its proxies included the Foundation's, NIOC's, NITC's, and KAA's substantial terrorist assets—in personnel (embedded for cover), cash, financial accounts, petroleum, cash equivalents, ships, ports, storage facilities, and more—upon which Hezbollah and the Qods Force relied to conduct attacks targeting the United States, and for which Hezbollah and the Qods Force played a direct day-to-day role in their de facto role as the General Managers of The Terrorist Sponsors' turnkey enterprise to smuggle oil to China and North Korea as part of a packaged deal in which the RGB provides direct arms, training, and tunnel construction assistance to Hezbollah, Hamas, and their allies. *Second*, The Terrorist Sponsors also knew that the U.S. and Israeli Armed Forces also believed that the Foundation for the Oppressed, NIOC, NITC, and KAA contained key assets that powered attacks. Such fact was obvious given decades of on-the-record quotes from both governments' counterterrorism personnel, intelligence services, and law enforcement.

903.     Armed with these two data points, the Foundation for the Oppressed, KAA, NIOC, and NITC invested heavily in RGB-supplied weapons and services including, but not

355

limited to, surface-to-air missile batteries, anti-aircraft guns, small arms, military-grade

communications equipment, and other weapons designed to harden such sites against a potential

airstrike or special operations raid by the U.S. or Israeli militaries. Accordingly, the mere

presence of such weapons at facilities owned and/or operated by the Foundation for the

Oppressed, KAA, NIOC, and NITC was powerful evidence that each such Terrorist Sponsor (in

the case of the Foundation) or front (in the case of KAA, NIOC, and NITC) **was** an operational

front for both Hezbollah and the Qods Force (given their shared ground-level management of the

operations-related aspects of the Iranian Terrorists Sponsors' overall network structure, including

its petroleum smuggling) **and** that such fact was sufficiently obvious that the Foundation, KAA,

NIOC, and NITC elected to spend the oil necessary to purchase such weapons, services, and

tunnels from the RGB.

904.    U.S. government findings confirmed the RGB's intimate partnership with the

IRGC, including the Qods Force and IRGC-IO. In 2021, for example, the Department of

Commerce tightened controls on U.S. technologies to prevent, *inter alia*, intelligence sharing

between the intelligence arms of terrorist groups "in terrorist-supporting countries" like Iran and

North Korea, highlighting "Iran's Islamic Revolutionary Guard Corps Intelligence Organization

(IRGC-IO)" and "North Korea's Reconnaissance General Bureau (RGB)," and stated:

> "We cannot allow the foreign military-intelligence organizations of our
> adversaries in … Iran, and other ***terrorist-supporting nations*** to benefit from U.S.
> technology or U.S. services to support their destabilizing activities," said
> Secretary of Commerce Wilbur Ross. "We must ensure our controls prevent U.S.
> persons, wherever located, from supporting unauthorized WMD activities around
> the globe … and [support export controls that] enhance our national security."
> (Emphasis added.)

905.    Israeli government findings confirmed the nexus. On February 28, 2008, for

example, during a joint press conference with Japan's Prime Minister, then-Israeli Prime

Minister Ehud Olmert directly warned that "there is an axis of evil which combines both North Korea, Iran, the Syrians, Hezbollah and the Hamas -- all these countries and organizations which are joining forces together in order to upset the balance to develop non-conventional weapons and to threaten" Israel and other moderate countries.

906.    Decades of reports and statements published by the United States, Iranian regime, Iranian opposition, mainstream media, terrorism scholars, and NGOs alerted BNPP that its Iranian oil- and gas-related transactions with the Iranian regime's oil monopoly, *i.e.*, NIOC, directly financed IRGC weapons purchased from North Korea's RGB. Such reports included, but were not limited to:

a.    *New York Times*, December 19, 1982: "North Korea has become the leading supplier of arms to Iran in an arrangement that has helped Iran finance its continuing war with Iraq, according to a high-ranking American defense official. The official, Francis J. West . . . said Iran had been paying North Korea partly in cash and partly in oil. Military analysts, who provided details at Mr. West's request, said North Korea had provided about 40 percent of the approximately $2 billion worth of weapons, ammunition and equipment Iran acquired abroad this year. . . . To pay for the arms imports, oil industry analysts said, Iran has increased its oil production beyond the limits set by the Organization of Petroleum Exporting Countries. They said it had also cut prices below those of OPEC and established the ***guns-for-oil bartering arrangement*** with North Korea. … Intelligence officials said earlier that arms obtained by Iran from North Korea [and others] enabled Iran to continue the war with Iraq. Iran appears to have paid for the weapons from a $4.2 billion special military budget . . . . [thanks to] a resurgence of Iranian oil production." (Emphasis added.)

b.    *Chicago Tribune*, August 31, 1989: "The story … is an ***open secret*** among the local foreign community. ... North Korea … sold [missiles] to Iran during the Gulf War. Teheran paid with oil, thus liberating the North Korean bars of gold set aside to purchase petroleum on the world market." (Emphasis added.)

c.    *Chicago Tribune*, April 1, 1990: "North Korea served as an intermediary in the shipment of Chinese missiles to Iran. That caper earned North Korea ***a year's supply of petroleum from the grateful mullahs in Tehran***." (Emphasis added.)

d.    *Reuters*, November 19, 1992: "Impoverished North Korea bartered Scud missiles for Iranian oil last year, a South Korean government-funded trade organisation said …. The Korea Trade Promotion Corp (KOTRA) said North Korea traded 100 remodelled Scuds for $120 million of crude oil. ***Pyongyang also signed a treaty with Tehran pledging to barter arms for $300 million worth of oil*** a year in the future but further details were

unavailable. Iran is now North Korea's fourth largest trading partner after China, Japan and the Commonwealth of Independent States (CIS), the KOTRA report said." (Emphasis added.)

e.    *Associated Press*, April 8, 1993: "Mohaddessin is a member of the opposition coalition's largest group, the Peoples Mujahedeen, which has a widespread network of supporters and sources in Iran and has given accurate information in the past on Iranian military developments. … Mohaddessin said the ***Iranians are repaying North Korea for the missiles and other arms purchases with oil shipments now running at a level of 100,000 barrels a day. … Iran and North Korea … [were in] a marriage of convenience: Iran gets offensive weapons not available from advanced Western nations and North Korea gets critical oil shipments which it lacks the dollars to buy. North Korea gets 40 percent of its oil needs from Iran. Mohaddessin said the current delegation is the fifth to visit North Korea in the past year, resulting in arms purchases of more than $3 billion to be delivered over the next five years.***" (Emphasis added.)

f.    *St. Paul Pioneer Press*, April 9, 1993: "An Iranian military delegation is in North Korea to complete the purchase of 150 missiles that have a 600-mile range. ***The Iranians are paying North Korea for the missiles and other arms purchases in a barter arrangement with oil shipments now running at 100,000 barrels a day***." (Emphasis added.)

g.    *USA Today*, August 18, 1993: "***The next time a terrorist bomb explodes in New York, Berlin or Cairo, expect to trace its origins to one or more of a half-dozen countries scattered across three continents***. Western intelligence agencies say a loose alliance of outlaw nations is slowly coming together. … 'It's a threat that we're not well prepared to meet,' says Vincent Cannistraro, former CIA chief of counterterrorism operations. 'There are more ties and more connections than actually have been made public so far.' These 'outlaw' nations - such as Libya, Sudan, Iran … and North Korea - have trade links, some dating to the 1960s. But because of their isolation from most of the world, they have increased cooperation by exchanging data, weapons and technology. … The links are numerous: … ***North Korea is dangling its latest version of the Scud missile before Iran … in exchange for hard currency and oil***." (Emphasis added.)

h.    *Globe and Mail*, September 13, 1993: "North Korea has resorted to bartering arms to Iran in exchange for oil."

i.    *Washington Post*, December 25, 1993: "***Now, North Korea gets as much as half of its oil from Iran, probably in exchange for weapons***, according to recent estimates, and that traffic might well continue or even increase in defiance of a U.S.-led campaign to impose U.N. sanctions. … '***To have maximum impact, you would have to intercept the oil shipments from Iran*** …,' said Selig S. Harrison, a longtime Korea specialist at the Carnegie Endowment for International Peace. …Iranian oil … [was a] key import for North Korea." (Emphasis added.)

j.    *Deutsche Presse-Agentur*, November 26, 2005: "Iran is seeking to strengthen its ties with North Korea by offering Pyongyang a comprehensive economic aid programme as part of co-operation between the two countries on rocket development, the weekly Spiegel

reported Saturday. ***Teheran wants to work together with North Korea on the development of … rockets, Spiegel reported citing western intelligence sources. An Iranian envoy has already promised North Korea substantial supplies of free oil*** and natural gas that could help the country through the winter. Teheran hopes to pursue two interests with its trade offer to the North Koreans, Spiegel said. Firstly, to ensure that it would have technical advantages, because the Iranian medium-range missile Schahab-3-Rakete [rocket] is based on North Korean technology." (Emphasis added.)

907.    The specific IRGC-North-Korea-Iranian proxy nexus was equally infamous.

Decades of reports and statements published by the United States, Iranian regime, Iranian opposition, media, terrorism scholars, and NGOs alerted BNPP that its Iranian oil- and gas-related transactions with the Iranian regime's oil monopoly, *i.e.*, NIOC, fueled IRGC-sponsored terrorist attacks committed by Hezbollah, Hamas, and PIJ that leveraged IRGC-purchased North Korean weapons and services for delivery (by the IRGC, or directly by the RGB) to IRGC proxies Hezbollah, Hamas, and PIJ. Such reports included, but were not limited to:

a.    *Guardian (UK)*, December 13, 2009: "A lethal cargo of rocket launchers, grenades and other weapons seized in Thailand at the weekend may be just a glimpse of what US and UN investigators say is a global North Korean illegal arms smuggling network … ***[S]uspicion immediately fell on Iran***, the destination of a previous illegal weapons shipment impounded in the United Arab Emirates in July. …The cargo, declared in the plane's manifest as oil-drilling equipment, was said to include rocket-propelled grenades, missile and rocket launchers, missile tubes, surface-to-air missile launchers, spare parts and other heavy weapons. … The Bangkok arms seizure followed several similar recent incidents. In July, the French-owned, Bahamian-flagged ANL Australia bound for Iran was intercepted in the UAE after a US tip-off. The ship was found to be carrying ***containers of small arms made in North Korea, military hardware and sufficient explosive powder to arm thousands of short-range rockets. Also uncovered was a cache of 2,030 detonators for 122mm rockets and other rocket components. The manifest also detailed the cargo as oil drilling supplies***. …US officials said the ANL Australia was one of ***five vessels caught this year carrying large consignments of weapons apparently intended for Iran's militia clients such as Hezbollah and Hamas***." (Emphasis added.)

b.    Dr. Christina Y. Lin (Former Director, China Affairs, Policy Planning, DoD), March 2010: "[N]umerous public reports have appeared since 1993 describing elements of DPRK-Iranian collaboration …. Cooperation reportedly began at the same time DPRK negotiated with Iran's Islamic Revolutionary Guard Corps (IRGC) for cooperation in developing and manufacturing Nodong missiles in Iran. …The next stage of cooperation, from 2003 onwards, appears to have been influenced by the joint advancement of the Nodong (Shahab) [rocket] program in Iran … [for which Iran] ***offered oil and gas shipments as payment***."

c.    U.N. Security Council, November 5, 2010: "In August 2009, the United Arab Emirates reported to the Committee that it had seized on 22 July 2009 *military shipment* aboard ANL Australia. … The shipper of the cargo was the Pyongyang representative office of OTIM SPA, an Italian shipping company. T*he cargo was falsely described on the shipping documents as oil boring machine (spare parts). The cargo was custom sealed and loaded on a Democratic People's Republic of Korea ship* in the port of Nampo, Democratic People's Republic of Korea, and trans-shipped multiple times on its way to the *declared destination, Bandar Abbass, Islamic Republic of Iran*."

908.    Summing it all up, former Congressional Research Service Korea specialist Larry Niksch testified before Congress on July 28, 2015 that "Iranian Money" was the "Lubricant for the Wheels of Iran-North Korean Collaboration":

> Iran has paid North Korea huge sums of money for cooperative projects related to missiles … and Pyongyang's assistance to Hezbollah and Hamas. … It seems to me that North Korea may receive from Iran upwards of $2 to $3 billion annually from Iran for the various forms of collaboration between them. … There should be no doubt that North Korea drives a hard financial bargain with Iran for the benefits it provides to Iran. As the collaboration has deepened and North Korea has expanded its programs, North Korea's asking price no doubt has risen. … Iranian money appears to be the lubricant for North Korea[] … Iran's greed for benefits from North Korea's … terrorist-supporting assistance also appears to be growing, so the match likely will continue despite the Iran nuclear agreement.

## 2. Joint Hezbollah-Hamas Operations Cells in Iran, Lebanon, Syria, and the Palestinian Territories

909.    From 2000 through 2024, Hezbollah and Hamas often collaborated on attacks targeting the United States (including through attacking its ally, Israel) through a **Joint Hezbollah/Hamas Operations Cell** with sites located in Lebanon, Syria, and the Palestinian territories (collectively, the "Joint Hezbollah/Hamas Operations Cell").

910.    Throughout, Hezbollah's role in the Joint Hezbollah/Hamas Operations Cell was substantially like Hezbollah's role in similar joint cells with JAM in Iraq. In both areas, Hezbollah terrorists embedded with the local Iranian proxy, served as a liaison between the proxy and, *inter alia*, Ayatollah Khamenei, the IRGC, and the SLO, and helped direct proxy attacks to align such activities with Khamenei's objectives.

911.    Hamas and Hezbollah have long cooperated on shared operations. Hamas jointly

planned some attacks with Hezbollah. For example, Hamas heavily leveraged Hezbollah's

technical skills, experience, training, and in-country operatives to plan and execute its

kidnapping operations.

912.    Terrorism scholars concurred. As Dr. Matthew Levitt summed-up in 2007,

"Hamas has long cooperated with Hezbollah operationally."

913.    The Iranian regime has spent decades promoting the close collaboration between

Hezbollah, Hamas, and PIJ. In 1993, for example, State reported to Congress: "Iran was the

principal sponsor of extremist Islamic and Palestinian groups. Besides providing funding,

training, and weapons to groups that conduct terrorist acts, Iran also hosted a series of high-

profile meetings with Hizballah and HAMAS that had the stated goal of coordinating efforts

against Israel and bringing the Arab-Israeli peace process to a halt." In 1998, likewise, State

reported to Congress:

> Iran continued to provide support—in the form of training, money, and/or
> weapons—to a variety of terrorist groups, such as Lebanese Hizballah, HAMAS,
> and the PIJ. The Iranian Government continues to oppose recognition of Israel
> and to encourage violent rejection of the Middle East Peace Process. In the fall of
> 1997, Tehran hosted numerous representatives of terrorist groups—including
> HAMAS, Lebanese Hizballah, [and] the PIJ...—at a conference of "Liberation
> Movements." Participants reportedly discussed the jihad, establishing greater
> coordination between certain groups, and an increase in support for some groups.

914.    In 2001, similarly, State reported to Congress: "Iran has long provided Lebanese

Hizballah and the Palestinian rejectionist groups--notably HAMAS [and] the Palestine Islamic

Jihad, … Iran continued to encourage Hizballah and the Palestinian groups to coordinate their

planning and to escalate their activities against Israel."

915.    Moreover, on September 19, 2006, Under Secretary of State R. Nicholas Burns

testified to Congress: "We have no illusions about the nature and objectives of the Iranian

regime. … In their foreign policy, they are pursuing a course of aggressive behavior from their arming of Hizballah with long-range rockets to strike Israel to their work to create a nexus of terrorism encompassing Hizballah, Hamas, Palestinian Islamic Jihad, the Popular Front for the Liberation of Palestine General Command, and Syria."

916.    The Joint Hezbollah/Hamas Operations Cell played a direct role in every Hamas-committed hostage-taking and rocket attack that killed and injured Plaintiffs. That is because kidnapping and rocket attacks were Hezbollah's specialty, for which Hezbollah provided in-country direction to Hamas, as well as coordination for things like resupply.

### 3.  Joint Hezbollah-PIJ Operations Cells in Iran, Lebanon, Syria, and the Palestinian Territories

917.    From 2000 through 2024, Hezbollah and PIJ often collaborated on attacks targeting the United States (including through attacking its ally, Israel) through a **Joint Hezbollah/PIJ Operations Cell** with sites located in Lebanon, Syria, and the Palestinian territories (collectively, the "Joint Hezbollah/PIJ Operations Cell").

918.    Throughout, Hezbollah's role in the Joint Hezbollah/PIJ Operations Cell was substantially like Hezbollah's role in similar joint cells with Hamas in Gaza and JAM in Iraq. In all areas, Hezbollah terrorists embedded with the local Iranian proxy, served as a liaison between the proxy and, inter alia, Ayatollah Khamenei, the IRGC, and the SLO, and helped direct proxy attacks to align such activities with Khamenei's objectives.

919.    PIJ and Hezbollah have long cooperated on shared operations. Indeed, State regularly reported to Congress—including, but not limited to, in 2015, 2017, 2018, and 2020—that "PIJ has partnered with Iranian- and Syrian-sponsored Hizballah to carry out joint operations."

920.    Indeed, per a UANI analysis published on December 8, 2020: "In 2019, … Iran's supreme leader reportedly proposed PIJ form a joint operations room in Gaza with Hezbollah and Iraqi militias," which was among recent "signs of increased coordination within Iran's broader Axis of Resistance in furtherance" of IRGC-sponsored terrorist attacks in Israel.[129]

921.    The Joint Hezbollah/PIJ Operations Cell played a direct role in every PIJ-committed rocket attack that killed and injured Plaintiffs. That is because rocket attacks were a Hezbollah specialty, for which Hezbollah provided in-country direction to PIJ, as well as coordination for things like resupply.

### C.   BNPP Helped the Terrorist Sponsors Generate Profits to Fund Terrorist Attacks

922.    When BNPP facilitated oil and gas transactions for the Iranian Petrochemical Company and its other Iranian customers, those transactions generated profits that flowed to the Terrorist Sponsors. In doing so, BNPP was pouring money into a well-oiled terrorist finance and logistics machine that ensured most of the profits the Terrorist Sponsors obtained would fund terrorist attacks like the ones that injured Plaintiffs.

#### 1.   Profits From BNPP's Transactions with the Terrorist Sponsors Systematically Flowed Through Multiple Channels to Fund Terrorist Attacks

923.    The profits from BNPP's transactions flowed systematically and ineluctably through several channels to fund terrorist attacks.

##### a.   The Logistics Policy Directive

924.    From 2003 through 2020, the Logistics Policy Directive required the IRGC to reinvest its profits, and those of affiliated entities such as the Foundation for the Oppressed, to

---

[129] Jordan Steckler (Research Analyst, United Against a Nuclear (UANI)), *How Iran Exports Its Ideology*, at 45 (UANI Dec. 8, 2020), https://tinyurl.com/4yrd8xcf.

fund terrorism. The Logistics Policy Directive provided that with respect to the profits derived from whenever "any unit" of "the Islamic Revolutionary Guard Corps … and related organizations … sign[ed] contract agreements for civil projects," "[t]he monies received from any [such IRGC-related] contract … shall be deposited to the Chancery, and its equivalent shall be placed at authority of the [IRGC] from the credit determined in the annual budget, so that it would be used for the costs related to the [IRGC-related] contract, also the strengthening of the [IRGC], and replacing [IRGC] equipment and machinery parts" needed for its operations, *i.e.*, terrorism. Moreover, under the Directive, the IRGC "can, proportionally to [the IRGC's] needs, exchange or sell excess material, and equipment and machinery" to finance IRGC operations.

925.    At bottom, the Logistics Policy Directive established an ironclad rule: the IRGC was authorized and encouraged to act as contractors in development schemes, subject to the requirement that any profit would be used to help the IRGC "purchase and upgrade equipment for the Revolutionary Guards and fund its other activities," *i.e.*, the IRGC's central anti-American terrorist mission under Iran's constitution. As a result, IRGC profits were required under Iranian law to be reinvested in the IRGC's specific lanes of activity that supported terrorism. The Logistics Policy Directive, in effect, mandated that IRGC profits derived from IRGC fronts be used primarily to enable IRGC-sponsored terrorism by providing off-the-books funding sources for key IRGC operations.

926.    From June 2003 through the present, the Logistics Policy Directive was always in force, always applied to profits generated for IRGC front companies by BNPP, and always required that such IRGC profits be dedicated to sponsoring acts of terrorism.

927.    The Logistics Policy Directive meant that the IRGC earmarked the profits its fronts generated to directly fund terrorist attacks committed by Hezbollah, Hamas, PIJ, and JAM.

928.    BNPP knew about the Logistics Policy Directive because, among other reasons, BNPP's Iranian personnel knew about it, BNPP's in-house compliance and intelligence personnel knew about it, BNPP was familiar with basic Iranian government pronouncements as part of its country-related diligence, and because media reports from at least 2007 onward alerted BNPP to such fact because such reports regularly described the Directive as a potential IRGC-related compliance challenge for companies contemplating partnerships with IRGC-controlled entities. In October 2007, for example, Iran scholar Ali Alfoneh reported the sum and substance of Logistics Policy Directive and explained that the Directive was intended to help the IRGC "purchase and upgrade equipment for the Revolutionary Guards and fund its other activities," *i.e.*, IRGC-sponsored acts of terrorism. On May 25, 2010, likewise, Iranian expatriate media outlet *Peyk-e Iran* reported (as translated from Farsi) that "the IRGC … gradually expanded its power and influence since 1979" through fronts like "Khatam ol-Anbiya['s] … projects extended across weapons manufacturing, petrochemical plant, dams and bee-keeping, reflecting Iranian economy's dominance by a military-mafia institution," for which "the Logistics Directive" served "as a component of this expansion" because the Directive was an "'order that all IRGC units … must participate in civil projects as contractors,'" upon which the IRGC relied to assert the "IRGC's dominance in security … institutions, and IRGC companies' influence" through "IRGC-controlled companies" that controlled Iran's *energy* and communication sectors.

### b.  Mandatory Donations (Khums)

929.    From 1979 through 2024, Ayatollah Khamenei, the SLO, IRGC, and Hezbollah relied upon mandatory donations, or *khums*, comprising 20% of all income, which flowed up to Khamenei and then back down to the Khamenei Cell and, through the Khamenei Celll, to IRGC proxies Hamas, PIJ, and JAM, to finance terrorist attacks. Shiite theological traditions call for donations (*khums*), usually equal to 20% of a person's income on every transaction, to support

the cause. The IRGC, however, has twisted this religious tradition, like tithing in Christianity, into something far different.

930.    Under the IRGC's approach to *khums*, *zakat*, and other means of raising funds, the IRGC emphasized simplicity in terms of percentages, analogous to terrorist flat taxes.[130]

931.    Per governing IRGC and Hezbollah doctrine, the IRGC emphasizes the need to consistently collect donations (or taxes) as something that is universally required from all profit-generating activities and transactions—***without exception***—including, but not limited to, profits generated through official business, criminal rackets, bribery and kickbacks, and a broad array of other illicit cash flow schemes. The IRGC's "no exceptions" rule ensures that the terrorist have an administratively simple scheme (analogous to a terrorist flat tax), which ensures ease of implementation, and comports with the broader IRGC emphasis on its terrorists and proxies embracing administrative simplicity in their jihad.

932.    Under IRGC doctrine, *khums* donations are mandatory on multiple different transaction types, all of which ultimately flow back to fund the IRGC, including Hezbollah and the Qods Force. *First*, if income flows through and IRGC-controlled front (*i.e.*, KAA) to the IRGC shareholders behind that front (*i.e.*, the IRGC and Hezbollah), the respective shareholders provide a donation to the others. Thus, for example, if BNPP flowed through $100 million to the IRGC, one may infer that the IRGC would, in turn, donate approximately 20%—$20 million—to

---

[130] For example, as Ayatollah Khomeini instructed in his 1975 treatise, "superfluous bureaucracies and the system of file-keeping and paper-shuffling that is enforced in them, all of which are totally alien to Islam, impose further expenditures on our national budget not less in quantity than the illicit expenditures of the first category. This administrative system has nothing to do with Islam. These superfluous formalities, which cause our people nothing but expense, trouble, and delay, have no place in Islam. For example, the method established by Islam for enforcing people's rights, adjudicating disputes, and executing judgments is at once simple, practical, and swift."

Hezbollah and the Qods Force in order to export Iran's Islamist revolution abroad through anti-American terror.

933.    *Second*, if a member of the IRGC—or a cutout acting on their behalf—receives a substantial economic benefit, *e.g.*, a profit from a baking transaction, IRGC doctrine mandates that the bribe recipient kickback, mafia-style, 20% of their income to the IRGC.

934.    The IRGC's universal practice of tithing a portion of each IRGC member's income back to the leadership of the IRGC was under the direct, public, widely known, edict of Ayatollah Khomeini. For example, in Ayatollah Khomeini's seminal 1975 instruction-manual-for-terror titled *Velayat-e Faqeeh*—which was always the foundation of all IRGC doctrine—the Ayatollah decreed:

> The taxes Islam levies … khums is a huge source of income that accrues to the treasury and represents one item in the budget. According to our Sh'ia school of thought, khums is to be levied in an equitable manner on all agricultural and commercial profits and all natural resources whether above or below the ground—in short, on all forms of wealth and income. It applies equally to the greengrocer with his stall outside this mosque, and to the shipping or mining magnate. They must all pay one-fifth of their surplus income, after customary expenses are deducted, to the Islamic ruler, so that it enters the treasury. … If an Islamic government is achieved, it will have to be administered on the basis of the taxes that Islam has established—khums, zakat …[,] jizyah, and kharaj. … The provision of such a huge budget … was established with the aim of providing for [inter alia] … defense [*i.e.*, terrorism].[131] … The budget of the Islamic state is constructed in such a way that every source of income is allocated to specific types of expenditures. Zakat, voluntary contributions and charitable donations, and khums are all levied and spent separately. … God Almighty says concerning the khums: "Know that of whatever booty you capture, a fifth belongs to God and His Messenger and to your kinsmen" (8:41). Concerning zakat He says: "Levy a tax on their property" (9:103). There are also other divine commands concerning

---

[131] While Ayatollah Khomeini referenced the use of khums, zakat, and similar donations to support things like the public's welfare, that was, as BNPP knew, merely code for the "soft" IRGC activities upon which the IRGC relied to facilitate its acts of terrorism—*e.g.*, the IRGC charities that served as fronts for IRGC operatives overseas. Everything the Ayatollah referenced for which *khums* and similar donations were directed had a sole purpose: exporting the Islamic Revolution, *i.e.*, propagating acts of terrorism targeting the United States.

other forms of taxation. Now the Most Noble Messenger had the duty not only of expounding these ordinances, but also of implementing them; just as he was to proclaim them to the people, he was also to put them into practice. He was to levy taxes, such as khums, zakat and kharj, and spend the resulting income for the benefit of the Muslims; establish justice among peoples and among the members of the community … God has entrusted to him the task of … command, and accordingly, in conformity with the interests of the Muslims, he [uses such taxes to] arrange[] for the equipping and mobilization of the army.

935.    Indeed, Ayatollah Khomeini specifically decreed that *khums* were mandatory on any oil-related profits. Per Khomeini: "Those who work in oil deposits … must pay the khoms to the Islamic Treasury if the profit made by him from such activities."

### c.   Financial Auditors and Aggregators

936.    Ayatollah Khamenei, the Foundation for the Oppressed, IRGC, Hezbollah, and Supreme Leader's Office exercised programmatic control over their respective profits generated by their stake in terrorist fronts operated by them or for their benefit, which the Terrorist Sponsors used to maximize the IRGC's ability to convert such value into acts of terrorism targeting the United States. As *Radio Free Europe* reported on September 18, 2009, "all the IRGC's economic activities are monitored only by internal IRGC auditors."

937.    In so doing, the Terrorist Sponsors were comporting with a terrorist version of best financial practices. As FATF reported in 2015:

Terrorist financial management requires planning and accounting for all resources and assets that the group controls, as well as its liabilities. Analysis of publicly-available financial documents originally from a variety of terrorist organisations demonstrates that financial management practices (such as documenting revenue levels and sources, expenditure reporting, accounting) are particularly important for terrorist groups with advanced capabilities, and particularly those that are territorially based. Large terrorist groups will often rely on terrorist financial managers to accumulate revenue, establish financial shelters (such as bank accounts, front and holding entities), and oversee financial disbursements. Their activities also include provisioning funds to the group's leadership, members, and operators and considering opportunities to invest any excess capital. Groups… have actively recruited … accountants, and other financial professionals, specifically to monitor the activities of financial entities within their areas of control in order to better manage revenues and minimise losses.

938.    Accordingly, FATF concluded that an "area of focus" for counterterrorism practitioners "could include identifying and targeting financial collection/aggregation/accounting points within a terrorist organisation."

939.    The legion of in-house Hezbollah, IRGC, and SLO auditors and accountants ensured that the terrorists maintained an ironclad grip over their money – and that Khamenei, in particular, could ensure that funds were being spent on attacks.

### d.  The Foundation for the Oppressed

940.    Financial transactions that benefited the Foundation for the Oppressed directly financed Hezbollah, Hamas, PIJ, and JAM terrorist attacks in Israel, the Palestinian territories, and Iraq because that was, always, the Foundation's primary reason for being. Indeed, at least two of its formal and informal leaders have publicly admitted that the Foundation funds the Qods Force and Hezbollah: Fattah, who currently (publicly) runs the Bonyad Mostazafan, did so in 2020, and Rafiqdoost did so, at least in 2014.

941.    The Foundation was purpose-built specifically to finance Hezbollah by providing a transnational funding, asset, real estate, corporate, and personnel structure that was tailor-made to access U.S. banks, markets, and institutions and purpose-built to enable acts of terrorism by Hezbollah and allied proxies like Hamas throughout the footprint of both Hezbollah's and the Qods Force's shared, interlocking, complex, global, terrorist enterprise. The Foundation for the Oppressed was also designed to provide complete financial, logistical, and operational sustenance and cover to the Hezbollah and Qods Force operatives who were embedded inside it by supporting, among other things, the Khamenei Cell, which included key Hezbollah leaders like Hassan Nasrallah, as well as Hezbollah's top attack planners, *e.g.*, Imad Mugniyeh, who was a member of the Khamenei Cell from 1983 until his death in 2008.

942.    Accordingly, from 1979 through at least 2019, whenever a bank, including BNPP, directly or indirectly routed substantial value to the Foundation for the Oppressed, such value flowed through the Foundation (including, if necessary, through applicable Hezbollah or IRGC fronts, agents, and "orbits") to ultimately reach, among others, the Khamenei Cell. Indeed, such an outcome was the entire reason the IRGC seized the Pahlavi Foundation in 1979 and converted its assets into the Foundation. Accordingly, value transfers to the Foundation ultimately flowed through to, and were deployed by: (1) Qassem Soleimani; (2) Hassan Nasrallah; (3) Rostum Ghasemi; (4) Mohsen Rafiqdoost; (5) Mohsen Rezai; (6) Mohammad Forouzandeh; (7) Parviz Fattah; and (8) Mojtaba Khamenei.

943.    From 1979 through 2024, the Qods Force and Hezbollah notoriously used the Foundation for the Oppressed's profits to finance terrorist attacks committed by the Qods Force, Hezbollah, and such FTOs' proxies. As the BBC reported on March 27, 2001,

> the Foundation for the Oppressed ... is an ***organization that gives financial support to Iran's ... acts of terrorism abroad***. ... The organization is supervised by ... Ayatollah Khamene'i ...and is a subsidiary of the IRGC [and its investments are] ... ***under the control of Hezbollah*** like other large commercial enterprises in Iran. These are organizations operating under the supervision of the IRGC ... [and are] engaged in controlling people visiting Iran, selecting and training people for Iran, financing pro-Iranian people and so on ...[,] under the guise of cultural centres and humanitarian structures.

944.    From United States sanctions against the Foundation for the Oppressed confirmed that the IRGC and SLO used the Foundation's profits, personnel, facilities, and resources to sponsor attacks targeting the United States, including attacks targeting regime enemies. On November 18, 2020, for example, the United States imposed counterterrorism sanctions on the Foundation pursuant to Executive Order 13876. In the same designation, Treasury confirmed that the Foundation for the Oppressed served primarily as a front for terror and performed little legitimate charitable work: "[w]hile the Supreme Leader enriches himself and his allies, the

Foundation's primary mission to care for the poor has become a secondary objective. According to the Foundation's previous president, in past years as little as seven percent of the Foundation's profit has been spent on projects aimed at reducing poverty."

945.    On March 30, 2012, the Center for Investigative Journalism, a South African NGO, the "Bonyad Mostazafan," *i.e.*, Foundation for the Oppressed, was "controlled by the supreme leader of Iran" and "controlled by the ... Revolutionary Guard Corps," which was "formed by Iran's supreme leader, Ayatollah Ali Khamenei," and the Foundation was "known for engaging in Iran's shadow foreign policy" – the cornerstone of which was always Hezbollah-directed, Iran-sponsored attacks targeting the United States.

946.    Terrorism scholars also confirmed that Foundation for the Oppressed profits directly financed Hezbollah-directed, Qods Force-supported, proxy attacks by Hamas, Palestinian Islamic Jihad, and Jaysh al-Mahdi that targeted the United States in Israel and Iraq. On March 25, 2012, for example, former Treasury official Avi Jorisch warned, in reference to flagship Foundation investment "Irancell," that there was "a corporate responsibility to cease … colluding with a state sponsor of terror" because "Irancell" provided funds and resources through which "Iran and its proxies [] engaged in multiple acts of terror" and therefore BNPP "[p]artner[ed] with a regime that uses mobile technology to … proliferate[] terrorism."

947.    On September 25, 2018, President Trump told the U.N. General Assembly in a globally televised address that "Iran's leaders sow chaos, death, and destruction" by "plunder[ing] the nation's resources to enrich themselves and to spread mayhem across the Middle East and far beyond," "seiz[ing] valuable portions of the economy, and loot[ing]" the people's religious endowments" – the largest of which was the Foundation for the Oppressed – "all to line their own pockets and send their proxies to wage war."

371

948.    As Treasury confirmed in 2020, the Foundation for the Oppressed always served as a "bridge to the IRGC." "As of 2020," per Treasury, "according to [Foundation] President [Parviz] Fattah, Foundation properties have been occupied by the IRGC." Per Treasury, the Foundation's "vast economic wealth is partly the result of … business with … those involved with Iran's support of international terrorism" including trade with "the IRGC" and "MODAFL," which "have been previously designated under multiple authorities, including counterterrorism authorities."

949.    As Treasury explained in 2020, the Foundation for the Oppressed "maintain[ed] close ties to the IRGC, personified by current Foundation president and former IRGC officer Parviz Fattah," who served as a "bridge to the IRGC." In such role, the Foundation always served to "line the pockets of [Ayatollah Khamenei's] allies," including Fattah, who was appointed to lead the Foundation "in July 2019," after previously serving as, *inter alia*, "managing director of the IRGC-linked Bonyad Taavon Sepah" and "head of the Imam Khomeini Relief Committee, whose Lebanon branch was designated pursuant to counter-terrorism authorities in 2010 for being owned or controlled by, and for providing financial and material support to, Hizballah." "Known for his loyalty to the Supreme Leader, Fattah has also forged ties to senior IRGC-Qods Force … officials," including "former IRGC-QF commander Qassem Soleimani." Indeed, "Soleimani sought Fattah's assistance to finance the Fatemiyoun Brigade, an IRGC-QF-led militia composed of Afghan migrants and refugees in Iran coerced to fight, … including children as young as 14 years old," which, "like the IRGC-QF itself, is designated pursuant to both counterterrorism and human rights authorities."

950.    Treasury also confirmed that the Iranian regime used the Foundation for the Oppressed's "assets" to finance designated terrorists who served in "the Supreme Leader's inner

circle" including Gholam-Ali Haddad-Adel, a Khamenei confidant," against whom the U.S. government imposed counterterrorism sanctions pursuant to Executive Order 13876 in November 2019.

951.    Per Treasury, the IRGC used Foundation for the Oppressed resources to directly finance attacks targeting the Iranian regime's perceived enemies. While the Foundation was "ostensibly a charitable organization charged with providing benefits to the poor and oppressed, its holdings [were] expropriated from the Iranian people and are used by … Ali Khamenei to … persecute the regime's enemies." As Treasury Secretary Mnuchin observed when the U.S. sanctioned the Foundation in 2020, "Iran's Supreme Leader use[d]" the Foundation "to reward his allies under the pretense of charity" by using it as a "revenue generating source[] that enable[d] the regime's ongoing repression of its own people."

952.    U.S. government statements confirming the Foundation for the Oppressed's direct connection to IRGC- and Hezbollah-sponsored, proxy-committed, terrorist attacks targeting the United States described a consistent pattern of conduct that existed at all relevant times throughout BNPP's scheme with the IRGC and Hezbollah. These sources show that the Foundation for the Oppressed was closely intertwined with terrorist violence because the Qods Force and Hezbollah used Foundation profits to fund attacks. BNPP's transactions directly enabled the terrorist attacks that killed or injured Plaintiffs. Among other reasons, the Foundation for the Oppressed's profits, assets, data, real estate, and operatives supplied Hezbollah, Hamas, PIJ, and JAM the violent instruments such terrorists needed to commit its attacks, including, but not limited to: (1) key, off-the-books financing for terrorist operations, *supra*; (2) a transnational logistics infrastructure, including in Iraq, Lebanon, the Palestinian territories, and Syria; and (3)

the mechanisms by which Hezbollah and the Qods Force routed attack-related payments that, by their very nature, had a direct connection to each attack against Plaintiffs.

953.     Accordingly, BNPP's vast direct and indirect financial assistance that flowed through the Foundation for the Oppressed ultimately reached Hezbollah's, Hamas's, PIJ's, and JAM's operations cells, including such groups Joint Cells in Iraq, Lebanon, Syria, and the Palestinian territories.

954.     Reports and findings by U.S. and E.U. counterterrorism officials confirm Plaintiffs' allegations. On June 22, 2006, for example, senior Treasury counterterrorism official Pat O'Brien publicly testified that "Iran [] actively sponsors terrorism and violence across the Middle East … [through] [t]he Islamic Revolutionary Guard Corps (IRGC)," which was "directly involved in the planning and support of terrorist acts by non-state actors and continue to sponsor and train a variety of violent groups that act as surrogates on Iran's behalf" as IRGC proxy "terrorist … groups in Lebanon, the Palestinian territories, and Iraq," which in "posed" a "very real threat" to the United States "by Iran's sponsorship of terrorism" and depended upon "the lines of support that fuel terrorist activities" for which the IRGC's "***money flows … draw[] upon a large network of state-owned banks and parastatal companies***," *i.e.*, foundations. (Emphasis added.)

955.     On July 27, 2010, the E.U. found that, *inter alia*: (i) "Bonyad-e Mostazafan" was among the IRGC fronts that "contributes to the financing of the strategic interests of the regime and of the Iranian parallel State"; and (ii) the Iranian regime pursued such strategic interests through IRGC-sponsored terrorist attacks targeting the United States: "[The] … Qods Force is responsible for operations outside Iran and is Tehran's principal foreign policy tool for special operations and support to terrorists and Islamic militants abroad. Hizballah used Qods Force-

supplied rockets, anti-ship cruise missiles (ASCMs), man-portable air defense systems

(MANPADS), and unmanned aerial vehicles (UAVs) in the 2006 conflict with Israel and

benefited from Qods Force training on these systems, according to press reporting. According to

a variety of reporting, the Qods Force continues to re-supply and train Hizballah on advanced

weaponry, anti-aircraft missiles, and long-range rockets."

956.    Former senior U.S. officials confirmed that U.S. sanctions targeting the

Foundation for the Oppressed recognized that the Foundation's profits financed IRGC-sponsored

proxy attacks. On March 3, 2022, Gabriel Noronha, Former Special Advisor for Iran at the State

Department, publicly observed: "[S]anctions on some of the regime's worst terrorists …

[included] sanctions on Khamenei's personal slush funds known as 'bonyads,' including …

[s]anctions … on Bonyad Mostazafan [Foundation for the Oppressed], a massive conglomerate

that … is enmeshed with the IRGC and is a corruption network used to enrich top Iranian

terrorists. … [U.S. Department of State] lawyers were clear when we released this [Executive

Order sanctioning entities like the Foundation for the Oppressed in November 2020]: it was a

response to actions by Iran & its proxies to …. promote international terrorism … [and sponsor]

attack[s] against US military assets [and] civilian vehicles."

957.    In 2018, likewise, Nader Uskowi – who served the United States in Iraq as Senior

Civilian Policy Advisor to U.S. Central Command in Iraq – published a book focused on the

IRGC, in which he observed that "commercial companies" that were "own[ed]" by "[t]he

Mostazafan Foundation" were a vital financial, logistical, and operational sponsor of acts of

international terrorism committed by Hezbollah and Iran's proxies in Israel, Iraq, and elsewhere:

> The Quds Force [] requires funding for its significant … efforts in Iraq, including
> financing operations and military equipment for some of the largest Shia militia
> groups in [Iraq]. In Yemen, the Quds Force provides advanced weaponry to the
> Houthis … In Lebanon, as the chief of Hezbollah has said, Iran provides nearly all

[Hezbollah]'s budget, which is estimated to be close to $1 billion annually. The Quds Force operates in … Afghanistan as well. It also maintains a large Afghan Shia militia force, the Fatemiyoun, estimated to be fifteen thousand strong. The cost of these operations are all shouldered by the Quds Force.

Outside … Syria, Iraq, Yemen, Lebanon, and Afghanistan, the Quds Force … maintains a vast network of associates across the globe.

Iran not only finances these projects, it has to pay for the majority of these expenses in hard currency …, a major expenditure for a country facing an economic crisis of its own.

It is not entirely clear how Iran finances its Quds Force-led projects, but the bulk of its military involvement in the region could be funded by the business empire run by the IRGC and the Office of the Supreme Leader. Between the two, they control a dozen major foundations, which in turn control more than five hundred companies and enterprises.

A 2017 report by the Iranian opposition has revealed the extensive business empire behind the extra-budgetary funding. An understanding of the extent to which the country's leader and … the IRGC[] control the Iranian economy is key to understanding the Quds Force-led projects. …

The IRGC and the Office of the Supreme Leader are estimated to control about 50 percent of the Iranian economy through the mega-foundations outlined above [e.g., the Foundation for the Oppressed]. Such massive economic control creates both opportunities and constraints for the Quds Force.

The IRGC's business empire provides the Quds Force with a secure source of funding even if the government budget is cut due to competing priorities at home. The foundations controlled by the IRGC and the Office of the Supreme Leader are both exempt from taxes and are off official records, making them especially suitable as emergency funding for Quds Force [] efforts without any scrutiny … The Quds Force also has established its own businesses in the [Middle East] region, partly through the IRGC-controlled foundations operating in the near abroad [i.e., the Middle East]. Access to those funds, coupled with its vast network of Shia militant groups and associates and its arms caches across the region, would enable the Quds Force for continue its operations as the headquarters of the Shia militance in the Middle East, albeit at a diminished level, in case of an emergency in Tehran.

958.    Moreover, Mr. Uskowi confirmed, in the same 2018 book, that income that

flowed through to the Foundation for the Oppressed supplied the IRGC with vital "off-the-

books" money that comprised an especially potent form of direct aid to attacks by Hezbollah and

Iran's proxies throughout the Middle East:

The official budget of the Quds Force is around $3 billion annually. This figure does not include off-budget and extra-budgetary funding, which make up a huge

portion of its revenues. … [T]he Quds Force draws a substantial portion of its revenues from sources other than the Iranian government.

The Quds Force receives off-budget revenues from the Office of the Supreme Leader, which in turns receives off-budget revenues from a business network under its control, including major foundations … and … their associated companies. The IRGC also provides the Quds Force with off-budget funding from the revenues of its own business enterprises inside Iran, which include companies in major economic sectors, including … telecommunications …

The Quds Force's own business network outside Iran provides extra-budgetary revenues; the income from these businesses is estimated to be around $3 billion annually.

These nongovernmental sources of funding, coupled with the decentralized financial structure of the off-budget and extra-budgetary funding of the Quds Force, reflect its mission to sustain activities even in a post-Islamic Republic era.

The current economic … sanctions inhibiting foreign investment in [Iran], negatively affect … the revenues of the foundations controlled by the supreme leader and the IRGC. … The foundations are generally behind the Quds Force-controlled economic enterprises outside the border. Drops in [IRGC] revenues and the foundations' profits have immediate effects on Quds Force funding.

The resulting decrease in revenues could directly affect Quds Force operations in the region, including its ability to pay full salaries … Any cut … could adversely affect Hezbollah's ability to pay salaries and overall costs of deployment. Likewise, other Shia militia groups would be affected. Iran pays the salaries and cost of operations for all its Afghan and Pakistani militias. It covers the budget of major Iraqi Shia militias and contributes significantly to the Houthi organization.

959.    Public decrees by Ayatollah Khamenei confirmed that the Foundation for the

Oppressed served as a front for Hezbollah and the Qods Force, and alerted BNPP to the same.

For example, in 1989, 2012, and other occasions when he appointed a new executive director of

the Foundation, the Ayatollah publicly touted how the Foundation promoted "resistance,"

supported "martyrs," and helped liberate the "oppressed"—which were all widely known, and

infamous, euphemisms for IRGC-sponsored attacks targeting America.

960.    IRGC admissions confirmed that the Foundation for the Oppressed's support

enabled terrorist attacks by Hezbollah, the Qods Force, and their proxies. On November 3, 2012,

for example, a "reporter" for IRGC-controlled media outlet *Aftab* acknowledged that the

Foundation supported IRGC proxies "[i]n countries like Syria and Palestine, where Iran's interests are outside the country... that means the activities of the Foundation [for the Oppressed] to help [IRGC proxies like] Bashar al-Assad's government." Under the same rationale, the IRGC used the Foundation for the Oppressed to sponsor acts of terrorism in Iraq, Yemen, and Afghanistan, just as the IRGC did elsewhere.

961.    Terrorism scholars also confirmed, and alerted BNPP, that the Foundation for the Oppressed was a front for Hezbollah and the Qods Force, and its notorious reputation for directly funding IRGC terrorist proxies in the Middle East continued at all relevant times. In 2016, for example, Mehran Riazaty—who served the U.S. military as an Iran Analyst attached to Multi-National Forces, Iraq—observed that "[t]actically, Bonyads are often connected to the Iranian Revolutionary Guard Corps [and] Operatives from the IRGC [*i.e.*, IRGC-IO], along with members of Al-Qods [*i.e.*, Qods Force] and Hezbollah, and often go undercover, representing themselves as employees or officials of trading companies, banks, and cultural centers, or as representatives of the Bonyad of the Oppressed and Dispossessed [*i.e.*, the Foundation for the Oppressed]."

962.    From 2017 through 2020, likewise, the National Council of Resistance of Iran ("NCRI"), published a series of reports documenting how transactions with companies owned or controlled by the Foundation for the Oppressed funded attacks by the Qods Force, Hezbollah, and their proxies, some of which even included the following graphic (red box added):



963. On May 14, 2019, similarly, Doublethink Institute reported: "The largest bonyads are managed by leading clerics, politicians and generals, while members of the … IRGC … sit on the boards of important bonyad-run companies in nearly all economic sectors. Though government-funded, bonyads are completely independent of state oversight. … One such case is Mostazafan Foundation (MF) [Foundation for the Oppressed], a bonyad with nearly $1 billion in annual exports to several continents. Even its director, Mohammad Saeedikia, has admitted to state-run media outlets that he lacks documentation on the total volume of [the Foundation for the Oppressed]'s wealth. … Part of the money is [] used to fund Iran's involvement in regional conflicts. Following last year's devastating earthquake in the west of the country, Iranians accused the IRGC of diverting aid from the afflicted region and sending it farther west to Syria." On May 11, 2020, moreover, Doublethink Institute published a substantial presentation online entitled "Bonyad Mostazafan," which alerted BNPP that "[i]nternationally," the IRGC-led "Mostazafan Foundation" – i.e., the Foundation for the Oppressed – "control[led] an organization that propagate[d] a militant version of Shi'a Islam … worldwide," "ha[d] a branch in New York and continues to be active in the United States," and supported the activities of

"Imam Khomeini Relief Foundation" (a notorious Qods Force and Hezbollah front) "in Lebanon,

Syria, … Afghanistan, Iraq, … Gaza and many other regions."

964.    Decades of other reports and statements published by the United States, Iranian

regime, Iranian opposition, media, terrorism scholars, and NGOs confirmed that the Foundation

for the Oppressed was a front for Hezbollah and the Qods Force that enabled such FTOs' attacks,

and alerted BNPP that their value flow-through to the Foundation for the Oppressed as one of

their counterparties' ultimate beneficial owners fueled Qods Force and Hezbollah-committed

terrorist attacks, including, but not limited to:

a.    _Montreal Gazette_, June 4, 1994: "The United States, most crucially, continues to classify
      Iran as a state sponsoring terrorism. It makes no distinction between official and
      unofficial Iranian actions, though there is strong reason to believe that directing many of
      Iran's more dubious overseas activities - including support for the Hezbollah in Lebanon
      - is not the core of government but the 'bonyads.'"

b.    _Christian Science Monitor_, February 1, 1995: "[D]espite corruption allegations[,] …
      [IRGC] General [Mohsen] Rafiqdoost is the managing director of Iran's Foundation of
      the Oppressed … [M]any analysts hold that Rafiqdoost's interests go beyond helping the
      poor of Iran. Western security sources believe the bonyads are used by Iran's religious
      authorities as deniable vehicles to finance … Hizbollah … 'There is bonyad money going
      to Lebanon, for sure,' said one source in Iran …. 'Look, the bonyad works in harmony
      with the government,' explained Rafiqdoost. 'At times we go to their aid.'"

c.    _Newsday_, May 28, 1995: "[I]n a four-month investigation based on dozens of interviews
      with law-enforcement officials and U.S. government specialists, knowledgeable Iranians
      who support the regime as well as dissidents, and public and private documents,
      Newsday has found that: [The Foundation for the Oppressed] … is controlled by Iran's
      clerical leadership, federal officials say. … [The Foundation] finances [entities] in the
      United States that support Iran's militant … Islam and provides safe haven for groups and
      individuals supporting the Islamic terrorist group[] … Hezbollah. … In a classified report
      … the FBI asserted that [the Foundation] was 'entirely controlled by the government of
      Iran,' which used [the Foundation for the Oppressed] to set up 'covert subbranches
      disguised as educational centers, mosques and other centers.' … The FBI report,
      according to a U.S. official, claims that [the Foundation] funds 'fundamentalist extremist
      groups' and that Iranian students who received scholarships from [the Foundation] to
      study in the United States 'gather[ed] intelligence' … and collected "technical and
      scientific information" for the Iranian regime. In 1989, Oliver Revell, then the No. 2
      official at the FBI, told the Senate terrorism subcommittee that some of the 'students'
      receiving [the Foundation's] grants were in fact [IRGC, including Qods Force] agents. …
      Revell … said much of [the Foundation]'s funds go to 'a great number of mosques (in the

United States) . . . where there are organizations which directly support Hezbollah…[,]' an Iranian-supported [] group … that has launched terrorist attacks under the tutelage of the Revolutionary Guards. … The [Foundation] is administered by Mohsen Rafiqdoost, founder of the Revolutionary Guards."

d. *Financial Times Mandate*, April 23, 1996: "[B]onyad[s] have a reputation for … corruption. The richest and most notorious, according to Iranian analysts, is the Mostazafan (the foundation for the deprived [*i.e.*, the Foundation for the Oppressed]), which is controlled by the Islamic Revolutionary Guard Corps. … Everywhere, … there is talk of greater economic liberalism … But Iran continues to spend money … on exporting Islamic revolution."

e. *Financial Times Mandate*, July 17, 1997: "Of all the state-vested interests competing for … scarce hard currency, Tehran businessmen say the most formidable are the bonyad, the state foundations set up by the clergy after the revolution and directed by political nominees without regard to business experience … Many economic commentators say it is the opacity and power of such privileged corporations, their reputation for mismanagement, obsessive secrecy and covert operations that are a greater deterrent to foreign investors than the fear of running foul of US sanctions, which Tehran blames. Among the Bonyad, the most notorious is the Bonyad Mostazafan, the 'foundation for the oppressed and disabled'. … The autonomy of the bonyad is not confined to banking, commerce or industry. One of them unilaterally took the initiative in 1989 to offer the Dollars 2m [] 'bounty' for Mr Salman Rushdie, the British author."

f. *Newsday*, December 8, 1998: "[T]he … Mostazafan Foundation [] controls billions of dollars of investments in Iran and around the world … [and] has been accused by western intelligence services of … supporting terrorism."

g. *BBC*, June 14, 2002: "Iran has been financing the Islamic Jihad Organization … since the group's establishment but its budget reached it through Hezbollah. The latter's budget is paid by Iranian establishments [*i.e.*, foundations a/k/a bonyads], the *vali-e faqih* office [*i.e.*, the Supreme Leader's Office], the Revolutionary Guards' liberation movements' office, in addition to the Qods Forces and exceeds 200m dollars. … Regarding the increase in Hezbollah's budget, the source said the party receives aid from various sources in addition to its annual budget and these come from … Iran … [including] [the] 'Mostaza'fin' (Foundation for the Oppressed) …"

h. *Forbes*, July 21, 2003: "[Under the IRGC's] The Cosa Nostra meets fundamentalism [approach,] [t]heoretically the Mostazafan Foundation is a social welfare organization. … Why does this foundation [*i.e.*, the Foundation for the Oppressed] exist? … A picture emerges from one Iranian businessman who used to handle the foreign trade deals for one of the big foundations. Organizations like the Mostazafan [*i.e.*, Foundation] serve as giant cash boxes, he says, to pay off supporters of the mullahs, … [including] Hezbollah … and, not least, the foundations serve as cash cows for their managers [*i.e.*, the IRGC including the senior IRGC terrorists who ran the Foundation]."

i.      *Newsmax*, June 3, 2009: "Once Iran created Hezbollah in 1983, Mousavi coordinated the financing for it as the head of the Bonyad Mostazafan, which he chaired as prime minister. 'For example, … Mousavi set up a scheme so that Hezbollah would get a share of Iranian [] sales,' Mesbahi said. … Under the scheme, [an agent of the Foundation for the Oppressed] established front companies for the [] transactions in [Europe], 'and the banks would do the rest, putting commissions into the Hezbollah accounts under fictitious names,' [former Iranian intelligence officer, Abdolghassem] Mesbahi said."

j.      Kerry Patton (Combat-Disabled Veteran; Senior Analyst, Wikistrat), January 2, 2012: "Bonyads assist in fueling world terror, enhanced military might, and promotion of propaganda and 'comfort for the oppressed.' … Enforcement of Iran's Bonyads is both strategic and tactical. … Tactically, Bonyads are often interrelated to the Iranian Revolutionary Guard Corp (IRGC). Operatives from the IRGC along with members founded in Al Quds and Hezbollah go undercover portraying themselves as employees or officials of trading companies, banks, cultural centers or as representatives of the Foundation of the Oppressed and Dispossessed (Bonyad-e- Mostazafan) ... Bonyads are funded actively and passively. The Islamic alms giving known as Zakat often serves as a Bonyad contributor."

k.      Robert A. Manning (Atlantic Council), April 30, 2015: "The IRGC … controls much of economy through the Bonyads [the largest of which was the Foundation for the Oppressed]. In addition there is the Qods Force, an elite group in the IRGC that leads interventions abroad – [including by partnering with] … Hezbollah …"

l.      Dr. Hesam Forozan (Middle East Scholar), 2015: "In addition to its internal organization units designed for its personnel, the [IRGC] has at its disposal a host of units and departments, … Many of these units exert an indirect influence on and are in close liaison with other governmental, extra governmental and revolutionary organizations. These include … the Foundation of the Oppressed .… Partly because of their connection with the [IRGC], the directors and managers of these foundations were capable of gaining access to sources of capital and government tender. For example, both the current and former heads of the [Foundation for the Oppressed], Mohammad Forouzandeh and Mohsen Rafiqdust, come from the ranks of former [IRGC] officers. Following the post-war reduction of the military budget, the [IRGC] augmented its ties with clerical-controlled foundations, in particular the [Foundation for the Oppressed]. … the [F]oundation apparently undertakes international endeavors that transgress the traditional definition of trade – the [Foundation] is commonly cited as a generous supporter and active political patron of the Lebanese Hezbollah terrorist organization."

m.      Dr. Mohammad al-Sulami (PhD, International Relations), August 31, 2020: "Systemic state corruption in Iran … ha[s] reached record-breaking levels within … the … IRGC … Parviz Fattah, the head of the … Foundation for the Oppressed … admitted this month that the IRGC … had used the foundation to engage in projects worth billions. This means the revenues generated from these projects have gone to the IRGC, not the foundation. … Fattah's revelations have once again exposed the Iranian regime's claim that it defends the vulnerable and oppressed, with the regime-backed IRGC profiteering from a foundation that is supposedly dedicated to helping the oppressed."

n.  Cyrus Yaqubi (Iran Scholar), January 24, 2021: "[W]here does the [Foundation for the Oppressed's] revenue go? … Since US sanctions caused a sharp decline in Iran's official revenues, the regime is facing financial difficulties and cannot fund its proxies to meddle in the [Middle East] region or as the mullahs' call it 'expand its strategic scope'. Iran cannot fund its proxies including Hezbollah, and its multitude of militia forces in Iraq and Yemen, or its Afghan Fatemiyoun Division … in Syria using its official annual budget. The millions of dollars used to fund these group must be provided from other financial sources. …[B]onyads such as Bonyad-e-Mostazafan [Foundation for the Oppressed], are among the organizations that have directly assisted the Quds Force in this regard. Iranian opposition sources have previously stated that the Quds Force receives most of its funds from [bonyads]. … The US's decision to sanction [bonyads] will definitely be welcomed by Iranians who are tired of having their stolen wealth used for terrorism."

o.  Dr. Mark D. Silinsky (Former DOD Military Intelligence Analyst and Adjunct Professor at the U.S. Army War College), 2021: "Today, bonyads … acquir[e] and distribut[e] wealth to the Guards [i.e., the IRGC]. The operations and business models of bonyads are very opaque because of corruption and mismanagement. One financial analyst snickered, 'Who know how they function? They are like a black hole.' Similar to nonprofit organizations, bonyads are tax-exempt charitable entities. Senior personnel are adept at transferring funds from one element to another to subvert U.S. sanctions and channel funds toward terrorist operations. ... The largest bonyad [i.e., the Foundation for the Oppressed] funds Hezbollah and operates in Europe and Asia."

### e. The Supreme Leader's Office

965.  On June 26, 2019, the United States issued Executive Order 13,876, which formally found that the SLO directly facilitated IRGC-sponsored acts of "international terrorism committed by "Iranian-backed proxies" in the "Middle East."

966.  On November 5, 2019, the United States imposed IRGC counterterrorism-related sanctions against the SLO to target its sponsorship of terrorist attacks committed by the Qods Force, Hezbollah, and their proxies, based upon findings that included as follows:

OFAC … act[ed] … against … individuals who are appointees of, or have acted for or on behalf of, Ali Khamenei, the Iranian regime's unelected Supreme Leader whose office is responsible for advancing Iran's radical agenda. This action seeks to block funds from flowing to a shadow network of Ali Khamenei's military and foreign affairs advisors who have for decades oppressed the Iranian people, exported terrorism, and advanced destabilizing policies around the world. Specifically, the action targets Ali Khamenei's appointees in the Office of the Supreme Leader ….
"Today the Treasury Department is targeting the unelected officials who surround Iran's Supreme Leader, Ayatollah Khamenei, and implement his destabilizing policies," said Treasury Secretary Steven T. Mnuchin. "These individuals [in the SLO] are linked to a

wide range of malign behaviors by the regime, including bombings of the U.S. Marine
Barracks in Beirut in 1983 and the Argentine Israelite Mutual Association in 1994, as
well as torture, extrajudicial killings, and repression of civilians. This action further
constricts the Supreme Leader's ability to execute his agenda of terror and oppression."
This action is being taken pursuant to President Donald J. Trump's Executive Order
(E.O.) 13876, signed on June 24, 2019. The E.O. imposed sanctions on the Supreme
Leader of the Islamic Republic of Iran and the Supreme Leader's Office (SLO), and
authorized sanctions on others associated with the Supreme Leader or the SLO. …
Mojtaba Khamenei, the second son of [Khamenei], is designated today for representing
the Supreme Leader in an official capacity despite never being elected or appointed to a
government position aside from work in the office of his father. The Supreme Leader has
delegated a part of his leadership responsibilities to Mojtaba [sic] Khamenei, who
worked closely with the commander of the … Qods Force [*i.e.*, Qasem Soleimani] … to
advance [Ayatollah Khamenei]'s destabilizing regional ambitions ….
Also designated today is Gholam-Ali Hadad-Adel, father-in-law of Mojtaba Khamenei, a
member of the Expediency Council and also an advisor to Ali Khamenei. Hadad-Adel is
known to be among those in the Supreme Leader's inner circle. … Gholam-Ali Hadad-
Adel is being designated [pursuant to E.O. 13876] for having acted or purported to act for
or on behalf of, directly or indirectly, the Supreme Leader of Iran.

967.    Notably, Mojtaba Khamenei and Gholam-Ali Hadad-Adel both operated through

Petro Nahad, and thus, the above findings also confirm the tight nexus between Petro Nahad and

Qods Force-sponsored attacks supported by Qasem Soleimani—which describes every attack

against Plaintiffs and their loved ones.

968.    On November 3, 2022, the United States imposed additional IRGC

counterterrorism-related sanctions against the SLO to target its direct and indirect sponsorship of

acts of terrorism committed by the Qods Force, Hezbollah, and their proxies, based upon

findings that included as follows:

[OFAC] designated members of an international oil smuggling network that facilitated oil
trades and generated revenue for Hizballah and the … Qods Force … in support of
Hizballah and the IRGC-QF.
"The individuals running this illicit network use a web of shell companies and fraudulent
tactics including document falsification to obfuscate the origins of Iranian oil, sell it on
the international market, and evade sanctions," said Under Secretary of the Treasury for
Terrorism … Brian E. Nelson. "Market participants should be vigilant of Hizballah and
the IRGC-QF's attempts to generate revenue from oil smuggling to enable their terrorist
activities around the world." …

> [An] Iranian national … oversaw … the network's illegal … exportation of Iranian oil in support of Hizballah and the IRGC-QF … [and] received orders from high-ranking Iranian officials associated with the U.S.-designated [] Supreme Leader's Office to direct the network's oil smuggling operation profits to companies and bank accounts associated with Hizballah and the IRGC-QF.

969.    That same day, Secretary of State Antony J. Blinken confirmed that the U.S. had sanctioned this SLO-directed, Hezbollah- and Qods Force-operated "sanctions evasion network" and "11 vessels" because the United States determined that they "provid[ed] support to Hizballah and the Islamic Revolutionary Guard Corps-Qods Force" when they "facilitate[d] the sale of hundreds of millions of dollars' worth of oil for these organizations [*i.e.*, Hezbollah and the Qods Force]" through the use of "shell and front companies established to facilitate the illegal blending and exportation of Iranian oil around the world," which the United States determined "provid[ed] support to terrorists or acts of terrorism" by Hezbollah and the Qods Force.

970.    From at least 2021 through 2024, the United States publicly sanctioned "Ali Husseini Khamenei, Supreme Leader, for support of the IRGC, a Foreign Terrorist Organization," and "Mojtaba Khamenei, son of Supreme Leader," which identified Ayatollah Khamenei and Mojtaba Khamenei as persons whom the U.S. had sanctioned pursuant to "Section 221 of the Iran Threat Reduction and Syria Human Rights Act of 2012, Public Law 112-158 (TRA), enacted on August 10, 2012, codified at 22 U.S.C. 8727, requires the President to publish a list of individuals that the President has determined are senior officials of the Government of Iran, as defined in the statute, that are involved in Iran's illicit nuclear activities or proliferation of weapons of mass destruction (WMD) or delivery systems for WMD; support for international terrorism; or the commission of serious human rights abuses against Iranian citizens or their family members."

971.    The U.S. government statements confirming the SLO's direct connection to IRGC sponsored, proxy-committed, acts of terrorism targeting the United States described a consistent pattern of conduct that existed at all relevant times throughout BNPP's scheme with the IRGC and Hezbollah. These sources show that the SLO was closely intertwined with terrorist violence because the Qods Force and Hezbollah used the SLO's profits to finance terrorist attacks.

972.    SLO used its BNPP-supplied dollars, BNPP-enabled access to the U.S. financial system, and BNPP-provided cover and concealment to help build, finance, and logistically sustain Hezbollah's and the Qods Force's operations in Iraq and Israel.

973.    From 2003 through 2016, the SLO's profits, assets, data, real estate, and operatives supplied Iran's proxies the violent instruments they needed to commit their attacks. Financial transactions that benefited the SLO directly financed terrorist attacks in Iraq and Israel, among other places, because that was always one of the primary rationales for Khamenei's expansion of the SLO in 1990 and beyond.

974.    A substantial percentage of SLO profits was earmarked for, and channeled to, Hezbollah and Qods Force operations, logistics, and finance cells that powered attacks in Iraq and Israel, consistent with operative Iranian regime rules, customs and practices, and tactics, techniques, and procedures, including the Logistics Policy Directive, mandatory donations (*khums*), and legion of in-house SLO auditors and accountants. Under Khamenei, the SLO was purpose-built and expanded specifically to finance Iran-backed terrorist proxy attacks, and served over time as a key complementary manager of the Iranian regime's other Terrorist Sponsors, including the Foundation for the Oppressed, IRGC, and Hezbollah, which enabled terrorist attacks drawing upon assets, operatives, and cells of all three loyal Khamenei followers

throughout the footprints of their respective, and interlocking, global, terrorist operations, logistics, financial, and personnel super-structure.

975.    Accordingly, from 1990 through 2020, whenever a bank, including BNPP, directly or indirectly routed substantial value to the SLO (including, if necessary, through applicable SLO fronts, agents, and "orbits"), such value flowed up the SLO and, given its khums practices, the Khamenei Cell, and then back down from the Khamenei Cell to Khamenei Cell-backed operations, logistics, finance, and intelligence cells responsible for sponsoring and conducting attacks targeting the United States. Indeed, such an outcome was the entire reason Khamenei overhauled the SLO into this expansive mission shortly after becoming Supreme Leader of the Islamic Revolution in 1989. Accordingly, value transfers to the SLO ultimately flowed through to, and were deployed by, senior terrorists who played key roles in the attacks in Iraq, including those against Plaintiffs,

976.    Since the late 1980s, the SLO has notoriously used its control of fronts to enable Hezbollah's and the IRGC's use commercial, off-books, profits to finance terrorist attacks committed by Hezbollah and its proxies, and sponsored by the Qods Force.

### f.   The IRGC

977.    The IRGC was purpose-built specifically to finance Iran-backed terrorist proxy attacks, and served over time as the primary manager of the Iranian regime's, including other Terrorist Sponsors, e.g., the Foundation for the Oppressed's, support for Hezbollah transnational operations, logistics, and finance fronts by providing the IRGC's global footprint, in effect, to Hezbollah through the joint cells approach described herein, which enabled terrorist attacks by Hezbollah sponsored by the Qods Force throughout the footprint of both groups' shared, interlocking, complex, global, terrorist enterprise.

978.    Financial transactions that benefited the IRGC directly financed terrorist attacks in Iraq and Israel because sponsoring terrorist violence outside of Iran was always the IRGC's primary reason for being. Indeed, the IRGC's flag, constitutional mandate, doctrine, and ideology publicly always confirmed such point.

979.    On July 17, 2017, the United States announced new IRGC-related sanctions, and warned that "[t]he United States remains deeply concerned about" how the "Islamic Revolutionary Guard Corps (IRGC)" enabled "Iran's malign activities across the Middle East," because the IRGC "continues to support terrorist groups such as Hizballah."

980.    On August 2, 2017, Congress enacted, and the President signed, the Countering America's Adversaries Through Sanctions Act, an amendment to the U.S. Code that formally codified that "Congress makes the following findings: ... (2) The Iranian Revolutionary Guard Corps–Quds Force (in this section referred to as the ''IRGC–QF'') … support[s] terrorist and insurgent groups [by] … provid[ing] material, logistical assistance, training, and financial support to militants and terrorist operatives throughout the Middle East and South Asia"; and "(3) The IRGC, not just the IRGC–QF, is responsible for implementing Iran's international program of … support for acts of international terrorism …." § 105, 22 U.S.C. § 9404, Pub. L. No. 115-44, 131 Stat. 892 (2017). Moreover, the updated U.S. Code noted "the IRGC, including the Quds Force … [provided] support, including funding, lethal and nonlethal contributions, and training, … to Hezbollah, Hamas, special groups in Iraq, … and other violent groups across the Middle East." § 103(b)(5), 22 U.S.C. § 9402, Pub. L. No. 115-44, 131 Stat. 889 (2017).

981.    On October 13, 2017, the United States designated the entirety of the IRGC as a Specially Designated Global Terrorist, and stated, in part, as follows:

a.    <u>Treasury</u>: "OFAC … designated [the] Islamic Revolutionary Guard Corps (IRGC) pursuant to the global terrorism Executive Order (E.O.) 13224 and consistent with the

Countering America's Adversaries Through Sanctions Act. OFAC designated the IRGC today for its activities in support of the IRGC-Qods Force (IRGC-QF), which was designated pursuant to E.O. 13224 on October 25, 2007, for providing support to a number of terrorist groups, including Hizballah and Hamas …. The IRGC has provided material support to the IRGC-QF, including by providing training, personnel, and military equipment."

b.    <u>Treasury</u>: "'The IRGC has played a central role to Iran becoming the world's foremost state sponsor of terror. … Treasury will continue using its authorities to disrupt the IRGC's destructive activities,' said Treasury Secretary Steven T. Mnuchin. 'We are designating the IRGC for providing support to the IRGC-QF, the key Iranian entity enabling … the lethal activities of Hizballah, Hamas, and other terrorist groups. We urge the private sector to recognize that the IRGC permeates much of the Iranian economy, and those who transact with IRGC-controlled companies do so at great risk.'"

c.    <u>Treasury</u>: "The IRGC was designated today for the activities it undertakes to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF."

d.    <u>White House</u>: "[T]he Iranian regime continues to fuel … terror … throughout the Middle East and beyond" through "[t]he Revolutionary Guard['s]" deployment as "the Iranian Supreme Leader's corrupt personal terror force."

e.    <u>White House</u>: "In Iraq and Afghanistan, groups supported by Iran have killed hundreds of American military personnel. The Iranian dictatorship's aggression continues to this day. The regime remains the world's leading state sponsor of terrorism, and provides assistance to … Hezbollah, Hamas, and other terrorist networks."

f.    <u>White House</u>: "The Revolutionary Guard … has hijacked large portions of Iran's economy and seized massive religious endowments [i.e., bonyads or foundations, e.g., the Foundation for the Oppressed] to fund … terror abroad. This includes … supplying proxies and partners with missiles and weapons to attack civilians in the region[] and even plotting to bomb a popular restaurant right here in Washington, D.C."

g.    <u>White House</u>: "I am authorizing … Treasury … to further sanction the entire [IRGC] for its support for terrorism and to apply sanctions to its officials, agents, and affiliates."

982.    On October 16, 2017, Treasury Under Secretary Sigal Mandelker publicly

confirmed how the entire IRGC was involved in supporting terrorist attacks in the Middle East

committed by Hezbollah, Hamas, PIJ, and JAM:

a.    "[T]here are few more pressing national security concerns for the United States and the international community right now than the growing threat posed by … [t]he Iranian regime," which was "wreaking havoc on the Middle East and beyond" and providing "state support of terrorism" that was "second-to-none" by "financ[ing] and support[ing]

Hizballah, Hamas, and … Iraqi … militant groups" by "seed[ing] these terror groups with increasingly destructive weapons as they try to establish footholds from Iran to Lebanon and Syria" and such "aid [was] primarily delivered by … the IRGC[] and its Quds Force, which … [existed as] vehicles to cultivate and support terrorists abroad."

b.      "The IRGC has even threatened terrorist attacks right here in the United States, plotting the murder of Saudi Arabia's Ambassador to the United States on American soil in 2011. Such an attack—if not thwarted by our terrific law enforcement and intelligence officers—would have not only killed a Saudi diplomat, but likely innocent bystanders here in Washington, DC."

c.      "[The United States's] Iran strategy … is designed to neutralize Iran's destabilizing influence and support for terrorists and militants. It includes four strategic objectives: First, we must neutralize Iran's destabilizing activities and constrain Iran's aggression, particularly its support for terrorism and militants with a focus on its activities in the Middle East …[,] includ[ing] its actions in Syria, which threatens Israel, and its support to terrorism through groups like Hizballah, Hamas, Iraqi Shia militant groups and others. Second, we must work to deny Iran and especially the IRGC funding for its malign activities, including its funding for terrorists and militant proxies …"

d.      "On [October 13, 2017], OFAC designated the IRGC for support to terrorism under Executive Order 13224, consistent with section 105 of the Countering America's Adversaries Through Sanctions Act passed in August. The President also authorized us to take additional action against the IRGC's officials, agents, and affiliates later this month. The IRGC designation … further increases the pressure on the IRGC. It also highlights the nefarious nature of the organization. Beyond being a proliferator of weapons and a supplier of militants and military equipment – actions for which it has been previously sanctioned by the United States – the IRGC has helped make Iran the world's leading state sponsors of terrorism."

e.      "The IRGC provides the organizational structure that allows them to export their militant extremism across the globe. It has been the Iranian regime's main weapon in pursuit of its radical goals and is a lifeline for Hizballah, … Shia militant groups in Iraq, and others. The IRGC's control over large portions of the Iranian economy furthers its ability to support these groups and enrich its members. In order to deny the IRGC the resources and financing it needs to spread instability, we must and we have been engaging our allies and partners, including those in the private sector."

f.      "[T]o deny the IRGC the resources and financing it needs to spread instability, we … have been engaging … the private sector. We have consistently raised concerns regarding the IRGC's malign behavior, the IRGC's level of involvement in the Iranian economy, and its lack of transparency. We have pointed out that the IRGC continues to be an integral part of the Iranian economy, including in the energy, construction, mining, and defense sectors. And as we have urged the private sector to recognize that the IRGC permeates much of the Iranian economy, we have told them that those who transact with IRGC-controlled entities do so at their own risk."

983.    On May 8, 2018, the United States announced new sanctions against the IRGC

confirming:

> The Iranian regime is the leading state sponsor of terror. It exports dangerous missiles …
> and supports terrorist proxies and militias such as Hezbollah [and] Hamas …. Over the
> years, [the IRGC] and its proxies have bombed American embassies and military
> installations, murdered hundreds of American servicemembers, and kidnapped,
> imprisoned, and tortured American citizens. The Iranian regime has funded [the IRGC's]
> long reign of chaos and terror by plundering the wealth of its own people.

984.    On October 1, 2018, the United States published its counterterrorism strategy,

confirming that the IRGC continued to seek to leverage its global networks of financiers,

logisticians, and recruits, including persons in the United States, to sponsor acts of terrorism

targeting the United States:

> Iran remains the most prominent state sponsor of terrorism, supporting militant and
> terrorist groups across the Middle East and cultivating a network of operatives that pose a
> threat in the United States and globally. These groups, most notably Lebanese Hizballah
> (Hizballah), use terrorism … in partnership with Iran to expand their influence in Iraq,
> Lebanon, [and] the Palestinian territories …. Hizballah fields powerful military and
> intelligence elements, possesses large stocks of sophisticated arms, and maintains
> extensive networks of operatives and sympathizers overseas, including individuals in the
> [United States] homeland.

985.    On October 11, 2018, FinCEN published its *Advisory On The Iranian Regime's*

*Illicit And Malign Activities And Attempts To Exploit The Financial System*, in which FinCEN

warned multinational companies and banks, including BNPP, that whenever a company or bank

enables the IRGC's "Abuse of the International Financial System … to access the financial

system through covert means and to further [the IRGC's] malign activities [by] … misusing

banks and exchange houses, operating procurement networks that utilize front or shell

companies, exploiting commercial shipping, and masking illicit transactions using senior

officials, … ***[o]ften, these efforts serve to fund the regime's nefarious activities, including***

***providing funds to the Islamic Revolutionary Guard Corps (IRGC) and its Islamic***

***Revolutionary Guard Corps-Qods Force (IRGC-QF), as well to Lebanese Hizballah, … and***

***other [IRGC proxy] terrorist groups.***" (Emphasis added.) Treasury's rollout confirmed, *inter*

*alia*:

> [T]he Iranian regime has masked illicit transactions using senior officials of the CBI, who used their official capacity to procure hard currency and conduct transactions for the benefit of the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxy group, Lebanese Hizballah. Accordingly, financial institutions are advised to exercise appropriate due diligence when dealing with transactions involving exchange houses that may have exposure to the Iranian regime and/or designated Iranian persons, and the advisory details examples of exchange house-related schemes. Iran-related actors use front and shell companies around the world in procurement networks through which the Iranian regime has gained goods and services related to currency counterfeiting, dual-use equipment, and the commercial aviation industry.
> In order to help financial institutions identify deceptive activity potentially linked to the Iranian regime, FinCEN has included red flags in its advisory. For example, CBI officials' routing transactions to personal accounts rather than central bank or government-owned accounts, and individuals or entities with no central bank or government affiliation withdrawing funds from such accounts, may be a red flag for financial institutions to investigate. Similarly, wire transfers or deposits that do not contain any information on the source of funds, contain incomplete information about the source of funds, do not match the customer's line of business, or that involve jurisdictions where there is a higher risk of dealing with entities linked to the Iranian regime may be red flag indicators of illicit Iranian attempts to gain access to the U.S. financial system or evade sanctions.

986.    On April 8, 2019, the U.S. announced its intention to formally designate the entire

IRGC—including regular IRGC, the Qods Force, and the Basij—as an FTO, which the U.S. did

on April 15, 2019. During the rollout, U.S. officials warned, in part, as follows:

a.    <u>President Donald J. Trump, April 2019</u>: "Today, I am formally announcing my Administration's plan to designate Iran's Islamic Revolutionary Guard Corps (IRGC), including its Qods Force, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act. This unprecedented step, led by the Department of State, recognizes the reality that Iran is not only a State Sponsor of Terrorism, but that the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft. The IRGC is the Iranian government's primary means of directing and implementing its global terrorist campaign. This designation will be the first time that the United States has ever named a part of another government as a FTO. It underscores the fact that Iran's actions are fundamentally different from those of other governments. … If you are doing business with the IRGC, you will be bankrolling terrorism."

b.    Secretary of State Michael R. Pompeo, April 2019: "I'm here to make an important foreign policy announcement concerning the Islamic Republic of Iran. Today the United States is continuing to build its maximum pressure campaign against the Iranian regime. I am announcing our intent to designate the Islamic Revolutionary Guard Corps, including its Qods Force, as a foreign terrorist organization in accordance with Section 219 of the Immigration and Nationality Act. … This is the first time that the United States has designated a part of another government as an FTO. We're doing because the Iranian regime's use of terrorism as a tool of statecraft makes it fundamentally different from any other government. This historic step will deprive the world's leading state sponsor of terror the financial means to spread misery and death around the world. … Our [IRGC FTO] designation makes clear to the world that Iranian regime not only supports terrorist groups, but engages in terrorism itself. This designation also brings unprecedented pressure on figures who lead the regime's terror campaign, individuals like Qasem Soleimani. He is the commander of the Qods Force and oversees Iran's forces deployed to advance the Islamic Revolution through terrorism and other forms of violence. He doles out the regime's profits to terrorist groups across the region and around the world. … [T]he mission of this [U.S.] designation [of the IRGC as a Foreign Terrorist Organization is] … to achieve the outcomes that we laid out back in May [2018] to … [stop the IRGC from] … risking American lives each and every day."

c.    State, April 2019: "The IRGC – primarily through its Qods Force – is the primary arm of the Iranian government that carries out and directs Tehran's dangerous and destabilizing global terrorist campaign. The IRGC provides funding, equipment, training and logistical support to a broad range of terrorist and militant organizations, totaling approximately one billion dollars annually in assistance. The IRGC has also been directly involved in terrorist plotting and related activity in many countries … The IRGC is integrally woven into the Iranian economy, operating front companies and institutions around the world that engage in both licit and illicit business activity. The profits from what appear to be legitimate business deals could end up … supporting Iran's terrorist agenda."

987.    On April 15, 2019, the United States designated the entire IRGC, including regular IRGC, the Qods Force, and the Basij, as an FTO for, *inter alia*, "provid[ing] financial and other material support, training, technology transfer, advanced conventional weapons, guidance, or direction to a broad range of terrorist organizations, including Hizballah, Palestinian terrorist groups like Hamas and Palestinian Islamic Jihad, Kata'ib Hizballah in Iraq, … and other terrorist group[s]…." In support, State concluded that the IRGC "has engaged in terrorist activity since its inception 40 years ago," that "its support for terrorism is foundational and institutional," that it "has killed U.S. citizens," and that it "has the greatest role among Iran's actors in directing and carrying out a global terrorist campaign." Announcing the designation, Secretary of State

393

Pompeo emphasized that the IRGC "plans, organizes, and executes terror campaigns all around the world," and that the "IRGC institutionalized terrorism shortly after its inception, directing horrific attacks . . . alongside the terror group it midwifed, Lebanese Hizballah." Secretary Pompeo described the designation as "simply recognizing a basic reality," placing the IRGC in "its rightful place on the same list as terror groups it sponsors." As State reported to Congress in 2020, its "designat[ion]" of the "IRGC as an FTO in April 2019" was a "historic action" and "unprecedented step," which "reflected the Iranian regime's unique place among the governments of the world in its use of terrorism as a central tool of its statecraft."

988.    On January 14, 2020, President Trump implemented Executive Order 13,902, which imposed additional counterterrorism sanctions on the IRGC, and found, *inter alia*:

> [The President] find[s] that Iran continues to be the world's leading sponsor of terrorism and that Iran has threatened United States military assets and civilians through the use of military force and support to Iranian-backed militia groups. It remains the policy of the United States to …counter the totality of Iran's malign influence in the region. In furtherance of these objectives, it is the policy of the United States to deny the Iranian government revenues, including revenues derived from the export of products from key sectors of Iran's economy, that may be used to fund and support its … terrorism and terrorist proxy networks ….
> [The President] hereby determine[s] that the making of donations of the types of articles specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 1 of this order would seriously impair the President's ability to deal with the national emergency declared in Executive Order 12957 [*i.e.*, the IRGC's sponsorship of acts of terrorism targeting the United States].

989.    On March 26, 2020, Treasury announced new counterterrorism sanctions against the IRGC pursuant to E.O. 13,324 and reported findings as follows:

> OFAC … today designated 20 Iran- and Iraq-based front companies, senior officials, and business associates that provide support to or act for or on behalf of the Islamic Revolutionary Guards Corps-Qods Force (IRGC-QF) in addition to transferring lethal aid to Iranian-backed terrorist militias in Iraq such as Kata'ib Hizballah (KH) and Asa'ib Ahl al-Haq (AAH). Among other malign activities, these entities and individuals perpetrated or supported: smuggling through the Iraqi port of Umm Qasr; money laundering through Iraqi front companies; selling Iranian oil to the Syrian regime; smuggling weapons to Iraq

…; promoting propaganda efforts in Iraq on behalf of the IRGC-QF and its terrorist militias …. The terrorist militias supported by the Iranian regime such as KH and AAH have continued to engage in attacks on U.S. and Coalition forces in Iraq. 'Iran employs a web of front companies to fund terrorist groups across the region, siphoning resources away from the Iranian people and prioritizing terrorist proxies over the basic needs of its people,' said Treasury Secretary Steven T. Mnuchin.

990.    On May 1, 2020, the United States announced new counterterrorism sanctions against the IRGC and confirmed that "senior officials of [the] Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF)" were "involved in IRGC-QF efforts to generate revenue and smuggle weapons abroad" through an IRGC front "company owned, controlled, or directed by" an IRGC member, thereby "violat[ing] [U.S.] sanctions and money laundering laws" by committing "crimes" that caused valuable "assets" to flow to "a foreign terrorist organization."

991.    On June 1, 2023, the United States imposed counterterrorism sanctions" pursuant to E.O. 13224 against numerous" members and affiliates of" the "IRGC-QF" and "IRGC-IO" based on Treasury's determination that such persons "participated in a series of terrorist plots including assassination plots targeting former United States government officials, dual U.S. and Iranian nationals, and Iranian dissidents"; with respect to IRGC-IO, Treasury "target[ed] … two senior officials of the IRGC's Intelligence Organization (IRGC-IO)[] who have been involved in plotting [such collaborative IRGC-QF/IRGC-IO] external lethal operations against [U.S. national] civilians including journalists and activists." In the same finding, Treasury also observed: "Treasury has consistently acted to address external terrorist plotting by the IRGC-QF and Iran's intelligence service [*i.e.*, IRGC-IO].

992.    U.S. Central Command-sponsored publications confirmed that BNPP's value flow through to the Foundation for the Oppressed financed Hezbollah-directed proxy attacks throughout the Middle East. On September 4, 2020, for example, CENTCOM-sponsored news website *Diyaruna* published a report – titled *Iranians Pay For Regime's Costly Proxy Wars;*

*With The Iranian Economy Facing Currency And Inflation Problems, The IRGC Continues To*

*Spend Money On Failing Proxy Wars* – that confirmed the Foundation's profits financed

Hezbollah-sponsored attacks in Iraq and Israel:

> [T]he IRGC has … taken over Iran's economic and trade resources. It … has won some of the most profitable government contracts inside and outside the country.
>
> IRGC influence over the country's economy has spread … to telecommunications, which includes the founding of [] Irancell. …
>
> The IRGC's revenue from these economic activities, instead of being used to get the country out of its financial woes, has been contributing to the Guard's foreign ventures, experts said.
>
> The IRGC uses these funds to recruit new members to its militias, including the Fatemiyoun Brigade, which operates in Syria. The division is mainly composed of Afghan Shia living in Iran and its leaders are members of the IRGC's Quds Force.
>
> Fatemiyoun members are enticed and recruited through financial and social benefits …. [including benefits] given to their families, should they be killed …, since they would be categorised as "martyrs" ….
>
> This amount [spent on Afghan Fatemiyoun was] is separate from [how Irancell also helped fund] the Quds Force's payments to Hizbullah[.]

993.    USCENTCOM sponsored *Diyaruna* to inform audiences in the U.S., Europe, and

the Middle East about terrorist threats targeting the United States throughout USCENTCOM's

entire area of responsibility, including the Middle East. Accordingly, USCENTCOM would not

have sponsored *Diyaruna*'s report, or permitted it to remain live on a website funded by the U.S.,

US CENTCOM concurred with the substance of *Diyaruna*'s report.[132]

994.    Accordingly, from 1979 through at least 2019, whenever a bank, including BNPP,

directly or indirectly routed substantial value to the IRGC (including, if necessary, through

---

[132] USCENTCOM would only sponsor *Diyaruna* if USCENTCOM believed that reports like that alleged herein:  (1) accurately characterized the facts to avoid misleading the contemplated primary audience or making any assertions that are implausible, e.g., someone paid by USCENTCOM to help counter terrorist propaganda with accurate information; (2) offered reasonable opinions worthy of consideration by responsible parties; and (3) strengthened USCENTCOM's ability to fight terrorism, which has always been its core mission since 9/11.

applicable IRGC fronts, agents, and "orbits"), such value flowed up the IRGC and, given its khums practices, the Khamenei Cell, and then back down from the Khamenei Cell to Khamenei Cell-backed operations, logistics, finance, and intelligence cells responsible for sponsoring and conducting attacks targeting the United States. Indeed, such an outcome was the entire reason Khomeini, Khamenei, Rafiqdoost, and Rezai established the IRGC shortly after they created the Foundation for the Oppressed in 1979. Accordingly, value transfers to the IRGC ultimately flowed through to, and were deployed by, senior terrorists who played key roles in the attacks in Iraq and Israel, including those against Plaintiffs.

995.    Since the late 1980s, the IRGC has notoriously used its control of fronts to enable Hezbollah's and the IRGC's use commercial, off-books, profits to finance terrorist attacks committed by Hezbollah and its proxies, and sponsored by the Qods Force.

### g.  Oil and Gas Fronts

996.    BNPP's financial services specifically to the Iranian Petrochemical Company (a/k/a Caspian Petrochemical FZE) and the Iranian Oil Company were essential to the ability the Terrorist Sponsors to direct funds to terrorist attacks.

997.    The U.S. government has directly confirmed that BNPP's decision to finance the transactions related to the Iranian Petrochemical Company and the Iranian Oil Company from 2006 through 2012 funded IRGC-sponsored terrorist attacks targeting the United States. On June 30, 2014, the United States announced that, per DOJ, "BNP Paribas S.A. (BNPP), a global financial institution headquartered in Paris, agreed to enter a guilty plea to conspiring to violate the International Emergency Economic Powers Act (IEEPA) and the Trading with the Enemy Act (TWEA) by processing billions of dollars of transactions through the U.S. financial system on behalf of Sudanese, Iranian, and Cuban entities subject to U.S. economic sanctions." Per DOJ, by "providing dollar clearing services to individuals and entities associated" with "Iran" in "clear

violation of U.S. law," the bank "helped [Iran] gain illegal access to the U.S. financial system,"

and in "doing so," the bank "deliberately disregarded U.S. law of which it was well aware, and

placed its financial network at the services of rogue nations" through its "***criminal support of***

***countries and entities engaged in acts of terrorism and other atrocities***." (Emphasis added.) On

information and belief, DOJ's statements above were specifically about BNPP's violation of

Iran-facing sanctions, including Iran-facing petroleum-related sanctions. On September 21, 2015,

for example, CNBC reported that a "[a]mong the French bank's violations were transactions with

Caspian Petrochemical FZE."

998.    BNPP's transactions on behalf of the Iranian Petrochemical Company fueled

Hezbollah's, Hamas', and PIJ's acts of terrorism against Plaintiffs. Decades of government

reports and speeches published by the United States, United Kingdom, European Union, and

United Nations confirmed the IRGC's oil-related financial transactions that benefited the IRGC

were inextricably connected with IRGC-sponsored acts of terrorism targeting the United States

that were committed by the Qods Force and the Axis of Resistance it led, including Hezbollah,

Hamas, and JAM. As Secretary of State Pompeo confirmed in 2020, while describing country-

wide oil-related sanctions targeting Iran and the IRGC like the sanctions that BNPP schemed to

help the IRGC evade years earlier:

> [S]anctions have denied Iran more than 90% of its oil export revenue, depriving the
> regime access to well over $70 billion in income that could have otherwise gone to fund
> terror operations …. These actions have saved the lives of innumerable Iranians, Syrians,
> Iraqis, Yemenis, and other innocent civilians in the regime's crosshairs … [through] the
> full spectrum of Iran's malign influence [including] its support to Shia militia groups in
> Iraq, [and] its longstanding sponsorship of Hizballah in Lebanon …
> In September 2019, the U.S. Department of the Treasury exposed a large oil shipping
> network that was directed by, and financially supported, the IRGC-QF and its partner
> Hizballah. The network was overseen by senior IRGC-QF official and former Iranian
> Minister of Petroleum Rostam Qasemi and employed an extensive network of ship
> managers, vessels, and facilitators in order to move oil worth hundreds of millions of
> dollars or more for the benefit of … Hizballah, and other illicit actors. The networks

complex system of intermediaries allowed the IRGC-QF to obfuscate its involvement. The IRGC-QF relied heavily on Hizballah officials and front companies to broker associated contracts.

999.    From the 2010 through the present, such U.S., U.K., E.U., and/or U.N.

government findings, reports, statements, and warnings included, but were not limited to:

a.    <u>Treasury, June 16, 2010</u>: "KAA … [is] the engineering arm of the IRGC that serves to help the IRGC generate income and fund its operations. … The IRGC maintains significant political and economic power in Iran. It has ties to companies controlling billions of dollars in business and construction projects and it is a growing presence in Iran's financial and commercial sectors. The IRGC has numerous economic interests related to … the oil industry."

b.    <u>State, April 8, 2011</u>: "Official Corruption … [:] … [T]he supreme leader continued to transfer a large portion of the country's … oil and gas … sectors to the IRGC. In recent years [Khamenei] gave control over state enterprises to the IRGC through the granting of special privileges. IRGC companies were large enough to underbid competitors and were generally favored in the bidding process for large contracts."

c.    <u>Treasury, March 28, 2012</u>: "'Treasury is sending a clear signal … that … [w]e will continue to target the Iranian regime and specifically the IRGC as it … continue[s] its nefarious infiltration of the Iranian economy,' said Adam Szubin, Director of [OFAC]. The IRGC continues to be a primary focus of U.S. and international sanctions against Iran because of the central role the IRGC plays in Iran's … support for terrorism …. The IRGC has continued to expand its control over the Iranian economy – in particular in the … oil and gas industries – subsuming increasing numbers of Iranian businesses and pressing them into service in support of the IRGC's illicit conduct."

d.    <u>State, May 24, 2012</u>: "The IRGC operated numerous front companies that were engaged in illicit trade and business activities. The IRGC includes a construction arm (Khatam ol-Anbiya) that had extensive economic operations and ties to the oil sector and benefited from corruption within that sector."

e.    <u>Treasury, May 23, 2013</u>: "'As long as Iran continues [its] … defiance of multiple UN Security Council Resolutions, the U.S. will target and disrupt those involved in Iran's illicit activities,' said Treasury Under Secretary for Terrorism … David S. Cohen. 'We will continue to work with our international partners to intensify this pressure and tighten sanctions on Iran's energy sector as it provides much needed financial support for the Iranian regime's proliferation activity.'"

f.    <u>DOJ, July 1, 2020</u>: "In 2014, … Treasury further noted that under the current Iranian regime, the IRGC's influence has grown within NIOC. For example, on August 3, 2011, Iran's parliament approved the appointment of Rostam Qasemi, a Brigadier General in the IRGC, as Minister of Petroleum. Prior to his appointment, Qasemi was the commander of [KAA], a construction and development wing of the IRGC that generates

income and funds operations for the IRGC. … On April 8, 2019, the President designated the IRGC as a Foreign Terrorist Organization. The designation noted that the IRGC actively finances and promotes terrorism. On April 15, 2019, the Secretary of State designated the IRGC, including the IRGC-QF, as Foreign Terrorist Organization. According to … Treasury, the IRGC and its major holdings have a dominant presence in Iran's … oil industry and the profits from these activities support the IRGC's full range of nefarious activities, including … support for terrorism … abroad. … "[IRGC] profits from [commercial] activities support the IRGC's full range of nefarious activities, including … support for terrorism… abroad. 'The IRGC systemically infiltrates critical sectors of the Iranian economy to enrich their coffers, while engaging in a host of other malign activities,' said then-Under Secretary for Terrorism … Sigal Mandelker."

1000.   When the IRGC priced its black market oil, liquefied petroleum gas ("LPG"), and other petroleum products, it took a simple approach: take the then-existing, publicly reported global market price for such commodity, and then haggle with their black market buyer over the size of a discount from that prevailing price to reflect the IRGC's inability to sell to any customer. At all times, the average price for LPG imports ranged between $600 - $1,200 per ton, IRGC fronts that sold LPG to black market buyers reportedly offered discounts for around $100 per ton for large shipments. Thus, for example, if the price of LPG was $1,000 per ton, the IRGC would offer to sell the LPG at a discounted price of $900 per ton. On that sales price, the IRGC kept around 75% of that sum as the profit. Accordingly, from 2007 through 2020 each ton of IRGC LPG sold by the IRGC likely caused, at least, $300 in terrorist finance to flow through the transaction to the IRGC (including its Qods Force) and SLO and, through the Qods Force and SLO, to Hezbollah, Hamas, PIJ, and JAM to finance their terrorist attacks in the Middle East.

1001.   Given the IRGC's oil- and gas-production-related profit margins, BNPP's facilitation of the IRGC's sales of oil and gas through BNPP's transactions on behalf of, or otherwise involving, the Iranian Petrochemical Company and/or the Iranian Oil Company produced a financial windfall for the Qods Force, Hezbollah, and proxies, including Hamas, PIJ, and JAM.

1002.   Representative transactions involving Caspian Petrochemical-related sales in 2017 and 2018—the direct product of BNPP's years of illegal aid—confirm the point.

In or about July 2017, Caspian Petrochemical coordinated with other IRGC fronts described herein to deliver about 44,000 tons of LPG produced by IRGC front PGPIC (affiliated with IRGC front KAA)—which PGPIC extracted from the IRGC's crown jewel, the South Pars gas field—and was shipped to a customer outside of Iran aboard the Gas Commerce.

a.    In or about July 2017, Caspian Petrochemical coordinated with other IRGC fronts described herein to deliver about 44,000 tons of LPG produced by IRGC front PGPIC (affiliated with IRGC front KAA)—which PGPIC extracted from the IRGC's crown jewel, the South Pars gas field—and was shipped to a customer outside of Iran aboard the *Gas Commerce*.

b.    In or about December 2017, Caspian Petrochemical helped IRGC front PGPIC (affiliated with IRGC front KAA) export 44,000 tons of LPG that the IRGC produced at the IRGC's South Pars field, which the IRGC (through Caspian Petrochemical, among others) shipped, aboard the *Gas Commerce*, to a buyer in Asia.

c.    In or about January 2018, Caspian Petrochemical helped IRGC front PGPIC (affiliated with IRGC front KAA) export 44,000 tons of LPG that the IRGC produced at its South Pars field, which the IRGC (through Caspian Petrochemical, among others) shipped, aboard the *Pacific Rizhao*, to a buyer in Asia.

d.    In or about January 2018, Caspian Petrochemical helped IRGC front PGPIC (affiliated with IRGC front KAA) export 44,000 tons of LPG that the IRGC produced at its South Pars field, which the IRGC (through Caspian Petrochemical, among others) shipped, aboard the *Gas Dignity*, to a buyer in Asia.

1003.   At the IRGC's prevailing profit margins, ***each*** of these four transactions likely yielded more than $10 million in funds that the Terrorist Sponsors caused to be distributed to Hezbollah, the Qods Force, Hamas, PIJ, and JAM to finance their terrorist attacks in the Middle East.

1004.   Indeed, the total scale of the Iranian Petrochemical Company's terrorist finance likely exceeded $300 million between 2011 and 2017 alone. Plaintiffs' review of market data suggests that the Iranian Petrochemical Company was likely involved in at least five or more

transactions, analogous to each of the four described above, each year from 2011 through 2017—and likely substantially more than that. For example, just one of Caspian Petrochemical's strategic partners, Oriental Oil, reportedly exported more than 300,000 tons of LPG during one six-month stretch in 2017, which is equal to about seven of the above-described shipments, and Oriental Oil likely used Caspian Petrochemical for all or nearly all such transactions.

1005.   BNPP's provision of financial services to the Iranian Petrochemical Company (2006-2012) and the Iranian Oil Company (2009) flowed at least several hundred million dollars of terrorist finance each year directly and indirectly to the Qods Force, Hezbollah, Hamas, PIJ, and JAM.

1006.   Terrorism scholars also confirmed that KAA-related profits—which described those of Caspian Petrochemicaland the Iranian Oil Company—directly financed IRGC-sponsored attacks committed by IRGC proxies, including Hezbollah, Hamas, and PIJ, and alerted BNPP to the same. On June 15, 2010, for example, IRGC scholars Mark Dubowitz and Emanuele Ottolenghi publicly warned:

> [KAA] is an integral part of the IRGC power structure. Its head is the IRGC's Commander in Chief, … Mohammad Ali Jafari, and its CEO, under his authority, is always a high-ranking IRGC officer. Many IRGC projects are military in nature, and the group diverts much of the technology and expertise it acquires from Western companies for seemingly innocuous projects to unsavory ends. …
> Any company that does business in Iran risks becoming an unwitting accomplice to the IRGC's nefarious activities, tarnishing its reputation in the process. Yet even when companies provide services and technologies that cannot be diverted to illicit projects, partnering with the IRGC entails some complicity with its activities. In June 2006, then-[KAA] deputy head [IRGC] Brigadier General Abdol Reza Abed confirmed in an interview with a local daily that [KAA]'s funds finance various national defense projects, including arming and training Hezbollah. …
> [B]oth the Iranian people and the Western companies that do business with the regime end up paying the price for the IRGC's cronyism, inefficiency and incompetence.
> No matter how you look at it, it's clear that when [KAA] wins, everyone else loses. …
> And the entire [Middle East] region loses, because the richer the IRGC becomes, the more resources it has to perpetuate Iranian subversion and repression at home and abroad.

The United States, and other western allies, have only just begun designating the IRGC front companies that operate in the Iranian energy sector. Business with the Iranian regime is going to get even riskier.

1007.   In 2017, Matthew McInnis, of the American Enterprise Institute, publicly testified before Congress that KAA profits funded IRGC-sponsored acts of terrorism committed by IRGC proxies throughout the Middle East, including by Hezbollah and JAM:

> Iran seeks to … assert its regional hegemony by displacing the United States as the dominant regional power. … Iran has utilized its "Resistance Network" of partners, proxies, and terrorist groups, including … Lebanese Hezbollah, and Iraqi groups like the Badr Corps, Khataib Hezbollah, and Asaib Ahl al-Haq. …
> Iran continues to invest in training and arming its proxies and partners with increasingly advanced equipment, with its most trusted groups receiving the best weaponry. Lebanese Hezbollah acquired unmanned aerial vehicles and an estimated 100,000 to 150,000 rockets and missiles through Iranian assistance, including advanced air-to-ground and ground-to-sea missiles. Iran's Iraqi proxies employed the QFs' signature improvised explosive device, the explosively formed projectiles against coalition forces in the last decade….
> How do we then stand up to Iran's destabilizing activities in the region and begin to dismantle Tehran's global terror network?
> A re-invigorated economic warfare campaign against the [IRGC] should be one component - along with well-coordinated political, military, intelligence and information campaigns - of a larger U.S. strategy against Iran's malign influence in the region. Since the end of the Iran-Iraq War, the IRGC slowly expanded its role in the Iranian economy with at least 20 percent estimated to be now under the [IRGC]'s control. The IRGC owns the state's largest construction firm, Khatam al-Anbiya, and has major stakes in the banking, energy, extractive, and manufacturing sectors. This is how the Guard is able to fuel so much of its operations, …[including] weapons production [and] … proxy support worldwide. The United States has also often designated IRGC front companies that help Iran evade sanctions, acquire illicit technologies and transport weapons to partners. The [IRGC] also operates most Iranian ports and is deeply involved in the commercial shipping … sectors, which are critical elements in building and sustaining its proxy and terror networks in the Middle East.

1008.   A wide array of terrorism scholars concluded that KAA profits directly financed IRGC-sponsored acts of terrorism committed by IRGC proxies like Hezbollah. For example, Ambassador Mark D. Wallace, CEO of UANI, observed that "Iran's aviation and engineering sectors are dominated by the Islamic Revolutionary Guards Corps ("IRGC") … the main instrument used in Iran's … global terrorist activities. The IRGC widely operates in these sectors

through its engineering arm, Khatam al-Anbiya, which is also blacklisted by the EU, the U.S. and the United Nations. Surely, the risks associated with potential (even inadvertent) partnership with the IRGC and IRGC-affiliated entities are much too great for any responsible and law-abiding company." Mehran Riazaty, a former Iran Analyst for Multi-National Forces, Iraq (*i.e.*, the U.S. military), observed that key Qods Force terrorists—who were direct beneficiaries of Khatam al-Anbiya profits—were tasked with using such profits to help the Qods Force and Hezbollah support IRGC-sponsored, JAM-involved attacks targeting the United States in Iraq after 2003. Saeed Ghasseminejad and Richard Goldberg, of the Foundation for Defense of Democracies, observed that "Khatam al-Anbiya is controlled by the IRGC … and helps finance Iran's … terrorist activities."

### h. Other Fronts

1009.   While the Iranian Petrochemical Company and the Iranian Oil Company were two of BNPP's most shocking long-term relationships with Terrorist Sponsors, they were hardly the only ones. On information and belief, BNPP engaged in years of misconduct on behalf of other Iranian customers with clear ties to the IRGC and the SLO.

1010.   On information and belief, from at least 2002 through at least late 2012, BNPP helped KAA access millions of dollars from New York banks through other transactions in addition to the ones alleged above and did so even though it knew that the KAA was sanctioned, and that its transactions would enable the Foundation to finance attacks by Hezbollah, Hamas, and PIJ.

1011.   On information and belief, from at least 2002 through at least late 2012, BNPP helped the Foundation for the Oppressed access millions of dollars from New York banks through other transactions in addition to the ones alleged above and did so even though it knew

that the Foundation was sanctioned, and that its transactions would enable the Foundation to finance attacks by Hezbollah, Hamas, and PIJ.

1012.   On information and belief, from at least 2002 through at least late 2012, BNPP helped NIOC access millions of dollars from New York banks through other transactions in addition to the ones alleged above and did so even though it knew that NIOC was sanctioned, and that its transactions would enable the Foundation to finance attacks by Hezbollah, Hamas, and PIJ.

### 2.  Most of the Profits from BNPP's Transactions Funded Terrorist Attacks

1013.   Ayatollah Khamenei, the SLO, IRGC, Hezbollah, and Foundation for the Oppressed spent most of the profits that BNPP helped them generate to directly or indirectly sponsor terrorist attacks targeting the United States and its allies in the Middle East. For the avoidance of all doubt, Plaintiffs do not allege that a small percentage of such profits flowed through to the Terrorist Sponsors and their proxies – Plaintiffs allege that more than half of all such dollars flowed to terrorist proxies in a manner that enabled terrorist-sponsored attacks.

1014.   Given the Foundation for the Oppressed's status as the Iranian regime's first purpose-bult terrorist operations front, a large portion of every dollar flowing through the Foundation was used to advance the Foundation's terrorist purposes. This is especially so given the U.S. government's publicly-stated finding on November 18, 2020 that the Khamenei, the SLO, and their terrorist allied used most of the Foundation's profits to enrich Khamenei's most important inner circle allies – a direct and unmistakable reference to the Iranian regime's programmatic use of the Foundation's profits to finance the operations of the Khamenei Cell, which was essentially a who's-who of Khamenei's longest-lasting, closest, and most important allies within the IRGC and Hezbollah.

1015.   As Gabriel Noronha (Former U.S. Dep't of State, Iran Action Group), testified before Congress in 2023, "Supreme Leader Ali Khamenei's economic and budgetary philosophy is to use all funds the regime can obtain for the support and conduct of its foreign policy of terrorism, leaving the bare minimum to sustain the needs of a functional state and ignoring entirely the material needs of the Iranian people." In 2018, likewise, Dr. Farhad Rezaei, of the Association for the Study of the Middle East and Africa, observed:

> Iran would use the influx of capital which it would receive from the sanction relief to ***invest in what is known as 'revolutionary export,' that is a program to destabilize neighboring countries through direct or proxy involvement in … terror activities.*** … [T]here are indications that the regime has spent part of it on its foreign adventurism, … [and] that the regime has ***spent some money on other proxies like … Hezbollah in Lebanon and Hamas in Gaza strip, to expand its Shiite influence. … Some of the money comes from … the foundations like Bonyad-e Mostazafan-e Enghelab-e Eslami [Foundation for the Oppressed]. ... However, the evidence supports the [] concern that Iran would utilize the money it had received from the sanctions relief to sponsor terrorism*** … Iran has been using the influx of capital which it has received … to invest in what is known as 'revolutionary export,' a code name for spreading the ideology of [Iran] in the region. (Emphasis added.)

1016.   In 2022, U.S. government-operated *Radio Farda* published leaked audio published by confirmed that Ayatollah Khamenei instructed the IRGC that most of the profits it earned from bonyad-linked fronts should fund Hezbollah- and Qods Force-sponsored operations. As *Radio Farda* reported on February 15, 2022 (translated via Google), and captured by one such leaked IRGC "audio file," a senior IRGC operative admitted "that Ali Khamenei had ordered that the main goal" of IRGC control of companies "should be to help the IRGC Quds Force and accordingly, 90% of the financial resources" that the IRGC extracted "should be given to the IRGC Quds Force and 10% to the [rest of the] IRGC" – e.g., the IRGC Intelligence Organization.

1017.   U.S. Members of Congress confirmed the plausibility of Plaintiffs' allegations on a bipartisan basis. On December 2, 2015, Representative Eliot Engel (D-CA) publicly confirmed that "logic says that if the goal of the Iranian regime, the Revolutionary Guards and the entire regime, is to sponsor terrorism to destabilize the region, now that they have money and it is not going to be a sacrifice, they are going to use it for terrorism. When the Rial, their currency was in the toilet, when their people clamored for more freedoms or more things that they needed, Iran, the government, the regime didn't care. The regime made sure, though, that groups like Hezbollah and even Hamas, which of course is the other side of the Sunni-Shia spectrum, had enough money. So now that Iran has money and it is not going to be so painful, … it is very easy to imagine, and it is not imagination, that [the IRGC] will have more money to support more terrorism." That same day, Representative Ileana Ros-Lehtinen (R-FL) publicly confirmed that "the IRGC is one of the major actors in the Iranian economy with a presence in nearly every sector" and given the IRGC's anti-American mission, the IRGC "will use the" money "it gets …. for its terror activities, instead of [choosing] that the [IRGC's additional] money will be used to shore up a failing Iranian economy." Representative Ros-Lehtinen continued:

> [W]hen you think about … whether or not the Iranian Government is going to take [new money it earns] … and direct it into the IRGC[,] … think … about the fact that after the negotiations began in 2014, the IRGC budget went up …, and this was just in anticipation of sanctions relief. This was publicly stated. This was publicly declared. So … if you are asking yourself how the [IRGC] [is] going to spend [new] money [it earns], [the IRGC] ha[s] already been very clear in indicating it. [And remember that] … it is cheap to pull off a terrorist attack.

1018.   On December 2, 2015, Ali Alfoneh (Senior Fellow, Foundation for Defense of Democracies), testified before Congress that when complex Iranian transactions produce substantial value transfers to fronts owned or controlled by the IRGC, "[m]uch of the money … is going to be channeled … directly to the military budget of the Revolutionary Guards …

[while] … the … Revolutionary Guard is pursuing policy objectives in the Middle East region which are … totally opposed to U.S. objectives."

1019.   When the U.S. government announced new counterterrorism sanctions against the IRGC on May 1, 2020, for example, Treasury Secretary Mnuchin confirmed that "[t]he Iranian regime and its supporters continue to prioritize the funding of international terrorist organizations over the health and well-being of the Iranian people."

1020.   From 2017 through 2024, the U.S. government regularly found—on a bipartisan basis—that the Iranian regime used *most* of the profits from U.S.-sanctioned transactions to sponsor terrorism, including attacks by Hezbollah, Hamas, PIJ, and Jaysh al-Mahdi. Such statements and reports included, but were not limited to:

a.   Amb. Nathan Sales (Coordinator for Counterterrorism, U.S. Dep't of State), November 13, 2018: "And who ultimately pays the price of this support? The Iranian people. The resources Iran uses to fund its global terrorist campaign come directly out of the pockets of ordinary Iranians. The regime robs its own citizens to pay its proxies abroad. Tehran's priorities are clear. It doesn't seek to boost economic growth at home, or to improve Iranian living standards. It doesn't seek to reduce Iran's growing unemployment. What the regime prioritizes, despite the country's increasing economic distress, is buying guns and bombs for foreign terrorists. Tragically, this vast waste of the Iranian people's assets has resulted in bloodshed and instability across the globe."

b.   U.S. Department of the Treasury, November 20, 2018: "'The Iranian regime continues to prioritize spending money on fomenting terror over supporting its own people,' said Undersecretary for Terrorism and Financial Intelligence, Sigal Mandelker. 'This is yet another example of the regime using the proceeds of millions of barrels of its oil to fund terrorists and the murderous Assad regime to the detriment of its own people.'"

c.   Wally Adeyemo (United States Deputy Secretary of the Treasury), April 9, 2024: "Senator, you're right that in democracy, money is fungible. But what we've seen time and time [again] from the Iranian regime is [that] they fail to feed their people and they put the IRGC first. Any dollar they have will go towards their violent activity before they deal with the people. That's partially why almost none of the humanitarian money has been used for humanitarian purposes is because they don't care about getting food and drugs for their people but the difference is the United States of American has made, as a values proposition, that we are always going to provide humanitarian relief for people. And that's what we said is the only purpose for this money. So while in our country money is fungible, in Iran, they've proven that any dollar they get that they have direct access to in the country will be used for the IRGC before it's ever used for their people."

d.   <u>U.S. Senate Committee on Banking, Housing, and Urban Affairs (Minority Staff), April 12, 2024</u>: "After U.S. Department of Treasury Deputy Secretary Wally Adeyemo admitted in testimony that any dollar Iran has access to funds terrorism, Ranking Member Tim Scott (R-S.C.) continues to press the Biden administration on U.S. enabled payments to Iran. In a letter to Treasury Secretary Janet Yellen, Ranking Member Scott … wrote, 'As we have previously discussed, I have serious concerns with U.S.-enabled efforts that increase Iran's access to sanctioned funds—funds that directly support Iran's terror proxies throughout the Middle East. Unfortunately, the testimony that was delivered before the Committee has only elevated those concerns by making it abundantly clear that the current sanctions relief and humanitarian assistance scheme provided to Iran are not viable solutions, and rather deteriorate U.S. national security interests. … Given the proven track-record Iran has on redirecting so-called humanitarian assistance to 'violent activity,' as characterized by Treasury, we must operate under the assumption that every dollar made available to Iran is another dollar that will be used to put U.S. servicemembers in harm's way or threaten our allies, especially Israel…In light of this, I am requesting an accounting of all international high-value Iranian assets around the world that are currently blocked by U.S. sanctions as well as additional steps Treasury will now take to actively account for current funds that have already been released to Iran. Not a single dollar, euro, or dinar, sanctioned by the United States should ever be released to Iran when this Administration actively recognizes that any money to Iran supports terrorism.'"

1021.   COVID offered a grim case study that confirmed, in real-time, that the IRGC always directed all or nearly all IRGC income from fronts, black markets, and other IRGC sources to the IRGC's primary mission: sponsoring acts of international terrorism targeting the United States as part of the IRGC's "Resistance" on behalf of the "Oppressed." On October 9, 2020, the U.S. government imposed additional counterterrorism sanctions on the IRGC and explained that:

> [W]hile COVID-19 was spreading through Iran, regime officials asked Supreme Leader Khamenei to urgently release funds to respond to the outbreak. Despite Khamenei's assurances to do so, Iran's Health Minister revealed last week that the Health Ministry had received only a small fraction of those funds. The Health Minister asked[,] "What are they using it for that could be more important?" We know the answer. In 2018 and 2019, Khamenei raided $4 billion from the Iranian National Development Fund for military expenses. And while the Health Ministry was pleading for resources to protect the Iranian people from the outbreak, Khamenei instead increased funding for the Islamic Revolutionary Guard Corps, a designated Foreign Terrorist Organization, by a third, and doubled the funding for the regime's Basij forces that terrorize the Iranian people every single day.

Our sanctions are directed at the regime and its corrupt officials that have used the wealth of the Iranian people to fuel a radical, revolutionary cause that has brought untold suffering across the Middle East and beyond.

**D.    BNPP Helped the Terrorist Sponsors Obtain Critical Access to U.S. Dollars that Funded Terrorist Attacks**

1022.    By knowingly and willfully giving the world's most notorious anti-American FTOs access to the United States financial system, BNPP gave these groups the reliability, credibility, liquidity, and strength of the U.S. dollar, U.S. and New York financial system, and American legal system and rule of law – all of which made the Terrorist Sponsors' front-related transactions more efficient (through New York's comparative economic advantage in contrast to every other market), more reliable (through the unparalleled U.S. financial systems), imbued with greater buying power (given the strength and global reach of the U.S. dollar), while being more concealed (through the cover provided by affixing the imprimatur of New York's financial system to the Terrorist Sponsors' transactions). New York's financial system was a force multiplier for Hezbollah, Jaysh al-Mahdi, Hamas, and PIJ—which they used to fund terrorist attacks. BNPP's culpable actions provided unusually potent, cross-cutting lethal aid to the attacks targeting the United States, including Plaintiffs, by Hezbollah, Jaysh al-Mahdi, Hamas, and PIJ for at least three reasons.

1023.    *First*, BNPP supplied ***global reach and unrivaled ease of transferring funds across international borders*** to the Terrorist Sponsors and, by extension, supported attacks by Hezbollah, Jaysh al-Mahdi, Hamas, and PIJ. As terrorism scholar Jessica Davis observed in 2021: "Moving money is a fundamental component of terrorist financing. More often than not, terrorists want to raise money in one location, store funds in another, and use the money in yet another. … The ability to move funds is critical for terrorist organizations, cells, and individuals

because funds often need to flow from groups to cells, among groups, and from donors to organizations."

1024.    *Second*, BNPP supplied ***cover and concealment*** to BNPP's Terrorist Sponsor customers when BNPP engaged in its affirmative misconduct that obscured such customers' identities from U.S. correspondent banks and BNPP's own New York compliance personnel, which strengthened the attacks of Hezbollah, Jaysh al-Mahdi, Hamas, and PIJ by providing cover and concealment to the financial flows that sustained the operations networks responsible for attack. As terrorism scholar Jessica Davis observed in 2021, the ability to transact globally, while obscuring the details of their transactions, enables terrorist attacks and frustrates counterterrorism efforts:

> The financial entities provide access to the international financial system, cover stories for the terrorists' money movement, accept false names and documentation, and a variety of other benefits. …
> Terrorist groups, cells, and individuals all use varying levels of financial tradecraft to obscure the sources, destinations, and uses of their funds. They use [*inter alia*] … financial technologies, cryptocurrencies, and specialized financial facilitators. . . . [T]errorist actors' use of financial tradecraft is a critical element of their financing methods and can, with little effort, complicate counterterrorism practitioners' efforts to follow the money trail.

1025.    *Third*, BNPP provided a ***backdoor to the U.S. financial system*** through their business strategy to enable the Terrorist Sponsors to leverage the financial system in the United States (including New York), while willfully violating U.S. AML/CFT rules and regulations, U.S. sanctions, and U.S. reporting requirements. BNPP's deliberate actions enabled the Terrorist Sponsors to flow vast sums of dollars to directly support attacks by Hezbollah, Jaysh al-Mahdi, Hamas, and PIJ.  BNPP's misconduct allowed the Terrorist Sponsors to confidently leverage the power of the U.S. dollar and New York financial system to optimize their ability to finance Hezbollah, Jaysh al-Mahdi, Hamas, and PIJ without risk that the transactions would be: (a)

blocked by a New York bank officer; (b) reported to the U.S. government in a SAR or other report; or (c) monitored by U.S. counterterrorism officials as part of the U.S government's ongoing monitoring of SWIFT messages.

1026.   Decades of official U.S. government reports warned and confirmed that FTOs depended on access to the international financial system to finance every aspect of their lethal attacks targeting the United States. In April 2008, for example, U.S. Special Operations Command published *Disrupting Threat Finances: Using Financial Information To Disrupt Terrorist Organizations*, which observed, *inter alia*:

a.    "'There are two things a brother must always have for jihad, himself and money.' - Al Qaeda Operative"

b.    "[I]nternational terrorist groups need significant amounts of money to organize, recruit, train, and equip new adherents and to otherwise support their infrastructure. Terrorist organizations must have financing to pay for protection (such as safe havens), to bribe corrupt public officials, for recruiting, for indoctrination and training, for general operational expenses and equipment, to provide logistical support, to communicate, to increase their organizations infrastructure, to support operatives' families, to provide support to families of martyrs, to fund humanitarian efforts, and for various other sundry items. In short, terrorist organizations require considerable amounts of funds to be raised, moved, and stored through various means to conduct operations."

c.    "Since [9/11], detecting and preventing terrorist activities have been top priorities for the United States Government (USG). One of the goals of President George W. Bush's Global War on Terrorism (GWOT) is to deny terrorist groups access to the international financial system, to impair their ability to raise funds, and to expose, isolate, and incapacitate their financial networks. Like most organizations, terrorist groups need financing to organize, recruit, train, and equip adherents."

d.    "Terrorist organizations raise funds through a variety of sources, including … individual contributors, witting and unwitting; criminal activity; corporate contributors, witting and unwitting; operating businesses; state sponsors; and legal employment. These funds provide the interchangeable, easily transportable means to secure all other forms of material support. Once the funds are raised, terrorist organizations move the funds through several mechanisms, including … formal international banking systems. If the U.S. and its partners are going to succeed in the fight against terrorists, they must deprive terrorists of the material support they require by disrupting and monitoring the various funding sources and by interdicting the different movement mechanisms currently available."

e.   "Based on the fact that terrorist organizations require financing to operate, finances are a critical factor, and disrupting finances will contribute to the U.S., its allies, and partner nations' success in the fight against terrorism."

### E.  BNPP Enabled Essential Financial and Logistical Aid to Terrorist Attacks

1027.   From 2000 through at least 2016, BNPP's scheme financed Hezbollah's, Hamas's, PIJ's, and JAM's terrorist attacks, including those against Plaintiffs, in several specific ways. All such terrorist groups relied on Ayatollah Khamenei, the SLO, IRGC, and Hezbollah to pay for, organize, train, arm, and logistically sustain such Iranian proxies. In that respect, every group participated in a network of joint organizations and entities—*i.e.*, joint cells—not unlike the latticework of joint organizations common to NATO and U.S. coalition-based structures in the Middle East.

1028.   From 2000 through at least 2016, Ayatollah Khamenei, the SLO, the IRGC, and Hezbollah always relied on at least the following types of aid to sponsor attacks committed by Hezbollah, Hamas, PIJ, and JAM targeting the United States in the Middle East, including in Israel and Iraq: (1) attack incentive and reward payments directly to the Hezbollah, Hamas, PIJ, and/or JAM operatives, or their families, responsible for attacks; (2) weapons, training, logistics, and tunnel support from the RGB; (3) attack-related intelligence; and (4) weapons manufacturing. BNPP's criminal scheme powered all; Plaintiffs discuss each in turn.

### 1.  Attack Incentive and Reward Payments

1029.   BNPP's transactions funded at least five distinct categories of U.S. dollar-denominated attack payments that notoriously, and empirically, incentivized attacks, including, but not limited to:

a.   **U.S. dollar-denominated salary payments** to finance attacks by Hezbollah's, Hamas's, PIJ's, and JAM's relevant attack-related operations, intelligence, logistics, and leadership cell operatives, including Khamenei Cell members, including such groups' attacks

against Plaintiffs, which salaries were usually around $200 per month for rank-and-file fighters and $400 per month for cell leaders;[133]

b.  **U.S. dollar-denominated martyr payments** to the families of such Hezbollah, Hamas, PIJ, JAM, and IRGC, including Khamenei Cell, martyrs in attacks targeting the United States in which the attacker died (*i.e.*, was "martyred", including their attacks against Plaintiffs, which always included a lump sum bonus payment to the martyr's family, usually in amounts like $3,000, $5,000, or $7,000 (depending on the group and year for the martyr), and smaller payments thereafter to the martyr's spouse and parents;

c.  **U.S. dollar-denominated bounty payments** to Hezbollah, Hamas, PIJ, JAM, or IRGC operatives for successful attacks targeting the United States or its allies in the Middle East, including Israel, which payments were usually in amounts ranging from $2,000 to $20,000, with most payments being less than $10,000, and calibrated to especially promote such attacks through larger bounties awarded for successful attacks killing, injuring, or capturing a U.S. victim as compared to non-U.S.-victims;

d.  **U.S. dollar-denominated disability payments** to Hezbollah, Hamas, PIJ, JAM, or IRGC operatives, and their families, if such operatives were injured while supporting a terrorist attack committed by such group, which often cost at least several thousand U.S. dollars per year, and were thus about as costly as martyr payments in terms of per-capita spend;

e.  **U.S. dollar-denominated orphan payments** to the caretakers of the children of Hezbollah, Hamas, PIJ, or JAM operatives who were killed while supporting a terrorist attack committed by such group, which carried a similar cost as martyr and disability payments in terms of per capita spend, and were made to reward and incentivize terrorist attacks (by ensuring that the operative's child will be looked after by the terrorist group), and enable recruitment of child terrorists by all such groups, all of which recruit – and deploy children aged 8-17 to commit attacks by the group.

1030.  Ayatollah Khamenei, the SLO, IRGC, Hezbollah, and Foundation for the

Oppressed financed each of these types of attack incentive and reward payments to support

attacks by Hezbollah, Hamas, PIJ, and JAM in the Middle East through means that were both

direct (*e.g.*, sponsor-to-terrorist) and indirect (*e.g.*, sponsor-to-Hezbollah-to-terrorist).

---

[133] For the avoidance of all doubt, while Plaintiffs' salary numbers are applicable to Hezbollah, Hamas, PIJ, and JAM personnel in general, the 25-30 terrorists who comprise the membership of the Khamenei Cell – *i.e.*, Khamenei's closest inner circle allies – were paid salaries that were orders of magnitude higher than the sums paid to everyone else in such groups. For example, Ayatollah Khamenei, the SLO, IRGC, Hezbollah, and the Foundation for the Oppressed likely paid key Khamenei assets like Hassan Nasrallah and Abu Mahdi al-Muhandis salaries of at least several thousand U.S. dollars per month.

Throughout this period, all five types of such attack incentive and reward payments were notorious, intended to promote terrorist attacks, and did, in fact, promote such attacks.

1031.   Ayatollah Khamenei's, the SLO's, the IRGC's, Hezbollah's, and Foundation for the Oppressed's support for, and facilitation of, such attack payments was programmatic because of the custom and practice of each person, and the tactics, techniques, and procedures of the IRGC (which all followed). Throughout, Hezbollah's, Hamas's, PIJ's, and JAM's, use of – and distribution of – such attack payments was equally programmatic because of the custom and practice of Hezbollah, Hamas, OIJ, and JAM, and the IRGC-derived, Hezbollah-exported tactics, techniques, and procedures common to each group. Simply put, every terrorist sponsor and terrorist group in this paragraph actively, affirmatively, promoted attack payments – they sought to get the word out, were highly effective in doing so, and had a rigorous monitoring, record-keeping, and follow-up process to ensure that attack payments were ordinarily paid for every applicable attack throughout the period from 2000 through 2016.

1032.   Accordingly, for each attack against Plaintiffs, the custom and practice, and tactics, techniques, and procedures of Ayatollah Khamenei, the SLO, the IRGC, Hezbollah, the Foundation for the Oppressed, Hamas, PIJ, and JAM meant that a counterterrorism analyst experienced in the field would usually conclude based on nothing more than the fact that Hezbollah, Hamas, PIJ, or JAM committed an attack targeting the United States in Iraq, Israel, or the Palestinian territories in which an American was killed or injured, or a terrorist was killed or injured, that Ayatollah Khamenei, the SLO, the IRGC, Hezbollah, and the Foundation for the Oppressed likely made, and Hezbollah's, Hamas's, PIJ's, and JAM's terrorist attacks were likely aided by, one or more of attack incentive and reward payments as described herein.

1033.    BNPP provided the key services that powered the terrorists' attack incentive and reward payments. Ayatollah Khamenei, the SLO, IRGC, Hezbollah, and the Foundation for the Oppressed relied upon, *inter alia*, U.S. dollar-denominated transactions on behalf of Iranian regime-owned or beneficiary customers and accounts relating to Iran's petroleum sector (including NIOC, NITC, and Iranian government-owned companies affiliated with either), the Foundation for the Oppressed (including affiliated entities and persons), and Bank Saderat to underwrite all five types of attack payments to Hezbollah, Hamas, PIJ, JAM, and the IRGC.

1034.    When BNPP helped finance Terrorist Sponsors' martyr payments to Hezbollah, Hamas, PIJ, and JAM terrorists, BNPP provided direct support to terrorist attacks by such groups. Decades of government reports and speeches published by the United States, United Kingdom, European Union ("E.U.") and United Nations ("U.N."), confirmed the IRGC's programmatic emphasis on "martyrs," "martyrdom," "martyr attacks," and compensating the families of martyrs as key tools that facilitated IRGC-sponsored acts of terrorism targeting the United States that were committed by the Qods Force and the Axis of Resistance it led, including Hezbollah, Ka'taib Hezbollah, the Houthis, al-Qaeda, and the Taliban. As Ayatollah Khomeini wrote in 1979, "the … Islamic Revolutionary Guard Corps … [is] armed with the divine power. [The IRGC's] weapon is the '*Allāhu akbar*' and there is no weapon like it in the world. … The … Päsdar [*i.e.*, IRGC member] who says his night prayers in the trench … fights as a lion."

1035.    The U.S. government has confirmed the inextricable connection between martyr payments and terrorist attacks. In 2015, for example, Treasury reported to Congress:

> Evidence suggests that terrorists and their support networks are aware of the ways in which charitable organizations can be abused as a cover to raise, move, and use funds and actively seek to exploit them. … U.S. prosecutors demonstrated at trial that [a religious foundation] intentionally cloaked its financial support for Hamas by funneling money through Zakat Committees and Charitable Societies in the West Bank and Gaza. In some cases, the defendants targeted financial aid specifically for families related to well-known

Hamas operatives who had been killed or jailed. In this manner, the defendants effectively rewarded past and encouraged future terrorist activities.

1036.   Moreover, in *Country Reports on Terrorism* 2020, State observed that, with respect to "transfers to" the "families of terrorists who died in attacks," *i.e.*, "prisoner and 'martyr' payments," the "United States and Israel argue the payments incentivize and reward terrorism, particularly given the higher monthly payments the longer an individual remains imprisoned, which corresponds to more severe crimes."

1037.   Terrorism scholars also confirmed that financing martyr payments results in more terrorist attacks. In 2006, for example, counterterrorism scholar Boaz Ganor observed:

> [T]he family of the shahid (martyr) is given a very tangible reward of thousands of dollars (until the Al Aksa Intifada, the amount that the family of the Palestinian shahid received from the terrorist organization was some $5,000 and during the Intifada, when Iraq allocated huge sums of money for this purpose, the amount awarded to the family of a suicide attacker rose to $25,000—an enormous sum compared with the average yearly salary in the West Bank). From this perspective, perpetrating suicide attacks could be considered by a youngster from a large family as an altruistic act for his family's benefit. … [T]hese rewards are so tangible that they can make an essentially irrational act—the act of suicide—into a rational act whose benefit is many times greater than its cost.

1038.   In 2017, likewise, Dr. Bruce Hoffman, of Georgetown University, observed:

> The Palestinian terrorist organizations have also worked hard to endow suicide operations with a positive social imprimatur and to ensure the support for this tactic by the Palestinian people. They have deliberately created an inverted sense of normality throughout much of Palestinian society whereby suicide—the senseless taking of one's life, an act that is usually negatively regarded as aberrant, if not abnormal—becomes something routinely accepted and applauded, and indeed endowed with demonstrably positive connotations.164 The veneration routinely accorded martyrs reinforces this view. … the terrorist organizations—and their supporters through financial contributions— provide material as well as spiritual encouragement to both the suicide terrorists and their families. According to one authoritative account, until at least 2001, Hamas paid the families of suicide terrorists a death benefit of $3,000 to $5,000—more than double the financial compensation paid to families of terrorists killed in other, non-suicidal attacks. Later, during the al-Aqsa Intifada, this amount increased to $10,000 and then, courtesy of then–Iraqi dictator Saddam Hussein's largesse, to $25,000. There were additional material benefits as well, including nicer living accommodations and gifts of consumer goods—"appliances, rugs and stuffed furniture … gaudy wall clocks, even … [a] bracelet and rings"—bestowed on the families of martyrs.

1039.   BNPP's financial support for martyr payments assisted knife attacks committed by Hamas and PIJ. In 2016, for example, *Deutsche Presse-Agentur* reported on how the Iranian regime intensified its support for such payment to accelerate Hamas's and PIJ's "knife intifada":

> Iran's ambassador to Lebanon announced … that the families of every Palestinian knife attacker shot dead by Israeli security forces will receive financial assistance from Tehran. "Based on the principles of the Islamic republic and its support of the Palestinian people ... it has been decided to give the families of each martyr 7,000 US dollars," Mohammed Fathali said during a press conference. …
> Fathali's statement was condemned by Israel, saying it "demonstrates again Iran's role in encouraging terror." "Following the nuclear agreement, Iran continues being a major player in international terror," Israeli Foreign Ministry spokesman Emmanuel Nahshon said in a statement. Palestinians have launched scores of knife attacks against Israelis since early October, … Israel has blamed the wave of violence on inflammatory rhetoric by radical Muslim leaders who "brainwash" youths and "glorify martyrdom."

1040.   BNPP's financial support for martyr payments assisted vehicle ramming attacks committed by Hamas and PIJ. In 2016, for example, the *Jerusalem Post* reported that the Iranian regime encouraged "car-ramming attacks against Israelis in recent months" when "Iran [] offered financial assistance to the families of Palestinian terrorists involved in" such "attacks."

1041.   Hezbollah's martyr payments were vital to Hezbollah's ability to execute attacks. In 2020, for example, the International Institute for Strategic Studies reported that a "central element" of Hezbollah's "strategy was Hizbullah's network of charities, social organisations and construction firms" that "aided recruitment in peacetime" and "could be deployed to support Hizbullah's military operations," for which "the provision of salaries and benefits to fighters and their families" was "[o]f paramount importance."

1042.   Iranian-supplied salary payments also powered Hezbollah's ability to recruit terrorist foot soldiers who were motivated by financial more than religious concerns. As Dr. Daniel Byman of Georgetown University observed in 2005, "Iran exercises tremendous influence over Hizballah through its financial and military support. Many recruits, moreover,

joined the movement due to the stipend they received - $150-200 a month, along with free education and medical care. Iranian officials' presence on Hizballah's governing bodies further increased Iran's influence." Likewise, as Dr. Mara Karlin testified before Congress in 2017, "[m]any of those now joining Hizballah are doing so more for monetary than ideological reasons," which made Iranian funds even more important.

1043.   From 2000 through at least 2012, BNPP directly flowed enough money to Iran's Terrorist Sponsors to make tens of thousands, if not more, attack payments as described above. At then-prevailing rates as described above, BNPP's conduct was enough to fund every salary payment, martyr payment, bounty payment, disability payment, and orphan underwritten by Ayatollah Khamenei, the SLO, IRGC, Hezbollah, and/or Foundation for the Oppressed for every attack that killed and injured Plaintiffs and their loved ones – many times over. In fact, BNPP's conduct would have financed the attack payments for thousands of such attacks, enough to cover every attack against Plaintiffs many times over.

## 2.   Bartered Weapons, Training, Logistics, and Tunnel Support from North Korea's RGB

1044.   Ayatollah Khamenei, the SLO, IRGC, Hezbollah, Foundation for the Oppressed, and NIOC relied upon their shared, decades-long, partnership with the North Korean regime, as operationalized by the latter's external terror arm, the RGB.

1045.   From 2000 through at least 2016, BNPP's facilitation of Iran's oil exports financed at least three distinct types of lethal aid that Iran's Terrorist Sponsors and their proxies received from the RGB in exchange for Iran's oil, amplifying the killing power of Hezbollah's, Hamas's, and PIJ's, and JAM's attacks against Plaintiffs.

1046.   *First*, BNPP facilitated the enormous volume of annual oil shipments from Iran to North Korea which allowed the Terrorist Sponsors to avoid spending much of their precious

dollars on needed weapons (since they were paying with oil instead of cash), which freed up such funds for more attacks. Simply put, a single oil tanker shipped to North Korea as facilitated by BNPP produced enough economic value to finance thousands of attacks. And on information and belief, BNPP helped facilitate at least several such deliveries per year given the scale of BNPP's assistance and Iranian shipments to North Korea (both large).

1047.  *Second*, the oil trade BNPP facilitated paid for RGB trainers and technical specialists to enhance the potency, accuracy, reliability, and range of Hamas's and PIJ's rocket arsenals – directly increasing the lethality of their attacks against Plaintiffs.

1048.  *Third*, the oil trade BNPP facilitated paid for RGB tunnel experts to build terrorist attack tunnels for Hezbollah and Hamas, which amplified the effectiveness of every attack, and were widely viewed as Hezbollah's and Hamas's single most important terrorist weapon.

1049.  Contemporaneous reports confirm the above points. On July 27, 2014, for example, the *Telegraph*, a U.K. newspaper, reported as follows:

> Hamas is attempting to negotiate a new arms deal with North Korea for missiles and communications commitment that will allow it to maintain its offensive against Israel, according to Western security sources.
> Security officials say the deal between Hamas and North Korea is worth hundreds of thousands of dollars and is being handled by a Lebanese-based trading company with ties to the militant Palestinian organization.
> Hamas officials are believed to have already made an initial cash downpayment to secure the deal and are hoping that North Korea will soon begin shipping extra supplies of weapons to Gaza.
> "Hamas is looking for ways to replenish its stocks of missiles because of the large numbers it has fired at Israel in recent weeks," said a security official. "North Korea is an obvious place to seek supplies because Pyongyang already has close ties with a number of militant Islamist groups in the Middle East."
> Using intermediaries based in Lebanon, Hamas officials are said to be intensifying their efforts to sign a new agreement with Pyongyang to provide hundreds of missiles together with communications equipment that will improve the ability of Hamas fighters to coordinate operations against Israeli forces.
> Like other Islamist terrorist groups in the region such as Hezbollah, Hamas has forged close links with North Korea, which is keen to support groups opposed to Western interests in the region.

The relationship between Hamas and North Korea first became public in 2009 when 35 tons of arms, including surface-to-surface missiles and rocket-propelled grenades, were seized after a cargo plane carrying the equipment was forced to make an emergency landing at Bangkok airport. Investigators later confirmed that the arms had been destined for Iran, which then planned to smuggle them to Hezbollah in Lebanon and Hamas in Gaza.

Israeli military commanders supervising operations against Gaza believe North Korean experts have given Hamas advice on building the extensive network of tunnels in Gaza that has enabled fighters to move weapons without detection by Israeli drones.

The North Koreans have one of the world's most sophisticated network of tunnels beneath the demilitarized zone with South Korea, and Israeli commanders believe Hamas has used this expertise to improve their own.

The Hamas arsenal has become increasingly sophisticated with foreign assistance and now boasts five variants of rockets and missiles.

1050.   On March 11, 2016, similarly, the *Jerusalem Post* reported as follows:

In 2014, North Korea and Hamas struck a deal for the sale of 107-mm. and 102- mm. multiple rocket launchers. Hamas installed some of these systems on pickup trucks. "The tunnels that Hamas dug under Gaza into Israel – the concrete reinforcements – those are North Korean characteristics. I don't know whether North Korea got people into Gaza and trained them, or whether that training occurred in Lebanon. But it is a North Korean modus operandi," [Korea scholar Bruce] Bechtol said. The pattern repeats itself all over the region. In Iran, on a much grander scale, North Korea constructed underground nuclear facilities that can withstand bunker-busting bombs. "They built them in such a way that only a suicide commando mission could get to them," the professor said.

### 3.   Attack-Related Intelligence

1051.   BNPP's transactions funded the Foundation for the Oppressed's acquisition and supply of attack-related intelligence.

1052.   Hezbollah and the Qods Force used Foundation for the Oppressed resources to power Hezbollah and IRGC intelligence activities that directly enabled Hezbollah- and IRGC-sponsored attacks. Indeed, as far back as 1989, an FBI official testified before Congress, as

reported by *Newsday* on May 28, 1995, how the IRGC used the Foundation to embed operatives in the United States who "gathered intelligence for the Iranian regime." The same U.S. government sources cited by *Newsday* in 1995 confirmed that the Foundation for the Oppressed "served as a front … for the placement of agents from the [IRGC], dedicated zealots who … spy" on the "United States."

1053.   BNPP's intelligence-related contributions directly strengthened the IRGC's (and its proxies') ability to target and kill Americans in places like the Palestinian territories and Iraq. As Iran scholar Owen Sirs noted in 2022, the "Qods Force['s]" "vital … contributions" in places like Gaza and Baghdad included "intelligence and logistics" in which the IRGC-QF – inclusive of the IRGC-IO operatives who served under their command while outside Iran – "shared both drone imagery and communications intercepts with its PMF allies," including JAM because KH leader Muhandis led the PMF. Indeed, per Sirs, "[o]ne Shiite militia commander was effusive in his praise of [Qods Force] aid":

> When [Iranian advisers] are there in the field, no one stands in our face and magically everything is available, the ammunition, the [intelligence], the smooth coordination with the military units and other [Shia] factions and the air force backup [i.e., IRGC-supplied drones operated by Kata'ib Hezbollah]….Without them every [Shia] militia was working alone and none of them were responding to the Iraqi military commanders….If [the Iranian advisers] are there, all sides are responding without any problems or complaints.

### 4.  Weapons Manufacturing

1054.   BNPP's transactions funded the Foundation for the Oppressed's procurement of weapons that aided attacks in Israel and Iraq committed by Hezbollah, Hamas, Palestinian Islamic Jihad, and Jaysh al-Mahdi.

1055.   In addition to supplying weapons through oil-for-arms barter trades with North Korea's RGB, the Foundation for the Oppressed manufactured and supplied Iran-produced weapons through IRGC fronts like Irancell.

1056.   BNPP's transactions powered IRGC weapons procurement that directly enabled IRGC-sponsored attacks by supplying key resources that enabled the Foundation to invest in weapons fronts like IEDC, IEI, and Irancell, all of which facilitated Hezbollah, Hamas, Palestinian Islamic Jihad, and Jaysh al-Mahdi deployment of Foundation for the Oppressed-financed, Iranian-manufactured: (1) rocket systems; (2) proximity fuses for IEDs; (3) electro-optics and lasers; (4) encrypted, military-grade, communication equipment; (5) telecoms security equipment, including equipment designed to detect satellite phones used by activists throughout the Middle East; and (6) electronic warfare equipment – all of which played an essential role in the effectiveness of the Hezbollah's, Hamas's, PIJ's, and JAM's signature attack types, including EFPs and IEDs, rockets, and kidnapping attacks.

1057.   Terrorism scholars confirmed that Foundation for the Oppressed profits powered Hezbollah's and the IRGC's weapons and logistics acquisition and sustainment that enabled attacks, and alerted BNPP to such fact. In September 2006, for example, former U.S. counterterrorism official Michael Rubin publicly warned "[t]he Islamic Revolutionary Guard Corps" benefited from the Foundation for the Oppressed's economic control of key sectors and companies like Irancell, the IRGC-owned "cellular phone company" that was "opposed to Israel" and "[m]ost importantly, it is these military and security forces" who controlled the Foundation "hold the files on advanced weaponry" for Hezbollah and the IRGC. In 2007, likewise, Zaki Chehab, Former London Bureau Chief of *Al Hayat*, observed in 2007: "the Foundation of the Oppressed and War Veterans … deals in … arms" and was led by someone who publicly preached that Islamists could only achieve their aims "through the barrel of the gun." In 2015, likewise, Dr. Hesam Forozan (Middle East Scholar) warned: "the [Foundation for the Oppressed] is believed to cooperate substantially with the [IRGC] in weapons procurement and production.

For example, the [Foundation]'s heavy presence in legitimate mining … production is an alleged camouflage for the" IRGC's "weaponry plants."

1058.   Media reports confirmed that Foundation for the Oppressed profits powered Hezbollah's and the IRGC's weapons and logistics acquisition and sustainment that enabled attacks, and alerted BNPP to such fact. On May 28, 1995, for example, *Newsday* reported that "[s]everal of [the Foundation for the Oppressed's] current and former officers and directors have been implicated in arms and technology shipments to Iran," the Foundation "served as a front … for the placement of agents from the [IRGC, including Qods Force], dedicated zealots who … obtain military technology from the United States," and "U.S. and European officials say that [the Foundation] has long been a front for the procurement of military goods and prohibited technology for … the Revolutionary Guards." On December 8, 1998, likewise, *Newsday* reported that the "Mostazafan Foundation" had "been accused by western intelligence services of … supporting terrorism," "several officers and directors … had been implicated in arms and technology shipments to Iran," and "the FBI believed it had served as a front for placement in the United States of Revolutionary Guards, Iranian zealots who … stole military technology." On September 25, 2012, for example, the *Tampa Bay Times* reported that the "Mostazafan Foundation" (*i.e.*, Foundation for the Oppressed) "turned up red flags aplenty," including that it was subject to "U.S. sanctions" for which "[a] Treasury news release in 2008 said [IEI] offered 'a diversified range of military products including electro-optics and lasers, communication equipment, telecommunication security equipment, electronic warfare equipment, new and refurbished radar tubes, and missile launchers.'" In August 2013, likewise, the *Tower* reported that litigation, corporate records, and U.S. sanctions designations documented how the Iranian regime used the Foundation for the Oppressed to source a wide array of weapons.

1059.   NGO reports confirmed that Foundation for the Oppressed profits powered Hezbollah's and the IRGC's weapons and logistics acquisition and sustainment that enabled attacks. On September 28, 2016, for example, IFMAT reported that "Bonyad e-Mostazafan Foundation is controlled by the Islamic Revolutionary Guards Corps (IRGC), [which] … [s]uppl[ied] weapons … to terrorist organizations," and the Foundation "[r]eportedly purchased chemicals, equipment for the nuclear program, and spare parts for Iranian fighter-bombers."

### F.  BNPP Enabled Thousands of Terrorist Attacks

1060.   The significance of BNPP's transaction amounts was especially pronounced when viewed in light of the low marginal cost of individual attacks by Hezbollah, Jaysh al-Mahdi, Hamas, and PIJ.[134] As Dr. Daniel Byman of Georgetown University observed in 2005, an "advantage of terrorism over conventional force is that it is cheap. Small numbers of terrorists can wreak havoc."

1061.   Accordingly, BNPP's deliberate provision of the ability to raise and transfer ***even small amounts*** of U.S. dollars through the New York financial system to the Terrorist Sponsors on behalf of Hezbollah, Jaysh al-Mahdi, Hamas, and PIJ had outsized effects on such groups' ability to commit deadly attacks. Indeed, terror attacks are inexpensive, and small numbers of terrorists can wreak havoc.

1062.   Studies consistently confirmed that the cost of nearly all attacks by terrorist groups in the Middle East in the post-9/11 era ranged from around $2,000 per attack to around $20,000 per attack—with most on the low end of that spectrum. IEDs, for example, usually cost around $100 per bomb. Generally, Hamas and Hezbollah fighters were paid around $200 per

---

[134] Given their shared pedigrees, common geographies, and similar (often identical) tactics, techniques, and procedures, the rough cost per attack was generally the same between these groups in their respective geographies.

month, while leaders were paid around $400. Indeed, al-Qaeda bragged in online publications in the early 2010s that it could conduct a sophisticated, transnational bombing targeting Americans for less than $5,000. As terrorism scholars Jessica Stern and J. M. Berger explained in 2016:

> Asymmetrical warfare is defined by asymmetry. Any terrorist ideology that can attract five recruits and the contents of their checking accounts can make headlines for months. ***A terrorist group with twenty willing recruits and half a million dollars can make headlines for years.*** (Emphasis added.)

1063.   At those rates, even a single transaction that flowed $5,000 to an IRGC proxy or ISIS would have financed substantial terrorist violence. At the time, a $5,000 payment would have put 10 terrorists (at $200 per fighter) and two commanders (at $400 per commander) in the field for a month, equipped with about 20 IEDs. Or terrorists could have spent the $5,000 to purchase dozens of bomb components or to finance multiple complex attacks. The transactions BNPP enabled were orders of magnitude higher—and they materially strengthened the terrorists' ability to commit the attacks that killed and injured Plaintiffs.

1064.   United States government studies confirmed the dramatic impact of even marginal financial contributions to FTOs operating in the Middle East. For example, one DoD study of AQI—which followed a substantially similar approach as every FTO here when it came to attack logistics—found a statistically significant relationship between small-dollar contributions and terrorist attacks, concluding that each successful terror attack in Iraq required on average only $2,732 to execute. The study thus demonstrated that even marginal reductions in the terrorist funds flowing to an AQI-like FTO corresponded with a statistically significant reduction in terrorist violence. The converse was also true. For every $2,700 (or its rough equivalent) BNPP gave to FTOs like AQI (including every FTO here) successors, they financed roughly one new terrorist attack. As a result, the millions in dollars in value that BNPP flowed to the FTOs here

was more than enough to fund thousands of attacks—sufficient to kill every Plaintiff in this case

multiple times over.

1065.   This effect was linear. Simply put, more money equaled more terrorist attacks. As

Dr. Margaret Sankey of the U.S. Naval Institute and Air University, concluded in 2022:

> With the caveat and reminder that operations don't cost a large amount in
> proportion to sustainment, VNSAs [Violent Non-State Actors] whose budgets
> have been reduced have to make hard decisions about maintaining their
> capabilities. In some cases, there's a clear pattern that more money means more
> attacks, with al-Qaeda in Iraq consistently increasing by one attack for every
> $2,700 sent by the central leadership to sectors. Mustafa Abu al-Yazid, an al-
> Qaeda financing chief, put it starkly: "There are hundreds wishing to carry out
> martyrdom-seeking operations, but they can't find the funds to equip themselves.
> So funding is the mainstay of jihad."

1066.   Hamas attacks also typically fit this pattern. As Dr. Matthew Levitt observed in

his 2007 book, *Hamas: Politics, Charity, and Terrorism in the Service of Jihad*:

> [In] a 2002 interview, Salah Shehada, the founder of [Hamas's] Izz al-Din al-Qassam
> Brigades, claimed an operation could cost from $3,500 to $50,000. A Hezbollah member
> has put the figure of a terror attack at $665-$1,105 …. Another terrorist from Palestinian
> Islamic Jihad, Ahmad Sari Hussein, received $2,210 … for his terrorist activity, while
> Wael Ghanam, a Tanzim activist from the Tulkarem refugee camp, said he received
> $7,000 to manufacture explosive charges. Others have claimed that a suicide bombing
> mission could be set up for as little as $150, consisting essentially of a bomb of chemicals
> (sugar or fertilizer), a battery, a light switch, wire, and a belt. Still others figure the cost
> of each bomb belt at $1,500 to $4,300.

1067.   Financial Action Task Force reports also confirmed that even the most complex

cross-border attacks involving teams of terrorists, multiple attacks, and globe-spanning plots –

which were significantly more complicated than the attacks against Plaintiffs – usually cost no

more than $50,000 in total, with most costing significantly less. On February 29, 2008, for

example, the FATF transmitted a Report that BNPP received, digested, and disregarded ("2008

FATF Report"), in which FATF confirmed – directly alerted BNPP – that, with respect to the

"direct costs of terrorist attacks and conflict": "The precursor materials necessary to stage

specific attacks are highly diverse and include, for example, vehicles, improvised bomb-making

components, maps, surveillance material etc. These direct costs of terrorist attacks are often very

low relative to the damage they can yield, as illustrated by the following estimates:"

| Table 1: The direct attack costs of a terrorist conspiracy | | |
|---|---|---|
| Attack | Date | Estimated cost[3] |
| London transport system | 7 July 2005 | GBP 8 000[4] |
| Madrid train bombings, | 11 March 2004 | USD 10 000 |
| Istanbul truck bomb attacks, | 15 & 20 November 2003 | USD 40 000 |
| Jakarta JW Marriot Hotel bombing | 5 August 2003 | USD 30 000 |
| Bali bombings | 12 October 2002 | USD 50 000 |
| USS Cole attack | 12 October 2000 | USD 10 000 |
| East Africa embassy bombings, | 7 August 1998 | USD 50 000 |

1068.   The below allegations reflect the transactions of which Plaintiffs are aware. These

allegations reflect what Plaintiffs have been able to piece together without discovery. The full

details of the volume of transactions performed by BNPP on behalf of the Terrorist Sponsors,

and the full scope of BNPP's knowledge of those transactions rest in BNPP's sole control.

Discovery is likely to show substantially more transactions by BNPP on behalf of the Terrorist

Sponsors occurring contemporaneously with the attacks in this case—causing even more value to

flow through to the Hezbollah, Jaysh al-Mahdi, Hamas, and PIJ leadership, operations, logistics,

and intelligence cells that committed the attacks, including the Khamenei Cell, Joint Logistics

Cells, and Joint Cells in Iraq and the Palestinian territories.

### G. BNPP Supplied Long-Lasting Assistance that Continued Aiding Terrorist Attacks Through at Least 2016

1069.   BNPP's conduct supplied unusually long-lasting assistance to attacks committed

by Hezbollah, Hamas, PIJ, and Jaysh al-Mahdi in at least five ways.

1070.   *First*, the uniquely long "tail" of petroleum industry investments ensured that business and contractual relationships that BNPP helped the Terrorist Sponsors secure through 2012 continued flowing profits for years thereafter.

1071.   *Second*, BNPP's assistance allowed key terrorists who sponsored the attacks against Plaintiffs to enhance the personal jihad networks upon which they relied to maximize the power of their attacks. For example, when Qasem Soleimani had more money, he could pay more people to assist on matters like intelligence, logistics, and recruitment. The larger the operatives' network, the more lethal their attacks.

1072.   *Third*, BNPP's conduct helped Hezbollah, Hamas, PIJ, and JAM stockpile weapons for future attacks years later. Consistent with IRGC and Hezbollah practice, Hezbollah, Hamas, PIJ, and JAM all emphasized long-term logistical planning, and massing weapons stockpiles.

1073.   *Fourth*, BNPP's conduct helped the Terrorist Sponsors finance the construction of a latticework of terrorist attack tunnels in Gaza and southern Lebanon, which led to a corresponding increase in terrorist attacks. Among other things, the tunnels facilitated rocket attacks because terrorists fired rockets from inside purpose-bult tunnels, thus maintaining cover, and the tunnel network allowed terrorists to continuously change the location from which they fired, which increased the survivability (for the terrorists) and therefore led to more attacks.

1074.   *Fifth*, BNPP supplied the terrorists with very large sums. At such amounts, the financial windfall BNPP bestowed upon Hezbollah, Hamas, PIJ, and JAM (via the Terrorist Sponsors) continued powering attacks for many years after BNPP stopped its conduct.

## V.    Hezbollah and its Proxy JAM Used BNPP's Substantial Assistance to Commit Terrorist Attacks in Iraq that Targeted the United States and Injured Plaintiffs

1075.   As DOJ confirmed when it announced BNPP's guilty plea in 2012, BNPP

supplied ***"criminal support of countries and entities engaged in acts of terrorism.***" DOJ's

conclusion directly applied to the Terrorist Sponsors' attacks in Iraq and confirmed that BNPP

aided Hezbollah-led attacks there by Hezbollah and Jaysh al-Mahdi..

1076.   From 2002 through at least 2012, BNPP directly and indirectly supported attacks

by Hezbollah and Jaysh al-Mahdi that targeted the United States in Iraq, which killed and

maimed thousands of Americans, including Plaintiffs. BNPP did so by powering two separate

but related Terrorist Sponsors – the Foundation for the Oppressed and the IRGC – both of which

were notorious sponsors of Hezbollah-backed terrorism, including in Iraq. BNPP's conduct

financed every attack against Plaintiffs many times over, flowed resources directly to the terrorist

operatives and cells responsible for the attacks against Plaintiffs, and powered the terrorists'

acquisition, movement, storage, and deployment of, the specific weapons that the terrorists used

in Iraq to kill and maim Plaintiffs and their loved ones.

## A.    Hezbollah Created, Armed, and Trained Jaysh al-Mahdi to Carry Out Terrorist Attacks Against Americans

1077.   The terrorist attacks that BNPP assisted in Iraq were committed, authorized, or

planned by Hezbollah, acting through or jointly with its proxy in Iraq, Jaysh al-Mahdi. Jaysh al-

Mahdi's campaign of terror against the United States in Iraq could not have occurred without the

planning and authorization provided by Hezbollah, a Lebanese-based Shi'a terrorist organization

that orchestrates terror attacks against Americans around the world on behalf of Iran. Richard

Armitage, the Deputy Secretary of State under President George W. Bush, has described

Hezbollah (as broadcast by *60 Minutes* in 2003) as "the 'A-Team of Terrorists,'" and former

CIA director George Tenet has opined (via public Congressional testimony in 2003) that

Hezbollah "is [al-Qaeda's] equal if not far more capable organization." Hezbollah's chief

terrorist mastermind, dual-hatted Hezbollah/IRGC Qods Force operative Imad Mugniyeh, helped

Sadr found Jaysh al-Mahdi to inflict "mass casualties" on Americans in Iraq and recruited many

of its first members; Hezbollah has since orchestrated Jaysh al-Mahdi's campaign of terror

against Americans in Iraq. Indeed, contemporaneous accounts—like the one published by *U.S.*

*News & World Report* on November 22, 2004—confirmed Hezbollah's direct operational role in

Jaysh al-Mahdi attacks, including that of iconic Hezbollah mastermind Mugniyeh.

1.    **Hezbollah Co-Founded Jaysh al-Mahdi with Sadr to Carry Out a
       Campaign of Terror Against Americans in Iraq**

1078.    In April 2003, Hezbollah dispatched its chief terrorist mastermind, Imad

Mugniyeh, to Iraq to help Muqtada al-Sadr found Jaysh al-Mahdi. Hezbollah's goal, according to

an October 2003 Israeli intelligence report (as described by *U.S. News & World Report* on

November 22, 2004), was to set up a terrorist network in Iraq to inflict "mass casualties" on

Americans. A U.S. Special Operations task force report also quoted by *U.S. News & World*

*Report* in the same 2004 analysis explained that "the Lebanese Hizballah leadership believes that

the struggle in Iraq is the new battleground in the fight against the U.S." As embedded war

correspondent Michael Totten put it on August 14, 2007, Jaysh al-Mahdi was created to be "the

Iraqi branch of Hezbollah."

1079.    Sadr was a natural fit to lead Hezbollah's campaign of terror in Iraq. In addition to

being the descendant of two revered Shi'a martyrs (Sadiq al-Sadr and Baqir al-Sadr) and sharing

Hezbollah's affinity for violence, Sadr himself had a close relationship with Hezbollah and Iran.

Hassan Nasrallah, Hezbollah's Secretary-General, had studied under Muqtada al-Sadr's uncle,

Baqir al-Sadr. Muqtada's cousin, Musa al-Sadr, founded Hezbollah's predecessor in Lebanon. A

2004 U.S. military-intelligence report (as quoted in *U.S. News & World Report* on November 22,

2004) concluded that Sadr had a direct relationship with Hassan Nasrallah, the head of

Hezbollah, and that a top adviser to Nasrallah had personally delivered funds to Sadr in Najaf. Sadr himself visited Tehran and Beirut on numerous occasions. And, in 2016, Nasrallah personally brokered talks between Sadr and the Iraqi government.

>    **2.    Hezbollah Organized Joint Hezbollah/Jaysh al-Mahdi Cells in Iraq to Direct Terrorist Attacks Targeting the United States, in Which Jaysh al-Mahdi Notoriously Served as Hezbollah's Agent**

1080.    From 2003 through 2024, Hezbollah followed the long-standing Iranian "joint cell" approach to directly sponsor Jaysh al-Mahdi's terrorist attacks targeting the United States in Iraq.  Hezbollah's role in Jaysh al-Mahdi's attacks was similar to its role in other terror campaigns it sponsored: Hezbollah recruited, trained, armed, and directed Jaysh al-Mahdi terrorists, who carried out terrorist attacks against Americans on Hezbollah's behalf as Hezbollah's agent in Iraq. Hezbollah Secretary-General Hassan Nasrallah was deeply involved in Jaysh al-Mahdi's campaign of terror, reportedly (per *NBC News* on July 1, 2008) spending "several hours daily dealing with 'the situation in Iraq.'"

1081.    Immediately after Jaysh al-Mahdi's founding in April 2003, Mugniyeh began to recruit and train soldiers for Jaysh al-Mahdi. Mugniyeh soon recruited 300 terrorists for Jaysh al-Mahdi from Shi'a communities in Kuwait and Saudi Arabia, then sent those terrorists to Lebanon for training in the use of assault rifles, booby traps, and kidnapping. These 300 fighters were some of Jaysh al-Mahdi's first members. That same month (per a report published by *Asia Times* in 2006), Hezbollah "opened two offices in the Iraqi cities of Basra and Safwan" in order to "build[] up [its] organizational and military apparatuses in Iraq." By August 2003, Hezbollah had established permanent teams of 30 to 40 operatives in Najaf to recruit and train Jaysh al-Mahdi terrorists. At the same time, these Hezbollah operatives were acquiring rocket-propelled grenades, antitank missiles, and other weapons for Jaysh al-Mahdi.

1082.    Hezbollah's involvement in Jaysh al-Mahdi's campaign of terror only grew during the subsequent months and years. By January 2004, nearly 800 Hezbollah agents had been sent to Iraq, where they directed Jaysh al-Mahdi's terrorist campaign from key Jaysh al-Mahdi strongholds in Iraq, including, but not limited to, Baghdad (Sadr City), Najaf, Safwan, and Basra.  Eighteen of these Hezbollah operatives were detained on charges of terrorism in February 2005. An October 2006 U.S. intelligence summary (as published by *WikiLeaks*) noted that "300 Hezbollah terrorists from Lebanon have joined with [the] Mahdi Militia in Najaf" after travelling to Iraq on tourist visas. Dual-hatted Hezbollah/IRGC-QF operative Imad Mugniyeh personally supervised Jaysh al-Mahdi's campaign of terror until his death in February 2008, at which point he was replaced by other Hezbollah operatives. At the time Mugniyeh was killed in 2008, the U.S. government continued to view him as an ongoing threat to Americans in Iraq.

1083.    Hezbollah created and operated a network of terrorist cells led by joint Hezbollah/Jaysh al-Mahdi cells in key parts of Iraq for Hezbollah's terrorist enterprise, including joint cells in Baghdad, Basra, Kirkuk, and Diyala, among other places. Such joint cells were established by Hezbollah's terrorist mastermind Imad Mugniyeh. Hezbollah deployed a litany of its senior terrorist planners to direct Jaysh al-Mahdi's campaign of terror against the United States in Iraq, including, but not limited to, the following Hezbollah terrorists:

a.    **Ali Mussa Daqduq (Senior Hezbollah Field Commander).**  Hezbollah directed Daqduq to work with the Quds Force instructing Jaysh al-Mahdi on the use of EFPs, mortars, rockets, and other terrorist tactics, including kidnapping operations.

b.    **Muhammad Kawtharani (Nasrallah's Personal Liaison to Sadr).**  Hezbollah deployed Kawtharani to serve as a liaison to Jaysh al-Mahdi.  In 2013, the U.S. Treasury Department identified Kawtharani as a member of "Hizballah's leadership" who "act[ed] for, or on behalf of Hizballah," and was "responsible for terrorist operations" in Iraq "[a]s the individual in charge of Hizballah's Iraq activities."  Kawtharani, as personal adviser to Nasrallah, was directly involved in coordinating attacks against Americans in Baghdad.

c.   **Yusuf Hashem (Iraq Operations – Country-wide).** Hezbollah tasked senior Hezbollah terrorist commander Hashem with coordinating Hezbollah's Jaysh al-Mahdi operations in Iraq.

d.   **Ali Falih Hadi (Iraq Operations – Basra and Amarah).** According to a Coalition threat report (as published by WikiLeaks), Hadi was a member of Hezbollah who was based in Amarah and Basra Province and was "responsible for supplying" weapons to members of a joint Jaysh al-Mahdi/Hezbollah cell operating in Basra.

e.   **Hezbollah Bombmakers.** On information and belief, Hezbollah deployed one or more experienced bombmakers into Iraq to provide direction to Jaysh al-Mahdi terrorists relating to the design, manufacture, storage, and maintenance of EFPs and IEDs for use against the United States in Iraq.

1084.   At Hezbollah's direction, Jaysh al-Mahdi escalated its attacks on Americans in Iraq beginning in the winter of 2005. As the *New York Times* reported on November 28, 2006, and per distinguished Iraq-related authors Michael Gordon and Dexter Filkins, this escalation was the result of Hezbollah's own "strategic decision" to ratchet up pressure on the United States by boosting Hezbollah's "support [for] Sadr" and fostering "managed instability" in Iraq. As Gordon and Filkins reported, a senior American intelligence official assessed that, as part of this "strategic decision" to escalate the terrorist campaign against Americans in Iraq, Iran served as "a link to Lebanese Hezbollah" and "helped facilitate Hezbollah training inside of Iraq, but more importantly Jaish al-Mahdi members going to Lebanon" for training.

1085.   Jaysh al-Mahdi and Sadr publicly embraced their links to Hezbollah. During his Friday sermon on March 26, 2004 – in which he praised the attacks of September 11th and called for violence against Americans in Iraq – Sadr swore fealty to Hezbollah in Shi'a Islamic terms, pledging support to "our victorious party, Hezbollah." Weeks later, in a sermon on April 2, 2004 (widely reported, including by the *Associated Press* on April 2, 2004), Sadr declared that he was Hezbollah's "striking arm in Iraq," proclaiming: "I will support the real Islamic unity that has been created by Hassan Nasrallah, the secretary-general of the victorious Hezbollah." In an August 2007 interview (as republished by the U.K.'s *Independent* on August 20, 2007), Sadr

again reportedly acknowledged that Jaysh al-Mahdi "ha[s] formal links with Hizbollah" and "cop[ies] Hizbollah in the way they fight and their tactics." Another Jaysh al-Mahdi member told the *Independent* that "[w]e learned [from Hezbollah] how to take advantage of an armored vehicle's weakness" – referring to the use of EFPs – "and how to wait and kill the soldiers who try to escape."

1086.   In the years after 2003, Jaysh al-Mahdi fighters regularly participated in anti-American marches in which they marched under Hezbollah flags and banners. Tens of thousands of members of Jaysh al-Mahdi publicly swore fealty to Hezbollah in various marches in Sadr City in 2006 alone, including on July 21, 2006 and August 4, 2006.

1087.   From 2007 through 2011, the Terrorist Sponsors coordinated with Hezbollah—which served as their face, agent, and primary interlocutor with JAM—to intensify terrorist attacks targeting the United States in Iraq. A key component was Hezbollah's supervision of JAM's deployment of explosively formed penetrators, a signature Hezbollah bomb that the U.K. government concluded in 2005 was associated "exclusively" with Hezbollah. This meant Hezbollah's direct involvement in every EFP attack in Iraq, using designs Hezbollah had field-tested during its 2006 hostilities with Israel. On January 20, 2007, a joint cell comprised of Hezbollah and JAM that was funded and logistically aided by the IRGC, including the Qods Force, attacked the Karbala Provincial Joint Coordination Center in Iraq, which resulted in the kidnapping and murder of five U.S. soldiers, and was quickly confirmed by the U.S. and media outlets to have been an example of IRGC-sponsored, Hezbollah/JAM-committed attacks in Iraq. More broadly, the U.S. government conducted a "surge" in Iraq in 2007, which was focused on preventing Hezbollah and JAM attacks in Baghdad, during which Hezbollah and JAM escalated their use of EFP attacks against the United States in Iraq.

1088.   Jaysh al-Mahdi notoriously served as Hezbollah's agent for purposes of sponsoring terrorist attacks targeting the United States in Iraq from 2003 through 2024. By no later than early 2004, and no later than summer 2006, BNPP was aware that Jaysh al-Mahdi served as Hezbollah's agent in Iraq for at least four reasons. *First*, BNPP's in-house corporate security, intelligence, and compliance personnel knew such facts, which they would have learned in their ordinary course geographic and media monitoring roles (among other functions). *Second*, BNPP's Iraq-facing employees, agents, and consultants knew such facts due to their country-related expertise. *Third*, BNPP's Iran-related employees also would have specifically known such facts, as such marches provided days of wire-to-wire media coverage in Iranian media, which always amplified pro-Hezbollah marches across all the Ayatollah Khamenei-, SLO-, and IRGC-controlled Iranian media monopoly, including IRIB. *Fourth*, events beginning as early as 2004 regularly produced widespread, contemporaneous, media coverage that confirmed Hezbollah's tight links with Jaysh al-Mahdi in Iraq, including but not limited to:

a.    On April 7, 2004, the *Washington Times* reported that Sadr was "being aided directly by Iran's Revolutionary Guard, which plays a large role in running that country, and by Hezbollah, an Iranian-created terrorist group based in Lebanon."

b.    On November 22, 2004, *U.S. News & World Report* reported that, according to intelligence reports, "Iran used Hezbollah to train and provide funds to Sadr's Mahdi Army"; that "Hezbollah had established 'a team of 30 to 40 operatives' in Najaf 'in support of Moqtada Sadr's Shia paramilitary group'"; that "Hezbollah was recruiting and training members of Sadr's militia"; and that "Hezbollah was 'buying rocket-propelled grenades . . . antitank missiles' and other weapons for Sadr's militia."

c.    On July 29, 2006, the *Asia Times* reported that Hezbollah had "opened two offices in the Iraqi cities of Basra and Safwan" in order to "build[ ] up [its] organizational and military apparatuses in Iraq."

d.    On November 28, 2006, the *New York Times* reported that "Hezbollah had been training members of the Mahdi Army," that Hezbollah had trained more than a thousand terrorists in Hezbollah camps in Lebanon alone, and that a senior U.S. intelligence official assessed that "Lebanese Hezbollah" made a "strategic decision" in late winter 2005 or early spring 2006 "to provide more support to Sadr to increase pressure on the U.S."

e.    On August 20, 2007, the London-based *Independent* printed Sadr's August 2007 interview, in which he admitted Jaysh al-Mahdi's "formal links with Hizbollah."

1089.    JAM terrorists publicly swore fealty to Hezbollah as its terrorist agent in Iraq through at least two separate multi-day public organizing, fundraising, and recruitment events organized by Hezbollah and Jaysh al-Mahdi in Baghdad for the specific purpose of publicly confirming, and communicating to the world, that JAM was Hezbollah's agent in Iraq and was just as it always touted itself to be—Hezbollah's "striking arm" in Iraq.[135] Both were organized and held in Baghdad on or about July 20-22, 2006, and August 3-5, 2006, respectively, and both featured around 10,000 members of Jaysh al-Mahdi—and, on information and belief, Hezbollah operatives as well—who attended these joint Jaysh al-Mahdi/Hezbollah events, which further demonstrated Hezbollah's control over Jaysh al-Mahdi operations and emphasized the joint nature of their operations in Iraq, including in Baghdad. As recounted in a field report in *Al-Jazeera* on August 4, 2006, for example, demonstrators wore "white shrouds symboli[z]ing [their] willingness to die for Hezbollah, waved the Lebanese guerrillas' yellow banner and chanted slogans in support of their leader, Sheik Hassan Nasrallah." The crowd of Jaysh al-Mahdi fighters further declared "Mahdi Army and Hezbollah are one," and chanted "Allah, Allah, give victory to Hassan Nasrallah." The close, symbiotic connection between Jaysh al-Mahdi and Hezbollah was summed up by Jaysh al-Mahdi members' repeated declaration at the rally:  "we are Hezbollah." In both events, Jaysh al-Mahdi members publicly marched under Hezbollah's iconic yellow flag, Hezbollah's iconic banners, and Hezbollah-taken propaganda (glamour shots) of Hezbollah Secretary General Hassan Nasrallah while loudly chanting slogans

---

[135] While, Hezbollah's and JAM's July and August 2006 events in Baghdad provided stark additional confirmation that JAM was Hezbollah's agent there, BNPP already knew such facts by no later early 2004, by which time Muqtada al-Sadr, Abu Mahdi al-Muhandis, and other senior JAM leaders had publicly confirmed their service as Hezbollah's agent in Iraq, e.g., when Sadr publicly admitted in or about 2004 that JAM was Hezbollah's "striking arm" in Iraq.

communicating their service to Hezbollah as part of, and agent for, Hezbollah in Iraq, included, those previously described. Such public, planned, massively-attended, Hezbollah events—replete with JAM's and JAM's members' public declarations of loyalty to Hezbollah's leader (Nasrallah) and service to Hezbollah (as an organization)—unmistakably confirmed, and alerted BNPP about, JAM's role as Hezbollah's agent in attack and JAM's intention to commit or support terrorist attacks targeting the United States in the Middle East in its capacity as Hezbollah's agent.

1090.   Hezbollah's and Jaysh al-Mahdi's public confirmation that JAM acted as Hezbollah's agent in the Middle East by, *inter alia*, acting as its attack arm in Iraq through their terrorist organizing events in Baghdad on July 20-22, 2006, and August 3-5, 2006, respectively, produced impossible-to-forget imagery replete with Hezbollah's iconic yellow flags and banners, glamor-shot (Hezbollah-supplied) photos of Hassan Nasrallah glamour, and JAM fighters in their signature black attire, some with raised AK-47s. Through these events, and the global media coverage they generated, Hezbollah and Jaysh al-Mahdi publicly confirmed, and alerted BNPP, that Jaysh al-Mahdi operated as Hezbollah's agent in Iraq: JAM's fighters publicly swore fealty to Hezbollah and Nasrallah, marched under Hezbollah's banners, and expressed their acceptance of their agency role (*e.g.*, "We are Hezbollah") and intention to attack America in such capacity (*e.g.*, "Death to America"). And they did so in parades specifically designed to gain attention through vivid imagery and video that leveraged the power of the media to amplify Jaysh al-Mahdi's public vow to serve Hezbollah. On August 4, 2006, for example, *NBC News* covered the march and published two images (below) from it that vividly reinforced Hezbollah's inextricable connection to Jaysh al-Mahdi; the images show a rally expressing fealty Hezbollah in which thousands of JAM terrorists, many of whom openly brandished AK-47s or JAM's signature

black attire, marched under Hezbollah's distinctive banners and flags and photos of Hezbollah

Secretary-General Hassan Nasrallah and JAM founder Muqtada al-Sadr:





1091.   U.S. government findings confirmed Hezbollah's inextricable connections to

Jaysh al-Mahdi in Iraq. On July 2, 2009, for example, Treasury formally recognized the links

between Hezbollah and Jaysh al-Mahdi when it designated Jaysh al-Mahdi commander – and

dual-hatted IRGC-QF operative who was a member of the Khamenei Cell and key lieutenant of

Hassan Nasrallah and Qasem Soleimani in Iraq – Abu Mahdi al-Muhandis as a Specially Designated Global Terrorist, and explained that, "[a]s of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces." Per Treasury, the United States found that these Jaysh al-Mahdi cells "received training in guerilla warfare, handling bombs and explosives, and employing weapons [such as] missiles, mortars, and sniper rifles" from Hezbollah instructors.

1092.   On November 19, 2012, likewise, Treasury again recognized the links between Hezbollah and JAM, finding that "Hizballah, along with its Iranian allies, trained and advised Iraqi militants to carry out numerous terrorist attacks." According to Treasury's findings, in 2005, "Iran asked Hizballah to form a group to train Iraqis to fight Coalition Forces in Iraq.  In response, Hassan Nasrallah established a covert Hizballah unit to train and advise Iraqi militants in Jaysh al-Mahdi (JAM) and JAM Special Groups." As of 2006, per Treasury, that covert Hezbollah unit was working with the Iranian Quds Force "to provide training and equipment to JAM Special Groups to augment their ability to inflict damage against U.S. troops."

### 3.   Hezbollah Provided Jaysh al-Mahdi with Weapons to Carry Out Terrorist Attacks Against Americans in Iraq

1093.   Hezbollah supplied many of the weapons that Jaysh al-Mahdi used to commit acts of terror against Americans in Iraq – though JAM still required money and resources (derived in significant part from its control of MOH) to acquire those weapons and transport them to the appropriate cells in Iraq. As a JAM commander confided to journalists from *McClatchy* on June 22, 2007, "[a]ll of the Mahdi Army's weapons except for the AK-47 rifles come from Iran."

1094.   Hezbollah facilitated the flow of these weapons from Iran into Iraq by working with Jaysh al-Mahdi to set up cross-border smuggling networks. As terrorism scholar Bill

Roggio of the *Long War Journal* reported on June 3, 2007, the rockets that JAM fired into Baghdad's Green Zone were ordinarily "the same rockets Hezbollah fired into northern Israel from Lebanon during the Israel-Hezbollah war in the summer of 2006." Indeed, on August 12, 2008, Coalition forces arrested nine Hezbollah members who had been funneling weapons into Iraq. Hezbollah's involvement in these smuggling operations accorded with its longstanding role as Iran's weapons smuggler (including its attempt in 2003 to smuggle 50 tons of weapons from Iran to Palestinian militants, the largest Iranian-linked smuggling operation ever uncovered).

1095.  Hezbollah has also purchased weapons for Jaysh al-Mahdi outright. For example, according to a U.S. military-intelligence document (as quoted in *U.S. News & World Report* in 2004), "Hezbollah was 'buying rocket-propelled grenades . . . antitank missiles' and other weapons for Sadr's militia."

1096.  Weapons supplied to Jaysh al-Mahdi by Hezbollah include the same types of weapons on which Hezbollah trained Jaysh al-Mahdi: small arms, IEDs, EFPs, rockets, mortars, and RPGs. These weapons were first smuggled into the Jaysh al-Mahdi command-and-control safe haven of Sadr City and then distributed to Jaysh al-Mahdi cells in outlying provinces. For attacks carried out with those weapons, Hezbollah not only trained Jaysh al-Mahdi how to use them; it supplied the weapons themselves.

### 4.  Hezbollah Authorized Jaysh al-Mahdi's Attacks Against Americans in Iraq

1097.  After helping to create Jaysh al-Mahdi in April 2003, Hezbollah began a wide-ranging public propaganda campaign to authorize and incite Shi'a in Iraq to join Jaysh al-Mahdi's campaign of terrorism against Americans in Iraq. It did so primarily through two channels. First, Hezbollah took advantage of the reverence that Iraqi Shi'a felt towards Hezbollah's senior leadership – and in particular Secretary-General Hassan Nasrallah and Grand

Ayatollah Fadlallah – by having those leaders issue repeated calls to Iraqi Shi'a to join Jaysh al-Mahdi and attack Americans in Iraq.  Second, Hezbollah encouraged senior members of Jaysh al-Mahdi, including Sadr himself, to carry out such attacks.  As a *Middle East Intelligence Bulletin* dispatch explained in March 2004, Hezbollah operatives in Iraq "have focused mainly on establishing lines of communication with Iraqi Shiite leaders and distributing anti-American propaganda, but the groundwork is clearly being laid for incitement of violence in the future."

1098.   Hezbollah's message of authorization was effective because many Jaysh al-Mahdi members looked to Hezbollah as a moral and religious authority on par with Sadr himself.  As early as 2004, propaganda posters picturing Sadr side-by-side with Secretary-General Nasrallah appeared throughout Baghdad.  In August 2006, tens of thousands of Jaysh al-Mahdi operatives staged a massive, public, pro-Hezbollah rally in Sadr City.  Rally-goers burned American flags, chanted "Death to America," and displayed the portraits of Sadr and Nasrallah side-by-side in the streets of Baghdad. As NBC News reported on August 4, 2006, members of the rally wore white shrouds to symbolize their willingness to die for Hezbollah and asked for "victory to Hassan Nasrallah." Jaysh al-Mahdi members also asked – as contemporaneously reported by the Middle East Media Research Institute ("MEMRI") on August 11, 2006 – that "al-Sadr to consider them an extension of Hizbullah" and "expressed a genuine desire to participate with Hizbullah against" the Coalition government in Iraq. In a subsequent demonstration in July 2007, Jaysh al-Mahdi members again carried signs featuring the pictures of Sadr and Nasrallah side-by-side. And, after Hezbollah terrorist mastermind Imad Mugniyeh was killed in 2008, Jaysh al-Mahdi held a public funeral service for him where senior members of Jaysh al-Mahdi again declared their allegiance to Hezbollah.

1099.   Grand Ayatollah Muhammad Hussein Fadlallah, whom Treasury identified as "Hizballah's Spiritual Leader" on June 10, 2004, occupied a similarly exalted position among Iraqi Shi'a. Fadlallah himself became a Specially Designated Terrorist in 1995 as a result of his role, per Treasury, as a "Leading Ideological Figure of Hizballah."  Among other things, by no later than May 22, 2006, the U.S. government had publicly expressed its conclusion that "Sheikh Muhammad Hussein Fadlallah, Hizballah's chief 'spiritual leader,' reportedly issued the *fatwa* (religious ruling) authorizing the Marine Corps barracks bombing" in Beirut in 1983, which was the deadliest terrorist attack against America before September 11th. Although he was of Lebanese descent, Fadlallah was born in Najaf, grew up in Najaf, studied in Najaf, reportedly spoke with an Iraqi accent, was a respected Shi'a theologian, and was close with the Sadr family, including the First and Second Martyrs as well as Muqtada himself. When Fadlallah died in 2010, Muqtada al-Sadr called on his followers to observe three days of mourning in honor of Hezbollah's spiritual leader.

1100.   Hezbollah's religious and moral authority was especially powerful because Jaysh al-Mahdi, like many other terrorist groups, looked to religious authorities for validation.  As Dr. Bruce Hoffman explained in 1995, "'Shiites do not believe in the legitimate authority of secular governments.'" Instead, he noted, "religion serves as a legitimizing force – conveyed by sacred text or imparted via clerical authorities claiming to speak for the divine." Thus, as Dr. Hoffman explained, for religious terrorist organizations such as Jaysh al-Mahdi, "violence first and foremost is a sacramental act or divine duty executed in direct response to some theological demand or imperative." As prominent voices in Shi'a Islam, Grand Ayatollah Fadlallah and Secretary-General Nasrallah were especially influential among members of Jaysh al-Mahdi.

1101.   Hezbollah's leaders leveraged their moral and religious authority over Jaysh al-Mahdi by publicly calling for "jihad" and issuing *fatwas* against Americans in Iraq, which media outlets contemporaneously reported, e.g., as the *New York Post* did on February 5, 2007.   An April 2003 dispatch from former Treasury counterterrorism official Avi Jorisch published by the *Middle East Intelligence Bulletin* reported that "Hezbollah has recently begun a campaign to incite opposition to American forces in Iraq" by broadcasting propaganda to millions of Arab viewers (including Shi'a in Iraq) on its television station al-Manar. Such propaganda, per Jorisch, explicitly called for acts of "resistance" against Americans in Iraq, made up more than one-quarter of al-Manar's content.

1102.   In furtherance of this campaign, Secretary-General Nasrallah made repeated and direct communications to Iraqi Jaysh al-Mahdi members to attack Americans:

a.      In a March 2003 speech, Nasrallah publicly declared Hezbollah's support for attacks against Americans, promising that "peoples of this part of the world will receive [America] . . . ***with guns, blood, weapons, and martyrdom operations***."

b.      In an April 2003 speech – about which western media outlets contemporaneously reported, *e.g.*, as the *Chicago Tribune* did on April 23, 2003 – Nasrallah directly called on Iraqi Shi'a to attack Americans in Iraq, declaring that "***[t]he Iraqi people must resist this occupation***" and that "[w]e can bet that the Iraqi people will resist the American occupation and liberate themselves."

c.      In an October 2006 interview that aired on Al-Jazeera – about which western media contemporaneously reported, *e.g.*, as MEMRI did on October 31, 2006 – Nasrallah stated:  "We consider the resistance in Iraq . . . to be legitimate resistance, which is justified and appropriate . . . and ***we support and endorse this resistance***."

d.      In a January 2007 interview broadcast on al-Manar – about which western media outlets contemporaneously reported, *e.g.*, as the *New York Post* did on February 5, 2007 – Nasrallah declared:  "We support the option of a comprehensive Iraqi resistance, with all its aspects, especially the military aspect.  We believe that the solution in Iraq begins with adopting the option of armed resistance – ***jihad against the occupation forces***."

e.      In a December 2009 speech broadcast on al-Manar – about which western media contemporaneously reported, *e.g.*, as MEMRI did on December 29, 2009 – Nasrallah promised "***all-out war***" against "the Great Satan" of America over a chorus of "Death to America" chants.

1103.   Nasrallah's call for "jihad" was particularly potent because of its religious significance. As one federal court has explained, a "jihad" is a "religiously sanctioned resistance against perceived enemies of Islam." *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 7 (D.D.C. 2016). This religious sanctioning was thus highly significant to members of Jaysh al-Mahdi, a militantly Shi'a terrorist organization that frequently engaged in religious violence.

1104.   As another federal court has found, Grand Ayatollah Fadlallah echoed similar themes in an August 2004 *fatwa* in which he instructed the Shi'a in Iraq that it was their religious duty to attack American military and civilian personnel in Iraq as a means of resisting the occupation. "A Fatwa is an edict of a religious leader, authorizing a faithful Muslim to commit murder." *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 103 n.8 (D.D.C. 2000). The Grand Ayatollah's *fatwa*, which received widespread coverage in the Iraqi and Western media, was a critical green light for Jaysh al-Mahdi terrorists in Iraq to attack Americans in Iraq.

1105.   Until Fadlallah's death in 2010, he consistently incited his Shi'a followers in Iraq and Lebanon to attack Americans. In at least six Friday sermons in the Imam Hassanayn Mosque in Beirut that took place between February and April 2003 – sermons that would have been widely shared in Iraq and would have undoubtedly been known to Sadr and other leaders of Jaysh al-Mahdi – Fadlallah blessed the calls made by others such as Nasrallah for Iraqi Shiites to violently resist the U.S. occupation.

1106.   Information gathered by Coalition forces during raids upon Jaysh al-Mahdi confirmed the power of Nasrallah's and Fadlallah's messages of authorization. For example, according to a U.S. military incident report (as published by *WikiLeaks*), an October 9, 2008 raid on a Jaysh al-Mahdi safe house in Basra yielded "religious Iranian video clips," "MAS [*i.e.*, Muqtada al-Sadr] literature," a "[n]otebook with JAM computer training dated 11 Jan 2007," and

a "[p]icture of Mohammad Hussein Fadala [sic]" who was identified in the report as a "Deputy of Hassan Wasrala [sic] (Hezbollah)."

1107.   Hezbollah also wielded significant influence over Sadr himself, who had deep personal ties to Hezbollah's leaders. As the *Arab Weekly* reported in 2016, Sadr was "greatly inspired by Hassan Nasrallah" in part because "both men rose to lead their parties at a fairly young age." According to a March 2007 report by the Jamestown Foundation, a counterterrorism think tank, Sadr "has looked up to Hezbollah of Lebanon as a model of Shiite military success[,] [because] [h]e respects the leadership of the organization and admires [Hassan Nasrallah]." Accordingly, Sadr publicly declared his loyalty to Hezbollah; co-founded Jaysh al-Mahdi with the help of Hezbollah's chief terrorist mastermind, Imad Mugniyeh; expressly modelled his organization on Hezbollah; and travelled to Beirut (where Hezbollah is headquartered) several times from 2005-2009. Hezbollah used its close relationship with Sadr to authorize and incite him to organize a terror campaign that would inflict "mass casualties" against Americans in Iraq.

1108.   Hezbollah's leaders have directly connected Hezbollah's authorization of terror attacks against Americans in Iraq to Hezbollah's terrorist objective of forcing the U.S. to abandon Iraq. For example, in a speech on October 25, 2011, Nasrallah stated that "resistance groups" Hezbollah had backed (that is, Jaysh al-Mahdi) pressured the U.S. to reduce its presence in Iraq. In the same speech, Nasrallah boasted that the Hezbollah-Jaysh al-Mahdi campaign of terror against Americans in Iraq should be considered a model for terrorist campaigns against the U.S. and its allies around the world.

### 5.    Hezbollah Planned Jaysh al-Mahdi's Terrorist Attacks Against Americans in Iraq

1109.   Hezbollah trained Jaysh al-Mahdi in the use of weapons and tactics that were specifically designed to target Americans in Iraq – and that Jaysh al-Mahdi in fact used

successfully to perpetrate terrorist attacks against Americans in Iraq. This training began at Jaysh al-Mahdi's inception in April 2003, when Imad Mugniyeh recruited and trained some of Jaysh al-Mahdi's first 300 fighters in Lebanon. It continued through at least 2008, when Hezbollah held training camps for Jaysh al-Mahdi fighters in Iran (in conjunction with Iran's Quds Force), Lebanon, and Iraq. According to a captured Jaysh al-Mahdi operative, paraphrased in an unclassified (as redacted) U.S. military-intelligence report published by the U.S. Army's Combating Terrorism Center at West Point in 2007, "[w]ithout a doubt, all training received in Iran" – at Hezbollah-run camps – "is intended for use against [Coalition forces]."

1110.    From 2003 through at least 2011, Jaysh al-Mahdi recruits travelled to Hezbollah training camps in Lebanon and Iran through meticulously planned routes. Because of the logistical challenges associated with bringing Jaysh al-Mahdi militants into Iran and Lebanon, Hezbollah occasionally trained members of Jaysh al-Mahdi to become "master trainers," who learned terrorist tactics from Hezbollah in Iran or Lebanon and then passed that knowledge on to other Jaysh al-Mahdi members in Iraq; which practice media outlets reported in real time, *e.g.*, as the *New York Times* did on May 5, 2008. U.S. officials have referred to this practice as "training the trainer" and did do so in media interviews, like they did with the *Times* in such 2008 report. Hezbollah also trained members of Jaysh al-Mahdi inside of Iraq, including, but not limited to, in Sadr City, Najaf, Basra, and Safwan.

1111.    Although Hezbollah training in Iran often occurred in conjunction with Terrorist Sponsors – including the IRGC Qods Force, IRGC Intelligence Organization, and Supreme Leader's Office, among others – Hezbollah's role was crucial to Jaysh al-Mahdi for at least four reasons. *First*, Hezbollah operatives had considerably more experience with terrorist tactics and explosives than their Iranian counterparts, even their Qods Force counterparts. *Second*,

Hezbollah operatives typically spoke Arabic, the language spoken by most Jaysh al-Mahdi members, while members of the Qods Force and other Terrorist Sponsors usually did not. *Third*, Hezbollah and Jaysh al-Mahdi shared a cultural affinity; captured Iraqi fighters have expressed their strong preference for training with Hezbollah over the Quds Force. *Fourth*, Hezbollah and Jaysh al-Mahdi shared common familial networks derived centuries of cross-relations between Shia Arabs clans with extensive networks in both Iraq and Lebanon.

1112.   Hezbollah's training was rigorous. According to unclassified (as redacted) U.S. military-intelligence reports published by the U.S. Army's Combating Terrorism Center at West Point in 2008, Hezbollah's training camps lasted anywhere from three weeks to several months. Trainees were awakened at 5:30 a.m. every day to pray and exercise. Classes started at 8:00 a.m. and continued until dusk. Each class lasted roughly 50 minutes, with 10-minute breaks in between classes. Some classes were held in actual classrooms with whiteboards and projectors; others were held at firing ranges and other outdoor locations. The training included programs in a myriad of skills, including "[w]eapons, bomb-making, intelligence, assassinations, the [gamut] of skill sets," according to a U.S. intelligence official quoted in the *New York Times* on November 28, 2006. The topics covered in these training programs included the following:

1113.   **Basic Weapons Training.** Many Jaysh al-Mahdi recruits had little to no combat experience or weapons training when they joined the organization, because the only qualification that prospective Jaysh al-Mahdi recruits were expected to have was the ability to read and write. Accordingly, Hezbollah provided basic training intended to give new Jaysh al-Mahdi recruits a broad overview of terrorist attack tactics and weapons use, as well as specific training in the use of pistols, AK-47s, machine guns, and sniper rifles.

1114.   **Kidnappings**. Hezbollah is well-known for its kidnapping operations. In 2006, for example, Hezbollah agents conducted cross-border raids into Israel and abducted a number of Israeli soldiers. Hezbollah also trained Jaysh al-Mahdi operatives "on how to conduct precision, military style kidnappings," according to a 2006 U.S. government cable (as quoted in the *New York Times* in 2006). Jaysh al-Mahdi put this training to use during the 2007 raid on the Provincial Joint Coordination Center in Karbala, where Jaysh al-Mahdi terrorists kidnapped four U.S. soldiers and killed another. And a 2011 letter from five U.S. Senators documented that Hezbollah operative Daqduq instructed "Iraqi extremists" who were part of Jaysh al-Mahdi on "how to conduct intelligence and kidnapping operations."

1115.   The extent of Hezbollah's involvement in Jaysh al-Mahdi's attacks was demonstrated by evidence gathered in connection with Daqduq's capture in 2007, which included a document described by five U.S. Senators as a 22-page "planning guide" memorializing Hezbollah's wide-ranging involvement in the terrorist attacks detailed above. This "planning guide" included specific instructions describing how to plant IEDs and carry out abductions of Americans. Hezbollah's instruction as reflected in this "planning guide" enabled Jaysh al-Mahdi to execute an array of sophisticated attacks against Americans that it otherwise would have been unable to carry out.

1116.   **EFPs.**  EFPs were a signature Hezbollah weapon that, by their vary usage, indicated direct Hezbollah involvement in the attack itself. In 2004, Hezbollah introduced the EFP into Iraq through its proxy Jaysh al-Mahdi. Writing a year later, celebrated war correspondent Michael Ware reported in *Time* that Hezbollah "introduced [to Iraq] a new breed of roadside bomb more lethal than any seen before" – the EFP. Hezbollah trained members of Jaysh al-Mahdi in the deployment of EFPs, which were expressly designed to penetrate the

American armor. Hezbollah was essential to those EFP training efforts because Hezbollah

fighters had direct experience using EFPs against Israeli armor in Lebanon. Indeed, at that point,

Hezbollah was the world's foremost expert on EFPs. Hezbollah also imparted to Jaysh al-Mahdi

the complex expertise required to manufacture and use EFPs, and drawing on its experience in

Lebanon, Hezbollah instructed Jaysh al-Mahdi to use EFPs against American soldiers. As the

*New York Times* reported in 2013, "Iran passed E.F.P. technology to the Lebanese militia

Hezbollah, which in turn passed E.F.P. kits to proxy groups fighting in Iraq." The EFP factory

that Iraqi forces discovered in Jaysh al-Mahdi's Sadr City stronghold in October 2008, was likely

built using the EFP technology that Hezbollah had provided to Jaysh al-Mahdi. As a declassified

May 3, 2007 British intelligence report concluded, EFPs used in Iraq during this period were

"exclusively associated with Hizballah."

    1117.  Hezbollah planned the Jaysh al-Mahdi EFP terrorist attack campaign (as with the

other Jaysh al-Mahdi attacks outlined in this Complaint) in Iraq through the extensive training

and coordination set forth above. Hezbollah's planning of Jaysh al-Mahdi's EFP attacks against

Americans included: (1) targeting specific geographies in Iraq, such as Baghdad and Basra,

where Jaysh al-Mahdi was permitted to launch EFP attacks; (2) instructing Jaysh al-Mahdi to use

EFPs against American armored vehicles in the first instance; (3) providing technical assistance

to Jaysh al-Mahdi with respect to EFP design schematics and concepts; (4) helping manufacture

EFPs for use against the United States in Iraq; (5) training senior Jaysh al-Mahdi terrorist

commanders in Lebanon, Baghdad, and Iran with respect to all aspects of the EFP network, from

design, to manufacture, to transportation, to attack strategy; (6) training lower-level Jaysh al-

Mahdi members in camps in Lebanon, Sadr City, and Iran with respect to EFP tactics; (7)

preparing and distributing sophisticated, high production value Arabic-language CD-ROMs and

instructional videos concerning EFPs; and (8) forward deploying senior Hezbollah terrorists, including but not limited to Daqduq, to coordinate EFP attacks against Americans.

1118.   **IEDs.** Hezbollah trained Jaysh al-Mahdi members in the creation and deployment of IEDs. For instance, Hezbollah provided an IED Specialty Training Course to members of Jaysh al-Mahdi at its training camps designed to teach Jaysh al-Mahdi fighters how to create and deploy improvised explosives such as roadside bombs.

1119.   **Rockets.** Hezbollah trained members of Jaysh al-Mahdi in the use of rocket launchers and anti-aircraft missiles. In particular, Hezbollah directed Jaysh al-Mahdi members to launch indirect-fire rocket attacks on the Green Zone from Sadr City, and it instructed them on how to do so. Hezbollah's direction to fire rockets on the Green Zone specifically included the indirect-fire attacks in early 2008 that precipitated the Battle of Sadr City. During these attacks in 2008, Jaysh al-Mahdi rocket teams showed an ability to hit specific targets several miles away, demonstrating the effectiveness of Hezbollah's instruction. By that point, Hezbollah had become renowned for its use of rockets during the 2006 Israel-Hezbollah war, when it fired rockets at civilian targets in northern Israel. Indeed, as celebrated terrorism scholar Bill Roggio confirmed in an analysis published by the *Long War Journal* on June 3, 2007, the rockets Jaysh al-Mahdi fired into Baghdad's Green Zone were "the same rockets Hezbollah fired into northern Israel from Lebanon during the Israel-Hezbollah war in the summer of 2006."

1120.   **Mortars.** Hezbollah trained Jaysh al-Mahdi fighters in the use of mortars, including by providing a Mortar Specialty Training Course to members of Jaysh al-Mahdi at its training camps in Iran. The purpose of this training was to teach Jaysh al-Mahdi militants to hit distant targets with mortar strikes. American military personnel have noted that Jaysh al-Mahdi's mortar strikes were particularly accurate.

1121.  **RPGs and Anti-Tank Missiles.** Hezbollah trained Jaysh al-Mahdi operatives in the use of RPGs and advanced anti-tank missiles, including assembly, firing procedures, target acquisition, and the use of various kinds of munitions. Hezbollah's RPG and anti-tank missile training focused on attacks against armored vehicles and command structures such as the ones the United States used in Iraq. For example, a Hezbollah "planning guide" that U.S. forces recovered from Daqduq provided tactical instructions to Jaysh al-Mahdi terrorists for the use of RPGs against Americans, including commands concerning volume of fire and specific vehicles in the convoy to target in order to inflict maximum casualties.

1122.  **Complex Attacks.** Hezbollah training programs emphasized "complex attacks" and small-group tactics that combine different types of attacks by different members of a team. One unclassified (as redacted) U.S. military-intelligence report, published by the U.S. Army's Combating Terrorism Center at West Point in 2008, summarized these tactics:

> For example, an engineer team may be responsible for emplacing and detonating IEDs on a convoy while a Support Weapons team is simultaneously responsible for launching mortars or rockets at the same vehicles.  A conventional weapons team would then be responsible for firing at the vehicles with small arms and assaulting the vehicles.  The Support Weapons team would be responsible for launching mortars at the vehicles again once the conventional weapons team pulled back.  Each team functions together but does not get involved in what the other team is doing.  A plan would be worked out ahead of time for this, and one individual in each team would be responsible for coordinating with the other team leaders during the attack.

1123.  Hezbollah also instructed Jaysh al-Mahdi operatives "on how to conduct precision, military style kidnappings," according to a 2006 U.S. government cable (as quoted in the *New York Times* on December 22, 2006).

### 6.    Hezbollah Jointly Committed Jaysh al-Mahdi's Attacks Against Americans in Iraq

1124.  Hezbollah supplied direct, attack-specific, training and operational assistance, including coordination, to the Jaysh al-Mahdi terrorists who were responsible for Hezbollah-

authorized terrorist attacks throughout Iraq. That training and coordination extended to the following areas (among others):

a. **Baghdad – Al Rashid District.** Al Rashid includes a main approach to Baghdad International Airport ("BIAP") and Victory Base Complex, a consolidated facility containing a range of Coalition military and civilian personnel that surrounded Baghdad International Airport ("BIAP") and so was a focus of Jaysh al-Mahdi's attacks in western Baghdad. Jaysh al-Mahdi coordinated attacks against Coalition forces in the Al Rashid District with Hezbollah. According to a U.S. military incident report dated November 22, 2008 (as published by *WikiLeaks*), "JAM/Hizballah members operating" in Al Rashid coordinated through Haji Abu Ali and Mohammad Kawtharani, the latter of whom personally advised Nasrallah. Such coordination also reportedly involved Jabbar Abdalnabi Alzarjawi, a "JAM leader" in Al Rashid who "facilitated . . . the movement of Hizballah members from Iran" into western Baghdad. Hezbollah-backed Jaysh al-Mahdi cells operating in Al Rashid were responsible for the attacks that killed, among others, Ronald Tucker.

b. **Baghdad – Kadamiyah District.** Kadamiyah was one of Jaysh al-Mahdi's strongholds in western Baghdad. Hezbollah training and coordination enabled Jaysh al-Mahdi's to target Americans in Kadamiyah. According to a U.S. military incident report dated October 19, 2006 (as published by *WikiLeaks*), Salah Aldeen Fayath, his brother, and his daughter, whom the U.S. government determined "was a member of Hezbollah," provided targeting support for Jaysh al-Mahdi operations against Coalition forces in Kadamiyah. Hezbollah-backed Jaysh al-Mahdi IED/EFP cells operating in or near Kadamiyah were responsible for the EFP attacks that killed, among others, John Aragon, Jr., and Hezbollah-backed Jaysh al-Mahdi cells operating in Kadamiyah were responsible for the attacks that injured, among others, Joshua Wells.

c. **Baghdad – Rusafa District.** Rusafa is a Jaysh al-Mahdi stronghold in eastern Baghdad that includes the MOH headquarters building. Hezbollah trained, locally supported, and coordinated with the Jaysh al-Mahdi IED/EFP cell operating in and near Rusafa. For example, Jaysh al-Mahdi cells trained by Hezbollah in Iran used Rusafa to launch rocket attacks on the U.S. Embassy in the Green Zone.

d. **Baghdad – Sadr City (Thawra District).** Sadr City serves as Jaysh al-Mahdi's command-and-control center, safe haven, and principal power base in Iraq. Hezbollah trained, locally supported, and coordinated with Jaysh al-Mahdi IED/EFP cells operating in and near Sadr City, with respect to both the attacks themselves and the subsequent Hezbollah and Jaysh al-Mahdi propaganda concerning such attacks. For example, an August 12, 2008 U.S. military incident report (as published by *WikiLeaks*) confirmed that a "Hezbollah IED/EFP . . . cell" was active in and near Sadr City and was coordinating EFP attacks against Coalition forces with a "recon [Jaysh al-Mahdi] element working in the area." Hezbollah-backed Jaysh al-Mahdi cells operating in and near Sadr City were responsible for the attacks in or near Sadr City against, among others, Plaintiffs Luis Rosa-Valentin, Brian Connelly, Steven Farley, John Daggett, Joshua Molina, Nicole Suveges, Cody Barham, Dustin Bauer, Michael Briggs, Alejandro Contrerasbaez, John

Daggett, Joshua Eckhoff, Anthony Farina, Anthony Gerber, Charles Gregston, Brandon Josey, Cory Kenfield, Adam Magers, David Manganella, Samuel Montalbano, Mark Thomsen, Andres Vazquez, Christopher Violette, Jeremy Wallace, James Wilson, and Benjamin Zibutis.

e.    **Baghdad – New Baghdad District, Karadah District, and FOB Rustamiyah.** New Baghdad, Karadah, and the area near Forward Operating Base ("FOB") Rustamiyah were focal points for Hezbollah-coordinated attacks by Jaysh al-Mahdi in eastern Baghdad. For example, one U.S. military report dated March 16, 2008 (as published by *WikiLeaks*) concluded that, with respect to attacks near FOB Rustamiyah, it was "most likely" that "Hezbollah operatives [were] directing [Jaysh al-Mahdi] to conduct [indirect fire] attacks against [Coalition forces] in [the] Baghdad area." Similarly, according to an arrest report dated June 23, 2008 (as published by *WikiLeaks*), Abu Aloze served as "JAM leadership" in the area, was responsible for coordinating attacks against Americans in the New Baghdad and Karadah Districts (including against FOBs in the area), and was specifically trained by Hezbollah in Lebanon. Jaysh al-Mahdi Hezbollah-trained cells operating in this area, were responsible for the attacks that killed, among others, Richard Vaughn, Jeremiah McNeal, Patrick Miller, Joshua Plocica, and Joseph Richard III, and that injured, among others, Evan Bogart, and Norman Forbes IV.

f.    **Babil, Wasit, and Salman Pak (Central Iraq).** Hezbollah trained, locally supported, and coordinated with Jaysh al-Mahdi cells operating in central Iraq, including Babil, Wasit, and Salman Pak. According to a U.S. incident report dated June 15, 2008 (as published by *WikiLeaks*), Ahmad Sahib Ghali was a commander of Jaysh al-Mahdi's "assassination cell and IED cell" in Hillah. Ghali and his co-commanders were Jaysh al-Mahdi terrorists who were trained by Hezbollah to conduct attacks against Coalition forces near Hillah. Jaysh al-Mahdi Hezbollah-trained terrorists operating in these areas were responsible for the EFP attacks that killed or injured Michael Doheny, Steven Evrard, Micah Shaw, Billy Johnson, Laurent West, Jesse Ault, William Juneau, and Omar Vazquez.

g.    **Basra and Amarah (Southern Iraq).** Basra and Amarah are Jaysh al-Mahdi strongholds in southern Iraq. Hezbollah trained, locally supported, and coordinated with Jaysh al-Mahdi cells operating in and near Basra and Amarah. For example, in July and August 2008 – according to U.S. government reports dated July 16, 2008 and July 20, 2008, respectively (as published by *WikiLeaks*) – the U.S. military confirmed that five terrorist squads, comprised of "a combination of Hezbollah and JAM who finished their training in Iran" were "heading to Basrah to attack [Coalition forces]" and "carry out terrorist activities" after "coming back from Iran," where they had been "trained" on how to "use [indirect fire] techniques" and "manufactur[e] IEDs." Cells that reflected a "combination of Hezbollah and JAM" were responsible for the attacks that resulted in the deaths of Sean Diamond, injuries to Timothy O'Sullivan, and the kidnapping, torture, and execution of Michael Chand, Joshua Munns, Paul Johnson-Reuben, Jonathon Coté, and John Young.

1125.    Hezbollah managed these efforts through a latticework of joint Hezbollah-Jaysh al-Mahdi cells in key Iraqi geographies that keyed the Terrorist Sponsors' ability to finance and logistically sustain Hezbollah's attacks targeting the United States in Iraq, including joint Hezbollah/JAM cells in Baghdad (Sadr City), Basra, Diyala, and Kirkuk.

1126.    Accordingly, Hezbollah often jointly committed attacks alongside Jaysh al-Mahdi in Baghdad, Basra, and the surrounding. Hezbollah's role as a joint offender was the result of the Iranian regime's long-standing joint cell approach, which emphasized embedding Hezbollah operatives inside key JAM cells operating in Baghdad, Basra, Diyala, and Kirkuk, among other places, so that Hezbollah could directly manage such joint Hezbollah/JAM cell's attacks targeting the United States in the most important areas for the Iranian regime in Iraq.

1127.    **Jointly Committed Hezbollah/Jaysh al-Mahdi Attacks in Southern Iraq.** A joint Hezbollah/Jaysh al-Mahdi cell operating out of Hezbollah's and JAM's southern Iraqi headquarters in Basra jointly committed the hostage-taking attacks in southern Iraq against Michael Chand, Sr., Jonathan Coté, Paul Johnson-Reuben, Joshua Munns, and John Young, whose family members are Plaintiffs. Indeed, DOD concluded that each victim's kidnapping and eventual murder was a "Hezbollah event" – i.e., a terrorist attack by Hezbollah.

1128.    The same joint Hezbollah/Jaysh al-Mahdi based in Basra also jointly committed the EFP attacks against Sean Diamond and Stephen Evans, whose family members are Plaintiffs.

1129.    **Jointly Committed Hezbollah/Jaysh al-Mahdi Attacks in Central Iraq.** A joint Hezbollah/Jaysh al-Mahdi cell operating out of Hezbollah's and JAM's central Iraqi headquarters in Sadr City in Baghdad jointly committed the EFP, IED, rocket, mortar, and complex attacks in Baghdad against Joshua Wells, Bryan Wagner, Michael Lukow, Joshua Eckhoff, Dustin Bauer, James Wilson Jr., James Flemming III, Laurent West, Norman Forbes

IV, Gregory Rundell, Durrell Bennett, Patrick Hanley, Patrick Miller, Carl Reiher, Robert Winegar Jr., Jason Robinson, Cory Kenfield, Jeremiah McNeal, Jesse Ault, Joseph Richard III, Evan Bogart, Luis Rosa-Valentin, Mark Thomsen, Christopher Violette, Cory Kenfield, Ronald Tucker, John Aragon, Steven Farley, Nicole Suveges, Joshua Plocica, Brian Connelly, Stephen Everhart, and Jason Rzepa, whose family members are Plaintiffs.

1130.   The same joint Hezbollah/Jaysh al-Mahdi cell in Baghdad also was responsible for instigating and sustaining the wave of rocket attacks targeting the United States embassy in Baghdad, which precipitated – and was the proximate cause for – the Battle of Sadr City in 2008. Accordingly, the joint Hezbollah/Jaysh al-Mahdi cell in Baghdad was the proximate cause of every Plaintiff injured by an attack during the Battle of City – even if it did not involve a signature Hezbollah EFP or rocket – was injured as the result of an attack that was jointly committed by Hezbollah and Jaysh al-Mahdi, including Anthony Gerber, Charles Gregston, David Manganella, Joshua Molina, Jeremy Wallace, Cody Barham, Alejandro Contrerasbaez, Richard Vaughn, Anthony Farina, Benjamin Zibutis, Brandon Josey, Adam Magers, Samuel Montalbano, John Daggett, whose family members are Plaintiffs.

1131.   The same joint Hezbollah/Jaysh al-Mahdi cell in Baghdad was also responsible for coordinating attacks in key Jaysh al-Mahdi geographies astride Hezbollah's logistics lines running from Baghdad to Basra and from Baghdad to the Iranian border, which included key Hezbollah/JAM priority geographies like Karbala, Najaf, Wasit, and Babil. Accordingly, the joint Hezbollah/Jaysh al-Mahdi cell operating out of the terrorists' central Iraqi headquarters in Sadr City helped local cells in Karbala, Najaf, Wasit, and/or Babil commit the IED, EFP, and rocket attacks against William Juneau, Michael Doheny, Steven Evrard, Billy Johnson, Micah Shaw, Raul Moncada, Joshua Craven, Omar Vazquez, whose family members are Plaintiffs.

**B.  BNPP's Assistance Aided the Attacks by Hezbollah and Jaysh al-Mahdi in Iraq**

1132.   By flowing funds to the Terrorist Sponsors, BNPP aided the attacks committed in Iraq by Hezbollah and Jaysh al-Mahdi.

**1.    BNPP's Culpable Behavior Empowered the Terrorist Sponsors to Provide Unique and Deadly Support To Attacks by Hezbollah and Jaysh al-Mahdi in Iraq**

1133.   BNPP assisted terrorist attacks in Iraq by enriching the Foundation for the Oppressed, including the Foundation's agents, fronts, and components. The Foundation for the Oppressed used its BNPP-supplied dollars, BNPP-enabled access to the U.S. financial system, and BNPP-provided cover and concealment to help build, finance, and logistically sustain Hezbollah's and the Qods Force's operations in Iraq, including the joint Hezbollah/Jaysh al-Mahdi Cells that were a hallmark of the Iranian regime's Hezbollah directed in-country terrorist attacks targeting the United States.

1134.   From 2003 through 2011, the Foundation's profits, assets, data, real estate, and operatives supplied Hezbollah and its Jaysh al-Mahdi proxy the violent instruments both groups needed to commit their shared attacks, including, but not limited to: (1) key, off-the-books financing for terrorist operations sponsored or committed by the Khamenei Cell; (2) a transnational logistics infrastructure, including in Iraq, Iran, the U.A.E., and elsewhere; and (3) the mechanisms by which Hezbollah-delivered "bounty" payments were routed to terrorists who killed or captured Americans; and (4) a key means by which Hezbollah financed the families of "martyrs" and severely injured Hezbollah operatives.

1135.   Financial transactions that benefited the Foundation for the Oppressed directly financed Hezbollah- and Qods Force-sponsored terrorist attacks in which the Khamenei Cell played a key role because that was, always, such Foundation's primary reason for being:  to supply the all-purpose transnational operations front controlled directly by the Supreme Leader,

IRGC and (by the 1980s) Hezbollah to operationalize terrorist attacks targeting the United States in the Middle East and worldwide.

1136.   By no later than 2002 (with respect to executing attacks inside Iraq), those purposes had congealed into the Khamenei Cell's programmatic emphasis on sponsoring attacks in Iraq, which evolved and endured ever since in a manner that always emphasized providing a robust supply of support to attacks by Hezbollah and Jaysh al-Mahdi in Iraq. Moreover, at least two of its formal and informal leaders have publicly admitted that the Foundation funds Hezbollah and the Qods Force:  Fattah, who currently (publicly) runs the Bonyad Mostazafan, did so in 2020, and Rafiqdoost did so, at least, in 2014.

1137.   Therefore, BNPP's U.S. dollars, U.S. sanctioned services, and access to the U.S. financial system flowed through the various Iranian entities benefitting the Foundation for the Oppressed, where a substantial percentage of such Foundation profits was earmarked for, and channeled to, Hezbollah and Qods Force operations, logistics, and finance cells that powered Hezbollah-sponsored attacks in Iraq, consistent with operative Iranian regime rules, customs and practices, and tactics, techniques, and procedures, including the Logistics Policy Directive, mandatory donations (*khums*), and legion of in-house IRGC auditors and accountants.

1138.   The Foundation for the Oppressed was purpose-built specifically to finance Iran-backed terrorist proxy attacks, and was developed over time as one of Hezbollah's primary transnational operations, logistics, and finance fronts by providing a global funding, asset, real estate, corporate, and personnel structure that was tailor-made to access U.S. banks, markets, and institutions and purpose-built for to enable terrorist attacks by Hezbollah sponsored by the Qods Force throughout the footprint of both groups' hared, interlocking, complex, global, terrorist enterprise. The Foundation for the Oppressed was designed to provide complete financial,

logistical, and operational sustenance and cover to the Qods Force and Hezbollah by supporting

the Supreme Leader's inner circle of terrorist supporters (which would eventually become the

Khamenei Cell), and Hezbollah's key leaders, logisticians, operatives, and their associated

logistics, fundraising, recruitment, weapons procurement, intelligence, and operational

(triggermen) cells.

1139.    Value transfers to the Foundation ultimately flowed through to, and were

deployed by, senior terrorists who played key roles in the attacks in Iraq, including those against

Plaintiffs, including, but not limited to: (1) Qasem Soleimani; (2) Hassan Nasrallah; (3) Muqtada

al-Sadr; (4) Abu Mahdi al-Muhandis; (5) Qais Khazali and Laith Khazali; (6) Mohsen

Rafiqdoost; (7) Mohsen Rezai; (8) Mohammad Forouzandeh; (9) Parviz Fattah; and (10) Esmail

Ghani.

1140.    Terrorism scholars confirmed that Foundation for the Oppressed profits funded

attacks by JAM in Iraq, including Jaysh al-Mahdi Special Groups AAH and Kataib Hezbollah.

On November 2, 2016, for example, Professor Ali Ansari, of the University of Saint Andrews,

observed that, "Iranian officials …. managed to extend their power in" key Middle Eastern

"regions rather efficiently" as they did "in Iraq," where the Iranian regime "moved in, first,

through various charitable organisations" – i.e., IRGC-controlled bonyads, the largest of which

was the Foundation for the Oppressed – "and then through the IRGC, with what we would

effectively call seed money to get things going." In 2018, for likewise, Nader Uskowi – who

served in Iraq as Senior Civilian Policy Advisor to U.S. Central Command in Iraq – reported that

"commercial companies" that were "own[ed]" by the "Mostazafan Foundation" and supplied

"funding for its significant … efforts in Iraq, including financing operations and military

equipment for some of the largest Shia militia groups in" Iraq were derived from the: (1) "[t]he

foundations controlled by the IRGC and the Office of the Supreme Leader"; and (2) the "IRGC," which "also provide[d] the Quds Force with off-budget funding from the revenues of its own business enterprises inside Iran, which include companies in major economic sectors, including … telecommunications."

1141.   Media reports also confirmed that Foundation for the Oppressed profits funded IRGC Shiite terrorist proxies in Iraq, including Kataib Hezbollah. On July 20, 2009, for example, the *Christian Science Monitor* reported:  "Iranian-backed militancy in Iraq" was sponsored by "the al-Quds Brigades of Iran's Revolutionary Guard Corps (IRGC), responsible for operations outside Iran," which "maintain[ed] its ability to target US military personnel, diplomats and private citizens in Iraq" and to threaten "a nightmare scenario for US generals and diplomats in Iraq" that was supported by "Iran['s] … 'whole-of-government' approach in which government-owned industries and IRGC-influenced religious foundations (bonyads) are used as tools of statecraft," which enabled "Iran to provide … paramilitary support to armed groups" targeting Americans in Iraq. On August 12, 2011, likewise, *Daily News Egypt* reported that "[t]he current crisis in Iraq," for which "the United States … paid with blood and sweat for the war on terror" was because, *inter alia*, "Iran was able to mobilize the vast network of religious foundations (bonyads) … in Iraq." On January 24, 2021, similarly, *Eurasia Review* reported that "bonyads such as Bonyad-e-Mostazafan [Foundation for the Oppressed], are among the organizations that have directly assisted the Quds Force" with respect to "fund[ing] its proxies including Hezbollah, and its multitude of militia forces in Iraq."

1142.   Throughout this period, BNPP flowed at least hundreds of millions, if not billions, of dollars into accounts for which the Foundation for the Oppressed and its Iraqi terrorist proxies were one of the ultimate beneficial owners, in effect, given the Foundation's relationship with

Hezbollah. Armed with such sums, the Foundation supplied key financial support to the operatives, logisticians, smugglers, and intelligence assets upon which Hezbollah's attacks relied. In so doing, BNPP helped Hezbollah and Jaysh al-Mahdi improve their ability to buy weapons (because the Foundation has more resources to spend), smuggle them into Iraq (more Foundation money to pay smugglers), store them while in Iraq (more Foundation money to build safe houses), and incentivize terrorists to use them (more Foundation money to make bounty, salary, and martyr payments, among others). In so doing, BNPP's support through the Foundation for the Oppressed played a key role in each attack against Plaintiffs in Iraq.

1143.   From at least 2006 through at least 2016, BNPP's scheme financed Hezbollah's and Jaysh al-Mahdi's attacks in Iraq, including those against Plaintiffs. Both terrorist groups derived vital aid from Ayatollah Khamenei, the SLO, the Foundation for the Oppressed, the IRGC, and Hezbollah, which underwrote an outsized majority percentage of Hezbollah's operations budget, as well as a substantial source of financing, through Hezbollah, to Jaysh al-Mahdi in Iraq, all of which paid for the expenditures needed to, organize, train, arm, and logistically sustain such Iranian proxies in Iraq while they attack Americans there through joint Hezbollah/Jaysh al-Mahdi cells in key areas throughout Iraq.

1144.   Senior U.S. officials confirmed that the Iranian regime, including the IRGC, were vital to financing Hezbollah's attacks. On September 29, 2006, for example, Frank C. Urbancic, Principal Deputy Coordinator at State, testified before Congress as follows:

> Iran is the 'central banker' of terrorism and a primary funding source for Hizballah. Because money is a terrorist group's oxygen, attacking terrorist financing is an essential element to combating terrorism. In that regard, we have made progress in impeding Iran's financial support for Hizballah and in undermining Hizballah's own financial network. …
>
> The USG has long assessed that Iran provides technological, operational, and financial support and guidance to Lebanese Hizballah. The Iranian regime has for 27 years used its

connections and influence with terrorist groups to combat U.S. interests it perceives as at odds with its own, and Hizballah has acted as a willing partner.

1145.  On May 27, 2009, Treasury imposed sanctions targeting Hezbollah and confirmed the Iranian regime's, including the IRGC's, continued key role in financing Hezbollah attacks:

> Treasury [] designated … supporters of … Hizballah …, under E.O. 13224. E.O. 13224 targets terrorists and those providing support to terrorists or acts of terrorism by … prohibiting U.S. persons from engaging in any transactions with them. "We will continue to take steps to protect the financial system from the threat posed by Hizballah and those who support it," said Under Secretary for Terrorism … Stuart Levey. … Iran … provide[s] significant support to Hizballah, giving money, weapons and training to the terrorist organization. In turn, Hizballah is closely allied with and has an allegiance to [Iran]. Iran is Hizballah's main source of weapons and uses its Islamic Revolutionary Guard Corps to train Hizballah operatives in Lebanon and Iran. Iran provides hundreds of millions of dollars per year to Hizballah.

1146.  BNPP's assistance to the attacks committed by Hezbollah, Hamas, Palestinian Islamic Jihad, and Jaysh al-Mahdi was especially lethal because of the outsized impact that state sponsors like Iran played on the effectiveness of their proxies. On September 1, 2006, for example, America's *National Strategy for Combating Terrorism* as published by the White House confirmed that  "State sponsors are a critical resource for our terrorist enemies, often providing funds, weapons, training, safe passage, and sanctuary" and the Iranian regime used "its Islamic Revolutionary Guard Corps" to help "the regime in Tehran plans terrorist operations and support[] groups such as Lebanese Hizballah, Hamas, and Palestine Islamic Jihad (PIJ)." On February 29, 2008, likewise, FATF reported that "state sponsors continue to represent crucial sources of support for terrorist organisations today" because such state "support of terrorist organisations" was "important in how terrorists move and use finance, in addition to their role in raising terrorist funds."

1147.  BNPP's assistance was also potent because it helped flow funds to the leadership cells of the Hezbollah proxies that committed the attacks that killed or injured Plaintiffs or their

loved ones. For example, State reported on September 17, 2020 that "the Islamic Republic's illicit financing activities," helped "undermine the integrity and security of the global financial system,: through "the Iranian regime's destabilizing campaigns and the aggrandizement of its leaders" when the "Iranian regime use[d] opaque and fraudulent financing activities to fund its partners" and "proxies."

1148.   Iranian assistance made the difference between proxies' ability to successfully conduct terrorist attacks. As State reported on September 17, 2020, "terrorist groups such as Hizballah and the Palestinian Islamic Jihad (PIJ) have frequently received from the IRGC-QF the training, weapons, and financing needed to conduct acts of terrorism."

1149.   Executive branch reports to Congress confirmed that Iranian support was essential to Hezbollah's and Jaysh al-Mahdi's attacks targeting the United States in Iraq.  On March 25, 2009, for example, DoD reported to Congress that "Iranian-sponsored Shi'a militant groups, Asa'ib Al-Haq (AAH), Ketaib Hezbollah (KH), and unaligned Shi'a extremists, including the newly-formed Promised Day Brigade" were a "threat" because "Iran continues to host, train, fund, arm, and guide militant groups that seek to bleed the U.S. in Iraq." On July 23, 2009, likewise, DoD reported to Congress that "Iran continues to … host, train, fund, arm, and guide Shi'a militant groups, including Asa'ib Ahl-Haqq, Kata'ib Hizballah, and Muqtada al-Sadr's new militia, the Promised Day Brigade, that attack U.S. forces in Iraq." On April 8, 2019, similarly, State reported that the "Iranian regime is responsible for the deaths of at least 603 American service members in Iraq since 2003."

1150.   Hezbollah and the Qods Force used the Foundation's profits to finance terrorist attacks committed by their proxies in at least six ways. Among other ways, the Qods Force and Hezbollah notoriously used the Foundation's profits to finance: **(1) martyr payments** to the

families of Qods Force and Hezbollah terrorists who were killed while executing such FTOs' attacks; **(2) bounty payments** directly to Qods Force and Hezbollah proxies Hamas, PIJ, Kataib Hezbollah, the Houthis, and the Taliban to reward successful attacks targeting the United States in which an American was killed or taken hostage; **(3) operations payments** to finance the costs of specific attacks (*e.g.*, pre-attack lodging); **(4) salary payments** paid to Qods Force and Hezbollah leadership, and to the leaders of Qods Force and Hezbollah proxies Hamas, PIJ, Kataib Hezbollah, the Houthis, and the Taliban; **(5) logistics payments** to finance terrorist ratlines and training; and **(6) laundered payments** routed through Foundation-affiliated charities, like the Imam Khomeini Relief Committee, which served as cut-outs for the Qods Force and Hezbollah, and helped such FTOs build their logistics networks in countries like the Palestinian territories, Iraq, Yemen, and Afghanistan.

1151.   In addition, BNPP's specific facilitation of the Iranian Petrochemical Company's supply of Liquified Petroleum Gas ("LPG") to Iraq provided direct support to attacks by JAM. LPG was a prized commodity in Iraq, as it was the dominant cooking fuel and therefore crucial for preparing food and boiling water. While BNPP was processing transactions for the sale of LPG to Iraq, there were severe shortages of LPG, which meant that whoever controlled access to LPG imports could resell them to make a significant profit. On December 6, 2006, Newsweek published an article describing how Jaysh al-Mahdi "dominates the Shia trade in propane-gas canisters, which Iraqis use for cooking. Sometimes the militiamen sell the propane at a premium, earning healthy profits; at other times they sell it well below market rates, earning gratitude from the poor and unemployed." A March 28, 2007 declassified report by former Assistant Secretary of Defense Bing West described in detail JAM's manipulation of LPG and other fuel markets, and quoted Lt. Col. Brian Winski as stating: "I know JAM controls who gets what, but no one

will drop a dime and explain the deal to me." A 2008 report from Professor Phil Williams, an

expert on the intersection of organized crime and terrorism, described this JAM strategy as

"warfare through welfare," explaining that JAM retained control over many Iraqi gas stations but

also "dominat[ed] 'the Shia trade in propane-gas canisters, which Iraqis use for cooking.'"

1152.   BNPP provided letters of credit and transaction services to the Iranian

Petrochemical Company for the sale of LPG to Iraq. Because JAM, including its special groups,

was known at the time to have dominated the Iraqi LPG market, BNPP's conduct directly funded

JAM. JAM could sell this LPG at above market rates to make significant profits for funding

terrorist attacks, as described by Professor Williams in 2009:

> In 2005, $1 billion was spent on black market fuel markets (which include
> gasoline, white oil, gas oil, and liquid gas) by Iraqi households. ***The real cost of
> the fuels, however was less than 20 percent of the sale price. In other words,
> about $800 million 'went straight into profits for those who run the illicit
> network***. . . . The smuggling ecosystem has helped fund a significant part of the
> violence in Iraq. . . . Another observer notes . . . "***until U.S. and Iraqi authorities
> manage to constrain Iraqi oil smuggling, violent crime and insurgency will
> continue to flourish***." (Emphasis added.)

BNPP's transactions also strengthened JAM's control in Iraq because when JAM sold LPG

below market rates, such conduct secured loyalty to JAM within Iraq.

1153.   "Welfare as warfare" was always a notorious strategy that Hezbollah perfected in

Lebanon and then passed along to JAM in Iraq. As practiced by Hezbollah and JAM, it included:

smuggling fuel to weaken US-allied states; over-pricing fuels to generate terrorist finance, and,

simultaneously, in areas controlled by Hezbollah and JAM, under-pricing fuel for the benefit of

the group's core constituencies. Hezbollah's and JAM's deployment of this strategy was reported

by NGOs and experts, and the news media. For example, *Newsweek* (*supra*), reported that

"[s]ometimes the militiamen sell the propane at a premium, earning healthy profits; at other

times they sell it at well below market rates, earning gratitude from the poor and unemployed."

Welfare provision supplied key aid to Hezbollah's and JAM's attacks because it weakened and impoverished U.S. allies, while ensuring the loyalty of populations that supplied recruits, concealment, and intelligence, among other resources, to terrorists. In this case, BNPP's conduct enabled terrorists to provide valuable resources to families who needed fuel to cook food, among other things. Going without LPG jeopardized life and limb, and paying extortionate prices—which JAM, including its Special Groups—ensured—on the open market could threaten already poor Shi'a Iraqis with utter destitution.

1154.   While they offered the carrot of low-cost LPG, Hezbollah and JAM wielded a big stick: terrorists could impose life-threatening scarcity on households that rejected their demands—for example, by 'dropping a dime', and providing vital intelligence to Coalition Forces. Because 'welfare as warfare' was widely reported and notoriously used by Hezbollah over many years, BNPP knowingly provided a uniquely potent tool to terrorists.

1155.   Propane tanks from LPG were also commonly used in terrorist attacks in Iraq, as part of improvised explosive devices and improvised rocket-assisted munitions ("IRAM" or "flying IEDs"). A report of a September 4, 2005 raid by U.S. Marine Corps forces in Iraq described propane tanks as "commonly used for bomb construction." Therefore, in addition to providing funds and loyalty to JAM, BNPP's transactions also literally supplied the tools needed to create terrorist weapons in Iraq.

### 2.    BNPP Contributed to the Specific Attacks in Iraq that Killed and Injured Plaintiffs by Funding the Individual Hezbollah and Jaysh al-Mahdi Terrorists and Cells that Committed Such Attacks

1156.   The Khamenei Cell was the most prominent cell that ensured a direct link between BNPP and the attacks that targeted Plaintiffs in Iraq. Leadership cells can function as the means by which terrorist groups plan, coordinate, and execute attacks. Few groups better embodied that phenomenon than the Khamenei Cell, the IRGC, and Hezbollah.

1157.   Consistent with the mandatory donations (*khums*), about 20% of all profits generated by BNPP flowed up to the Khamenei Cell as *khums*, before Khamenei (and Soleimani, to whom Khamenei usually delegated such decisions) redistributed the funds back to Khamenei Cell members, *e.g.*, Hassan Nasrallah, to finance the attacks they sponsored, including in Iraq.

1158.   BNPP's illicit transactions helped the Khamenei Cell play a key role in the Hezbollah and Jaysh al-Mahdi attacks in Iraq that killed and injured Plaintiffs. From 2000 through 2020, the Khamenei Cell typically captured about 20% of the income generated through any entity he controlled, including the Foundation for the Oppressed, SLO, IRGC, and Hezbollah – including the profits caused by the transactions that BNPP illicitly managed. Given this standard practice, and the volume of profits generated by BNPP, the Bank's illicit conduct likely delivered well in excess of at least $20 million per year to each Khamenei Cell leader for the specific lane below, *e.g.*, at least $20 million through the Supreme Leader's Office, which funds Mohsen Rezai and Mojtaba Khamenei ultimately controlled alongside Qasem Soleimani and spent funding Hezbollah attacks.  Indeed, BNPP likely collectively delivered ***well more than $100 million per year*** to the Khamenei Cell each year the Cell enabled the Hezbollah-led attacks that killed and injured Plaintiffs in Iraq. Notably, these numbers are inherently conservative because they do not reflect the intended, measurable, second-order economic effects of BNPP's illicit transactions with, and for the benefit of, the Terrorist Sponsors. Accordingly, it is likely that even the above numbers underestimate the magnitude of dollars that BNPP flowed to the specific terrorists below. BNPP, however, likely has substantial information that would tend to corroborate Plaintiffs' allegations, including, but not limited to, BNPP's sophisticated analyses of the petroleum, transportation, and construction sectors, and other economic considerations

known to BNPP, for which sanctions evasion has foreseeable—and intended—second order benefits for the evading parties and the attacks they sponsor.

1159.   BNPP's assistance had a tight nexus with the Hezbollah and JAM attacks that killed and injured Plaintiffs in Iraq.  Under the Terrorist Sponsors' custom and practice, BNPP's funds were systematically routed to key members of the Khamenei Cell who served as aggregators to sponsor attacks by Hezbollah (as the direct beneficiary) and Jaysh al-Mahdi (as indirect beneficiary, via Hezbollah) and were specifically tasked by Khamenei to ensure that the Terrorist Sponsors' illicit oil and commercial profits were directly routed to the Iraq-based operations cells of Hezbollah and, through Hezbollah, JAM, including joint Hezbollah/JAM cells, under a tightly regulated process through which these terrorists programmatically operationalized into such the Hezbollah and JAM attacks in Iraq against Plaintiffs.

### a.  BNPP's Money Reached Key Khamenei Cell Terrorists Responsible for Attacks in Iraq

1160.   BNPP directly and indirectly funded each identified Hezbollah or Jaysh al-Mahdi terrorist or sponsor below through the hundreds of millions—if not billions—in off-the-books illicit profits that it generated for the Terrorist Sponsors via the Foundation for the Oppressed, Supreme Leader's Office, KAA, and NIOC profits, among other sources. Each Hezbollah, IRGC, Foundation for the Oppressed, and Supreme Leader's Office member of the Khamenei Cell identified below was a relevant decisionmaker regarding what happened to the specific profits generated by BNPP once they were realized by the Foundation, SLO, NIOC, KAA, Caspian Petrochemical, and the other operations fronts upon which the Terrorist Sponsors relied to enable their attacks. As set forth below, the hardened "Death to America"-chanting terrorists to whom BNPP illicitly supplied at least hundreds of millions, if not billions, in USD-denominated funds and profits, predicably chose to use much of their BNPP-fueled profits to

finance, arm, source fighters for, and logistically support, the attacks by Hezbollah and JAM in Iraq that killed and injured Plaintiffs. Such individual Khamenei Cell members included, but were not limited to:

1161. **Hassan Nasrallah** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Iraq by Hezbollah and Jaysh al-Mahdi, including JAM Special Group Kataib Hezbollah, for which he supplied key funds, recruits, logistical aides, and intelligence support. For example, Nasrallah played a personal role organizing Hezbollah and JAM operations, logistics, and fundraising from 2003 through 2024, including the period from 2007 through 2011 when every Plaintiff was attacked in Iraq. As Hezbollah scholar Matthew Levitt observed in 2021, "Hasan Nasrallah" supplied key aid to "operations" by "Iran's proxies" in "the 'Axis of Resistance'" designed "to force the U.S. military out of the region," including Iraq.

1162. **Imad Mugniyeh** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Iraq by Hezbollah and Jaysh al-Mahdi, including JAM Special Group Kataib Hezbollah, for which he supplied key funds, recruits, logistical aides, and intelligence support, until his death in a counterterrorism strike in 2008. Among other things, Mugniyeh established JAM alongside Sadr, helped set up the joint Hezbollah/JAM cells in key Iraqi geographies like Basra and Baghdad (alongside JAM terrorists and the Hezbollah operatives below), and was maximized the lethality of JAM attacks by drawing on Mugniyeh's unparalleled experience as Hezbollah's and the IRGC's—for whom Mugniyeh was also a member, given his dual-hatted status as a "brother" of both organizations—lead global terrorist mastermind since 1983.

1163.   **Muhammad Kawtharani** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Iraq by Hezbollah and Jaysh al-Mahdi, including JAM Special Group Kataib Hezbollah, for which he supplied key funds, recruits, logistical aides, and intelligence support. As a member of the Khamenei Cell from, at least, 2007 until 2024, Kawtharani was always one of Hezbollah most senior Khamenei-facing, operations-related, liaisons tasked with Hezbollah's sponsorship of attacks targeting the United States in Iraq. Kawtharani worked closely with, and was a Hezbollah liaison for, Khamenei, Nasrallah, Mugniyeh, and Daqduq, among others. On August 22, 2013, Treasury designated Kawtharani as an SDGT upon finding that he served as a senior Hezbollah operative who was "responsible for operations throughout the Middle East," served as a "member of Hizballah's Political Council" while being "the individual in charge of Hizballah's Iraq activities," who had "worked on behalf of Hizballah's leadership to promote the group's interests in Iraq, including Hizballah efforts to provide training, funding, political, and logistical support to Iraqi Shi'a insurgent group." Moreover, as State's Coordinator for Counterterrorism, Ambassador Nathan Sales, explained on November 13, 2018, "Muhammad Kawtharani" and his biological (and Hezbollah) brother "Adnan Kawtharani"—himself designated an SDGT on November 13, 2018—"facilitate[d] business transactions for Hezbollah inside Iraq and regularly" met in Iraq "with militias and Hezbollah officials" and "helped secure funding for Hezbollah."

1164.   **Ali Mussa Daqduq** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Iraq by Hezbollah and Jaysh al-Mahdi, including JAM Special Group Kataib Hezbollah, for which he supplied key funds, recruits, logistical aides, and intelligence support. Throughout, Daqduq was

always one of Hezbollah most senior Khamenei-facing, operations-related, liaisons specifically tasked with Hezbollah's sponsorship of attacks targeting the United States in Iraq. Daqduq was amongst Hezbollah's senior-most field commanders and served as one of Imad Mugniyeh's most important lieutenants. Accordingly, Hezbollah deployed Mugniyeh, Daqduq, and other Hezbollah members of the Khamenei Cell, *e.g.*, Yusuf Hashim, to Iraq to help create Jaysh al-Mahdi and then direct its attacks. To this end, Hezbollah directed its senior field commander, Ali Mussa Daqduq, to work with the Qods Force to instruct Jaysh al-Mahdi on the use of EFPs, mortars, rockets, and other terrorist tactics, including kidnapping operations. Daqduq helped lead key joint Hezbollah/JAM cells in Iraq, coordinated the creation, and deployment, of Hezbollah-directed JAM Special Groups like AAH and Kataib Hezbollah, and personally conducted joint Hezbollah/JAM hostage-taking, rocket, and EFP attacks targeting the United States in key geographies of emphasis for Hezbollah in Iraq, including Baghdad and Basra, including many attacks against Plaintiffs. Treasury designated Ali Mussa Daqduq as an SDGT on November 19, 2012, "pursuant to Executive Order (E.O.) 13224, which targets terrorists and those providing support to terrorists or acts of terrorism" upon finding that he was one of the Hezbollah terrorists whom the Terrorist Sponsors—acting through Ayatollah Khamenei, Hassan Nasrallah, and Muhammad Kawtharani, among others—tasked to serve as one of their operatives in Iraq, was "a senior Hizballah commander responsible for numerous attacks against Coalition Forces in Iraq" and was "a member of Hizballah since 1983" who had "served in multiple Hizballah leadership positions, including as commander of a Hizballah special forces unit and chief of a protective detail for Hizballah Secretary-General Hassan Nasrallah."

1165. **Yusuf Hashim** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Iraq by

Hezbollah and Jaysh al-Mahdi, including JAM Special Group Kataib Hezbollah, for which he

supplied key funds, recruits, logistical aides, and intelligence support. As a member of the

Khamenei Cell from, at least, 2007 until 2024, Hashim was always one of Hezbollah most senior

Khamenei-facing, operations-related, liaisons specifically tasked with Hezbollah's sponsorship

of attacks targeting the United States in Iraq. Among other roles, he helped organize the

bombmaking logistics for Hezbollah to use throughout Iraq to deploy its explosively formed

penetrators (EFPs), improvised explosive devices (IEDs), and customized explosive devices

(CEDs).[136] From 2007 through 2011, when Hezbollah and JAM detonated these EFPs, IEDs,

and CEDs to cause the bomb explosions that killed and injured Plaintiffs. Throughout, each

weapon and attack type, comprised a specific, and notorious, Hezbollah specialty, for which

Hezbollah had the most tactical experience of any Axis member (including the IRGC) given

Hezbollah's unparalleled (for Axis members) operations experience directly targeting the Unted

States and its allies worldwide, including Hezbollah's attacks in Lebanon from 1983 through

2006, Israel from 1983 through 2006, and Iraq from 2003 through 2006, in addition to the mine-

run of catastrophic Hezbollah attacks targeting the U.S. and its allies in Europe, South America,

---

[136] "Customized Explosive Devices" or "CEDs" refer to a sub-class of improvised explosive device (IED) that can best be thought of as: the bespoke, one-off, IED designs, and/or IED placements that are exceptionally intelligence driven and motivated by a specific location, about which Hezbollah has advance knowledge that a high-profile United States-linked assassination target will be present. As complex, intelligence-driven attacks that relied upon bespoke location-specific bombs designed to be embedded inside a known meeting site before a high-value assassination target arrives, e.g., placing a bomb inside the wall of the meeting room before the meeting takes place. Hezbollah's joint Hezbollah/JAM bomb attack targeting a U.S. combined State/DOD team in Sadr City on June 24, 2008—which killed Steven Farley and Nicole Suveges, whose estates and loved ones are Plaintiffs—is an example of perhaps the paradigmatic CED attack type: a complex assassination-via-bomb attack targeting the United States based on pre-attack intelligence that enabled the attackers to securely implant and conceal a custom-built bomb for the specific layout (office/municipal), building type (construction materials), and intended victims (need to surmount U.S. defensive, security, and intelligence precautions, e.g., U.S. security agents' pre-meeting sweep for bombs).

and Africa, among other places, from 1983 through 2006. Treasury designated Yusuf Hashim as an SDGT on November 13, 2018, "pursuant to Executive Order (E.O.) 13224, which targets terrorists and those providing support to terrorists or acts of terrorism" upon finding that he was one of the Hezbollah terrorists whom the Terrorist Sponsors—acting through Ayatollah Khamenei, Hassan Nasrallah, and Muhammad Kawtharani, among others—tasked to serve as one of their operatives in Iraq, had "oversee[n] all Hizballah-related operational activities in Iraq," was "in charge of protecting Hizballah interests in Iraq," and "managed Hizballah's relations with sectarian armed groups in Iraq," among other places.

1166.   **Parviz Fattah** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Iraq by Hezbollah and Jaysh al-Mahdi, including JAM Special Group Kataib Hezbollah, for which he supplied key funds, recruits, logistical aid, and intelligence support. In 2020, for example, Fattah publicly admitted to such role. As Iran scholar Kasra Aarabi confirmed in a report published by the Middle East Institute on July 1, 2020 (emphasis added):

> A return to core "revolutionary values" at home would almost certainly see the simultaneous adoption of a zealous foreign policy abroad. This would bring an increased commitment to regional militancy … [Parviz] Fattah is very well placed to achieve this. He has already built a ***strong personal network across the region, having accompanied the late Soleimani on many of his trips to Syria, Lebanon, and Iraq. This includes close ties to Syrian President Bashar al-Assad, Hezbollah Secretary-General Hassan Nasrallah, and with senior members of the Iraqi Hashd al-Shaabi*** [led by Kataib Hezbollah]. Given that the Imam Khomeini Relief Foundation's regional activities often serve as a tool of the IRGC Quds Force's "soft power," Fattah will also have ***worked closely with Quds Force commanders during his tenure as its head. These personal relationships could prove valuable for Khamenei's ambitions to strengthen the so-called "axis of resistance,"*** a key pillar of the [Khamenei global Islamic State revolutionary roadmap's] "Second Phase." And this could not be more important in the post-Soleimani context, which has seen Tehran struggle to fill the void the Quds Force commander left behind. ***Fattah has already asserted that the "path of Qassim Soleimani will continue [and] become stronger,"*** and … he … [likely believed that] funding Iranian-backed militias across the region [was] … a top

priority … [to] turbo-charge Tehran's regional ambitions. While Iran's ailing economy may not appear to be in the right condition for this [,] … the IRGC[] has shown no hesitation in prioritizing its ideological objectives over domestic needs. Indeed, Fattah has already demonstrated his willingness to divert money from home to abroad. … ***Since the killing of Soleimani, Fattah has been a leading voice calling for 'hard revenge' against Washington through military means.***

Reports by media outlets and terrorism scholars confirmed the point in real-time, including, but not limited to, reports published by IRGC media arm IRNA on November 21, 2006; the BBC on November 21, 2006, which translated the IRNA report from Farsi to English and re-published it globally; and Dr. Saeid Golkar, as published by the Tony Blair Institute, in August 2021.

1167.  **Qasem Soleimani** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Iraq by Hezbollah and Jaysh al-Mahdi, including JAM Special Group Kataib Hezbollah, for which he supplied key funds, recruits, logistics, intelligence support, and unparalleled networks.[137] Real-time reports confirmed Soleimani's direct involvement, and key sponsorship of, anti-American attacks in Iraq and Syria by Hezbollah and Jaysh al-Mahdi, including Kataib Hezbollah, including, but not limited to, the mine-run of U.S. government sanctions designations and public statements that name-checked Soleimani, which invariably confirmed his specific, and kye, role sponsoring attacks in Iraq and/or Syria and media reports throughout that also linked him to such attacks. On October 12, 2011, for example, a DOD-published analysis confirmed that "Qods Force Commander Soleimani" was reportedly "the most powerful man in Iraq, without question" and supplied vital aid that caused "the significant casualties US Forces sustained" in Iraq. In 2019, likewise, a Marine Corps University-published analysis by Dr. Mark D. Silinsky observed

---

[137] Soleimani's operational history with senior JAM leaders was deep: he worked with Ayatollah Khamenei, Mohsen Rezai, and Mohsen Rafiqdoost to sponsor attacks by JAM leader Abu Mahdi al-Muhandis during the Iran-Iraq War, when Muhandis was the Iranian's star dural Iranian/Iraqi operative who led efforts to take conduct attacks on Iraqi soil.

that "Qassem Soleimani" was famously "close to Khamenei" and "reportedly commands operations in some theaters" like Iraq and Syria, for which "Khamenei" publicly "praise[d] Soleimani as the 'Liberator of Iraq.'" Moreover, after Soleimani's death was announced on January 3, 2020, U.S. political leaders confirmed—on a bipartisan basis—that he directly enabled attacks that killed, kidnapped, or maimed thousands of Americans in Iraq, including Plaintiffs—including, *inter alia*, President Trump, Senator Elizabeth Warren (D-MA), Senator Lindsey Graham (R-SC), and Senator Chris Murphy (D-CT). Testifying before Congress on January 15, 2020, terrorism scholar Barbara A. Leaf summarized Soleimani's key role:

> Both architect and orchestrator of Iran's destructive regional policies in Syria, … [and] Iraq, … Soleimani had achieved a singular stature … for his unmatched role as kingmaker or breaker in Iraq, in no small part through the ***network of militias he had created, groomed, trained and resourced from the early months after the 2003 invasion of Iraq***. As my colleague, Phillip Smyth, has neatly put it, ***"Iran's Shia militia network are their true nuclear program and one that has achieved measurably huge results for Tehran"*** in the region. At the time of his death Soleimani thus appeared to be a Colossus bestride the region. (Emphasis added.)

1168.    **Rostam Qasemi** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Iraq by Hezbollah and Jaysh al-Mahdi, including JAM Special Group Kataib Hezbollah, for which he supplied key funds, recruits, logistical aid, and intelligence support. U.S. government findings confirmed it, because Qasemi led the Hezbollah/Qods Force oil-smuggling networks that BNPP illicitly aided through its transactions alleged herein. On September 4, 2019, for example, Treasury designated "Senior IRGC-QF official and former Iranian Minister of Petroleum Rostam Qasemi" as an SDGT "pursuant to E.O. 13224" because he oversaw "a large shipping network that is directed by and financially supports the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxy Hizballah." Per Treasury, this finding "makes it explicitly clear that those purchasing Iranian oil" had "directly support[ed] Iran's militant and terrorist arm,

475

the IRGC-Qods Force," and that "Iran's exportation of oil directly funds acts of terrorism by Iranian proxies" through "[t]his vast oil-for-terror shipping network," which meant that "[t]he international community must vehemently reject Iranian oil and related products in the same way that it rejects the violent acts of terrorism these networks fund."

1169.    **Mojtaba Khamenei** and **Gholam-Ali Hadad-Adel** were each a member of the Khamenei Cell and used BNPP's funds routed to them through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Iraq by Hezbollah and Jaysh al-Mahdi, including JAM Special Group Kataib Hezbollah, for which they supplied key funds, recruits, logistical aid, and intelligence support. Hadad-Adel was Mojtaba's father-in-law; both worked closely with Ayatollah Ali Khamenei and every other member of the Khamenei Cell as, among other things, one of the Supreme Leader's primary gatekeepers and interlocutors with Hezbollah, the IRGC, the Foundation for the Oppressed, Supreme Leader's Office, Jaysh al-Mahdi, Hamas, and PIJ. Indeed, U.S. government findings confirmed that the illicit petroleum transactions—like those enabled by BNPP—supplied the key stockpile of dollars and tangible assets upon which Mojtaba and Hadad-Adel relied to help the Terrorist Sponsors commit Hezbollah-led attacks throughout the Middle Esat, including Hezbollah-directed attacks Iraq by Jaysh al-Mahdi. On November 5, 2019, Treasury designated both Mojtaba Khamenei and Gholam-Ali Hadad-Adel under its counterterrorism authorities "pursuant to E.O. 13876" based upon findings that both directly enabled Hezbollah-directed attacks by Iranian proxies throughout the Middle East. The same findings confirmed the inextricable nexus between the Khamenei Cell and Petro Nahad and Hezbollah- and Qods Force-sponsored attacks supported by Hassan Nasrallah and Qasem Soleimani in Iraq—which describes every attack against Plaintiffs and their loved ones and were, by their terms, were applicable to the Supreme Leader's Office's activities from the early 1980s

through at least 2019. Among other reasons, U.S. officials publicly confirmed this, as Treasury, and State (through Secretary of State Pompeo) both did on November 4, 2019.

1170. **Mohsen Rezai** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Iraq by Hezbollah and Jaysh al-Mahdi, including JAM Special Group Kataib Hezbollah, for which he supplied key funds, recruits, logistical aid, and intelligence support. Rezai's direct operational history with senior JAM leaders was deep and decades-long. For example, he had sponsored attacks led by JAM leader Abu Mahdi al-Muhandis since 1983, when Rezai, Muhandis, and Hezbollah (along with Rafiqdoost and Khamenei) coordinated an audacious bomb attack targeting the United States in Kuwait, and from 1983 through 1988 when Rezai commanded Muhandis during the Iran-Iraq war, when Rezai, Muhandis, Khamenei, and Hezbollah coordinated Iranian attacks inside Iraq. Media reports confirmed Rezai's close relationship with Kataib Hezbollah and Muhandis, including, but not limited to, reports by the U.S. government-published *Radio Free Europe/Radio Liberty* on January 9, 2020, and Iran-focused NGO IFMAT on July 2, 2020. Terrorism scholars confirmed that Mohsen Rezai was a key sponsor of Jaysh al-Mahdi attacks in Iraq. In 2021, for example, Ofira Seliktar and Farhad Rezaei reported:

> By … creating tension between [Iraqi Grand Ayatollah] al Sistani and Sader [*i.e.*, Muqtada al-Sadr], the Iranians took the first step in implementing their plan to Lebanonize Iraq. Mohsen Rezaei, the former IRGC chief and the head of the Discernment Council, told a gathering in early April [2003] that he expected Iraq to follow the pattern of Lebanon. Many in the Guards believed that Sader could become the next 'Hassan Nasrallah' with Hezbollah serving as a model for the Mahdi Army. The Iranians were particularly pleased by Sader's slogan 'the smaller devil has gone, but the bigger devil has come,' an allusion to the fact that the Americans turned into successors of Saddam Hussein. … Indeed, when Sadr arrived in Iran on June 2, 2003, the media covered his visit in great detail and praised his anti-American stand. Tellingly, he met Qassem Suleimani, in addition to Ayatollah Khamenei ….

1171.  **Mohsen Rafiqdoost** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Iraq by Hezbollah and Jaysh al-Mahdi, including JAM Special Group Kataib Hezbollah, for which he supplied key funds, recruits, logistical aid, and intelligence support.

1172.  Rafiqdoost was the former personal bodyguard and driver of Khomeini; presided over the largest *bazaari* network in Iran, Iraq, Lebanon, and Syria; founded the IRGC in 1979; co-founded Hezbollah in 1982; masterminded (alongside Imad Mugniyeh) Hezbollah's 1983 attacks targeting the United States in Lebanon, which killed hundreds of Americans; and served as de-facto leader of the Foundation for the Oppressed from 1989 through 2024.

1173.  Regardless of title, Mohsen Rafiqdoost always served as one of Khamenei's key inner circle operatives responsible for securing weapons for Hezbollah, the IRGC, Hamas, PIJ, and JAM, which included acquisitions secured through Iranian arms, training, and tunnel purchases supplied by North Korea's terrorist arm, the RGB ***and*** via Iranian-developed weapons built by firms controlled by the Foundation for the Oppressed, IRGC, and Supreme Leader's Office. For both lanes of Hezbollah, Hamas, PIJ, and JAM weapons acquisition, Rafiqdoost sat at the intersection of both relationships (*i.e.*, he knew the key players in North Korea, Lebanon, Iraq, and the Palestinian territories), transportation (*i.e.*, he knew how to move weapons from North Korea to places like the Palestinian territories), and logistics (*i.e.*, he knew how to distribute such weapons in a methodical way once they were in-country in order to maximize the killing power that the terrorists could extract from their use of the weapons he helped supply).

1174.  **Muqtada al-Sadr** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Iraq by Hezbollah and Jaysh al-Mahdi, including JAM Special Group Kataib Hezbollah, for which he

supplied key funds, recruits, logistical aid, and intelligence support. Sadr led JAM (inclusive of its various rebrands) as Hezbollah's terrorist agent in Iraq, to whom Sadr publicly pledged his fealty. While Sadr made a jihadist-politician's choice to not publicly swear allegiance to Ayatollah Khamenei, Sadr met with Khamenei, accepted funds from Khamenei (delivered by Hezbollah), and received shelter from Khamenei after U.S. forces obliterated most of Hezbollah's and JAM's infrastructure in Iraq in 2008.

1175.    **Abu Mahdi al-Muhandis** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Iraq by Hezbollah and Jaysh al-Mahdi, including JAM Special Group Kataib Hezbollah, for which he supplied key funds, recruits, logistical aid, and intelligence support. U.S. government findings confirmed that Abu Mahdi al-Muhandis played a vital role in helping Hezbollah orchestrate JAM's attacks in Iraq. On July 2, 2009, Treasury announced that the United States had "designated" the "Iran-based individual Abu Mahdi al-Muhandis" as an SDGT, and "under Executive Order (E.O.) 13438, which targets insurgent and militia groups and their supporters," upon the United States finding, *inter alia*, that:

a.      "Abu Mahdi al-Muhandis … ha[s] committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces and as a result [is] designated [under E.O. 13438]."

b.      "Th[is] designation[] play[s] a critical role in our efforts to protect Coalition troops, Iraqi security forces, and civilians from those who use violence against innocents to intimidate and to undermine a free and prosperous Iraq, said Stuart Levey, Under Secretary for Terrorism and Financial Intelligence."

c.      "Abu Mahdi al-Muhandis is an advisor to Qasem Soleimani, the commander of [the] Qods Force, the arm of the Islamic Revolutionary Guard Corps (IRGC) responsible for providing material support to Lebanon-based Hizballah" and "to Kata'ib Hizballah and other Iraqi Shia militia groups who target and kill Coalition … Forces."

d.      "As of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for

attacks against Coalition Forces" through the receipt of "training in guerilla warfare, handling bombs and explosives, and employing weapons [such as] missiles, mortars, and sniper rifles" from Hezbollah instructors.

1176.   Abu Mahdi al-Muhandis was always a key sponsor of attacks by Hezbollah and Jaysh al-Mahdi, including Kataib Hezbollah, in Iraq and Syria, for which he supplied key funds, recruits, logistics, and intelligence support. As terrorism scholars Michael Knights, Hamdi Malik, and Aymenn Jawad al-Tamimi explained in March 2020, "Muhandis and Kataib Hezbollah" were "U.S.-designated terrorist entities" who "actively conspired to kill scores, if not hundreds, of Americans" in Iraq and Syria.

1177.   Abu Mahdi al-Muhandis was always a key sponsor of missile, rocket, UAV, RPG, small arms, and IED attacks by Hezbollah, the IRGC, Jaysh al-Mahdi, including Kataib Hezbollah, Hamas, and PIJ in Iraq, Syria, Lebanon, and Israel, for which he supplied key funds, recruits, logistics, and intelligence support. Among other ways, Muhandis—and the resources Muhandis controlled—supplied the lynchpin of the specific Axis of Resistance logistics and transportation pipelines in which all or nearly the IEI-made weapons used by the terrorists to kill and injure Plaintiffs or their loved ones were transported, stored in reliable, well-maintained, and secure safe houses, and protected from attack or theft throughout.[138]

---

[138] In any terrorist logistics "ratline," at fighters, funds, and weapons typically travel from safe-house to safe-house through well-planned logistics channels that relied upon substantial resources, networks, and competencies, and a linked-chain of safehouses for which it was not uncommon for a single weapon to make five or more stops. In any ratline for any FTO, at least three were always present: transportation, secure storage, and protection. Given the omnipresent threat of U.S. and Israeli strikes against Kataib Hezbollah in Iraq and Syria, Muhandis's leadership role was incredibly expensive because he had to account for U.S. and Israeli technical and operational capabilities. Simply put, that created the most expensive possible environment in which Muhandis supplied such logistics aid to the attacks by Hezbollah, Jaysh al-Mahdi, including Kataib Hezbollah, Hamas, and PIJ in Iraq, Syria, and Israel.

1178.   With respect to the Terrorists Sponsors' weapons- and logistics-related aspects of the kill chain in which an Iranian weapon was used to murder or maim an American victim, each IEI weapon used against Plaintiffs was: (1) created at an IEI manufacturing site in Iran, and then (2) transported overland from IEI in Iran, across the Iran/Iraq border, and delivered to at least one, and likely several, secure storage sites in Iraq, that would ordinarily have been operated by joint Hezbollah Jaysh al-Mahdi, including Kataib Hezbollah, under such groups' custom and practice, and then (3) transported from such secure Iraqi sites overland, across the Iraq/Syria border, and delivered to the Joint Logistics Cell sites there to supply Hezbollah-led attacks in Iraq, Syria, and Israel committed with, or via, Kataib Hezbollah, Hamas, and PIJ), through the Joint Logistics Cell site in Syria. With respect to such IEI-manufactured, Muhandis-smuggled, weapons that Muhandis helped transport to the Joint Logistics Cells in Syria, the Terrorist Sponsors regularly routed a substantial percentage of them to Hamas and PIJ terrorists in Gaza, which weapons smuggling they achieved via a route that combined overland transportation from Syria to Lebanon, and then boat/aircraft transportation from Lebanon to Egypt, and then onward to Hamas and PIJ operations cells in the Palestinian territories. Notably, this primarily occurred through the tunnels built by the North Korean RGB and that BNPP financed from through illicit transactions that flowed vast profits to the Foundation for the Oppressed, IRGC, Hezbollah, and Supreme Leader's Office from 2017 through 2024. *See infra* (Foundation for the Oppressed coordinated Terrorist Sponsors' "oil-for-arms, training, and tunnels" barter deals with North Korea, for which Foundation dollars financed the barter logistics by paying the transportation and transaction costs associated with smuggling the associated oils, weapons, tunneling and construction equipment, and personnel from 2000 through 2024).

1179.    Terrorism scholars confirmed Muhandis's key role in Axis of Resistance attack logistics throughout the Middle East. On January 15, 2020, for example, Barbara A. Leaf testified before Congress that, under Abu Mahdi al-Muhandis's leadership, Kataib Hezbollah (commonly called "KH") had "repeated[ly] target[ed]" known "U.S. military training sites and U.S. diplomatic facilities" in Iraq and Syria "for the past 18 months," i.e., July 2018 through January 2020, during which period "KH" had also "participat[ed] in Iran's program to transfer advanced missile technology to Lebanese Hezballah" and "KH" also helped its Axis allies "target" the "Saudi East-West pipeline" to conduct missile, rocket, and drone attacks targeting the United States through U.S. ally Saudi Arabia.

1180.    **Qais Khazali** and **Laith Khazali** were each a member of the Khamenei Cell and used BNPP's funds routed to them through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Iraq by Hezbollah and Jaysh al-Mahdi, including JAM Special Group Kataib Hezbollah, for which they supplied key funds, recruits, logistical aid, and intelligence aid. Brothers Qais and Laith were iconic Iraqi terrorists who served as key allies of Hezbollah, Khamenei, and JAM founder Muqtada al-Sadr. From 2003 through 2005, Qais and Laith helped Sadr and Hezbollah operationalize JAM. In or about 2006, Hezbollah, Sadr, and Khamenei tasked Qais and Laith with standing up a so-called JAM Special Group that would leverage Hezbollah's, JAM's, the Khazalis', and Khamenei's networks and resources to promote specially trained, Hezbollah-directed, joint Hezbollah/JAM cells known as "Jaysh al-Mahdi Special Groups," one of the two most notorious of which was always JAM Special Group Asaib Ahl al-Haq.

### b.   Khamenei Cell Terrorists Funded By BNPP Directly Participated in the Attacks that Killed and Injured Plaintiffs in Iraq

1181.  BNPP financed the specific cell and operatives who helped Hezbollah commit, plan, and authorize Hezbollah's and Jaysh al-Mahdi's attacks in Iraq that killed and injured Plaintiffs or their loved ones by financing the Khamenei Cell and key Khamenei Cell operatives from Hezbollah, the Foundation for the Oppressed, IRGC, and Supreme Leader's Office, including those identified herein. Among others, Ali Khamenei, Hassan Nasrallah, Imad Mugniyeh, Muhammad Kawtharani, Ali Mussa Daqduq, Yusuf Hashim, Parviz Fattah, Qasem Soleimani, Rostam Qasemi, Mojtaba Khamenei, Gholam-Ali Hadad-Adel, Mohsen Rezai, Mohsen Rafiqdoost, Muqtada al-Sadr, Abu Mahdi al-Muhandis, Qais Khazali, Laith Khazali, and the Khamenei Cell directly participated in Hezbollah's and Jaysh al-Mahdi's attacks in Iraq that killed and injured Plaintiffs as follows:

1182.  **Hostage-Taking Attacks in Iraq.** Ali Khamenei, Hassan Nasrallah, Imad Mugniyeh, Muhammad Kawtharani, Ali Mussa Daqduq, Yusuf Hashim, Parviz Fattah, Qasem Soleimani, Rostam Qasemi, Mojtaba Khamenei, Gholam-Ali Hadad-Adel, Mohsen Rezai, Mohsen Rafiqdoost, Muqtada al-Sadr, Abu Mahdi al-Muhandis, Qais Khazali, Laith Khazali, and the Khamenei Cell directly participated in Hezbollah's and Jaysh al-Mahdi's hostage-taking attacks in Iraq from 2006 through 2011, including the attacks that killed or injured Plaintiffs Jonathan Coté, Paul Johnson-Reuben, Joshua Munns, John Young, and Michael Chand Sr. That role included ordering and/or managing the decision:

a.  forward deploying senior Hezbollah terrorists, including but not limited to Imad Mugniyeh, Muhammad Kawtharani, Ali Mussa Daqduq, and Yusuf Hashim, to coordinate hostage-taking attacks against Americans, including strategic escalations of kidnapping attacks timed to maximize the Terrorist Sponsors' pressure over the United States, *e.g.*, the joint Hezbollah/JAM Basra cell's wave of hostage-taking attacks from 2006 through 2008 targeting Americans in southern Iraq;

b.  targeting specific geographies in Iraq, such as Baghdad and Basra, where Jaysh al-Mahdi was permitted to kidnap Americans;

c.   instructing Jaysh al-Mahdi to target Americans in Baghdad and Basra;

d.   establishing the infrastructure and protocols for the kidnappers;

e.   providing technical assistance to Jaysh al-Mahdi with respect to hostage-taking concepts, including Hezbollah's notorious hostage-taking experts and training in Lebanon;

f.   training senior Jaysh al-Mahdi terrorist commanders in Lebanon, Iraq, and Iran with respect to all aspects of the hostage-taking network, including attack strategy;

g.   training lower-level Jaysh al-Mahdi members in camps in Lebanon, Iraq, and Iran with respect to hostage-taking tactics;

h.   supplying vital pre-attack intelligence that materially strengthened the lethality of Hezbollah's and JAM's hostage-taking attacks, *e.g.*, drone or satellite imagery data about potential locations to kidnap hostage targets;

i.   approving, and funding, the attack incentive and reward payments alleged herein, including, but not limited to, martyr payments and salary payments;

j.   coordinating, through Hezbollah, the detention of each American hostage after they were kidnapped; and

k.   managing the negotiations over the release of such hostages.

1183.   **EFP Attacks in Iraq.** Ali Khamenei, Hassan Nasrallah, Imad Mugniyeh, Muhammad Kawthrani, Ali Mussa Daqduq, Yusuf Hashim, Parviz Fattah, Qasem Soleimani, Rostam Qasemi, Mojtaba Khamenei, Gholam-Ali Hadad-Adel, Mohsen Rezai, Mohsen Rafiqdoost, Muqtada al-Sadr, Abu Mahdi al-Muhandis, Qais Khazali, Laith Khazali, and the Khamenei Cell directly participated in Hezbollah's and Jaysh al-Mahdi's EFP attacks in Iraq from 2007 through 2011, including the attacks that killed or injured the following Plaintiffs: Joshua Wells, Michael Doheny, Steven Evrard, Billy Johnson, Micah Shaw, Bryan Wagner, Michael Lukow, Joshua Eckhoff, James Flemming III, Norman Forbes IV, James Wilson Jr., Durrell Bennett, Patrick Hanley, Patrick Miller, Carl Reiher, Robert Winegar Jr., Richard Vaughn, Jason Robinson, Cory Kenfield, Jeremiah McNeal, Jesse Ault, Joseph Richard III, Evan Bogart, Luis Rosa-Valentin, Christopher Violette, Ronald Tucker, Adam Magers, John Aragon,

Joshua Plocica, Sean Diamond, Brian Connelly, Michael Anaya, Raul Moncada, Stephen Evans, Joshua Craven, Omar Vazquez, Stephen Everhart, and Jason Rzepa. That role included ordering, authorizing, and/or managing the decisions:

a.      forward deploying senior Hezbollah terrorists, including but not limited to Imad Mugniyeh, Muhammad Kawtharani, Ali Mussa Daqduq, and Yusuf Hashim, to coordinate EFP attacks against Americans;

b.      targeting specific geographies in Iraq, such as Baghdad and Basra, where Jaysh al-Mahdi was permitted to launch EFP attacks;

c.      instructing Jaysh al-Mahdi to use EFPs against American armored vehicles in the first instance;

d.      providing technical assistance to Jaysh al-Mahdi with respect to EFP design schematics and concepts;

e.      helping manufacture EFPs for use against the United States in Iraq;

f.      facilitating the regular resupply of the EFPs from Iran, as smuggled and sustained by Hezbollah;

g.      training senior Jaysh al-Mahdi terrorist commanders in Lebanon, Iraq, and Iran with respect to all aspects of the EFP network, from design, to manufacture, to transportation, to attack strategy;

h.      training lower-level Jaysh al-Mahdi members in camps in Lebanon, Iraq, and Iran with respect to EFP tactics;

i.      preparing and distributing sophisticated, high production value Arabic-language CD-ROMs and instructional videos concerning EFPs;

j.      supplying vital pre-attack intelligence that materially strengthened the lethality of Hezbollah's and JAM's rocket attacks, *e.g.*, drone or satellite imagery data about the attack target; and

k.      approving, and funding, the attack incentive and reward payments alleged herein, including, but not limited to, martyr payments and salary payments.

1184.   **Rocket and Mortar Attacks in Iraq.** Ali Khamenei, Hassan Nasrallah, Imad Mugniyeh, Muhammad Kawtharani, Ali Mussa Daqduq, Yusuf Hashim, Parviz Fattah, Qasem Soleimani, Rostam Qasemi, Mojtaba Khamenei, Gholam-Ali Hadad-Adel, Mohsen Rezai,

Mohsen Rafiqdoost, Muqtada al-Sadr, Abu Mahdi al-Muhandis, Qais Khazali, Laith Khazali, and the Khamenei Cell directly participated in Hezbollah's and Jaysh al-Mahdi's rocket or mortar attacks in Iraq from 2007 through 2011, including the attacks that killed or injured the following Plaintiffs: Dustin Bauer, Mark Thomsen, and Brandon Josey. That role included ordering and/or managing the decision:

a.    forward deploying senior Hezbollah terrorists, including but not limited to Imad Mugniyeh, Muhammad Kawtharani, Ali Mussa Daqduq, and Yusuf Hashim, to coordinate rocket and mortar attacks against Americans, including strategic escalations of them timed to maximize the Terrorist Sponsors' pressure over the United States, *e.g.*, the joint Hezbollah/JAM Baghdad cell's rocket attacks targeting the U.S. Embassy there in March 2008 that preceded, and were the but-for cause of, the Battle of Sadr City;

b.    targeting specific geographies in Iraq, such as Baghdad and Basra, where Jaysh al-Mahdi was permitted to launch rocket and mortar attacks;

c.    instructing Jaysh al-Mahdi to use rockets and mortars against the U.S. Embassy in Baghdad, U.S. consulates in Baghdad and Basra, and U.S. military and civilian installations throughout Iraq;

d.    providing technical assistance to Jaysh al-Mahdi with respect to rocket and mortar schematics and concepts, including Hezbollah's notorious Improvised Rocket Assisted Munitions (or "IRAMs");

e.    helping manufacture rockets and mortars for use against the United States in Iraq;

f.    facilitating the regular resupply of the rockets and mortars from Iran and North Korea's RGB to Hezbollah and Jaysh al-Mahdi in Iraq, as coordinated by, *inter alia*, Hezbollah;

g.    training senior Jaysh al-Mahdi terrorist commanders in Lebanon, Iraq, and Iran with respect to all aspects of the rocket and mortar network, from design, to manufacture, to transportation, to attack strategy;

h.    training lower-level Jaysh al-Mahdi members in camps in Lebanon, Iraq, and Iran with respect to rocket and mortar tactics;

i.    supplying vital pre-attack intelligence that materially strengthened the lethality of Hezbollah's and JAM's rocket and mortar attacks, *e.g.*, drone or satellite imagery data about the attack target; and

j.    approving, and funding, the attack incentive and reward payments alleged herein, including, but not limited to, martyr payments and salary payments.

1185.   **IED Attacks in Iraq.** Ali Khamenei, Hassan Nasrallah, Imad Mugniyeh, Muhammad Kawtharani, Ali Mussa Daqduq, Yusuf Hashim, Parviz Fattah, Qasem Soleimani, Rostam Qasemi, Mojtaba Khamenei, Gholam-Ali Hadad-Adel, Mohsen Rezai, Mohsen Rafiqdoost, Muqtada al-Sadr, Abu Mahdi al-Muhandis, Qais Khazali, Laith Khazali, and the Khamenei Cell directly participated in Hezbollah's and Jaysh al-Mahdi's EFP attacks in Iraq from 2007 through 2011, including the attacks that killed or injured the following Plaintiffs: William Juneau, James Wilson Jr., Laurent West, Steven Farley, and Nicole Suveges. That role included ordering and/or managing the decisions:

a.    providing technical assistance to Jaysh al-Mahdi with respect to IED design schematics and concepts;

b.    helping manufacture IEDs for use against the United States in Iraq;

c.    facilitating the regular resupply of the IEDs and IED components from Iran and North Korea's RGB to Hezbollah and Jaysh al-Mahdi in Iraq, including, but not limited to, explosives, detonation devices, radio signals, and the associated technologies customarily required for JAM's Hezbollah-schematic-derived IED attacks in Iraq;

d.    training senior Jaysh al-Mahdi terrorist commanders in Lebanon, Iraq, and Iran with respect to all aspects of the IED network, from design, to manufacture, to transportation, to attack strategy;

e.    training lower-level Jaysh al-Mahdi members in camps in Lebanon, Iraq, and Iran with respect to IED tactics;

f.    supplying vital pre-attack intelligence that materially strengthened the lethality of Hezbollah's and JAM's IED attacks, *e.g.*, drone or satellite imagery data about the attack target; and

g.    approving, and funding, the attack incentive and reward payments alleged herein, including, but not limited to, martyr payments and salary payments.

1186.   **RPG, Small Arms, and Complex Attacks in Iraq.** Ali Khamenei, Hassan Nasrallah, Imad Mugniyeh, Muhammad Kawtharani, Ali Mussa Daqduq, Yusuf Hashim, Parviz Fattah, Qasem Soleimani, Rostam Qasemi, Mojtaba Khamenei, Gholam-Ali Hadad-Adel,

Mohsen Rezai, Mohsen Rafiqdoost, Muqtada al-Sadr, Abu Mahdi al-Muhandis, Qais Khazali, Laith Khazali, and the Khamenei Cell directly participated in Hezbollah's and Jaysh al-Mahdi's RPG, small arms, and complex attacks in Iraq from 2006 through 2011,[139] including the attacks that killed or injured the following Plaintiffs: Jonathon Coté, Paul Johnson-Reuben, Joshua Munns, John Young, Michael Chand Sr., Gregory Rundell, Anthony Gerber, Charles Gregston, David Manganella, Joshua Molina, Jeremy Wallace, Cody Barham, Alejandro Contrerasbaez, Durrell Bennett, Patrick Hanley, Patrick Miller, Carl Reiher, Robert Winegar Jr., James Wilson Jr., James Flemming III, Richard Vaughn, Anthony Farina, Benjamin Zibutis, Brandon Josey, Adam Magers, Samuel Montalbano, John Daggett, Michael Briggs, and Andres Vazquez. That role included ordering and/or managing the decisions:

a.    helping manufacture small arms and RPGs, including RPG-7s and RPG-29s, for use against the United States in Iraq;

b.    facilitating the regular resupply of small arms and RPGs, including RPG-7 and RPG-29 components, from Iran and North Korea's RGB to Hezbollah and Jaysh al-Mahdi in Iraq, including, but not limited to, Iranian-manufactured optics that were vital to the accuracy of small arms and RPGs, and Iranian and RGB-supplied small arms, RPGs, and associated ammunition;

c.    training senior Jaysh al-Mahdi terrorist commanders in Lebanon, Iraq, and Iran with respect to all aspects of the RPG, small arms, and complex attack networks, from design, to manufacture, to transportation, to attack strategy;

d.    training lower-level Jaysh al-Mahdi members in camps in Lebanon, Iraq, and Iran with respect to small arms, RPG, and complex attack tactics;

e.    supplying vital pre-attack intelligence that materially strengthened the lethality of Hezbollah's and JAM's RPG, small arms, and complex attacks, *e.g.*, drone or satellite imagery data about the attack target; and

---

[139] Pursuant to Hezbollah tradecraft, as instructed to Jaysh al-Mahdi, most attack featuring any of these three elements often featured at least one, and regularly both, of the others, e.g., a complex attack involving both RPG and small arms fire was a regular Hezbollah/JAM attack type throughout the parts of Iraq where they were most active. Accordingly, Plaintiffs discuss RPG, small arms, and complex attacks herein as one group.

f.  approving, and funding, the attack incentive and reward payments alleged herein, including, but not limited to, martyr payments and salary payments.

## VI.  Hezbollah, Hamas, and PIJ Used BNPP's Substantial Assistance to Commit Terrorist Attacks in Israel that Targeted the United States and Injured Plaintiffs

1187.  As DOJ confirmed when it announced BNPP's guilty plea in 2012, BNPP supplied ***"criminal support of countries and entities engaged in acts of terrorism."*** DOJ's conclusion directly applied to the Terrorist Sponsors' attacks in Israel and confirmed that BNPP aided Hezbollah-sponsored attacks there by Hezbollah, Hamas, and PIJ.

1188.  From 2002 through at least 2016, BNPP directly and indirectly supported attacks by Hezbollah, Hamas, and Palestinian Islamic Jihad that targeted the United States by targeting its closest ally in the Middle East, Israel. Those attacks killed and maimed thousands of innocent victims, of whom many were Americans, including Plaintiffs. BNPP supported these attacks by powering two separate but related Terrorist Sponsors—the Foundation for the Oppressed and the IRGC – both of which were notorious sponsors of Hezbollah-backed terrorism, including in Israel and the Palestinian territories, for which the Foundation and IRGC both played vital roles. BNPP's conduct financed every attack against Plaintiffs many times over, flowed resources directly to the terrorist operatives and cells responsible for the attacks against Plaintiffs, and powered the terrorists' acquisition, movement, storage, and deployment of the specific weapons that the terrorists used in Israel and the Palestinian territories to kill and maim Plaintiffs and their loved ones.

### A.  Hezbollah, Hamas, and PIJ Committed Terrorist Attacks Targeting the United States that were Sponsored by the Foundation for the Oppressed, Supreme Leader's Office, and IRGC

1189.  In or about 1990, Khamenei and the IRGC cemented a deep bond with Hamas and Palestinian Islamic Jihad. Ever since, Hamas has been the IRGC's second most notorious proxy, behind only Hezbollah, and PIJ has been widely understood as an equally notorious, albeit

smaller, Iranian proxy. Accordingly, the United States regularly described Iranian support for

Hamas and PIJ in the same public warnings, and often collectively referred to both as

"Palestinian terrorist groups" or something similar.

1190.   From 1990 through 2024, Ayatollah Khamenei, the Supreme Leader's Office,

IRGC, and Foundation for the Oppressed directly sponsored Hezbollah-coordinated, Hamas- and

Palestinian Islamic Jihad-committed, attacks targeting the United States in the Middle East by

murdering persons residing in Israel, including U.S. nationals like Plaintiffs.

1191.   For decades, the gist of their relationship was simple: Terrorist Sponsors supplied

the funds, weapons, training, and in-person Hezbollah direction to Hamas and Palestinian

Islamic Jihad so that those Iranian proxies could effectively kidnap, murder, and maim perceived

U.S. allies in Israel. Terrorist Sponsors, Hamas, and PIJ viewed these U.S. allies in Israel, as a

matter of doctrine, to be a mere extension of the United States, given their related view that

Israel was but an arm of America in the Middle East.

1192.   Hamas, like Hezbollah, viewed the United States and Israel as two inextricably

connected enemies. For example, Hamas leaders regularly blamed Israeli counterterrorism

operations targeting Hamas on the United States by pointing out that Israel buys most of its

advanced weapons from America.

1193.   Ayatollah Khamenei played a key, direct, and enduring role organizing attacks by

Hezbollah, Hamas, and Palestinian Islamic Jihad in Israel. Indeed, Khamenei's pledge to ramp

up Palestinian-committed attacks was one of his core pledges to the IRGC to secure power in

1989. Building on that, in June 2002, Khamenei met with Palestinian terrorists on the sidelines of

an Iranian-sponsored conference in Tehran explicitly designed to support Palestinian terrorist

attacks against Israelis that were known as the *intifada*. As Dr. Matthew Levitt reported in his

2007 book on Hamas:

> Khamene'i pledged to … increase … funding by 70 percent "to cover the expense of recruiting young Palestinians for suicide operations." U.S. officials note that in the period following the onset of violence in September 2000, Tehran instituted an incentive system in which millions of dollars in cash bonuses … were conferred … for successful attacks. Tehran often demands of its terrorist beneficiaries videotapes or other evidence of successful attacks.

1194.    After the Israeli government completed its withdrawal from Gaza in or about

2006, Hamas quickly moved to consolidate its position there, backed up every steps of the way

by Terrorist Sponsors. On June 7, 2007, Hamas launched a terrorist campaign to seize control of

the Gaza Strip. Seven days later, Hamas's killings had done their job, and Hamas assumed clear

control of all of Gaza. Immediately, it was apparent to the U.S. government—and BNPP—that

the Iranian regime was behind Hamas's attacks. As Hamas scholar Jonathan Schanzer later

observed in 2021, in looking back on Hamas's assault in 2007:

> Iran was widely suspected of being behind the orchestrated assault in Gaza. Iranian assistance had likely helped Hamas build tunnels and train fighters. . . . Iranian support increased "exponentially" after the 2006 elections. Senior Hamas leader Mahmoud al-Zahar later admitted that Iran had given him $22 million in cash in 2006. . . . Hamas leaders also later admitted that the group's fighters received training in Iran.

1195.    During this time, the US government strove to prevent the flow of cash from Iran

to Hamas. In July 2007, the US Treasury Department issued sanctions against Iran's Martyr's

Foundation for funneling money from Iran to Hamas, among other groups. Later that year,

Treasury targeted Iran's Quds Force and Bank Saderat for funding Hamas, along with Hezbollah

and PIJ. Through these designations, Treasury's message was clear: Iran was providing Hamas

with significant financial support.

1196.   More recently, the Terrorist Sponsors' support for Hamas and PIJ was exemplified in their October 7, 2023 attack in Israel.

1197.   On October 7, 2023, Hamas and Palestinian Islamic Jihad deployed the Terrorist Sponsor's funds, weapons, training, and logistical support to conduct their devastating attack that day (the "October 7 Attack"). The October 7 Attack comprised a single, integrated attack, which featured a litany of aspects, including, but not limited to, the use of: (1) rockets, small arms fire, mortars, and drones to target Israeli counterterrorism forces and overwhelm Israeli defenses; (2) Hamas's and PIJ's network of tunnels; (3) coordinated attacks on specific venues near the Gaza border with Israel; (4) wide-scale kidnapping, rape, and murder; and (5) an integrated, contemporaneous, strategic communications campaign for which the purpose was to both magnify the terror created by the attack and inspire terrorist supporters to contribute funds to further the ongoing attack (which, on information and belief, prompted real-time contributions to Hamas) and future attacks by Hamas and PIJ.

1198.   Hamas's and Palestinian Islamic Jihad's shared commitment to terrorism reflected their faithful implementation of Hezbollah's terrorist tactics, techniques, and procedures, and was the direct result of the support supplied to Hamas and PIJ by Terrorist Sponsors.

**B.  BNPP's Assistance Aided the Attacks by Hezbollah, Hamas, and PIJ in Israel**

1199.   By flowing funds to the Terrorist Sponsors, BNPP aided the attacks committed in Israel by Hezbollah, Hamas, and PIJ.

**1.      BNPP's Culpable Behavior Empowered the Terrorist Sponsors to Provide Unique and Deadly Support To Attacks by Hezbollah, Hamas, and PIJ in Israel**

1200.   From 2008 through 2024, the Terrorist Sponsors directly funded, logistically supported, and supervised attacks by Hezbollah, Hamas, and Palestinian Islamic Jihad in Israel.

They did so through the Khamenei Cell, Joint Logistics Cell, Joint Hezbollah-Hamas Operations Cells, and Joint Hezbollah-Palestinian Islamic Jihad Operations Cells.

1201.   Through the Terrorist Sponsors, BNPP financed Hamas and Palestinian Islamic Jihad attacks from 2002 through 2016, including the attacks against Plaintiffs. While BNPP supplied such aid, the Terrorist Sponsors' relationships, networks, customs and practices, and tactics, techniques, and procedures relating to Hamas mirrored those relating to Palestinian Islamic Jihad. Anything the Iranian regime did for Hamas, it likewise did for PIJ, and usually through the same operatives, fronts, and modalities. As FinCEN confirmed on May 8, 2024:

> PIJ and Hamas share many similarities: both are violent offshoots of the Muslim Brotherhood; both seek to create an Islamic Palestinian state through the destruction of Israel; and both receive significant funding and support from Iran. Like Hamas and Hizballah, PIJ's operatives have been trained by Iran to use Iranian-made missiles for long-range rocket attacks against Israeli cities and to carry out suicide bombings.
>     PIJ relies on many of the same funding channels as Hamas. It receives much of its support from the IRGC and IRGC-QF.

1202.   BNPP's aid mattered because Hamas and Palestinian Islamic Jihad needed money to conduct the attacks alleged herein. As a Hamas financial appeal in 2019 admitted: "The reality of jihad is the expenditure of effort and energy, and money is the backbone of war." PIJ needed money to conduct the attacks alleged herein for the same reasons as Hamas.

1203.   Moreover, when Hamas and Palestinian Islamic Jihad received money, they usually used it to conduct terrorist attacks. On September 9, 2014, for example, Hamas scholar Jonathan Schanzer testified before Congress that "Hamas's finances need to be countered" because Hamas relied on money to commit "violent attacks" that "have killed hundreds."

1204.   From 2000 through 2024, the Terrorist Sponsors provided funds, weapons, training, and operational support to Hamas and Palestinian Islamic Jihad. For example, State's *Country Reports on Terrorism* reported to Congress in June 2015, June 2016, July 2017,

September 2018, October 2019, June 2020, December 2021, and February 2023 (verbatim or in sum and substance) that "Iran has historically provided weapons, training, and funding to Hamas" and "Palestine Islamic Jihad" while such "terrorist groups" were "behind a number of deaths from attacks originating in Gaza and the West Bank."

1205.   Decades of official reports and statements published by the United States confirmed that the Terrorist Sponsors supplied vital aid to Hezbollah-directed, Hamas- and Palestinian Islamic Jihad-committed attacks in Israel, including, but not limited to, the following:

a.    In April 2003, State reported to Congress: "Iran provided Lebanese Hizballah and Palestinian rejectionist groups—notably HAMAS, the Palestine Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command—with funding, safe-haven, training, and weapons" and "encouraged Hizballah and the Palestinian rejectionist groups to coordinate their planning and to escalate their terrorist activities."

b.    In June 2004, State reported to Congress, "Iranian support for Hizballah activities in southern Lebanon, as well as training and assistance to Palestinian rejectionist groups, help promote an environment where terrorist elements flourish."

c.    On August 3, 2010, senior Treasury official Stuart Levey testified that "Iranian support"—usually routed through the Foundation for the Oppressed or Hezbollah—"to Palestinian terrorist groups like Hamas" and "the Palestinian Islamic Jihad" was "significant" to Hamas's and PIJ's ability to conduct attacks. Similar U.S. observations about Iran's key role in Hamas and PIJ attacks endured throughout the period from 2000 through 2024.

d.    On June 1, 2011, the White House declared in America's *National Strategy for Counterterrorism* that "Hizballah" and "HAMAS" continued to "remain opposed to aspects of U.S. foreign policy and pose significant threats to U.S. strategic interests as regional destabilizers and as threats to our citizens, facilities, and allies worldwide" and receive key support from "Iran," which remained an "active sponsor[] of terrorism," for which the United States was "committed to opposing the support" that Iran "provide[d] to groups pursuing terrorist attacks" in Israel and the Palestinian territories.

e.    On August 24, 2015, Treasury's *National Terrorist Financing Risk Assessment* informed Congress: "As with Hizballah, state sponsorship has played a significant role in Hamas' financing. Historically, Hamas has received funding, weapons, and training from Iran."

These examples only scratch the surface of the constant stream of U.S. warnings and findings from 2003 through 2024.

494

1206.   The United Nations publicly reported the same. On June 1, 2015, for example, the U.N. Security Council "note[d] media reports pointing to [Iran's] continuing military support and alleged arms transfers to" "Hizbullah and Hamas," among others, and "further note[d]" that "Iranian officials" were "not denying" that they supplied "military support" to those FTOs.

1207.   European officials publicly reported similar conclusions. On July 30, 2006, for example E.U. parliamentarian Struan Stevenson observed: "Without the backing of Tehran, Hamas … would wither and die."

1208.   Hamas and Palestinian Islamic Jihad leaders also publicly and regularly admitted that Iranian support provided vital aid to their attacks. In "December 2006," as Iran scholar Jonathan Schanzer explained in a 2022 analysis, "[d]uring his … visit to Tehran," Hamas leader Ismael "Hanieh" publicly "applauded the Islamic Republic as 'the Palestinians' strategic depth'" and stated that it would be a mistake to "assume the Palestinian nation is alone … This is an illusion … We have a strategic depth in the Islamic Republic of Iran. This country [Iran] is our powerful, dynamic, and stable depth." On November 24, 2012, the *Associated Press* reported that "Hamas' leader-in-exile Khaled Mashaal" gave "a very public thanks to Iran for standing by Gaza with crucial military assistance" while its "[f]ighters in Gaza also hailed the new reach of their arsenal, with Iranian-designed Fajr-5 rattling … Tel Aviv and Jerusalem."

1209.   Iranian terrorist leaders also publicly confirmed that the Terrorist Sponsors' support was essential to Hamas's and Palestinian Islamic Jihad's ability to conduct attacks. In 1999, for example, then Iranian foreign minister Ali Akbar Velayati—who later served as a key advisor to Khamenei and the Supreme Leader's Office—publicly admitted that "Iran is the main supporter of Hamas and Hezbollah and their struggle against Israel"—*i.e.*, Iran-sponsored terrorist (or "resistance") attacks targeting the United States in Israel. From 1999 through 2024,

the Terrorist Sponsors, and their agents, regularly made similar public admissions, the gist of which was always that such Iranians were Hezbollah's, Hamas's, and Palestinian Islamic Jihad's most important ally for specific purpose of launching attacks in Israel.

1210.   Terrorism scholars also publicly confirmed that the Terrorist Sponsors' aid was pivotal to attacks by Hamas and Palestinian Islamic Jihad. In 2007, for example, former Treasury official Dr. Matthew Levitt observed that "Hamas" was "also a massive beneficiary of support from … Iran," which "provide[d] direct state funding" to "sponsor" "terrorism" committed by Hamas. Per Dr. Levitt, "Israeli, British, Canadian, and Palestinian intelligence all concur[red] with the U.S. conclusion that Iran directly aid[ed] Hamas with money, training camps, and logistical support. Estimates of Iran's financial assistance to Hamas var[ied], but there [was] unanimity on one score: the sum [was] significant." In 2011, likewise, Iran scholar Dr. Ronen Bergman wrote:

> How much has Iran helped Palestinian terror groups? The full answer is: A great deal. Often, it came in the form of direct assistance to terrorist cells. But it has also come indirectly, in the form of intelligence sharing. For the most part, Iran has worked through Hizballah ....

1211.   Although Hamas and Palestinian Islamic Jihad had other sponsors in addition to Iran, most notably Qatar, there was never any serious question that Iran's Terrorist Sponsors were always the most important sponsors of Hamas and PIJ attacks.

1212.   BNPP assisted attacks in Israel and the Palestinian territories by providing direct and indirect financial support to the Foundation for the Oppressed, including the Foundation's agents, fronts, and components. Indeed, BNPP flowed vast profits into the hands of the Foundation for the Oppressed during the same period from 2002 through 2016 when Ayatollah Khamenei—who exercised direct control of the Foundation alongside the IRGC, Hezbollah, and

Supreme Leader's Office—was most outspoken about his support for attacks by Hezbollah, Hamas and Palestinian Islamic Jihad in Israel and the Palestinian territories.

1213.   Since the early 1980s, Hezbollah has notoriously helped exercise control over the Foundation for the Oppressed in order to enable Hezbollah's and the IRGC's use of Foundation profits to finance terrorist attacks committed by Hezbollah, Hamas, and Palestinian Islamic Jihad in Israel and the Palestinian territories. Decades of public Iranian admissions confirmed that Hezbollah and its sponsors deployed Foundation profits to finance proxy attacks in Palestinian territories, including by Hamas and Palestinian Islamic Jihad. In 1981, for example, IRGC founder, and Foundation for the Oppressed leader, Mohsen Rafiqdoost gave a speech to a Palestinian conference at which he infamously told the delegates:

> The Iranian Revolution learned a lot from the Palestinian Revolution and because of our belief in God we were capable of defeating the might of the imperialist Shah.… ***Carrying an olive branch is the beginning of your downfall, because Palestine can only be liberated through the barrel of the gun***. (Emphasis added.)

1214.   From 1981 through 2024, the Foundation for the Oppressed continued to publicly confirm—indeed, brag about—its key role in sponsoring Palestinian attacks in Israel. In 2010, for example, senior Supreme Leader's Office representative to the Foundation for the Oppressed Mohammad Hassan Rahimian publicly stated: "We have manufactured missiles that allow us, when necessary to ***replace Israel in its entirety with a big holocaust***." (Emphasis added.)

1215.   Media reports confirmed that Hezbollah and its sponsors deployed Foundation for the Oppressed profits to finance proxy attacks in Palestinian territories, including by Hamas and Palestinian Islamic Jihad. On August 3, 1993, for example, the *Washington Post* reported: "Israelis estimate that … million[s] [of] dollars ha[ve] been reaching Hamas annually from Iran, channeled through Tehran's overseas Islamic propagation organizations … known as bonyads, [which] are one key aspect of its institutional and financial support for these groups …

[including] the Bonyad Mustazaafan [Foundation for the Oppressed] .... Israeli analysts believe this is the structure that sends money to its radical Islamic movement, Hamas." On May 28, 1995, likewise, *Newsday* reported that the Foundation for the Oppressed "finance[d] mosques and Islamic centers in the United States that support Iran's militant version of Islam and provides safe haven for groups and individuals supporting . . . Hamas." In 2007, similarly, a former London bureau chief for *al Hayat*, Zaki Chehab, reported "Khomeini … lavished financial support on [terrorist] groups opposing Israel and its state television described suicide bombings as 'martyrdom operations'" which "was Hamas' gain" because "the Foundation of the Oppressed … now … above all, claim[ed] the Iran Free Press, 'facilitate[d] Iranian funding of … organizations such as … Palestinian Islamic Jihad.'" On April 19, 2019, likewise, *Al-Arab* reported:

> The IRGC … controls … the powerful bonyads, charitable foundations that run a considerable part of Iran's economy [of which the Foundation for the Oppressed was the largest]. The IRGC has been active in … the Palestinian territories [where] it supports Islamic Jihad and Hamas …. The IRGC provides money and weapons technology training, which is funneled through al-Quds force … Al-Quds Force has also been accused by the United States of plotting or carrying out terrorist attacks, directly or through its proxies, in five continents.

1216.   Terrorism scholars confirmed that Hezbollah and its sponsors deployed Foundation for the Oppressed profits to finance proxy attacks in Palestinian territories, including by Hamas and Palestinian Islamic Jihad. On September 9, 2014, for example, Jonathan Schanzer, the Vice President of Research at the Foundation for Defense of Democracies, testified to Congress that "[t]he Bonyad-e Mostazafan"—*i.e.*, Foundation for the Oppressed—was "a splinter of Iran's IRGC" and had "reportedly opened its coffers to Hamas, providing critical financial support.

1217.  BNPP also assisted attacks by Hezbollah, Hamas, and Palestinian Islamic Jihad in Israel and the Palestinian territories by providing direct, and indirect, financial support to the IRGC, including the IRGC's agents, fronts, and components. The IRGC used its BNPP-supplied dollars, BNPP-enabled access to the U.S. financial system, and BNPP-provided cover and concealment to help build, finance, and logistically sustain Hezbollah's and the Qods Force's operations in Israel and the Palestinian territories, including the joint Hezbollah/Hamas and joint Hezbollah/PIJ Cells that were a hallmark of the Iranian regime's Hezbollah directed terrorist attacks in Israel.

1218.  From 2000 through 2024, IRGC funding supplied key aid to attacks by Hamas and Palestinian Islamic Jihad by supplying the funds, weapons, logistics, and tunnels needed for such attacks. For each lane of support, the IRGC supplied vital aid to attacks by Hamas and PIJ. For example, the IRGC was amongst the largest financiers of attacks by Hamas and Palestinian Islamic Jihad in Israel, the funding for which the IRGC usually routed to Hamas and PIJ through Hezbollah and the Foundation for the Oppressed. Similarly, the IRGC was Hamas's and PIJ's most important funding source of weapons, for which the IRGC usually used Hezbollah as its interlocutor. Under the IRGC's and Hezbollah's custom and practice, Hezbollah smuggled IRGC-supplied weapons to Hamas and PIJ and trained Hamas and PIJ terrorists how to use them. The IRGC's and Hezbollah's provision of weapons to Hamas and PIJ made both FTOs more lethal and had a direct impact on both FTOs' ability to conduct attacks.

1219.  The IRGC's assistance to attacks by Hamas and Palestinian Islamic Jihad was also potent because the IRGC supplied both groups with cutting-edge human, signals, and open-source intelligence, drone and satellite imagery, and the drones and drone technologies to enable Hamas and PIJ to build their own attack-intelligence-related capabilities.

1220.   The IRGC's rocket- and drone-related assistance to Hamas and Palestinian Islamic Jihad was vital to the lethality of both FTOs' attacks using such weapons. As Hamas scholar Jonathan Schanzer noted in 2022, through its attacks in 2021, "Hamas revealed the advances it made with Iranian help, firing off larger salvos of rockets than ever before"; "as analyst Michael J. Armstrong observed, 'Accuracy has improved … About 50 per cent of the rockets arriving over Israel have threatened populated areas. That's up from 22 per cent in 2012 and 18 per cent in 2014. Fewer rockets land in empty fields after missing their targets.'"

1221.   From 2000 through 2024, the IRGC also funded Hezbollah-led provision of comprehensive, multi-month, multi-location training to, at least, hundreds of Hamas and PIJ operatives each year, including members of Hamas's and PIJ's respective leadership, operations, logistics, intelligence, and financial cells. Such IRGC sponsored, Hezbollah-led, training of Hamas and PIJ greatly—and notoriously—amplified the lethality of attacks by both groups. On October 1, 2009, for example, terrorism scholar Yossef Bodansky reported how the leader of Hamas's "Security and Protection Force - an élite element within the Izzadin al-Qassam Brigades" transformed one of Hamas's key operations arm "into a unit of 2,000 highly-trained fighters dedicated to protecting the HAMAS administration in the Gaza Strip" and supplied "VIP protection" so senior Hamas (and Hezbollah and IRGC) terrorists deployed on the ground inside the Palestinian territories and boasted that his Hamas terrorists "have benefitted from"—per Hamas—"Iranian-style VIP protection tactics and skills." On August 10, 2014, likewise, Iran scholar Ronen Bergman reported that Hamas "learned lessons and acted on them" by mandating that all or nearly all of Hamas's "battalion commanders" to have "undergone training in Lebanon or Iran" by Hezbollah and the IRGC, which afforded Hamas "major advances" in its ability to launch attacks in Israel.

1222.   U.S. government reports and statements confirmed that the IRGC supplied key support to attacks by Hezbollah, Hamas, and Palestinian Islamic Jihad in Israel. As the White House explained when it published the *National Strategy for Combating Terrorism* on September 1, 2006: "State sponsors are a critical resource for our terrorist enemies, often providing funds, weapons, training, safe passage, and sanctuary" that were vital to successful "act[s] of international terrorism," for which U.S. policy recognized that the "Islamic Revolutionary Guard Corps" was one of the Terrorist Sponsors, and one of the organizations through which "the regime in Tehran plans terrorist operations and supports groups such as Lebanese Hizballah, Hamas, and Palestine Islamic Jihad (PIJ)." Likewise, as State reported to Congress in April 2009, "Iran remained the most active state sponsor of terrorism": "Iran's involvement in the planning and financial support of terrorist attacks throughout the Middle East, Europe, and Central Asia had a direct impact" including expenditures from the "Qods Force, an elite branch of" the "IRGC" through which the "Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups." On August 3, 2010, likewise, Treasury imposed counterterrorism sanctions targeting Hezbollah and the Qods Force based upon Treasury's finding that, in "the Levant, the IRGC-QF continues to support designated terrorist groups" like "Hamas" through Qods Force-funded, Hezbollah-supplied, "training, weapons, and money to Hamas, bolstering the group's ability to maintain its armed resistance and opposition to Israeli-Palestinian peace negotiations." On April 24, 2015, similarly, House Committee on Foreign Affairs Chair Ed Royce publicly observed:

> [A]ccording to… Western Intelligence, Iran's Revolutionary Guards, during the past few months, have transferred tens of millions of dollars to Hamas' brigades. Intelligence reports show that the funds have been transferred on the direct order of the commander of the Revolutionary Guard's Elite Kurds [sic] Force [*i.e.*, Qods Force], who also dedicated an annual budget to finance Hamas' military operations. The funds, according to the intelligence report, are being used primarily to help Hamas rebuild the network of tunnels

that were destroyed. And apart from using Iranian aid to rebuild the tunnel network, the brigades are also replenishing their depleted stocks of medium range missiles according to officials.

These observations applied with equal force throughout the period from 2000 through 2024.

1223.   Public reports also routinely emphasized the IRGC's key aid to attacks by Hamas and Palestinian Islamic Jihad. On July 6, 2005, for example, Canada's *National Post* reported that the "links between Hezbollah, Iran and the Palestinian terror groups are based on multiple layers of covert contacts that wind back to" the "Iranian Revolutionary Guards Corps" that was "tasked with providing material support to terrorist organizations dedicated to fighting" the "United States" though "self-serving plans for the Palestinians" via "funding attacks" because "bloodshed" was the "only interest" of "Tehran and its terrorist proxies" Hamas and PIJ.

1224.   BNPP also assisted attacks by Hezbollah, Hamas, and Palestinian Islamic Jihad in Israel and the Palestinian territories by providing direct, and indirect, financial support to Hezbollah, including Hezbollah's agents, fronts, and components. Hezbollah used its BNPP-supplied dollars, BNPP-enabled access to the U.S. financial system, and BNPP-provided cover and concealment to help build, finance, and logistically sustain Hezbollah's and the Qods Force's operations in Israel and the Palestinian territories, including the joint Hezbollah/Hamas and joint Hezbollah/PIJ Cells that were a hallmark of the Iranian regime's Hezbollah directed terrorist attacks in Israel.

1225.   Hezbollah strategically deployed Terrorist Sponsors' funds, weapons, and logistics support to power attacks by Hamas and Palestinian Islamic Jihad. On September 29, 2006, for example, Frank C. Urbancic, Principal Deputy Coordinator at State, testified that "Hizballah supports … Palestinian terrorist organizations" through "the covert provision of weapons, explosives, training, funding, and guidance, as well as overt political support" since "at

least 2000" for which "Hizballah actively foments terrorist activity that directly undermines" the Israeli-Palestinian peace process that the Terrorist Sponsors, Hamas, and PIJ always opposed through terrorist violence.

1226.   Hezbollah's assistance to Hamas and Palestinian Islamic Jihad was inextricably linked to attacks by both groups because Hezbollah notoriously focused its efforts on financing the Hamas and PIJ operations cells responsible for conducting attacks. On July 6, 2005, likewise, Canada's *National Post* reported that "about 50 squads of six to eight gunmen in the West Bank, most of them affiliated with the Al-Aqsa Martyrs Brigade, are directly funded by Hezbollah via Iran" through Hezbollah funding attacks" by "its terrorist proxies" Hamas and PIJ to create "bloodshed."

1227.   Hezbollah supplied vital training to Hamas and Palestinian Islamic Jihad that was the difference-maker in both groups' abilities to conduct effective—and lethal—attacks.

1228.   BNPP also assisted attacks by Hezbollah, Hamas, and Palestinian Islamic Jihad in Israel and Palestinian territories by providing direct and indirect financial support to Ayatollah Ali Khamenei, the Supreme Leader's Office, and Khamenei's and the SLO's respective agents, fronts, and components. Khamenei and the SLO used their BNPP-supplied dollars, BNPP-enabled access to the U.S. financial system, and BNPP-provided cover and concealment to help build, finance, and logistically sustain Hezbollah's and the Qods Force's operations in Israel and the Palestinian territories, including the joint Hezbollah/Hamas and joint Hezbollah/PIJ Cells that were a hallmark of the Iranian regime's Hezbollah directed terrorist attacks in Israel.

1229.   From 1990 through 2024, Ayatollah Khamenei was always notorious, and key, financial, logistical, and operational enabler of terrorist attacks targeting the United States in Israel and the Palestinian territories by Hezbollah, Hamas, and Palestinian Islamic Jihad.

1230.   When BNPP flowed funds to Khamenei and the Supreme Leader's Office, they supplied the essential funding for Khamenei's and the SLO's: (1) direct support of Hamas and PIJ attacks, *e.g.*, through costly SLO fundraising campaign for Hamas and PIJ, for which the SLO had to spend money so Hamas and PIJ could make the money they needed to attack Plaintiffs; and (2) indirect support of Hamas and PIJ attacks, *e.g.*, by funding the SLO's financing of Hezbollah, IRGC-QF, and IRGC-IO operatives (including Khamenei Cell members) who assisted Hamas's and PIJ's attacks against Plaintiffs.

1231.   U.S. government statements and findings confirmed that the Supreme Leader's Office relied upon the funds it generated to finance attacks sponsored by Hezbollah and its proxies in the Middle East, including Hamas and Palestinian Islamic Jihad. On November 4, 2019, for example, Treasury sanctioned the Supreme Leader's Office and its senior officials, including Mojtaba Khamenei, based upon a finding that the profits they controlled directly funded Khamenei Cell-sponsored proxy attacks throughout the Middle East, necessarily including attacks by Hamas and PIJ in Israel. On November 3, 2022, likewise, Treasury confirmed that "high-ranking Iranian officials associated with the U.S.-designated Iranian Supreme Leader's Office" helped Hezbollah and the Qods Force "to direct" Iranian regime "profits to companies and bank accounts associated with Hizballah and the IRGC-QF" as part of "Hizballah and the IRGC-QF's attempts to generate revenue" to "enable their terrorist activities around the world."

1232.   Terrorist Sponsors' public pronouncements confirmed that the Supreme Leader's Office relied upon the funds it generated to finance attacks sponsored by Hezbollah and its proxies in the Middle East, including Hamas and Palestinian Islamic Jihad. In or about May 2020, for example, Ayatollah Khamenei publicly decreed: "Iran realized Palestinian fighters'

only problem was lack of access to weapons. With divine guidance and assistance, we planned, and the balance of power has been transformed in Palestine, and today the Gaza Strip can stand against the aggression of the Zionist enemy and defeat it."

1233.   Terrorism scholars confirmed that the Supreme Leader's Office relied upon the funds it generated to finance attacks sponsored by Hezbollah and its proxies in the Middle East, including Hamas and Palestinian Islamic Jihad. On February 24, 2020, for example, Dr. Yossi Mansharof, of the Jerusalem Institute for Strategy and Security, observed: "Despite the sanctions Iran is facing, its leader, Ali Khamenei, is determined to keep funding Palestinian terror against Israel – even if the scale of support is reduced."

1234.   From 2002 through 2016, BNPP's scheme financed Hezbollah's Palestinian Islamic Jihad's, and Hamas's attacks in Israel and the Palestinian territories, including those against Plaintiffs. All terrorist groups derived vital aid from Ayatollah Khamenei, the Supreme Leader's Office, Foundation for the Oppressed, IRGC, and Hezbollah, who collectively underwrote an outsized majority percentage of Hezbollah's operations budget, as well as a substantial source of financing, through Hezbollah, to Hamas and PIJ in the Palestinian territories, Lebanon, and Syria, all of which paid for the expenditures needed to, organize, train, arm, and logistically sustain such Iranian proxies in Iraq while they attack Americans there through joint Hezbollah/Hamas and Hezbollah/PIJ cells in key locations throughout these areas.

1235.   Ayatollah Khamenei, the Supreme Leader's Office, IRGC, Foundation for the Oppressed, and Hezbollah financed Hamas and PIJ attacks through a range of vehicles, including salary and bonus payments to Hamas and PIJ leaders and attack cells, bounties for successful Hamas and PIJ attacks, and martyr payments to the families of dead Hamas and PIJ terrorists. From 2007 through 2024, the Iranian regime did so by collectively routing between $50 million

and $300 million per year to Hamas and PIJ each through the above organs, which sums were ***in***

***addition to*** the value of the weapons, training, and logistical support provided by the Terrorist

Sponsors to Hamas and PIJ. Once the cost of those aspects of their support is included, the

Terrorist Sponsors were likely spending in excess of $500 million per year, collectively, to

support Hamas and PIJ attacks each year from 2017 through 2024, when every Plaintiff was

attacked by Hamas and/or PIJ.

1236.   Terrorist Sponsors supplied key aid to Hezbollah-directed, Hamas- and

Palestinian Islamic Jihad-committed attacks in Israel for at least five reasons. *First*, When

Terrorist Sponsors financed Hamas and PIJ, they earmarked their money for use by Hamas's and

PIJ's attack cells, which made their funds uniquely lethal. As Dr. Levitt noted in 2007:

> Unlike much of the [non-Iranian sources of Hamas] financing …, Iranian funding of Hamas is generally … ***directed straight to operational units***. According to a December 2000 Palestinian intelligence report confiscated by Israeli authorities, Iran had transferred $400,000 directly to Hamas' Qassam Brigades to specifically support "the Hamas military arm in Israel and encouraging suicide operations," and another $700,000 to other Islamic organizations opposed to the PA.
>
> According to a former Jordanian prime minister, "grassroots fundraising is really not enough for big Hamas operations. Most of the support [for such operations] is from Iran. Iran's money is more influential." A senior Fatah official and member of the Palestinian Legislative Council offered a similar assessment, saying that while "some of Tehran's money over the past three years [2001- 2004] may go to supporting health and humanitarian services in Gaza," the bottom line is that the "money from Tehran that goes to Hamas is for the political leaders of Hamas and for the bombings, not for the Palestinians." (Emphasis added.)

1237.   *Second*, Terrorist Sponsors notoriously funded—through Hezbollah and the

Foundation for the Oppressed—most of the martyr payments that Hamas and Palestinian Islamic

Jihad paid to the families of terrorists killed while conducting attacks. On February 25, 2016, for

example, the *Times of Israel* and other media outlets reported that Qods Force operative

Mohammad Fateh Ali—who served the IRGC-QF under illegal cover as Iran's ambassador to

Lebanon—stated at a press conference that the Iranian regime had substantially increased the

amount it would pay to Hamas and PIJ martyr families moving forward as payment for, and incentive for, such groups to continue to conduct their attacks targeting the United States in Israel, which he announced would now be at least $7,000 to the families of "martyrs of the intifada in occupied Jerusalem."

1238.    *Third*, Terrorist Sponsors leveraged their respective purchasing powers, logistics networks, and in-house resources to substantially drive down the cost of Iranian-funded, Hezbollah-directed, weapons, training, and logistical support to attacks by Hamas and Palestinian Islamic Jihad, including attacks enabled by Iranian purchasing of Hezbollah-supervised tunnel construction for Hamas and PIJ's attack tunnels. Per Treasury's *2024 National Terrorist Financing Risk Assessment*, "Hamas has advanced military capabilities at its disposal, partly as a result of decades of accumulating weapons through Iranian government support." On November 9, 2023, likewise, former State official Gabriel Noronha testified to Congress:

> While Iranian and their proxies' attacks on U.S. forces and interests are typically based on immediate strategic needs, opportunities, and perceptions of American willingness to respond, the terror networks personnel, operations, and the weapons they use rely on steady and predictable financial support from the Iranian regime. Lack of funding forces Iranian-backed terror groups to spend enormous political, diplomatic, and operational capital to find alternative sources of support to sustain and advance their terror plans, while pushing the groups to layoff large numbers of their terrorist fighters and personnel. Alternatively, recent increases in Iranian funding to Hamas provided them the opportunity to take advantage of strategic patience in plotting and executing their October 7 attacks.

1239.    Hamas's and Palestinian Islamic Jihad's Iranian funded, Hezbollah directed, North Korean RGB-built, attack tunnels notoriously powered Hezbollah-sponsored attacks by Hamas and PIJ in Israel from the 2000s through 2024. On August 24, 2015, for example, the *Times of Israel* reported that "Iran is financing Hamas' building of new underground tunnels to attack Israel." On September 8, 2015, likewise, Representative Lois Frankel publicly warned: "New reports indicate that Iran is funding the rebuilding of Hamas' sophisticated tunnel network

to attack Israeli civilians." On November 21, 2017, similarly, the *Jerusalem Post* reported that Israelis had "discovered" at least "32" Hamas and PIJ "tunnels" during such FTOs' attacks in 2014, "including 14 that extended into Israel" and "Hamas and [Palestinian] Islamic Jihad have made no secret of the fact that the ongoing construction of new attack tunnels remains one of their top priorities with massive financial and manpower resources channeled to such projects." On December 4, 2018, moreover, *Reuters* reported that "Israel" had "target[ed] 'Hezbollah Attack Tunnels'" because "Israel's vulnerability to tunnels was laid bare" through "Hamas" attacks "in Gaza in 2014, when Palestinian militants used dozens of secret passages dug from Gaza into Israel to carry out ambushes."

1240.  *Fourth*, Terrorist Sponsors' funds notoriously supplied the money to pay for vital terrorist training camps in Lebanon, Syria, Iran, and North Korea (among other places) purpose-built to facilitate attacks by Hezbollah, Hamas, and Palestinian Islamic Jihad in Israel. On July 6, 2005, for example, Canada's *National Post* reported: "It has long been known in intelligence circles that Iran's terrorist proxy in southern Lebanon, Hezbollah, has been training Palestinian terror groups, including Hamas" and "[Palestinian] Islamic Jihad" because "Hezbollah's masters in Tehran" always "delighted in fighting a war by proxy against the hated 'Zionist Entity'" and so, "on instructions from Iran, Hezbollah started a recruiting campaign, targeting Palestinian militants soon after the outbreak of the second Intifada in September, 2000" and the resulting Israeli interdictions in 2002 and thereafter of Iranian-supplied, Hezbollah-shipped, weapons to Hamas and PIJ - which "included Katyusha rockets with a 20-kilometre range, anti-tank missiles, mortars, mines, sniper rifles, ammunition and more than two tons of high explosives"—supplied "the smoking gun proving Iran's involvement in Palestinian terror."

1241.   *Fifth*, Terrorist Sponsors supplied especially lethal aid because of their famous "pay for performance" approach with Hamas and Palestinian Islamic Jihad, under which the Iranians would ramp up their financial support for such groups to reward them for successful attacks and incentivize future attacks at the same time. United States officials publicly confirmed the sum and substance of this approach. On April 17, 2008, for example, senior Treasury official Daniel Glaser testified before Congress: "In the case of PIJ, Iran's financial support has been contingent upon the terrorist group carrying out attacks against Israel." (The reason for PIJ applied equally to Hamas.) Likewise, as Dr. Levitt explained in 2007, "the specific sum [] fluctuates given circumstances on the ground; Iran is known to employ a performance-based approach to determining the level of funding it is willing to provide terrorist groups. As a U.S. court noted in *Weinstein v. Iran*, the period of 1995-1996 'was a peak period for Iranian economic support of Hamas because Iran typically paid for results, and Hamas was providing results by committing numerous bus bombings.'"

### 2.    BNPP Contributed to the Specific Attacks in Israel that Killed and Injured Plaintiffs by Funding the Individual Hezbollah, Hamas, and PIJ Terrorists and Cells that Committed Such Attacks

1242.   The Khamenei Cell was the most prominent cell that ensured a direct link between BNPP and the attacks that targeted Plaintiffs in Israel.

1243.   Consistent with the mandatory donations (*khums*), about 20% of all profits generated by BNPP flowed up to the Khamenei Cell as *khums*, before Khamenei (and Soleimani, to whom Khamenei usually delegated such decisions) redistributed the funds back to Khamenei Cell members, *e.g.*, Hassan Nasrallah, to finance the attacks they sponsored, including in Israel.

1244.   BNPP's illicit transactions helped the Khamenei Cell play a key role in the Hezbollah, Hamas, and PIJ attacks in Israel that killed and injured Plaintiffs. From 2000 through 2020, the Khamenei Cell typically captured about 20% of the income generated through any

entity he controlled, including the Foundation for the Oppressed, SLO, IRGC, and Hezbollah – including the profits caused by the transactions that BNPP illicitly managed. Given this standard practice, and the volume of profits generated by BNPP, the Bank's illicit conduct likely delivered well in excess of at least $20 million per year to each Khamenei Cell leader for the specific lane below, *e.g.*, at least $20 million through the Supreme Leader's Office, which funds Mohsen Rezai and Mojtaba Khamenei ultimately controlled alongside Qasem Soleimani and spent funding Hezbollah attacks. Indeed, BNPP likely collectively delivered ***well more than $100 million per year*** to the Khamenei Cell each year the Cell enabled the Hezbollah-led attacks that killed and injured Plaintiffs in Israel. Notably, these numbers are inherently conservative because they do not reflect the intended, measurable, second-order economic effects of BNPP's illicit transactions with, and for the benefit of, the Terrorist Sponsors. Accordingly, it is likely that even the above numbers underestimate the magnitude of dollars that BNPP flowed to the specific terrorists below. BNPP, however, likely has substantial information that would tend to corroborate Plaintiffs' allegations, including, but not limited to, BNPP's sophisticated analyses of the petroleum, transportation, and construction sectors, and other economic considerations known to BNPP, for which sanctions evasion has foreseeable—and intended—second order benefits for the evading parties and the attacks they sponsor.

1245. BNPP's assistance had a tight nexus with the Hezbollah, Hamas, and PIJ attacks that killed and injured Plaintiffs in Israel. Under the Terrorist Sponsors' custom and practice, BNPP's funds were systematically routed to key members of the Khamenei Cell who served as aggregators to sponsor attacks by Hezbollah (as the direct beneficiary) and Hamas and PIJ (as indirect beneficiaries, via Hezbollah) and were specifically tasked by Khamenei to ensure that the Terrorist Sponsors' illicit oil and commercial profits were directly routed to Gaza-, Lebanon-,

and Syria-based operations cells of Hezbollah and, through Hezbollah, Hamas and PIJ, under a tightly regulated process through which these terrorists programmatically operationalized into such Hezbollah, Hamas, and PIJ attacks in Israel against Plaintiffs.

### a. BNPP's Money Reached Key Khamenei Cell Terrorists Responsible for Attacks in Israel

1246.   BNPP directly and indirectly funded each identified Hezbollah, Hamas, and PIJ terrorist or sponsor below through the hundreds of millions—if not billions—in off-the-books illicit profits that it generated for the Terrorist Sponsors via the Foundation for the Oppressed, Supreme Leader's Office, KAA, and NIOC profits, among other sources. Each Hezbollah, IRGC, Foundation for the Oppressed, and Supreme Leader's Office member of the Khamenei Cell identified below was a relevant decisionmaker regarding what happened to the specific profits generated by BNPP once they were realized by the Foundation, SLO, NIOC, KAA, Caspian Petrochemical, and the other operations fronts upon which the Terrorist Sponsors relied to enable their attacks.  As set forth below, the hardened "Death to America"-chanting terrorists to whom BNPP illicitly supplied at least hundreds of millions, if not billions, in USD-denominated funds and profits, predicably chose to use much of their BNPP-fueled profits to finance, arm, source fighters for, and logistically support, the attacks by Hezbollah, Hamas, and PIJ in Israel that killed and injured Plaintiffs.  Such individual Khamenei Cell members included, but were not limited to:

1247.   **Hassan Nasrallah** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Israel by Hezbollah, Hamas, and PIJ, for which he supplied key funds, recruits, logistical aides, and intelligence support. Nasrallah was always a key sponsor of Hezbollah, Hamas, and PIJ attacks in Israel, for which he supplied key funds, recruits, logistical aides, and intelligence support.

Indeed, Nasrallah boasted about his role propagating such attacks to target the United States. In 2004, for example, State reported to Congress that "Hizballah Secretary General Hassan Nasrallah stated in speeches that 'we are heading . . . toward the end and elimination of Israel from the region' and that the group's 'slogan is and will continue to be death to America.'"

1248.    **Imad Mugniyeh** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Israel by Hezbollah, Hamas, and PIJ, for which he supplied key funds, recruits, logistical aides, and intelligence support, until his death in a counterterrorism strike in 2008.

1249.    **Muhammad Kawtharani** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Israel by Hezbollah, Hamas, and PIJ, for which he supplied key funds, recruits, logistical aides, and intelligence support. As a member of the Khamenei Cell from, at least, 2007 until 2024, Kawtharani was always one of Hezbollah most senior Khamenei-facing, operations-related, liaisons tasked with Hezbollah's sponsorship of attacks targeting the United States in Israel. Kawtharani worked closely with, and was a Hezbollah liaison for, Khamenei, Nasrallah, and Mugniyeh, among others.

1250.    **Khalil Harb** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Israel by Hezbollah, Hamas, and PIJ, for which he supplied key funds, recruits, logistical aides, and intelligence support. U.S. government findings confirmed it. Treasury designated Harb as an SDGT on August 22, 2013 "pursuant to Executive Order 13224" given his role as a senior Hezbollah operative who was "responsible for operations throughout the Middle East," "served as commander of a Lebanon-based Hizballah special unit that focused on Israel," had been "given

responsibility for overseeing work of the Islamic Resistance, including assisting with the smuggling of Hamas and Palestinian Islamic Jihad operatives from Syria into the West Bank via Jordan" since 2000, had served as "head of the Syrian/Jordan/Israel/Egypt operations unit, which was subordinate to Hizballah's Islamic Jihad council" since 2003, and "served as Hizballah's chief of military liaison with the Palestinian factions and Iran, dealing almost exclusively with Palestinians and Iranians inside and outside the territories" since 2006, prior to which "Harb had served as Hizballah's chief of military special operations." Per Treasury, by "early 2007, Khalil Harb was chief of Hizballah's Unit 1800, also known as Hizballah's Nun Unit, the Hizballah entity responsible for supporting Palestinian militants and conducting Hizballah operations in the countries surrounding Israel, and he travelled to Iran for meetings regarding coordination between Hizballah, Iran, and the Palestinians." "In February 2010," per Treasury, "Harb, serving as the leader of the Palestinian activities for Hizballah, planned unspecified attacks against Israeli officials in Israel, in retaliation for the assassination of former Hizballah External Security Organization (ESO) chief Imad Mughniyah." "By mid-May 2010," per Treasury, "Hizballah created a new position for Harb as 'advisor to the Secretary General,' which provided Harb oversight of Hizballah Unit 1800, which he previously commanded." From 2007 through 2024, Harb was always a key sponsor of attacks by Hezbollah, Hamas, and PIJ in Israel.

1251. **Muhammad Yusuf Ahmad Mansur** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Israel by Hezbollah, Hamas, and PIJ, for which he supplied key funds, recruits, logistical aides, and intelligence support. U.S. government findings confirmed it. On August 22, 2013, Treasury sanctioned Mansur as an SDGT "pursuant to Executive Order 13224" given his role as a senior Hezbollah operative who was "responsible for operations throughout the Middle

East," "served as the Egypt-based cell leader" of a "Hizballah cell" responsible for "planning to carry out terrorist operations against Israeli and other tourists in Egypt" and "transporting arms and equipment to Palestinian militants" in Gaza, for which Hezbollah and Hamas relied upon tunnels running from Gaza to Egypt.

1252.    **Parviz Fattah** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Israel by Hezbollah, Hamas, and PIJ, for which he supplied key funds, recruits, logistical aides, and intelligence support. Fattah was always a key sponsor of Hezbollah, Hamas, PIJ, and the Houthis in Israel and Yemen, for which he supplied key funds, recruits, logistical aid, and intelligence support. For example, as Dr. Majid Rafizadeh explained in an analysis published by *Eurasia Review* on August 24, 2020, "Parviz Fattah, the head of the Mostazafan Foundation," was one of the key members of the "Iranian regime" who routed "billions of dollars and other resources" that the Terrorist Sponsors "lavishe[d] on violent proxies across the Middle East's hotspots" by "squandering the nation's resources on terror and militia groups," like "Hezbollah and the Houthis" and Fattah "publicly announced" that the Terrorist Sponsors did "not have the money required to pay their mercenaries abroad."

1253.    **Mohsen Rafiqdoost** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Israel by Hezbollah, Hamas, and PIJ, for which he supplied key funds, recruits, logistical aides, and intelligence support.

1254.    Rafiqdoost was the former personal bodyguard and driver of Khomeini; presided over the largest *bazaari* network in Iran, Iraq, Lebanon, and Syria; founded the IRGC in 1979; co-founded Hezbollah in 1982; masterminded (alongside Imad Mugniyeh) Hezbollah's 1983

attacks targeting the United States in Lebanon, which killed hundreds of Americans; and served as de-facto leader of the Foundation for the Oppressed from 1989 through 2024.

1255.   Regardless of title, Mohsen Rafiqdoost always served as one of Khamenei's key inner circle operatives responsible for securing weapons for Hezbollah, the IRGC, Hamas, PIJ, and JAM, which included acquisitions secured through Iranian arms, training, and tunnel purchases supplied by North Korea's terrorist arm, the RGB **and** via Iranian-developed weapons built by firms controlled by the Foundation for the Oppressed, IRGC, and Supreme Leader's Office. For both lanes of Hezbollah, Hamas, PIJ, and JAM weapons acquisition, Rafiqdoost sat at the intersection of both relationships (*i.e.*, he knew the key players in North Korea, Lebanon, Iraq, and the Palestinian territories), transportation (*i.e.*, he knew how to move weapons from North Korea to places like the Palestinian territories), and logistics (*i.e.*, he knew how to distribute such weapons in a methodical way once they were in-country in order to maximize the killing power that the terrorists could extract from their use of the weapons he helped supply).

1256.   **Qasem Soleimani** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Israel by Hezbollah, Hamas, and PIJ, for which he supplied key funds, recruits, logistical aides, and intelligence support. Indeed, Soleimani admitted it in his infamous letter to General Petraeus, and Soleimani's admission continued to accurately describe his role from 2007 through 2020. Soleimani was always a key sponsor of attacks by Hezbollah, Hamas, and PIJ in Israel, for which he supplied key funds, recruits, logistics, and intelligence support. Indeed, Soleimani admitted it in his infamous letter to General Petraeus. Moreover, after the end of one Hamas's attack campaign in 2014, per Iran scholar Jonathan Schanzer in 2022, "Qassem Soleimani, Quds Force commander and a favored Khamenei protégé, described Hamas leaders as 'my dear brothers' and

reaffirmed Tehran's support." As IRGC media arm *Fars News Agency* reported on July 31, 2014 (emphasis added):

> Qassem Soleimani reiterated Iran's call for ***supplying the Palestinian Resistance Movement of Hamas and its affiliated brigades with more weapons*** to [use] … against the Israeli army. [Soleimani] underlined that confronting the Zionist enemy is a necessity, and expressed hope that the Palestinian resistance movement would ***turn land and sky into hell for the Zionists soon through its massive … operations.*** He further rooted out the issue of preventing the Palestinians from receiving weapons and ammunitions, and said, ***"Disarmament of resistance is daydream that will only come true in the graveyard (for the Zionists)."***

Soleimani's public call for his followers to supply Hamas and PIJ with funds and weapons with which to attack Israel was widely documented by media outlets in real-time, including, inter alia, separate reports published by the BBC (republishing *Fars*), *Agence France Presse English Wire*, and *Israel National News* on July 31, 2014.

1257.   **Esmail Qaani** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Israel by Hezbollah, Hamas, and PIJ, for which he supplied key funds, recruits, logistical aides, and intelligence support. After he took over for Soleimani in 2020, Qaani performed the same general functions as Soleimani had done with respect to Hezbollah, Hamas, and PIJ attacks in Israel. On August 2, 2022, for example, Iran scholar Jonathan Schanzer observed that examples of how "Tehran" publicly touted its support for Hamas in "[d]uring" Hamas's terrorist campaign of attacks in Israel in "2021" included, *inter alia*, that "Esmail Qaani, who succeeded Soleimani as Quds Force commander, called Hamas leader Ismail Haniyeh to offer moral support and lauded Hamas military chief Muhammad Deif as a 'living martyr'" and an "IRGC statement warned that 'in the future, the Zionists can expect to endure deadly blows from within the occupied territories.'"

1258.  **Rostam Qasemi** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Israel by Hezbollah, Hamas, and PIJ, for which he supplied key funds, recruits, logistical aides, and intelligence support. U.S. government findings effectively confirmed it, because Qasemi led the Hezbollah/Qods Force oil-smuggling networks that BNPP illicitly aided through its transactions alleged herein.

1259.  **Mojtaba Khamenei** and **Gholam-Ali Hadad-Adel** were each a member of the Khamenei Cell and used BNPP's funds routed to them through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Israel by Hezbollah, Hamas, and PIJ, for which they supplied key funds, recruits, logistical aid, and intelligence support. Hadad-Adel was Mojtaba's father-in-law; both worked closely with Ayatollah Ali Khamenei and every other member of the Khamenei Cell as, among other things, one of the Supreme Leader's primary gatekeepers and interlocutors with all these proxies. Indeed, U.S. government findings confirmed that the illicit petroleum transactions—like those enabled by BNPP—supplied the key stockpile of dollars and tangible assets upon which Mojtaba and Hadad-Adel relied to help the Terrorist Sponsors commit Hezbollah-led attacks throughout the Middle Esat, including Hezbollah-directed attacks Iraq by Jaysh al-Mahdi, including Treasury designation of Mojtaba Khamenei and Gholam-Ali Hadad-Adel on  November 5, 2019 under its counterterrorism authorities "pursuant to E.O. 13876" based upon findings that both directly enabled Hezbollah-directed attacks by Iranian proxies throughout the Middle East. The same findings confirmed the inextricable nexus between the Khamenei Cell and Petro Nahad and Hezbollah- and Qods Force-sponsored attacks supported by Hassan Nasrallah and Qasem Soleimani in Israel—which describes every attack against Plaintiffs and their loved ones and were, by their terms, were applicable to the Supreme Leader's

Office's activities from the early 1980s through at least 2019. Among other reasons, U.S. officials publicly confirmed this, as Treasury, and State (through Secretary of State Pompeo) both did on November 4, 2019.

1260. **Mohsen Rezai** was a member of the Khamenei Cell and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Israel by Hezbollah, Hamas, and PIJ, for which he supplied key funds, recruits, logistical aides, and intelligence support. Mohsen Rezai was always a key sponsor of Hamas and PIJ attacks in Israel, for which he supplied key funds, recruits, logistics, and intelligence support. Indeed, Rezai regularly boasted about the key role that he had played for decades in sponsoring terrorist attacks in Israel. On August 5, 2014, for example, the *Chicago Tribune* reported that "senior Iranian officials said [] that Tehran has supplied missile technology to Hamas in its fight against Israel. … Mohsen Rezaei, a senior adviser to Iran's supreme leader, Ayatollah Ali Khamenei, said Tehran had already provided Hamas with missile-building technology." As Mohsen Rezai infamously proclaimed on October 21, 1991, similarly: "The day will come when, like Salman Rushdie, the Jews will not find a place to live anywhere in the world."

1261. **Ismail Haniyeh** was a member of the Khamenei Cell from at least 2000 until his death in 2024 and used BNPP's funds routed to him through Terrorist Sponsors and the Khamenei Cell to sponsor attacks in Israel by Hezbollah, Hamas, and PIJ, for which he supplied key funds, recruits, logistical aides, and intelligence support.

1262. **Yahya al-Sinwar** was a member of the Khamenei Cell from at least 2000 until his death in 2024 and used BNPP's funds routed to him through Terrorist Sponsors and Khamenei Cell to sponsor attacks in Israel by Hezbollah, Hamas, and PIJ, for which he supplied key funds, recruits, logistical aides, and intelligence support.

**b. Khamenei Cell Terrorists Funded by BNPP Directly Participated in the Attacks that Killed and Injured Plaintiffs in Israel**

1263.   BNPP financed the specific cell and operatives who helped Hezbollah sponsor, and in sometimes jointly commit, Hezbollah's, Hamas's, and PIJ's attacks in Israel that killed and injured Plaintiffs or their loved ones by financing the Khamenei Cell and key Khamenei Cell operatives from Hezbollah, the Foundation for the Oppressed, IRGC, and Supreme Leader's Office, including those identified herein. Among others, Ali Khamenei, Hassan Nasrallah, Imad Mugniyeh, Muhammad Kawtharani, Khalil Harb, Muhammad Yusuf Ahmad Mansur, Parviz Fattah, Mohsen Rafiqdoost, Qasem Soleimani, Esmail Qaani, Rostam Qasemi, Mojtaba Khamenei, Gholam-Ali Hadad-Adel, Mohsen Rezai, Ismail Haniyeh, and Yahya al-Sinwar, and the Khamenei Cell directly participated in Hezbollah's, Hamas's, and PIJ's attacks in Israel that killed and injured Plaintiffs as follows:

1264.   **Hostage-Taking Attacks in Israel.** Ali Khamenei, Hassan Nasrallah, Imad Mugniyeh, Muhammad Kawtharani, Khalil Harb, Muhammad Yusuf Ahmad Mansur, Parviz Fattah, Mohsen Rafiqdoost, Qasem Soleimani, Esmail Qaani, Rostam Qasemi, Mojtaba Khamenei, Gholam-Ali Hadad-Adel, Mohsen Rezai, Ismail Haniyeh, and Yahya al-Sinwar, and the Khamenei Cell directly participated in Hezbollah's, Hamas's, and PIJ's hostage-taking attacks in Israel from 2008 through 2016, including the attacks that killed or injured the following Plaintiffs: Kristine Luken and Yaakov Fraenkel. That role included ordering and/or managing the decision:

a.     forward deploying senior Hezbollah terrorists, including but not limited to Khalil Harb and Muhammad Yusuf Ahmad Mansur, to coordinate hostage-taking attacks to target the United States through U.S. ally Israel;

b.     targeting specific geographies in Israel, where Hamas and PIJ were encouraged to kidnap civilians;

c.  providing technical assistance to Hamas and PIJ with respect to hostage-taking concepts, including Hezbollah's notorious hostage-taking experts and training in Lebanon;

d.  training senior Hamas and PIJ terrorist commanders in Lebanon, Iraq, and Iran with respect to all aspects of the hostage-taking network, including attack strategy;

e.  training lower-level Hamas and PIJ members in camps in Lebanon, Iraq, and Iran with respect to hostage-taking tactics;

f.  supplying vital pre-attack intelligence that materially strengthened the lethality of Hezbollah's, Hamas's, and PIJ's hostage-taking attacks, *e.g.*, drone or satellite imagery data about potential locations to kidnap hostage targets; and

g.  approving, and funding, the attack incentive and reward payments alleged herein, including, but not limited to, martyr payments and salary payments.

1265.  **Rocket and Mortar Attacks in Israel.** Ali Khamenei, Hassan Nasrallah, Imad Mugniyeh, Muhammad Kawtharani, Khalil Harb, Muhammad Yusuf Ahmad Mansur, Parviz Fattah, Mohsen Rafiqdoost, Qasem Soleimani, Esmail Qaani, Rostam Qasemi, Mojtaba Khamenei, Gholam-Ali Hadad-Adel, Mohsen Rezai, Ismail Haniyeh, and Yahya al-Sinwar, and the Khamenei Cell directly participated in Hezbollah's, Hamas's, and PIJ's rocket and mortar attacks in Israel from 2007 through 2016, including the attacks that killed or injured Plaintiff Shmuel Brauner. That role included ordering and/or managing the decision:

a.  forward deploying senior Hezbollah terrorists, including but not limited to Khalil Harb and Muhammad Yusuf Ahmad Mansur, to coordinate rocket and mortar attacks against Americans, including strategic escalations of them timed to maximize the Terrorist Sponsors' pressure over the United States, *e.g.*, the joint Hezbollah/JAM Baghdad cell's rocket attacks targeting the U.S. Embassy there in March 2008 that preceded, and were the but-for cause of, the Battle of Sadr City;

b.  targeting specific geographies in Israel where Hamas and PIJ were encouraged to launch rocket and mortar attacks;

c.  providing technical assistance to Hamas and PIJ with respect to rocket and mortar schematics and concepts;

d.  helping manufacture rockets and mortars for use against the United States in Israel;

e.    facilitating the regular resupply of the rockets and mortars from Iran and North Korea's RGB to Hezbollah, Hamas, and PIJ in Gaza, Lebanon, and Syria, as coordinated by, *inter alia*, Hezbollah;

f.    training senior Hamas and PIJ terrorist commanders in Lebanon, Iraq, and Iran with respect to all aspects of the rocket and mortar network, from design, to manufacture, to transportation, to attack strategy;

g.    training lower-level Hamas and PIJ members in camps in Lebanon, Iraq, and Iran with respect to rocket and mortar tactics;

h.    supplying vital pre-attack intelligence that materially strengthened the lethality of Hezbollah's, Hamas's, and PIJ's rocket and mortar attacks, *e.g.*, drone or satellite imagery data about the attack target; and

i.    approving, and funding, the attack incentive and reward payments alleged herein, including, but not limited to, martyr payments and salary payments.

1266.    **Small Arms, Sniper, Mass Shooting, and Assassination Attacks in Israel.** Ali Khamenei, Hassan Nasrallah, Imad Mugniyeh, Muhammad Kawtharani, Khalil Harb, Muhammad Yusuf Ahmad Mansur, Parviz Fattah, Mohsen Rafiqdoost, Qasem Soleimani, Esmail Qaani, Rostam Qasemi, Mojtaba Khamenei, Gholam-Ali Hadad-Adel, Mohsen Rezai, Ismail Haniyeh, and Yahya al-Sinwar, and the Khamenei Cell directly participated in Hezbollah's, Hamas's, and PIJ's small arms-based mass shooting and assassination attacks in Israel from 2008 through 2016, including the attacks that killed or injured the following Plaintiffs: Avraham Moses, Naftali Shitrit, Yehuda Glick, Richard Lakin, Ronen Borochov, Eli Borochov, and Josef Borochov. That role included ordering and/or managing the decision:

a.    forward deploying senior Hezbollah terrorists, including but not limited to Khalil Harb and Muhammad Yusuf Ahmad Mansur, to coordinate mass shooting and assassination attacks involving small arms;

b.    helping manufacture small arms for use against the United States in Israel;

c.    facilitating the regular resupply of the small arms, including military-grade automatic rifles, sniper rifles, and associated ammunition and support systems, from Iran and North Korea's RGB to Hezbollah, Hamas, and PIJ in Gaza, Lebanon, and Syria, as coordinated by, *inter alia*, Hezbollah;

d.     training senior Hamas and PIJ terrorist commanders in Lebanon, Iraq, and Iran with respect to all aspects of small arms, mass shooting, and assassination attack logistics, training, doctrine, and strategy;

e.     training lower-level Hamas and PIJ members in camps in Lebanon, Iraq, and Iran with respect to small arms, mass shooting, and assassination tactics; and

f.     approving, and funding, the attack incentive and reward payments alleged herein, including, but not limited to, martyr payments and salary payments.

1267.   **Blade and Vehicle Attacks in Israel.** Ali Khamenei, Hassan Nasrallah, Imad Mugniyeh, Muhammad Kawtharani, Khalil Harb, Muhammad Yusuf Ahmad Mansur, Parviz Fattah, Mohsen Rafiqdoost, Qasem Soleimani, Esmail Qaani, Rostam Qasemi, Mojtaba Khamenei, Gholam-Ali Hadad-Adel, Mohsen Rezai, Ismail Haniyeh, and Yahya al-Sinwar, and the Khamenei Cell directly participated in Hamas's and PIJ's blade attacks, *i.e.*, stabbing the victim with a knife or machete, and vehicle attacks, *i.e.*, ramming the victim with an automobile at high speed, in Israel from 2008 through 2016, including the blade and vehicle attacks that killed or injured the following Plaintiffs: Chana Braun, Chaya Braun, Samuel Braun, Richard Lakin, Yoav Golan, Noam Shamba, Menachem Rivkin, Taylor Force, Raphael Lisker, and Shoshana Lisker. That role included ordering and/or managing the decision approving, and funding, the attack incentive and reward payments alleged herein, including, but not limited to, martyr payments and salary payments.

## VII.   Plaintiffs' Claims are Timely

1268.   The ATA provides that suits for damages must be brought "within 10 years after the date the cause of action accrued." 18 U.S.C. § 2335. This statute of limitations applies to all ATA claims, including claims for aiding and abetting under JASTA. JASTA, however, was not enacted until September 28, 2016, and was expressly made retroactive. Accordingly, Plaintiffs'

claims could not have accrued before that date, and Plaintiffs' claims are all timely because they are being brought within 10 years after September 28, 2016, the date they accrued.

1269.   If the Court concludes that Plaintiffs' causes of action accrued earlier (*e.g.*, on the date of the terrorist attacks that injured them), and to the extent tolling is required for any particular Plaintiff's claim, Plaintiffs are entitled to tolling because BNPP fraudulently concealed its misconduct, and no plaintiff exercising reasonable diligence could have discovered that misconduct prior to June 30, 2014, when the United States submitted court documents (and issued a corresponding press release) explaining that BNPP agreed to enter a guilty plea and pay nearly $9 billion for its prolonged provision of illegal financial services to Iranian entities.

1270.   BNPP's misconduct—which involved providing Terrorist Sponsors and fronts back-door access to the U.S. financial system, while deceiving financial regulators and financial institutions—was inherently self-concealing. Indeed, the entire point of BNPP's misconduct was to help Terrorist Sponsors and fronts transact in U.S. dollars, through U.S. financial institutions, in ways that would not reveal those entities' connections to the IRGC or Iran. None of the transactions were visible to third parties, let alone to individuals in Plaintiffs' position.

1271.   BNPP went to extreme lengths to conceal its wrongdoing. Among other things, BNPP misled several financial regulators and law enforcement agencies about its sanctions compliance and AML practices and lied to other financial institutions for its IRGC-connected clients.

1272.   Accordingly, to the extent the statute of limitations began running before June 30, 2014, it must be tolled prior to that date because no plaintiff exercising diligence could have uncovered BNPP's support for terrorists prior to that date.

### VIII. Plaintiffs and their Family Members were Killed or Injured in Terrorist Acts in Israel Committed, Planned, or Authorized by Iran-Sponsored Foreign Terrorist Organizations

### A. The March 6, 2008 Mass Shooting Attack in Israel (Moses and Shitrit Families)

1273. On March 6, 2008, Hamas committed a mass shooting attack in Jerusalem, Israel (the "March 6, 2008 Attack").

1274. The March 6, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victims of this attack were civilians not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1275. **Avraham Moses** was in Israel as a civilian studying at Temple. Avraham Moses was injured in the March 6, 2008 Attack. Avraham Moses died on March 6, 2008, as a result of injuries sustained during the attack.

1276. Avraham Moses was a U.S. national at the time of the attack and his death.

1277. Plaintiff Naftali Moses is the father of Avraham Moses and a U.S. national. He brings claims in both his personal capacity and co-representative capacity, with Rivkah Moses Moriah, on behalf of Avraham Moses's estate.

1278. Plaintiff Rivkah Moses Moriah is the mother of Avraham Moses and a U.S. national. She brings claims in both her personal capacity and co-representative capacity, with Naftali Moses, on behalf of Avraham Moses's estate.

1279. Plaintiff Chai Moriah is the brother of Mr. Moses and a U.S. national.

1280. Plaintiff Elisha Moses is the brother of Avraham Moses and a U.S. national.

1281. Plaintiff Noam Moriah is the brother of Avraham Moses and a U.S. national.

1282. Plaintiff Ayelet Moses is the sister of Avraham Moses and a U.S. national.

1283.   Plaintiff Ora Moses is the sister of Avraham Moses and a U.S. national.

1284.   Plaintiff David Moriah is the stepfather of Avraham Moses and a U.S. national. David Moriah lived in the same household as Avraham Moses for a substantial period of time and considered Avraham Moses the functional equivalent of a biological son.

1285.   Plaintiff Ifat Cohen is the stepsister of Avraham Moses and an Israeli national. Ifat Cohen lived in the same household as Avraham Moses for a substantial period of time and considered Avraham Moses the functional equivalent of a biological son.

1286.   Plaintiff Chagit Gibor is the stepsister of Avraham Moses and an Israeli national. Chagit Gibor lived in the same household as Avraham Moses for a substantial period of time and considered Avraham Moses the functional equivalent of a biological brother.

1287.   Plaintiff Atara Katz is the stepsister of Avraham Moses and an Israeli national. Atara Katz lived in the same household as Avraham Moses for a substantial period of time and considered Avraham Moses the functional equivalent of a biological brother.

1288.   Plaintiff Aviad Moriah is the stepbrother of Avraham Moses and a U.S. national. Aviad Moriah lived in the same household as Avraham Moses for a substantial period of time and considered Avraham Moses the functional equivalent of a biological brother.

1289.   Plaintiff Eytan Moriah is the stepbrother of Avraham Moses and an Israeli national. Eytan Moriah lived in the same household as Avraham Moses for a substantial period of time and considered Avraham Moses the functional equivalent of a biological brother.

1290.   Plaintiff Tzur Moriah is the stepbrother of Avraham Moses and an Israeli national. Mr. Moriah lived in the same household as Avraham Moses for a substantial period of time and considered Avraham Moses the functional equivalent of a biological brother.

1291.   As a result of the March 6, 2008 Attack and Moses's injuries and death, the Plaintiff members of the Moses family have experienced severe mental anguish, emotional pain and suffering, and the loss of Moses's society, companionship, and counsel.

1292.   As a result of the March 6, 2008 Attack, Moses was injured in his person and/or property. The Plaintiff members of the Moses family are the survivors and/or heirs of Moses and are entitled to recover for the damages Moses sustained.

1293.   **Naftali Shitrit** was a civilian studying at Temple during the March 6, 2008 Attack. The attack severely wounded Naftali Shitrit who suffered from multiple gunshot wounds.

1294.   As a result of the March 6, 2008 Attack and his injuries, Naftali Shitrit has experienced severe physical and emotional pain and suffering.

1295.   Plaintiff Shitrit was a U.S. national at the time of the attack and remains one today.

1296.   Plaintiff Gila Shitrit is the mother of Naftali Shitrit and a U.S. national.

1297.   Plaintiff Yaacov Shitrit is the father of Naftali Shitrit and an Israeli national.

1298.   Plaintiff Oshrat Amir is the sister of Naftali Shitrit and a U.S. national.

1299.   Plaintiff Avishai Shitrit is the brother of Naftali Shitrit and a U.S. national.

1300.   Plaintiff Elyashiv Shitrit is the brother of Naftali Shitrit and a U.S. national.

1301.   Plaintiff Meiri Shitrit is the brother of Naftali Shitrit and a U.S. national.

1302.   Plaintiff Noya Shitrit is the sister of Naftali Shitrit and a U.S. national.

1303.   Plaintiff Yedidya Shitrit is the brother of Naftali Shitrit and a U.S. national.

1304.   As a result of the March 6, 2008 Attack and Naftali Shitrit's injuries, the Plaintiff members of the Shitrit family have experienced severe mental anguish as well as emotional pain and suffering.

**B. The December 18, 2010 Kidnapping Attack in Israel (Luken Family)**

1305.   On December 18, 2010, Hamas committed a kidnapping attack in Beit Shemesh, Israel (the "December 18, 2010 Attack").

1306.   The December 18, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1307.   **Kristine Luken** was in Israel as a civilian hiking. Kristine Luken was injured in the December 18, 2010 Attack. Kristine Luken died on December 18, 2010, as a result of injuries sustained during the attack.

1308.   Kristine Luken was a U.S. national at the time of the attack and her death.

1309.   Plaintiff Kathleen Alt is the sister of Kristine Luken and a U.S. national. She brings claims in her individual capacity and in her representative capacity on behalf of Kristine Luken's estate.

1310.   Plaintiff Lawrence Luken is the father of Kristine Luken and a U.S. national.

1311.   Plaintiff Gerald Luken is the brother of Kristine Luken and a U.S. national.

1312.   Plaintiff Margaret Luken is the stepmother of Kristine Luken and a U.S. national. Margaret Luken lived in the same household as Kristine Luken for a substantial period of time and considered Kristine Luken the functional equivalent of a biological daughter.

1313.   As a result of the December 18, 2010 Attack and Kristine Luken's injuries and death, the Plaintiff members of the Luken family have experienced severe mental anguish, emotional pain and suffering, and the loss of Kristine Luken's society, companionship, and counsel.

1314.   As a result of the December 18, 2010 Attack, Kristine Luken was injured in her person and/or property. The Plaintiff members of the Luken family are the survivors and/or heirs of Kristine Luken and are entitled to recover for the damages Kristine Luken sustained.

### C.  The August 19, 2011 Rocket Attack in Israel (Brauner Family)

1315.   On August 19, 2011, Hamas committed a rocket attack in Ashdod, Israel, which detonated a rocket supplied by the IRGC for which Hamas was trained and directed to attack by Hezbollah (the "August 19, 2011 Attack").

1316.   The August 19, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1317.   **Shmuel Brauner** was a citizen living in Israel during the August 19, 2011 Attack. The attack severely wounded Shmuel Brauner who suffered from shrapnel to his back and stomach, loss of a kidney, loss of partial small intestine, and is permanently disabled.

1318.   As a result of the August 19, 2011 Attack and his injuries, Shmuel Brauner has experienced severe physical and emotional pain and suffering.

1319.   Plaintiff Shmuel Brauner was a U.S. national at the time of the attack and remains one today.

1320.   Plaintiff Nechama Brauner is the wife of Shmuel Brauner and a U.S. national.

1321.   Plaintiff C.B., by and through his next friend Shmuel Brauner, is the minor son of Shmuel Brauner and an Israeli national.

1322.   Plaintiff Esther Brauner is the mother of Shmuel Brauner and a U.S. national.

1323.   Plaintiff Mordechai Brauner is the father Shmuel Brauner and a U.S. national.

1324.   As a result of the August 19, 2011 Attack and Shmuel Brauner's injuries, The Plaintiff members of the Brauner family have experienced severe mental anguish as well as emotional pain and suffering.

### D.  The June 12, 2014 Kidnapping Attack in Israel (Fraenkel Family)

1325.   On June 12, 2014, Hamas committed a kidnapping attack in Gush Etzion, Israel, which was jointly planned by Hamas and Hezbollah, and funded by Hezbollah with money supplied by the SLO and IRGC (the "June 12, 2014 Attack").

1326.   The June 12, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities and was executed without trial. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1327.   Sixteen-year-old **Yaakov Fraenkel** was traveling with two other teenaged friends in Gush Etzion in the West Bank of Israel when all three were abducted. Yaakov Fraenkel's remains were discovered on June 30, 2014, and it was determined that he was murdered shortly after abduction.

1328.   Yaakov Fraenkel was a U.S. national at the time of the attack and his death.

1329.   Plaintiff Abraham Fraenkel is the father of Yaakov Fraenkel and an Israeli national. He brings claims in both his personal capacity and representative capacity on behalf of Yaakov Fraenkel's estate.

1330.   Plaintiff Rachelle Fraenkel is the mother of Yaakov Fraenkel and a U.S. national.

1331.   Plaintiff Ayala Fraenkel is the sister of Yaakov Fraenkel and a U.S. national.

1332.   Plaintiff Noga Fraenkel is the sister of Yaakov Fraenkel and a U.S. national.

1333.   Plaintiff N.F., by and through her next friend Abraham Fraenkel, is the minor sister of Yaakov Fraenkel and a U.S. national.

1334.   Plaintiff S.F., by and through his next friend Abraham Fraenkel, is the minor brother of Yaakov Fraenkel and a U.S. national.

1335.   Plaintiff Avigail Fraenkel is the sister of Yaakov Fraenkel and a U.S. national.

1336.   Plaintiff Tzvi Fraenkel is the brother of Yaakov Fraenkel and a U.S. national.

1337.   As a result of the June 12, 2014 Attack and Yaakov Fraenkel's injuries and death, the Plaintiff members of the Fraenkel family have experienced severe mental anguish, emotional pain and suffering, and the loss of Yaakov Fraenkel's society, companionship, and counsel.

1338.   As a result of the June 12, 2014 Attack, Yaakov Fraenkel was injured in his person and/or property. The Plaintiff members of the Fraenkel family are the survivors and/or heirs of Yaakov Fraenkel and are entitled to recover for the damages Yaakov Fraenkel sustained.

**E.  The October 22, 2014 Vehicle Attack in Israel (Braun Family)**

1339.   On October 22, 2014 Hamas committed a vehicle attack in Jerusalem, Israel (the "October 22, 2014 Attack").

1340.   The October 22, 2014 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victims of this attack were civilians not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1341.   **Chana Braun** was traveling in Israel with her husband and baby daughter during the October 22, 2014 Attack. The attack severely wounded Chana Braun, who suffered from severe psychological and emotional trauma.

1342.   As a result of the October 22, 2014 Attack and her injuries, Chana Braun has experienced severe physical and emotional pain and suffering.

1343.   Plaintiff Chana Braun was a U.S. national at the time of the attack and remains one today.

1344.   Plaintiff Samuel Braun is the husband of Chana Braun and a U.S. national.

1345.   Plaintiff Sara Halperin is the mother of Chana Braun and a U.S. national.

1346.   Plaintiff Shimshon Halperin is the father of Chana Braun and a U.S. national.

1347.   As a result of the October 22, 2014 Attack and Chana Braun's injuries, the Plaintiff members of the Braun family have experienced severe mental anguish as well as emotional pain and suffering.

1348.   Three-month-old **Chaya Braun** was traveling in Israel with her parents during the October 22, 2014 Attack. Chaya Braun was injured in the October 22, 2014 Attack. Chaya Braun died on October 22, 2014 as a result of injuries sustained during the attack.

1349.   Chaya Braun was a U.S. national at the time of the attack and her death.

1350.   Plaintiff Samuel Braun is the father of Chaya Braun and a U.S. national. He brings claims in both his personal capacity and co-representative capacity, with Chana Braun, on behalf of Chaya Braun's estate.

1351.   Plaintiff Chana Braun is the mother of Chaya Braun and a U.S. national. She brings claims in both her personal capacity and co-representative capacity, with Sameul Braun, on behalf of Chaya Braun's estate.

1352.   As a result of the October 22, 2014 Attack and Chaya Braun's injuries and death, the Plaintiff members of the Braun family have experienced severe mental anguish, emotional pain and suffering, and the loss of Chaya Braun's society, companionship, and counsel.

1353.   As a result of the October 22, 2014 Attack, Chaya Braun was injured in her person and/or property. The Plaintiff members of the Braun family are the survivors and/or heirs of Chaya Braun and are entitled to recover for the damages Chaya Braun sustained.

1354.   **Samuel Braun** was traveling in Israel with his wife and baby daughter during the October 22, 2014 Attack. The attack severely wounded Samuel Braun, who suffered from broken ribs and a torn ligament in his knee. Samuel Braun's knee continues to be painful to this day.

1355.   As a result of the October 22, 2014 Attack and his injuries, Samuel Braun has experienced severe physical and emotional pain and suffering.

1356.   Plaintiff Samuel Braun was a U.S. national at the time of the attack and remains one today.

1357.   Plaintiff Chana Braun is the wife of Samuel Braun and a U.S. national.

1358.   Plaintiff Esther Braun is the mother of Samuel Braun and a U.S. national.

1359.   Plaintiff Murray Braun is the father of Samuel Braun and a U.S. national.

1360.   As a result of the October 22, 2014 Attack and Samuel Braun's injuries, the Plaintiff members of the Braun family have experienced severe mental anguish as well as emotional pain and suffering.

**F.  The October 29, 2014 Assassination Attack in Israel (Glick Family)**

1361.   On October 29, 2014, the Palestinian Islamic Jihad committed an assassination attack in Jerusalem, Israel (the "October 29, 2014 Assassination Attack").

1362.   The October 29, 2014 Assassination Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1363.  **Yehudah Glick** was packing up his car after giving a speech during the October 29, 2014 Assassination Attack. Yehudah Glick was shot four times during this attack. The attack severely wounded Yehudah Glick who suffered from gunshot wounds injuring his chest including his throat, lung, and multiple broken ribs. Gunshot wounds also injured his liver, spine, one hand, and both intestines.

1364.  As a result of the October 29, 2014 Assassination Attack and his injuries, Yehudah Glick has experienced severe physical and emotional pain and suffering.

1365.  Plaintiff Yehudah Glick was a U.S. national at the time of the attack. He brings claims in his individual capacity and in his representative capacity on behalf of Yaffa Glick's estate. Yaffa Glick is the deceased wife of Yehudah Glick and was an Israeli national at the time of the attack and her death.

1366.  Plaintiff Hallel Glick is the son of Yehudah Glick and a U.S. national.

1367.  Plaintiff Neria Glick is the son of Yehudah Glick and a U.S. national.

1368.  Plaintiff Shahar Glick is the son of Yehudah Glick and a U.S. national.

1369.  Plaintiff Shlomo Glick is the son of Yehudah Glick and a U.S. national.

1370.  Plaintiff Rachel Glick is the foster daughter of Yehudah Glick and a an Israeli national. Rachel Glick lived in the same household as Yehudah Glick for a substantial period of time and considered Yehudah Glick the functional equivalent of a biological father.

1371.  Plaintiff Tatiana Glick is the foster daughter of Yehudah Glick and a an Israeli national. Tatiana Glick lived in the same household as Yehudah Glick for a substantial period of time and considered Yehudah Glick the functional equivalent of a biological father.

1372.   Plaintiff Avital Breuer is the stepdaughter of Yehudah Glick and a an Israeli national. Avital Breuer lived in the same household as Yehudah Glick for a substantial period of time and considered Yehudah Glick the functional equivalent of a biological father.

1373.   As a result of the October 29, 2014 Assassination Attack and Yehudah Glick's injuries, the Plaintiff members of the Glick family have experienced severe mental anguish as well as emotional pain and suffering.

### G.  The October 13, 2015 Shooting and Stabbing Attack in Israel (Lakin Family)

1374.   On October 13, 2015, Hamas committed a shooting and stabbing attack in Jerusalem, Israel (the "October 13, 2015 Attack").

1375.   The October 13, 2015 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1376.   **Richard Lakin** was riding a bus in Israel returning from a doctor's appointment during the October 13, 2015 Attack. Richard Lakin was shot and stabbed during the October 13, 2015 Attack, which resulted in a series of invasive surgeries. Richard Lakin died on October 27, 2015 as a result of injuries sustained during the attack.

1377.   Richard Lakin was a U.S. national at the time of the attack and his death.

1378.   Plaintiff Micah Lakin is the son of Richard Lakin and a U.S. national. He brings claims in both his personal capacity and representative capacity on behalf of Richard Lakin's estate.

1379.   Plaintiff Manya Lakin is the daughter of Richard Lakin and a U.S. national.

1380.   As a result of the October 13, 2015 Attack and Richard Lakin's injuries and death, the Plaintiff members of the Lakin family have experienced severe mental anguish, emotional pain and suffering, and the loss of Richard Lakin's society, companionship, and counsel.

1381.   As a result of the October 13, 2015 Attack, Richard Lakin was injured in his person and/or property. The Plaintiff members of the Lakin family are the survivors and/or heirs of Richard Lakin and are entitled to recover for the damages Richard Lakin sustained.

### H.  The November 6, 2015 Sniper Attack in Israel (Borochov Family)

1382.   On November 6, 2015, Hamas committed a sniper attack in Mearas Hamachpela, Israel (the "November 6, 2015 Attack").

1383.   The November 6, 2015 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victims of this attack were civilians not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1384.   **Ronen Borochov** was traveling in Israel visiting the Cave of Patriarchs, a sacred Jewish site, at the time of the November 6, 2015 Attack. The attack caused Ronen Borochov to fear for his life as well as his sons' lives. Ronen Borochov suffers from psychological and emotional trauma as a result of the November 6, 2015 Attack.

1385.   As a result of the November 6, 2015 Attack and his injuries, Ronen Borochov has experienced severe physical and emotional pain and suffering.

1386.   Plaintiff Ronen Borochov was a U.S. national at the time of the attack and remains one today.

1387.   Plaintiff Devora Borochov is the wife of Ronen Borochov and a U.S. national.

1388.   Plaintiff Eli Borochov is the son of Ronen Borochov and a U.S. national.

1389.   Plaintiff Avraham Borochov is the son of Ronen Borochov and a U.S. national.

1390.   Plaintiff Shira Borochov is the daughter of Ronen Borochov and a U.S. national.

1391.   Plaintiff Josef Borochov is the son of Ronen Borochov and U.S. national.

1392.   As a result of the November 6, 2015 Attack and Ronen Borochov's injuries, the Plaintiff members of the Borochov family have experienced severe mental anguish as well as emotional pain and suffering.

1393.   **Eli Borochov** was traveling in Israel visiting the Cave of Patriarchs, a sacred Jewish site, at the time of the November 6, 2015 Attack. The attack severely wounded Eli Borochov, who suffered from gunshot wounds to the thigh and testicles, which resulted in surgery and months of severe pain. Eli Borochov also suffers from psychological trauma and nightmares as a result of the November 6, 2015 Attack.

1394.   As a result of the November 6, 2015 Attack and his injuries, Eli Borochov has experienced severe physical and emotional pain and suffering.

1395.   Plaintiff Eli Borochov was a U.S. national at the time of the attack and remains one today.

1396.   Plaintiff Shari Borochov is the wife of Eli Borochov and a U.S. national.

1397.   Plaintiff Devora Borochov is the mother of Eli Borochov and a U.S. national.

1398.   Plaintiff Ronen Borochov is the father of Eli Borochov and a U.S. national.

1399.   Plaintiff Avraham Borochov is the brother of Eli Borochov and a U.S. national.

1400.   Plaintiff Josef Borochov is the brother of Eli Borochov and U.S. national.

1401.   Plaintiff Shira Borochov is the sister of Eli Borochov and a U.S. national.

1402.   As a result of the November 6, 2015 Attack and Eli Borochov's injuries, the Plaintiff members of the Borochov family have experienced severe mental anguish as well as emotional pain and suffering.

1403.   **Josef Borochov** was traveling in Israel visiting the Cave of Patriarchs, a sacred Jewish site, at the time of the November 6, 2015 Attack. The attack severely wounded Josef Borochov who suffers from severe psychological and emotional trauma. Josef Borochov was only sixteen years old at the time of the attack.

1404.   As a result of the November 6, 2015 Attack and his injuries, Josef Borochov has experienced severe physical and emotional pain and suffering.

1405.   Plaintiff Josef Borochov was a U.S. national at the time of the attack and remains one today.

1406.   Plaintiff Devora Borochov is the mother of Josef Borochov and a U.S. national.

1407.   Plaintiff Ronen Borochov is the father of Josef Borochov and a U.S. national.

1408.   Plaintiff Avraham Borochov is the brother of Josef Borochov and a U.S. national.

1409.   Plaintiff Eli Borochov is the brother of Josef Borochov and U.S. national.

1410.   Plaintiff Shira Borochov is the sister of Josef Borochov and a U.S. national.

1411.   As a result of the November 6, 2015 Attack and Josef Borochov's injuries, the Plaintiff members of the Borochov family have experienced severe mental anguish as well as emotional pain and suffering.

**I.   The December 14, 2015 Vehicle Attack in Israel (Golan and Shamba Families)**

1412.   On December 14, 2015, Hamas committed a vehicle attack in Jerusalem, Israel (the "December 14, 2015 Attack").

1413.   The December 14, 2015 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a

civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1414.    **Yoav Golan** was waiting at a bus stop in Israel at the time of the December 14, 2015 Attack. The attack severely wounded Yoav Golan, who suffered injuries to his leg and shoulder. The leg injury caused him to be wheelchair-bound for a substantial period after the attack. Yoav Golan continues to suffer from psychological and emotional trauma as a result of the December 14, 2015 Attack.

1415.    As a result of the December 14, 2015 Attack and his injuries, Yoav Golan has experienced severe physical and emotional pain and suffering.

1416.    Plaintiff Yoav Golan was a U.S. national at the time of the attack and remains one today.

1417.    Plaintiff Rotem Golan is the wife of Yoav Golan and an Israeli national.

1418.    Plaintiff Yehudit Green-Golan is the mother of Yoav Golan and a U.S. national.

1419.    Plaintiff Raphael Golan is the father of Yoav Golan and an Israeli national.

1420.    Plaintiff Matan Golan is the brother of Yoav Golan and a U.S. national.

1421.    As a result of the December 14, 2015 Attack and Yoav Golan's injuries, the Plaintiff members of the Golan family have experienced severe mental anguish as well as emotional pain and suffering.

1422.    **Noam Shamba** was waiting at a bus stop in Jerusalem, Israel at the time of the December 14, 2015 Attack. The attack severely wounded Noam Shamba, who suffered from severe pains in his chest. He was taken to the hospital and diagnosed as having a massive heart

attack. His doctors concluded that it was a result of the terror attack as he was only 32 years old and had no prior health conditions.

1423.   As a result of the December 14, 2015 Attack and his injuries, Noam Shamba has experienced severe physical and emotional pain and suffering.

1424.   Plaintiff Noam Shamba was a U.S. national at the time of the attack and remains one today.

1425.   Plaintiff Yana Shamba is the wife of Noam Shamba and a U.S. national.

1426.   Plaintiff M.S., by and through his next friend Noam Shamba, is the minor son of Noam Shamba. He is a U.S. national.

1427.   Plaintiff N.E.S., by and through his next friend Noam Shamba, is the minor son of Noam Shamba. He is a U.S. national.

1428.   Plaintiff N.S., by and through her next friend Noam Shamba, is the minor daughter of Noam Shamba. She is a U.S. national.

1429.   Plaintiff O.S., by and through her next friend Noam Shamba, is the minor daughter of Noam Shamba. She is a U.S. national.

1430.   Plaintiff T.S., by and through her next friend Noam Shamba, is the minor daughter of Noam Shamba. She is a U.S. national.

1431.   Plaintiff Hadar Shamba is the daughter of Noam Shamba and a U.S. national.

1432.   As a result of the December 14, 2015 Attack and Noam Shamba's injuries, the Plaintiff members of the Shamba family have experienced severe mental anguish as well as emotional pain and suffering.

### J.   The January 27, 2016 Stabbing Attack in Israel (Rivkin Family)

1433.   On January 27, 2016, Hamas committed a stabbing attack in Givat Ze'ev, Israel (the "January 27, 2016 Attack").

1434.   The January 27, 2016 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1435.   **Menachem Rivkin** was walking to a restaurant in Givat Ze'ev, Israel during the January 27, 2016 Attack. The attack severely wounded Menachem Rivkin, who suffered from a stab wound to his neck.

1436.   As a result of the January 27, 2016 Attack and his injuries, Menachem Rivkin has experienced severe physical and emotional pain and suffering.

1437.   Plaintiff Menachem Rivkin was a U.S. national at the time of the attack and remains one today.

1438.   Plaintiff Bracha Rivkin is the wife of Menachem Rivkin and an Israeli national.

1439.   Plaintiff M.R., by and through her next friend Menachem Rivkin, is the minor daughter of Menachem Rivkin and a U.S. national.

1440.   Plaintiff R.R., by and through her next friend Menachem Rivkin, is the minor daughter of Menachem Rivkin and a U.S. national.

1441.   Plaintiff S.R., by and through his next friend Menachem Rivkin, is the minor son of Menachem Rivkin and a U.S. national.

1442.   Plaintiff Sterna Rivkin is the daughter of Menachem Rivkin and a U.S. national.

1443.   Plaintiff S.Z.R., by and through his next friend Menachem Rivkin, is the minor son of Menachem Rivkin and a U.S. national.

1444.   As a result of the January 27, 2016 Attack and Menachem Rivkin's injuries, the Plaintiff members of the Rivkin family have experienced severe mental anguish as well as emotional pain and suffering.

### K.  The March 8, 2016 Stabbing Attack in Israel (Force Family)

1445.   On March 8, 2016, Hamas committed a stabbing attack in Tel Aviv, Israel (the "March 8, 2016 Attack").

1446.   The March 8, 2016 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1447.   **Taylor Force** was in Israel for a graduate school trip through Vanderbilt University. Taylor Force was injured in the March 8, 2016 Attack. Taylor Force died on March 8, 2016, resulting from injuries sustained during the attack.

1448.   Taylor Force was a U.S. national at the time of the attack and his death.

1449.   Plaintiff Stuart Force Jr. is the father of Taylor Force and a U.S. national. He brings claims in both his personal capacity and representative capacity on behalf of Taylor Force's estate.

1450.   Plaintiff Robbi Force is the mother of Taylor Force and a U.S. national.

1451.   Plaintiff Kristen Boswell is the sister of Taylor Force and a U.S. national.

1452.   As a result of the March 8, 2016 Attack and Taylor Force's injuries and death, the Plaintiff members of the Force family have experienced severe mental anguish, emotional pain and suffering, and the loss of Taylor Force's society, companionship, and counsel.

1453.   As a result of the March 8, 2016 Attack, Taylor Force was injured in his person and/or property. The Plaintiff members of the Force family are the survivors and/or heirs of Taylor Force and are entitled to recover for the damages Taylor Force sustained.

**L.  The December 23, 2016 Stabbing Attack in Israel (Lisker Family)**

1454.   On December 23, 2016, Hamas committed a stabbing attack in Efrat, Israel (the "December 23, 2016 Attack").

1455.   The December 23, 2016 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victims of this attack were civilians not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1456.   **Raphael Lisker** was in Israel walking home after Sabbath services at the time of the December 23, 2016 Attack. The attack severely wounded Raphael Lisker, who suffered from stab wounds to his neck.

1457.   As a result of the December 23, 2016 Attack and his injuries, Raphael Lisker has experienced severe physical and emotional pain and suffering.

1458.   Plaintiff Raphael Lisker was a U.S. national at the time of the attack and remains one today.

1459.   Plaintiff Shoshana Lisker is the wife of Raphael Lisker and a U.S. national.

1460.   Plaintiff Avital Lejzor is the daughter of Raphael Lisker and a U.S. national.

1461.   Plaintiff Daniel Lisker is the son of Raphael Lisker and a U.S. national.

1462.   Plaintiff Jonathan Lisker is the son of Raphael Lisker and a U.S. national.

1463.   Plaintiff Tamar Gutman is the daughter of Raphael Lisker and a U.S. national.

1464.   As a result of the December 23, 2016 Attack and Raphael Lisker's injuries, the Plaintiff members of the Lisker family have experienced severe mental anguish as well as emotional pain and suffering.

1465.   **Shoshana Lisker** was in Israel walking home after Sabbath services at the time of the December 23, 2016 Attack. The attack severely wounded Shoshana Lisker, who suffers from severe emotional and psychological trauma.

1466.   As a result of the December 23, 2016 Attack and her injuries, Shoshana Lisker has experienced severe physical and emotional pain and suffering.

1467.   Plaintiff Shoshana Lisker was a U.S. national at the time of the attack and remains one today.

1468.   Plaintiff Raphael Lisker is the husband of Shoshana Lisker and a U.S. national.

1469.   Plaintiff Avital Lejzor is the daughter of Shoshana Lisker and a U.S. national.

1470.   Plaintiff Daniel Lisker is the son of Shoshana Lisker and a U.S. national.

1471.   Plaintiff Jonathan Lisker is the son of Shoshana Lisker and a U.S. national.

1472.   Plaintiff Tamar Gutman is the daughter of Shoshana Lisker and a U.S. national.

1473.   As a result of the December 23, 2016 Attack and Shoshana Lisker's injuries, the Plaintiff members of the Lisker family have experienced severe mental anguish as well as emotional pain and suffering.

## IX.   Plaintiffs and their Family Members were Killed or Injured in Terrorist Acts in Iraq Committed, Planned, or Authorized by Iran-Sponsored Foreign Terrorist Organizations

### A.   The November 16, 2006 Complex Attack in Basra (Coté, Johnson-Reuben, Munns, and Young Families)

1474.   On November 16, 2006, a joint cell comprised of Jaysh al-Mahdi and Hezbollah committed a complex abduction and execution attack in Basra, Iraq targeting a convoy operated

by Crescent Security, which resulted in the hostage-taking, detention, torture, and murder of Jonathan Coté, Paul Johnson-Reuben, Joshua Munns, and John Young, which attack continued through on or about 2008, when the remains of each victim were recovered (the "Crescent Security Attack").

1475.   The Crescent Security Attack was planned and authorized by Hezbollah.

1476.   The Crescent Security Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victims of this attack were civilians not taking part in hostilities, were tortured during their captivity, and were executed without trial. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1477.   **Jonathon Coté** was in Iraq as a civilian contractor working for Crescent Security. Jonathon Coté was kidnapped, held hostage, tortured, and ultimately murdered in the Crescent Security Attack. The terrorists mutilated Jonathon Coté's remains after executing him. On April 23, 2008, the FBI announced that it had identified the remains of Jonathon Coté—which were recovered four days prior—and made arrangements to return Jonathon Coté's remains to his family.

1478.   Jonathon Coté was a U.S. national at the time of the attack and his death.

1479.   Plaintiff Christopher Coté is the brother of Jonathon Coté and a U.S. national. He brings claims in his individual capacity and in his representative capacity on behalf of Jonathon Coté's estate.

1480.   Plaintiff Francis Coté is the father of Jonathon Coté and a U.S. national.

1481.   Plaintiff Nancy Coté is the stepmother of Jonathon Coté and a U.S. national. Nancy Coté lived in the same household as Jonathon Coté for a substantial period of time and considered Jonathon Coté the functional equivalent of a biological son.

1482.   Plaintiff Samantha Dunford is the stepsister of Jonathon Coté and a U.S. national. Samantha Dunford lived in the same household as Jonathon Coté for a substantial period of time and considered Jonathon Coté the functional equivalent of a biological brother.

1483.   Plaintiff Maximillian Shroyer is the stepbrother of Jonathon Coté and a U.S. national. Maximillian Shroyer lived in the same household as Jonathon Coté for a substantial period of time and considered Jonathon Coté the functional equivalent of a biological brother.

1484.   As a result of the Crescent Security Attack and Jonathon Coté's injuries and death, the Plaintiff members of the Coté family have experienced severe mental anguish, emotional pain and suffering, and the loss of Jonathon Coté's society, companionship, and counsel.

1485.   As a result of the Crescent Security Attack, Jonathon Coté was injured in his person and/or property. The Plaintiff members of the Coté family are the survivors and/or heirs of Jonathon Coté and are entitled to recover for the damages Jonathon Coté sustained.

1486.   **Paul Johnson-Reuben** was in Iraq as a civilian contractor working for Crescent Security. Paul Johnson-Reuben was kidnapped, held hostage, tortured, and ultimately murdered in the Crescent Security Attack. The terrorists mutilated Paul Johnson-Reuben's remains after executing him. Paul Johnson-Reuben's body was ultimately returned to his family in April 2008.

1487.   Paul Johnson-Reuben was a U.S. national at the time of the attack and his death.

1488.   Plaintiff Bree Reuben is the daughter of Paul Johnson-Reuben and a U.S. national.

1489.   Plaintiff Casey Reuben is the daughter of Paul Johnson-Reuben and a U.S. national.

1490.   Plaintiff Quinten Reuben is the brother of Paul Johnson-Reuben and a U.S. national.

1491.   Plaintiff Patrick Reuben is the twin brother of Paul Johnson-Reuben and a U.S. national.

1492.   As a result of the Crescent Security Attack and Paul Johnson-Reuben's injuries and death, the Plaintiff members of the Johnson-Reuben family have experienced severe mental anguish, emotional pain and suffering, and the loss of Paul Johnson-Reuben's society, companionship, and counsel.

1493.   As a result of the Crescent Security Attack, Paul Johnson-Reuben was injured in his person and/or property. The Plaintiff members of the Johnson-Reuben family are the survivors and/or heirs of Paul Johnson-Reuben and are entitled to recover for the damages Paul Johnson-Reuben sustained.

1494.   **Joshua Munns** was in Iraq as a civilian contractor working for Crescent Security. Joshua Munns was kidnapped, held hostage, tortured, and ultimately murdered in the Crescent Security Attack. On or about March 2008, four bodies were discovered near Basra. On March 27, 2008, the FBI publicly announced that it had confirmed that Joshua Munns's remains were among those recovered, and in April 2008 his body was returned to his family for cremation.

1495.   Joshua Munns was a U.S. national at the time of the attack and his death.

1496.   Plaintiff Martha Elaine Stewart is the mother of Joshua Munns and a U.S. national.

1497.   Plaintiff Mark Munns is the father of Joshua Munns and a U.S. national.

1498.   Plaintiff Crista Munns is the stepmother of Joshua Munns and a U.S. national. Crista Munns lived in the same household as Joshua Munns for a substantial period of time and considered Joshua Munns the functional equivalent of a biological son.

1499.   As a result of the Crescent Security Attack and Joshua Munns's injuries and death, the Plaintiff members of the Munns family have experienced severe mental anguish, emotional pain and suffering, and the loss of Joshua Munns's society, companionship, and counsel.

1500.   As a result of the Crescent Security Attack, Joshua Munns was injured in his person and/or property. The Plaintiff members of the Munns family are the survivors and/or heirs of Joshua Munns and are entitled to recover for the damages Joshua Munns sustained.

1501.   **John Young** was in Iraq as a civilian security contractor employed by Crescent Security. John Young was kidnapped, held hostage, tortured, and ultimately murdered in the Crescent Security Attack. The terrorists mutilated John Young's remains after executing him. On March 24, 2008, the FBI announced that it had identified the remains of John Young.

1502.   John Young was a U.S. national at the time of the attack and his death.

1503.   Plaintiff John R. Young is the son of John Young and a U.S. national.

1504.   Plaintiff Sharon DeBrabander is the mother of John Young and a U.S. national.

1505.   Plaintiff Nicole DeBrabander is the sister of John Young and a U.S. national.

1506.   Plaintiff Joella Pratt is the sister of John Young and a U.S. national.

1507.   Plaintiff Dennis DeBrabander is the stepfather of John Young and a U.S. national. Dennis DeBrabander lived in the same household as John Young for a substantial period of time and considered John Young the functional equivalent of a biological son.

1508.   As a result of the Crescent Security Attack and John Young's injuries and death, the Plaintiff members of the Young family have experienced severe mental anguish, emotional pain and suffering, and the loss of John Young's society, companionship, and counsel.

1509.   As a result of the Crescent Security Attack, John Young was injured in his person and/or property. The Plaintiff members of the Young family are the survivors and/or heirs of John Young and are entitled to recover for the damages John Young sustained.

**B.  The August 17, 2007 Complex Attack in Amarah (Chand Family)**

1510.   On August 17, 2007, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed a complex abduction and execution attack in Amarah, Iraq, which resulted in the hostage-taking, torture, and eventual murder of Michael Chand Sr., which attack endured from 2007 until on or about 2010 (the "Chand Kidnapping Attack").

1511.   The Chand Kidnapping Attack was planned and authorized by Hezbollah.

1512.   The Chand Kidnapping Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities, was tortured during his captivity, and was executed without trial. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1513.   **Michael Chand Sr.** was in Iraq as a civilian contractor. Initial reports of the Chand Kidnapping Attack suggested that Michael Chand had been killed in the attack. On August 24, 2007, the U.S. State Department officially informed Michael Chand's wife that he was dead. On October 31, 2007, the State Department reversed course and informed his wife, Sally Chand, that, according to eyewitnesses, Michael Chand was actually alive and being held in captivity. However, efforts to secure his release over the next several years failed, and, on or

about March 13, 2010, the Chand family learned that Jaysh al-Mahdi had tortured and executed Michael Chand while he was being held in captivity.

1514.   Michael Chand was a U.S. national at the time of the attack and his death.

1515.   Sally Chand is the widow of Michael Chand and a U.S. national. She brings claims in her individual capacity and in her representative capacity on behalf of Michael Chand's estate.

1516.   Plaintiff Michael Chand Jr. is the son of Michael Chand and a U.S. national.

1517.   Plaintiff Brenda Chand is the daughter of Michael Chand and a U.S. national.

1518.   Plaintiff Ryan Chand is the son of Michael Chand and a U.S. national.

1519.   Plaintiff Christina Mahon is the daughter of Michael Chand and a U.S. national.

1520.   As a result of the Chand Kidnapping Attack and Michael Chand's injuries and death, the Plaintiff members of the Chand family have experienced severe mental anguish, emotional pain and suffering, and the loss of Michael Chand's society, companionship, and counsel.

1521.   As a result of the Chand Kidnapping Attack, Michael Chand was injured in his person and/or property. The Plaintiff members of the Chand family are the survivors and/or heirs of Michael Chand and are entitled to recover for the damages Michael Chand sustained.

### C.  The November 2, 2007 EFP Attack in Kadhimiya (Wells Family)

1522.   On November 2, 2007, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in Kadhimiya, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "November 2, 2007 Attack").

1523.   The November 2, 2007 Attack was planned and authorized by Hezbollah.

1524.   The November 2, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1525.   **Specialist Joshua Wells** served in Iraq as a member of the U.S. Army. The November 2, 2007 Attack severely wounded SPC Wells, who suffered from double amputation of both legs above the knee, resulting in SPC Wells receiving a 100% disability rating from the VA.

1526.   As a result of the November 2, 2007 Attack and his injuries, SPC Wells has experienced severe physical and emotional pain and suffering.

1527.   Plaintiff SPC Wells was a U.S. national at the time of the attack and remains one today.

1528.   Plaintiff Lydia Lantrip is the mother of SPC Wells and a U.S. national.

1529.   Plaintiff Billie Wells Jr. is the father of SPC Wells and a U.S. national.

1530.   Plaintiff David Lantrip Jr. is the brother of SPC Wells and a U.S. national.

1531.   Plaintiff Jeremy Wells is the brother of SPC Wells and a U.S. national.

1532.   As a result of the November 2, 2007 Attack and SPC Wells's injuries, the Plaintiff members of the Wells family have experienced severe mental anguish as well as emotional pain and suffering.

### D.   The November 26, 2007 IED Attack in Wasit (Juneau Family)

1533.   On November 26, 2007, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an IED attack in Wasit, Iraq (the "November 26, 2007 Attack").

1534.   The November 26, 2007 Attack was planned and authorized by Hezbollah.

1535.   The November 26, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1536.   **William Juneau** was in Iraq as a civilian government contractor working for DynCorp International. William Juneau was injured in the November 26, 2007 Attack. William Juneau died on November 26, 2007, as a result of injuries sustained during the attack.

1537.   William Juneau was a U.S. national at the time of the attack and his death.

1538.   Plaintiff Bridget Juneau is the twin sister of William Juneau and a U.S. national. She brings claims in her individual capacity and in her representative capacity on behalf of William Juneau's estate.

1539.   Plaintiff Stephanie Juneau is the sister of William Juneau and a U.S. national.

1540.   As a result of the November 26, 2007 Attack and William Juneau's injuries and death, the Plaintiff members of the Juneau family have experienced severe mental anguish, emotional pain and suffering, and the loss of William Juneau's society, companionship, and counsel.

1541.   As a result of the November 26, 2007 Attack, William Juneau was injured in his person and/or property. The Plaintiff members of the Juneau family are the survivors and/or heirs of William Juneau and are entitled to recover for the damages William Juneau sustained.

### E.  The December 9, 2007 EFP Attack in Az Zubayidiyah (Doheny, Evrard, Johnson, and Shaw Families)

1542.   On December 9, 2007, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in Az Zubayidiyah, Wasit, Iraq, which detonated an EFP supplied by

the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "December 9, 2007 Attack").

1543.   The December 9, 2007 Attack was planned and authorized by Hezbollah.

1544.   The December 9, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victims of this attack were civilians not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1545.   **Michael Doheny** was in Iraq as a civilian security specialist. Michael Doheny was injured in the December 9, 2007 Attack. Michael Doheny died on December 9, 2007, as a result of injuries sustained during the attack.

1546.   Michael Doheny was a U.S. national at the time of the attack and his death.

1547.   Plaintiff Melissa Doheny is the widow of Michael Doheny and a U.S. national. She brings claims in her individual capacity and in her representative capacity on behalf of Michael Doheny's estate.

1548.   Plaintiff Kathy Kugler is the mother of Michael Doheny and a U.S. national.

1549.   Plaintiff Robert Kugler is the brother of Michael Doheny and a U.S. national.

1550.   As a result of the December 9, 2007 Attack and Michael Doheny's injuries and death, the Plaintiff members of the Doheny family have experienced severe mental anguish, emotional pain and suffering, and the loss of Michael Doheny's society, companionship, and counsel.

1551.   As a result of the December 9, 2007 Attack, Michael Doheny was injured in his person and/or property. The Plaintiff members of the Doheny family are the survivors and/or heirs of Michael Doheny and are entitled to recover for the damages Michael Doheny sustained.

1552.   **Steven Evrard** was in Iraq as a civilian security specialist. Steven Evrard was injured in the December 9, 2007 Attack. Steven Evrard died on December 9, 2007, as a result of injuries sustained during the attack.

1553.   Steven Evrard was a U.S. national at the time of the attack and his death.

1554.   Plaintiff Tanya Evrard is the widow of Steven Evrard and a U.S. national.

1555.   As a result of the December 9, 2007 Attack and Steven Evrard's injuries and death, Plaintiff Tanya Evrard has experienced severe mental anguish, emotional pain and suffering, and the loss of Steven Evrard's society, companionship, and counsel.

1556.   As a result of the December 9, 2007 Attack, Steven Evrard was injured in his person and/or property. Plaintiff Tanya Evrard is a survivor and/or heir of Steven Evrard and is entitled to recover for the damages Steven Evrard sustained.

1557.   **Billy Johnson** was in Iraq as a civilian security specialist. The December 9, 2007 Attack severely wounded Billy Johnson who was in the vehicle that killed Michael Doheny, Micah Shaw, and Steven Evrard.

1558.   Plaintiff Billy Johnson was a U.S. national at the time of the attack and remains one today.

1559.   As a result of the December 9, 2007 Attack and his injuries, Billy Johnson has experienced severe mental anguish as well as emotional pain and suffering.

553

1560.   **Micah Shaw** was in Iraq as a civilian security specialist. Micah Shaw was injured in the December 9, 2007 Attack. Micah Shaw died on December 9, 2007, as a result of injuries sustained during the attack.

1561.   Micah Shaw was a U.S. national at the time of the attack and his death.

1562.   Plaintiff Elena Shaw is the widow of Micah Shaw and a U.S. national.

1563.   Plaintiff Casey Shaw is the son of Micah Shaw and a U.S. national.

1564.   Plaintiff Lilly-Bean Shaw is the daughter of Micah Shaw and a U.S. national.

1565.   Plaintiff Emily Shaw is the daughter of Micah Shaw and a U.S. national.

1566.   As a result of the December 9, 2007 Attack and Micah Shaw's injuries and death, the Plaintiff members of the Shaw family have experienced severe mental anguish, emotional pain and suffering, and the loss of Micah Shaw's society, companionship, and counsel.

1567.   As a result of the December 9, 2007 Attack, Micah Shaw was injured in his person and/or property. The Plaintiff members of the Shaw family are the survivors and/or heirs of Micah Shaw and are entitled to recover for the damages Micah Shaw sustained.

**F.  The December 17, 2007 EFP Attack in New Baghdad (Bryan Wagner)**

1568.   On December 17, 2007, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in New Baghdad, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "December 17, 2007 Attack").

1569.   The December 17, 2007 Attack was planned and authorized by Hezbollah.

1570.   The December 17, 2007 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1571.   **Specialist Bryan Wagner** served in Iraq as a member of the U.S. Army. The December 17, 2007 Attack severely wounded SPC Wagner, who suffered from amputation of his right leg below the knee.

1572.   Plaintiff SPC Wagner was a U.S. national at the time of the attack and remains one today.

1573.   As a result of the December 17, 2007 Attack and his injuries, SPC Wagner has experienced severe mental anguish as well as emotional pain and suffering.

### G.  The January 30, 2008 EFP Attack in New Baghdad (Lukow Family)

1574.   On January 30, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in New Baghdad, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "January 30, 2008 Attack").

1575.   The January 30, 2008 Attack was planned and authorized by Hezbollah.

1576.   The January 30, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1577.   **Staff Sergeant Michael Lukow** served in Iraq as a member of the U.S. Army. The January 30, 2008 Attack severely wounded SSG Lukow, who suffered severe damage to his left foot and complete amputation of his right foot.

1578.   As result of the January 30, 2008 Attack and his injuries, SSG Lukow has experienced severe physical and emotional pain and suffering.

1579.   Plaintiff SSG Lukow was a U.S. national at the time of the attack and remains one today.

1580.   Plaintiff Rikki Lukow is the mother of SSG Lukow and a U.S. national.

1581.   Plaintiff Bruce Lukow is the father of SSG Lukow and a U.S. national.

1582.   Plaintiff Kristen Kelley is the sister of SSG Lukow and a U.S. national.

1583.   Plaintiff Joseph Lukow is the brother of SSG Lukow and a U.S. national.

1584.   Plaintiff Andrew Lukow is the brother of SSG Lukow and a U.S. national.

1585.   As a result of the January 30, 2008 Attack and SSG Lukow's injuries, the Plaintiff members of the Lukow family have experienced severe mental anguish as well as emotional pain and suffering.

### H.   The February 6, 2008 EFP Attack in Mansour (Joshua Eckhoff)

1586.   On February 6, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in Mansour, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "February 6, 2008 Attack").

1587.   The February 6, 2008 Attack was planned and authorized by Hezbollah.

1588.   The February 6, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1589.   **Staff Sergeant Joshua Eckhoff** served in Iraq as a member of the Army National Guard. The February 6, 2008 Attack severely wounded SSG Eckhoff, who suffered from the collapse of 75% of the right hemisphere of his brain. His doctors did not expect him to survive, and in the immediate aftermath of the attack, he could not talk, drink, or eat on his own. SSG Eckhoff was medically retired from the military and continues to have permanent brain damage from the attack.

1590.   Plaintiff SSG Eckhoff was a U.S. national at the time of the attack and remains one today.

1591.   As a result of the February 6, 2008 Attack and his injuries, SSG Eckhoff has experienced severe mental anguish as well as emotional pain and suffering.

**I.   The February 7, 2008 Mortar Attack in Adhamiyah (Bauer Family)**

1592.   On February 7, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed a mortar attack in Adhamiyah, Baghdad, Iraq (the "February 7, 2008 Attack").

1593.   The February 7, 2008 Attack was planned and authorized by Hezbollah.

1594.   The February 7, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1595.   **Sergeant Dustin Bauer** served in Iraq as a member of the U.S. Army. The February 7, 2008 Attack severely wounded SGT Bauer, who suffered from a traumatic brain injury and fused vertebrae in his back. As a result of his injuries, SGT Bauer was medically retired from the military.

1596.   As a result of the February 7, 2008 Attack and his injuries, SGT Bauer has experienced severe physical and emotional pain and suffering.

1597.   Plaintiff SGT Bauer was a U.S. national at the time of the attack and remains one today.

1598.   Plaintiff Sophia Bauer is the daughter of SGT Bauer and a U.S. national.

1599.   As a result of the February 7, 2008 Attack and SGT Bauer's injuries, the Plaintiff members of the Bauer family have experienced severe mental anguish as well as emotional pain and suffering.

**J.   The February 10, 2008 IED Attack in Sadr City (James Wilson Jr.)**

1600.   On February 10, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an IED attack in Sadr City, Baghdad, Iraq (the "February 10, 2008 Attack").

1601.   The February 10, 2008 Attack was planned and authorized by Hezbollah.

1602.   The February 10, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1603.   **Staff Sergeant James Wilson Jr.** served in Iraq as a member of the U.S. Army. The February 10, 2008 Attack (along with the March 20, 2008 and the April 1, 2008 Attacks discussed *infra*) severely wounded SSG Wilson, who suffered from traumatic brain injury ("TBI"), multiple concussions, back injuries, chlorine lung exposure causing breathing difficulties, and severe sleep apnea. SSG Wilson was forced to medically retire from the military.

1604.   Plaintiff SSG Wilson was a U.S. national at the time of the attack and remains one today.

1605.   As a result of the February 10, 2008 Attack and his injuries, SSG Wilson has experienced severe mental anguish as well as emotional pain and suffering.

**K.  The February 20, 2008 EFP Attack in Adhamiyah (James Flemming III)**

1606.   On February 20, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in Adhamiyah, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "February 20, 2008 Attack").

1607.   The February 20, 2008 Attack was planned and authorized by Hezbollah.

1608.   The February 20, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1609.   **Sergeant James Flemming III** served in Iraq as a member of the U.S. Army. The February 20, 2008 Attack (along with the April 7, 2008 Attack discussed *infra*) severely wounded SGT Flemming, who suffered from concussions, TBI, shrapnel wounds, debilitating headaches, and post-traumatic stress disorder ("PTSD").

1610.   Plaintiff SGT Flemming was a U.S. national at the time of the attack and remains one today.

1611.   As a result of the February 20, 2008 Attack and his injuries, SGT Flemming has experienced severe mental anguish as well as emotional pain and suffering.

### L.  The March 11, 2008 IED Attack in Babil (West Family)

1612.   On March 11, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an IED attack in Babil, Iraq (the "March 11, 2008 Attack").

1613.   The March 11, 2008 Attack was planned and authorized by Hezbollah.

1614.   The March 11, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1615.   **Staff Sergeant Laurent West** served in Iraq as a member of the U.S. Army. SSG West was injured in the March 11, 2008 Attack. SSG West died on March 11, 2008, as a result of injuries sustained during the attack.

1616.   SSG West was a U.S. national at the time of the attack and his death.

1617.   Plaintiff Michelle West is the widow of SSG West and a U.S. national.

1618.   Plaintiff Madison West is the daughter of SSG West and a U.S. national.

1619.   Plaintiff Nistasha Perez is the stepdaughter of SSG West and a U.S. national. Nistasha Perez lived in the same household as SSG West for a substantial period of time and considered SSG West the functional equivalent of a biological father.

1620.   As a result of the March 11, 2008 Attack and SSG West's injuries and death, the Plaintiff members of the West family have experienced severe mental anguish, emotional pain and suffering, and the loss of SSG West's society, companionship, and counsel.

1621.   As a result of the March 11, 2008 Attack, SSG West was injured in his person and/or property. The Plaintiff members of the West family are the survivors and/or heirs of SSG West and are entitled to recover for the damages SSG West sustained.

**M. The March 17, 2008 EFP Attack in New Baghdad (Norman Forbes IV)**

1622.   On March 17, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in New Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "March 17, 2008 Attack").

1623.   The March 17, 2008 Attack was planned and authorized by Hezbollah.

1624.   The March 17, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1625.   **Sergeant Norman Forbes IV** served in Iraq as a member of the U.S. Army. The March 17, 2008 Attack severely wounded SGT Forbes, who suffered from a shattered left arm and left hand, broken left femur, and the destruction of his left thigh muscle.

1626.   Plaintiff SGT Forbes was a U.S. national at the time of the attack and remains one today.

1627.   As a result of the March 17, 2008 Attack and his injuries, SGT Forbes has experienced severe mental anguish as well as emotional pain and suffering.

**N.  The March 20, 2008 EFP Attack in Sadr City (James Wilson Jr.)**

1628.   On March 20, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in Sadr City, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "March 20, 2008 Attack").

1629.   The March 20, 2008 Attack was planned and authorized by Hezbollah.

1630.   The March 20, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1631.   **Staff Sergeant James Wilson Jr.** served in Iraq as a member of the U.S. Army. The March 20, 2008 Attack (along with the February 10, 2008 Attack discussed *supra* and the April 1, 2008 Attack discussed *infra*) severely wounded SSG Wilson, who suffered from TBI, multiple concussions, back injuries, chlorine lung exposure causing breathing difficulties, and severe sleep apnea. SSG Wilson was forced to medically retire from the military.

1632.   Plaintiff SSG Wilson was a U.S. national at the time of the attack and remains one today.

1633.   As a result of the March 20, 2008 Attack and his injuries, SSG Wilson has experienced severe mental anguish as well as emotional pain and suffering.

**O.  The March 26, 2008 Sniper Attack in Camp Taji (Rundell Family)**

1634.   On March 26, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed a sniper attack near Camp Taji, Baghdad, Iraq (the "March 26, 2008 Attack").

1635.   The March 26, 2008 Attack was planned and authorized by Hezbollah.

1636.   The March 26, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1637.   **Specialist Gregory Rundell** served in Iraq as a member of the U.S. Army. SPC Rundell was injured in the March 26, 2008 Attack. SPC Rundell died on March 26, 2008, as a result of injuries sustained during the attack.

1638.   SPC Rundell was a U.S. national at the time of the attack and his death.

1639.   Plaintiff Jimmy Rundell Jr. is the father of SPC Rundell and a U.S. national.

1640.   As a result of the March 26, 2008 Attack and SPC Rundell's injuries and death, Plaintiff Jimmy Rundell Jr. has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Rundell's society, companionship, and counsel.

1641.   As a result of the March 26, 2008 Attack, SPC Rundell was injured in his person and/or property. Plaintiff Jimmy Rundell Jr. is a survivor and/or heir of SPC Rundell and is entitled to recover for the damages SPC Rundell sustained.

## P.  The March 27, 2008 Complex Attack in Sadr City (Gerber, Manganella, Molina, Gregston, and Wallace Families)

1642.   On March 27, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed a complex attack in Sadr City, Baghdad, Iraq (the "March 27, 2008 Attack").

1643.   The March 27, 2008 Attack was planned and authorized by Hezbollah.

1644.   The March 27, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1645.   **Sergeant Anthony Gerber** served in Iraq as a member of the U.S. Army. The March 27, 2008 Attack severely wounded SGT Gerber, who suffered from severe concussions, chronic back pain, tinnitus, and PTSD.

1646.   Plaintiff SGT Gerber was a U.S. national at the time of the attack and remains one today.

1647.   As a result of the March 27, 2008 Attack and his injuries, SGT Gerber has experienced severe mental anguish as well as emotional pain and suffering.

1648.   **Specialist Charles Gregston** served in Iraq as a member of the U.S. Army. The March 27, 2008 Attack (along with the September 30, 2007 Attack discussed *supra*) severely wounded SPC Gregston, who suffered from 100% VA disability rating for PTSD, TBI, tinnitus, irritable bowel syndrome, and hearing loss.

1649.   Plaintiff SPC Gregston was a U.S. national at the time of the attack and remains one today.

1650.   As a result of the March 27, 2008 Attack and his injuries, SPC Gregston has experienced severe mental anguish as well as emotional pain and suffering.

1651.   **Staff Sergeant David Manganella** served in Iraq as a member of the U.S. Army. The March 27, 2008 Attack severely wounded SSG Manganella, who suffered from TBI, including memory, sleep, and speech issues, PTSD, S1-S3 compression, and back L4-L5 nerve damage resulting in sciatica which causes him to lose control over his legs.

1652.   Plaintiff SSG Manganella was a U.S. national at the time of the attack and remains one today.

1653.   As a result of the March 27, 2008 Attack and his injuries, SSG Manganella has experienced severe mental anguish as well as emotional pain and suffering.

1654.   **Corporal Joshua Molina** served in Iraq as a member of the U.S. Army. CPL Molina was injured in the March 27, 2008 Attack. CPL Molina died on March 27, 2008, as a result of injuries sustained during the attack.

1655.   CPL Molina was a U.S. national at the time of the attack and his death.

1656.   Plaintiff Josue Molina is the father of CPL Molina and a U.S. national

1657.   Plaintiff Manuel Molina is the brother of CPL Molina and a U.S. national.

1658.   As a result of the March 27, 2008 Attack and CPL Molina's injuries and death, the Plaintiff members of the Molina family have experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Molina's society, companionship, and counsel.

1659.   As a result of the March 27, 2008 Attack, CPL Molina was injured in his person and/or property. The Plaintiff members of the Molina family are the survivors and/or heirs of CPL Molina and are entitled to recover for the damages CPL Molina sustained.

1660.   **Private First Class Jeremy Wallace** served in Iraq as a member of the U.S. Army. The March 27, 2008 Attack (along with the April 1, 2008 Attack discussed *infra*) severely wounded PFC Wallace, who suffered from TBI, nerve damage, and muscle atrophy.

1661.   Plaintiff PFC Wallace was a U.S. national at the time of the attack and remains one today.

1662.   As a result of the March 27, 2008 Attack and his injuries, PFC Wallace has experienced severe mental anguish as well as emotional pain and suffering.

**Q. The March 28, 2008 Complex Attack in Sadr City (Barham and Contrerasbaez Families)**

1663.    On March 28, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed a complex attack in Sadr City, Baghdad, Iraq (the "March 28, 2008 Attack").

1664.    The March 28, 2008 Attack was planned and authorized by Hezbollah.

1665.    The March 28, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1666.    **Sergeant Cody Barham** served in Iraq as a member of the U.S. Army. The March 28, 2008 Attack severely wounded SGT Barham, who suffered severe back injuries, including several blown discs and PTSD.

1667.    Plaintiff SGT Barham was a U.S. national at the time of the attack and remains one today.

1668.    As a result of the March 28, 2008 Attack his injuries, SGT Barham has experienced severe mental anguish as well as emotional pain and suffering.

1669.    **Staff Sergeant Alejandro Contrerasbaez** served in Iraq as a member of the U.S. Army. The March 28, 2008 Attack severely wounded SSG Contrerasbaez, who has suffered from intractable migraines, chronic pain, hearing loss, and TBI.

1670.    As a result of the March 28, 2008 Attack and his injuries, SSG Contrerasbaez has experienced severe physical and emotional pain and suffering.

1671.    Plaintiff SSG Contrerasbaez was a U.S. national at the time of the attack and remains one today.

1672.   Plaintiff Jessica Contrerasbaez is the wife of SSG Contrerasbaez and a U.S. national.

1673.   Plaintiff Jesse Contrerasbaez is the son of SSG Contrerasbaez and a U.S. national.

1674.   Plaintiff A.C., by and through her next friend Alejandro Contrerasbaez, is the minor daughter of SSG Contrerasbaez and a U.S. national.

1675.   Plaintiff Peter Pasillas is the stepson of SSG Contrerasbaez and a U.S. national. Peter Pasillas lived in the same household as SSG Contrerasbaez for a substantial period of time and considered SSG Contrerasbaez the functional equivalent of a biological father.

1676.   As a result of the March 28, 2008 Attack and SSG Contrerasbaez's injuries, the Plaintiff members of the Contrerasbaez family have experienced severe mental anguish as well as emotional pain and suffering.

### R. The March 29, 2008 Complex Attack in New Baghdad (Bennett, Hanley, Miller, Reiher, and Winegar Families)

1677.   On March 29, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed a complex attack involving an EFP and small arms in New Baghdad, Baghdad, Iraq (the "March 29, 2008 Attack"), which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah.

1678.   The March 29, 2008 Attack was planned and authorized by Hezbollah.

1679.   The March 29, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1680.  **Specialist Durrell Bennett** served in Iraq as a member of the U.S. Army. SPC Bennett was injured in the March 29, 2008 Attack. SPC Bennett died on March 29, 2008, as a result of injuries sustained during the attack.

1681.  SPC Bennett was a U.S. national at the time of the attack and his death.

1682.  Plaintiff Doris Bennett is the mother of SPC Bennett and a U.S. national.

1683.  Plaintiff Dempsey Bennett is the father of SPC Bennett and a U.S. national.

1684.  Plaintiff Darnell Bennett is the brother of SPC Bennett and a U.S. national.

1685.  As a result of the March 29, 2008 Attack and SPC Bennett's injuries and death, the Plaintiff members of the Bennett family have experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Bennett's society, companionship, and counsel.

1686.  As a result of the March 29, 2008 Attack, SPC Bennett was injured in his person and/or property. The Plaintiff members of the Bennett family are the survivors and/or heirs of SPC Bennett and are entitled to recover for the damages SPC Bennett sustained.

1687.  **Specialist Patrick Hanley** served in Iraq as a member of the U.S. Army. The March 29, 2008 Attack severely wounded SPC Hanley, who suffered from amputation of his left arm and the loss of one third of his skull.

1688.  As a result of the March 29, 2008 Attack and his injuries, SPC Hanley has experienced severe physical and emotional pain and suffering.

1689.  Plaintiff SPC Hanley was a U.S. national at the time of the attack and remains one today.

1690.  Plaintiff Katherine Hanley is the mother of SPC Hanley and a U.S. national.

1691.  Plaintiff Edward Hanley is the father of SPC Hanley and a U.S. national.

1692.  Plaintiff Cecelia Hanley is the sister of SPC Hanley and a U.S. national.

1693.   As a result of the March 29, 2008 Attack and SPC Hanley's injuries, the Plaintiff members of the Hanley family have experienced severe mental anguish as well as emotional pain and suffering.

1694.   **Private First Class Patrick Miller** served in Iraq as a member of the U.S. Army. PFC Miller was injured in the March 29, 2008 Attack. PFC Miller died on March 29, 2008, as a result of injuries sustained during the attack.

1695.   PFC Miller was a U.S. national at the time of the attack and his death.

1696.   Plaintiff Kimberly Miller is the mother of PFC Miller and a U.S. national.

1697.   Plaintiff Dana Svenson is the sister of PFC Miller and a U.S. national.

1698.   As a result of the March 29, 2008 Attack and PFC Miller's injuries and death, the Plaintiff members of the Miller family have experienced severe mental anguish as well as emotional pain and suffering, and the loss of PFC Miller's society, companionship, and counsel.

1699.   As a result of the March 29, 2008 Attack, PFC Miller was injured in his person and/or property. The Plaintiff members of the Miller family are the survivors and/or heirs of PFC Miller and are entitled to recover for the damages PFC Miller sustained.

1700.   **Private First Class Carl Reiher** served in Iraq as a member of the U.S. Army. The March 29, 2008 Attack severely wounded PFC Reiher, who suffered from an amputation of his hand.

1701.   Plaintiff PFC Reiher was a U.S. national at the time of the attack and remains one today.

1702.   As a result of the March 29, 2008 Attack and his injuries, PFC Reiher has experienced severe mental anguish as well as emotional pain and suffering.

1703.    **Specialist Robert Winegar Jr.** served in Iraq as a member of the U.S. Army. The March 29, 2008 Attack severely wounded SPC Winegar, resulting in a 90% disability rating from the VA.

1704.    As a result of the March 29, 2008 Attack and his injuries, SPC Winegar has experienced severe physical and emotional pain and suffering.

1705.    Plaintiff SPC Winegar was a U.S. national at the time of the attack and remains one today.

1706.    Plaintiff Patricia Clavenna is the mother of SPC Winegar and a U.S. national.

1707.    Plaintiff Robert Winegar is the father of SPC Winegar and a U.S. national.

1708.    Plaintiff Mary Jagello is the sister of SPC Winegar and a U.S. national.

1709.    Plaintiff Elyse Winegar is the sister of SPC Winegar and a U.S. national.

1710.    As a result of the March 29, 2008 Attack and SPC Winegar's injuries, the Plaintiff members of the Winegar family have experienced severe mental anguish as well as emotional pain and suffering.

**S.    The April 1, 2008 Complex Attack in Sadr City (Jeremy Wallace and James Wilson Jr.)**

1711.    On April 1, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed a complex attack involving a rocket propelled grenade and small arms fire in Sadr City, Baghdad, Iraq (the "April 1, 2008 Attack").

1712.    The April 1, 2008 Attack was planned and authorized by Hezbollah.

1713.    The April 1, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1714.   **Private First Class Jeremy Wallace** served in Iraq as a member of the U.S. Army. The April 1, 2008 Attack (along with the March 27, 2008 Attack discussed *supra*) severely wounded PFC Wallace, who suffered from TBI, nerve damage, and muscle atrophy.

1715.   Plaintiff PFC Wallace was a U.S. national at the time of the attack and remains one today.

1716.   As a result of the April 1, 2008 Attack and his injuries, PFC Wallace has experienced severe mental anguish as well as emotional pain and suffering.

1717.   **Staff Sergeant James Wilson Jr.** served in Iraq as a member of the U.S. Army. The April 1, 2008 Attack (along with the February 10, 2008 Attack and March 20, 2008 Attack discussed *supra*) severely wounded SSG Wilson, who suffered from TBI, multiple concussions, back injuries, chlorine lung exposure causing breathing difficulties, and severe sleep apnea. SSG Wilson was forced to medically retire from the military.

1718.   Plaintiff SSG Wilson was a U.S. national at the time of the attack and remains one today.

1719.   As a result of the April 1, 2008 Attack and his injuries, SSG Wilson has experienced severe mental anguish as well as emotional pain and suffering.

**T.  The April 3, 2008 EFP Attack in Sadr City (Robinson Family)**

1720.   On April 3, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in Sadr City, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "April 3, 2008 Attack").

1721.   The April 3, 2008 Attack was planned and authorized by Hezbollah.

1722.   The April 3, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1723.   **Staff Sergeant Jason Robinson** served in Iraq as a member of the U.S. Army. The April 3, 2008 Attack severely wounded SSG Robinson, who suffered from shrapnel wounds to his face, neck, and shoulder, dislocation of two lumbar disks, and bilateral ruptured eardrums.

1724.   As a result of the April 3, 2008 Attack and his injuries, SSG Robinson has experienced severe physical and emotional pain and suffering.

1725.   Plaintiff SSG Robinson was a U.S. national at the time of the attack and remains one today.

1726.   Plaintiff Frances Robinson is the wife of SSG Robinson and a U.S. national.

1727.   Plaintiff Emily Robinson is the daughter of SSG Robinson and a U.S. national.

1728.   Plaintiff Michael Weatherly is the stepson of SSG Robinson and a U.S. national. Michael Weatherly lived in the same household as SSG Robinson for a substantial period of time and considered SSG Robinson the functional equivalent of a biological father.

1729.   Plaintiff William Weatherly is the stepson of SSG Robinson and a U.S. national. William Weatherly lived in the same household as SSG Robinson for a substantial period of time and considered SSG Robinson the functional equivalent of a biological father.

1730.   As a result of the April 3, 2008 Attack and SSG Robinson's injuries, the Plaintiff members of the Robinson family have experienced severe mental anguish as well as emotional pain and suffering.

### U.  The April 5, 2008 EFP Attack in New Baghdad (Cory Kenfield)

1731.   On April 5, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in New Baghdad, Baghdad, Iraq, which detonated an EFP supplied by

the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "April 5, 2008 Attack").

1732.   The April 5, 2008 Attack was planned and authorized by Hezbollah.

1733.   The April 5, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1734.   **Specialist Cory Kenfield** served in Iraq as a member of the U.S. Army. The April 5, 2008 Attack (along with the April 28, 2008 Attack discussed *infra*) severely wounded SPC Kenfield, who suffered from herniated discs, TBI, balance issues, memory impairment, and speech issues.

1735.   Plaintiff SPC Kenfield was a U.S. national at the time of the attack and remains one today.

1736.   As a result of the April 5, 2008 Attack and his injuries, SPC Kenfield has experienced severe mental anguish as well as emotional pain and suffering.

**V.  The April 6, 2008 EFP Attack in New Baghdad (McNeal Family)**

1737.   On April 6, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in New Baghdad, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "April 6, 2008 Attack").

1738.   The April 6, 2008 Attack was planned and authorized by Hezbollah.

1739.   The April 6, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack

572

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1740.   **Staff Sergeant Jeremiah McNeal** served in Iraq as a member of the Army National Guard. SSG McNeal was injured in the April 6, 2008 Attack. SSG McNeal died on April 6, 2008, as a result of injuries sustained during the attack.

1741.   SSG McNeal was a U.S. national at the time of the attack and his death.

1742.   Plaintiff Jordien McNeal is the son of SSG McNeal and a U.S. national.

1743.   As a result of the April 6, 2008 Attack and SSG McNeal's injuries and death, Plaintiff Jordien McNeal has experienced severe mental anguish, emotional pain and suffering, and the loss of SSG McNeal's society, companionship, and counsel.

1744.   As a result of the April 6, 2008 Attack, SSG McNeal was injured in his person and/or property. Plaintiff Jordien McNeal is a survivor and/or heir of SSG McNeal and is entitled to recover for the damages SSG McNeal sustained.

**W. The April 7, 2008 RPG Attack in Sadr City (James Flemming III)**

1745.   On April 7, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed a rocket propelled grenade attack in Sadr City, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "April 7, 2008 RPG Attack").

1746.   The April 7, 2008 RPG Attack was planned and authorized by Hezbollah.

1747.   The April 7, 2008 RPG Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1748.  **Sergeant James Flemming III** served in Iraq as a member of the U.S. Army. The April 7, 2008 RPG Attack (along with the February 20, 2008 Attack discussed *supra*) severely wounded SGT Flemming, who suffered from concussions, TBI, shrapnel wounds, debilitating headaches, and PTSD.

1749.  Plaintiff SGT Flemming was a U.S. national at the time of the attack and remains one today.

1750.  As a result of the April 7, 2008 RPG Attack and his injuries, SGT Flemming has experienced severe mental anguish as well as emotional pain and suffering.

**X.  The April 7, 2008 Complex Attack in New Baghdad (Vaughn Family)**

1751.  On April 7, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed a complex attack involving RPGs and EFPs in New Baghdad, Baghdad, Iraq, which detonated one or more EFPs supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "April 7, 2008 Complex Attack").

1752.  The April 7, 2008 Complex Attack was planned and authorized by Hezbollah.

1753.  The April 7, 2008 Complex Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1754.  **Sergeant Richard Vaughn** served in Iraq as a member of the U.S. Army. SGT Vaughn was injured in the April 7, 2008 Complex Attack. SGT Vaughn died on April 7, 2008, as a result of injuries sustained during the attack.

1755.  SGT Vaughn was a U.S. national at the time of the attack and his death.

1756.  Plaintiff Rachelle Idol is the widow of SGT Vaughn and a U.S. national.

1757.  Plaintiff Jennine Vaughn is the mother of SGT Vaughn and a U.S. national.

1758.   Plaintiff James Vaughn is the father of SGT Vaughn and a U.S. national.

1759.   Plaintiff Clifford Vaughn is the brother of SGT Vaughn and a U.S. national.

1760.   As a result of the April 7, 2008 Complex Attack and SGT Vaughn's injuries and death, the Plaintiff members of the Vaughn family have experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Vaughn's society, companionship, and counsel.

1761.   As a result of the April 7, 2008 Complex Attack, SGT Vaughn was injured in his person and/or property. The Plaintiff members of the Vaughn family are the survivors and/or heirs of SGT Vaughn and are entitled to recover for the damages SGT Vaughn sustained.

**Y.  The April 9, 2008 EFP Attack in New Baghdad (Ault Family)**

1762.   On April 9, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in New Baghdad, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "April 9, 2008 Attack").

1763.   The April 9, 2008 Attack was planned and authorized by Hezbollah.

1764.   The April 9, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1765.   **Staff Sergeant Jesse Ault** served in Iraq as a member of the Army National Guard. SSG Ault was injured in the April 9, 2008 Attack. SSG Ault died on April 9, 2008, as a result of injuries sustained during the attack.

1766.   SSG Ault was a U.S. national at the time of the attack and his death.

1767.   Plaintiff Virginia Billiter is the mother of SSG Ault and a U.S. national.

1768.   Plaintiff Eric Billiter is the stepfather of SSG Ault and a U.S. national. Eric Billiter lived in the same household as SSG Ault for a substantial period of time and considered SSG Ault the functional equivalent of a biological son.

1769.   Plaintiff Adrianne Kidd is the stepsister of SSG Ault and a U.S. national. Adrianne Kidd lived in the same household as SSG Ault for a substantial period of time and considered SSG Ault the functional equivalent of a biological brother.

1770.   As a result of the April 9, 2008 Attack and SSG Ault's injuries and death, the Plaintiff members of the Ault family have experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Ault's society, companionship, and counsel.

1771.   As a result of the April 9, 2008 Attack, SSG Ault was injured in his person and/or property. The Plaintiff members of the Ault family are the survivors and/or heirs of SSG Ault and are entitled to recover for the damages SSG Ault sustained.

**Z.  The April 14, 2008 EFP Attack in New Baghdad (Richard Family)**

1772.   On April 14, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in New Baghdad, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "April 14, 2008 Attack").

1773.   The April 14, 2008 Attack was planned and authorized by Hezbollah.

1774.   The April 14, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1775. **Sergeant Joseph Richard III** served in Iraq as a member of the U.S. Army. SGT Richard was injured in the April 14, 2008 Attack. SGT Richard died on April 14, 2008, as a result of injuries sustained during the attack.

1776. SGT Richard was a U.S. national at the time of the attack and his death.

1777. Plaintiff Joseph Richard Jr. is the father of SGT Richard and a U.S. national.

1778. As a result of the April 14, 2008 Attack and SGT Richard's injuries and death, the Plaintiff members of the Richard family have experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Richard's society, companionship, and counsel.

1779. As a result of the April 14, 2008 Attack, SGT Richard was injured in his person and/or property. The Plaintiff members of the Richard family are the survivors and/or heirs of SGT Richard and are entitled to recover for the damages SGT Richard sustained.

### AA.    The April 21, 2008 EFP Attack in New Baghdad (Bogart Family)

1780. On April 21, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in New Baghdad, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "April 21, 2008 New Baghdad Attack").

1781. The April 21, 2008 New Baghdad Attack was planned and authorized by Hezbollah.

1782. The April 21, 2008 New Baghdad Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1783. **Specialist Evan Bogart** served in Iraq as a member of the U.S. Army. The April 21, 2008 New Baghdad Attack severely wounded SPC Bogart, who suffered from burns and blast injuries to his face, shrapnel injury to his left shoulder, PTSD, and tinnitus.

1784. As a result of the April 21, 2008 New Baghdad Attack and his injuries, SPC Bogart experienced severe physical and emotional pain and suffering. SPC Bogart later died on February 9, 2022, in an accident unrelated to his attack.

1785. SPC Bogart was a U.S. national at the time of the attack and at his death.

1786. Plaintiff Lani Bogart is the mother of SPC Bogart and a U.S. national.

1787. Plaintiff Douglas Bogart is the father of SPC Bogart and a U.S. national.

1788. Plaintiff Christopher Bogart is the brother of SPC Bogart and a U.S. national.

1789. Plaintiff Cana Hickman is the sister of SPC Bogart and a U.S. national.

1790. As a result of the April 21, 2008 New Baghdad Attack and SPC Bogart's injuries, the Plaintiff members of the Bogart family have experienced severe mental anguish as well as emotional pain and suffering.

1791. As a result of the April 21, 2008 New Baghdad Attack, SPC Bogart was injured in his person and/or property. The Plaintiff members of the Bogart family are the survivors and/or heirs of SPC Bogart and are entitled to recover for the damages SPC Bogart sustained.

**BB.    The April 21, 2008 EFP Attack in Adhamiyah (Rosa-Valentin Family)**

1792. On April 21, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in Adhamiyah, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "April 21, 2008 Adhamiyah Attack").

1793. The April 21, 2008 Adhamiyah Attack was planned and authorized by Hezbollah.

1794.   The April 21, 2008 Adhamiyah Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1795.   **Sergeant Luis Rosa-Valentin** served in Iraq as a member of the U.S. Army. The April 21, 2008 Adhamiyah Attack severely wounded SGT Rosa-Valentin, who suffered from amputations to both legs and his left arm, blindness in one eye, loss of hearing, the fracturing of every bone in his face, TBI, and PTSD.

1796.   As a result of the April 21, 2008 Adhamiyah Attack and his injuries, SGT Rosa-Valentin has experienced severe physical and emotional pain and suffering.

1797.   Plaintiff SGT Rosa-Valentin was a U.S. national at the time of the attack and remains one today.

1798.   Plaintiff Milinda Rosa is the daughter of SGT Rosa-Valentin and a U.S. national.

1799.   Plaintiff Luis Rosa-Alberty is the father of SGT Rosa-Valentin and a U.S. national.

1800.   Plaintiff Iliana Rosa-Valentin is the sister of SGT Rosa-Valentin and a U.S. national.

1801.   Plaintiff Alex Rosa-Valentin is the brother of SGT Rosa-Valentin and a U.S. national.

1802.   As a result of the April 21, 2008 Adhamiyah Attack and SGT Rosa-Valentin's injuries, the Plaintiff members of the Rosa-Valentin family have experienced severe mental anguish as well as emotional pain and suffering.

**CC.    The April 21, 2008 Indirect Fire Attack in Sadr City (Thomsen Family)**

1803.   On April 21, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an indirect fire attack in Sadr City, Baghdad, Iraq (the "April 21, 2008 Sadr City Attack").

1804.   The April 21, 2008 Sadr City Attack was planned and authorized by Hezbollah.

1805.   The April 21, 2008 Sadr City Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1806.   **Sergeant Mark Thomsen** served in Iraq as a member of the U.S. Army. The April 21, 2008 Sadr City Attack severely wounded SGT Thomsen, who suffered from TBI and PTSD, resulting in a 100% disability rating from the VA.

1807.   As a result of the April 21, 2008 Sadr City Attack and his injuries, SGT Thomsen has experienced severe physical and emotional pain and suffering.

1808.   Plaintiff SGT Thomsen was a U.S. national at the time of the attack and remains one today.

1809.   Plaintiff Ardell Thomsen is the mother of SGT Thomsen and a U.S. national.

1810.   Plaintiff Ralph Thomsen is the father of SGT Thomsen and a U.S. national.

1811.   As a result of the April 21, 2008 Sadr City Attack and SGT Thomsen's injuries, the Plaintiff members of the Thomsen family have experienced severe mental anguish as well as emotional pain and suffering.

### DD.   The April 24, 2008 EFP Attack in Sadr City (Christopher Violette)

1812.   On April 24, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in Sadr City, Baghdad, Iraq, which detonated an EFP supplied by the

IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "April 24, 2008 Attack").

1813.   The April 24, 2008 Attack was planned and authorized by Hezbollah.

1814.   The April 24, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1815.   **Sergeant First Class Christopher Violette** served in Iraq as a member of the U.S. Army. The April 24, 2008 Attack severely wounded SFC Violette, who suffered from severe cervical, thoracic, and lumbar spine injuries. SFC Violette was prescribed heavy pain killers and developed a 7-year addiction to pain medication.

1816.   Plaintiff SFC Violette was a U.S. national at the time of the attack and remains one today.

1817.   As a result of the April 24, 2008 Attack and his injuries, SFC Violette has experienced severe mental anguish as well as emotional pain and suffering.

**EE.   The April 27, 2008 RPG Attack in Sadr City (Farina Family)**

1818.   On April 27, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed a rocket propelled grenade attack in Sadr City, Baghdad, Iraq (the "April 27, 2008 RPG Attack").

1819.   The April 27, 2008 RPG Attack was planned and authorized by Hezbollah.

1820.   The April 27, 2008 RPG Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1821.   **Staff Sergeant Anthony Farina** served in Iraq as a member of the U.S. Army. The April 27, 2008 RPG Attack severely wounded SSG Farina, who suffered severe shrapnel wounds to his neck and was hit with sufficient force as to be knocked unconscious. Due to his injuries, SSG Farina received a 100% VA disability rating.

1822.   As a result of the April 27, 2008 RPG Attack and his injuries, SSG Farina has experienced severe physical and emotional pain and suffering.

1823.   Plaintiff SSG Farina was a U.S. national at the time of the attack and remains one today.

1824.   Plaintiff Kathleen Pirtle is the mother of SSG Farina and a U.S. national.

1825.   As a result of the April 27, 2008 RPG Attack and SSG Farina's injuries, the Plaintiff members of the Farina family have experienced severe mental anguish as well as emotional pain and suffering.

**FF. The April 27, 2008 Sniper Attack in Sadr City (Benjamin Zibutis)**

1826.   On April 27, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed a sniper attack in Sadr City, Baghdad, Iraq (the "April 27, 2008 Sniper Attack").

1827.   The April 27, 2008 Sniper Attack was planned and authorized by Hezbollah.

1828.   The April 27, 2008 Sniper Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1829.   **Sergeant Benjamin Zibutis** served in Iraq as a member of the U.S. Army. The April 27, 2008 Sniper Attack severely wounded SGT Zibutis, who suffered from TBI, PTSD, severe knee and back pain, nerve damage, and scarring to his right arm.

1830.   Plaintiff SGT Zibutis was a U.S. national at the time of the attack and remains one today.

1831.   As a result of the April 27, 2008 Sniper Attack and his injuries, SGT Zibutis has experienced severe mental anguish as well as emotional pain and suffering.

**GG.    The April 28, 2008 EFP Attack in New Bagdad (Cory Kenfield)**

1832.   On April 28, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in New Bagdad, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "April 28, 2008 EFP Attack").

1833.   The April 28, 2008 EFP Attack was planned and authorized by Hezbollah.

1834.   The April 28, 2008 EFP Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1835.   **Specialist Cory Kenfield** served in Iraq as a member of the U.S. Army. The April 28, 2008 EFP Attack (along with the April 5, 2008 Attack discussed *supra*) severely wounded SPC Kenfield, who suffered from herniated discs, TBI, balance issues, memory impairment, and speech issues.

1836.   Plaintiff SPC Kenfield was a U.S. national at the time of the attack and remains one today.

1837.   As a result of the April 28, 2008 EFP Attack and his injuries, SPC Kenfield has experienced severe mental anguish as well as emotional pain and suffering.

**HH.    The April 28, 2008 Complex Attack in Sadr City (Josey, Magers, and Montalbano Families)**

1838.   On April 28, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi and Hezbollah committed a complex attack in Sadr City, Baghdad, Iraq (the "April 28, 2008 Complex Attack").

1839.   The April 28, 2008 Complex Attack was planned and authorized by Hezbollah.

1840.   The April 28, 2008 Complex Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1841.   **Staff Sergeant Brandon Josey** served in Iraq as a member of the U.S. Army. The April 28, 2008 Complex Attack (along with the April 29, 2008 Attack discussed *infra*) severely wounded SSG Josey, who suffered from a concussion, glass and metal shrapnel in his legs and arms, TBI, and bulging disks.

1842.   Plaintiff SSG Josey was a U.S. national at the time of the attack and remains one today.

1843.   As a result of the April 28, 2008 Complex Attack and his injuries, SSG Josey has experienced severe mental anguish as well as emotional pain and suffering.

1844.   **Sergeant Adam Magers** served in Iraq as a member of the Army National Guard. The April 28, 2008 Complex Attack (along with the May 9, 2008 Attack discussed *infra*) severely wounded SGT Magers, who suffered from an injured shoulder and TBI.

1845.   Plaintiff SGT Magers was a U.S. national at the time of the attack and remains one today.

1846.   As a result of the April 28, 2008 Complex Attack and his injuries, SGT Magers has experienced severe mental anguish as well as emotional pain and suffering.

1847.   **Private First Class Samuel Montalbano** served in Iraq as a member of the U.S. Army. The April 28, 2008 Complex Attack severely wounded PFC Montalbano, who suffered from a herniated disk, PTSD, and hearing loss.

1848.   Plaintiff PFC Montalbano was a U.S. national at the time of the attack and remains one today.

1849.   As a result of the April 28, 2008 Complex Attack and his injuries, PFC Montalbano has experienced severe physical and emotional pain and suffering.

## II.  The April 29, 2008 Complex Attack in Sadr City (Brandon Josey)

1850.   On April 29, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed a complex attack involving RPGs, small arms, and mortars in Sadr City, Baghdad, Iraq (the "April 29, 2008 Attack").

1851.   The April 29, 2008 Attack was planned and authorized by Hezbollah.

1852.   The April 29, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1853.   **Staff Sergeant Brandon Josey** served in Iraq as a member of the U.S. Army. The April 29, 2008 Attack (along with the April 28, 2008 Complex Attack discussed *supra*) severely wounded SSG Josey, who suffered from a concussion, glass and metal shrapnel in his legs and arms, TBI, and bulging disks.

1854.   Plaintiff SSG Josey was a U.S. national at the time of the attack and remains one today.

1855.   As a result of the April 29, 2008 Attack and his injuries, SSG Josey has experienced severe mental anguish as well as emotional pain and suffering.

**JJ. The April 30, 2008 EFP Attack in Al Rashid (Tucker Family)**

1856.   On April 30, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in Al Rashid, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "April 30, 2008 Attack").

1857.   The April 30, 2008 Attack was planned and authorized by Hezbollah.

1858.   The April 30, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1859.   **Specialist Ronald Tucker** served in Iraq as a member of the U.S. Army. SPC Tucker was injured in the April 30, 2008 Attack. SPC Tucker died on April 30, 2008, as a result of injuries sustained during the attack.

1860.   SPC Tucker was a U.S. national at the time of the attack and his death.

1861.   Plaintiff Susan Arnold is the mother of SPC Tucker and a U.S. national. She brings claims in her individual capacity and in her representative capacity on behalf of Ronald Tucker's estate.

1862.   Plaintiff Brandon Arnold is the brother of SPC Tucker and a U.S. national.

1863.   Plaintiff Daisy Tucker is the sister of SPC Tucker and a U.S. national.

1864.   Plaintiff Samantha Tucker is the sister of SPC Tucker and a U.S. national.

1865.   Plaintiff David Arnold is the stepfather of SPC Tucker and a U.S. national. David Arnold lived in the same household as SPC Tucker for a substantial period of time and considered SPC Tucker the functional equivalent of a biological son.

1866.    As a result of the April 30, 2008 Attack and SPC Tucker's injuries and death, the Plaintiff members of the Tucker family have experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Tucker's society, companionship, and counsel.

1867.    As a result of the April 30, 2008 Attack, SPC Tucker was injured in his person and/or property. The Plaintiff members of the Tucker family are the survivors and/or heirs of SPC Tucker and are entitled to recover for the damages SPC Tucker sustained.

**KK.    The May 1, 2008 RPG Attack in Sadr City (Daggett Family)**

1868.    On May 1, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed a rocket propelled grenade attack in Sadr City, Baghdad, Iraq (the "May 1, 2008 Attack").

1869.    The May 1, 2008 Attack was planned and authorized by Hezbollah.

1870.    The May 1, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1871.    **Sergeant John Daggett** served in Iraq as a member of the U.S. Army. SGT Daggett was injured in the May 1, 2008 Attack and immediately underwent surgery. During the flight back to the U.S., SGT Daggett developed complications which necessitated an emergency landing in Halifax, Nova Scotia. SGT Daggett succumbed to his injuries several days later and died on May 15, 2008.

1872.    SGT Daggett was a U.S. national at the time of the attack and his death.

1873.    Plaintiff Colleen Czaplicki is the mother of SGT Daggett and a U.S. national.

1874.    Plaintiff John Daggett is the father of SGT Daggett and a U.S. national.

1875.    Plaintiff Kendall Rasmusson is the sister of SGT Daggett and a U.S. national.

1876.   As a result of the May 1, 2008 Attack and SGT Daggett's injuries and death, the Plaintiff members of the Daggett family have experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Daggett's society, companionship, and counsel.

1877.   As a result of the May 1, 2008 Attack, SGT Daggett was injured in his person and/or property. The Plaintiff members of the Daggett family are the survivors and/or heirs of SGT Daggett and are entitled to recover for the damages SGT Daggett sustained.

### LL.   The May 4, 2008 RPG Attack in Adhamiyah (Briggs and Vazquez Families)

1878.   On May 4, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed a rocket propelled grenade attack in Adhamiyah, Baghdad, Iraq (the "May 4, 2008 Attack").

1879.   The May 4, 2008 Attack was planned and authorized by Hezbollah.

1880.   The May 4, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1881.   **Sergeant Michael Briggs** served in Iraq as a member of the U.S. Army. The May 4, 2008 Attack severely wounded SGT Briggs, who suffered from a severe concussion, TBI, migraines, hearing loss, slipped disk in his neck which adds pressure on his spinal cord, and nerve damage to his arms as a result of the compression on his spine.

1882.   As a result of the May 4, 2008 Attack and his injuries, SGT Briggs has experienced severe physical and emotional pain and suffering.

1883.   Plaintiff SGT Briggs was a U.S. national at the time of the attack and remains one today.

1884.   Plaintiff Takarra Briggs is the wife of SGT Briggs and a U.S. national.

1885.   Plaintiff M.B., by and through her next friend Takarra Briggs, is the minor daughter of SGT Briggs and a U.S. national.

1886.   Plaintiff M.J.B., by and through his next friend Takarra Briggs, is the minor son of SGT Briggs and a U.S. national.

1887.   Plaintiff Michael David Briggs is the stepson of SGT Briggs and a U.S. national. Michael David Briggs lived in the same household as SGT Briggs for a substantial period of time and considered SGT Briggs the functional equivalent of a biological father.

1888.   As a result of the May 4, 2008 Attack and SGT Briggs's injuries, the Plaintiff members of the Briggs family have experienced severe mental anguish as well as emotional pain and suffering.

1889.   **Sergeant Andres Vazquez** served in Iraq as a member of the U.S. Army. The May 4, 2008 Attack severely wounded SGT Vazquez, who suffered from TBI, concussion-related injuries, migraines, photosensitivity, memory loss, and damage to his right ankle.

1890.   As a result of the May 4, 2008 Attack and his injuries, SGT Vazquez has experienced severe physical and emotional pain and suffering.

1891.   Plaintiff SGT Vazquez was a U.S. national at the time of the attack and remains one today.

1892.   Plaintiff Barbara Palacio-Vazquez is the wife of SGT Vazquez and a U.S. national.

1893.   Plaintiff J.V., by and through her next friend Barbara Palacio-Vazquez, is the minor daughter of SGT Vazquez and a U.S. national.

1894.   Plaintiff Melissa Vazquez is the daughter of SGT Vazquez and a U.S. national.

1895.   Plaintiff Alexandra Vazquez is the daughter of SGT Vazquez and a U.S. national.

1896.   As a result of the May 4, 2008 Attack and SGT Vazquez's injuries, the Plaintiff members of the Vazquez family have experienced severe mental anguish as well as emotional pain and suffering.

**MM.   The May 9, 2008 EFP Attack in Sadr City (Adam Magers)**

1897.   On May 9, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in Sadr City, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "May 9, 2008 Attack").

1898.   The May 9, 2008 Attack was planned and authorized by Hezbollah.

1899.   The May 9, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1900.   **Sergeant Adam Magers** served in Iraq as a member of the Army National Guard. The May 9, 2008 Attack (along with the April 28, 2008 Complex Attack discussed *supra*) severely wounded SGT Magers, who suffered from an injured shoulder and TBI.

1901.   Plaintiff SGT Magers was a U.S. national at the time of the attack and remains one today.

1902.   As a result of the May 9, 2008 Attack and his injuries, SGT Magers has experienced severe mental anguish as well as emotional pain and suffering.

**NN.   The June 12, 2008 EFP Attack in Kadhimiya (Aragon Family)**

1903.   On June 12, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in Kadhimiya, Baghdad, Iraq, which detonated an EFP supplied by the

IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "June 12, 2008 Attack").

1904.   The June 12, 2008 Attack was planned and authorized by Hezbollah.

1905.   The June 12, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1906.   **Sergeant John Aragon** served in Iraq as a member of the U.S. Army. SGT Aragon was injured in the June 12, 2008 Attack. SGT Aragon died on June 12, 2008, as a result of injuries sustained during the attack.

1907.   SGT Aragon was a U.S. national at the time of the attack and his death.

1908.   Plaintiff John Aragon Sr. is the father of SGT Aragon and a U.S. national.

1909.   As a result of the June 12, 2008 Attack and SGT Aragon's injuries and death, Plaintiff John Aragon Sr. has experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Aragon's society, companionship, and counsel.

1910.   As a result of the June 12, 2008 Attack, SGT Aragon was injured in his person and/or property. Plaintiff John Aragon Sr. is a survivor and/or heir of SGT Aragon and is entitled to recover for the damages SGT Aragon sustained.

### OO.   The June 24, 2008 Bomb Attack in Sadr City (Farley and Suveges Families)

1911.   On June 24, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed a bomb attack in Sadr City, Baghdad, Iraq (the "June 24, 2008 Attack").

1912.   The June 24, 2008 Attack was planned and authorized by Hezbollah.

1913.   The June 24, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victims of this attack were civilians not

taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1914.    **Steven Farley** was in Iraq as a civilian working for the U.S. Department of State. Steven Farley was injured in the June 24, 2008 Attack. Steven Farley died on June 24, 2008, as a result of injuries sustained during the attack.

1915.    Steven Farley was a U.S. national at the time of the attack and his death.

1916.    Plaintiff Brett Farley is the son of Steven Farley and a U.S. national. He brings claims in his individual capacity and in his representative capacity on behalf of Steven Farley's estate.

1917.    Plaintiff Donna Farley is the widow of Steven Farley and a U.S. national.

1918.    Plaintiff Christopher Farley is the son of Steven Farley and a U.S. national.

1919.    Plaintiff Cameron Farley is the son of Steven Farley and a U.S. national.

1920.    Plaintiff Vickie McHone is the sister of Steven Farley and a U.S. national. She brings claims in her individual capacity and in her representative capacities on behalf of the estates of Noel Farley and Barbara Farley. Noel Farley is the father of Steven Farley and was a U.S. national at the time of the attack and at his death. Barbara Farley is the mother of Steven Farley and was a U.S. national at the time of the attack and at her death.

1921.    Plaintiff David Farley is the brother of Steven Farley and a U.S. national.

1922.    Plaintiff Noel S. Farley is the brother of Steven Farley and a U.S. national.

1923.    David Proffitt is the personal representative of the estate of Carla Proffitt and a U.S. national. He brings claims solely in a representative capacity on behalf of Carla Proffitt's

estate. Carla Proffitt was the sister of Steven Farley and was a U.S. national at the time of the attack and at her death.

1924.   As a result of the June 24, 2008 Attack and Steven Farley's injuries and death, the Plaintiff members of the Farley family have experienced severe mental anguish, emotional pain and suffering, and the loss of Steven Farley's society, companionship, and counsel.

1925.   As a result of the June 24, 2008 Attack, Steven Farley was injured in his person and/or property. The Plaintiff members of the Farley family are the survivors and/or heirs of Steven Farley and are entitled to recover for the damages Steven Farley sustained.

1926.   **Nicole Suveges** was in Iraq as a civilian working for BAE Systems. Nicole Suveges was injured in the June 24, 2008 Attack. Nicole Suveges died on June 24, 2008, as a result of injuries sustained during the attack.

1927.   Nicole Suveges was a U.S. national at the time of the attack and her death.

1928.   Plaintiff David Iverson is the widower of Nicole Suveges and a U.S. national.

1929.   As a result of the June 24, 2008 Attack and Nicole Suveges's injuries and death, Plaintiff David Iverson has experienced severe mental anguish, emotional pain and suffering, and the loss of Nicole Suveges's society, companionship, and counsel.

1930.   As a result of the June 24, 2008 Attack, Nicole Suveges was injured in her person and/or property. Plaintiff David Iverson is a survivor and/or heir of Nicole Suveges and is entitled to recover for the damages Nicole Suveges sustained.

**PP. The June 25, 2008 EFP Attack in New Baghdad (Plocica Family)**

1931.   On June 25, 2008, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in New Baghdad, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "June 25, 2008 Attack").

1932.   The June 25, 2008 Attack was planned and authorized by Hezbollah.

1933.   The June 25, 2008 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1934.   **Specialist Joshua Plocica** served in Iraq as a member of the U.S. Army. SPC Plocica was injured in the June 25, 2008 Attack. SPC Plocica died on June 25, 2008, as a result of injuries sustained during the attack.

1935.   SPC Plocica was a U.S. national at the time of the attack and his death.

1936.   Plaintiff Brenna Mack is the sister of SPC Plocica and a U.S. national.

1937.   Plaintiff Lowell Thompson is the stepfather of SPC Plocica and a U.S. national. Lowell Thompson lived in the same household as SPC Plocica for a substantial period of time and considered SPC Plocica the functional equivalent of a biological son.

1938.   As a result of the June 25, 2008 Attack and SPC Plocica's injuries and death, the Plaintiff members of the Plocica family have experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Plocica's society, companionship, and counsel.

1939.   As a result of the June 25, 2008 Attack, SPC Plocica was injured in his person and/or property. The Plaintiff members of the Plocica family are the survivors and/or heirs of SPC Plocica and are entitled to recover for the damages SPC Plocica sustained.

**QQ.    The February 15, 2009 EFP Attack in Basra (Diamond Family)**

1940.   On February 15, 2009, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in Basra, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "February 15, 2009 Attack").

1941.   The February 15, 2009 Attack was planned and authorized by Hezbollah.

1942.   The February 15, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1943.   **Staff Sergeant Sean Diamond** served in Iraq as a member of the U.S. Army. SSG Diamond was injured in the February 15, 2009 Attack. SSG Diamond died on February 15, 2009, as a result of injuries sustained during the attack.

1944.   SSG Diamond was a U.S. national at the time of the attack and his death.

1945.   Plaintiff Loramay Diamond is the widow of SSG Diamond and a U.S. national. She brings claims in her individual capacity and in her representative capacity on behalf of Sean Diamond's estate.

1946.   Plaintiff Sean R. Diamond is the son of SSG Diamond and a U.S. national.

1947.   Plaintiff Madison Diamond is the daughter of SSG Diamond and a U.S. national.

1948.   Plaintiff Taylor Diamond is the daughter of SSG Diamond and a U.S. national.

1949.   Plaintiff Athena Diamond is the daughter of SSG Diamond and a U.S. national.

1950.   Plaintiff Sally Wiley is the mother of SSG Diamond and a U.S. national.

1951.   Plaintiff Jason Diamond is the brother of SSG Diamond and a U.S. national.

1952.   As a result of the February 15, 2009 Attack and SSG Diamond's injuries and death, the Plaintiff members of the Diamond family have experienced severe mental anguish, emotional pain and suffering, and the loss of SSG Diamond's society, companionship, and counsel.

1953.   As a result of the February 15, 2009 Attack, SSG Diamond was injured in his person and/or property. The Plaintiff members of the Diamond family are the survivors and/or heirs of SSG Diamond and are entitled to recover for the damages SSG Diamond sustained.

**RR.   The February 26, 2009 EFP Attack in Adhamiyah (Connelly Family)**

1954.   On February 26, 2009, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in Adhamiyah, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "February 26, 2009 Attack").

1955.   The February 26, 2009 Attack was planned and authorized by Hezbollah.

1956.   The February 26, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1957.   **Corporal Brian Connelly** served in Iraq as a member of the U.S. Army. CPL Connelly was injured in the February 26, 2009 Attack. CPL Connelly died on February 26, 2009, as a result of injuries sustained during the attack.

1958.   CPL Connelly was a U.S. national at the time of the attack and his death.

1959.   Plaintiff Kara Connelly is the widow of CPL Connelly and a U.S. national.

1960.   Plaintiff Jean Dammann is the mother of CPL Connelly and a U.S. national.

1961.   Plaintiff Mark Dammann is the father of CPL Connelly and a U.S. national.

1962.   Plaintiff Kevin Connelly is the brother of CPL Connelly and a U.S. national.

1963.   As a result of the February 26, 2009 Attack and CPL Connelly's injuries and death, the Plaintiff members of the Connelly family have experienced severe mental anguish,

emotional pain and suffering, and the loss of CPL Connelly's society, companionship, and counsel.

1964.   As a result of the February 26, 2009 Attack, CPL Connelly was injured in his person and/or property. The Plaintiff members of the Connelly family are the survivors and/or heirs of CPL Connelly and are entitled to recover for the damages CPL Connelly sustained.

**SS. The April 12, 2009 EFP Attack in Saladin (Anaya Family)**

1965.   On April 12, 2009, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in Saladin, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "April 12, 2009 Attack").

1966.   The April 12, 2009 Attack was planned and authorized by Hezbollah.

1967.   The April 12, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1968.   **Corporal Michael Anaya** served in Iraq as a member of the U.S. Army. CPL Anaya was injured in the April 12, 2009 Attack. CPL Anaya died on April 12, 2009, as a result of injuries sustained during the attack.

1969.   CPL Anaya was a U.S. national at the time of the attack and his death.

1970.   Plaintiff Trista Moffett is the sister of CPL Anaya and a U.S. national. She brings claims in her individual capacity and in her representative capacities on behalf of Michael Anaya's estate and on behalf of Cheryl Anaya's estate. Cheryl Anaya was the mother of CPL Anaya and was a U.S. national at the time of the attack and at her death.

1971.   As a result of the April 12, 2009 Attack and CPL Anaya's injuries and death, the Plaintiff members of the Anaya family have experienced severe mental anguish, emotional pain and suffering, and the loss of CPL Anaya's society, companionship, and counsel.

1972.   As a result of the April 12, 2009 Attack, CPL Anaya was injured in his person and/or property. The Plaintiff members of the Anaya family are the survivors and/or heirs of CPL Anaya and are entitled to recover for the damages CPL Anaya sustained.

**TT.    The April 13, 2009 EFP Attack in Karbala (Moncada Family)**

1973.   On April 13, 2009, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack near Karbala, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "April 13, 2009 Attack").

1974.   The April 13, 2009 Attack was planned and authorized by Hezbollah.

1975.   The April 13, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1976.   **Sergeant Raul Moncada** served in Iraq as a member of the U.S. Army. SGT Moncada was injured in the April 13, 2009 Attack. SGT Moncada died on April 13, 2009, as a result of injuries sustained during the attack.

1977.   SGT Moncada was a U.S. national at the time of the attack and his death.

1978.   Plaintiff Obdulia Moncada is the mother of SGT Moncada and a U.S. national.

1979.   Plaintiff Alexandra Aguilar is the sister of SGT Moncada and a U.S. national.

1980.   Plaintiff Matthew Moncada is the brother of SGT Moncada and a U.S. national.

1981.   Plaintiff Daniela Moncada is the sister of SGT Moncada and a U.S. national.

1982.   Plaintiff Miriam Lopez is the sister of SGT Moncada and a U.S. national.

1983.   As a result of the April 13, 2009 Attack and SGT Moncada's injuries and death, the Plaintiff members of the Moncada family have experienced severe mental anguish, emotional pain and suffering, and the loss of SGT Moncada's society, companionship, and counsel.

1984.   As a result of the April 13, 2009 Attack, SGT Moncada was injured in his person and/or property. The Plaintiff members of the Moncada family are the survivors and/or heirs of SGT Moncada and are entitled to recover for the damages SGT Moncada sustained.

**UU.    The October 12, 2009 EFP Attack in Al Amara (Stephen Evans)**

1985.   On October 12, 2009, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in Al Amara, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "October 12, 2009 Attack").

1986.   The October 12, 2009 Attack was planned and authorized by Hezbollah.

1987.   The October 12, 2009 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1988.   **Sergeant Stephen Evans** served in Iraq as a member of the U.S. Army. The October 12, 2009 Attack severely wounded SGT Evans, who suffered from a broken left tibia, burns to his face and body, loss of one testicle, TBI, and loss of tissue in his thigh.

1989.   Plaintiff SGT Evans was a U.S. national at the time of the attack and remains one today.

1990.   As a result of the October 12, 2009 Attack and his injuries, SGT Evans has experienced severe mental anguish as well as emotional pain and suffering.

**VV.    The August 4, 2010 EFP attack in Najaf (Craven Family)**

1991.    On August 4, 2010, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in Najaf, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "August 4, 2010 Attack").

1992.    The August 4, 2010 Attack was planned and authorized by Hezbollah.

1993.    The August 4, 2010 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

1994.    **Specialist Joshua Craven** served in Iraq as a member of the U.S. Army. The August 4, 2010 Attack severely wounded SPC Craven, who suffered from amputation of his left leg above the knee and a right limb salvage with paralysis.

1995.    As a result of the August 4, 2010 Attack and his injuries, SPC Craven has experienced severe physical and emotional pain and suffering.

1996.    Plaintiff SPC Craven was a U.S. national at the time of the attack and remains one today.

1997.    Plaintiff Holly Craven is the wife of SPC Craven and a U.S. national.

1998.    As a result of the August 4, 2010 Attack and SPC Craven's injuries, Plaintiff Holly Craven has experienced severe mental anguish as well as emotional pain and suffering.

**WW.    The April 22, 2011 EFP Attack in Wasit (Vazquez Family)**

1999.    On April 22, 2011, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in Wasit, Iraq, which detonated an EFP supplied by the IRGC for

which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "April 22, 2011 Attack").

2000.  The April 22, 2011 Attack was planned and authorized by Hezbollah.

2001.  The April 22, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

2002.  **First Lieutenant Omar Vazquez** served in Iraq as a member of the U.S. Army. 1LT Vazquez was injured in the April 22, 2011 Attack. 1LT Vazquez died on April 22, 2011, as a result of injuries sustained during the attack.

2003.  1LT Vazquez was a U.S. national at the time of the attack and his death.

2004.  Plaintiff Maria Vazquez is the mother of 1LT Vazquez and a U.S. national. She brings claims in her individual capacity and in her representative capacity on behalf of Omar Vazquez's estate.

2005.  Plaintiff Marisel Vazquez is the stepsister of 1LT Vazquez and a U.S. national. Marisel Vazquez lived in the same household as 1LT Vazquez for a substantial period of time and considered 1LT Vazquez the functional equivalent of a biological brother.

2006.  As a result of the April 22, 2011 Attack and 1LT Vazquez's injuries and death, the Plaintiff members of the Vazquez family have experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Vazquez's society, companionship, and counsel.

2007.  As a result of the April 22, 2011 Attack, 1LT Vazquez was injured in his person and/or property. The Plaintiff members of the Vazquez family are the survivors and/or heirs of 1LT Vazquez and are entitled to recover for the damages 1LT Vazquez sustained.

## XX.    The June 23, 2011 EFP Attack in Baghdad (Everhart Family)

2008.    On June 23, 2011, a joint cell comprised of Hezbollah and Jaysh al-Mahdi, committed an EFP attack in Karadah, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "June 23, 2011 Attack").

2009.    The June 23, 2011 Attack was planned and authorized by Hezbollah.

2010.    The June 23, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the victim of this attack was a civilian not taking part in hostilities. Further, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

2011.    **Dr. Stephen Everhart** was in Iraq as a civilian serving as part of the faculty at The American University in Cairo. Dr. Everhart was injured in the June 23, 2011 Attack. Dr. Everhart died on June 23, 2011, as a result of injuries sustained during the attack.

2012.    Dr. Everhart was a U.S. national at the time of the attack and his death.

2013.    Plaintiff Stephanie Zobay is the widow of Dr. Everhart and a U.S. national. She brings claims in her individual capacity and in her representative capacity on behalf of Stephen Everhart's estate.

2014.    Plaintiff Lindsay Everhart is the daughter of Dr. Everhart and a U.S. national.

2015.    Plaintiff Hannah Everhart is the daughter of Dr. Everhart and a U.S. national.

2016.    Plaintiff Hayden Everhart is the son of Dr. Everhart and a U.S. national.

2017.    As a result of the June 23, 2011 Attack and Dr. Everhart's injuries and death, the Plaintiff members of the Everhart family have experienced severe mental anguish, emotional pain and suffering, and the loss of Dr. Everhart's society, companionship, and counsel.

2018.   As a result of the June 23, 2011 Attack, Dr. Everhart was injured in his person and/or property. The Plaintiff members of the Everhart family are the survivors and/or heirs of Dr. Everhart and are entitled to recover for the damages Dr. Everhart sustained.

### YY.   The July 7, 2011 EFP Attack in Adhamiyah (Rzepa Family)

2019.   On July 7, 2011, a joint cell comprised of Hezbollah and Jaysh al-Mahdi committed an EFP attack in Adhamiyah, Baghdad, Iraq, which detonated an EFP supplied by the IRGC for which Jaysh al-Mahdi was trained and directed to attack by Hezbollah (the "July 7, 2011 Attack").

2020.   The July 7, 2011 Attack was planned and authorized by Hezbollah.

2021.   The July 7, 2011 Attack would have violated the laws of war if these terrorists were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

2022.   **Staff Sergeant Jason Rzepa** served in Iraq as a member of the Army National Guard. The July 7, 2011 Attack severely wounded SSG Rzepa, who suffered from double leg amputations below the knees.

2023.   As a result of the July 7, 2011 Attack and his injuries, SSG Rzepa has experienced severe physical and emotional pain and suffering.

2024.   Plaintiff SSG Rzepa was a U.S. national at the time of the attack and remains one today.

2025.   Plaintiff Kohl Rzepa is the son of SSG Rzepa and a U.S. national.

2026.   As a result of the July 7, 2011 Attack and SSG Rzepa's injuries, the Plaintiff members of the Rzepa family have experienced severe mental anguish as well as emotional pain and suffering.

## CLAIM FOR RELIEF

### Aiding and Abetting Under the Anti-Terrorism Act
### 18 U.S.C. § 2333(d)(2)

2027.   Plaintiffs incorporate their factual allegations above.

2028.   To establish a claim for aiding and abetting under JASTA, 18 U.S.C. § 2333(d), Plaintiffs must show: (1) that they are U.S. nationals, or the estates, survivors, or heirs of U.S. nationals; (2) that they were injured by an act of "international terrorism," as defined by 18 U.S.C. § 2331(1); (3) that the act of international terrorism was committed, planned, or authorized by a designated FTO; (4) that BNPP was generally aware that it was playing a role in an overall illegal or tortious activity from which the act of international terrorism was a foreseeable consequence; and (5) that BNPP knowingly provided substantial assistance.

2029.   Every Plaintiff is a U.S. national, or the estate, survivor, or heir of a U.S. national.

2030.   The terrorist attacks that injured Plaintiffs were acts of "international terrorism" because:

2031.   the attacks involved violent and dangerous acts that violate the criminal laws of the United States and many States (or would if committed in the United States). In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f, respectively;

2032.   the attacks, carried out by terrorists bent on expelling the United States and its allies from Iraq and the Middle East, appear to have been intended (i) to intimidate or coerce the civilian populations of Iraq, Israel, the United States, and other nations, (ii) to influence the policy of the U.S., Israeli, Iraqi, and other governments by intimidation and coercion, and (iii) to affect the conduct of the U.S., Israeli, Iraqi, and other governments by mass destruction, assassination, and kidnapping; and

2033.   the attacks occurred primarily outside the territorial jurisdiction of the United States, in Iraq and Israel.

2034.   Each attack was committed, planned, or authorized by one or more FTOs. Every attack was committed by one or more of Hezbollah, Hamas, and PIJ, all of which were FTOs at all relevant times.

2035.   Every attack, regardless of who committed it, was planned or authorized by Hezbollah and/or Hamas and/or PIJ, each of which was always an FTO.

2036.   BNPP was generally aware that it was playing a role in illegal activity, and that the terrorist attacks that injured Plaintiffs were a natural and foreseeable consequence of that activity.

2037.   BNPP provided assistance knowingly and culpably, and not innocently or inadvertently. BNPP did so with knowledge that it was aiding terrorist organizations carrying out attacks on Americans.

2038.   BNPP's assistance was substantial.

2039.   BNPP's assistance was pervasive and systemic, involving the highest levels of BNPP's management, years of willful misconduct, and tremendous sums of money that provided critically important assistance to the IRGC and its terrorist proxies.

2040.   As a result of BNPP's liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

2041.   In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

2042.   Wherefore, Plaintiffs pray this Court:

 a. Enter judgment against BNPP finding it liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

 b. Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

 c. Award Plaintiffs their attorneys' fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

 d. Award Plaintiffs prejudgment interest; and

 e. Award Plaintiffs any such further relief the Court deems just and proper.

Dated: November 22, 2024

Respectfully submitted,

SPARACINO PLLC

*/s/ Adam J. Goldstein*

Adam J. Goldstein
Ryan R. Sparacino (*pro hac vice* forthcoming)
Geoffrey P. Eaton (*pro hac vice* forthcoming)
Tejinder Singh
Jacob R. Loshin (*pro hac vice* forthcoming)
Stacey L. Wilson (*pro hac vice* forthcoming)
Matthew J. Fisher (*pro hac vice* forthcoming)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
adam.goldstein@sparacinopllc.com
ryan.sparacino@sparacinopllc.com
geoff.eaton@sparacinopllc.com
tejinder.singh@sparacinopllc.com
jacob.loshin@sparacinopllc.com
stacey.wilson@sparacinopllc.com
matt.fisher@sparacinopllc.com

*Counsel for Plaintiffs*