UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| NAFTALI MOSES, et al.,<br><br>                              Plaintiffs,<br><br>              -against-<br><br>BNP PARIBAS, S.A.,<br><br>                              Defendant. | 24-CV-4938 (JGLC)<br><br>**OPINION AND ORDER** |

JESSICA G. L. CLARKE, United States District Judge:

     For decades, Iran, through its Supreme Leader, and with the assistance of related organizations and factions, has carried out heinous acts of terror in Iraq and Israel, many of which targeted Americans. This terrorism machine relied on the use of commercial fronts, primarily in the oil and gas sectors in Iran, which purported to be legitimate business operations.

     In 2014, it came to light that Defendant BNP Paribas, S.A ("BNPP" or "Defendant") entered into criminal guilty pleas and civil settlement agreements with the Department of Justice, the Manhattan District Attorney's Office, the New York Department of Financial Services, and other regulatory agencies. These agreements revealed that, for a decade, BNPP deliberately, and systematically, sought to evade United States counterterrorism controls and regulations by facilitating financial transactions to Iranian entities in a manner that violated United States sanctions requirements. This conduct included, among other things: (1) BNPP substituting the names of Iranian parties with BNPP's own name in payment messages; (2) omitting Iranian entities' names from transactions; and (3) structuring payments in highly complex ways with no legitimate business purpose to evade detection. BNPP did so despite direct warnings and troves of publicly available information elucidating the connection between Iranian terrorism groups and oil and gas companies in the nation.

Based primarily on the revelations of fact contained in these pleas and agreements, Plaintiffs—a large collection of American civilians and servicemembers (and their family members) who were injured in, or directly affected by, terrorist attacks carried out by the Iranian regime in Israel and Iraq between 2006 and 2016—filed this action alleging that BNPP violated the Anti-Terrorism Act, 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act, codified at Pub. L. No. 114-222, 130 Stat. 852 (2016). Specifically, Plaintiffs allege that BNPP aided-and-abetted the terrorist attacks by financially contributing to front companies in the oil and gas industries that foreign terrorist organizations used to fund terrorist activity.

Presently before the Court is the Defendant's motion to dismiss pursuant to Rules 12(b)(2) (lack of personal jurisdiction) and 12(b)(6) (failure to state a claim). As set forth below, the Court finds that, while it is a close call, Plaintiffs have adequately alleged that Defendant had the requisite general awareness of its involvement in illicit activity from which terrorist attacks were foreseeable. The Court also finds that Plaintiffs have plausibly alleged that Defendant knowingly and substantially assisted the terrorist scheme by facilitating numerous financial transactions in a manner that violated U.S. sanctions.

However, the Court only makes this finding regarding BNPP's services to two customers described in the amended complaint, and dismisses Plaintiffs' claim to the extent it relies on BNPP's services to unidentified and unnamed Iranian entities. The Court also finds that Plaintiffs' claims are not time-barred, and that personal jurisdiction can properly be exercised over BNPP. Therefore, Defendant's motion to dismiss is GRANTED in part and DENIED in part.

## BACKGROUND

The Court assumes the parties' familiarity with the relevant facts in this litigation, and therefore provides only a brief summary touching upon the facts most relevant to the pending motion. In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). The following facts are, unless otherwise noted, taken from the Complaint and presumed to be true for the purposes of the instant motion. *See LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).

## I.    The Parties

Plaintiffs are 288 direct and indirect victims of 12 terrorist attacks committed in Israel from 2008 to 2016, and 51 attacks committed in Iraq from 2006 to 2011. ECF No. 19 ("Am. Compl." or "AC") [1] ¶ 12. "Direct" victims refer to those who were physically injured or killed in an attack, and "indirect" victims are the close family members of "direct" victims. *Id.* The AC alleges that certain Plaintiffs or their family members were killed or injured in connection with a series of attacks in Iraq and in Israel which were sponsored by various Foreign Terrorist Organizations ("FTOs"). ¶¶ 1273–2026.

Defendant BNP Paribas is a foreign bank with operations and business lines in a myriad of countries across the globe. ¶ 14. Among other things, BNPP provides clearing services for international wire payments, which includes currency conversion. ¶ 16. BNPP has licensed branches throughout the Middle East, including in Bahrain, Kuwait, Qatar, Saudi Arabia, and the

---

[1] Unless otherwise indicated, citations with a paragraph symbol refer to the operative Amended Complaint (ECF No. 19).

United Arab Emirates. ¶ 17. BNPP also had a representative office in Iran (from 1972 through late 2007) and has had an office in Israel since 1998. ¶¶ 18–19.

## II.    The Alleged Iranian Terrorism Machine

As the United States Department of State found in 2018, Iran's Islamic Republic has made it a policy to actively direct and facilitate terrorist activity globally, and does so through the Islamic Revolutionary Guard Corps ("IRGC"). ¶ 49. From 1979 through 2024, the Iranian Regime, through various proxies and FTOs, sponsored and carried out terrorist attacks in the Middle East that targeted the United States. ¶¶ 49–518. Plaintiffs allege that a specific group of institutions and organizations, which they refer to as the "Terrorist Sponsors," assisted the Iranian Regime in carrying out terrorist attacks against Americans. This group included Hezbollah; the Foundation for the Oppressed (a purported charitable foundation that Plaintiffs allege in fact operated as a global operations front for Hezbollah); the IRGC; and the Supreme Leader Ayatollah Khamenei and the Supreme Leader's Office ("SLO"). ¶¶ 47, 951. Financial transactions with Iran have been subject to U.S. economic sanctions since 1979. ¶ 523.

From 2007 through 2024, the Terrorist Sponsors controlled over half of the entire Iranian economy, with some estimates reaching as high as 85%. ¶ 470. The increased control occurred in stages and involved the Terrorist Sponsors capturing sectors of Iran's economy and turning businesses into fronts to finance terrorism. ¶¶ 470–518. For instance, between 2005 and 2009, the IRGC and SLO orchestrated a monopolistic takeover of key components of Iran's economy including the communications, construction, import/export, and oil and gas sectors. ¶¶ 478, 481. The IRGC and SLO exercised a monopoly over these sectors from 2007 through 2020. ¶¶ 478–489. The U.S. government observed that key Iranian leaders and factions "gained a substantial

4

measure of control over major segments of the Iranian economy, avoiding virtually any official transparency or accountability[.]" ¶ 474.

Plaintiffs allege that the IRGC exercised "market segment monopolies" in the energy, construction, sanctions evasion, finance, import/export, and communications industries. ¶ 481. The AC asserts that "by 2009 one or more of [the Terrorist Sponsors] controlled and/or beneficially owned every major and minor oil, petroleum, and petrochemical company in Iran[.]" ¶ 628.

The "terrorism machine" also siphoned money from commercial ventures. From 2003 through 2020, the "Logistics Policy Directive" required that the proceeds from commercial ventures of "any unit" of the IRGC be used to, among other things, strengthen the IRGC and replace the IRGC's equipment and machinery needed for its operations (i.e., terrorism). ¶¶ 924–928. In addition, from 1979 through 2024, Ayatollah Khamenei mandated donations (usually 20% on all IRGC transactions) to support his agenda that flowed up to him and back down to the Terrorist Sponsors as needed. ¶¶ 929–35. That mandate ensured that at least twenty cents of every dollar flowed to supporting terrorist attacks. ¶¶ 930–32, 935.

Specific individuals and entities directly responsible for orchestrating terrorist attacks were part of the commercial infrastructure described above. One of the groups responsible for orchestrating these attacks was the "Khamenei Cell," which refers to a group of key lieutenants and members of Ayatollah Khamenei's inner circle who sponsored and participated in attacks against Americans. ¶¶ 757–890. It followed that substantial revenue from IRGC and SLO-controlled sectors were used to support terrorism and terrorist proxies. ¶¶ 1013–21. The payments also incentivized terrorism by making payments to families of terrorists killed while

executing attacks, bounty payments for successful attacks, and salary payments to leaders of the FTO proxies who oversaw attacks. ¶¶ 1027–43.

In short, the "terrorism machine," maintained and perpetuated by the Terrorist Sponsors, monopolized and substantially controlled key sectors of Iran's economy and infrastructure to ensure consistent funding for terrorist activities.

## III.    BNPP's Alleged Knowledge & Contributions

Plaintiffs allege that BNPP knew about the terrorism machine. Plaintiffs generally point to the following allegations as support for that assertion:

- BNPP analysts followed developments in the oil and gas sectors and noted geopolitical developments and potential impacts on markets as the result of the geopolitical situation. ¶¶ 695–96.

- Publicly available reports, warnings, statements, articles, and press releases by the United States government (from 1990 through 2015, *see* ¶ 678) and U.S. media noted the connection between the IRGC's activities (terrorism, money laundering, development of nuclear and missile programs) and ostensibly legitimate business transactions. ¶¶ 670–83; ¶¶ 691–727. Plaintiffs allege that BNPP would have learned of or been privy to these public materials. Some of these statements were:

  o A statement from Juan Zarate (United States Department of Treasury's former Assistant Secretary for Terrorist Financing and Financial Crimes) that the IRGC had embedded itself into industries with Iran and blended legitimate business transactions with illicit ones. ¶ 672.

- o A "whisper campaign" wherein the U.S. Treasury Department warned banks about the risks of doing business with Iran because ostensibly legitimate business could have been facilitating illegal activity. ¶ 675.

- o A statement from a United States Treasury official, in 2007, that "[w]hen corporations do business with IRGC companies, they are doing business with organizations that are providing direct support to terrorism[.]" ¶ 678(f).

- o A statement from a United States Treasury official, in 2007, that "[t]he IRGC is so deeply entrenched in Iran's economy and commercial enterprises, it is increasingly likely that if you are doing business with Iran, you are somehow doing business with the IRGC." ¶ 678(g).

- Statements from the Iranian government explaining how resources and proxies were being used to fund terrorism. ¶¶ 691–96. For instance, former Iranian President Mohammad Khatami called on Muslim oil-producing countries to give a portion of their oil revenues to the Palestinian government led by Hamas. ¶ 692.

- BNPP, as a global bank, has extensive customer due diligence and anti-money laundering obligations. ¶¶ 522–58. Those obligations include monitoring transactions for suspicious activity and investigating transactions for illegal activity, particularly for "high risk" customers and geographic locations (like entities in Iran). ¶¶ 540–54.

- BNPP received "direct" warnings of the relatedness between Iran's oil and gas industry and terrorism, and was the target of a U.S. government financial pressure campaign between 2006 and 2008 which included public and private warnings. ¶¶ 670, 674, 671–79, 702–27. Plaintiffs assert, on information and belief, that these warnings included a "direct" warning to BNPP that transacting with Iranian banks, Iranian fronts, or

companies in Iran's oil and gas sector would facilitate IRGC-sponsored acts of terrorism. ¶ 675. In addition, in 2007, the Office of Foreign Assets Control ("OFAC") contacted BNPP directly to voice concerns about the bank's U.S. dollar transactions concerning Iranian entities. ¶ 692.

Plaintiffs allege that despite knowledge from the above warnings that the Iranian terrorism machine operated through fronts maintained by the Terrorist Sponsors, BNPP, between 2002 and 2012, contributed to the "terrorism machine" by doing substantial business with companies in the oil and gas industry. ¶¶ 3, 629. A government official remarked that BNPP "disregard[ed] U.S. law of which it was well aware, and placed its financial network at the services of rogue nations." ¶ 6.

As the Amended Complaint acknowledges, Plaintiffs' allegations regarding BNPP's contributions largely rely on guilty pleas and regulatory settlements with the United States Department of Justice ("DOJ"), New York State Department of Financial Services ("NYSDFS"), and OFAC. ¶¶ 29–31; *see* ECF Nos. 27-1, 27-2, 27-3 (collectively, the "Liability Agreements"). The Amended Complaint identifies three key customers: (1) an unnamed Iranian oil company (the "Iranian Oil Company"); (2) a petrochemical front company ("Iranian Petrochemical Company" a/k/a/ "Caspian Petrochemical FZE" or simply "Caspian"); and (3) a group of (unnamed and unspecified) Iranian customers that BNPP serviced in connection with the sanctionable activities discussed in the Liability Agreements.

Regarding Caspian, BNPP provided at least $586 million to the company through letters of credit in 2006, 2008, and 2011. ¶ 602. According to BNPP's Know-Your-Customer documentation, Caspian was registered as a corporation in Dubai, but wholly owned by an Iranian energy group based in Iran which was in turn owned by an Iranian citizen. ¶ 609. BNPP

also possessed an organization chart indicating that Caspian was part of a network of eight companies comprising an Iranian energy group. ¶ 610. Caspian's corporate filings listed its officers as Phati Sebua and Seyedasadoollah Emamjomeh—Plaintiffs allege the "Emamjomeh" surname is a direct reference to the Ayatollah. ¶ 616. BNPP admitted by December 2011 transactions with Caspian was impermissible. ¶ 617. BNPP ceased banking services to Caspian in 2012. ¶ 623.

As to the Iranian Oil Company, BNPP pleaded guilty to helping the company access the U.S. financial system while evading U.S. counterterrorism controls. ¶ 624. In 2009, BNPP provided approximately $100.5 million, pursuant to six letters of credit, in U.S. dollar payments to the Iranian Oil Company in violation of U.S. sanctions. ¶ 625.

Regarding the slew of unnamed customers discussed in the Liability Agreements, between July 15, 2005, and November 27, 2012, BNPP processed at least 318 electronic funds in violation of U.S. sanctions on Iran. ¶ 561. Through these agreements, it came to light that BNPP "developed and implemented policies and procedures to systematically conceal" payments on behalf of Iranian customers. ¶ 560. These policies and procedures included (1) BNPP substituting the names of Iranian parties with BNPP's own name in payment messages; (2) omitting Iranian entities' names from transactions; and (3) structuring payments in highly complex ways with no legitimate business purpose to evade detection. ¶¶ 567–70. BNPP employed these methods with respect to Caspian and the Iranian Oil Company as well. ¶¶ 600–04, 624–29. In 2004, New York regulators identified "systemic failures" in BNPP's compliance with the Bank Secrecy Act, and specifically highlighted deficiencies in BNPP's New York office. ¶ 581.

In summary, BNPP admitted to violating U.S. sanctions laws by (1) doing business with Iranian oil and petrochemical companies (and other unknown Iranian entities), which Plaintiffs

allege were fronts for the Terrorist Sponsors (but which the Liability Agreements themselves did not state); and (2) structuring and presenting transactions in a manner that made identification of sanctioned Iranian entities more difficult. However, the Amended Complaint does not allege that these Agreements made an express finding that the Iranian customers that BNPP serviced were terrorist organizations or were linked to terrorist organizations; instead, the Agreements focused on the sanctions violations.

## IV.    Procedural History

Plaintiffs filed this action on June 29, 2024, stating a single claim for aiding-and-abetting under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(d)(2). Defendant filed a motion to dismiss on October 4, 2024. ECF No. 15. Plaintiffs thereafter filed an amended complaint, asserting the same single claim under the ATA and adding numerous factual allegations regarding the formation, operation, and goals of the Iranian Regime. ECF No. 19. Defendant filed the instant renewed motion to dismiss on January 10, 2025. ECF No. 26. The parties also filed various supplemental authority letters apprising the Court of a recent Second Circuit decision and a finding as to one of BNPP's former customers (Caspian) being linked to terrorist activities. ECF Nos. 36–39.

## LEGAL STANDARD

The Court sets forth below the applicable legal standards under Federal Rules of Civil Procedure 12(b)(2) (personal jurisdiction) and 12(b)(6) (failure to state a claim).

## I.    Failure to State a Claim

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008)

(internal citation omitted). A claim will survive a Rule 12(b)(6) motion only if the plaintiff

alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550

U.S. at 556). "Determining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense." *Id*. at 679. "Threadbare recitals of the elements of a cause of action, supported

by mere conclusory statements, do not suffice." *Id*. at 678. If a complaint does not state a

plausible claim for relief, it must be dismissed. *Id*. at 679.

## II.    Lack of Personal Jurisdiction

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears

the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v.*

*Robertson-Ceco Corp*., 84 F.3d 560, 566 (2d Cir. 1996). "To meet this burden where there has

been no discovery or evidentiary hearing, the plaintiff must plead facts sufficient for a prima

facie showing of jurisdiction." *Quezada v. U.S. Wings*, Inc., No. 20-CV-10707 (ER), 2021 WL

5827437, at *5 (S.D.N.Y. Dec. 7, 2021) (internal citation omitted). Courts "construe the

pleadings and affidavits in the light most favorable to the plaintiff, resolving all doubts in their

favor." *Romero v. 88 Acres Foods, Inc*., 580 F. Supp. 3d 9, 14 (S.D.N.Y. 2022) (quoting *Porina v.*

*Mayward Shipping Co., Ltd*., 521 F.3d 122, 126 (2d Cir. 2008)).

## DISCUSSION

The discussion below proceeds as follows. First, the Court examines and sets forth the

statutory framework of the Justice Against Sponsors of Terrorism Act ("JASTA"), the statute

authorizing Plaintiffs' claim. The Court then considers whether, and to what extent, Plaintiffs' claims are time-barred, and concludes they are not. Third, the Court analyzes the elements of a JASTA aiding-and-abetting claim, and concludes that Plaintiffs have narrowly pled facts supporting the plausible inference that BNPP had the requisite "general awareness" of the terrorist attacks at issue and knowingly provided assistance as to Caspian and the Iranian Oil Company. The Court, however, dismisses Plaintiffs' claims based on services to the unidentified Iranian customers described in the Liability Agreements. Finally, the Court determines that it may properly exercise personal jurisdiction over Defendant. Accordingly, Defendant's motion to dismiss is GRANTED in part and DENIED in part.

## I.     JASTA's Statutory Framework

The ATA authorizes U.S. nationals "injured in his or her person, property, or business by reason of an act of international terrorism" to sue for treble damages as well as attorney's fees and costs. 18 U.S.C. § 2333(a). "[I]nternational terrorism" encompasses "activities that—(A) involve violent acts or acts dangerous to human life that . . . would be a criminal violation if committed within the jurisdiction of the United States or of any State;" "(B) appear to be intended—(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping;" and "(C) occur primarily outside the territorial jurisdiction of the United States[.]" *Id*. § 2331(1)(A)–(C).

The ATA therefore did not originally permit relief against parties who aided the primary perpetrator of the act of international terrorism. In other words, the ATA originally would have only permitted Plaintiffs to sue the actual perpetrators of the heinous events discussed in the Amended Complaint (such as members of the FTOs).

JASTA, codified at Pub. L. No. 114-222, 130 Stat. 852 (2016), amended the ATA and created a new subsection (d) to § 2333 to create a cause of action against "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed . . . an act of international terrorism." 18 U.S.C. § 2333(d)(2). Congress noted that the JASTA amendment to the ATA shall apply to "any civil action . . . pending on, or commenced on or after, the date of [its] enactment . . . and . . . arising out of an injury to a person, property, or business on or after September 11, 2001." 130 Stat. at 855.

The purpose underlying the enactment of JASTA was to "provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries . . . that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." *Id.* at 853. With this history (and these principles) in mind, the Court turns to an analysis of Plaintiffs' claim.

## II.    Plaintiffs' JASTA Claim Is Not Time-Barred

The Court first considers whether, and to what extent, Plaintiffs' claim is time-barred. Congress enacted JASTA—the statute creating the private right of action for secondary liability under the ATA—in 2016. The terrorist attacks that BNPP allegedly aided-and-abetted occurred between 2006 and 2016. Defendant argues that any cause of action with respect to these acts of terrorism accrued as of the date of the terrorist attacks (because they are the dates of injury), and notes that because JASTA provides a ten-year statute of limitations, any claim based on attacks prior to June 29, 2014 (ten years before Plaintiffs filed this action) are barred. ECF No. 28 ("Mem.") at 24–26. Plaintiffs disagree, arguing that the clock could not begin to run prior to JASTA's enactment, and that in any event, the period would be equitably tolled to 2014 when the

13

Liability Agreements became public. ECF No. 32 ("Opp.") at 27–29. Plaintiffs' claims are not time-barred.

The ATA provides that a suit for damages under Section 2333 (subject to exceptions which do not apply here) "shall not be maintained unless commenced within 10 years after the date the cause of action accrued." 18 U.S.C. § 2335(a). "The question of whether and when a claim accrued is almost invariably tied to the question [of] whether it is timely under the applicable statute of limitations." *Olivieri v. Stifel, Nicolaus & Co., Inc.*, 112 F.4th 74, 85–86 (2d Cir. 2024) "As a general matter," the Supreme Court has explained, "a statute of limitations begins to run when the cause of action accrues—that is, when the plaintiff can file suit and obtain relief." *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 105 (2013) (internal citation and quotation marks omitted). It is "unquestionably the traditional rule that absent other indication, a statute of limitations begins to run at the time the plaintiff has the right to apply to the court for relief." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 811 (2024) (cleaned up). Some claims accrue when the defendant commits the act, others accrue when the plaintiff experiences injury, and others accrue at the time the plaintiff discovers the injury. *Olivieri*, 112 F.4th at 87. Still, when a claim accrues "depends on the nature of the claim," and federal law determines when federal causes of actions accrue. *Olivieri*, 112 F.4th at 87; *see Kronisch v. United States*, 150 F.3d 112, 123 (2d Cir. 1998). "In short, the time a claim "accrues" means the point at which the statute of limitations clock starts ticking." *Olivieri*, 112 F.4th at 87.

Plaintiffs' cause of action is *timely* because the clock began to run when JASTA was enacted in 2016. JASTA created secondary liability under the ATA—liability that did not exist prior to 2016. As such, Plaintiffs could not have filed a secondary liability suit before then, and Plaintiffs seek to hold Defendant liable for conduct that occurred before JASTA's enactment.

Instead, the relevant question is whether JASTA applies retroactively to the pre-2016 conduct alleged in this case. *See Landgraf v. USI Film Products*, 511 U.S. 244, 245 (1994). JASTA contains a retroactivity provision, and so the analysis of this provision "begin[s] with the plain language, giving all undefined terms their ordinary meaning while attempting to ascertain how a reasonable reader would understand the statutory text, considered as a whole." *Whitaker v. Dep't of Com*., 970 F.3d 200, 204 (2d Cir. 2020) (internal citation omitted). Congress expressed its intent that JASTA apply retroactively by providing that secondary liability would be available in "any civil action . . . pending on, or commenced on or after, the date of [its] enactment . . . and . . . arising out of an injury to a person, property, or business on or after September 11, 2001." 130 Stat. at 855; *see Weiss v. Nat'l Westminster Bank, PLC*., 993 F.3d 144, 163 (2d Cir. 2021) (noting retroactivity of JASTA).

Defendant argues that retroactivity only applies to cases that were pending as of JASTA's enactment, arguing that "while a case pending [i]n 2016 could include . . . an injury from 2001, the statute [itself] does not allow for claims commenced after 2016 to include claims that are more than 10 years old." ECF No. 35 ("Reply") at 9–10. Defendant further points to the special rule accompanying the amendment of Section 2335, which lengthened the ATA statute of limitations from four years to ten years, as further evidence of understanding Congress' intent:

> Notwithstanding section 2335 of title 18, United States Code, as amended by subsection (a), a civil action under section 2333 of such title resulting from an act of international terrorism that occurred on or after September 11, 2001, and before the date that is 4 years before the date of the enactment of this Act, may be maintained if the civil action is commenced during the 6-year period beginning on such date of enactment.

National Defense Authorization Act for Fiscal Year 2013, Sec. 1251, 126 Stat. 1632, 2017 (2013).

The Court construes JASTA's retroactivity provision as not exclusively applying to actions pending prior to its enactment based on its clear language. The unambiguous language of JASTA makes clear that within ten years of its enactment, a plaintiff can bring suit under JASTA for any relevant injury that occurred on or after September 11, 2001. Furthermore, construing the retroactivity provision in the manner Defendant suggests would run counter to Congress' stated purpose to "provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities and foreign countries . . . that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." 130 Stat. at 853.

Indeed, Defendant appears to implicitly acknowledge this. BNPP contends that Plaintiffs' claims are time-barred for any injury prior to 2014 only. But this argument means that Defendant concedes that attacks occurring in the 2014–2016 time frame would be legally actionable under JASTA, a concession that is inconsistent with their retroactivity position, because these attacks would cover conduct before JASTA's enactment, when Plaintiffs' action was not already pending. *Cf. Cabrera v. Black & Veatch Special Project Corp.*, No. 19-CV-3833 (LLA), 2024 WL 1435146, at *5 (D.D.C. Mar. 28, 2024) (noting that secondary liability claims under JASTA did not expire because plaintiffs did not have a complete and present ability to sue until after it was enacted).

In short, the Court declines to preclude any of Plaintiffs' claims on the basis that they are time-barred.

### III.    Plaintiffs Plausibly State an Aiding-and-Abetting Claim Under JASTA

Defendant seeks dismissal of the JASTA aiding-and-abetting claim by arguing that the Amended Complaint fails to allege, in a non-conclusory fashion, facts which plausibly support the inference that BNPP had the requisite "general awareness" for JASTA liability. Mem. at 10–

18. Defendant also argues that the Amended Complaint fails to plausibly allege knowing and substantial assistance. *Id.* at 18–24. Plaintiffs counter that the Amended Complaint more than adequately alleges facts indicating BNPP's awareness of the inter-relatedness between Iran's "terrorism machine" and its use of ostensibly legitimate business transactions—particularly in the oil and gas industries—to fund that terrorism machine. Opp. at 12–20.

For the reasons set forth below, the Court finds that Plaintiffs have narrowly, but plausibly, stated a JASTA aiding-and-abetting claim.

### A. Aiding-and-Abetting Framework under JASTA

With respect to aiding-and-abetting claims under JASTA, Congress specifically endorsed the reasoning of the D.C. Circuit in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). In *Halberstam*, the D.C. Circuit concluded that aiding-and-abetting includes three elements: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury"; (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance"; and (3) "the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 477.

Despite Congress's express endorsement of *Halberstam*'s elements, however, the Supreme Court, in 2023, noted that *Halberstam* itself warned that its formulations should "not be accepted as immutable components" and instead suggested that its framework should be "adapted as new cases test their usefulness in evaluating vicarious liability." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 487 (2023) (cleaned up). As a result, the Supreme Court noted the "elements and factors" articulated in *Halberstam* should not be taken as inflexible codes, and that the framework rests on "the same conceptual core that has animated aiding-and-abetting

17

liability for centuries: that the defendant consciously and culpably participated in a wrongful act so as to help make it succeed." *Id.* at 493 (cleaned up).

Still, the Second Circuit has recently confirmed there is "no doubt that the conclusions [it has] reached in the past are entirely consistent with *Twitter*'s command that aiding-and-abetting liability is reserved 'to cases of truly culpable conduct.'" *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 437 (2d Cir. 2025) (quoting *Twitter*, 598 U.S. at 489). The Second Circuit's conclusion is particularly true as to the instant case, which alleges *affirmative* acts of facilitation, not a *failure* to take action to prevent such atrocities. *Cf. Twitter*, 598 U.S. at 500–01 (observing that the plaintiffs' complaint rested heavily on defendants' failure to act).

With these principles in mind, the Court now turns to an analysis of the applicable requirements for an aiding-and-abetting claim under JASTA.

### B.  Act of Terrorism

The first requirement under *Halberstam*'s framework is that "the party whom the defendant aids must perform a wrongful act that causes an injury." *Twitter*, 598 U.S. at 486 (quoting *Halberstam*, 705 F.2d at 477). A plaintiff may bring a claim for aiding-and-abetting under JASTA so long as "the defendant's acts aided and abetted the principal even where his relevant substantial assistance was given to an intermediary." *Ashley*, 144 F.4th at 437 (internal citation omitted). A plaintiff must also satisfy the "definitional requirements" in 18 U.S.C. § 2331, including, most significantly, the statutory definition of "international terrorism." *See* 18 U.S.C. § 2331(1).

In its motion to dismiss, Defendant does not appear to contest the first requirement under JASTA. Mem. at 10–23. And a plain reading of the Amended Complaint more than permits the

inference that the terrorist attacks described therein fall within the statute's reach. Therefore, it is deemed to be satisfied, and the Court proceeds to the second and third elements.

## C. General Awareness

The Court first articulates the applicable analysis under *Halberstam* and surveys several recent cases touching on the issue of general awareness. The Court then considers the AC's allegations and finds that it plausibly alleges that Defendant had the requisite general awareness.

### i. *Framework and Relevant Prior Decisions*

Under the second requirement of the *Halberstam* framework, the defendant must be "generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance." *Twitter*, 598 U.S. at 486 (quoting *Halberstam*, 705 F.2d at 477). The phrase "generally aware" connotes "something less than full, or fully focused, recognition," and so while "a defendant need not be aware of its role in the specific terrorist attack that caused the plaintiff's injury, it must be generally aware of its role in some illegal activity from which the terrorist attack was foreseeable." *Ashley*, 144 F.4th at 438 (internal citations omitted).

Further, in cases like this one involving bank defendants—where plaintiffs allege the defendant-bank aided the principal *indirectly* through its customers—the "general awareness" inquiry focuses on: "(1) whether the bank was aware of the customers' connections with the terrorist organization before the relevant attacks; and (2) whether the customers 'were so closely intertwined with' the terrorist organization's 'violent terrorist activities that one can reasonably infer' that the bank 'was generally aware of its role in unlawful activities from which the attacks were foreseeable while it was providing financial services' to those customers." *Id.* (quoting *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 501 (2d Cir. 2021)). Plaintiffs also typically "seek

to establish a bank's awareness of its customers' ties to terrorist organizations by citing public sources, such as media articles predating the attacks." *Id.*

Fortunately, the Second Circuit (and the Supreme Court) has had ample occasion in the preceding years to consider the element of "general awareness" in similar contexts. For instance, in *Siegel v. HSBC N. Am. Holdings, Inc.*, the Second Circuit affirmed dismissal of the plaintiffs' JASTA claims for lack of general awareness. 933 F.3d 217, 226 (2d Cir. 2019). The Second Circuit noted that the customer at issue had legitimate operations, and the complaint did not allege that most, or even many, of the customer's banking's activities were linked to terrorists. *Id.* at 224. The Second Circuit also noted that HSBC had decided to stop providing banking services to the customer for the ten months preceding the terrorist attacks at issue. *Id.* at 224–225.

Two years later, the Second Circuit promulgated *Kaplan v. Lebanese Canadian Bank, SAL*, wherein the plaintiffs had brought suit against Lebanese Canadian Bank (LCB) for their provision of financial services to five customers (though the analysis focused on three specific customers). 999 F.3d 842 (2d Cir. 2021). The district court granted the defendant's motion to dismiss, finding that the complaint's allegations as to general awareness were insufficient because it did not imply that LCB knew or should have known the customers were "integral constituent parts and leaders" of Hezbollah. *Kaplan*, 999 F.3d at 864. The Second Circuit reversed, noting that the plaintiffs alleged that Hezbollah (the terrorist organization) itself had been designed as an FTO since 1997, Hezbollah had openly and publicly acknowledged carrying out terrorist attacks, and that Hezbollah openly and publicly acknowledged the fact that the three customers that LCB serviced were integral constituents of Hezbollah. *Id.* The Second Circuit noted it was critical to evaluate LCB's provision of services in the entire context, which included, for instance, the fact of Hezbollah's policy and practice of carrying out terrorist raids

and repeatedly publicizing that practice. *Id.* at 865. As such, it was "plausible that LCB knew that [the] three named customers . . . were part of Hezbollah." *Id.*

*Honickman v. BLOM Bank SAL* came only a month after *Kaplan.* In *Honickman*, the plaintiffs brought suit against BLOM Bank under JASTA for their alleged aiding-and-abetting of Hamas attacks by providing financial services to three customers affiliated with Hamas: Sanabil, Subul al-Kair, and Union of Good. 6 F.4th 487, 491 (2d Cir. 2021). Sanabil was designated as a Specially Designated Global Terrorist, Subul al-Kair was an unindicted co-conspirator in a prosecution of another entity, and Union of Good was founded as the "umbrella organization for Hamas's global fundraising activity." *Id.* at 491–92 (alteration adopted). The Second Circuit affirmed the district court's dismissal, finding that the public sources cited in the complaint did not support the inference that BLOM Bank had the requisite general awareness. *Id.* at 503. The Second Circuit affirmed that Plaintiffs did not need to allege that BLOM had actual knowledge of the public material, but still noted that the public statements and sources were either undated, dated after the underlying terrorist attacks, or otherwise undermined the plausibility that BLOM Bank understood the true nature of these entities, which appeared to actually engage in legitimate (and sometimes humanitarian) activities. *Id.* at 501–02.

Then in 2023, the Supreme Court rendered its decision in *Twitter*, discussed above. In *Twitter, Inc. v. Taamneh*, the Supreme Court analyzed the rigidity of the *Halberstam* framework and the principles underlying the aiding-and-abetting theories present in JASTA. The Supreme Court noted that a strict nexus is not required for aiding-and-abetting liability, ultimately holding:

> To summarize the requirements of § 2333(d)(2), the phrase "aids and abets, by knowingly providing substantial assistance," points to the elements and factors articulated by *Halberstam*. Those elements and factors should not be taken as inflexible codes but should be understood in light of the common law and applied as a framework designed to hold defendants liable when they consciously and culpably participated in a tortious act in such a way as to help make it succeed.

*Twitter*, 598 U.S. at 497 (cleaned up). The Supreme Court assumed, without discussion, that the "general awareness" prong had been satisfied by the allegations that the defendants knew ISIS had been using their social media platforms for years to recruit, fundraise, and spread propaganda. *Id.*

And just earlier this year, in *Ashley v. Deutsche Bank Aktiengesellschaft*, the Second Circuit affirmed the judgment of a district court dismissing the plaintiffs' JASTA claims. 144 F.4th 420, 449. Of relevance to the instant case, the plaintiff alleged that one of the defendant banks, Standard Chartered (SCB), provided services to two fertilizer companies that had a near monopoly on the production of calcium ammonium nitrate ("CAN"). *Id.* at 428. In 2008, a web of terrorists in Afghanistan and Pakistan (the "Syndicate") began to use CAN in making bombs. *Id.* at 429. Plaintiffs sought to hold SCB liable as an aider-and-abettor for providing banking services to these companies despite knowing the companies' product was being used to make IEDs that would harm Americans. *Id.* at 439. The Second Circuit found that plaintiffs plausibly alleged SCB's general awareness of its indirect connection to Syndicate activities because an article specifically identified the companies' (SCB's customers) product as being the main ingredient in homemade bombs used by the Syndicate. *Id.* The Second Circuit also noted that SCB was generally aware of its role because it had a meeting with the leader of the Department of Defense's counter-IED organization, who informed SCB that the two customers' product had caused about 80% of all American bomb causalities in Afghanistan and that the customers refused to cooperate with U.S. authorities as to CAN smuggling issues. *Id.* at 440. The Second Circuit, however, went on to find the plaintiffs did not adequately plead the third *Halberstam* element of knowing and substantial assistance. *Id.* at 440–43.

Finally, the Court must acknowledge *O'Sullivan v. Deutsche Bank, AG*, a case in which Chief Judge Swain considered, and rejected, similar allegations under JASTA asserted against BNPP. No. 17-CV-8709 (LTS), 2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019). In *O'Sullivan*, the plaintiffs alleged that the defendants "knew that Iran was a state sponsor of terrorism, that the purpose of U.S. sanctions was to prevent Iran's sponsorship of terrorism, and that it was foreseeable that the funds transferred to Iran and its Agents and Proxies would be used to carry out acts of international terrorism against U.S. nationals[.]" *O'Sullivan*, 2019 WL 1409446, at *4 (internal citations omitted). BNPP allegedly provided financial services to various Iranian entities in violation of U.S. sanctions. *Id.* at *3. Chief Judge Swain dismissed the secondary liability claims, observing that the "[c]omplaint is devoid of any factual allegations from which the Court can properly infer that [d]efendants knew that the financial services they provided to the various Iranian entities were destined to aid the FTOs responsible for the attacks that injured [p]laintiffs." *Id.* at *10. Chief Judge Swain continued that "[a]llegations regarding Iran's status as a state sponsor of terrorism, as well as allegations regarding the purpose of U.S. sanctions are, on their own, insufficient to allege plausibly that [d]efendants were 'generally aware' that they had taken a 'role' in the attacks that killed or injured [p]laintiffs." *Id.*

All told, the key thread through the case law (as to general awareness in cases alleging secondary liability for banks) indicates that a defendant will be deemed to have "general awareness" where there has been some connection made between a terrorist regime, group, or practice and one of the bank's customers (or the customer's products and operations).

### ii.   *Application to the Instant Case*

To recount the relevant allegations in the instant case, with respect to each of the three categories of customers at issue here—Caspian, the Iranian Oil Company, and the unnamed

customers—BNPP provided financial services to them despite, among other things, direct warnings and public statements mentioning the use of fronts by the IGRC in the oil and gas industry to facilitate acts of terrorism. The AC also cites to a swath of publicly available statements—both from the U.S. government and the Iranian Regime—speaking to and indicating the close relationship between the oil and gas sector and the cultivation of terrorist activity. BNPP also received direct warnings, including from OFAC in 2007, that transacting with Iranian entities may facilitate terrorism. A government official, in 2007, also stated that "[t]he IRGC is so deeply entrenched in Iran's economy and commercial enterprises, it is increasingly likely that if you are doing business with Iran, you are somehow doing business with the IRGC." ¶ 678(g). And the AC also notes statements from the Iranian government explaining how resources and proxies were being used to fund terrorism. All told, the AC plausibly alleges that by 2009, one or more of the Terrorist Sponsors controlled and/or beneficially owned every major and minor oil, petroleum, and petrochemical company in Iran. ¶ 628.

This case does not neatly fit into either line of cases depicted above, instead falling right in the middle. *On the one hand*, the AC's allegations do not reach the vast majority of cases finding general awareness wherein a link, either publicly or privately, had been expressly made between a *particular* terrorist organization and a *specific customer* of the defendant bank, and the nature of the link was explored in depth. *Cf., e.g., Hakimyar v. Habib Bank Ltd.*, No. 24-CV-993 (LGS), 2025 WL 605575, at *7 (S.D.N.Y. Feb. 25, 2025) (finding general awareness requirement satisfied where express connection was made between bank's customer and the applicable FTO); *Raanan v. Binance Holdings Ltd.*, No. 24-CV-697 (JGK), 2025 WL 605594, at *20 (S.D.N.Y. Feb. 25, 2025) (similar). *On the other hand*, the Amended Complaint stands in contrast to *O'Sullivan, Honickman, and Siegel*, described above, where the defendant bank was deemed to

not have general awareness. In those cases, the defendant bank by and large only provided routine banking services to customers that appeared to have legitimate business purposes and without any direct link to terrorist organizations beyond the plaintiff's conclusory allegations.

Based on the AC's allegations, and drawing all reasonable inferences in Plaintiffs' favor, the Court finds that Plaintiffs narrowly make the requisite showing of general awareness as to Caspian and the Iranian Oil Company to survive dismissal. It is a reasonable inference that BNPP was aware of these customers' connections with the Terrorist Sponsors, and that they were intertwined with the Terrorist Sponsors. The AC explains at length the public materials from the time period elucidating the incentives and purposes beyond Iran's monopolization of key sectors, and the multitude of ways in which that monopolization fueled the ongoing terrorist regime. Unlike in *O'Sullivan,* the AC does not just rely on Iran's status as a state sponsor of terror and the fact that BNPP violated sanctions. Rather, it has alleged direct and public warnings elucidating (1) the intricate nature of the terrorism machine; (2) the terrorism machine's use of front companies to fund terrorist activities; and (3) that every company in the oil and gas industries had a direct tie to at least one Terrorist Sponsor.

The AC also contains specific allegations supporting a finding of general awareness plausible as to Caspian and the Iranian Oil Company. As to the latter, the Complaint alleges that by 2009—the year in which BNPP provided services—one or more of the Terrorist Sponsors controlled and/or beneficially owned every major and minor oil, petroleum, and petrochemical company in Iran. ¶ 628. And as to Caspian, the AC alleges, among other things, that Caspian was part of a network of eight companies comprising an Iranian energy group. ¶ 610. The AC also notes that Caspian's corporate filings listed its officers as Phati Sebua and Seyedasadoollah Emamjomeh, the latter of which Plaintiffs allege refers to the Ayatollah. ¶ 616.

The instant case is therefore sufficiently analogous to *Zobay v. MTN Grp. Ltd*. There, in considering whether MTN had the requisite general awareness, the court noted the litany of public sources connecting the IRGC to the telecommunications sector. *Id.* at 337–38. The court then investigated whether the "specific public sources" described in the complaint were sufficient to situate the applicable bank customers within that context. *Id.* 338. Ultimately, the court found that the plaintiffs plausibly alleged general awareness because, among other things, the defendant bank "went into business with Iranian companies known for their ti[e]s to the IRGC's procurement activities and funding of terrorist ventures, and schemed to evade U.S. sanctions in order to obtain embargoed dual-use American technologies as requested by those business partners." 695 F. Supp. 3d 301, 343 (E.D.N.Y. 2023). Here, Plaintiffs have similarly alleged a wealth of public materials connecting the Terrorist Sponsors to the oil and gas industries, and have "situated" Caspian and the Iranian Oil Company in that context. And the AC has described at length how companies in those sectors systematically financed the Iranian Regime and its terrorism machine.

In short, the Court can properly infer that BNPP "knew that the financial services they provided to [Caspian and the Iranian Oil Company] were destined to aid the FTOs responsible for the attacks that injured Plaintiffs." *O'Sullivan*, 2019 WL 1409446, at *10. Taking together (1) BNPP's efforts to conceal transactions and facilitate transactions with no apparent legitimate business reason; (2) direct and indirect warnings of the concentration of front companies in the oil and gas industry; and (3) BNPP's continued services of companies in that industry despite those warnings, and drawing all reasonable inferences in favor of Plaintiffs, the AC plausibly alleges that it was "reasonably foreseeable" that BNPP was facilitating acts of terror. *See, e.g., Hakimyar v. Habib Bank Ltd.*, 2025 WL 605575, at *7 (finding general awareness requirement

satisfied because, among other things, the defendant bank recorded "extensive compliance failures and repeated regulatory issues that put [it] on notice that its actions were facilitating the flow of funds to a web of well-known terrorist organizations); *cf. Twitter*, 598 U.S. at 497 (finding that plaintiffs satisfied the general awareness requirement by alleging that the defendants "knew they were playing some sort of role" in the terrorists' enterprise).

However, the Court cannot find general awareness, sufficient to invoke JASTA liability, as to the unidentified and unnamed Iranian entities discussed in the Liability Agreements. As Plaintiffs concede, the AC offers no information about the Iranian entities described in those Agreements. ¶ 633. Because the Liability Agreements themselves do not state that any of the customers were connected to the Terrorist Sponsors, or otherwise identify any other information about them, the Court cannot reasonably infer any substantial connection to all or any of the Terrorist Sponsors. Accordingly, the Court finds that Plaintiffs have adequately pled general awareness as to Caspian and the Iranian Oil Company, but not the unidentified customers discussed in the Liability Agreements.

### D.  Knowing and Substantial Assistance

Defendant makes three arguments for dismissal as to the third element (that BNPP provided knowing and substantial assistance): (1) the AC conflates the second general awareness requirement with the "knowing and conscious" mental state required for the third element, and as such, the AC fails to allege BNPP voluntarily or consciously processed transactions relating to the terrorist attacks (and pointing to sanctions violations itself does not suffice); (2) the AC fails to allege a concrete nexus connecting BNPP's activity to the specific acts of international terrorism; and (3) the AC fails to allege that BNPP systematically and pervasively assisted the terrorist activities to render it in essentially a "near-common enterprise." Mem. at 18–24.

Plaintiffs counter that BNPP actively participated by violating sanctions (which included concealing information and failing to comply with monitoring and compliance obligations), point out that the AC does in fact explain how BNPP's transactions flowed to the terrorist attacks, and argue that the central inquiry for aiding-and-abetting liability—as espoused in *Twitter*—more than adequately convers BNPP's conduct. Opp. at 20–27. The Court agrees and finds the third requirement to be satisfied.

The third and final requirement under the *Halberstam* framework is that the defendant provides knowing and substantial assistance. The "twin requirements" of "knowing and substantial assistance" are "part of a single inquiry designed to capture conscious and culpable conduct." *Ashley*, 144 F.4th at 438 (citing *Twitter*, 598 U.S. at 491, 504). Whether the defendant rendered knowing assistance is distinct from a defendant's general awareness of its role in a terrorist scheme. *Id.* Unlike the general awareness inquiry, the defendant's knowing assistance is "designed to capture the defendant['s] state of mind with respect to their actions and the tortious conduct." *Id.* (citation omitted). To reiterate, as the Supreme Court explained in *Twitter*, this requirement does not necessarily demand a strict nexus between the alleged assistance and terrorist act. *Twitter*, 598 U.S. at 497. For example, the defendant need not "always" know "all particulars of the primary actor's plan" or even of "the particular terrorist act." *Id.* at 495, 504. Rather, "a close nexus between the assistance and the tort might help establish that the defendant aided and abetted the tort[.]" *Id*. at 496.

"The determination of whether the assistance was substantial is guided by six factors: (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Hakimyar*, 2025 WL

605575, at *8 (cleaned up) (citing *Kaplan*, 999 F.3d at 856). However, these are not inflexible codes, and the crux of *Halberstam*'s six "substantial assistance" factors requires balancing "the nature and amount of assistance on the one hand and the defendant's scienter on the other." *Twitter*, 598 U.S. at 492–93. The six factors are a tool to identify "participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Id.* at 504.

Considering these factors, Plaintiffs have pleaded sufficient facts to satisfy this requirement because "[t]he requirement that assistance be 'knowing' is satisfied if 'the defendant knowingly -- and not innocently or inadvertently -- gave assistance.'" *Hakimyar*, 2025 WL 605575, at *8 (quoting *Honickman*, 6 F.4th at 499–500). Regarding the first factor, "the nature of the act encouraged was violent terrorist attacks." *Id.* As to the second factor, BNPP, over a period of years, provided millions of dollars to Iranian entities in industries controlled by the Terrorist Sponsors, in a manner that violated, and sought to help the customers evade, counterterrorism controls and U.S. sanctions. The AC has alleged that this funding and the use of front companies by the Terrorist Sponsors was integral to their terrorist scheme, and specifically explained how BNPP's funding facilitated terrorism by, for instance, funding incentive programs for militants. "Factual allegations that permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the FTO [will] suffice." *Honickman*, 6 F.4th at 500. The fifth and sixth factors also weigh in favor of Plaintiffs, given that BNPP provided services valued at millions of dollars in the midst of specific warnings from the U.S. government. BNPP "arguably took deliberate steps to enable [its customers to] evade regulatory scrutiny . . . [and] provided routine financial services in an unusual, dangerous way." *Raanan v. Binance Holdings Ltd.*, No. 24-CV-697 (JGK), 2025 WL 605594, at *23 (S.D.N.Y. Feb. 25, 2025).

BNPP's continued provision of financial services to entities despite ample warning "certainly evinces a culpable, or at least willfully blind state of mind." *Bartlett v. Societe Generale de Banque Au Liban SAL*, No. 19-CV-00007 (CBA) (VMS), 2020 WL 7089448, at *14 (E.D.N.Y. Nov. 25, 2020).

In short, BNPP "disregard[ed] U.S. law of which it was well aware, and placed its financial network at the services of rogue nations." AC ¶ 6. The Amended Complaint "alleges assistance that is neither innocent nor inadvertent, goes beyond the standard for 'general awareness,' and is consistent with *Twitter*'s holding that the 'knowing' requirement should 'capture the defendant['s] state of mind with respect to their actions and the tortious conduct." *Hakimyar*, 2025 WL 605575, at *9 (cleaned up). BNPP's provision of financial services that willfully violated sanctions laws and deterred the ability of the United States to identify and ascertain the identities of their customers, despite a wealth of information linking FTOs to front companies in the oil and gas sectors, constitutes the very kind of culpable conduct contemplated by aiding-and-abetting liability. *Cf. Ashley*, 144 F.4th at 441 (finding third element was not satisfied because the complaint did not offer "a single allegation of fact that [defendant] sought to indirectly assist the Syndicate's bomb operations by violating sanctions or other restrictions as they relate to banking services provided to the [customers]").

Defendant may seek to limit their liability by pointing out, among other things, the fact that they ceased providing services to Caspian in 2012, and only provided services to the Iranian Oil Company during one year (2009). But these arguments are better suited for summary judgment—at this stage, it would be improper for the Court to delimit the temporal scope of liability without any meaningful discovery taken by the parties.

For the above reasons, Plaintiffs' JASTA aiding-and-abetting claim based on BNPP's provision of services to Caspian and the Iranian Oil Company survives.

## IV.    The Court May Exercise Personal Jurisdiction over BNPP

The Court now analyzes whether it can properly exercise personal jurisdiction over Defendant. Plaintiffs allege this Court may exercise personal jurisdiction over BNPP pursuant to N.Y. CPLR § 302. AC ¶ 22. Defendant argues the Court lacks jurisdiction because there is no basis for specific jurisdiction, and it cannot be considered to be at home in New York given it is a foreign bank. As set forth below, the Court disagrees.

To exercise personal jurisdiction over a defendant, three requirements must be met: "(1) the plaintiff's service of process upon the defendant must have been procedurally proper; (2) there must be a statutory basis for personal jurisdiction that renders such service of process effective; and (3) the exercise of personal jurisdiction must comport with constitutional due process principles." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 121 (2d Cir. 2021) (cleaned up). Defendant does not appear to contest the propriety of service, and so the Court proceeds to only analyze the latter two requirements: (1) New York's statutory scheme for personal jurisdiction; and (2) whether jurisdiction in this case would comport with due process.

In New York, a "court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1). Plaintiffs must meet two requirements to establish personal jurisdiction under Section 302(a)(1): "(1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015) (internal citation

omitted); *accord Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 129 (2d Cir. 2022). "[T]he overriding criterion necessary to establish a transaction of business is some act by which the defendant purposefully avails itself of the privilege of conducting activities within New York[.]" *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 61 (2d Cir. 2012) (quoting *Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501, 508 (2007)). New York courts define transacting business as a purposeful activity—"some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Best Van Lines*, *Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (cleaned up).

Jurisdiction must also comport with constitutional due process. Here, Defendant contends, and Plaintiffs do not appear to dispute, that the Court cannot exercise general jurisdiction over BNPP given it is "at home" overseas. "Specific personal jurisdiction exists if a defendant is alleged to have selected and repeatedly used 'New York's banking system as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress[.]" *Hakimyar v. Habib Bank Ltd.*, 2025 WL 605575, at *4 (cleaned up) (citing *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013)).

The Court finds that the Amended Complaint alleges sufficient facts to satisfy the above elements for personal jurisdiction. Plaintiffs assert that BNPP directed its misconduct at New York by (1) conducting U.S. dollar transactions through its New York branch and correspondent banks; (2) stripping wire information to deceive New York banks; and (3) misleading New York and federal regulators. Opp. at 29–30. "When determining whether the use of a bank branch constitutes purposeful availment, courts typically consider the number of transfers identified and volume of money transferred, as well as whether plaintiffs allege the dates of the transfers." *Brown v. Nat'l Bank of Pakistan*, No. 19-CV-11876 (AKH), 2022 WL 1155905, at *3 (S.D.N.Y.

Apr. 19, 2022). But the Second Circuit has observed that "the use of a New York correspondent bank account, standing alone, may be considered a 'transaction of business' under the long-arm statute if the defendant's use of the correspondent account was purposeful." *Licci ex rel. Licci*, 732 F.3d at 170. Indeed, since *Licci*, "a series of terrorism-financing cases in the Second Circuit have concluded that jurisdiction lies over banks that executed funds transfers in New York, including through their New York branch." *King v. Habib Bank Ltd*., No. 20-CV- 4322 (LGS), 2022 WL 4537849, at *2 (S.D.N.Y. Sept. 28, 2022) (cleaned up); *see Bartlett v. Societe Generale de Banque Au Liban SAL*, No. 19-CV-00007 (CBA) (VMS), 2020 WL 7089448, at *5 (E.D.N.Y. Nov. 25, 2020) (collecting cases).

Here, Plaintiffs allege that BNPP conducted transactions through its New York office, and provided its customers (and indirectly, the Terrorist Sponsors) with substantial assistance. Even though the complaint does not point to specific, terrorist-linked transactions in New York, what reasonably follows from Plaintiffs' allegations is that BNPP used its New York office several times to facilitate its interactions with Iranian customers. *See Bonacasa v. Standard Chartered PLC*, No. 22-CV-3320 (ER), 2023 WL 2390718, at *6 (S.D.N.Y. Mar. 7, 2023) (finding personal jurisdiction in similar circumstances), *reconsideration denied*, No. 22-CV-3320 (ER), 2023 WL 7110774 (S.D.N.Y. Oct. 27, 2023). The Amended Complaint contains allegations that BNPP's New York branch "engaged in a systematic practice, as directed from high levels of the Bank's group management, of removing or omitting Iranian information from U.S. dollar-denominated payment messages that it sent" through BNPP New York. AC ¶ 576. That allegation supports a reasonable inference that terrorist transactions occurred repeatedly through Defendant's New York branch, even though no specific transactions have been identified. The Amended Complaint therefore alleges sufficient facts to permit the inference that BNPP "used its New York branch . .

. as an instrument to achieve the very wrong alleged[.]" *King*, 2022 WL 4537849, at *3 (internal citation omitted).

"Because the Complaint sufficiently alleges personal jurisdiction based on Defendant's own purposeful availment of the New York banking system and transacting business in New York in connection with the claims, there is no need at this time to decide whether the Complaint adequately pleads other bases for personal jurisdiction." *Hakimyar*, 2025 WL 605575, at *4.

## CONCLUSION

For the above stated reasons, Defendant's motion to dismiss is GRANTED in part and DENIED in part. The Clerk of Court is respectfully directed to terminate ECF Nos. 15 and 26.

Dated:  September 30, 2025
        New York, New York

SO ORDERED.

JESSICA G. L. CLARKE
United States District Judge