UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NAFTALI MOSES, et al.,

Plaintiffs,

-against-

BNP PARIBAS, S.A.,

Defendant.

24-CV-4938 (JGLC)

**OPINION AND ORDER**

JESSICA G. L. CLARKE, United States District Judge:

Pending before the Court is Defendant's Motion for Reconsideration and Motion to Certify an Interlocutory Appeal regarding the Court's Opinion and Order on the Motion to Dismiss. ECF Nos. 42, 44. The Court agrees, on reconsideration and in light of more recent case law, that the prior Opinion and Order improperly analyzed the knowing and substantial assistance element of aiding and abetting terrorism—the sole claim Plaintiff asserts in this action. For this reason, the Court grants the Motion for Reconsideration and denies as moot the Motion to Certify an Interlocutory Appeal.

**BACKGROUND**

Plaintiffs filed this action on June 29, 2024, stating a single claim for aiding and abetting terrorism under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(d)(2), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"). ECF No. 1 ¶¶ 1234–44. Defendant moved to dismiss the Complaint on October 4, 2024. ECF No. 15. Plaintiffs thereafter filed their First Amended Complaint, which exceeded 600 pages, asserted the same claim, and added numerous factual allegations regarding the formation, operation, and goals of the "Iranian Regime." ECF No. 19 ("AC"). Defendant filed a renewed motion to dismiss on January 10, 2025. ECF No. 26. The Court granted in part and denied in part the renewed motion to dismiss on September 30,

2025, sustaining the claim as to transactions with only Caspian and the Iranian Oil Company. ECF No. 40 ("MTD Opinion"). The Court assumes familiarity with the prior MTD Opinion and relevant factual background.[1]

As relevant to the instant motion, the Court's MTD Opinion accepted the following well-pled allegations as true for purposes of deciding the Motion to Dismiss. Between 2006 and 2011, BNP Paribas, S.A. ("BNPP" or the "Bank") provided banking services to the Iranian Oil Company totaling $100.5 million and to Caspian totaling $586 million. MTD Opinion at 8–9 (citing AC ¶¶ 602, 625). BNPP's internal documents showed that Caspian was a Dubai corporation owned by an Iranian energy group, which was in turn owned by an Iranian citizen. *Id.* at 8 (citing AC ¶ 609). Caspian's public filings, meanwhile, showed that the company was focused on "gas, oil and petrochemicals" and listed two officers, one of whom Plaintiffs allege was a known alias for Ayatollah Khamenei or someone in his inner circle. *Id.* at 9 (citing AC ¶ 616); AC ¶ 616.

BNPP provided these services despite receiving "direct and public warnings" that the so-called "terrorism machine" in Iran was intricate and used "front companies to fund terrorist activities." MTD Opinion at 25; *see also, e.g.*, AC ¶¶ 531–33, 675–78, 682. The Bank was warned that "every company in the oil and gas industries had a direct tie to at least one [of the] Terrorist Sponsor[s]"—a group of Iranian institutions and organizations including Hezbollah, the Foundation for the Oppressed, the Islamic Revolutionary Guard Corps ("IRGC"), Supreme Leader Ayatollah Khamenei and the Supreme Leader's Office ("SLO"). MTD Opinion at 4, 25; *see also, e.g.*, AC ¶¶ 47, 412–18, 474–76, 496, 951.

[1] Where otherwise undefined in this Opinion, capitalized terms have the same effect as in the MTD Opinion.

Nonetheless, to avoid United States sanctions, BNPP "'developed and implemented policies and procedures to systematically conceal' payments on behalf of Iranian customers," including Caspian and the Iranian Oil Company. MTD Opinion at 9 (quoting AC ¶ 560 and citing AC ¶¶ 600–04, 624–29). Among other things, BNPP (1) "substitut[ed] the names of Iranian parties with BNPP's own name in payment messages; (2) omitt[ed] Iranian entities' names from transactions; and (3) structure[ed] payments in highly complex ways with no legitimate business purpose to evade detection." *Id.* at 9 (citing AC ¶¶ 567–70). By conducting business this way, BNPP evaded United States counterterrorism controls and sanctions for years. *Id.* at 9.

Plaintiffs contend that the warnings BNPP received about the "terrorism machine" were borne out. The "Terrorist Sponsors" exercised a monopoly over Iran's oil and gas sectors, such that by 2009, a "Terrorist Sponsor" "controlled and/or beneficially owned" every Iranian oil and gas company. MTD Opinion at 4–5 (citing AC ¶¶ 481, 628). They siphoned money from oil and gas companies, including Caspian and the Iranian Oil Company, through a variety of mechanisms, including mandated donations to Ayatollah Khamenei and a requirement for the IRGC to reinvest its profits into equipment and machinery. *Id.* at 5 (citing AC ¶¶ 924–35). "[A]t least at least twenty cents of every dollar flowed" in this direction. *Id.* at 5 (citing AC ¶¶ 930–32, 935).

Plaintiffs allege that money in the hands of the "Terrorist Sponsors" was used to fund the terrorist groups and attacks at issue here. The individuals and groups who organized those attacks, Plaintiffs allege, were "directly funded, logistically supported, and organized" by Ayatollah Khamenei. AC ¶ 758; *see also* MTD Opinion at 5 (citing AC ¶¶ 757–890). The Khamenei Cell "coordinated the deployment of operatives, weapons, logistics, pre-attack intelligence, and associated finances and fronts." AC ¶ 758. Money from the Khamenei Cell

flowed directly into attacks: The Cell incentivized attacks by "by making payments to families of terrorists killed while executing attacks, bounty payments for successful attacks, and salary payments to leaders of the [Foreign Terrorist Organization] proxies who oversaw attacks." MTD Opinion at 5–6 (citing AC ¶¶ 1027–43). Thus, Plaintiffs claim, Hezbollah, Hamas, Palestinian Islamist Jihad, and Jaysh al-Mahdi—the entities responsible for the attacks here—acted as "proxies" for the "Terrorist Sponsors." AC ¶ 2. Accordingly, the profits derived from BNPP's transactions with Caspian and the Iranian Oil Company facilitated sixty-three attacks in Iraq and Israel that Plaintiffs fell victim to (directly or indirectly). MTD Opinion at 3 (citing AC ¶ 12).

In light of these allegations, the Court found that Plaintiffs sufficiently pled aiding-and-abetting liability against Defendant. MTD Opinion at 31. On October 14, 2025, Defendant moved for reconsideration, disputing the Court's finding that Plaintiffs adequately alleged "knowing and substantial assistance" to terrorism. ECF Nos. 42–43. Defendant also moved, in the alternative, for an order certifying the MTD Opinion for interlocutory appeal. ECF Nos. 44–45. The motions were fully briefed on November 13, 2025. The parties also filed various supplemental authority letters apprising the Court of recent decisions in this District and in the D.C. Circuit. ECF Nos. 54–57.

## DISCUSSION

The Court previously set out the standard for aiding-and-abetting liability under JASTA, which is incorporated by reference here. *See* MTD Opinion at 17–18. In enacting JASTA, Congress endorsed the D.C. Circuit's reasoning in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), which lays out the three required elements to state a claim: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury;" (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he

provides the assistance;" and (3) "the defendant must knowingly and substantially assist the principal violation." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). This Opinion and Order reconsiders the Court's analysis of the third element—the provision of knowing and substantial assistance. Ultimately, for the reasons stated below and in light of more recent case law, the Court agrees that the Opinion and Order erred in its analysis with respect to this element.

"An assessment of a defendant's knowing and substantial assistance under the JASTA framework is highly fact intensive." *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 443 (2d Cir. 2025). "The 'twin requirements' of 'knowing and substantial assistance' are 'part of a single inquiry designed to capture conscious and culpable conduct.'" MTD Opinion at 28 (citing *Ashley*, 144 F.4th at 438). The relationship between scienter and the quantum of assistance is a sliding scale, the crux of which is "balancing 'the nature and amount of assistance on the one hand and the defendant's scienter on the other.'" *Ashley*, 144 F.4th at 439 (quoting *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 492–93 (2023)). A "'lesser showing of one' demands 'a greater showing of the other'"—and vice versa. *Ashley*, 144 F.4th at 438 (quoting *Twitter*, 598 U.S. at 491–92). "In other words, less substantial assistance require[s] more scienter before a court [can] infer conscious and culpable assistance." *Twitter*, 598 U.S. at 492. Ultimately, the defendant must "intend to facilitate the offense's commission" and "participate in [the] crime as in something that he wishes to bring about and seek by his action to make it succeed." *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 291 (2025) (cleaned up).

Ordinarily, aiding-and-abetting liability also requires a connection between the alleged assistance and the particular wrongful act—here, the terrorist attacks. *See Twitter*, 598 U.S. at 495. The nexus requirement forms a second sliding scale with culpability, as captured by knowing and substantial assistance. *Atchley v. AstraZeneca UK Ltd.*, 165 F.4th 592, 604 (D.C.

Cir. 2026). "[A] close nexus between the assistance and the tort *might help* establish that the defendant aided and abetted the tort," but a "strict nexus" is not always required. *Ashley*, 144 F.4th at 438–39 (quoting *Twitter*, 598 U.S. at 496) (emphasis added). "[I]n the right case," the Supreme Court clarified, "even more remote support can still constitute aiding and abetting." *Twitter*, 598 U.S. at 496. "But, the more attenuated the nexus, the more courts should demand that plaintiffs show culpable participation through intentional aid that substantially furthered the tort." *Id.* at 506.

Where there is no "concrete nexus" to a specific terrorist attack, another avenue of aiding-and-abetting liability is available. *Id.* at 501. A defendant can have such "pervasive, systemic, and culpable" participation in "a broad category of misconduct" that a court can deem a defendant to have "aided every wrongful act" of the enterprise. *Ashley*, 144 F.4th at 445 (quoting *Smith & Wesson Brands, Inc.*, 605 U.S. at 292). Such liability requires a "near-common enterprise" between the defendant and the tortfeasors. *Twitter*, 598 U.S. at 502.

**I. Plaintiffs Fail to Sufficiently Allege that BNPP Culpably Associated Itself with the Sponsors of the Enumerated Terrorist Attacks**

On first blush, BNPP's alleged culpability (as captured through scienter and substantial assistance) appears high. Unlike the allegations in *Twitter*, what is alleged here is not "mere passive nonfeasance." *Twitter*, 598 U.S. at 500. The Bank intentionally and systematically flouted United States sanctions and counterterrorism protections to provide banking services for entities that Plaintiffs allege were known to siphon money directly into the coiffeurs of persons and entities committing terrorist attacks. However, when examined through the lens of recent court decisions and integrated with a scienter requirement that is "distinct from a defendant's general awareness of its role in a terrorist scheme," the Court finds that Plaintiff fails to allege

that BNPP "culpably associated" itself with the terrorist attacks at a level that rises to aiding-and-abetting liability. *Ashley*, 144 F.4th at 438; *Twitter*, 598 U.S. at 504.

"[A] JASTA claim requires intent to further a terrorist organization's terrorist activities and awareness that one is playing a role in those activities." *Ashley*, 144 F.4th at 444 (cleaned up). The Supreme Court instructs that, in considering the amount and kind of assistance provided, courts should consider whether the terrorists' "ability to benefit . . . was merely incidental to defendants' services and general business models." *Twitter*, 598 U.S. at 504. The Second Circuit similarly that recognized there is a stronger case for culpability where a defendant bank "was treating the Companies differently than it treated its other clients." *Ashley*, 144 F.4th at 443; *see also Atchley*, 165 F.4th at 603 ("[I]f a provider of services does so in an unusual way for the benefit of a tortfeasor, the provider may be liable for aiding and abetting the tort." (citation and internal quotation marks omitted)). Plaintiffs contend that BNPP's procedures to hide transactions with Caspian and the Iranian Oil Company are exactly the type of "special treatment" that indicates culpable association aimed at the "Terrorist Sponsors." ECF No. 49 ("Opp. to Recons.") at 10.

However, the allegations in the Amended Complaint fall short of showing that BNPP afforded Caspian and the Iranian Oil Company special treatment. There is no indication that the Bank treated persons or entities with a connection to terrorism any different from how it treated Iranian customers more broadly. *See* AC ¶ 560. The Amended Complaint implicitly acknowledges that BNPP's procedures for Iranians were not distinct to entities with a purported connection to terrorism. *See id.* ¶ 563 (indicating that "many," but not most or all, of BNPP's Iranian customers "were fronts or agents for Terrorist Sponsors"). Indeed, BNPP was found to have "developed and implemented policies and procedures to systematically conceal at least

*$160 billion* in U.S. dollar-denominated payments on behalf of Iranian customers." *Id.* ¶ 560 (quoting New York State Dep't of Fin. Servs., *In the Matter of BNP Paribas, S.A.* New York Branch, Consent Order Under New York Banking Law § 44 (June 30, 2014) ("NYDFS Consent Order") ¶ 28). The money transacted through Caspian and the Iranian Oil Company does not even constitute 1% of this total. *See* AC ¶¶ 560, 623, 625 (describing $586.1 million for Caspian, $100.5 million for the Iranian Oil Company, and $160 *billion* for Iranian customers more broadly). The Amended Complaint does not allege that the remaining Iranian customers had any particular connection to the "Terrorist Sponsors"—or even to the oil and gas industry. Indeed, Plaintiffs concede that "the AC offers no information about the Iranian entities described in those Agreements." MTD Opinion at 27 (citing AC ¶ 633). These circumstances suffice to show that the strategies BNPP appeared to employ to conceal its services for Caspian and the Iranian Oil Company were not unique to Iran's oil and gas industry or to customers with a purported relationship with terrorism.[2]

Furthermore, the Court agrees on reconsideration that the allegations also do not suggest conduct aimed at the "Terrorist Sponsors." To be sure, BNPP did not provide "routine banking services" to Caspian and the Iranian Oil Company, and the provision of services in an "unusual

[2] Indeed, as reflected in the 2014 Consent Order from the New York Department of Financial Services, which was incorporated by reference into the Amended Complaint, the Court also notes that BNPP employed substantially similar strategies to conceal services for entities in Sudan and Cuba—that is, other entities subject to U.S. sanctions. *Compare* NYDFS Consent Order ¶¶ 28–33 (Iran) *with id.* ¶¶ 10–27 (Sudan) *and id.* ¶¶ 34–42 (Cuba); *see also id.* ¶ 3 ("In processing transactions on behalf of these Sanctioned Parties, BNP Paribas engaged in a systematic practice, as directed from high levels of the Bank's group management, of removing or omitting Sudanese, Iranian, or Cuban information from U.S. dollar-denominated payment messages . . . ."); AC ¶ 997 (recognizing that the guilty plea pertained to Sudan, Iran, and Cuba). Although the Amended Complaint makes similar aiding and abetting allegations regarding BNPP's transactions with Sudan, AC ¶¶ 634–66, it is conspicuously quiet on any parallel allegations for Cuba.

way" can support knowing assistance. *Ashley*, 144 F.4th at 441; *Twitter*, 598 U.S. at 502. But merely concealing interactions with sanctioned entities is insufficient to establish aiding-and-abetting liability. *See, e.g.*, *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 220–21, 224–25 (2d Cir. 2019) (finding that the defendant did not substantially assist and was not generally aware of a customer bank's role in financing terrorism, despite agreeing "to alter, falsify, or omit information from payment messages . . . to conceal financial activities and transactions from detection by U.S. regulators . . . ." (cleaned up)); *cf. Freeman v. HSBC Holdings PLC*, No. 18-CV-7359 (PKC), 2026 WL 880107, at *15–16 (E.D.N.Y. Mar. 31, 2026) (collecting and distinguishing cases, decided before *Ashley*, in which the intentional evasion of U.S. sanctions and anti-terror financing regulations was found to constitute knowing assistance).

In fact, a defendant's routine practice of concealing transactions that would otherwise invite regulatory scrutiny, when conducted at scale for disparate entities, counsels against an inference of knowing assistance to terrorism. As another court in this District explained, "where the defendant banks [are] alleged to 'have culpably executed financially suspect transactions writ large,' it [can]not be inferred that they were intentionally seeking to associate themselves with terrorist organizations." *Troell v. Binance Holdings Ltd.*, No. 24-CV-7136 (JAV), 2026 WL 636849, at *21 (S.D.N.Y. Mar. 6, 2026) (quoting *Ashley*, 144 F.4th at 445). It is exactly this type of "indiscriminate[]" treatment that judges in this Circuit have found insufficient to establish aiding-and-abetting liability. *See id.* (rejecting an inference of conscious and culpable association where the defendants "indiscriminately permitted illicit activity" on their platform but did not "uniquely flout[] . . . regulations and reporting requirements for the benefit of [the Foreign Terrorist Organizations]" or otherwise afford them any "special accommodations"); *Freeman*,

2026 WL 880107, at *15–16 (finding that the defendants' provision of unusual financial services was "too widespread to impart the requisite intent to aid the specific terrorist acts at issue").

This case is also readily distinguishable from *Kaplan v. Lebanese Canadian Bank*, *SAL*, which Plaintiffs contend involved analogous "special treatment" and the Second Circuit determined stated a claim under JASTA. 999 F.3d 842, 850 (2d Cir. 2021); Opp. to Recons. at 10. There, the defendant bank disregarded a United Nations Report that identified some of its customers as part of a "Hizbollah-linked money laundering gang." *Id.* at 849. In response to the "propaganda" report, the next year, the bank "authorized an increase in credit limits" and implemented "special treatment" and "exemptions" that protected the relevant customers from disclosing the sources of large cash deposits. *Id.* at 849–50. Unlike the instant case, *Kaplan* explained that the bank "disregarded its own internal policies in order to grant its known Hizbollah-affiliated Customers 'special exceptions'" *Id.* at 858. Such conduct aimed specifically at the terrorism-affiliated entities is incomparable to BNPP's broad-based concealment. As in *Ashley*, "here, [BNPP's] continued services demonstrate knowledge, acquiescence, carelessness, indifference, lack of concern—not interested cooperation, stimulation, instigation." 144 F.4th at 443 (internal quotation marks and citations omitted).

## II. The Amended Complaint Does Not Allege a Sufficient Nexus to Overcome Its Weak Showing of Culpable Association

In the absence of a strong culpability showing, liability under JASTA requires a strong nexus between BNPP's banking services and the attacks committed against Plaintiffs—but no such sufficient nexus is alleged here. "The practical upshot" of a nexus, the D.C. Circuit has explained, "is that to survive a motion to dismiss plaintiffs must allege some connection between defendants' assistance and the *acts* that injured them." *Atchley*, 165 F.4th at 604 (D.C. Cir. 2026) (emphasis added).

Plaintiffs attempt to rebuff Defendant's suggestion that they have not alleged a concrete nexus between BNPP's assistance and the particular attacks. Opp. to Recons. at 7–8; *see also* ECF No. 32 ("MTD Opp.") at 24–25 (providing a more fulsome account of the purported nexus). According to Plaintiffs, the "Terrorist Sponsors" devoted "most" of the profits that Caspian and the Iranian Oil Company received to terror attacks, including by providing attack incentive and reward payments, funding weapons and training, generating intelligence for attacks, and manufacturing weapons. AC ¶¶ 1013, 1028. The "Terrorist Sponsors" garnered those profits because "by 2009 one or more of those Iranian entities controlled and/or beneficially owned every major and minor oil, petroleum, and petrochemical company in Iran." *Id.* ¶ 628; *see also id.* ¶¶ 478, 616. Those profits were siphoned from Caspian and the Iranian Oil Company to the IRGC and Ayatollah Khamenei, who subsequently reinvested the money into IRGC equipment and machinery and into the Khamenei Cell, among other things. Members of the Khamenei Cell—which Plaintiffs allege received profits from the BNPP transactions—then funded, recruited, and provided logistical and intelligence support for terrorist attacks via joint cells. *See id.* ¶¶ 1156–80. The Amended Complaint alleges that specific Khamenei Cell members contributed to terrorist infrastructure in the relevant countries and time periods and with the relevant terrorist cells that participated in the attacks that killed or injured Plaintiffs. *See id.* ¶¶ 1182–86, 1264–67.

Despite the elaborate mechanism that Plaintiffs describe, the nexus they describe is both attenuated and lacks connections to the discrete acts that Plaintiffs seek a remedy for. In their own words, BNPP's money "contributed to terrorist *infrastructure* used to commit attacks for many years." MTD Opp. at 25 (emphasis added). This level of remoteness, which lacks a concrete nexus, runs throughout Plaintiffs' allegations. For example, "for each attack against

Plaintiffs," they allege, "a counterterrorism analyst experienced in the field would usually conclude" that the incentive and reward payment structures were in play based on which organization claimed responsibility and who was targeted. AC ¶ 1032. This allegation covers sixty-three attacks. *See* AC ¶ 12. "[I]t is not enough," the Supreme Court has stated, "that a defendant ha[s] given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it" or that a defendant has assisted the terrorist organization's "activities in general." *Twitter*, 598 U.S. at 495, 503. That is because, under tort law, "aiding and abetting is inherently a rule of secondary liability for *specific wrongful acts*." *Id.* at 494 (emphasis added). "Courts have routinely found allegations that financial institutions intentionally and knowingly facilitated transactions by sanctioned entities insufficient to establish the nexus required to render a defendant secondarily liable for specific terrorist attacks." *Troell*, 2026 WL 636849, at *18 (collecting cases); *see also Fraenkel v. Standard Chartered Bank*, No. 24-CV-4484 (MMG), 2025 WL 2773251, at *9 (S.D.N.Y. Sept. 26, 2025) ("Even though SCB clearly engaged in some wrongdoing with regard to evading sanctions regimes and assisting customers to evade those sanctions, this conduct is far too attenuated to establish a direct nexus between SCB's conduct and the [terrorist attacks].").

Nor are the facts here analogous to the D.C. Circuit's decision in *Atchley v. AstraZeneca UK Ltd*, 165 F.4th 592 (D.C. Cir. 2026), as Plaintiffs argue. *See* ECF No. 54. There, the plaintiffs survived a motion to dismiss on their JASTA aiding-and-abetting claim against pharmaceutical and medical equipment companies, which were alleged to have substantially and knowingly assisted a terrorist organization that openly controlled Iraq's Ministry of Health and injured the plaintiffs' family members in various attacks. *Id.* at 596. Unlike the Supreme Court's decision in *Twitter*, the D.C. Circuit panel explained, *Atchley* involved allegations that the defendants

"persistently pursued opportunities to do business" with the terrorist-controlled Ministry. *Id.* at 605. Although the direct recipient of the defendant's assistance—the Ministry—was also alleged to be a "front" for "terrorist violence," the proximity was substantially different than in this case: "[The] [d]efendants' local agents . . . finalized their contracts at the Ministry headquarters surrounded by terrorist propaganda and other indicia of [terrorist] control." *Id.* at 598–99, 607. A concrete nexus existed between the "cash bribes and free pharmaceuticals" that the defendants provided to the Ministry and the specific terrorist attacks that injured plaintiffs' family members because the defendants' monetary support occurred in the same time period and almost entirely in the same city as the terrorist attacks. *Id.* at 599, 605, 607. One of the terrorist attacks was perpetrated just outside of the Ministry by people who also worked as security guards there. *Id.* at 607. Thus, "[b]ecause [the] plaintiffs' allegations [were] limited to [the] defendants' provision of aid to a temporally and geographically discrete set of . . . terrorist acts," a nexus was adequately alleged. *Id.* In the instant case, however, none of this concrete proximity is available. Plaintiffs do not allege that BNPP provided banking services in Iraq or Israel—where the relevant attacks occurred—or that the company had a physical presence in Iran. They do not allege that Caspian or Iranian Oil Company employees who directly benefitted from BNPP's services turned around and committed the relevant attacks. Rather, the connection between BNPP's banking services and the actual attacks occurs via a string of intermediaries.

Plaintiffs' allegations about the terrorist infrastructure that BNPP facilitated sound in systemic and pervasive assistance, which can form the basis for aiding-and-abetting liability absent a concrete nexus. *See Twitter*, 598 U.S. at 501; *see also* MTD Opp. at 26 (arguing such liability). However, Plaintiffs' allegations do not meet that "high bar" required for "intentional and systematic" conduct that would render BNPP culpable for all of the actions of the terrorist

proxies. *Ashley*, 144 F.4th at 445; *Twitter*, 598 U.S. at 495. Such liability requires a "near-common enterprise" between the defendant and the tortfeasors. *Twitter*, 598 U.S. at 502. For example, in the *Halberstam* case, the Supreme Court described Linda Hamilton's aiding and abetting as assistance that her co-defendant "would have relied on" in "each and every burglary" to "launder[] the stolen goods and transform[] them into usable wealth." *Twitter*, 598 U.S. at 495 (citing *Halberstam v. Welch*, 705 F.2d 472, 488 (D.C. Cir. 1983)). Plaintiffs "acknowledge that [BNPP] is a large bank with vast operations," and "[t]hey do not allege that most, or even many, of [BNPP's] banking activities are linked to terrorists." *Siegel*, 933 F.3d at 224; *see also* AC ¶ 14. Like the complaint in *Ashley*, the Amended Complaint also does not allege that, through its banking services, BNPP sought to "associate" itself with the relevant terrorists' "operations" or form "a near-common enterprise" with them—or even with the "Terrorist Sponsors." *Ashley*, 144 F.4th at 445 (quoting *Twitter*, 598 U.S. at 502). Accordingly, the Court finds that Plaintiffs have neither alleged a concrete nexus between BNPP's actions and the relevant attacks nor such overlapping involvement as to obviate the need for a concrete nexus.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Reconsideration is GRANTED and the Amended Complaint is thus DISMISSED. As a result, the Motion to Certify an Interlocutory Appeal is DENIED as moot. Dismissal is rendered with prejudice because an amendment would be futile: Plaintiffs have already availed themselves of one opportunity to amend as of right, which benefitted from Defendant's first motion to dismiss and yielded a complaint containing more than 600 pages of allegations. ECF Nos. 15, 19. Plaintiff subsequently fully briefed a second motion to dismiss and two supplemental letters of authority, after which it briefed a motion for reconsideration, motion to certify an interlocutory appeal, and two additional

supplemental letters of authority. *See* ECF Nos. 32–33, 36, 39, 49–50, 54, 57. Through all of this briefing, Plaintiffs did not request leave to amend or indicate that there are additional allegations that would alter the merits of their claim. Accordingly, *sua sponte* denial of leave to amend is warranted.

The Clerk of Court is directed to terminate ECF Nos. 42 and 44 and close the case.

Dated: September 29, 2026
White Plains, New York

SO ORDERED.

Jessica Clarke

JESSICA G. L. CLARKE
United States District Judge